**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, ) ) ) ) ) ) ) | Case No. |
| Plaintiffs, ) ) | **DEMAND FOR JURY TRIAL** |
| v. ) ) ) | |
| ALPHABET, INC., a Delaware corporation, and GOOGLE LLC, a Delaware limited liability company, ) ) ) ) | |
| Defendants. ) | |

**COMPLAINT**

Plaintiffs, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendants Alphabet Inc. and Google LLC (collectively, "Google"), allege as follows:

**NATURE OF THE CASE**

1. Google built its voice AI using the voices of real people, including some of the most accomplished broadcast journalists, investigative podcasters, and audiobook narrators working in the United States today. To create the foundational models that now power Gemini Live, NotebookLM Audio Overviews, YouTube auto-dubbing, Google Cloud Text-to-Speech, and Google

Assistant on more than a billion devices, Google ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers from those recordings. Plaintiffs' voices are among them.

2. Google, as used in this Complaint, refers jointly to Alphabet Inc. and its operating subsidiary Google LLC. Alphabet disclosed in its 2024 Annual Report on Form 10-K, filed with the U.S. Securities and Exchange Commission ("SEC") and signed by its Chief Executive Officer, Sundar Pichai, that the artificial intelligence research and development at issue in this Complaint is conducted as an "Alphabet-level activity." The voice AI products described in this Complaint, including Gemini Live and NotebookLM, have been identified by Pichai by name, in his capacity as Chief Executive Officer of Alphabet, on Alphabet's quarterly earnings calls and in Alphabet's filings with the SEC.

3. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade broadcast journalist, three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; Alison Flowers, a 2021 Pulitzer finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Philip Rogers, an Emmy and Murrow Award–winning broadcaster who covered four decades of Chicago news; Lindsey Dorcus, a SOVAS and Independent Audiobook Award–winning narrator of more

2

than two hundred audiobooks for the major American publishers; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them were told that their voices were being used to train Google's commercial voice AI. None of them was asked. None of them consented.

4. A voiceprint is a digital fingerprint of the human voice. It is a mathematical capture of the acoustic features — pitch, timbre, resonance — that emerge from a person's distinctive physiology, combined with the speech patterns that person develops over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual. Like a fingerprint, it cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biology and speech patterns that produced the voiceprint are the same ones the person uses to speak every day.

5. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection,

3

along with a written release. 740 ILCS 14/15(b). Google failed to comply with any of those requirements as to the Plaintiffs.

6. Google's noncompliance was not a misreading of the statute. Google has been a repeat defendant in BIPA cases. It paid approximately $100 million to settle BIPA claims arising from Google Photos' face grouping feature. In October 2025, it paid $8.75 million to settle BIPA claims that it built voice and face models from Illinois schoolchildren using Google Workspace for Education without notice or consent. In November 2025, it paid $1.375 billion to the State of Texas, the second-largest privacy settlement any state has ever obtained from any company, to resolve parallel claims that it captured voiceprints and facial geometry through Google Photos and Google Assistant. A separate Google Assistant voice-recording class action settled for $68 million in January 2026.

7. Nor was Google's noncompliance a failure of capability. For its consumer voice-cloning products, Custom Voice and Chirp 3 Instant Custom Voice, Google built a comprehensive consent infrastructure. It requires every speaker to record a specific consent statement affirming, "I am the owner of this voice, and I consent to Google using this voice to create a synthetic voice model." It runs each use case through a "Responsible AI governance" review to confirm that "adequate voice actor consent is given." Google built that system because it understands that extracting a person's voice to train a voice model implicates the speaker's legal rights.

8.     Google built that consent system for the voices it paid for. It built nothing for the hundreds of thousands of hours of speech on which it pretrained the foundational models that now power its commercial voice business. Google knew how to obtain consent. It chose to obtain consent for some voices and not others. That was not an oversight. It was a business decision.

9.     The voiceprints Google extracted from Plaintiffs are not stored in a database that can be deleted on request. They are encoded in the parameters of Google's commercial voice models and reproduced in the audio that those models generate. At this point, the biometric data and the product are the same thing.[1]

10.    The technology Google built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their living. Google Cloud Text-

---

[1] Google's published research describes the architecture by which voice characteristics are extracted from speech recordings and encoded into the parameters of its voice models. Audio waveforms are tokenized by a neural audio codec (SoundStream) into discrete "acoustic tokens" that, in Google's own description, capture "the details of the audio waveform (such as speaker characteristics or recording conditions)." A transformer-based language model is then trained to predict sequences of those tokens, embedding the speaker-identifying features of the training audio in the model's parameters. Google's Chirp 3 product documentation confirms that the speaker-identifying output of the same pipeline — what Google calls a "voice cloning key" — is "a text-string representation of your voice data." *See* Zalán Borsos et al., *AudioLM: A Language Modeling Approach to Audio Generation*, 31 IEEE/ACM Transactions on Audio, Speech, and Language Processing 2523 (2023), https://ieeexplore.ieee.org/document/10158503 (last visited on May 11, 2026); Neil Zeghidour et al., *SoundStream: An End-to-End Neural Audio Codec*, 30 IEEE/ACM Transactions on Audio, Speech, and Language Processing 495 (2022), https://ieeexplore.ieee.org/document/9625818 (last visited on May 11, 2026); Google Cloud, *Instant custom voice creation* (Chirp 3 documentation), https://cloud.google.com/text-to-speech/docs/chirp3-instant-custom-voice (last visited on May 11, 2026). Plaintiffs allege on information and belief that the same architecture and processing pipeline was applied to the voice training data ingested for the foundational models that power Google's commercial voice products.

to-Speech is licensed to audiobook publishers as an alternative to the human narration Plaintiffs Dorcus and Nassif provide. NotebookLM Audio Overviews generates podcast-format audio from written sources, directly competing with the long-form investigative audio journalism Plaintiffs Lacour, Flowers, and Amer have spent their careers developing. YouTube auto-dubbing replaces the localization voiceover work voice actors have historically performed. Each of these products is priced at a fraction of the cost of human narration. Each was built using the vocal characteristics of the human performers it now displaces, including, on information and belief, those of every Plaintiff in this case.

11. Plaintiffs' injuries are concrete and particularized. Google extracted their voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Google retains those voiceprints in its commercial models and continues to profit from them. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging Google's unlawful collection, retention, commercial exploitation, dissemination, and failure to protect from disclosure of their voiceprints without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that Google's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act

("IRPA"). Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

13. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for violations of BIPA's notice, consent, retention, disclosure, and protection requirements; (ii) actual damages and disgorgement of the profits Google has earned from the commercial exploitation of Plaintiffs' biometric data; (iii) injunctive relief requiring Google to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its foundational voice models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the class, and (d) destroy or retrain, without the unlawfully obtained data, the foundational voice models and downstream commercial products that contain that data; and (iv) reasonable attorneys' fees, costs, and expenses.

**PARTIES**

14. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a broadcast journalist whose career has been conducted primarily in Chicago. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 79-83.

15. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose

investigative podcast work, including the Pulitzer Prize–winning *You Didn't See Nothin'*, is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Google extracted his voiceprint are described at ¶¶ 84-89.

16. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 90-94.

17. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 95-99.

18. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Google extracted his voiceprint are described at ¶¶ 100-104.

19.    Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 105-109.

20.    Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 110-114.

21.    Defendants Alphabet Inc. and Google LLC (together, "Google") engaged jointly in the conduct alleged in this Complaint. The voice AI research, model development, training, and commercial deployment described in this Complaint were carried out within an integrated enterprise that Alphabet has publicly described as "AI-first," that Alphabet's Chief Executive Officer personally directs in his dual capacity as Chief Executive Officer of both Alphabet and Google LLC, and that Alphabet has funded, overseen, and benefited from at every stage. Plaintiffs allege that Alphabet is directly liable for the conduct alleged herein and, in the alternative, that Google LLC acted as Alphabet's agent in carrying out that conduct.

9

22.     Alphabet Inc. is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Alphabet's revenue, market capitalization, and enterprise value are derived from and depend on the commercial products of its operating subsidiary, Google LLC, including the voice AI products at issue in this Complaint.

23.     Alphabet's Chief Executive Officer, Sundar Pichai, also serves as Chief Executive Officer of Google LLC. Pichai is the most senior executive of both entities, reports to the Alphabet Board of Directors, and exercises operational control over their research, engineering, and commercial activities. There is no separate Chief Executive Officer of Google LLC; Pichai's authority over the conduct alleged in this Complaint is exercised in his concurrent capacities as the chief executive of both Alphabet and its operating subsidiary.

24.     In his capacity as Chief Executive Officer of Alphabet, Pichai has personally announced and directed the structural and strategic decisions that produced the research organization, the infrastructure, and the commercial product roadmap at issue in this Complaint. In April 2023, Pichai announced the merger of Google's Brain research team with DeepMind Technologies Limited into a single research organization, Google DeepMind, in a memo and public announcement issued under his name. Google DeepMind is the research organization that developed and continues to develop the foundational voice AI models alleged in this Complaint. In April 2024, Pichai issued a further public memo, titled "Building for our AI future," in which he announced that Alphabet had unified "our ML infrastructure and ML developer teams to enable faster

10

decisions, smarter compute allocation, and a better customer experience" — that is, the specific machine-learning infrastructure and engineering organizations responsible for training Alphabet's foundational AI models, including the foundational voice models at issue in this Complaint. Alphabet's publication of the April 2024 memo describes it as "Today, Google and Alphabet CEO Sundar Pichai shared a number of structural changes." On October 17, 2024, Pichai announced a further reorganization, moving the Gemini app team into Google DeepMind, which Alphabet's contemporaneous communications described as designed to "speed up deployment of new models, and streamline post-training work."

25. On Alphabet's third-quarter 2024 earnings call, held on October 29, 2024, Pichai, speaking in his capacity as Chief Executive Officer of Alphabet, personally identified by name two of the voice AI products at issue in this Complaint. He stated: "We recently moved the Gemini app team to Google DeepMind to speed up deployment of new models, and streamline post-training work. … For instance, it was a small, dedicated team that built NotebookLM, an incredibly popular product that has so much promise." On the same call, Pichai added, "Gemini Live lets you have free-flowing conversations with Gemini; people love it."[2] Pichai's personal identification of NotebookLM and

---

[2] Alphabet's published transcript of those remarks appears under the heading "Alphabet Q3 earnings call: CEO Sundar Pichai's remarks" on Alphabet's investor relations website and corporate blog. *See* Alphabet Inc., *2024 Q3 Earnings Call*, https://abc.xyz/investor/events/event-details/2024/2024-q3-earnings-call/ (last visited on May 11, 2026); Sundar Pichai, *Alphabet Q3 earnings call: CEO Sundar Pichai's remarks*, The

Gemini Live — two of the products whose voice synthesis capabilities are at the center of this Complaint — on Alphabet's quarterly earnings call, in his Alphabet capacity, is direct evidence that Alphabet exercises operational authority over the specific products and the research organization at issue.

26.    Alphabet's Annual Report on Form 10-K for fiscal year 2024, filed with the SEC on February 5, 2025, and signed by Pichai, makes the same point in the formal language of federal securities disclosure. The 10-K identifies Pichai as "Alphabet and Google CEO" and states: "Alphabet is a collection of businesses — the largest of which is Google. We report Google in two segments, Google Services and Google Cloud, and all non-Google businesses collectively as Other Bets. Supporting these businesses, we have centralized certain AI-related research and development which is reported in Alphabet-level activities." The 10-K identifies NotebookLM by name as one of Alphabet's products and describes Gemini as the model "powering AI features across our products and services." The 10-K's Risk Factors section, also signed by Pichai, states that "We are expanding our investment in AI across the entire company." The 10-K's own definition of "we" includes "Alphabet Inc. and its subsidiaries." Alphabet has therefore disclosed to its shareholders and to the federal securities regulator that the AI research and development at issue in this

---

Keyword (Oct. 29, 2024), https://blog.google/company-news/inside-google/message-ceo/alphabet-earnings-q3-2024/ (last visited on May 11, 2026).

12

Complaint is conducted as an Alphabet-level activity, not as an independent operation of a subsidiary.

27. Alphabet, acting through Pichai in his capacity as Chief Executive Officer of Alphabet, directed the formation of Google DeepMind, directed the strategic priorities of Google DeepMind's research agenda, directed the capital allocation that funded the training of the foundational voice models, and directed the commercial deployment of those models across Alphabet's product lines. The collection of biometric identifiers alleged in this Complaint was the direct and foreseeable result of those decisions.

28. BIPA prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or "otherwise obtain[ing]" biometric identifiers without compliant notice and written release. 740 ILCS 14/15(b). Alphabet, through Pichai's direction of the integrated AI research enterprise, obtained the voiceprints of Plaintiffs and the class within the meaning of the statute.

29. In the alternative, Google LLC carried out the conduct alleged in this Complaint as Alphabet's agent. Each element of the agency relationship is established by Alphabet's own contemporaneous, public, and SEC-filed statements:

(a) *Alphabet's manifestation of consent that Google LLC act on its behalf.* Alphabet has publicly identified its AI research and development as a centralized "Alphabet-level activity" supporting Alphabet's businesses. Alphabet has identified the specific voice AI products at issue, including NotebookLM

13

and Gemini Live, by name in Alphabet's quarterly earnings calls and annual report. Alphabet has funded the voice AI research with capital allocation decisions that Pichai signed in his capacity as Alphabet's CEO in Alphabet's 10-K and that Alphabet's CFO discussed on Alphabet's earnings calls.

(b) *Google LLC's acceptance of the undertaking.* Google LLC houses Google DeepMind and employs the engineers, researchers, and product teams who carried out the conduct alleged. Google LLC accepted the undertaking as evidenced by its execution of the research, training, and commercial deployment under the structural arrangements that Pichai announced in his capacity as Alphabet's CEO in April 2023, April 2024, and October 2024.

(c) *Alphabet's right of control over the undertaking.* Alphabet has retained and exercised the right of control as evidenced by Pichai's concurrent role as chief executive of both entities; by Alphabet's public direction of the structural reorganizations that produced and refined the research organization; by Alphabet's public identification of the AI research as "Alphabet-level activities" in its 10-K; by Alphabet's capital allocation to the specific training infrastructure at issue, disclosed in Alphabet's SEC filings signed by Pichai; and by Alphabet's representations to its shareholders, on Alphabet's earnings calls, that Pichai personally directs the strategic decisions concerning the voice AI products at issue.

30. The benefits of the undertaking, including the revenue, market capitalization, and enterprise value generated by the commercial voice products, flowed to Alphabet and to Alphabet's shareholders. Alphabet's Q3

2025 earnings release, filed with the SEC, attributes Alphabet's "first-ever $100 billion quarter" to its "full stack approach to AI" and quotes Pichai by name in his "CEO of Alphabet and Google" capacity, discussing Gemini's commercial performance.

31.     Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google LLC is a wholly owned direct or indirect subsidiary of Alphabet and is the operating subsidiary through which Alphabet conducts its core commercial businesses, including Google Search, YouTube, Android, Google Cloud, Gemini, Google Assistant, and the voice synthesis and audio generation products at issue in this Complaint. Google LLC houses Google DeepMind. The voice AI research, model training, and commercial deployment alleged in this Complaint were carried out by employees of Google LLC, within Google DeepMind, on infrastructure funded by Alphabet's capital allocation, under the direction of executives who report to Pichai, who in turn reports to Alphabet.

**JURISDICTION AND VENUE**

32.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in California, while Defendant

15

Google LLC is a Delaware limited liability company whose sole member, Alphabet, is likewise a citizen of Delaware and California. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

33. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and may recover those statutory damages on a per-subsection, per-person basis where multiple distinct provisions of § 15 are violated. Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, UDTPA, and common-law unjust enrichment.

34. This Court has specific personal jurisdiction over Google. Google has purposefully directed its conduct at Illinois and at this District in ways that bear directly on Plaintiffs' claims. Google operates its self-described "Midwest headquarters" in this District, where it employs approximately 1,800 people in engineering, sales, and Cloud-infrastructure roles, including engineering and Cloud-infrastructure roles supporting the commercial AI products at issue in this Complaint, and has agreed to purchase the James R. Thompson Center in Chicago for approximately $105 million as an expanded Chicago headquarters expected to house approximately 2,000 employees. Google sells and delivers to Illinois customers the voice AI products at issue in

this Complaint — including Google Cloud Text-to-Speech, Chirp 3 voices, Gemini Live, NotebookLM Audio Overviews, and Google Assistant — under recurring subscription and usage-based pricing arrangements that generate substantial Illinois revenue. Google has previously appeared in Illinois state and federal courts in multiple BIPA actions concerning the collection of biometric identifiers from Illinois residents, including *Rivera v. Google LLC*, No. 2019-CH-00990 (Cir. Ct. Cook Cnty. Ill.), and the Google Workspace for Education matter that resulted in an $8.75 million BIPA class settlement in October 2025, and has not in those actions contested the propriety of an Illinois forum.

35. Plaintiffs' claims arise directly from Google's Illinois-directed conduct. Google extracted the voiceprints of Plaintiffs, Illinois residents whose recorded vocal performances were produced and distributed in Illinois, without the notice, consent, or written release BIPA requires. The voiceprints are now encoded in the parameters of Google's commercial voice models, which Google sells and delivers to Illinois customers through the products identified above. Every commercial transaction Google completes in Illinois involving those products monetizes the biometric data Google obtained from Plaintiffs without their consent. Google's Illinois contacts are not incidental to this Complaint; they are the downstream commercialization of the conduct that gives rise to it.

36. Exercising specific personal jurisdiction over Google in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with the requirements of due process. Illinois has a strong interest in providing a forum

17

for the redress of unlawful biometric data collection from voice recordings produced in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA. 740 ILCS 14/5. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on Google of litigating in Illinois is not undue, given Google's substantial Illinois operations and its prior appearances in Illinois courts in matters involving the same statute and the same category of conduct. Google has not contested the propriety of an Illinois forum in any of those prior matters, and could reasonably anticipate being haled into Illinois courts for claims, like Plaintiffs', that arise from its extraction and commercial exploitation of biometric identifiers from voice recordings produced in Illinois.

37. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District: Plaintiffs are residents of this District whose recorded vocal performances were produced and distributed from this District, the biometric privacy violations Plaintiffs allege were suffered in this District, and the commercial exploitation of Plaintiffs' voiceprints continues to occur through Google's sale and delivery of the voice AI products at issue to customers in this District. Venue is independently proper under 28 U.S.C. § 1391(b)(1) because Defendants are subject to personal jurisdiction in this District for the reasons set forth above and therefore "reside" in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

## FACTUAL BACKGROUND

*Google and Its Voice AI Business*

38. The voice AI business at issue in this Complaint is housed within Google DeepMind, the artificial intelligence research division that Pichai created in April 2023 by merging the Google Brain research team with the London-based DeepMind organization Google acquired in 2014. Google DeepMind is the research organization that developed, and continues to develop, the foundational voice synthesis models on which Google's commercial voice products depend, including the WaveNet, Tacotron, SoundStream, AudioLM, and SoundStorm model families and the production multi-speaker dialogue model that powers Gemini Live, NotebookLM Audio Overviews, Google Illuminate, and YouTube auto-dubbing. Google DeepMind operates research offices and employs personnel in Mountain View, New York, Princeton, and other United States locations, and the research, engineering, and model-development work underlying Google's foundational voice models was performed, in substantial part, in the United States.

39. Google's commercial voice products are deployed at an enormous scale. Google Cloud Text-to-Speech, launched in June 2018, is licensed to thousands of enterprise customers across industries. Google Assistant operates on more than one billion devices worldwide. NotebookLM, whose Audio Overviews feature launched in September 2024, was adopted by more than 80,000 organizations within weeks of launch. Gemini Live is available to consumers through the Gemini app on iOS and Android. Each of these

19

products depends on the foundational voice synthesis models developed within Google DeepMind, and each generates revenue that flows through Google's consolidated financial reporting to Alphabet.

40. The training of those foundational models occurred, in substantial part, on Google Cloud computing infrastructure, including data centers and Tensor Processing Unit clusters owned and operated by Google LLC in the United States. The production voice models that Google deploys through its commercial products are hosted on Google Cloud infrastructure in the United States and are served to United States users from Google Cloud data centers operated by Google LLC.

*How Google's Voice AI Extracts and Encodes Voiceprints*

41. Modern AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network learns to identify and reproduce the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, and the dynamics of emotional expression. The network encodes those features as mathematical representations and stores them in the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices.

42. Google's published research describes this process in technical detail. In a 2021 paper, Google researchers introduced SoundStream, a neural audio codec that compresses raw audio waveforms into sequences of discrete representations Google calls "acoustic tokens." In a 2023 paper, Google

researchers introduced AudioLM, a framework that uses SoundStream's acoustic tokens to train a transformer-based language model on audio sequences. Google's researchers describe the acoustic tokens that this pipeline extracts as capturing "the details of the audio waveform (such as speaker characteristics or recording conditions)."[3]

43.    Google's product documentation confirms that the speaker-identifying output of this pipeline is, in form and substance, a voiceprint. Google's Chirp 3 Instant Custom Voice product creates what Google calls a "voice cloning key" from as little as ten seconds of reference audio. Google's documentation describes the voice cloning key as "a text-string representation of your voice data."[4] A representation of voice data sufficient to clone the speaker's voice is, in any ordinary understanding of the term, a voiceprint.

44.    BIPA's definitions confirm the legal classification. The statute defines "biometric identifier" to include "voiceprint." 740 ILCS 14/10. It separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* The acoustic

---

[3] Zalán Borsos et al., *AudioLM: A Language Modeling Approach to Audio Generation*, 31 IEEE/ACM Transactions on Audio, Speech, and Language Processing 2523 (2023), https://ieeexplore.ieee.org/document/10158503 (last visited on May 11, 2026); Neil Zeghidour et al., *SoundStream: An End-to-End Neural Audio Codec*, 30 IEEE/ACM Transactions on Audio, Speech, and Language Processing 495 (2022), https://ieeexplore.ieee.org/document/9625818 (last visited on May 11, 2026).

[4] Google Cloud, *Instant custom voice creation* (Chirp 3 documentation), https://cloud.google.com/text-to-speech/docs/chirp3-instant-custom-voice (last visited on May 11, 2026).

21

tokens, speaker embeddings, and voice cloning keys produced by Google's voice synthesis pipeline fall within both definitions. The label the AI research community uses for these representations does not determine their statutory classification; the function of the data does.

45.     In a 2018 research paper, Google researchers demonstrated that the disentangled representations its voice models learn during training can be used to "convert speaker identities into each other" — that is, to swap one person's voice for another's while preserving the linguistic content of the original recording.[5] That capability is the operational consequence of voiceprint extraction at scale: once the model has learned the acoustic signatures of the training voices, it can be directed to produce speech in any of those voices.

*Google Built a Consent System for Some Voices and Not Others*

46.     Google understands that extracting a person's voice to train a voice model implicates the speaker's legal rights. Google has built and publicly deployed a consent infrastructure that says so directly.

47.     In 2018, after public controversy at Google I/O over Google Duplex, an AI calling system capable of generating human-sounding voices, Google publicly committed that the Duplex system would be "designed … with disclosure built-in" and would identify itself as an AI. Google described the

---

[5] Yingzhen Li & Stephan Mandt, *Disentangled Sequential Autoencoder*, in Proceedings of the 35th International Conference on Machine Learning (2018), https://arxiv.org/abs/1803.02991 (last visited on May 11, 2026).

commitment as part of its responsibility to be transparent when its systems generated speech that sounded like a human.

48.    In March 2022, Google launched Google Cloud Custom Voice. Custom Voice, as Google described it, was the product through which Google would create synthetic voice models from "studio-quality audio recordings" of professional voice actors. Google built a "Responsible AI governance" review process around Custom Voice to ensure, in Google's words, that "each use case is aligned with our AI Principles and adequate voice actor consent is given." Google required every voice actor whose recordings were used to train a Custom Voice model to record a specific consent statement, provided by Google, affirming that the actor owned the voice and consented to Google's use of it to create a synthetic voice model.

49.    In October 2024, Google DeepMind published a company blog post titled "Pushing the frontiers of audio generation," which described the production of a multi-speaker dialogue model that powers NotebookLM Audio Overviews, Google Illuminate, Gemini Live, and related products. Google disclosed that the model had been "pretrained … on hundreds of thousands of hours of speech data" and then "finetuned … on a much smaller dataset of dialogue with high acoustic quality and precise speaker annotations, consisting of unscripted conversations from a number of voice actors."[6] Google identified

---

[6] Zalán Borsos et al., *Pushing the frontiers of audio generation*, Google DeepMind (Oct. 30, 2024), https://deepmind.google/discover/blog/pushing-the-frontiers-of-audio-generation/ (last visited on May 11, 2026).

neither the source of the pretraining data nor the speakers whose voices populated it. The disclosure was, in its own terms, a public acknowledgment by Google that the foundational model on which Google's most prominent consumer voice product depends had been trained on hundreds of thousands of hours of human speech that Google would not name.

50.     In 2025, Google extended its Custom Voice consent framework to a new consumer voice-cloning product, Chirp 3 Instant Custom Voice, which generates a voice-cloning key from as little as 10 seconds of reference audio. Google required, and continues to require, every speaker whose voice is cloned through Chirp 3 to record a specific consent statement: "I am the owner of this voice, and I consent to Google using this voice to create a synthetic voice model."

51.     The pattern of those four events — 2018, 2022, 2024, 2025 — is the story of an institution that knows what BIPA-compliant consent looks like, has the engineering capacity to implement it, and has chosen to apply it selectively. Google obtained recorded consent from the dozens of professional voice actors whose voices were used to train Custom Voice and Chirp 3. Google did not obtain consent or notice, or any disclosure of any kind, from the speakers whose voices populated the hundreds of thousands of hours of pretraining data on which Google's foundational voice models depend. The same engineering organization built both pipelines. The same legal department drafted both consent regimes. The decision to apply consent to one and not the other was deliberate and contemporaneous.

24

*Google Trained on Data It Knew It Had No Right to Use*

52.     Google has never disclosed the sources of the voice training data used to build its foundational voice synthesis models. It has not published a model card, a data sheet, a training data manifest, a licensing inventory, or any transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented. The October 2024 disclosure of "hundreds of thousands of hours of speech data" remains Google's only public statement about the pretraining corpus, and that statement identified no source, licensor, or speaker.

53.     The contemporaneous public record establishes that Google obtained substantial portions of its voice training data from publicly accessible internet sources without the consent of the speakers, and that Google understood it was doing so.

54.     In April 2024, *The New York Times* reported that Google employees had been aware that OpenAI was harvesting audio from YouTube videos to train its AI models, and that Google had taken no action against OpenAI because, according to the reporting, Google was "doing the same."[7] The reporting establishes that, by April 2024 at the latest, Google's engineering and legal organizations were aware that Google was training AI models on YouTube

---

[7] Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, The New York Times (Apr. 6, 2024), https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html (last visited on May 11, 2026).

audio under conditions that Google itself recognized as parallel to OpenAI's unauthorized scraping.

55. In September 2024, Google amended the YouTube Terms of Service to add, for the first time, an express grant to Google of the right to use uploaded content for "machine learning and AI applications." The timing of the amendment, coming five months after the *New York Times* reporting and one month before Google's October 2024 disclosure of the pretraining corpus for its multi-speaker dialogue model, underscores that Google did not previously have an express contractual basis for training on YouTube content and that it recognized this.

56. The September 2024 YouTube Terms of Service amendment cannot reach the speakers whose claims this Complaint asserts. Plaintiffs and the class are not parties to the YouTube Terms of Service. Many of them never uploaded a recording to YouTube. Their voices appear in YouTube content uploaded by other parties — interviews, podcasts redistributed by third parties, news clips — over which Plaintiffs have no contractual control. The legal rights protected by BIPA and IRPA are personal to the speaker, not to the entity that recorded the speaker's voice; a YouTube uploader cannot license to Google rights the uploader does not possess.

57. In December 2024, Google introduced opt-in controls allowing YouTube creators to prevent third-party AI companies from training on their uploads. By their terms, those controls do not apply to Google's own use of YouTube content. Google has not published, and, on information and belief,

does not maintain, any opt-out or removal mechanism for speakers like Plaintiffs whose voices appear in audio ingested into Google's foundational voice synthesis models.

58. In March 2026, a putative class action filed in this District by independent musicians alleged that Google trained its Lyria 3 AI music generation model — which, like Google's voice models, was developed within Google DeepMind and uses the same SoundStream/AudioLM family of neural audio codec techniques — on millions of copyrighted musical recordings extracted from YouTube without license or consent, including by extracting voiceprints from the plaintiffs' recorded vocal performances. *Kogon et al. v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026). *Kogon* was filed by Plaintiffs' counsel, Loevy & Loevy. The Kogon complaint alleges that "Google had every opportunity to develop this product legally," that Google "owns YouTube and runs Content ID," and that Google "chose not to" obtain rights "because copying was faster and cheaper."

59. The pattern is consistent. Google trained its foundational voice models on a pretraining corpus it has refused to identify. Google's employees recognized in 2024 that Google's training practices on YouTube content were comparable to scraping practices Google did not itself defend as lawful. Google amended the YouTube Terms of Service in 2024 to grant itself rights it previously lacked. Google has not provided, and does not provide, any mechanism by which speakers whose voices were ingested can discover that fact, withdraw consent, or request deletion. And Google now faces a parallel

27

class action alleging that the same research organization, using the same family of techniques, ingested copyrighted recordings from YouTube without a license to build a different generative AI product. Plaintiffs allege, on the basis of these public facts, that Google trained its foundational voice models on voice recordings that included Plaintiffs' recordings, obtained from publicly accessible platforms, and extracted voiceprints from those recordings without the knowledge or consent of the speakers.

*The Biometric Data Was Generated in Illinois*

60.     The conduct giving rise to Plaintiffs' claims is localized in Illinois in three independent and mutually reinforcing respects: (i) the biometric data at issue was generated in Illinois; (ii) Google's acquisition of that biometric data targeted material that was identifiably Illinois-origin; and (iii) Google's ongoing retention, dissemination, and commercial exploitation of the biometric data is directed at, or felt in, Illinois. Each ground supports the application of BIPA, IRPA, and the related Illinois statutes invoked in this Complaint to Google's conduct as to Plaintiffs and the Class.

61.     Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois. The voice itself, as a unique biometric signature, came into existence in Illinois.

62.     The audio recordings embodying Plaintiffs' voices, from which Google is alleged to have extracted voiceprints and biometric information, were created in Illinois. The Plaintiffs were physically present in Illinois at the time of

28

the recordings, and the recordings captured the biometric characteristics of speakers who were in Illinois at the time of recording.

63. The recordings were published from Illinois to publicly accessible platforms, including platforms on which Plaintiffs' identity, geographic origin, professional biography, and content catalog were and are publicly visible to any person accessing the recordings. The metadata, descriptions, and contextual information accompanying the recordings publicly identified Plaintiffs as Illinois-based speakers and identified the recordings as Illinois-origin content at the time the recordings were made and continuously thereafter.

64. The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is therefore of Illinois origin. The biometric data Google is alleged to have extracted from those recordings is Illinois-origin, regardless of where any subsequent processing occurred.

*Google's Acquisition Was Targeted at Identifiably Illinois-Origin Material*

65. Google accessed Plaintiffs' voice recordings from its own and third-party platforms on which the recordings were publicly hosted with metadata identifying each Plaintiff by name and identifying the recordings' origin, as alleged in ¶¶ 79 through 114. To a person with knowledge of Illinois broadcast, journalism, audiobook, podcast, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work originated from Illinois.

66. Google's act of accessing and processing those recordings was therefore not the passive receipt of an anonymized dataset assembled by a third party. It was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production, as alleged in ¶¶ 79 through 114. The Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time Google accessed and processed the recordings.

*BIPA's Duty Runs to the Subject of the Biometric Data*

67. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois, as alleged in ¶¶ 60 through 64.

68. Google's continuing possession of voiceprints and biometric information generated in Illinois likewise runs afoul of obligations BIPA

30

imposes for the benefit of the subjects of that data. Google has not made publicly available a written retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from non-user training-data sources, as alleged in ¶161 [Count II], and has provided no mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data, as alleged in ¶57. Google's commercial agreements assert perpetual rights over voice data and over models derived from voice data, with the consequence that the biometric data of Illinois-origin training subjects is, on information and belief, retained indefinitely. These continuing failures are owed to Illinois subjects whose biometric data was generated in Illinois.

*Google's Monetization of the Voice Models*

69.     Google's commercial exploitation of the foundational voice synthesis models is not limited to a single product line. Google monetizes the voice models through a vertically integrated commercial chain spanning Google Cloud, Google Workspace, Google's consumer products, Google's hardware, and Alphabet's broader commercial footprint. The voice characteristics learned during training, the same characteristics extracted from Plaintiffs' and Class members' voice recordings, enable each of these revenue streams.

70.     Google monetizes the voice models through, among other channels:

(a)     *Direct usage fees.* Google Cloud Text-to-Speech and the Chirp 3 family of voice products are licensed to enterprise customers on a per-character

and per-audio-second basis. These usage fees are a direct payment for access to the voice synthesis capabilities of Google's foundational models.

(b)     *Subscription bundles.* Google Workspace subscriptions include voice-enabled features such as Meet voice dictation and Workspace for Education voice controls. The voice capabilities bundled into Google Workspace are derived from the foundational voice models.

(c)     *Enterprise contract value.* Google Cloud's enterprise contracts with major customers — including for Dialogflow, Contact Center AI, and related conversational AI services — are supported by the voice synthesis capabilities of the foundational models. The voice-enabled portions of these contracts are revenue Google would not otherwise capture.

(d)     *Advertising revenue.* Google Assistant, Gemini, Gemini Live, and NotebookLM each operate as channels for Google's advertising business. Each of these products depends on the voice AI capabilities built on the foundational models. Advertising revenue derived from these products is, in part, revenue made possible by the voice synthesis technology Google built using Plaintiffs' voiceprints.

(e)     *Hardware sales.* The market value and functional capability of Google's consumer hardware products — Pixel phones, Google Nest speakers and displays, and other Google Assistant-enabled devices — depend materially on the voice AI capabilities the foundational models provide. Sales of these devices, more than one billion of which have been deployed worldwide as

Google Assistant-capable, are revenue Google captures because the voice models exist.

(f) *Strategic deployment value across Alphabet's commercial footprint.* Google deploys the voice synthesis capability across Alphabet's broader product portfolio, including through YouTube auto-dubbing, which expands YouTube's monetizable audience by enabling cross-language access to uploaded video content. The competitive and strategic value of best-in-class voice AI deployment across Alphabet's product portfolio is itself a benefit Google captures from the foundational voice models.

71. Each monetization channel depends on the foundational voice models. Each foundational voice model depends on the training data used to build it. And the training data, on information and belief, includes the voice recordings of Plaintiffs and Class members from which Google extracted voiceprints without notice or consent. The commercial exploitation Google captures across the full chain is, in operational substance, the monetization of biometric data Google obtained from Plaintiffs without authorization.

*Google's Dissemination of the Voice Models Across*
*Its Corporate and Cloud Infrastructure*

72. The voice synthesis models in which Plaintiffs' and Class members' voiceprints are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, and processed across Google's cloud and corporate infrastructure, including infrastructure designed, operated, and supported by Google personnel in this District, in the ordinary course of Google's voice AI business.

73.     Google's Cloud Data Processing Addendum, the standard framework under which Google processes data for Google Cloud customers, expressly contemplates and permits Google's reliance on a chain of sub-processors. Google's voice synthesis pipeline operates within that sub-processor framework. The pipeline's training, evaluation, deployment, and operation involve the transmission of model parameters — and on information and belief, of the voiceprints encoded within those parameters — among Google's affiliated entities, vendors, and service providers in the ordinary course of business.

74.     Google's foundational voice synthesis models are developed, deployed, and served across Google Cloud infrastructure that spans multiple Google Cloud regions and multiple data center facilities. The infrastructure is operated by, or on behalf of, Google through multiple Alphabet subsidiaries and contracted service providers. The delivery of voice synthesis services to customers, including Illinois customers, necessarily involves transmitting model parameters over that infrastructure.

75.     Google's corporate structure requires the transfer of relevant assets, including the foundational voice models and the biometric data encoded within them, among entities within the Alphabet corporate family. As alleged in ¶¶ 21-31, Alphabet Inc. is the parent of Google LLC, Google DeepMind operates within Google LLC, and the voice synthesis research, training, and deployment alleged in this Complaint occurs within an integrated Alphabet enterprise. The development, refinement, and commercial deployment of the voice models

requires the transfer of those models, and the voiceprints encoded within them, among Alphabet entities in the ordinary course of business.

76. Plaintiffs and Class members did not consent to the dissemination of their voiceprints to any of the entities, vendors, or service providers within Google's cloud and corporate infrastructure. No enumerated exception to BIPA's dissemination prohibition under 740 ILCS 14/15(d) applies to the disseminations described in this subsection.

*Ongoing Retention and Commercial Exploitation Is Directed at Illinois*

77. Google's commercial exploitation of voiceprints and biometric information generated in Illinois is itself Illinois-directed. Google sells subscriptions and AI-generated voice outputs to Illinois subscribers and Illinois-based commercial users on a continuing basis, as alleged in ¶70 (subparts (a), (b), (c), (d), (e), and (f)). The commercial value of those subscriptions and outputs derives, on information and belief, from voice models developed through unconsented extraction of biometric data, including biometric data generated in Illinois, as alleged in ¶¶ 52-59. Each Illinois transaction in those products is therefore an exercise of commercial value that Google derived from the same biometric extraction Plaintiffs allege is unlawful.

78. The injury suffered by Plaintiffs and the Class is felt in Illinois. The privacy interest BIPA protects — the right to control the collection, retention, and commercial use of one's biometric identity — is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their loss of the licensing and consent rights BIPA preserves, and the dilution of the commercial

35

value of their voices in markets in which they participate are all injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois, as more fully alleged in ¶¶ 79 through 114. Together with the Illinois origin of the biometric data, the Illinois-targeted nature of Google's acquisition, and the Illinois-directed nature of Google's ongoing commercial exploitation, this Illinois-localized harm establishes that the operative conduct of this case occurred, and continues to occur, primarily and substantially in Illinois.

*Named Plaintiffs' Individual Experiences*

*Carol Marin*

79.     Carol Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (*60 Minutes*, *60 Minutes II*, the *CBS Evening News*), WTTW (*Chicago Tonight*), CNN, and the Discovery Channel, and includes television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. She has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor.

36

80. Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC 5 Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

81. On information and belief, Marin's voice recordings were among the audio that Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in those models' parameters and reproduced in the audio they generate. Marin's body of work matches, on every material dimension, the profile of training audio that Google's technical documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source. Her recordings are publicly accessible on the same categories of platforms — broadcast archives, streaming video — from which Google has been alleged to have sourced training data, including in *Kogon v. Google LLC*,

No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026). Google has refused to disclose the sources of the pretraining corpus that powers its commercial voice products, placing the specific records of training data ingestion under Google's exclusive control.

82. Marin never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release. Google's collection of Marin's voiceprint, and Google's continuing possession and commercial exploitation of that voiceprint, occurred and continues without her knowledge or consent.

83. Marin's injury is concrete and particular to her. Google extracted her voiceprint from recordings she produced over five decades of professional work, encoded it into commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Marin uses to speak every day. The technology Google built using Marin's voiceprint now operates in the same broadcast and journalism markets in which Marin built her career, against the same colleagues with whom she worked, in a competitive position Marin neither chose nor authorized.

*Yohance Lacour*

84.     Yohance Lacour is a journalist, audio storyteller, writer, entrepreneur, and playwright from the South Side of Chicago whose work centers on the lives and stories of Black Chicago. Lacour is affiliated with the Invisible Institute, a nonprofit investigative journalism organization based on Chicago's South Side.

85.     Lacour is the creator, host, writer, and lead reporter of *You Didn't See Nothin'*, a seven-part investigative podcast produced by the Invisible Institute and USG Audio that revisits the 1997 hate-crime attack on Lenard Clark on the South Side of Chicago, tracks down key players in the case a quarter-century later, and examines how the case shaped Lacour's own life. The series was awarded the 2024 Pulitzer Prize for Audio Reporting and a 2024 Peabody Award. It was named to Apple Podcasts' "Podcasts We Love" and recognized as one of Apple Podcasts' "100 Best Podcasts of All Time," received nominations at the Signal Podcasting Awards in the Limited Series & Specials – Best Host and Limited Series & Specials – Documentary categories, and received four nominations at the Black Podcasting Awards in the Best Sound Design, Best History Podcast, Best True Crime Podcast, and Best Limited Series Podcast categories. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series. Lacour's voice-based journalism and podcast work, including the entirety of *You Didn't See Nothin'*, was produced in Chicago while Lacour was physically present in Illinois.

39

86.     *You Didn't See Nothin'* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, Overcast, and other major podcast platforms, with metadata identifying Lacour as the host and Chicago as the location of production. Lacour's interview appearances on NPR's *Fresh Air with Tonya Mosley*, NPR's *All Things Considered with Adrian Florido*, the Canadian Broadcasting Corporation's *Crime Story with Kathleen Goldhar*, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast (produced by Audacy's Pineapple Street Studios) are likewise continuously available across major public-radio and podcast platforms. The series has been continuously available since its 2023 release, and Lacour's interview appearances have been continuously available since their respective publications, in each case for periods that precede Google's training of the foundational voice models at issue in this Complaint and continue thereafter.

87.     On information and belief, Lacour's voice recordings were among the audio that Google ingested to train its foundational voice models, and voiceprints derived from his recordings are encoded in those models' parameters. Lacour's catalog matches the profile of training audio Google's documentation identifies as optimal — long-form, single-speaker, studio-quality, professionally produced — and his Pulitzer-honored audio work was, by virtue of its public recognition, a readily identifiable high-value source of training audio. His recordings are distributed on the same podcast platforms from which Google has been alleged to have sourced training data, and the specific records of Google's ingestion are within Google's exclusive control.

88.    Lacour never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of his voice for AI training. He never uploaded any recording to a Google voice cloning product. He never received notice that Google had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

89.    Lacour's injury is concrete and particular to him. NotebookLM Audio Overviews, the Google product whose multi-speaker dialogue model was trained on the unidentified pretraining corpus alleged in this Complaint, generates podcast-format audio from written sources, directly in the format and the market of *You Didn't See Nothin'* and Lacour's other audio journalism. The technology Google built using Lacour's voiceprint now operates in the same long-form audio investigative-journalism market in which Lacour earns his livelihood, with the capabilities of his own voice contributing to the products that compete against him.

*Alison Flowers*

90.    Alison Flowers is an investigative journalist and audio producer based in Chicago. Before founding her Chicago-based production company Spiralbound, Flowers served as Head of Production at the Invisible Institute, a Chicago nonprofit investigative journalism organization on the South Side, where she built and led journalism production teams whose work received four nominations from the Pulitzer Prize Board over a four-year period. Flowers produced and reported the seven-part investigative podcast *Somebody*, which premiered on March 31, 2020, investigates the 2016 murder of Courtney

41

Copeland in Chicago, and was a 2021 Pulitzer Prize finalist for Audio Reporting. *Somebody* received the National Magazine Award (the "Ellie") for Podcasting from the American Society of Magazine Editors, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association award for Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story. *Rolling Stone* named *Somebody* to "The 25 Best True-Crime Podcasts of All Time" and ranked it first on its "Best Podcasts of 2020" list; *The New York Times* ranked it first on its list of true crime podcasts at the intersection of race; *The Atlantic* ranked it second on its "50 Best Podcasts of 2020"; and the podcast reached the number two position among true crime podcasts on the Apple Podcasts chart.

91.    *Somebody* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and other major podcast platforms, with metadata identifying Flowers as a producer and on-air journalist and Chicago as the location of production. Flowers's additional audio reporting on *Reveal* (from the Center for Investigative Reporting), *The Heist* (from the Center for Public Integrity), *Vox*, *Dateline NBC*, and *Democracy Now!* is likewise continuously available on those programs' respective platforms. Flowers's body of audio work has been continuously available across these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

92.     On information and belief, Flowers's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those models. Flowers's audio reporting matches the profile of training audio Google's documentation identifies as optimal, her Pulitzer-finalist work was a readily identifiable high-value source of professional audio journalism — recognized commercially as among the best podcasts of its release year by *Rolling Stone, The New York Times*, and *The Atlantic* — and her recordings are distributed on the same podcast platforms from which Google has been alleged to have sourced training data. *Somebody* was among the podcasts distributed through Google Podcasts, Google's podcast distribution service, until that service was discontinued in 2024 — placing copies of Flowers's recordings on Google-controlled distribution infrastructure during the period of Google's foundational voice model pretraining.

93.     Flowers never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

94.     Flowers's injury is concrete and particular to her. Flowers continues to produce investigative audio journalism through Spiralbound, and the long-form audio markets in which she earns her livelihood — investigative podcast journalism, narrative audio documentary — are precisely the markets

that Google's NotebookLM Audio Overviews and related products are designed to serve. The technology Google built using Flowers's voiceprint now competes with Flowers in her own active markets, with the capabilities of her own voice contributing to the products that compete against her.

*Robin Amer*

95.     Robin Amer is a journalist, podcast creator, audio producer, and on-air host who has produced the substantial majority of her audio work from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the investigative podcast produced by USA Today over two seasons. Season 1 of *The City*, which focused on Chicago, peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New York Times*, *Quartz*, and Apple Podcasts. Amer's earlier production work for *Gravy*, the podcast produced by the Southern Foodways Alliance, contributed to that program's 2015 James Beard Award for Best Podcast — among the most prestigious U.S. honors in food and culture media. Amer subsequently spent three years as Senior Producer for Audio Features at *The Washington Post*, where she edited the *Post Reports* daily news podcast and produced the standalone narrative series *Field Trip*. During her tenure at *The Washington Post*, Amer won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for

Best Independent Non-Fiction and was shortlisted for the Whickers Prize at the Sheffield Documentary Festival.

96. *The City* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, and other major podcast platforms, with metadata identifying Amer as the host, narrator, and showrunner. *Post Reports*, *Field Trip*, *Love + Radio: Blood Memory*, and Amer's contributions to *Reveal*, *The Heist*, *Vox*, and *Gravy* are likewise continuously available on the respective programs' platforms. Amer's audio work has been continuously available across these channels for years preceding Google's training of the foundational voice models alleged in this Complaint. The substantial majority of Amer's voice work was recorded in Chicago while Amer was an Illinois resident, and Amer has been an Illinois resident at all times relevant to this Complaint.

97. On information and belief, Amer's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those models. Amer's hosted, narrated, and showrun audio work — totaling hundreds of hours of single-speaker, studio-quality audio — matches the profile of training audio Google's documentation identifies as optimal, and *The City*'s commercial peak position on the Apple Podcasts charts and Amer's three-time duPont–Columbia recognition established her work as a readily identifiable high-value source of professional audio journalism. *The City* and Amer's other audio work were distributed in part through Google Podcasts, Google's podcast distribution service, until that service was discontinued in 2024 — placing copies of Amer's

recordings on Google-controlled distribution infrastructure during the period of Google's foundational voice model pretraining.

98. Amer never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

99. Amer's injury is concrete and particular to her. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting — directly the market that Google's NotebookLM Audio Overviews and related products are designed to serve at substantially lower cost than the human production Amer provides. The technology Google built using Amer's voiceprint now competes with Amer in her own active market.

*Philip Rogers*

100. Philip Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. The Lisagor Awards, conferred

by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region.

101.   Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC 5 Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting. The platforms display metadata identifying Rogers as the speaker and Chicago as the location of production. Rogers's body of work has been continuously available through these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

102.   On information and belief, Rogers's voice recordings were among the audio that Google ingested to train its foundational voice models, and voiceprints derived from his recordings are encoded in those models' parameters. Rogers's broadcast catalog matches the profile of training audio Google's documentation identifies as optimal, and the volume and continuity of his on-air work — four decades of single-speaker professional broadcasting — represents a category of source material particularly valuable for voice synthesis training.

103.   Rogers never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of his voice for AI training. He never

uploaded any recording to a Google voice cloning product. He never received notice that Google had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

104. Rogers's injury is concrete and particular to him. Google extracted his voiceprint from recordings he produced over four decades of professional work, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced. The technology Google built using Rogers's voiceprint now operates in the same broadcast journalism market in which Rogers built his career, against the same colleagues with whom he worked.

*Lindsey Dorcus*

105. Lindsey Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. She is a 2020 Society of Voice Arts and Sciences Voice Arts Award winner (as part of the full-cast ensemble for *Wild Monsters Dance About: Stories from an Unruly Mind*) and a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. Her narration spans young adult fiction, science fiction and fantasy, romance, mystery and thriller, and works featuring LGBTQ+ themes and characters. AudioFile Magazine, the principal independent trade publication reviewing audiobook narration in the United States, has reviewed her work favorably, describing her performances as

"silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects used across her narration work, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, and Greek for main characters and narration, and New England, New York, German, Indian, and Russian for supporting characters. Dorcus operates a professional home recording studio in Chicago, where she records the audiobooks at issue in this Complaint to broadcast-quality, professionally edited specifications that meet the technical requirements of the major audiobook publishers.

106. Dorcus's audiobook catalog is continuously distributed across Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and other major audiobook platforms. Each platform displays metadata identifying Dorcus as the narrator, the publisher, and the title. The complete catalog is searchable on Audible.com. Dorcus has also appeared as a voice actor in multiple fiction podcasts performing dramatic voice work for serialized audio storytelling distributed through major podcast platforms. Dorcus's narrated catalog has been continuously available through these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

107. On information and belief, Dorcus's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those

models. Dorcus's catalog represents precisely the long-form, single-speaker, studio-quality audio that Google's own documentation identifies as optimal training material — more than two hundred audiobooks, each comprising hours of consistent single-speaker narration, professionally produced, publicly searchable by narrator, distributed on major commercial audio platforms. Few professional voice catalogs match Google's training-data profile more directly than Dorcus's does. The technical sophistication of her voice work — including her professionally recognized range across more than a dozen accents and dialects — represents an additional category of training-data value to a multilingual voice synthesis system designed to generate speech across more than forty languages and more than two hundred twenty voices. And Dorcus's audiobooks are distributed in part through Google Play Books — Google's audiobook distribution service — placing copies of her recordings on Google-controlled infrastructure.

108. Dorcus never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

109. Dorcus's injury is concrete, particular to her, and direct. Google Cloud Text-to-Speech and Chirp 3 voice products are licensed to audiobook publishers — including the publishers for whom Dorcus has narrated more than two hundred audiobooks — at per-character and per-audio-second fees

50

that are orders of magnitude lower than human narrator rates. The market displacement is not abstract. The technology Google built using Dorcus's voiceprint, on information and belief, is now sold to the same publishers that have historically paid Dorcus to narrate audiobooks, as a substitute for the human narration she provides. Dorcus's voiceprint, taken without her consent, is now part of the commercial product that competes against her in her own market.

### Victoria Nassif

110. Victoria Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois. Nassif is a trained mezzo-soprano singer whose vocal performance skills extend beyond spoken narration to include musical and singing capabilities developed through classical acting training. Nassif's audiobook narration work has been commercially released by Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster, and her on-camera work includes multiple episodes of NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Her notable audiobook narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), in which she serves as the solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize and named a *them* Best Book of the Year; *Gulf* by Mo

Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by bestselling author Susan Abulhawa featuring stories from Palestinian writers. Nassif possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation and Cockney), Persian, Levantine Arabic, and American Southern, among others.

111. Nassif's audiobook catalog is continuously distributed across Audible, Apple Books, Spotify, Libro.fm, and other major audiobook platforms, with metadata identifying Nassif as the narrator, the publisher, and the title. Her on-camera work is continuously available through NBC and other broadcast distribution channels. Her audiobook catalog has been continuously available through these platforms for years preceding Google's training of the foundational voice models alleged in this Complaint.

112. On information and belief, Nassif's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those models. Nassif's audiobook catalog matches the profile of training audio Google's documentation identifies as optimal, and her authentic Levantine Arabic-accented narrations are a distinctive and readily identifiable category of voice content particularly valuable for a multilingual voice synthesis system. As a first-generation Lebanese-Palestinian American with native cultural and linguistic familiarity, Nassif brings to her narration of works featuring Middle Eastern characters and settings an authenticity that represents a category of

52

training-data value Google's foundational voice models — which power products that synthesize speech in more than forty languages and more than two hundred twenty voices — depend on capturing.

113. Nassif never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

114. Nassif's injury is concrete and particular to her. The cultural and linguistic specificity of Nassif's professional voice work — authentic Arabic-accented narration of works by Arab and Palestinian American authors — is itself the basis of her distinctive market position. Google's voice models, on information and belief, can now generate Arabic-accented English narration that competes specifically with Nassif's professional niche, and that competitive capability exists because voice characteristics encoded in the models include the characteristics of speakers like Nassif. The technology Google built using Nassif's voiceprint now operates in the precise market — culturally authentic Arabic-accented narration — in which Nassif has built her career, in a competitive position Nassif neither chose nor authorized.

*The Voice Products Compete With the People Whose Voices Built Them*

115. The voice AI products built on Plaintiffs' biometric data are now sold and deployed into the markets where Plaintiffs and the class earn their livelihoods.

116. Audiobook narration is one of the markets most directly affected. Professional audiobook narration historically has been performed by human narrators at industry rates of $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate. Google Cloud Text-to-Speech, Chirp 3 HD voices, and Chirp 3 Instant Custom Voice are licensed to audiobook publishers at per-character or per-audio-second fees that are orders of magnitude lower than human narrator rates, enabling audiobook-length synthetic narration at a fraction of the cost. The major American audiobook publishers — including Penguin Random House, Hachette, Simon & Schuster, and Macmillan — for whom Plaintiffs Dorcus and Nassif have narrated books, have begun to integrate AI-generated narration into their production pipelines.

117. Long-form investigative audio journalism is similarly affected. NotebookLM Audio Overviews, a free consumer product built on the multi-speaker dialogue model whose pretraining corpus Google has refused to disclose, generates podcast-format audio from written sources. NotebookLM had been adopted by more than 80,000 organizations within weeks of launch, and Google has reported that more than two million users use the Audio Overviews feature. The product directly substitutes for the long-form investigative audio journalism that Plaintiffs Lacour, Flowers, and Amer have spent their careers developing — produced, until now, by human reporters and narrators at substantial professional cost.

118. Localization voiceover is similarly affected. YouTube auto-dubbing, built on the same voice synthesis technology, automatically generates dubbed

audio in other languages while preserving speaker characteristics across the translation. The product replaces the localization voiceover work that voice actors have historically performed and is offered to YouTube creators at no marginal cost.

119. Each of these products was built using the vocal characteristics of the human performers it now displaces. Plaintiffs allege, on information and belief, that the voiceprints of every Plaintiff in this case are among the voiceprints encoded in the foundational voice models on which these products depend. The market substitution is therefore not merely temporal but causal. The machines generate the audio they generate because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output.

*Google Acted Willfully and Recklessly*

120. Google's collection, retention, and commercial exploitation of Plaintiffs' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. Google acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*Google knew its obligations under BIPA*

121. By the time Google began training the foundational voice models at issue in this Complaint, BIPA had been the law of Illinois for more than a decade and Google had been a defendant in some of the largest biometric privacy actions in the United States. In *Rivera v. Google LLC*, the consolidated Cook County action concerning Google Photos' face-grouping feature, Google

55

paid approximately $100 million to settle BIPA claims arising from the unconsented creation of biometric face templates from photographs of Illinois residents; the settlement received final approval on September 28, 2022. In *Farwell v. Google LLC / H.K. v. Google LLC*, Google paid $8.75 million to settle BIPA claims that Google created voice models and face models from Illinois schoolchildren using Google Workspace for Education without notice or consent; the settlement received final approval on October 17, 2025. In November 2025, Google paid $1.375 billion to the State of Texas, the second largest privacy settlement any state has ever obtained from any company, to resolve parallel claims under Texas's biometric identifier statute, including allegations that Google captured "voiceprints and records of face geometry" through Google Photos and Google Assistant. By any measure, Google was on notice of its biometric-privacy obligations under BIPA and analogous state statutes throughout the period in which it ingested Plaintiffs' voiceprints into its foundational voice models.

*Google knew that voice training extracts biometric identifiers*

122.  Google's published research and product documentation describe the voice synthesis pipeline in terms that align with BIPA's biometric definitions. Google's researchers describe the acoustic tokens its voice models extract from training audio as capturing "speaker characteristics," and Google's Chirp 3 product documentation describes the speaker-identifying output of its voice cloning pipeline — the "voice cloning key" — as "a text-string representation of your voice data." Google could not credibly plead ignorance of

56

the proposition that its voice synthesis pipeline extracts and stores speaker-specific representations capable of identifying the source speakers. Google built the pipeline, published the research, and shipped the product on that very capability.

123. Google has confirmed its understanding that voice synthesis training implicates the legal rights of source speakers by building, in parallel with the foundational voice models at issue here, a complete consent infrastructure for the consumer voice cloning products that train on individual speakers' recordings. Google's Custom Voice product, generally available since March 2022, requires each voice actor to record a consent statement, supplied by Google, affirming that the actor is the owner of the voice and consents to Google's use of the voice to create a synthetic voice model. Custom Voice is subjected to a "review process to help ensure each use case is aligned with our AI Principles and adequate voice actor consent is given."

124. Chirp 3 Instant Custom Voice, launched in 2025, requires the same recorded consent statement: "I am the owner of this voice, and I consent to Google using this voice to create a synthetic voice model."

125. Google has also developed SynthID, a digital watermarking technology that embeds imperceptible markers into AI-generated audio, in recognition that synthetic voice content creates risks requiring technical safeguards.

126. Each of these measures is Google's admission that the extraction and commercial use of a person's voice to train a voice model is conduct that warrants consent, governance review, and technical mitigation.

*Google chose to apply consent selectively*

127. The chronology of Google's consent-infrastructure buildout reflects a deliberate, contemporaneous choice. Google launched Custom Voice with its recorded-consent requirement in March 2022. In October 2024, Google disclosed that it had pretrained its multi-speaker dialogue model — the foundational model that powers NotebookLM Audio Overviews, Gemini Live, and related products — on "hundreds of thousands of hours of speech data" without identifying any source or speaker. In 2025, Google extended the same recorded-consent framework to Chirp 3 Instant Custom Voice. The same engineering organization, Google DeepMind, developed both the Custom Voice and Chirp 3 consent pipelines and the foundational voice models trained on the unconsented pretraining corpus. The same legal department drafted both consent regimes. The same Responsible AI governance process that reviewed Custom Voice did not, on information and belief, review the foundational voice training pipeline for BIPA compliance. The choice to apply consent to the voices Google paid for, rather than to the voices it took, was a contemporaneous, institutionally coherent decision made with the consent infrastructure already in place.

128. The decision was a commercial calculation. BIPA-compliant collection of voice training data would have required Google to identify the

source speakers, provide written notice of the specific purpose and duration of the collection, and obtain a written release from each speaker before ingesting the recording into the training pipeline. With a pretraining corpus of "hundreds of thousands of hours of speech data" — comprising, on information and belief, the recordings of tens of thousands of distinct speakers and likely more — that compliance burden would have constrained the speed and scale of Google's voice AI development. Google chose speed and scale over compliance. The decision is documented in the contrast between Google's robust consent infrastructure for the voices it paid to license and the complete absence of consent infrastructure for the voices it took.

*Google's training-data acquisition practices confirm deliberateness*

129. Google's training-data acquisition practices, taken on the public record, confirm that Google's noncompliance was deliberate rather than inadvertent. In April 2024, *The New York Times* reported that Google employees were aware that OpenAI was harvesting audio from YouTube videos to train its AI models and had taken no action against OpenAI because, according to the reporting, Google was "doing the same."

130. In September 2024, five months after that reporting and one month before Google disclosed the volume of its pretraining corpus, Google amended the YouTube Terms of Service to add, for the first time, an express grant to Google of the right to use uploaded content for "machine learning and AI applications" — a grant that, by its terms, cannot bind non-uploaders like Plaintiffs whose voices appear in YouTube content uploaded by third parties.

59

131. And in March 2026, a putative class action filed in this District alleged that Google's same DeepMind research organization, using the same SoundStream/AudioLM-family of techniques that underlie the voice models at issue here, trained its Lyria 3 music generation model on millions of copyrighted recordings extracted from YouTube without license or consent. *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026).

132. The pattern across these facts — internal awareness, retroactive Terms-of-Service amendment, parallel allegations against the same research organization using the same techniques — establishes that Google's training-data practices were deliberate institutional choices rather than inadvertent oversights.

133. Each of the violations alleged in this Complaint was therefore committed by Google with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(a)(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(a)(1).

**CLASS ACTION ALLEGATIONS**

134. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Google extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or

60

operation of Google's foundational voice synthesis models, during the Class Period.

135. The Class Period runs from the earlier of (a) the date Google first ingested any voice recording into the training pipeline for its foundational voice synthesis models, or (b) January 1, 2014, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period.

136. Excluded from the Class are: (i) Alphabet Inc., Google LLC, and each of their respective parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Alphabet Inc. and Google LLC; (iii) Google's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; and (vi) any person who executed BIPA-compliant written consent for Google's use of their voice recordings to train Google's foundational voice synthesis models, including persons whose voices were used through Google Cloud Custom Voice with completed Custom Voice consent review and persons who created Chirp 3 Instant Custom Voice voice cloning keys by recording the required consent statement.

137. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

138. *Ascertainability.* Class membership is defined by objective criteria and can be determined from records that exist or will be produced in discovery. Whether a particular voice recording entered Google's training pipeline is a binary factual question — the recording is either in the pipeline's ingestion logs or it is not — and the records that answer the question are within Google's exclusive control: training data manifests, ingestion logs, source URL records, pipeline metadata, data provenance records, and associated speaker and file-level identifiers. Class membership can be further confirmed through publicly available distribution metadata for voice recordings (audiobook platform records, podcast directory records, streaming service catalogs, broadcast archive records), through speaker-identification technology applied to Google's training corpus, and through voice-matching analysis comparing Google's voice model outputs against publicly available recordings of class members.

139. *Numerosity.* Joinder of all members of the Class is impracticable. Fed. R. Civ. P. 23(a)(1). Google has disclosed that its production multi-speaker dialogue model was pretrained on hundreds of thousands of hours of speech data. The number of distinct individuals whose voice recordings were produced or recorded in Illinois and ingested into the training pipeline that produced Google's commercial voice products plainly satisfies the threshold for numerosity. The Class includes not only the professional broadcast journalists, audiobook narrators, podcasters, voice actors, and other voice professionals who have produced work in Illinois during the Class Period — themselves a population numbering in the thousands — but also the interviewees, guests,

panelists, witnesses, callers, public officials, and other persons whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, archival, and other publicly distributed audio content. On information and belief, the Class population numbers in the hundreds of thousands or more. The exact number is within Google's exclusive control and will be established through discovery.

140. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Google did not engage in any individualized notice, consent, retention-policy disclosure, release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Google's foundational voice training pipeline. Google's conduct was uniform: the same training pipeline ingested the same categories of voice recordings under the same absent-consent posture, applied to all class members through the same automated and standardized process. The questions of whether Google complied with BIPA's notice, consent, retention policy, profiting, dissemination, and privacy-protection requirements before and after extracting the voiceprints of class members can be answered classwide because Google's compliance, or noncompliance, was identical as to every class member.

141. Common questions of law and fact include, without limitation:

(a)     whether the computational representations of vocal characteristics that Google extracts during voice model training, including speaker

63

embeddings, acoustic tokens, and voice cloning keys, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b)    whether Google informed class members in writing that their biometric identifiers were being collected, of the specific purpose and duration of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c)    whether Google developed and made publicly available a written retention and destruction policy applicable to class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(d)    whether Google sold, leased, traded, or otherwise profited from class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(e)    whether Google disclosed or disseminated class members' biometric identifiers to third parties without consent in violation of 740 ILCS 14/15(d);

(f)    whether Google stored, transmitted, and protected class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2);

(g)    whether Google's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h)    whether Google used class members' voices and identities for commercial purposes without prior written consent in violation of the Illinois Right of Publicity Act;

64

(i)  whether Google's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b), and Google materially contributes to or facilitates their distribution;

(j)  whether Google's conduct constitutes deceptive trade practices likely to cause confusion in violation of the Illinois Uniform Deceptive Trade Practices Act;

(k)  whether Google was unjustly enriched by its unauthorized use of class members' voice data; and

(l)  the appropriate measures of damages, restitution, and injunctive relief.

142.  *Typicality.* The claims of the named Plaintiffs are typical of the claims of the Class. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, and related professional voice work, recorded in Chicago studios, broadcast facilities, and home recording studios in this District. Google, on information and belief, ingested those recordings into the training pipeline for its foundational voice synthesis models and extracted voiceprints from them without notice, consent, or written release. The voiceprints are now embedded in Google's commercial voice models and reproduced in the audio those models generate. The legal theories asserted on behalf of the Class — that Google's extraction, retention, commercial exploitation, and dissemination of voiceprints from Illinois-recorded voice work

without BIPA-compliant consent violates 740 ILCS 14/15(a)–(e), and that Google's commercial use of voices and identities without consent violates the Illinois Right of Publicity Act — apply with equal force to each named Plaintiff and to every other class member. Each named Plaintiff has the same interest as every other class member in establishing Google's liability and obtaining the relief sought in this Complaint.

143. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent class members; each named Plaintiff has the same incentive as every other class member to maximize recovery and to obtain comprehensive injunctive relief addressing the unlawful extraction of voiceprints. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

144. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Google has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Google's training pipeline operated uniformly across every class member's voice recordings; Google's failure to obtain BIPA-compliant consent was uniform; Google's failure to publish a retention and destruction policy applicable to class members was uniform; and Google's continuing possession and commercial exploitation of class members' voiceprints in commercial models is uniform. Plaintiffs seek classwide

injunctive relief under 740 ILCS 14/20, 815 ILCS 510/3 (the Illinois Uniform Deceptive Trade Practices Act, which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining of the foundational voice models in which class members' voiceprints are encoded — that necessarily applies on the same terms to every class member.

145. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate for the Class on the damages and restitutionary claims asserted in this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

146. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. Whether Google's voice model training pipeline extracts voiceprints within the meaning of BIPA is a common technical question with a common answer. Whether Google complied with BIPA's notice, consent, retention, profiting, and dissemination requirements is a common legal question with a common answer — Google did not, with respect to any non-user whose voice recordings were ingested into the training pipeline. Whether Google's conduct was willful or reckless turns on Google's institutional knowledge, decision-making, and conduct, all of which are common to the Class. The principal individual question — whether a specific class member's voice recordings entered the training pipeline — is

binary and resolvable from Google's own records, which include training-data manifests, ingestion logs, and source-URL identifiers in Google's exclusive control. Individual damages calculations under BIPA's per-violation liquidated-damages framework, 740 ILCS 14/20, do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

147. *Superiority.* A class action is the superior method for adjudicating these claims:

(a) *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover artists — whose voiceprints were extracted without their knowledge. Many class members are unaware their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against one of the world's largest technology conglomerates, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Google on behalf of Illinois residents whose voices were used to train Google's foundational voice synthesis models. The only related action is *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026), a putative class action concerning Google's training of its Lyria 3

AI music generation model on copyrighted musical recordings extracted from YouTube. *Kogon* arises from music training-data practices within Google DeepMind and asserts claims on behalf of musicians and copyright holders, not the voice talent — broadcast journalists, podcasters, audiobook narrators, voiceover artists, and other voice professionals — whose voices were ingested into Google's foundational voice synthesis models.

(c)     *Desirability of concentration in this forum.* Concentrating this litigation in this District is appropriate. Plaintiffs are Illinois residents. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Google operates a substantial Chicago presence, including its self-described Midwest headquarters in this District. This Court is well-suited to adjudicate BIPA and other Illinois statutory claims arising from Google's commercial conduct in Illinois.

(d)     *Manageability.* The case is manageable as a class action. Google's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; class membership can be determined from Google's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-violation liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

148.     To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs

allege that the limitations periods are equitably tolled by Google's concealment of its training-data sources, by Google's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Google had ingested their recordings into its training pipelines, and by the continuing nature of Google's violations.

## CLAIMS FOR RELIEF

### Count I
### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

149. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

150. Plaintiffs bring this Count individually and on behalf of the Class.

151. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

70

152. Alphabet Inc. and Google LLC are each "private entities" within the meaning of BIPA. 740 ILCS 14/10.

153. Google collected, captured, and otherwise obtained voiceprints from the voice recordings of Plaintiffs and Class members by ingesting their voice recordings into its training pipeline and extracting from those recordings computational representations capable of identifying the speakers, as alleged in detail in ¶¶ 41-45. The resulting representations — variously denominated as speaker embeddings, acoustic tokens, or voice cloning keys in Google's technical and product documentation — are voiceprints and biometric information within the meaning of BIPA.

154. Google did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Google obtained no consent of any kind, in any form, from any Plaintiff or Class member.

155. Google's violations of § 15(b) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

156. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per

intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

## Count II

## Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)

*Brought on behalf of the Class*

157.  Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

158.  Plaintiffs bring this Count individually and on behalf of the Class.

159.  Section 15(a) of BIPA requires a private entity in possession of biometric identifiers to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with Google in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

160.  Google has been, and remains, in possession of voiceprints extracted from recordings of Plaintiffs and Class members.

161.  Google has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training data and embedded in the parameters of Google's foundational voice

72

synthesis models. Google's general data retention disclosures, including those addressing Gemini activity and human-reviewer data, do not address the destruction of biometric data extracted from non-user voice recordings and now embedded in commercial voice models.

162. Google's violations of § 15(a) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

163. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

### Count III

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)

*Brought on behalf of the Class*

164. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

165. Plaintiffs bring this Count individually and on behalf of the Class.

166. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier may sell, lease, trade, or otherwise profit from a person's biometric identifier. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

167. Google has profited and continues to profit from Plaintiffs' and Class members' voiceprints by using them to develop, train, and commercially operate the voice synthesis models that power Google's commercial voice products, and by monetizing those products through usage fees, subscription

fees, enterprise contracts, advertising revenue, and hardware sales as alleged in detail in ¶¶ 69-71. The voice quality, expressiveness, and multilingual capability that Google sells through these channels exist because of the voiceprints encoded in Google's foundational voice models. Google's commercial exploitation of Plaintiffs' and Class members' voiceprints does not fall within any exception to § 15(c).

168. Google's violations of § 15(c) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

169. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count IV

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)

*Brought on behalf of the Class*

170. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

171. Plaintiffs bring this Count individually and on behalf of the Class.

172. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier may disclose, redisclose, or otherwise disseminate a person's biometric identifier unless an enumerated exception applies. 740 ILCS 14/15(d).

173. On information and belief, Google has disclosed, redisclosed, or otherwise disseminated Plaintiffs' and Class members' voiceprints to affiliated Alphabet subsidiaries, vendors, and service providers within Google's cloud

and product infrastructure, in the ordinary course of training, evaluating, deploying, and operating its foundational voice synthesis models. The basis for this allegation is set forth in ¶¶ 72-76. Plaintiffs and Class members did not consent to any disclosure of their voiceprints. No enumerated exception under § 15(d) applies.

174.   Google's violations of § 15(d) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

175.   Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

### Count V

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)

*Brought on behalf of the Class*

176.   Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

177.   Plaintiffs bring this Count individually and on behalf of the Class.

178.   Section 15(e) of BIPA requires a private entity in possession of biometric identifiers to store, transmit, and protect the identifiers from disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive

information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

179. Google fails the § 15(e)(2) asymmetry test. Google's established institutional practice regarding voice and audio research models is to release model code and, in many cases, model weights under open-source licenses, while simultaneously protecting its other confidential and sensitive information under strict closed-system controls.

180. Google's open release of voice and audio model code and weights spans nearly a decade and multiple model families. With respect to Tacotron, Google maintains the public repository at https://github.com/google/tacotron, which Google describes as containing materials related to "an end-to-end speech synthesis model from the Sound Understanding and Brain teams at Google," and has publicly released multiple iterations of the Tacotron family — Tacotron (March 2017), Tacotron 2 (December 2017), Parallel Tacotron 2 (March 2021), Non-Attentive Tacotron (October 2020), and Very Attentive Tacotron (October 2024) — through its own publications and code repositories. With respect to WaveNet, Google DeepMind published the WaveNet research describing a generative model for raw audio in September 2016, followed by Parallel WaveNet in November 2017, both with substantial technical detail enabling third-party reproduction. With respect to the Magenta project, Google Brain operates Magenta as a publicly designated open-source initiative; the Magenta GitHub repository at https://github.com/magenta/magenta describes

Magenta as started "by some researchers and engineers from the Google Brain team" and states, "We use TensorFlow and release our models and tools in open source on this GitHub." Through Magenta, Google has openly released NSynth (a WaveNet-style audio autoencoder), Music Transformer, MusicVAE, DDSP, GrooVAE, Onsets and Frames, MelodyRNN, DrumsRNN, and PerformanceRNN.

181. Most prominently, in June 2025 Google released Magenta RealTime as an "open-weights" generative audio model that, by Google's own description, is "an 800 million parameter autoregressive transformer model trained on ~190k hours" of audio. Google publicly stated that "the model code is available on Github and the weights are available on Google Cloud Storage and Hugging Face under permissive licenses." Google hosts Magenta RealTime on Hugging Face under the namespace google/magenta-realtime and on GitHub at https://github.com/magenta/magenta-realtime, with model code released under the Apache 2.0 license and model weights released under the Creative Commons Attribution 4.0 International license.

182. Google describes Magenta RealTime as "the open-weights cousin of Lyria RealTime, the real-time generative music model powering Music FX DJ and the real-time music API in Google AI Studio, developed by Google DeepMind," and Google's model documentation acknowledges that "with specific prompting, this model has been observed to generate some vocal sounds and effects." With respect to SoundStream and AudioLM, the foundational neural audio codec and language modeling architectures

77

underlying the voice models at issue in this Complaint, Google Research published both openly — SoundStream in 2021 with reference materials, and AudioLM in 2022 with substantial technical detail describing the model's use of acoustic tokens that "capture speaker characteristics or recording conditions" — and SoundStream's successor "SpectroStream" is a built-in component of the open-weights Magenta RealTime release. With respect to the Gemma family of large foundation models, Google has released Gemma, Gemma 2, CodeGemma, RecurrentGemma, and PaliGemma as "open weights" models available for public download, modification, and redeployment.

183. Google contemporaneously protects its other confidential and sensitive information under closed-system controls that are materially more protective than open release. Google maintains the source code for its core commercial products — Search, Ads, Gmail, YouTube, Google Cloud, and the production deployments of Gemini — as closed-source proprietary information.

184. Google protects its internal financial records, employee personnel files, customer data, and business communications under strict access controls, encryption, internal classification systems, and ISO 27001, SOC 2 Type II, and similar information-security regimes.

185. Google requires nondisclosure agreements from employees, contractors, and business partners, and treats its trade secrets, internal research roadmaps, and unreleased product plans as confidential and protected from public disclosure.

186. Google's BeyondCorp zero-trust security architecture, multi-factor authentication requirements, encryption-at-rest and encryption-in-transit standards, and physical-access controls at Google data centers reflect Google's actual security capabilities for protecting its confidential and sensitive information from disclosure.

187. The asymmetry between Google's open release of voice and audio model assets — including, on information and belief, model parameters derived from training data containing voiceprints and biometric information from non-consenting individuals — and Google's closed protection of its other confidential and sensitive information violates § 15(e)(2)'s requirement that biometric data be protected "in a manner that is the same as or more protective than" Google's protection of its other confidential and sensitive information. Open-sourcing model weights is publication, not protection. Google's institutional pattern of open release applies to or will be applied to the production voice synthesis models that ingested Class members' voiceprints; at minimum, those production models are not protected with the same level of care that Google applies to its other confidential and sensitive information, because Google's established public practice with respect to comparable voice and audio models is open release rather than closed protection.

188. Independently, Google fails the § 15(e)(1) reasonable-standard-of-care test as to voiceprints extracted from non-user training data. No mechanism exists for non-users to request access to, correction of, or deletion of their biometric data from Google's training datasets or models. A private

79

entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of their data, because those individuals have no ability to monitor, verify, or challenge how their data is stored, transmitted, or protected. The reasonable industry standard of care for biometric data presupposes some mechanism by which the data subject can verify the integrity of the protection; Google has provided none.

189. Google's violations of § 15(e) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

190. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

### Count VI

### Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.

*Brought on behalf of the Class*

191. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

192. Plaintiffs bring this Count individually and on behalf of the Class.

193. The Illinois Right of Publicity Act protects an individual's right to control commercial use of their identity. 765 ILCS 1075/30(a) provides that a person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the individual or, in the case of a minor, the appropriate guardian. IRPA defines "identity" to include "any attribute of an individual that serves to identify that

individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

194. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

195. Google used Plaintiffs' and Class members' identities for commercial purposes within the meaning of IRPA, by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the voice synthesis products that Google monetizes through the integrated commercial chain alleged in ¶¶ 69-71. Google holds out its products' ability to generate realistic, expressive, and human-sounding voices as a core commercial feature of those products — a capability built from the identities of the individuals whose recordings were used to train the foundational models. Google did not obtain written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

196. Independently, the Illinois Right of Publicity Act, as amended effective January 1, 2025, prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative. 765 ILCS

81

1075/30(b). The amended IRPA further imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution. *Id.*

197. On information and belief, Google's commercial voice products generate, distribute, and make available to the public voice outputs that constitute unauthorized digital replicas of Plaintiffs and Class members within the meaning of the amended IRPA, and Google materially contributes to and facilitates the distribution of such replicas through Google Cloud Text-to-Speech, Chirp 3, Gemini-TTS, Gemini Live, NotebookLM Audio Overviews, and YouTube auto-dubbing.

198. Google's violations of IRPA were willful and knowing, as alleged in ¶¶ 120-133. Google built and publicly deployed recorded-consent infrastructure for its consumer voice cloning products specifically because Google understood that the commercial use of an individual's voice requires that individual's consent. Google chose not to apply that consent infrastructure to Plaintiffs and Class members.

199. Plaintiffs and the Class have suffered concrete injury from Google's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods.

200. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to Google's

82

unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40, where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees, and such other relief as the Court deems just and proper.

**Count VII**

**Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act,
815 ILCS 505/1 et seq.**

*Brought on behalf of the Class*

201. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

202. Plaintiffs bring this Count individually and on behalf of the Class.

203. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices … in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices is broader than its prohibition of deceptive practices and reaches conduct that, even absent affirmative misrepresentation, offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002).

204. Google engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis services to Illinois customers, and by collecting, extracting, and commercially

83

exploiting the biometric identifiers of Illinois persons in connection with that commerce.

205. Google's conduct is unfair within the meaning of ICFA. Google's collection and commercial exploitation of the biometric identifiers of Illinois persons without their knowledge or consent offends Illinois public policy as expressed in BIPA, the Illinois statute enacted specifically to address the unauthorized collection of biometric identifiers, 740 ILCS 14/5, and as expressed in IRPA, the Illinois statute enacted specifically to address the unauthorized commercial use of personal identity, 765 ILCS 1075/30.

206. Google's conduct caused substantial injury to Plaintiffs and Class members, including the diversion of licensing income they would otherwise have earned for the use of their voices and the displacement of their professional voice work in the markets where they earn their livelihoods, as alleged in ¶¶ 115-119. Plaintiffs and Class members could not reasonably have avoided this injury because they had no knowledge that Google was collecting their biometric data.

207. Google's conduct is also independently deceptive within the meaning of ICFA. Google's Privacy Policy represents to users that Google collects "biometric information" only when users "choose to provide it." That representation is materially misleading because, on information and belief, Google was simultaneously ingesting hundreds of thousands of hours of voice recordings from non-users and extracting biometric voice representations from those recordings without the speakers' knowledge. Google maintained total

84

opacity about the sources of its voice training data while commercially exploiting that data at scale.

208. Google's unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Google's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, and not merely from the existence of competing AI products.

209. Google's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged in ¶¶ 120-133.

210. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a, injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## Count VIII

### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class - injunctive relief only*

211. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

212. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

85

213. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

214. Google's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, and commercially exploited by Google's customers without consumer-facing disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content.

215. Plaintiffs and Class members are persons likely to be damaged by Google's deceptive practices within the meaning of 815 ILCS 510/3. Google's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services

markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

216. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Google to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that Google has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3, Plaintiffs also seek reasonable attorneys' fees.

### Count IX

### Unjust Enrichment (Illinois Common Law)

*Brought on behalf of the Class*

217. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

218. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

219. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

220. Google obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without

87

permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Google's foundational voice synthesis models; the product capability and competitive advantage Google captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and the revenue Google generates and continues to generate through the commercial exploitation of those models, as alleged in ¶¶ 69-71.

221. Google obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invest time, talent, training, and resources to develop their voices and create professional recordings. Google's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Google, and Google's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

222. Google's retention of these benefits is unjust. Google's conduct violated the Illinois statutory protections for biometric data (BIPA) and for personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful.

223. Google's institutional practice confirms the inequity of its retention: Google built and deployed BIPA-compliant consent infrastructure for the voices it paid to license through Custom Voice and Chirp 3 Instant Custom

88

Voice, but did not apply that infrastructure to the voices of Plaintiffs and Class members from whom it took voiceprints without consent. Google could have pursued the same lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

224. Plaintiffs and the Class seek restitution of the benefits Google has unjustly retained, including disgorgement of profits Google earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendants Alphabet Inc. and Google LLC and award the following relief:

A. *Injunctive Relief.* Permanent and, where appropriate, preliminary injunctive relief requiring Google to:

(1) Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2) Cease the commercial use, sale, lease, trade, profiting from, or dissemination of voiceprints and biometric information of Plaintiffs and Class members that Google has already collected without BIPA-compliant consent;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate Google's foundational voice synthesis models, including without limitation Gemini Live, NotebookLM Audio Overviews, Google Cloud Text-to-Speech, Chirp 3 voices, Google Assistant, and YouTube auto-dubbing;

(4) Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information of non-users, in compliance with 740 ILCS 14/15(a);

(5) Destroy all voiceprints and biometric information of Plaintiffs and Class members that Google obtained without BIPA-compliant consent, and certify the destruction;

(6) Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational voice synthesis models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded;

(7) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution or making available of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b); and

(8) Provide adequate consumer-facing disclosure that voice outputs generated by Google's commercial voice products are AI-generated, are derived from foundational voice models built using voice recordings of unidentified

90

speakers, and have not been authorized by the individuals whose vocal characteristics are reproduced.

B.    *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendants are found liable, the greater of liquidated damages or actual damages on a per-person basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C.    *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of Google's unauthorized commercial use of their identities and voices, the profits Google earned from that unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages where applicable, and punitive damages under 765 ILCS 1075/40.

D.    *ICFA Damages.* Award the actual economic damages Plaintiffs and Class members sustained as a result of Google's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a.

E.    *Restitution and Disgorgement.* Order restitution of the benefits Google has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities; disgorgement of the profits Google has earned through the integrated commercial chain alleged in this Complaint, including without limitation revenue from Google Cloud Text-to-Speech, Chirp 3, Gemini Live, NotebookLM

Audio Overviews, Google Assistant, YouTube auto-dubbing, Google Workspace voice-enabled features, Google Cloud enterprise voice contracts, and Google-made hardware whose value derives from the foundational voice models; and an accounting of all such revenues and benefits.

F. *Non-Duplication.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendants Alphabet Inc. and Google LLC on all Counts on which Defendants are found liable.

I. *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J.      *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K.      *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 11, 2026              LOEVY & LOEVY

/s/ Ross Kimbarovsky

_____

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*