# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| ALPHABET, INC., a Delaware corporation, and GOOGLE LLC, a Delaware limited liability company, | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiffs, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendants Alphabet Inc. and Google LLC (collectively, "Google"), allege as follows:

## <u>NATURE OF THE CASE</u>

1. Google built its voice AI using the voices of real people, including some of the most accomplished broadcast journalists, investigative podcasters, and audiobook narrators working in the United States today. To create the foundational models that now power Gemini Live, NotebookLM Audio Overviews, YouTube auto-dubbing, Google Cloud Text-to-Speech, and Google

Assistant on more than a billion devices, Google ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers from those recordings. Plaintiffs' voices are among them.

2. Google, as used in this Complaint, refers jointly to Alphabet Inc. and its operating subsidiary Google LLC. Alphabet disclosed in its 2024 Annual Report on Form 10-K, filed with the U.S. Securities and Exchange Commission ("SEC") and signed by its Chief Executive Officer, Sundar Pichai, that the artificial intelligence research and development at issue in this Complaint is conducted as an "Alphabet-level activity." The voice AI products described in this Complaint, including Gemini Live and NotebookLM, have been identified by Pichai by name, in his capacity as Chief Executive Officer of Alphabet, on Alphabet's quarterly earnings calls and in Alphabet's filings with the SEC.

3. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade broadcast journalist, three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; Alison Flowers, a 2021 Pulitzer finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Philip Rogers, an Emmy and Murrow Award–winning broadcaster who covered four decades of Chicago news; Lindsey Dorcus, a SOVAS and Independent Audiobook Award–winning narrator of more

than two hundred audiobooks for the major American publishers; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them were told that their voices were being used to train Google's commercial voice AI. None of them was asked. None of them consented.

4. A voiceprint is a digital fingerprint of the human voice. It is a mathematical capture of the acoustic features — pitch, timbre, resonance — that emerge from a person's distinctive physiology, combined with the speech patterns that person develops over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual. Like a fingerprint, it cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biology and speech patterns that produced the voiceprint are the same ones the person uses to speak every day.

5. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection,

along with a written release. 740 ILCS 14/15(b). Google failed to comply with any of those requirements as to the Plaintiffs.

6. Google's noncompliance was not a misreading of the statute. Google has been a repeat defendant in BIPA cases. It paid approximately $100 million to settle BIPA claims arising from Google Photos' face grouping feature. In October 2025, it paid $8.75 million to settle BIPA claims that it built voice and face models from Illinois schoolchildren using Google Workspace for Education without notice or consent. In November 2025, it paid $1.375 billion to the State of Texas, the second-largest privacy settlement any state has ever obtained from any company, to resolve parallel claims that it captured voiceprints and facial geometry through Google Photos and Google Assistant. A separate Google Assistant voice-recording class action settled for $68 million in January 2026.

7. Nor was Google's noncompliance a failure of capability. For its consumer voice-cloning products, Custom Voice and Chirp 3 Instant Custom Voice, Google built a comprehensive consent infrastructure. It requires every speaker to record a specific consent statement affirming, "I am the owner of this voice, and I consent to Google using this voice to create a synthetic voice model." It runs each use case through a "Responsible AI governance" review to confirm that "adequate voice actor consent is given." Google built that system because it understands that extracting a person's voice to train a voice model implicates the speaker's legal rights.

8. Google built that consent system for the voices it paid for. It built nothing for the hundreds of thousands of hours of speech on which it pretrained the foundational models that now power its commercial voice business. Google knew how to obtain consent. It chose to obtain consent for some voices and not others. That was not an oversight. It was a business decision.

9. The voiceprints Google extracted from Plaintiffs are not stored in a database that can be deleted on request. They are encoded in the parameters of Google's commercial voice models and reproduced in the audio that those models generate. At this point, the biometric data and the product are the same thing.[1]

10. The technology Google built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their living. Google Cloud Text-

---

[1] Google's published research describes the architecture by which voice characteristics are extracted from speech recordings and encoded into the parameters of its voice models. Audio waveforms are tokenized by a neural audio codec (SoundStream) into discrete "acoustic tokens" that, in Google's own description, capture "the details of the audio waveform (such as speaker characteristics or recording conditions)." A transformer-based language model is then trained to predict sequences of those tokens, embedding the speaker-identifying features of the training audio in the model's parameters. Google's Chirp 3 product documentation confirms that the speaker-identifying output of the same pipeline — what Google calls a "voice cloning key" — is "a text-string representation of your voice data." *See* Zalán Borsos et al., *AudioLM: A Language Modeling Approach to Audio Generation*, 31 IEEE/ACM Transactions on Audio, Speech, and Language Processing 2523 (2023), https://ieeexplore.ieee.org/document/10158503 (last visited on May 11, 2026); Neil Zeghidour et al., *SoundStream: An End-to-End Neural Audio Codec*, 30 IEEE/ACM Transactions on Audio, Speech, and Language Processing 495 (2022), https://ieeexplore.ieee.org/document/9625818 (last visited on May 11, 2026); Google Cloud, *Instant custom voice creation* (Chirp 3 documentation), https://cloud.google.com/text-to-speech/docs/chirp3-instant-custom-voice (last visited on May 11, 2026). Plaintiffs allege on information and belief that the same architecture and processing pipeline was applied to the voice training data ingested for the foundational models that power Google's commercial voice products.

to-Speech is licensed to audiobook publishers as an alternative to the human narration Plaintiffs Dorcus and Nassif provide. NotebookLM Audio Overviews generates podcast-format audio from written sources, directly competing with the long-form investigative audio journalism Plaintiffs Lacour, Flowers, and Amer have spent their careers developing. YouTube auto-dubbing replaces the localization voiceover work voice actors have historically performed. Each of these products is priced at a fraction of the cost of human narration. Each was built using the vocal characteristics of the human performers it now displaces, including, on information and belief, those of every Plaintiff in this case.

11. Plaintiffs' injuries are concrete and particularized. Google extracted their voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Google retains those voiceprints in its commercial models and continues to profit from them. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging Google's unlawful collection, retention, commercial exploitation, dissemination, and failure to protect from disclosure of their voiceprints without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that Google's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act

(“IRPA”). Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (“ICFA”), the Illinois Uniform Deceptive Trade Practices Act (“IUDTPA”), and the common law of unjust enrichment.

13. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for violations of BIPA's notice, consent, retention, disclosure, and protection requirements; (ii) actual damages and disgorgement of the profits Google has earned from the commercial exploitation of Plaintiffs' biometric data; (iii) injunctive relief requiring Google to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its foundational voice models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the class, and (d) destroy or retrain, without the unlawfully obtained data, the foundational voice models and downstream commercial products that contain that data; and (iv) reasonable attorneys' fees, costs, and expenses.

## **PARTIES**

14. Plaintiff Carol Marin (“Marin”) is a citizen of Illinois and resides in this District. Marin is a broadcast journalist whose career has been conducted primarily in Chicago. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 79-83.

15. Plaintiff Yohance Lacour (“Lacour”) is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose

investigative podcast work, including the Pulitzer Prize–winning *You Didn't See Nothin'*, is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Google extracted his voiceprint are described at ¶¶ 84-89.

16. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 90-94.

17. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 95-99.

18. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Google extracted his voiceprint are described at ¶¶ 100-104.

19. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 105-109.

20. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Google extracted her voiceprint are described at ¶¶ 110-114.

21. Defendants Alphabet Inc. and Google LLC (together, "Google") engaged jointly in the conduct alleged in this Complaint. The voice AI research, model development, training, and commercial deployment described in this Complaint were carried out within an integrated enterprise that Alphabet has publicly described as "AI-first," that Alphabet's Chief Executive Officer personally directs in his dual capacity as Chief Executive Officer of both Alphabet and Google LLC, and that Alphabet has funded, overseen, and benefited from at every stage. Plaintiffs allege that Alphabet is directly liable for the conduct alleged herein and, in the alternative, that Google LLC acted as Alphabet's agent in carrying out that conduct.

22. Alphabet Inc. is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Alphabet's revenue, market capitalization, and enterprise value are derived from and depend on the commercial products of its operating subsidiary, Google LLC, including the voice AI products at issue in this Complaint.

23. Alphabet's Chief Executive Officer, Sundar Pichai, also serves as Chief Executive Officer of Google LLC. Pichai is the most senior executive of both entities, reports to the Alphabet Board of Directors, and exercises operational control over their research, engineering, and commercial activities. There is no separate Chief Executive Officer of Google LLC; Pichai's authority over the conduct alleged in this Complaint is exercised in his concurrent capacities as the chief executive of both Alphabet and its operating subsidiary.

24. In his capacity as Chief Executive Officer of Alphabet, Pichai has personally announced and directed the structural and strategic decisions that produced the research organization, the infrastructure, and the commercial product roadmap at issue in this Complaint. In April 2023, Pichai announced the merger of Google's Brain research team with DeepMind Technologies Limited into a single research organization, Google DeepMind, in a memo and public announcement issued under his name. Google DeepMind is the research organization that developed and continues to develop the foundational voice AI models alleged in this Complaint. In April 2024, Pichai issued a further public memo, titled "Building for our AI future," in which he announced that Alphabet had unified "our ML infrastructure and ML developer teams to enable faster

decisions, smarter compute allocation, and a better customer experience" — that is, the specific machine-learning infrastructure and engineering organizations responsible for training Alphabet's foundational AI models, including the foundational voice models at issue in this Complaint. Alphabet's publication of the April 2024 memo describes it as "Today, Google and Alphabet CEO Sundar Pichai shared a number of structural changes." On October 17, 2024, Pichai announced a further reorganization, moving the Gemini app team into Google DeepMind, which Alphabet's contemporaneous communications described as designed to "speed up deployment of new models, and streamline post-training work."

25. On Alphabet's third-quarter 2024 earnings call, held on October 29, 2024, Pichai, speaking in his capacity as Chief Executive Officer of Alphabet, personally identified by name two of the voice AI products at issue in this Complaint. He stated: "We recently moved the Gemini app team to Google DeepMind to speed up deployment of new models, and streamline post-training work. … For instance, it was a small, dedicated team that built NotebookLM, an incredibly popular product that has so much promise." On the same call, Pichai added, "Gemini Live lets you have free-flowing conversations with Gemini; people love it."[2] Pichai's personal identification of NotebookLM and

[2] Alphabet's published transcript of those remarks appears under the heading "Alphabet Q3 earnings call: CEO Sundar Pichai's remarks" on Alphabet's investor relations website and corporate blog. *See* Alphabet Inc., *2024 Q3 Earnings Call*, https://abc.xyz/investor/events/event-details/2024/2024-q3-earnings-call/ (last visited on May 11, 2026); Sundar Pichai, *Alphabet Q3 earnings call: CEO Sundar Pichai's remarks*, The

Gemini Live — two of the products whose voice synthesis capabilities are at the center of this Complaint — on Alphabet's quarterly earnings call, in his Alphabet capacity, is direct evidence that Alphabet exercises operational authority over the specific products and the research organization at issue.

26. Alphabet's Annual Report on Form 10-K for fiscal year 2024, filed with the SEC on February 5, 2025, and signed by Pichai, makes the same point in the formal language of federal securities disclosure. The 10-K identifies Pichai as "Alphabet and Google CEO" and states: "Alphabet is a collection of businesses — the largest of which is Google. We report Google in two segments, Google Services and Google Cloud, and all non-Google businesses collectively as Other Bets. Supporting these businesses, we have centralized certain AI-related research and development which is reported in Alphabet-level activities." The 10-K identifies NotebookLM by name as one of Alphabet's products and describes Gemini as the model "powering AI features across our products and services." The 10-K's Risk Factors section, also signed by Pichai, states that "We are expanding our investment in AI across the entire company." The 10-K's own definition of "we" includes "Alphabet Inc. and its subsidiaries." Alphabet has therefore disclosed to its shareholders and to the federal securities regulator that the AI research and development at issue in this

---

Keyword (Oct. 29, 2024), https://blog.google/company-news/inside-google/message-ceo/alphabet-earnings-q3-2024/ (last visited on May 11, 2026).

Complaint is conducted as an Alphabet-level activity, not as an independent operation of a subsidiary.

27. Alphabet, acting through Pichai in his capacity as Chief Executive Officer of Alphabet, directed the formation of Google DeepMind, directed the strategic priorities of Google DeepMind's research agenda, directed the capital allocation that funded the training of the foundational voice models, and directed the commercial deployment of those models across Alphabet's product lines. The collection of biometric identifiers alleged in this Complaint was the direct and foreseeable result of those decisions.

28. BIPA prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or "otherwise obtain[ing]" biometric identifiers without compliant notice and written release. 740 ILCS 14/15(b). Alphabet, through Pichai's direction of the integrated AI research enterprise, obtained the voiceprints of Plaintiffs and the class within the meaning of the statute.

29. In the alternative, Google LLC carried out the conduct alleged in this Complaint as Alphabet's agent. Each element of the agency relationship is established by Alphabet's own contemporaneous, public, and SEC-filed statements:

(a) *Alphabet's manifestation of consent that Google LLC act on its behalf.* Alphabet has publicly identified its AI research and development as a centralized "Alphabet-level activity" supporting Alphabet's businesses. Alphabet has identified the specific voice AI products at issue, including NotebookLM

and Gemini Live, by name in Alphabet's quarterly earnings calls and annual report. Alphabet has funded the voice AI research with capital allocation decisions that Pichai signed in his capacity as Alphabet's CEO in Alphabet's 10-K and that Alphabet's CFO discussed on Alphabet's earnings calls.

(b) *Google LLC's acceptance of the undertaking.* Google LLC houses Google DeepMind and employs the engineers, researchers, and product teams who carried out the conduct alleged. Google LLC accepted the undertaking as evidenced by its execution of the research, training, and commercial deployment under the structural arrangements that Pichai announced in his capacity as Alphabet's CEO in April 2023, April 2024, and October 2024.

(c) *Alphabet's right of control over the undertaking.* Alphabet has retained and exercised the right of control as evidenced by Pichai's concurrent role as chief executive of both entities; by Alphabet's public direction of the structural reorganizations that produced and refined the research organization; by Alphabet's public identification of the AI research as "Alphabet-level activities" in its 10-K; by Alphabet's capital allocation to the specific training infrastructure at issue, disclosed in Alphabet's SEC filings signed by Pichai; and by Alphabet's representations to its shareholders, on Alphabet's earnings calls, that Pichai personally directs the strategic decisions concerning the voice AI products at issue.

30. The benefits of the undertaking, including the revenue, market capitalization, and enterprise value generated by the commercial voice products, flowed to Alphabet and to Alphabet's shareholders. Alphabet's Q3

2025 earnings release, filed with the SEC, attributes Alphabet's "first-ever $100 billion quarter" to its "full stack approach to AI" and quotes Pichai by name in his "CEO of Alphabet and Google" capacity, discussing Gemini's commercial performance.

31. Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google LLC is a wholly owned direct or indirect subsidiary of Alphabet and is the operating subsidiary through which Alphabet conducts its core commercial businesses, including Google Search, YouTube, Android, Google Cloud, Gemini, Google Assistant, and the voice synthesis and audio generation products at issue in this Complaint. Google LLC houses Google DeepMind. The voice AI research, model training, and commercial deployment alleged in this Complaint were carried out by employees of Google LLC, within Google DeepMind, on infrastructure funded by Alphabet's capital allocation, under the direction of executives who report to Pichai, who in turn reports to Alphabet.

## **JURISDICTION AND VENUE**

32. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in California, while Defendant

Google LLC is a Delaware limited liability company whose sole member, Alphabet, is likewise a citizen of Delaware and California. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

33. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and may recover those statutory damages on a per-subsection, per-person basis where multiple distinct provisions of § 15 are violated. Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, UDTPA, and common-law unjust enrichment.

34. This Court has specific personal jurisdiction over Google. Google has purposefully directed its conduct at Illinois and at this District in ways that bear directly on Plaintiffs' claims. Google operates its self-described "Midwest headquarters" in this District, where it employs approximately 1,800 people in engineering, sales, and Cloud-infrastructure roles, including engineering and Cloud-infrastructure roles supporting the commercial AI products at issue in this Complaint, and has agreed to purchase the James R. Thompson Center in Chicago for approximately $105 million as an expanded Chicago headquarters expected to house approximately 2,000 employees. Google sells and delivers to Illinois customers the voice AI products at issue in

this Complaint — including Google Cloud Text-to-Speech, Chirp 3 voices, Gemini Live, NotebookLM Audio Overviews, and Google Assistant — under recurring subscription and usage-based pricing arrangements that generate substantial Illinois revenue. Google has previously appeared in Illinois state and federal courts in multiple BIPA actions concerning the collection of biometric identifiers from Illinois residents, including *Rivera v. Google LLC*, No. 2019-CH-00990 (Cir. Ct. Cook Cnty. Ill.), and the Google Workspace for Education matter that resulted in an $8.75 million BIPA class settlement in October 2025, and has not in those actions contested the propriety of an Illinois forum.

35. Plaintiffs' claims arise directly from Google's Illinois-directed conduct. Google extracted the voiceprints of Plaintiffs, Illinois residents whose recorded vocal performances were produced and distributed in Illinois, without the notice, consent, or written release BIPA requires. The voiceprints are now encoded in the parameters of Google's commercial voice models, which Google sells and delivers to Illinois customers through the products identified above. Every commercial transaction Google completes in Illinois involving those products monetizes the biometric data Google obtained from Plaintiffs without their consent. Google's Illinois contacts are not incidental to this Complaint; they are the downstream commercialization of the conduct that gives rise to it.

36. Exercising specific personal jurisdiction over Google in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with the requirements of due process. Illinois has a strong interest in providing a forum

for the redress of unlawful biometric data collection from voice recordings produced in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA. 740 ILCS 14/5. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on Google of litigating in Illinois is not undue, given Google's substantial Illinois operations and its prior appearances in Illinois courts in matters involving the same statute and the same category of conduct. Google has not contested the propriety of an Illinois forum in any of those prior matters, and could reasonably anticipate being haled into Illinois courts for claims, like Plaintiffs', that arise from its extraction and commercial exploitation of biometric identifiers from voice recordings produced in Illinois.

37. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District: Plaintiffs are residents of this District whose recorded vocal performances were produced and distributed from this District, the biometric privacy violations Plaintiffs allege were suffered in this District, and the commercial exploitation of Plaintiffs' voiceprints continues to occur through Google's sale and delivery of the voice AI products at issue to customers in this District. Venue is independently proper under 28 U.S.C. § 1391(b)(1) because Defendants are subject to personal jurisdiction in this District for the reasons set forth above and therefore "reside" in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

## FACTUAL BACKGROUND

*Google and Its Voice AI Business*

38. The voice AI business at issue in this Complaint is housed within Google DeepMind, the artificial intelligence research division that Pichai created in April 2023 by merging the Google Brain research team with the London-based DeepMind organization Google acquired in 2014. Google DeepMind is the research organization that developed, and continues to develop, the foundational voice synthesis models on which Google's commercial voice products depend, including the WaveNet, Tacotron, SoundStream, AudioLM, and SoundStorm model families and the production multi-speaker dialogue model that powers Gemini Live, NotebookLM Audio Overviews, Google Illuminate, and YouTube auto-dubbing. Google DeepMind operates research offices and employs personnel in Mountain View, New York, Princeton, and other United States locations, and the research, engineering, and model-development work underlying Google's foundational voice models was performed, in substantial part, in the United States.

39. Google's commercial voice products are deployed at an enormous scale. Google Cloud Text-to-Speech, launched in June 2018, is licensed to thousands of enterprise customers across industries. Google Assistant operates on more than one billion devices worldwide. NotebookLM, whose Audio Overviews feature launched in September 2024, was adopted by more than 80,000 organizations within weeks of launch. Gemini Live is available to consumers through the Gemini app on iOS and Android. Each of these

products depends on the foundational voice synthesis models developed within Google DeepMind, and each generates revenue that flows through Google's consolidated financial reporting to Alphabet.

40. The training of those foundational models occurred, in substantial part, on Google Cloud computing infrastructure, including data centers and Tensor Processing Unit clusters owned and operated by Google LLC in the United States. The production voice models that Google deploys through its commercial products are hosted on Google Cloud infrastructure in the United States and are served to United States users from Google Cloud data centers operated by Google LLC.

*How Google's Voice AI Extracts and Encodes Voiceprints*

41. Modern AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network learns to identify and reproduce the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, and the dynamics of emotional expression. The network encodes those features as mathematical representations and stores them in the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices.

42. Google's published research describes this process in technical detail. In a 2021 paper, Google researchers introduced SoundStream, a neural audio codec that compresses raw audio waveforms into sequences of discrete representations Google calls "acoustic tokens." In a 2023 paper, Google

Case: 1:26-cv-05436 Document #: 4-1 Filed: 05/21/26 Page 21 of 93 PageID #:21

researchers introduced AudioLM, a framework that uses SoundStream's acoustic tokens to train a transformer-based language model on audio sequences. Google's researchers describe the acoustic tokens that this pipeline extracts as capturing "the details of the audio waveform (such as speaker characteristics or recording conditions)."[3]

43. Google's product documentation confirms that the speaker-identifying output of this pipeline is, in form and substance, a voiceprint. Google's Chirp 3 Instant Custom Voice product creates what Google calls a "voice cloning key" from as little as ten seconds of reference audio. Google's documentation describes the voice cloning key as "a text-string representation of your voice data."[4] A representation of voice data sufficient to clone the speaker's voice is, in any ordinary understanding of the term, a voiceprint.

44. BIPA's definitions confirm the legal classification. The statute defines "biometric identifier" to include "voiceprint." 740 ILCS 14/10. It separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* The acoustic

---

[3] Zalán Borsos et al., *AudioLM: A Language Modeling Approach to Audio Generation*, 31 IEEE/ACM Transactions on Audio, Speech, and Language Processing 2523 (2023), https://ieeexplore.ieee.org/document/10158503 (last visited on May 11, 2026); Neil Zeghidour et al., *SoundStream: An End-to-End Neural Audio Codec*, 30 IEEE/ACM Transactions on Audio, Speech, and Language Processing 495 (2022), https://ieeexplore.ieee.org/document/9625818 (last visited on May 11, 2026).

[4] Google Cloud, *Instant custom voice creation* (Chirp 3 documentation), https://cloud.google.com/text-to-speech/docs/chirp3-instant-custom-voice (last visited on May 11, 2026).

tokens, speaker embeddings, and voice cloning keys produced by Google's voice synthesis pipeline fall within both definitions. The label the AI research community uses for these representations does not determine their statutory classification; the function of the data does.

45. In a 2018 research paper, Google researchers demonstrated that the disentangled representations its voice models learn during training can be used to "convert speaker identities into each other" — that is, to swap one person's voice for another's while preserving the linguistic content of the original recording.[5] That capability is the operational consequence of voiceprint extraction at scale: once the model has learned the acoustic signatures of the training voices, it can be directed to produce speech in any of those voices.

*Google Built a Consent System for Some Voices and Not Others*

46. Google understands that extracting a person's voice to train a voice model implicates the speaker's legal rights. Google has built and publicly deployed a consent infrastructure that says so directly.

47. In 2018, after public controversy at Google I/O over Google Duplex, an AI calling system capable of generating human-sounding voices, Google publicly committed that the Duplex system would be "designed … with disclosure built-in" and would identify itself as an AI. Google described the

[5] Yingzhen Li & Stephan Mandt, *Disentangled Sequential Autoencoder*, in Proceedings of the 35th International Conference on Machine Learning (2018), https://arxiv.org/abs/1803.02991 (last visited on May 11, 2026).

commitment as part of its responsibility to be transparent when its systems generated speech that sounded like a human.

48. In March 2022, Google launched Google Cloud Custom Voice. Custom Voice, as Google described it, was the product through which Google would create synthetic voice models from "studio-quality audio recordings" of professional voice actors. Google built a "Responsible AI governance" review process around Custom Voice to ensure, in Google's words, that "each use case is aligned with our AI Principles and adequate voice actor consent is given." Google required every voice actor whose recordings were used to train a Custom Voice model to record a specific consent statement, provided by Google, affirming that the actor owned the voice and consented to Google's use of it to create a synthetic voice model.

49. In October 2024, Google DeepMind published a company blog post titled "Pushing the frontiers of audio generation," which described the production of a multi-speaker dialogue model that powers NotebookLM Audio Overviews, Google Illuminate, Gemini Live, and related products. Google disclosed that the model had been "pretrained ... on hundreds of thousands of hours of speech data" and then "finetuned ... on a much smaller dataset of dialogue with high acoustic quality and precise speaker annotations, consisting of unscripted conversations from a number of voice actors."[6] Google identified

---

[6] Zalán Borsos et al., *Pushing the frontiers of audio generation*, Google DeepMind (Oct. 30, 2024), https://deepmind.google/discover/blog/pushing-the-frontiers-of-audio-generation/ (last visited on May 11, 2026).

neither the source of the pretraining data nor the speakers whose voices populated it. The disclosure was, in its own terms, a public acknowledgment by Google that the foundational model on which Google's most prominent consumer voice product depends had been trained on hundreds of thousands of hours of human speech that Google would not name.

50. In 2025, Google extended its Custom Voice consent framework to a new consumer voice-cloning product, Chirp 3 Instant Custom Voice, which generates a voice-cloning key from as little as 10 seconds of reference audio. Google required, and continues to require, every speaker whose voice is cloned through Chirp 3 to record a specific consent statement: "I am the owner of this voice, and I consent to Google using this voice to create a synthetic voice model."

51. The pattern of those four events — 2018, 2022, 2024, 2025 — is the story of an institution that knows what BIPA-compliant consent looks like, has the engineering capacity to implement it, and has chosen to apply it selectively. Google obtained recorded consent from the dozens of professional voice actors whose voices were used to train Custom Voice and Chirp 3. Google did not obtain consent or notice, or any disclosure of any kind, from the speakers whose voices populated the hundreds of thousands of hours of pretraining data on which Google's foundational voice models depend. The same engineering organization built both pipelines. The same legal department drafted both consent regimes. The decision to apply consent to one and not the other was deliberate and contemporaneous.

*Google Trained on Data It Knew It Had No Right to Use*

52. Google has never disclosed the sources of the voice training data used to build its foundational voice synthesis models. It has not published a model card, a data sheet, a training data manifest, a licensing inventory, or any transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented. The October 2024 disclosure of "hundreds of thousands of hours of speech data" remains Google's only public statement about the pretraining corpus, and that statement identified no source, licensor, or speaker.

53. The contemporaneous public record establishes that Google obtained substantial portions of its voice training data from publicly accessible internet sources without the consent of the speakers, and that Google understood it was doing so.

54. In April 2024, *The New York Times* reported that Google employees had been aware that OpenAI was harvesting audio from YouTube videos to train its AI models, and that Google had taken no action against OpenAI because, according to the reporting, Google was "doing the same."[7] The reporting establishes that, by April 2024 at the latest, Google's engineering and legal organizations were aware that Google was training AI models on YouTube

[7] Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, The New York Times (Apr. 6, 2024), https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html (last visited on May 11, 2026).

audio under conditions that Google itself recognized as parallel to OpenAI's unauthorized scraping.

55. In September 2024, Google amended the YouTube Terms of Service to add, for the first time, an express grant to Google of the right to use uploaded content for "machine learning and AI applications." The timing of the amendment, coming five months after the *New York Times* reporting and one month before Google's October 2024 disclosure of the pretraining corpus for its multi-speaker dialogue model, underscores that Google did not previously have an express contractual basis for training on YouTube content and that it recognized this.

56. The September 2024 YouTube Terms of Service amendment cannot reach the speakers whose claims this Complaint asserts. Plaintiffs and the class are not parties to the YouTube Terms of Service. Many of them never uploaded a recording to YouTube. Their voices appear in YouTube content uploaded by other parties — interviews, podcasts redistributed by third parties, news clips — over which Plaintiffs have no contractual control. The legal rights protected by BIPA and IRPA are personal to the speaker, not to the entity that recorded the speaker's voice; a YouTube uploader cannot license to Google rights the uploader does not possess.

57. In December 2024, Google introduced opt-in controls allowing YouTube creators to prevent third-party AI companies from training on their uploads. By their terms, those controls do not apply to Google's own use of YouTube content. Google has not published, and, on information and belief,

does not maintain, any opt-out or removal mechanism for speakers like Plaintiffs whose voices appear in audio ingested into Google's foundational voice synthesis models.

58. In March 2026, a putative class action filed in this District by independent musicians alleged that Google trained its Lyria 3 AI music generation model — which, like Google's voice models, was developed within Google DeepMind and uses the same SoundStream/AudioLM family of neural audio codec techniques — on millions of copyrighted musical recordings extracted from YouTube without license or consent, including by extracting voiceprints from the plaintiffs' recorded vocal performances. *Kogon et al. v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026). *Kogon* was filed by Plaintiffs' counsel, Loevy & Loevy. The Kogon complaint alleges that "Google had every opportunity to develop this product legally," that Google "owns YouTube and runs Content ID," and that Google "chose not to" obtain rights "because copying was faster and cheaper."

59. The pattern is consistent. Google trained its foundational voice models on a pretraining corpus it has refused to identify. Google's employees recognized in 2024 that Google's training practices on YouTube content were comparable to scraping practices Google did not itself defend as lawful. Google amended the YouTube Terms of Service in 2024 to grant itself rights it previously lacked. Google has not provided, and does not provide, any mechanism by which speakers whose voices were ingested can discover that fact, withdraw consent, or request deletion. And Google now faces a parallel

class action alleging that the same research organization, using the same family of techniques, ingested copyrighted recordings from YouTube without a license to build a different generative AI product. Plaintiffs allege, on the basis of these public facts, that Google trained its foundational voice models on voice recordings that included Plaintiffs' recordings, obtained from publicly accessible platforms, and extracted voiceprints from those recordings without the knowledge or consent of the speakers.

*The Biometric Data Was Generated in Illinois*

60. The conduct giving rise to Plaintiffs' claims is localized in Illinois in three independent and mutually reinforcing respects: (i) the biometric data at issue was generated in Illinois; (ii) Google's acquisition of that biometric data targeted material that was identifiably Illinois-origin; and (iii) Google's ongoing retention, dissemination, and commercial exploitation of the biometric data is directed at, or felt in, Illinois. Each ground supports the application of BIPA, IRPA, and the related Illinois statutes invoked in this Complaint to Google's conduct as to Plaintiffs and the Class.

61. Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois. The voice itself, as a unique biometric signature, came into existence in Illinois.

62. The audio recordings embodying Plaintiffs' voices, from which Google is alleged to have extracted voiceprints and biometric information, were created in Illinois. The Plaintiffs were physically present in Illinois at the time of

the recordings, and the recordings captured the biometric characteristics of speakers who were in Illinois at the time of recording.

63. The recordings were published from Illinois to publicly accessible platforms, including platforms on which Plaintiffs' identity, geographic origin, professional biography, and content catalog were and are publicly visible to any person accessing the recordings. The metadata, descriptions, and contextual information accompanying the recordings publicly identified Plaintiffs as Illinois-based speakers and identified the recordings as Illinois-origin content at the time the recordings were made and continuously thereafter.

64. The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is therefore of Illinois origin. The biometric data Google is alleged to have extracted from those recordings is Illinois-origin, regardless of where any subsequent processing occurred.

*Google's Acquisition Was Targeted at Identifiably Illinois-Origin Material*

65. Google accessed Plaintiffs' voice recordings from its own and third-party platforms on which the recordings were publicly hosted with metadata identifying each Plaintiff by name and identifying the recordings' origin, as alleged in ¶¶ 79 through 114. To a person with knowledge of Illinois broadcast, journalism, audiobook, podcast, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work originated from Illinois.

66. Google’s act of accessing and processing those recordings was therefore not the passive receipt of an anonymized dataset assembled by a third party. It was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production, as alleged in ¶¶ 79 through 114. The Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time Google accessed and processed the recordings.

*BIPA's Duty Runs to the Subject of the Biometric Data*

67. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois, as alleged in ¶¶ 60 through 64.

68. Google’s continuing possession of voiceprints and biometric information generated in Illinois likewise runs afoul of obligations BIPA

imposes for the benefit of the subjects of that data. Google has not made publicly available a written retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from non-user training-data sources, as alleged in ¶161 [Count II], and has provided no mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data, as alleged in ¶57. Google’s commercial agreements assert perpetual rights over voice data and over models derived from voice data, with the consequence that the biometric data of Illinois-origin training subjects is, on information and belief, retained indefinitely. These continuing failures are owed to Illinois subjects whose biometric data was generated in Illinois.

*Google's Monetization of the Voice Models*

69. Google's commercial exploitation of the foundational voice synthesis models is not limited to a single product line. Google monetizes the voice models through a vertically integrated commercial chain spanning Google Cloud, Google Workspace, Google's consumer products, Google's hardware, and Alphabet's broader commercial footprint. The voice characteristics learned during training, the same characteristics extracted from Plaintiffs' and Class members' voice recordings, enable each of these revenue streams.

70. Google monetizes the voice models through, among other channels:

(a) *Direct usage fees.* Google Cloud Text-to-Speech and the Chirp 3 family of voice products are licensed to enterprise customers on a per-character

and per-audio-second basis. These usage fees are a direct payment for access to the voice synthesis capabilities of Google's foundational models.

(b) *Subscription bundles.* Google Workspace subscriptions include voice-enabled features such as Meet voice dictation and Workspace for Education voice controls. The voice capabilities bundled into Google Workspace are derived from the foundational voice models.

(c) *Enterprise contract value.* Google Cloud's enterprise contracts with major customers — including for Dialogflow, Contact Center AI, and related conversational AI services — are supported by the voice synthesis capabilities of the foundational models. The voice-enabled portions of these contracts are revenue Google would not otherwise capture.

(d) *Advertising revenue.* Google Assistant, Gemini, Gemini Live, and NotebookLM each operate as channels for Google's advertising business. Each of these products depends on the voice AI capabilities built on the foundational models. Advertising revenue derived from these products is, in part, revenue made possible by the voice synthesis technology Google built using Plaintiffs' voiceprints.

(e) *Hardware sales.* The market value and functional capability of Google's consumer hardware products — Pixel phones, Google Nest speakers and displays, and other Google Assistant-enabled devices — depend materially on the voice AI capabilities the foundational models provide. Sales of these devices, more than one billion of which have been deployed worldwide as

Google Assistant-capable, are revenue Google captures because the voice models exist.

(f) *Strategic deployment value across Alphabet's commercial footprint.* Google deploys the voice synthesis capability across Alphabet's broader product portfolio, including through YouTube auto-dubbing, which expands YouTube's monetizable audience by enabling cross-language access to uploaded video content. The competitive and strategic value of best-in-class voice AI deployment across Alphabet's product portfolio is itself a benefit Google captures from the foundational voice models.

*71.* Each monetization channel depends on the foundational voice models. Each foundational voice model depends on the training data used to build it. And the training data, on information and belief, includes the voice recordings of Plaintiffs and Class members from which Google extracted voiceprints without notice or consent. The commercial exploitation Google captures across the full chain is, in operational substance, the monetization of biometric data Google obtained from Plaintiffs without authorization.

*Google's Dissemination of the Voice Models Across Its Corporate and Cloud Infrastructure*

72. The voice synthesis models in which Plaintiffs' and Class members' voiceprints are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, and processed across Google's cloud and corporate infrastructure, including infrastructure designed, operated, and supported by Google personnel in this District, in the ordinary course of Google's voice AI business.

73. Google's Cloud Data Processing Addendum, the standard framework under which Google processes data for Google Cloud customers, expressly contemplates and permits Google's reliance on a chain of sub-processors. Google's voice synthesis pipeline operates within that sub-processor framework. The pipeline's training, evaluation, deployment, and operation involve the transmission of model parameters — and on information and belief, of the voiceprints encoded within those parameters — among Google's affiliated entities, vendors, and service providers in the ordinary course of business.

74. Google's foundational voice synthesis models are developed, deployed, and served across Google Cloud infrastructure that spans multiple Google Cloud regions and multiple data center facilities. The infrastructure is operated by, or on behalf of, Google through multiple Alphabet subsidiaries and contracted service providers. The delivery of voice synthesis services to customers, including Illinois customers, necessarily involves transmitting model parameters over that infrastructure.

75. Google's corporate structure requires the transfer of relevant assets, including the foundational voice models and the biometric data encoded within them, among entities within the Alphabet corporate family. As alleged in ¶¶ 21-31, Alphabet Inc. is the parent of Google LLC, Google DeepMind operates within Google LLC, and the voice synthesis research, training, and deployment alleged in this Complaint occurs within an integrated Alphabet enterprise. The development, refinement, and commercial deployment of the voice models

requires the transfer of those models, and the voiceprints encoded within them, among Alphabet entities in the ordinary course of business.

76. Plaintiffs and Class members did not consent to the dissemination of their voiceprints to any of the entities, vendors, or service providers within Google's cloud and corporate infrastructure. No enumerated exception to BIPA's dissemination prohibition under 740 ILCS 14/15(d) applies to the disseminations described in this subsection.

*Ongoing Retention and Commercial Exploitation Is Directed at Illinois*

77. Google's commercial exploitation of voiceprints and biometric information generated in Illinois is itself Illinois-directed. Google sells subscriptions and AI-generated voice outputs to Illinois subscribers and Illinois-based commercial users on a continuing basis, as alleged in ¶70 (subparts (a), (b), (c), (d), (e), and (f)). The commercial value of those subscriptions and outputs derives, on information and belief, from voice models developed through unconsented extraction of biometric data, including biometric data generated in Illinois, as alleged in ¶¶ 52-59. Each Illinois transaction in those products is therefore an exercise of commercial value that Google derived from the same biometric extraction Plaintiffs allege is unlawful.

78. The injury suffered by Plaintiffs and the Class is felt in Illinois. The privacy interest BIPA protects — the right to control the collection, retention, and commercial use of one's biometric identity — is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their loss of the licensing and consent rights BIPA preserves, and the dilution of the commercial

value of their voices in markets in which they participate are all injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois, as more fully alleged in ¶¶ 79 through 114. Together with the Illinois origin of the biometric data, the Illinois-targeted nature of Google's acquisition, and the Illinois-directed nature of Google's ongoing commercial exploitation, this Illinois-localized harm establishes that the operative conduct of this case occurred, and continues to occur, primarily and substantially in Illinois.

*Named Plaintiffs' Individual Experiences*

*Carol Marin*

79. Carol Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (*60 Minutes*, *60 Minutes II*, the *CBS Evening News*), WTTW (*Chicago Tonight*), CNN, and the Discovery Channel, and includes television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. She has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor.

80. Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC 5 Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

81. On information and belief, Marin's voice recordings were among the audio that Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in those models' parameters and reproduced in the audio they generate. Marin's body of work matches, on every material dimension, the profile of training audio that Google's technical documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source. Her recordings are publicly accessible on the same categories of platforms — broadcast archives, streaming video — from which Google has been alleged to have sourced training data, including in *Kogon v. Google LLC*,

No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026). Google has refused to disclose the sources of the pretraining corpus that powers its commercial voice products, placing the specific records of training data ingestion under Google's exclusive control.

82. Marin never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release. Google's collection of Marin's voiceprint, and Google's continuing possession and commercial exploitation of that voiceprint, occurred and continues without her knowledge or consent.

83. Marin's injury is concrete and particular to her. Google extracted her voiceprint from recordings she produced over five decades of professional work, encoded it into commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Marin uses to speak every day. The technology Google built using Marin's voiceprint now operates in the same broadcast and journalism markets in which Marin built her career, against the same colleagues with whom she worked, in a competitive position Marin neither chose nor authorized.

*Yohance Lacour*

84. Yohance Lacour is a journalist, audio storyteller, writer, entrepreneur, and playwright from the South Side of Chicago whose work centers on the lives and stories of Black Chicago. Lacour is affiliated with the Invisible Institute, a nonprofit investigative journalism organization based on Chicago's South Side.

85. Lacour is the creator, host, writer, and lead reporter of *You Didn't See Nothin'*, a seven-part investigative podcast produced by the Invisible Institute and USG Audio that revisits the 1997 hate-crime attack on Lenard Clark on the South Side of Chicago, tracks down key players in the case a quarter-century later, and examines how the case shaped Lacour's own life. The series was awarded the 2024 Pulitzer Prize for Audio Reporting and a 2024 Peabody Award. It was named to Apple Podcasts' "Podcasts We Love" and recognized as one of Apple Podcasts' "100 Best Podcasts of All Time," received nominations at the Signal Podcasting Awards in the Limited Series & Specials – Best Host and Limited Series & Specials – Documentary categories, and received four nominations at the Black Podcasting Awards in the Best Sound Design, Best History Podcast, Best True Crime Podcast, and Best Limited Series Podcast categories. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series. Lacour's voice-based journalism and podcast work, including the entirety of *You Didn't See Nothin'*, was produced in Chicago while Lacour was physically present in Illinois.

86. *You Didn't See Nothin'* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, Overcast, and other major podcast platforms, with metadata identifying Lacour as the host and Chicago as the location of production. Lacour's interview appearances on NPR's *Fresh Air with Tonya Mosley*, NPR's *All Things Considered with Adrian Florido*, the Canadian Broadcasting Corporation's *Crime Story with Kathleen Goldhar*, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast (produced by Audacy's Pineapple Street Studios) are likewise continuously available across major public-radio and podcast platforms. The series has been continuously available since its 2023 release, and Lacour's interview appearances have been continuously available since their respective publications, in each case for periods that precede Google's training of the foundational voice models at issue in this Complaint and continue thereafter.

87. On information and belief, Lacour's voice recordings were among the audio that Google ingested to train its foundational voice models, and voiceprints derived from his recordings are encoded in those models' parameters. Lacour's catalog matches the profile of training audio Google's documentation identifies as optimal — long-form, single-speaker, studio-quality, professionally produced — and his Pulitzer-honored audio work was, by virtue of its public recognition, a readily identifiable high-value source of training audio. His recordings are distributed on the same podcast platforms from which Google has been alleged to have sourced training data, and the specific records of Google's ingestion are within Google's exclusive control.

88. Lacour never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of his voice for AI training. He never uploaded any recording to a Google voice cloning product. He never received notice that Google had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

89. Lacour's injury is concrete and particular to him. NotebookLM Audio Overviews, the Google product whose multi-speaker dialogue model was trained on the unidentified pretraining corpus alleged in this Complaint, generates podcast-format audio from written sources, directly in the format and the market of *You Didn't See Nothin'* and Lacour's other audio journalism. The technology Google built using Lacour's voiceprint now operates in the same long-form audio investigative-journalism market in which Lacour earns his livelihood, with the capabilities of his own voice contributing to the products that compete against him.

*Alison Flowers*

90. Alison Flowers is an investigative journalist and audio producer based in Chicago. Before founding her Chicago-based production company Spiralbound, Flowers served as Head of Production at the Invisible Institute, a Chicago nonprofit investigative journalism organization on the South Side, where she built and led journalism production teams whose work received four nominations from the Pulitzer Prize Board over a four-year period. Flowers produced and reported the seven-part investigative podcast *Somebody*, which premiered on March 31, 2020, investigates the 2016 murder of Courtney

Copeland in Chicago, and was a 2021 Pulitzer Prize finalist for Audio Reporting. *Somebody* received the National Magazine Award (the "Ellie") for Podcasting from the American Society of Magazine Editors, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association award for Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story. *Rolling Stone* named *Somebody* to "The 25 Best True-Crime Podcasts of All Time" and ranked it first on its "Best Podcasts of 2020" list; *The New York Times* ranked it first on its list of true crime podcasts at the intersection of race; *The Atlantic* ranked it second on its "50 Best Podcasts of 2020"; and the podcast reached the number two position among true crime podcasts on the Apple Podcasts chart.

91. *Somebody* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and other major podcast platforms, with metadata identifying Flowers as a producer and on-air journalist and Chicago as the location of production. Flowers's additional audio reporting on *Reveal* (from the Center for Investigative Reporting), *The Heist* (from the Center for Public Integrity), *Vox*, *Dateline NBC*, and *Democracy Now!* is likewise continuously available on those programs' respective platforms. Flowers's body of audio work has been continuously available across these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

92. On information and belief, Flowers's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those models. Flowers's audio reporting matches the profile of training audio Google's documentation identifies as optimal, her Pulitzer-finalist work was a readily identifiable high-value source of professional audio journalism — recognized commercially as among the best podcasts of its release year by *Rolling Stone*, *The New York Times*, and *The Atlantic* — and her recordings are distributed on the same podcast platforms from which Google has been alleged to have sourced training data. *Somebody* was among the podcasts distributed through Google Podcasts, Google's podcast distribution service, until that service was discontinued in 2024 — placing copies of Flowers's recordings on Google-controlled distribution infrastructure during the period of Google's foundational voice model pretraining.

93. Flowers never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

94. Flowers's injury is concrete and particular to her. Flowers continues to produce investigative audio journalism through Spiralbound, and the long-form audio markets in which she earns her livelihood — investigative podcast journalism, narrative audio documentary — are precisely the markets

that Google's NotebookLM Audio Overviews and related products are designed to serve. The technology Google built using Flowers's voiceprint now competes with Flowers in her own active markets, with the capabilities of her own voice contributing to the products that compete against her.

*Robin Amer*

95. Robin Amer is a journalist, podcast creator, audio producer, and on-air host who has produced the substantial majority of her audio work from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the investigative podcast produced by USA Today over two seasons. Season 1 of *The City*, which focused on Chicago, peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New York Times*, *Quartz*, and Apple Podcasts. Amer's earlier production work for *Gravy*, the podcast produced by the Southern Foodways Alliance, contributed to that program's 2015 James Beard Award for Best Podcast — among the most prestigious U.S. honors in food and culture media. Amer subsequently spent three years as Senior Producer for Audio Features at *The Washington Post*, where she edited the *Post Reports* daily news podcast and produced the standalone narrative series *Field Trip*. During her tenure at *The Washington Post*, Amer won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for

Best Independent Non-Fiction and was shortlisted for the Whickers Prize at the Sheffield Documentary Festival.

96. *The City* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, and other major podcast platforms, with metadata identifying Amer as the host, narrator, and showrunner. *Post Reports*, *Field Trip*, *Love + Radio: Blood Memory*, and Amer's contributions to *Reveal*, *The Heist*, *Vox*, and *Gravy* are likewise continuously available on the respective programs' platforms. Amer's audio work has been continuously available across these channels for years preceding Google's training of the foundational voice models alleged in this Complaint. The substantial majority of Amer's voice work was recorded in Chicago while Amer was an Illinois resident, and Amer has been an Illinois resident at all times relevant to this Complaint.

97. On information and belief, Amer's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those models. Amer's hosted, narrated, and showrun audio work — totaling hundreds of hours of single-speaker, studio-quality audio — matches the profile of training audio Google's documentation identifies as optimal, and *The City*'s commercial peak position on the Apple Podcasts charts and Amer's three-time duPont–Columbia recognition established her work as a readily identifiable high-value source of professional audio journalism. *The City* and Amer's other audio work were distributed in part through Google Podcasts, Google's podcast distribution service, until that service was discontinued in 2024 — placing copies of Amer's

recordings on Google-controlled distribution infrastructure during the period of Google's foundational voice model pretraining.

98. Amer never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

99. Amer's injury is concrete and particular to her. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting — directly the market that Google's NotebookLM Audio Overviews and related products are designed to serve at substantially lower cost than the human production Amer provides. The technology Google built using Amer's voiceprint now competes with Amer in her own active market.

*Philip Rogers*

100. Philip Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. The Lisagor Awards, conferred

by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region.

101. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC 5 Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting. The platforms display metadata identifying Rogers as the speaker and Chicago as the location of production. Rogers's body of work has been continuously available through these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

102. On information and belief, Rogers's voice recordings were among the audio that Google ingested to train its foundational voice models, and voiceprints derived from his recordings are encoded in those models' parameters. Rogers's broadcast catalog matches the profile of training audio Google's documentation identifies as optimal, and the volume and continuity of his on-air work — four decades of single-speaker professional broadcasting — represents a category of source material particularly valuable for voice synthesis training.

103. Rogers never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of his voice for AI training. He never

uploaded any recording to a Google voice cloning product. He never received notice that Google had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

104. Rogers's injury is concrete and particular to him. Google extracted his voiceprint from recordings he produced over four decades of professional work, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced. The technology Google built using Rogers's voiceprint now operates in the same broadcast journalism market in which Rogers built his career, against the same colleagues with whom he worked.

*Lindsey Dorcus*

105. Lindsey Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. She is a 2020 Society of Voice Arts and Sciences Voice Arts Award winner (as part of the full-cast ensemble for *Wild Monsters Dance About: Stories from an Unruly Mind*) and a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. Her narration spans young adult fiction, science fiction and fantasy, romance, mystery and thriller, and works featuring LGBTQ+ themes and characters. AudioFile Magazine, the principal independent trade publication reviewing audiobook narration in the United States, has reviewed her work favorably, describing her performances as

"silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects used across her narration work, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, and Greek for main characters and narration, and New England, New York, German, Indian, and Russian for supporting characters. Dorcus operates a professional home recording studio in Chicago, where she records the audiobooks at issue in this Complaint to broadcast-quality, professionally edited specifications that meet the technical requirements of the major audiobook publishers.

106. Dorcus's audiobook catalog is continuously distributed across Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and other major audiobook platforms. Each platform displays metadata identifying Dorcus as the narrator, the publisher, and the title. The complete catalog is searchable on Audible.com. Dorcus has also appeared as a voice actor in multiple fiction podcasts performing dramatic voice work for serialized audio storytelling distributed through major podcast platforms. Dorcus's narrated catalog has been continuously available through these channels for years preceding Google's training of the foundational voice models alleged in this Complaint.

107. On information and belief, Dorcus's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those

models. Dorcus's catalog represents precisely the long-form, single-speaker, studio-quality audio that Google's own documentation identifies as optimal training material — more than two hundred audiobooks, each comprising hours of consistent single-speaker narration, professionally produced, publicly searchable by narrator, distributed on major commercial audio platforms. Few professional voice catalogs match Google's training-data profile more directly than Dorcus's does. The technical sophistication of her voice work — including her professionally recognized range across more than a dozen accents and dialects — represents an additional category of training-data value to a multilingual voice synthesis system designed to generate speech across more than forty languages and more than two hundred twenty voices. And Dorcus's audiobooks are distributed in part through Google Play Books — Google's audiobook distribution service — placing copies of her recordings on Google-controlled infrastructure.

108. Dorcus never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

109. Dorcus's injury is concrete, particular to her, and direct. Google Cloud Text-to-Speech and Chirp 3 voice products are licensed to audiobook publishers — including the publishers for whom Dorcus has narrated more than two hundred audiobooks — at per-character and per-audio-second fees

that are orders of magnitude lower than human narrator rates. The market displacement is not abstract. The technology Google built using Dorcus's voiceprint, on information and belief, is now sold to the same publishers that have historically paid Dorcus to narrate audiobooks, as a substitute for the human narration she provides. Dorcus's voiceprint, taken without her consent, is now part of the commercial product that competes against her in her own market.

*Victoria Nassif*

110. Victoria Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois. Nassif is a trained mezzo-soprano singer whose vocal performance skills extend beyond spoken narration to include musical and singing capabilities developed through classical acting training. Nassif's audiobook narration work has been commercially released by Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster, and her on-camera work includes multiple episodes of NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Her notable audiobook narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), in which she serves as the solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize and named a *them* Best Book of the Year; *Gulf* by Mo

Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by bestselling author Susan Abulhawa featuring stories from Palestinian writers. Nassif possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation and Cockney), Persian, Levantine Arabic, and American Southern, among others.

111. Nassif's audiobook catalog is continuously distributed across Audible, Apple Books, Spotify, Libro.fm, and other major audiobook platforms, with metadata identifying Nassif as the narrator, the publisher, and the title. Her on-camera work is continuously available through NBC and other broadcast distribution channels. Her audiobook catalog has been continuously available through these platforms for years preceding Google's training of the foundational voice models alleged in this Complaint.

112. On information and belief, Nassif's voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from her recordings are encoded in the parameters of those models. Nassif's audiobook catalog matches the profile of training audio Google's documentation identifies as optimal, and her authentic Levantine Arabic-accented narrations are a distinctive and readily identifiable category of voice content particularly valuable for a multilingual voice synthesis system. As a first-generation Lebanese-Palestinian American with native cultural and linguistic familiarity, Nassif brings to her narration of works featuring Middle Eastern characters and settings an authenticity that represents a category of

training-data value Google's foundational voice models — which power products that synthesize speech in more than forty languages and more than two hundred twenty voices — depend on capturing.

113. Nassif never created a Google Cloud, Gemini, or Custom Voice account in connection with the use of her voice for AI training. She never uploaded any recording to a Google voice cloning product. She never received notice that Google had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

114. Nassif's injury is concrete and particular to her. The cultural and linguistic specificity of Nassif's professional voice work — authentic Arabic-accented narration of works by Arab and Palestinian American authors — is itself the basis of her distinctive market position. Google's voice models, on information and belief, can now generate Arabic-accented English narration that competes specifically with Nassif's professional niche, and that competitive capability exists because voice characteristics encoded in the models include the characteristics of speakers like Nassif. The technology Google built using Nassif's voiceprint now operates in the precise market — culturally authentic Arabic-accented narration — in which Nassif has built her career, in a competitive position Nassif neither chose nor authorized.

*The Voice Products Compete With the People Whose Voices Built Them*

115. The voice AI products built on Plaintiffs' biometric data are now sold and deployed into the markets where Plaintiffs and the class earn their livelihoods.

Case 1:26-cv-05436 Document #: 24-1 Filed: 05/21/26 Page 54 of 93 PageID #:4207

116. Audiobook narration is one of the markets most directly affected. Professional audiobook narration historically has been performed by human narrators at industry rates of $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate. Google Cloud Text-to-Speech, Chirp 3 HD voices, and Chirp 3 Instant Custom Voice are licensed to audiobook publishers at per-character or per-audio-second fees that are orders of magnitude lower than human narrator rates, enabling audiobook-length synthetic narration at a fraction of the cost. The major American audiobook publishers — including Penguin Random House, Hachette, Simon & Schuster, and Macmillan — for whom Plaintiffs Dorcus and Nassif have narrated books, have begun to integrate AI-generated narration into their production pipelines.

117. Long-form investigative audio journalism is similarly affected. NotebookLM Audio Overviews, a free consumer product built on the multi-speaker dialogue model whose pretraining corpus Google has refused to disclose, generates podcast-format audio from written sources. NotebookLM had been adopted by more than 80,000 organizations within weeks of launch, and Google has reported that more than two million users use the Audio Overviews feature. The product directly substitutes for the long-form investigative audio journalism that Plaintiffs Lacour, Flowers, and Amer have spent their careers developing — produced, until now, by human reporters and narrators at substantial professional cost.

118. Localization voiceover is similarly affected. YouTube auto-dubbing, built on the same voice synthesis technology, automatically generates dubbed

audio in other languages while preserving speaker characteristics across the translation. The product replaces the localization voiceover work that voice actors have historically performed and is offered to YouTube creators at no marginal cost.

119. Each of these products was built using the vocal characteristics of the human performers it now displaces. Plaintiffs allege, on information and belief, that the voiceprints of every Plaintiff in this case are among the voiceprints encoded in the foundational voice models on which these products depend. The market substitution is therefore not merely temporal but causal. The machines generate the audio they generate because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output.

*Google Acted Willfully and Recklessly*

120. Google's collection, retention, and commercial exploitation of Plaintiffs' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. Google acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*Google knew its obligations under BIPA*

121. By the time Google began training the foundational voice models at issue in this Complaint, BIPA had been the law of Illinois for more than a decade and Google had been a defendant in some of the largest biometric privacy actions in the United States. In *Rivera v. Google LLC*, the consolidated Cook County action concerning Google Photos' face-grouping feature, Google

Case 1:26-cv-05436 Document #: 4-1 Filed: 05/21/26 Page 56 of 940 PageID #:62

paid approximately $100 million to settle BIPA claims arising from the unconsented creation of biometric face templates from photographs of Illinois residents; the settlement received final approval on September 28, 2022. In *Farwell v. Google LLC / H.K. v. Google LLC*, Google paid $8.75 million to settle BIPA claims that Google created voice models and face models from Illinois schoolchildren using Google Workspace for Education without notice or consent; the settlement received final approval on October 17, 2025. In November 2025, Google paid $1.375 billion to the State of Texas, the second largest privacy settlement any state has ever obtained from any company, to resolve parallel claims under Texas's biometric identifier statute, including allegations that Google captured "voiceprints and records of face geometry" through Google Photos and Google Assistant. By any measure, Google was on notice of its biometric-privacy obligations under BIPA and analogous state statutes throughout the period in which it ingested Plaintiffs' voiceprints into its foundational voice models.

*Google knew that voice training extracts biometric identifiers*

122. Google's published research and product documentation describe the voice synthesis pipeline in terms that align with BIPA's biometric definitions. Google's researchers describe the acoustic tokens its voice models extract from training audio as capturing "speaker characteristics," and Google's Chirp 3 product documentation describes the speaker-identifying output of its voice cloning pipeline — the "voice cloning key" — as "a text-string representation of your voice data." Google could not credibly plead ignorance of

the proposition that its voice synthesis pipeline extracts and stores speaker-specific representations capable of identifying the source speakers. Google built the pipeline, published the research, and shipped the product on that very capability.

123. Google has confirmed its understanding that voice synthesis training implicates the legal rights of source speakers by building, in parallel with the foundational voice models at issue here, a complete consent infrastructure for the consumer voice cloning products that train on individual speakers' recordings. Google's Custom Voice product, generally available since March 2022, requires each voice actor to record a consent statement, supplied by Google, affirming that the actor is the owner of the voice and consents to Google's use of the voice to create a synthetic voice model. Custom Voice is subjected to a "review process to help ensure each use case is aligned with our AI Principles and adequate voice actor consent is given."

124. Chirp 3 Instant Custom Voice, launched in 2025, requires the same recorded consent statement: "I am the owner of this voice, and I consent to Google using this voice to create a synthetic voice model."

125. Google has also developed SynthID, a digital watermarking technology that embeds imperceptible markers into AI-generated audio, in recognition that synthetic voice content creates risks requiring technical safeguards.

126. Each of these measures is Google's admission that the extraction and commercial use of a person's voice to train a voice model is conduct that warrants consent, governance review, and technical mitigation.

*Google chose to apply consent selectively*

127. The chronology of Google's consent-infrastructure buildout reflects a deliberate, contemporaneous choice. Google launched Custom Voice with its recorded-consent requirement in March 2022. In October 2024, Google disclosed that it had pretrained its multi-speaker dialogue model — the foundational model that powers NotebookLM Audio Overviews, Gemini Live, and related products — on "hundreds of thousands of hours of speech data" without identifying any source or speaker. In 2025, Google extended the same recorded-consent framework to Chirp 3 Instant Custom Voice. The same engineering organization, Google DeepMind, developed both the Custom Voice and Chirp 3 consent pipelines and the foundational voice models trained on the unconsented pretraining corpus. The same legal department drafted both consent regimes. The same Responsible AI governance process that reviewed Custom Voice did not, on information and belief, review the foundational voice training pipeline for BIPA compliance. The choice to apply consent to the voices Google paid for, rather than to the voices it took, was a contemporaneous, institutionally coherent decision made with the consent infrastructure already in place.

128. The decision was a commercial calculation. BIPA-compliant collection of voice training data would have required Google to identify the

source speakers, provide written notice of the specific purpose and duration of the collection, and obtain a written release from each speaker before ingesting the recording into the training pipeline. With a pretraining corpus of "hundreds of thousands of hours of speech data" — comprising, on information and belief, the recordings of tens of thousands of distinct speakers and likely more — that compliance burden would have constrained the speed and scale of Google's voice AI development. Google chose speed and scale over compliance. The decision is documented in the contrast between Google's robust consent infrastructure for the voices it paid to license and the complete absence of consent infrastructure for the voices it took.

*Google's training-data acquisition practices confirm deliberateness*

129. Google's training-data acquisition practices, taken on the public record, confirm that Google's noncompliance was deliberate rather than inadvertent. In April 2024, *The New York Times* reported that Google employees were aware that OpenAI was harvesting audio from YouTube videos to train its AI models and had taken no action against OpenAI because, according to the reporting, Google was "doing the same."

130. In September 2024, five months after that reporting and one month before Google disclosed the volume of its pretraining corpus, Google amended the YouTube Terms of Service to add, for the first time, an express grant to Google of the right to use uploaded content for "machine learning and AI applications" — a grant that, by its terms, cannot bind non-uploaders like Plaintiffs whose voices appear in YouTube content uploaded by third parties.

131. And in March 2026, a putative class action filed in this District alleged that Google's same DeepMind research organization, using the same SoundStream/AudioLM-family of techniques that underlie the voice models at issue here, trained its Lyria 3 music generation model on millions of copyrighted recordings extracted from YouTube without license or consent. *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026).

132. The pattern across these facts — internal awareness, retroactive Terms-of-Service amendment, parallel allegations against the same research organization using the same techniques — establishes that Google's training-data practices were deliberate institutional choices rather than inadvertent oversights.

133. Each of the violations alleged in this Complaint was therefore committed by Google with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(a)(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(a)(1).

**CLASS ACTION ALLEGATIONS**

134. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Google extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or

operation of Google's foundational voice synthesis models, during the Class Period.

135. The Class Period runs from the earlier of (a) the date Google first ingested any voice recording into the training pipeline for its foundational voice synthesis models, or (b) January 1, 2014, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period.

136. Excluded from the Class are: (i) Alphabet Inc., Google LLC, and each of their respective parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Alphabet Inc. and Google LLC; (iii) Google's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; and (vi) any person who executed BIPA-compliant written consent for Google's use of their voice recordings to train Google's foundational voice synthesis models, including persons whose voices were used through Google Cloud Custom Voice with completed Custom Voice consent review and persons who created Chirp 3 Instant Custom Voice voice cloning keys by recording the required consent statement.

137. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

138. *Ascertainability.* Class membership is defined by objective criteria and can be determined from records that exist or will be produced in discovery. Whether a particular voice recording entered Google's training pipeline is a binary factual question — the recording is either in the pipeline's ingestion logs or it is not — and the records that answer the question are within Google's exclusive control: training data manifests, ingestion logs, source URL records, pipeline metadata, data provenance records, and associated speaker and file-level identifiers. Class membership can be further confirmed through publicly available distribution metadata for voice recordings (audiobook platform records, podcast directory records, streaming service catalogs, broadcast archive records), through speaker-identification technology applied to Google's training corpus, and through voice-matching analysis comparing Google's voice model outputs against publicly available recordings of class members.

139. *Numerosity.* Joinder of all members of the Class is impracticable. Fed. R. Civ. P. 23(a)(1). Google has disclosed that its production multi-speaker dialogue model was pretrained on hundreds of thousands of hours of speech data. The number of distinct individuals whose voice recordings were produced or recorded in Illinois and ingested into the training pipeline that produced Google's commercial voice products plainly satisfies the threshold for numerosity. The Class includes not only the professional broadcast journalists, audiobook narrators, podcasters, voice actors, and other voice professionals who have produced work in Illinois during the Class Period — themselves a population numbering in the thousands — but also the interviewees, guests,

panelists, witnesses, callers, public officials, and other persons whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, archival, and other publicly distributed audio content. On information and belief, the Class population numbers in the hundreds of thousands or more. The exact number is within Google's exclusive control and will be established through discovery.

140. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Google did not engage in any individualized notice, consent, retention-policy disclosure, release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Google's foundational voice training pipeline. Google's conduct was uniform: the same training pipeline ingested the same categories of voice recordings under the same absent-consent posture, applied to all class members through the same automated and standardized process. The questions of whether Google complied with BIPA's notice, consent, retention policy, profiting, dissemination, and privacy-protection requirements before and after extracting the voiceprints of class members can be answered classwide because Google's compliance, or noncompliance, was identical as to every class member.

141. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics that Google extracts during voice model training, including speaker

embeddings, acoustic tokens, and voice cloning keys, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b) whether Google informed class members in writing that their biometric identifiers were being collected, of the specific purpose and duration of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c) whether Google developed and made publicly available a written retention and destruction policy applicable to class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(d) whether Google sold, leased, traded, or otherwise profited from class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(e) whether Google disclosed or disseminated class members' biometric identifiers to third parties without consent in violation of 740 ILCS 14/15(d);

(f) whether Google stored, transmitted, and protected class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2);

(g) whether Google's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether Google used class members' voices and identities for commercial purposes without prior written consent in violation of the Illinois Right of Publicity Act;

(i) whether Google's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b), and Google materially contributes to or facilitates their distribution;

(j) whether Google's conduct constitutes deceptive trade practices likely to cause confusion in violation of the Illinois Uniform Deceptive Trade Practices Act;

(k) whether Google was unjustly enriched by its unauthorized use of class members' voice data; and

(l) the appropriate measures of damages, restitution, and injunctive relief.

142. *Typicality*. The claims of the named Plaintiffs are typical of the claims of the Class. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, and related professional voice work, recorded in Chicago studios, broadcast facilities, and home recording studios in this District. Google, on information and belief, ingested those recordings into the training pipeline for its foundational voice synthesis models and extracted voiceprints from them without notice, consent, or written release. The voiceprints are now embedded in Google's commercial voice models and reproduced in the audio those models generate. The legal theories asserted on behalf of the Class — that Google's extraction, retention, commercial exploitation, and dissemination of voiceprints from Illinois-recorded voice work

without BIPA-compliant consent violates 740 ILCS 14/15(a)–(e), and that Google's commercial use of voices and identities without consent violates the Illinois Right of Publicity Act — apply with equal force to each named Plaintiff and to every other class member. Each named Plaintiff has the same interest as every other class member in establishing Google's liability and obtaining the relief sought in this Complaint.

143. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent class members; each named Plaintiff has the same incentive as every other class member to maximize recovery and to obtain comprehensive injunctive relief addressing the unlawful extraction of voiceprints. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

144. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Google has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Google's training pipeline operated uniformly across every class member's voice recordings; Google's failure to obtain BIPA-compliant consent was uniform; Google's failure to publish a retention and destruction policy applicable to class members was uniform; and Google's continuing possession and commercial exploitation of class members' voiceprints in commercial models is uniform. Plaintiffs seek classwide

injunctive relief under 740 ILCS 14/20, 815 ILCS 510/3 (the Illinois Uniform Deceptive Trade Practices Act, which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining of the foundational voice models in which class members' voiceprints are encoded — that necessarily applies on the same terms to every class member.

145. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate for the Class on the damages and restitutionary claims asserted in this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

146. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. Whether Google's voice model training pipeline extracts voiceprints within the meaning of BIPA is a common technical question with a common answer. Whether Google complied with BIPA's notice, consent, retention, profiting, and dissemination requirements is a common legal question with a common answer — Google did not, with respect to any non-user whose voice recordings were ingested into the training pipeline. Whether Google's conduct was willful or reckless turns on Google's institutional knowledge, decision-making, and conduct, all of which are common to the Class. The principal individual question — whether a specific class member's voice recordings entered the training pipeline — is

binary and resolvable from Google's own records, which include training-data manifests, ingestion logs, and source-URL identifiers in Google's exclusive control. Individual damages calculations under BIPA's per-violation liquidated-damages framework, 740 ILCS 14/20, do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

147. *Superiority.* A class action is the superior method for adjudicating these claims:

(a) *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover artists — whose voiceprints were extracted without their knowledge. Many class members are unaware their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against one of the world's largest technology conglomerates, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Google on behalf of Illinois residents whose voices were used to train Google's foundational voice synthesis models. The only related action is *Kogon v. Google LLC,* No. 1:26-cv-02582 (N.D. Ill. filed Mar. 6, 2026), a putative class action concerning Google's training of its Lyria 3

AI music generation model on copyrighted musical recordings extracted from YouTube. *Kogon* arises from music training-data practices within Google DeepMind and asserts claims on behalf of musicians and copyright holders, not the voice talent — broadcast journalists, podcasters, audiobook narrators, voiceover artists, and other voice professionals — whose voices were ingested into Google's foundational voice synthesis models.

(c) *Desirability of concentration in this forum.* Concentrating this litigation in this District is appropriate. Plaintiffs are Illinois residents. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Google operates a substantial Chicago presence, including its self-described Midwest headquarters in this District. This Court is well-suited to adjudicate BIPA and other Illinois statutory claims arising from Google's commercial conduct in Illinois.

(d) *Manageability.* The case is manageable as a class action. Google's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; class membership can be determined from Google's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-violation liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

148. To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs

Case 1:26-cv-05436 Document #: 24-1 Filed: 07/21/26 Page 71 of 94 PageID #:223

allege that the limitations periods are equitably tolled by Google's concealment of its training-data sources, by Google's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Google had ingested their recordings into its training pipelines, and by the continuing nature of Google's violations.

## CLAIMS FOR RELIEF

### Count I
### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

149. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

150. Plaintiffs bring this Count individually and on behalf of the Class.

151. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

152. Alphabet Inc. and Google LLC are each "private entities" within the meaning of BIPA. 740 ILCS 14/10.

153. Google collected, captured, and otherwise obtained voiceprints from the voice recordings of Plaintiffs and Class members by ingesting their voice recordings into its training pipeline and extracting from those recordings computational representations capable of identifying the speakers, as alleged in detail in ¶¶ 41-45. The resulting representations — variously denominated as speaker embeddings, acoustic tokens, or voice cloning keys in Google's technical and product documentation — are voiceprints and biometric information within the meaning of BIPA.

154. Google did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Google obtained no consent of any kind, in any form, from any Plaintiff or Class member.

155. Google's violations of § 15(b) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

156. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per

intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**

*Brought on behalf of the Class*

157. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

158. Plaintiffs bring this Count individually and on behalf of the Class.

159. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with Google in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

160. Google has been, and remains, in possession of voiceprints extracted from recordings of Plaintiffs and Class members.

161. Google has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training data and embedded in the parameters of Google's foundational voice

synthesis models. Google's general data retention disclosures, including those addressing Gemini activity and human-reviewer data, do not address the destruction of biometric data extracted from non-user voice recordings and now embedded in commercial voice models.

162. Google's violations of § 15(a) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

163. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

164. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

165. Plaintiffs bring this Count individually and on behalf of the Class.

166. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier may sell, lease, trade, or otherwise profit from a person's biometric identifier. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

167. Google has profited and continues to profit from Plaintiffs' and Class members' voiceprints by using them to develop, train, and commercially operate the voice synthesis models that power Google's commercial voice products, and by monetizing those products through usage fees, subscription

fees, enterprise contracts, advertising revenue, and hardware sales as alleged in detail in ¶¶ 69-71. The voice quality, expressiveness, and multilingual capability that Google sells through these channels exist because of the voiceprints encoded in Google's foundational voice models. Google's commercial exploitation of Plaintiffs' and Class members' voiceprints does not fall within any exception to § 15(c).

168. Google's violations of § 15(c) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

169. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

170. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

171. Plaintiffs bring this Count individually and on behalf of the Class.

172. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier may disclose, redisclose, or otherwise disseminate a person's biometric identifier unless an enumerated exception applies. 740 ILCS 14/15(d).

173. On information and belief, Google has disclosed, redisclosed, or otherwise disseminated Plaintiffs' and Class members' voiceprints to affiliated Alphabet subsidiaries, vendors, and service providers within Google's cloud

and product infrastructure, in the ordinary course of training, evaluating, deploying, and operating its foundational voice synthesis models. The basis for this allegation is set forth in ¶¶ 72-76. Plaintiffs and Class members did not consent to any disclosure of their voiceprints. No enumerated exception under § 15(d) applies.

174. Google's violations of § 15(d) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

175. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count V

## Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)

*Brought on behalf of the Class*

176. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

177. Plaintiffs bring this Count individually and on behalf of the Class.

178. Section 15(e) of BIPA requires a private entity in possession of biometric identifiers to store, transmit, and protect the identifiers from disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive

information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

179. Google fails the § 15(e)(2) asymmetry test. Google's established institutional practice regarding voice and audio research models is to release model code and, in many cases, model weights under open-source licenses, while simultaneously protecting its other confidential and sensitive information under strict closed-system controls.

180. Google's open release of voice and audio model code and weights spans nearly a decade and multiple model families. With respect to Tacotron, Google maintains the public repository at https://github.com/google/tacotron, which Google describes as containing materials related to "an end-to-end speech synthesis model from the Sound Understanding and Brain teams at Google," and has publicly released multiple iterations of the Tacotron family — Tacotron (March 2017), Tacotron 2 (December 2017), Parallel Tacotron 2 (March 2021), Non-Attentive Tacotron (October 2020), and Very Attentive Tacotron (October 2024) — through its own publications and code repositories. With respect to WaveNet, Google DeepMind published the WaveNet research describing a generative model for raw audio in September 2016, followed by Parallel WaveNet in November 2017, both with substantial technical detail enabling third-party reproduction. With respect to the Magenta project, Google Brain operates Magenta as a publicly designated open-source initiative; the Magenta GitHub repository at https://github.com/magenta/magenta describes

Magenta as started "by some researchers and engineers from the Google Brain team" and states, "We use TensorFlow and release our models and tools in open source on this GitHub." Through Magenta, Google has openly released NSynth (a WaveNet-style audio autoencoder), Music Transformer, MusicVAE, DDSP, GrooVAE, Onsets and Frames, MelodyRNN, DrumsRNN, and PerformanceRNN.

181. Most prominently, in June 2025 Google released Magenta RealTime as an "open-weights" generative audio model that, by Google's own description, is "an 800 million parameter autoregressive transformer model trained on ~190k hours" of audio. Google publicly stated that "the model code is available on Github and the weights are available on Google Cloud Storage and Hugging Face under permissive licenses." Google hosts Magenta RealTime on Hugging Face under the namespace google/magenta-realtime and on GitHub at https://github.com/magenta/magenta-realtime, with model code released under the Apache 2.0 license and model weights released under the Creative Commons Attribution 4.0 International license.

182. Google describes Magenta RealTime as "the open-weights cousin of Lyria RealTime, the real-time generative music model powering Music FX DJ and the real-time music API in Google AI Studio, developed by Google DeepMind," and Google's model documentation acknowledges that "with specific prompting, this model has been observed to generate some vocal sounds and effects." With respect to SoundStream and AudioLM, the foundational neural audio codec and language modeling architectures

underlying the voice models at issue in this Complaint, Google Research published both openly — SoundStream in 2021 with reference materials, and AudioLM in 2022 with substantial technical detail describing the model's use of acoustic tokens that "capture speaker characteristics or recording conditions" — and SoundStream's successor "SpectroStream" is a built-in component of the open-weights Magenta RealTime release. With respect to the Gemma family of large foundation models, Google has released Gemma, Gemma 2, CodeGemma, RecurrentGemma, and PaliGemma as "open weights" models available for public download, modification, and redeployment.

183. Google contemporaneously protects its other confidential and sensitive information under closed-system controls that are materially more protective than open release. Google maintains the source code for its core commercial products — Search, Ads, Gmail, YouTube, Google Cloud, and the production deployments of Gemini — as closed-source proprietary information.

184. Google protects its internal financial records, employee personnel files, customer data, and business communications under strict access controls, encryption, internal classification systems, and ISO 27001, SOC 2 Type II, and similar information-security regimes.

185. Google requires nondisclosure agreements from employees, contractors, and business partners, and treats its trade secrets, internal research roadmaps, and unreleased product plans as confidential and protected from public disclosure.

186. Google's BeyondCorp zero-trust security architecture, multi-factor authentication requirements, encryption-at-rest and encryption-in-transit standards, and physical-access controls at Google data centers reflect Google's actual security capabilities for protecting its confidential and sensitive information from disclosure.

187. The asymmetry between Google's open release of voice and audio model assets — including, on information and belief, model parameters derived from training data containing voiceprints and biometric information from non-consenting individuals — and Google's closed protection of its other confidential and sensitive information violates § 15(e)(2)'s requirement that biometric data be protected "in a manner that is the same as or more protective than" Google's protection of its other confidential and sensitive information. Open-sourcing model weights is publication, not protection. Google's institutional pattern of open release applies to or will be applied to the production voice synthesis models that ingested Class members' voiceprints; at minimum, those production models are not protected with the same level of care that Google applies to its other confidential and sensitive information, because Google's established public practice with respect to comparable voice and audio models is open release rather than closed protection.

188. Independently, Google fails the § 15(e)(1) reasonable-standard-of-care test as to voiceprints extracted from non-user training data. No mechanism exists for non-users to request access to, correction of, or deletion of their biometric data from Google's training datasets or models. A private

entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of their data, because those individuals have no ability to monitor, verify, or challenge how their data is stored, transmitted, or protected. The reasonable industry standard of care for biometric data presupposes some mechanism by which the data subject can verify the integrity of the protection; Google has provided none.

189. Google's violations of § 15(e) were intentional or reckless, as alleged in ¶¶ 120-133. In the alternative, Google's violations were negligent.

190. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count VI**

**Violation of the Illinois Right of Publicity Act,**
**765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

191. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

192. Plaintiffs bring this Count individually and on behalf of the Class.

193. The Illinois Right of Publicity Act protects an individual's right to control commercial use of their identity. 765 ILCS 1075/30(a) provides that a person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the individual or, in the case of a minor, the appropriate guardian. IRPA defines "identity" to include "any attribute of an individual that serves to identify that

individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

194. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

195. Google used Plaintiffs' and Class members' identities for commercial purposes within the meaning of IRPA, by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the voice synthesis products that Google monetizes through the integrated commercial chain alleged in ¶¶ 69-71. Google holds out its products' ability to generate realistic, expressive, and human-sounding voices as a core commercial feature of those products — a capability built from the identities of the individuals whose recordings were used to train the foundational models. Google did not obtain written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

196. Independently, the Illinois Right of Publicity Act, as amended effective January 1, 2025, prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative. 765 ILCS

1075/30(b). The amended IRPA further imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution. *Id.*

197. On information and belief, Google's commercial voice products generate, distribute, and make available to the public voice outputs that constitute unauthorized digital replicas of Plaintiffs and Class members within the meaning of the amended IRPA, and Google materially contributes to and facilitates the distribution of such replicas through Google Cloud Text-to-Speech, Chirp 3, Gemini-TTS, Gemini Live, NotebookLM Audio Overviews, and YouTube auto-dubbing.

198. Google's violations of IRPA were willful and knowing, as alleged in ¶¶ 120-133. Google built and publicly deployed recorded-consent infrastructure for its consumer voice cloning products specifically because Google understood that the commercial use of an individual's voice requires that individual's consent. Google chose not to apply that consent infrastructure to Plaintiffs and Class members.

199. Plaintiffs and the Class have suffered concrete injury from Google's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods.

200. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to Google's

unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40, where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees, and such other relief as the Court deems just and proper.

**Count VII**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.**

*Brought on behalf of the Class*

201. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

202. Plaintiffs bring this Count individually and on behalf of the Class.

203. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices ... in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices is broader than its prohibition of deceptive practices and reaches conduct that, even absent affirmative misrepresentation, offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002).

204. Google engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis services to Illinois customers, and by collecting, extracting, and commercially

exploiting the biometric identifiers of Illinois persons in connection with that commerce.

205. Google's conduct is unfair within the meaning of ICFA. Google's collection and commercial exploitation of the biometric identifiers of Illinois persons without their knowledge or consent offends Illinois public policy as expressed in BIPA, the Illinois statute enacted specifically to address the unauthorized collection of biometric identifiers, 740 ILCS 14/5, and as expressed in IRPA, the Illinois statute enacted specifically to address the unauthorized commercial use of personal identity, 765 ILCS 1075/30.

206. Google's conduct caused substantial injury to Plaintiffs and Class members, including the diversion of licensing income they would otherwise have earned for the use of their voices and the displacement of their professional voice work in the markets where they earn their livelihoods, as alleged in ¶¶ 115-119. Plaintiffs and Class members could not reasonably have avoided this injury because they had no knowledge that Google was collecting their biometric data.

207. Google's conduct is also independently deceptive within the meaning of ICFA. Google's Privacy Policy represents to users that Google collects "biometric information" only when users "choose to provide it." That representation is materially misleading because, on information and belief, Google was simultaneously ingesting hundreds of thousands of hours of voice recordings from non-users and extracting biometric voice representations from those recordings without the speakers' knowledge. Google maintained total

Case: 1:26-cv-05436 Document #: 1 Filed: 05/11/26 Page 85 of 94 PageID #:85

opacity about the sources of its voice training data while commercially exploiting that data at scale.

208. Google's unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Google's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, and not merely from the existence of competing AI products.

209. Google's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged in ¶¶ 120-133.

210. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a, injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class - injunctive relief only*

211. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

212. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

213. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

214. Google's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, and commercially exploited by Google's customers without consumer-facing disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content.

215. Plaintiffs and Class members are persons likely to be damaged by Google's deceptive practices within the meaning of 815 ILCS 510/3. Google's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services

markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

216. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Google to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that Google has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3, Plaintiffs also seek reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

217. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

218. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

219. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

220. Google obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without

permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Google's foundational voice synthesis models; the product capability and competitive advantage Google captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and the revenue Google generates and continues to generate through the commercial exploitation of those models, as alleged in ¶¶ 69-71.

221. Google obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invest time, talent, training, and resources to develop their voices and create professional recordings. Google's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Google, and Google's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

222. Google's retention of these benefits is unjust. Google's conduct violated the Illinois statutory protections for biometric data (BIPA) and for personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful.

223. Google's institutional practice confirms the inequity of its retention: Google built and deployed BIPA-compliant consent infrastructure for the voices it paid to license through Custom Voice and Chirp 3 Instant Custom

Voice, but did not apply that infrastructure to the voices of Plaintiffs and Class members from whom it took voiceprints without consent. Google could have pursued the same lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

224. Plaintiffs and the Class seek restitution of the benefits Google has unjustly retained, including disgorgement of profits Google earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendants Alphabet Inc. and Google LLC and award the following relief:

A. *Injunctive Relief.* Permanent and, where appropriate, preliminary injunctive relief requiring Google to:

(1) Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2) Cease the commercial use, sale, lease, trade, profiting from, or dissemination of voiceprints and biometric information of Plaintiffs and Class members that Google has already collected without BIPA-compliant consent;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate Google's foundational voice synthesis models, including without limitation Gemini Live, NotebookLM Audio Overviews, Google Cloud Text-to-Speech, Chirp 3 voices, Google Assistant, and YouTube auto-dubbing;

(4) Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information of non-users, in compliance with 740 ILCS 14/15(a);

(5) Destroy all voiceprints and biometric information of Plaintiffs and Class members that Google obtained without BIPA-compliant consent, and certify the destruction;

(6) Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational voice synthesis models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded;

(7) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution or making available of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b); and

(8) Provide adequate consumer-facing disclosure that voice outputs generated by Google's commercial voice products are AI-generated, are derived from foundational voice models built using voice recordings of unidentified

speakers, and have not been authorized by the individuals whose vocal characteristics are reproduced.

B. *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendants are found liable, the greater of liquidated damages or actual damages on a per-person basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C. *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of Google's unauthorized commercial use of their identities and voices, the profits Google earned from that unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages where applicable, and punitive damages under 765 ILCS 1075/40.

D. *ICFA Damages*. Award the actual economic damages Plaintiffs and Class members sustained as a result of Google's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a.

E. *Restitution and Disgorgement.* Order restitution of the benefits Google has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities; disgorgement of the profits Google has earned through the integrated commercial chain alleged in this Complaint, including without limitation revenue from Google Cloud Text-to-Speech, Chirp 3, Gemini Live, NotebookLM

Audio Overviews, Google Assistant, YouTube auto-dubbing, Google Workspace voice-enabled features, Google Cloud enterprise voice contracts, and Google-made hardware whose value derives from the foundational voice models; and an accounting of all such revenues and benefits.

F. *Non-Duplication.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendants Alphabet Inc. and Google LLC on all Counts on which Defendants are found liable.

I. *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J. *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 11, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| YOHANCE LACOUR, CAROL MARIN, PHILIP ROGERS, ROBIN AMER, LINDSEY DORCUS, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| APPLE INC., a California corporation, | ) | |
| Defendant. | ) | |

**<u>COMPLAINT</u>**

Plaintiffs, Yohance Lacour, Carol Marin, Philip Rogers, Robin Amer, Lindsey Dorcus, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Apple Inc. (“Apple”), allege as follows:

**<u>NATURE OF THE CASE</u>**

1. “What happens on your iPhone, stays on your iPhone." Apple has spent more than a decade marketing privacy as its defining commitment. Apple has placed billboards along American highways announcing that "Privacy. That's iPhone." Apple has built Touch ID, Face ID, Personal Voice, App Tracking Transparency, on-device processing, the Secure Enclave, and Private

Cloud Compute, and has marketed each as architectural proof that Apple, unlike its competitors, protects the private information of the people who use its products. Apple's CEO has called privacy "a fundamental human right." Apple has positioned this privacy commitment as the difference between Apple and every other technology company in the world.

2. Behind that commitment, Apple built its commercial voice synthesis technology by extracting voiceprints from recordings of real people, without their knowledge or consent. Apple's voice models speak in synthetic human voices in more than thirty languages, narrate audiobooks marketed as indistinguishable from those produced by human performers, generate Siri's speech across more than two billion active devices, and clone a user's voice from a brief on-device recording session. The technology behind these products was not built from nothing. It was built on voiceprints. Plaintiffs' voiceprints are among them.

3. Plaintiffs are six Illinois residents whose recorded voices are among the most distinguished in their fields. They include Philip Rogers, an Emmy- and Edward R. Murrow Award-winning broadcaster whose four decades of on-air reporting were based in Chicago; Carol Marin, a five-decade broadcast journalist, a three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Robin Amer, the creator, host, and showrunner of USA Today's *The City* and a three-time duPont-Columbia honoree; Lindsey Dorcus, a SOVAS Voice Arts Award-winning narrator of more than two hundred audiobooks for the major American publishers; Yohance

Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their voices were being used to train Apple's commercial voice AI. None of them was asked. None of them consented.

4. To build the technology that powers Apple's voice products, Apple took recordings of real human voices, fed them into a training pipeline to extract each speaker's voiceprint, and used those voiceprints to develop commercial products that contribute to Apple's approximately $416 billion in annual revenue and its more than $4 trillion market capitalization. The voices belonged to journalists, podcasters, audiobook narrators, voice actors, and other performers who were never informed that their vocal identities were being captured, never told why, and never given the chance to object.

5. A voiceprint is a digital fingerprint of the human voice, a mathematical representation of the acoustic features (pitch, timbre, resonance) that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their

voice. The biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

6. Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to prevent exactly this. The Illinois General Assembly recognized that biometric identifiers, including voiceprints, are "unlike other unique identifiers" because they are "biologically unique to the individual" and, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before a private entity may collect a biometric identifier, it must inform the subject in writing, disclose the specific purpose and duration of collection, and obtain a written release. 740 ILCS 14/15(b). Apple complied with none of these requirements with respect to Plaintiffs or the Class. It did not notify Plaintiffs that their voiceprints were being collected. It did not tell them why. It did not tell them for how long. It did not obtain a written release. It did not develop or publish a retention and destruction policy applicable to the voiceprints it extracted from non-users. Apple treated the voices of real people as unencumbered raw material for commercial products, without a word to the people whose voices made the products possible, and without permission or compensation.

7. The privacy commitment Apple markets to its users is the same one it denied to Plaintiffs and the Class. Apple is institutionally defined by its sophistication in handling biometric data. Apple's Touch ID, Face ID, and Personal Voice systems store user biometric data exclusively within the Secure Enclave, a dedicated hardware coprocessor isolated from the main application

processor. Apple has publicly committed that this biometric data is never transmitted off the device, never made available to Apple itself, and never made available to applications. Apple's Personal Voice feature, released in September 2023, applies parallel protections to user voice biometric data: on-device recording and fine-tuning, encrypted storage, own-voice-only synthesis, and personal, noncommercial use restrictions. Apple is institutionally capable of building voice-cloning technology with rigorous consent and rights protections. It implemented those protections for its users. It did not implement them, or any equivalent, for the third parties whose voices it had already used to train the foundational voice models that Personal Voice and Apple's other voice products rely upon. The asymmetry was not an accident. It was a choice.

8. Apple was not operating in ignorance of its legal obligations. BIPA has been the law of Illinois since 2008. Apple itself has been a BIPA defendant in Illinois since December 2019 in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty., Ill.), where the Circuit Court of Cook County certified a class of approximately 2.6 to 3.9 million Illinois Siri users on January 29, 2026. Apple agreed in January 2025 to pay $95 million to settle related federal claims about Siri-related voice data in *Lopez v. Apple Inc.*, No. 4:19-cv-04577 (N.D. Cal.). BIPA litigation had produced some of the largest privacy settlements in American history, including settlements involving Facebook ($650 million), Google ($100 million), and TikTok/ByteDance ($92 million); parallel state biometric statutes had produced more recent settlements of $1.4 billion (Texas-Meta) and $1.375 billion (Texas-Google). Apple chose to build its

commercial voice synthesis models without complying with BIPA. That was not an oversight. It was a business decision.

9. Apple's silence about its voice training data is itself probative. Apple has never disclosed the sources, scale, or provenance of the voice data used to train the foundational voice synthesis models that power Siri, Personal Voice, or "Narrated by Apple Books" digital narration. Apple has published no model card, data sheet, training-data manifest, or transparency report for its voice synthesis pipeline. The contrast with Apple's general-purpose Apple Intelligence text foundation models is conspicuous: in July 2024, Apple expressly described its text-model training data as drawn from "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot."[1] No equivalent statement has ever been made about Apple's commercial voice synthesis models. If those models had been trained on properly licensed and consented data, Apple would have an obvious commercial incentive to say so. It has not.

10. The technology Apple built using Plaintiffs' voices now directly serves the professional markets where Plaintiffs earn their livelihoods. "Narrated by Apple Books" digital narration competes with Plaintiffs Dorcus and Nassif in audiobook narration on the same Apple Books platform through

---

[1] Apple Machine Learning Research, *Introducing Apple's On-Device and Server Foundation Models* (June 10, 2024), https://machinelearning.apple.com/research/introducing-apple-foundation-models (last visited on May 12, 2026); *see also* Tom Gunter et al., *Apple Intelligence Foundation Language Models*, arXiv:2407.21075v1 (July 29, 2024), https://arxiv.org/abs/2407.21075v1 (last visited on May 12, 2026).

which Apple distributes their human narrations. Synthetic podcast and broadcast voices generated by Apple's voice synthesis models compete with Plaintiffs Marin, Rogers, Lacour, and Amer in journalism and podcast production. Apple offers these services at a fraction of the cost of hiring human performers, displacing demand for the very people whose voices were needed to build the technology. The product with which Apple competes against the Plaintiffs is built from the Plaintiffs' own voices.

11. Plaintiffs and the Class have suffered concrete, particularized injuries. Apple invaded their legally protected privacy interest in their own biometric identifiers by extracting voiceprints and biometric information without notice or consent. Apple deprived them of the right, guaranteed by BIPA, to make an informed decision about whether a private entity may collect, store, and use their biometric data. Apple retains their biometric data in its commercial models and continues to profit from it. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that Apple unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that Apple's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act

("IRPA"). Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

13. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), for violations of BIPA's notice, consent, retention, profiting, dissemination, and protection requirements; (ii) actual damages and disgorgement of profits Apple has earned from the commercial exploitation of Plaintiffs' biometric data; and (iii) injunctive relief requiring Apple to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its voice synthesis models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the Class, and (d) destroy or retrain, without the unlawfully obtained data, the voice synthesis models, and the downstream commercial products built on those models, in which the unlawfully obtained voiceprints and biometric information are encoded.

**PARTIES**

14. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast *You Didn't See Nothin'* was awarded the 2024 Pulitzer Prize for Audio Reporting. Lacour's body of professional voice work, the public

availability of his recordings, and the basis for Plaintiffs' allegation that Apple extracted his voiceprint are described at ¶¶ 76–79, 80-82.

15. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade Chicago broadcast journalist and three-time George Foster Peabody Award laureate. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 83-85.

16. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a four-decade Chicago broadcast journalist whose career at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5) earned him a National Emmy Award. Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Apple extracted his voiceprint are described at ¶¶ 76–79, 86-88.

17. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 89-91.

18. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her

home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 92-94.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois and whose audiobook narrations are commercially released by Penguin Random House, Hachette Book Group, and Simon & Schuster. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Apple extracted her voiceprint are described at ¶¶ 76–79, 95-97.

20. Defendant Apple Inc. ("Apple") is a California corporation with its principal executive offices at One Apple Park Way, Cupertino, California 95014. Apple is one of the largest publicly traded companies in the world. Apple owns and operates Siri, Personal Voice, Live Speech, the "Narrated by Apple Books" digital narration program, the SFSpeechRecognizer and SpeechAnalyzer developer APIs, and a substantial speech research program published under the Apple Machine Learning Research banner. Apple's conduct in this case is the conduct of Apple Inc. itself, acting through its officers, directors, employees, contractors, and agents.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, and Defendant Apple Inc. is a California corporation with its principal place of business in California. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

22. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and Plaintiffs may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections, § 15(a), (b), (c), (d), and (e), each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Apple extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across

the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

23. This Court has specific personal jurisdiction over Apple under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the Due Process Clause of the Fourteenth Amendment. Apple has purposefully directed conduct at Illinois and into this District, and Plaintiffs' claims arise out of or relate to those Illinois-directed contacts.

24. Apple maintains a substantial commercial and operational presence in Illinois. Apple owns and operates Apple Store retail locations throughout the State, including its flagship Michigan Avenue store on the Chicago River, a building Apple designed, built, and opened in 2017 as one of its signature global retail locations, together with stores at Lincoln Park, Oakbrook Center, Old Orchard, Woodfield, Northbrook Court, and other Illinois locations. Apple sells iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, Apple TV, and the full range of Apple-branded products and accessories to Illinois residents through those retail stores, the Apple Online Store, and the App Store. Apple enters into recurring contractual relationships with Illinois residents through the iCloud Terms and Conditions, the Apple Media Services Terms and Conditions, the Apple Developer Program License Agreement, the Apple Card Customer Agreement, and the iOS, iPadOS, macOS, watchOS, and tvOS Software License Agreements, and accepts recurring payments from Illinois subscribers for Apple One, Apple Music, Apple TV+, Apple Arcade, Apple Fitness+, Apple News+, Apple Books, iCloud+, and AppleCare. Each

subscription renewal, each App Store purchase, each Apple Books or Apple Podcasts transaction, and each retail purchase from an Illinois customer is a separate commercial transaction with an Illinois resident. Apple derives substantial revenue from Illinois.

25. Apple's Illinois contacts are suit-related in four reinforcing respects. *First*, Apple collected, captured, and obtained biometric identifiers, specifically voiceprints, from voice recordings of Illinois residents, including Plaintiffs, without the notice, written release, or other safeguards BIPA requires. The biometric source material, the voice itself, originated in Illinois; the audio recordings of Plaintiffs' voices were created in Illinois while Plaintiffs were physically present there. Apple acquired identifiable Illinois-produced content from platforms, including Apple's first-party Apple Podcasts and Apple Books, on which the speaker's identity and Illinois production location were publicly displayed. The biometric identifiers belong to Illinois residents; the privacy interests invaded are those of Illinois residents; the duty to inform and obtain consent under 740 ILCS 14/15(b) was owed to Illinois persons; and the failure to perform that duty was localized where those persons reside and where their voices were produced and recorded. Apple's act of extracting voiceprints from voice recordings produced or recorded in Illinois is conduct directed at Illinois regardless of the physical location of the servers on which the extraction occurred.

26. *Second*, the voiceprints and biometric information that Apple extracted are now encoded in foundational voice synthesis models that Apple

deploys in commercial products sold and delivered to Illinois customers—Siri across iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV; Personal Voice; Live Speech; “Narrated by Apple Books” digital narration; Dictation; and related services—through Apple’s Illinois retail stores, its online store, the App Store, and the Apple Books and Apple Podcasts platforms. Apple’s commercial activity in Illinois is the downstream monetization of the same biometric data extracted at the upstream training stage; the two are different points in the same integrated commercial chain.

27. *Third*, Apple commercially exploits the voices and identities of Illinois residents in violation of IRPA by developing, marketing, and distributing voice synthesis products to Illinois customers and by disseminating voice-simulative outputs to and within Illinois through its products and services.

28. *Fourth*, on information and belief, Apple disseminates voiceprints and biometric information, including biometric data derived from Illinois residents’ voice recordings, across its corporate infrastructure and to third-party vendors and service providers, including across affiliated entities Apple identifies in its public SEC filings, in violation of § 15(d).

29. Apple's possession of voiceprints and biometric information derived from voice recordings of Illinois residents is ongoing. BIPA § 15(a) imposes continuing obligations on entities that possess biometric identifiers, including the duty to develop and publish a written retention and destruction schedule. Apple has been in possession of voiceprints derived from Illinois-recorded voice recordings since their collection and remains in possession of those voiceprints

today, encoded in the parameters of the foundation voice models that power Siri, Apple Intelligence, Personal Voice, Live Speech, "Narrated by Apple Books," and Dictation. The persons whose biometric data Apple holds are persons whose voices were produced and recorded in Illinois. Apple's ongoing retention and commercial use of that data is a continuing wrong directed at Illinois-recorded speakers and felt in Illinois.

30. The exercise of specific personal jurisdiction over Apple in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Illinois has a strong and particularized interest in providing a forum for redressing the unlawful collection and commercial exploitation of biometric identifiers of persons whose voices were produced or recorded in Illinois — an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating in their home forum. The burden on Apple of litigating in this District is not undue. Apple is a publicly traded company that reported $416.16 billion in net sales for fiscal year 2025 and is an experienced litigant in federal courts across the United States. Apple has been a defendant in voice-privacy litigation in Illinois state court since 2019 in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty.), and resolved a nationwide Siri voice-privacy class action in January 2025 for $95 million in *Lopez v. Apple Inc.*, No. 4:19-cv-04577 (N.D. Cal.). Apple could reasonably anticipate being haled into court in this District for claims arising from its

extraction and commercial exploitation of biometric data sourced from voice recordings produced or recorded in Illinois.

31. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Apple is, within the meaning of 28 U.S.C. § 1391(c)(2), a resident of any judicial district in which it is subject to personal jurisdiction, including this District. Independently, a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District: Plaintiffs reside in this District; Plaintiffs' voice recordings were produced and recorded in this District; Apple's collection, capture, extraction, and commercial exploitation of biometric identifiers belonging to residents of this District occurred without notice, consent, or written release; Apple sells, distributes, and delivers the voice synthesis products built on those biometric identifiers to residents of this District through its retail stores, online store, App Store, Apple Books, Apple Podcasts, and related distribution channels; and the economic and privacy injuries Plaintiffs and Class members suffered are felt in this District where Plaintiffs work, perform, and earn their livelihoods.

## **FACTUAL BACKGROUND**

### *Apple and Its Voice Synthesis Business*

32. Apple's voice-AI lineage began with its April 2010 acquisition of Siri, Inc., a startup spun out of SRI International's DARPA-funded Cognitive Assistant that Learns and Organizes program. Apple has since acquired Novauris Technologies (UK-based automatic speech recognition, 2013), VocalIQ (Cambridge spin-out, 2015), PullString (conversational AI, 2019), and Voysis

(Irish on-device voice AI, 2020). For more than 15 years, through acquisitions and internal development, Apple has continuously operated in voice-AI research and product development.

33. Siri launched on iPhone 4S in October 2011. In 2017, Apple transitioned Siri's voice synthesis from concatenative unit selection, which splices recorded fragments of voice talent, to a deep-learning architecture that learns generative representations of voice. The product cadence accelerated from there: new voice-actor-recorded Siri voices in April 2021; the gender-neutral Quinn voice in March 2022; *"Narrated by Apple Books"* digital narration in January 2023; Personal Voice and Live Speech announced in May 2023 and released in iOS 17 that September; and the Apple Intelligence foundation models announced in June 2024.

34. Apple is one of the largest publicly traded companies in the world. For fiscal year 2025, Apple reported $416.16 billion in net sales and approximately 166,000 employees worldwide. In the first quarter of fiscal year 2026, Apple reported $143.8 billion in net sales and an installed base exceeding 2.5 billion active devices. Siri alone handles approximately 1.5 billion voice requests per day.

35. Apple's voice products at issue span the full range of consumer AI voice technology:

(a) *Siri*, Apple's voice assistant, is deployed across iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV, with voice synthesis

in more than thirty languages and speech recognition serving hundreds of millions of users;

(b) *Personal Voice*, released in iOS 17 in September 2023, an on-device feature that lets a user create a synthetic clone of his or her own voice from prompted recordings, built on a pre-trained acoustic and vocoder base model that Apple publicly describes as trained on the LibriTTS corpus;

(c) *Live Speech*, which generates spoken audio from typed text in real time during phone and FaceTime calls;

(d) *"Narrated by Apple Books"*, Apple Books' digital narration program, launched January 2023, distributing synthetic-narration audiobooks generated by voice models trained on human narrators, with synthetic voices including Madison and Jackson for fiction and romance and Helena and Mitchell for non-fiction and self-development;

(e) *Dictation, Voice Memos transcription, Live Voicemail, and iMessage audio-message transcription*, speech-recognition features deployed across Apple's consumer products; and

(f) *SFSpeechRecognizer and SpeechAnalyzer*, developer APIs that route Apple's speech models into third-party applications.

36. Apple does not separately quantify revenue, headcount, or profit for any of these features. They are bundled into Apple's consolidated device-and-services revenue.

37. Apple's foundational voice synthesis models, the underlying technology layer powering Siri, Personal Voice, *"Narrated by Apple Books,"* and

the developer-API speech models, are common across product lines. A single training pipeline produces the base capabilities that Apple's product organization then deploys across consumer-facing features. The training data is shared. The biometric extraction is shared. The product is the data; the data is the product.

*Apple's Voice Synthesis Technical Pipeline and the Extraction of Voiceprints and Biometric Information*

38. AI voice synthesis technology works by training computational models on large quantities of recorded human speech.[2] During training, the models learn the acoustic features that distinguish one speaker from another and the general properties that make speech recognizable as natural human communication.[3] The training process extracts and encodes the distinctive acoustic characteristics of individual speakers from the training recordings.[4] These characteristics, commonly referred to in the AI research community as "speaker embeddings,"[5] include features of each speaker's voice such as

---

[2] Sivanand Achanta et al., *On-Device Neural Speech Synthesis*, arXiv:2109.08710 (Sept. 17, 2021), https://arxiv.org/abs/2109.08710 (last visited on May 12, 2026) (describing Apple's Tacotron-based acoustic model paired with a WaveRNN vocoder, trained on speech corpora to synthesize new speech audio).

[3] Apple Machine Learning Research, *Advancing Speech Accessibility with Personal Voice* (Dec. 18, 2023), https://machinelearning.apple.com/research/personal-voice (last visited on May 12, 2026) ("Both the acoustic model and vocoder model are speaker-dependent in a typical TTS system. . . . [W]e add speaker ID as part of the decoder input to learn general voice information during the pretraining stage.").

[4] Id.

[5] Prateeth Nayak et al., *Improving Voice Trigger Detection with Metric Learning*, arXiv:2204.02455 (Apr. 5, 2022), https://arxiv.org/abs/2204.02455 (last visited on May 12, 2026) ("the decoder is trained with metric learning and predicts a personalized embedding for each utterance").

timbre, pitch, resonance, cadence, articulation, phrasing, dynamics, and emotional expression.[6] A speaker embedding is a mathematical representation that captures the biologically and behaviorally unique features of an individual's voice.[7] It is, in both function and substance, a voiceprint and biometric information derived from a voice recording within the meaning of BIPA.

39. BIPA defines "biometric identifier" to include a "voiceprint." 740 ILCS 14/10. BIPA separately defines "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* Whether the extracted representations are classified as voiceprints, biometric information derived from voiceprints, or both, they fall within BIPA's scope. The label the technology industry uses does not determine the statutory classification. The function of the data does.

40. Apple's published research and product documentation confirm that Apple's voice synthesis pipeline extracts these characteristics. Apple's 2017 description of Siri's voice synthesis describes the process as building a voice model that can generate new utterances from text by learning from voice-

---

[6] Apple Machine Learning Research, *Advancing Speech Accessibility with Personal Voice* (Dec. 18, 2023), https://machinelearning.apple.com/research/personal-voice (last visited on May 12, 2026)

[7] Apple Machine Learning Research, *Voice Trigger System for Siri* (Aug. 11, 2023), https://machinelearning.apple.com/research/voice-trigger (last visited on May 12, 2026) (describing speaker characteristics as "useful but private").

Case 1:26-cv-05436 Document #: 1 Filed: 05/13/26 Page 21 of 97 PageID #:21

talent recordings.[8] Apple's 2021 paper on on-device neural speech synthesis describes a Tacotron-style acoustic model paired with a WaveRNN vocoder that synthesizes new speech audio from a learned representation of the source voice and generates new utterances at 24 kHz, three to five times faster than real time.[9] Apple's 2023 Personal Voice research publication describes "voice model pretraining and fine-tuning" explicitly: a base voice model is first trained on a corpus of speech and then specialized to mimic a target speaker, with the cleaned pre-training dataset comprising "300 hours of 1000 speakers" from the LibriTTS corpus.[10] By 2025, Apple's public research extended into speech tokenization (dMel), streaming text-to-speech (SpeakStream), speech-enabled large language models (SELMA), and speaker-characteristic learning (Speaker-IPL).

41. Apple's wake-word and speaker-recognition research describes voice-derived representations directly. Apple's "Hey Siri" research describes deep neural network classifiers that operate on acoustic features of user speech. Apple's August 2023 research publication *Voice Trigger System for Siri* describes an always-on streaming transformer encoder that processes

---

[8] Apple Machine Learning Research, *Deep Learning for Siri's Voice: On-Device Deep Mixture Density Networks for Hybrid Unit Selection Synthesis* (Aug. 6, 2017), https://machinelearning.apple.com/research/siri-voices (last visited May 12, 2026).

[9] Sivanand Achanta et al., *On-Device Neural Speech Synthesis*, arXiv:2109.08710 (Sept. 17, 2021), https://arxiv.org/abs/2109.08710 (last visited May 12, 2026).

[10] Apple Machine Learning Research, *Advancing Speech Accessibility with Personal Voice* (Dec. 18, 2023), https://machinelearning.apple.com/research/personal-voice (last visited May 12, 2026).

incoming audio chunks and maintains audio context, and expressly characterizes the speaker characteristics involved as "useful but private."[11] Apple's metric-learning trigger paper describes computing "a personalized embedding" from a small number of target-speaker utterances.[12]

42. The voiceprints and biometric information extracted during training are not stored as discrete files separate from the resulting models. They are encoded directly into the parameters, the numerical weights, of the foundational voice synthesis models. At this technical layer, the biometric data and the trained model are the same thing. Deleting the underlying training recordings does not remove the voiceprints; they persist in the model weights and continue to inform every output the model generates. Apple's commercial use of the models—every Siri voice request, every Personal Voice synthesis, every "Narrated by Apple Books" audiobook generation, every SFSpeechRecognizer API call—is the ongoing use of the voiceprints encoded within them. The product is the data; the data is the product.

*Apple's Selective Consent Infrastructure*

43. Apple operates an extensive consent and rights infrastructure for the biometric and voice data of its users, and no equivalent infrastructure for the third parties whose voice recordings Apple ingested into the foundational

---

[11] Apple Machine Learning Research, *Voice Trigger System for Siri* (Aug. 11, 2023), https://machinelearning.apple.com/research/voice-trigger (last visited May 12, 2026).

[12] Prateeth Nayak et al., *Improving Voice Trigger Detection with Metric Learning*, arXiv:2204.02455 (Apr. 5, 2022), https://arxiv.org/abs/2204.02455 (last visited May 12, 2026).

training pipelines underwriting its voice synthesis products. The asymmetry is documented in Apple's public-facing privacy materials, technical documentation, and product design choices.

44. For its users, Apple has built written-consent flows: Touch ID enrollment, Face ID enrollment, and Personal Voice creation all involve user-initiated processes in which the user is told what data is being collected, for what purpose, and under what protections. For Personal Voice specifically, released in September 2023, Apple's public design imposes: (i) on-device recording and fine-tuning, so that the user's voice data never leaves the user's device during training; (ii) encryption of the resulting voice model and storage under Apple's Secure Enclave-class cryptographic protections; (iii) a restriction to own-voice only, such that the synthetic voice can be used only to clone the user's own voice and cannot be used to clone third parties; and (iv) a restriction to personal noncommercial purposes.[13]

45. For users of Siri, Dictation, and related speech-recognition features, Apple operates a separate consent regime. Apple's "Ask Siri, Dictation & Privacy" page states that Siri audio is processed on Apple servers in many cases, and that request history (including transcripts and related request data) may be retained for up to two years to develop and improve Siri, Dictation, Search, and limited other language-processing functionality.[14] Apple's "Improve

[13] Apple Support, *Create a Personal Voice on iPhone, iPad, or Mac*, https://support.apple.com/en-us/HT213878 (last visited on May 12, 2026).

[14] Apple, *Ask Siri, Dictation & Privacy*, https://www.apple.com/legal/privacy/data/en/ask-siri-dictation/ (last visited on May 12, 2026).

Siri and Dictation & Privacy" page states that, where users opt in, audio recordings, transcripts, and related request data may be stored and used to fine-tune Siri, Search, Voice Control, Translate, and automatic speech recognition models.[15] In August 2019, after a whistleblower reported on Apple's Siri grading program, Apple publicly apologized and restructured the program to make audio retention opt-in, to restrict review to Apple employees, and to improve user controls.

46. For the text content used to train Apple's general-purpose Apple Intelligence foundation models, Apple has built a website-level consent mechanism. In June 2024, Apple introduced "Applebot-Extended" as a user agent that allows website operators to opt out of having their site content used in generative AI training.[16] Applebot-Extended operates at the website level, not at the speaker level. It is irrelevant to voice training data ingested from audiobook distributors, podcast platforms, or broadcast archives, which is what is at issue in this case.

47. For the third parties whose voice recordings were ingested into Apple's voice synthesis training pipelines, Apple has built no consent infrastructure at all. No written notice. No disclosure of purpose or duration. No written release. No retention or destruction policy applicable to non-user

---

[15] Apple, *Improve Siri and Dictation & Privacy*, https://www.apple.com/legal/privacy/data/en/improve-siri-dictation/ (last visited on May 12, 2026).

[16] Apple Support, *About Applebot*, https://support.apple.com/en-us/119829 (last visited on May 12, 2026) (describing the introduction of "Applebot-Extended" as an opt-out user agent for use of crawled content in generative-AI training).

training data. No mechanism by which a speaker can determine whether his or her recordings were ingested. No mechanism by which a speaker can request access to, correction of, or deletion of biometric data extracted from those recordings. No mechanism by which a speaker can opt out of future ingestion. The Personal Voice consent architecture exists. The Touch ID consent architecture exists. The Face ID consent architecture exists. The Siri-user consent architecture exists. The Applebot-Extended text-content opt-out exists. The non-user voice-training consent architecture does not exist. The selective consent is not a function of technical impossibility, regulatory ambiguity, or institutional unfamiliarity. It is an institutional choice documented in Apple's contemporaneous product design.

*Apple’s Biometric Data Handling for User Data*

48. Apple is institutionally defined in substantial part by its sophistication in biometric data handling. Apple’s Touch ID and Face ID systems are among the most widely deployed consumer biometric authentication systems in the world. Apple’s Platform Security documentation describes these systems’ protective architecture in detail. Fingerprint data captured by Touch ID is processed by, stored within, and accessible only to the Secure Enclave, a dedicated hardware coprocessor isolated from the main application processor. The fingerprint data is encrypted in the Secure Enclave and is, by Apple’s representation, never transmitted off the device, never made available to Apple itself, and never made available to applications. Face ID applies the same architecture: facial geometry data captured by Face ID is

processed by, stored within, and accessible only to the Secure Enclave; it is encrypted; and it is never transmitted off the device, never made available to Apple itself, and never made available to applications.

49. Apple’s Personal Voice feature applies parallel protections to user voice biometric data, as alleged at ¶ 44. The on-device fine-tuning means the user’s voice data never leaves the user’s device during training; the voice model is encrypted; and use is restricted to the user’s own voice and to personal noncommercial purposes.

50. The protections Apple applies to user biometric data—Touch ID, Face ID, and Personal Voice—operate at multiple reinforcing layers: hardware isolation (Secure Enclave), cryptographic encryption (on-device, at rest, and in transit), on-device processing (no transmission to Apple servers), scope restrictions (use limited to authentication or own-voice synthesis), and access restrictions (Apple itself is excluded from access).

51. Apple's protection of the non-user voiceprints and biometric information at issue in this case is, by contrast, undocumented, unannounced, and undefended in the public record. Apple has never publicly identified that it possesses voiceprints or biometric information extracted from non-user training recordings. Apple has never described the storage location, transmission protocols, encryption regime, access controls, or retention practices applicable to those voiceprints. Apple has never made publicly available a retention and destruction policy applicable to non-user voiceprints, as required by 740 ILCS 14/15(a). Apple has avoided the words “voiceprint,”

"speaker embedding," and "biometric identifier" in its public-facing voice-data disclosures, despite Apple's fluency with biometric terminology elsewhere, reflecting an institutional choice not to take a definitive position on whether its voice processing implicates biometric privacy law.

52. On information and belief, Apple does not store the voiceprints and biometric information extracted from non-user training recordings within the Secure Enclave; does not isolate them from Apple's general server infrastructure; does not process them on-device only; does not restrict their use to a narrow authentication or own-voice purpose; and does not withhold access from Apple itself. The voiceprints and biometric information at issue here are, on information and belief, encoded in the parameters of Apple's foundational voice synthesis models, transmitted across Apple's internal corporate and cloud infrastructure, and deployed in commercial products distributed globally on iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV. The asymmetry between Apple's protection of user biometric data and Apple's protection of non-user voiceprints is, in operational terms, total: one category is protected as the most sensitive data Apple's systems handle; the other has no documented protection at all.

*Apple's Training-Data Acquisition Practices*

53. Apple has never disclosed the sources, scale, or provenance of the voice data used to train the foundational voice synthesis models that power Siri's text-to-speech voices, Personal Voice's pre-trained acoustic and vocoder models, or the "Narrated by Apple Books" digital narration voices. Apple has

not published a model card, a data sheet, a training-data manifest, or any transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented.

54. The only publicly disclosed training data Apple has provided regarding its voice synthesis pipeline appears in its December 2023 Personal Voice research paper. There, Apple stated that the pre-trained acoustic and vocoder models on which Personal Voice fine-tuning sits were trained on the LibriTTS dataset, comprising approximately 300 hours of speech from approximately 1,000 speakers. The LibriTTS dataset is derived from LibriVox, a volunteer-run audiobook project in which individual narrators read public-domain books and donate their recordings under a non-restrictive license intended for audiobook listening, not for use as the substrate for a commercial voice-cloning feature. On information and belief, the LibriVox volunteer narrators whose recordings constitute the LibriTTS corpus did not consent to the extraction of their voiceprints or biometric information for the purpose of building a commercial voice-cloning product; were not informed by Apple of any such use; and were not paid for it.

55. The Personal Voice paper's LibriTTS admission is the only voice-training corpus Apple has ever publicly disclosed. It is not the only one. Producing the multilingual Siri voices Apple ships in over thirty languages, the four *"Narrated by Apple Books"* digital narration voices, and the consumer-grade voice quality on which Apple's products depend cannot be achieved with 300 hours of speech from 1,000 speakers. On information and belief, Apple's

foundational voice synthesis training corpora aggregate to tens of thousands of hours of speech from tens of thousands of distinct speakers, sourced from a combination of licensed voice-talent recordings, publicly available audio platforms (including audiobook distribution platforms, podcast directories, streaming services, YouTube, and broadcast archives), and Apple's first-party platforms (Apple Podcasts and Apple Books).

56. The most concrete documented instance of Apple's training-data acquisition practices is the Findaway Voices controversy of February 2023. In January 2023, Apple launched *"Narrated by Apple Books"* digital narration, releasing a slate of synthetic voices marketed as "digital voice[s] based on a human narrator." Within weeks, public reporting revealed that Apple had obtained training audio for its synthetic narration voices through Findaway Voices, a Spotify-owned audiobook distributor, under a contract clause that authorized Apple to "use audiobook files for machine learning training and models."[17] Authors and audiobook narrators publicly stated that they had not been told of, and had not consented to, this use.[18] Following intervention by SAG-AFTRA, Apple agreed in February 2023 to halt "use of files for machine

---

[17] Shubham Agarwal, *Audiobook Narrators Fear Apple Used Their Voices to Train AI*, Wired (Feb. 14, 2023), https://www.wired.com/story/apple-spotify-audiobook-narrators-ai-contract/ (last visited May 12, 2026).

[18] Wesley Hilliard, *Audiobook Narrators Complain Apple May Have Used Them to Train AI Voices*, AppleInsider (Feb. 14, 2023), https://appleinsider.com/articles/23/02/14/audiobook-narrators-complain-apple-may-have-used-them-to-train-ai-voices (last visited May 12, 2026).

learning purposes," with the halt covering "all files dating back to the beginning of this practice."[19]

57. The Findaway halt does not repair the underlying violation. Apple has not publicly identified which audiobook files it ingested, how many narrators' voices contributed to its synthetic narration models, or whether the synthetic voices Apple now sells through Apple Books still contain biometric information derived from those files. The halt addresses future ingestion. It does not address the voiceprints and biometric information already extracted, already encoded in Apple's foundational models, and still being deployed in Apple's commercial products.

58. Apple affirmatively accessed recordings attributable to individual speakers, recordings containing metadata identifying the speaker and the geographic origin of the content, and recordings published on platforms where the speaker's identity, location, and body of work were publicly associated with the recordings. YouTube, Apple Podcasts, Spotify, Audible, Apple Books, and Findaway-distributed channels, the platforms on which Plaintiffs' and Class members' recordings are available, display creator profiles that include the creator's name, geographic location, channel or artist description, and content catalog. This identifying information was visible and accessible to Apple at the time of data acquisition. Apple's sourcing of voice recordings from these platforms was not geographically blind. It involved accessing content from

[19] Id.

identified speakers whose association with specific locations, including Illinois, was publicly visible. Apple Podcasts and Apple Books are Apple's first-party platforms, to which Apple maintains full crawl access for all metadata associated with each episode or title.

59. The conspicuous absence of any affirmative training data claim for Apple's voice synthesis models, in contrast to Apple's transparency about its general-purpose Apple Intelligence text foundation models, confirms the institutional posture. In its July 2024 disclosure of its on-device and server foundation language models, Apple expressly described its text-model training data as drawn from "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot." No equivalent affirmative statement has ever been made about the corpus from which Apple's commercial voice synthesis models were trained. If Apple's voice synthesis models had been trained on properly licensed and consented data, Apple would have an obvious commercial incentive to say so. Apple has not.

*Illinois-Origin Biometric Data*

60. The biometric data at issue in this case originated in Illinois. Plaintiffs and Class members are speakers whose voices, the biological characteristic from which a voiceprint is derived, were produced while the speakers were physically present in Illinois. The audio recordings embodying those voices were created in Illinois. The recordings were published from Illinois to publicly accessible platforms. The recording-location anchor—that

Class membership turns on whether the voice recordings were produced or recorded in Illinois—flows from the recording's place of creation, not from the speaker's later residence.

61. Apple's extraction of voiceprints and biometric information from Illinois-produced voice recordings is conduct directed at Illinois in three independent respects. *First, the biometric data was generated in Illinois.* The voice is the raw biometric characteristic from which a voiceprint is derived. Each Plaintiff's voice was produced by the Plaintiff while physically present in Illinois. The audio encoding of each Plaintiff's voice—the recording itself—was created in Illinois. The voiceprint Apple extracted from that audio encoding is a derivative of biometric source material that originated in Illinois. The biometric data Apple ingested does not become non-Illinois biometric data by virtue of being processed on Apple servers outside Illinois. The data was generated in Illinois; it remains, in legal substance, Illinois-origin biometric data.

62. *Second, Apple's acquisition was targeted at identifiably Illinois-origin material.* Apple's training-data acquisition was not geographically blind. Apple did not receive an anonymized dataset from a third-party intermediary that scrubbed location information from its contents. Apple sourced recordings from platforms, including Apple's first-party Apple Podcasts and Apple Books platforms, and third-party platforms accessible to Apple's data acquisition pipelines, on which the speaker's name, professional biography, and geographic location were publicly displayed in platform metadata Apple controlled or accessed. Apple's act of accessing and processing each Plaintiff's

recordings involved the acquisition of identifiable Illinois-origin biometric data from an identified Illinois speaker. Apple knew, or with the application of automated metadata-extraction tools available to any AI laboratory operating at Apple's scale, could have known, that the recordings it ingested were produced by Illinois speakers in Illinois.

63. *Third, Apple's ongoing exploitation of the extracted biometric data is directed at Illinois.* The voiceprints and biometric information Apple extracted are encoded in foundational voice synthesis models that Apple deploys in commercial products sold and distributed in Illinois. Apple's Siri, Personal Voice, *"Narrated by Apple Books"* digital narration, Live Speech, Dictation, Live Voicemail, and developer-API speech models all operate on Illinois consumer devices continuously. Apple has not geoblocked Illinois users. Apple processes Siri voice requests, generates synthetic-narration audiobook outputs, and delivers voice-synthesis API outputs into Illinois on every day Apple's products operate. Apple's ongoing possession of Plaintiffs' and Class members' voiceprints, and its continued commercial use of those voiceprints to power products delivered into Illinois, constitutes a continuing wrong directed at Illinois residents and felt in Illinois.

64. The BIPA duties Apple violated run to the persons whose biometric data is at stake. The § 15(b) duty to inform and obtain consent was owed to Illinois persons. The § 15(a) duty to develop and publish a retention policy applies to a private entity in possession of Illinois persons' biometric data. The § 15(c) prohibition on profiting protects Illinois persons whose biometric data is

exploited. The § 15(d) prohibition on dissemination protects Illinois persons whose biometric data is disseminated. The § 15(e) duty to protect biometric data from disclosure protects Illinois persons whose biometric data is in the entity's possession. Each obligation runs to the Illinois persons whose data is at stake. The failure to perform each duty—the omission, in the case of §§ 15(a), (b), and (e); the affirmative act, in the case of §§ 15(c) and (d), is localized where those persons reside and where their biometric source material was produced.

*Monetization Through the Integrated Commercial Chain*

65. Apple monetizes the voiceprints and biometric information at issue in this case through an integrated commercial chain that converts upstream extraction into downstream revenue. The chain has five reinforcing channels.

66. *Channel One: Consumer devices.* Apple sells consumer devices that depend on the voice technology built using the unlawfully extracted biometric data. iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV each incorporate Siri voice synthesis, speech recognition, and related voice features. Voice features are core to the consumer experience of every Apple device. Apple's installed base of more than 2.5 billion active devices reflects, in part, the commercial value of those voice capabilities. The voiceprints extracted from training data are the technical foundation of the voice features that contribute to that installed base.

67. *Channel Two: "Narrated by Apple Books" digital narration audiobooks.* Apple Books distributes synthetic narration audiobooks generated

by voice models trained on human narrators' voices. The synthetic narration is produced through Apple's authorized aggregator partners (Draft2Digital, Ingram CoreSource, and PublishDrive) for a fraction of the cost of human narration. Apple pays revenue shares to publishers and authors whose books are produced using *"Narrated by Apple Books"* digital narration. Each audiobook generated by the synthetic narration program is a direct commercial product of the voiceprints and biometric information extracted during training.

68. *Channel Three: Subscription services.* Apple offers Apple-branded subscription services—including Apple Music, Apple TV+, iCloud+, Apple Arcade, Apple Books, Apple News+, Apple Fitness+, and AppleCare+—that incorporate voice technology directly or that operate on devices whose voice capabilities depend on Apple's voice models. Apple accepts recurring subscription payments from Illinois and nationwide users and processes those payments as ongoing commercial relationships.

69. *Channel Four: Developer ecosystem and App Store.* Apple's SFSpeechRecognizer and SpeechAnalyzer developer APIs route Apple's voice and speech models into third-party applications distributed through the App Store. On information and belief, Apple's developer APIs handle a substantial portion of all third-party speech-recognition requests on Apple devices. Apple's App Store revenue, including commission on in-app purchases and subscription fees, derives in part from applications that depend on Apple's voice and speech models.

70. *Channel Five: Audiobook distribution through Apple Books.* Apple Books is Apple's commercial audiobook distribution platform. Apple distributes human-narrated audiobooks through Apple Books and collects a commercial commission on each sale. Apple Books is also the distribution channel for *"Narrated by Apple Books"* synthetic-narration audiobooks. Because Apple distributes human-narrated audiobooks through Apple Books, Apple already directly possesses and controls copies of those recordings. Apple did not need to scrape narrator recordings from third-party platforms to access them; the recordings were in Apple's first-party catalog. For the audiobook market, Apple's commercial path from voice ingestion to voice product is a closed loop: Apple distributes human narration through Apple Books, ingests it as training data for foundational voice models, and sells synthetic AI narration back through Apple Books. The product Apple competes against the narrators with is built from the narrators' own voices.

71. Each channel of monetization depends on the channel before it: the consumer-device channel depends on the voice features the devices incorporate; the voice features depend on the foundational voice synthesis models; the foundational models depend on the training data; the training data was obtained without notice, consent, or written release from the speakers whose voices the data embodies. The integrated commercial chain is the conversion mechanism by which Apple turns unconsented biometric extraction into ongoing commercial revenue.

*Dissemination Across Corporate and Cloud Infrastructure*

72. Apple does not operate its voice synthesis products from a single self-contained facility. Apple operates a global corporate infrastructure of subsidiaries, affiliates, and processors, and uses third-party cloud and content-delivery infrastructure to deliver voice products to its global user base. Apple's 2025 Form 10-K identifies material subsidiaries, including Apple Operations International, Apple Distribution International Ltd. (Ireland), Apple Operations Europe, Apple Singapore Pte. Ltd., Apple South Asia Pte. Ltd., and Beats Electronics, LLC, among others. Apple Distribution International Ltd. and Apple Operations Europe handle the international distribution of Apple's voice-enabled products and services. Apple's regional subsidiaries operate the local infrastructure through which Siri voice requests, Personal Voice synthesis, and "Narrated by Apple Books" audiobook outputs are delivered to users worldwide. The voiceprints encoded in Apple's foundational voice synthesis models traverse this corporate and infrastructure network in the ordinary course of Apple's voice business.

73. On information and belief, Apple shares voice data, including voiceprints and biometric information derived from training data, with its affiliates, subsidiaries, vendors, and service providers across jurisdictions. The foundational voice synthesis models and the voiceprints encoded within them have been transferred among Apple's affiliated entities and to third-party cloud infrastructure partners in the ordinary course of training, evaluating, deploying, and operating Apple's commercial voice products. Each such

transfer is a separate act of dissemination under 740 ILCS 14/15(d), conducted without the consent of the Plaintiffs and Class members whose voiceprints were transferred.

74. Apple has publicly announced one piece of its server-side AI infrastructure, Private Cloud Compute, and has described it as cryptographically isolated, access-restricted, and engineered to keep user data private. Apple has not publicly disclosed where its voice training data is hosted, where its trained voice models are stored, which Apple subsidiaries or third-party processors have access to either, or what protections, if any, apply. The infrastructure Apple announces and protects is the infrastructure that holds user data. The infrastructure that stores non-user voiceprints and the models in which they are encoded are undisclosed and not documented in the public record.

75. Apple operates a "Data and Privacy" portal through which Apple Account holders may request copies of, corrections to, and deletion of data Apple holds about them. The portal is limited to users with Apple Accounts and only accesses user-side data. It provides no mechanism for non-users, including Plaintiffs and Class members, to determine whether Apple has extracted their voiceprints, to request access to or deletion of those voiceprints, to learn which Apple entities or third-party processors hold that data, or to opt out of future ingestion. The non-user access mechanism does not exist.

*Named Plaintiffs*

*Allegations Common to Each Named Plaintiff*

76. On information and belief, the voice recordings of each named Plaintiff were among the audio that Apple ingested to train its foundational voice synthesis models, and the voiceprints and biometric information derived from those recordings are encoded in the parameters of those models and reproduced in the audio that those models generate. Each named Plaintiff's catalog of professional voice work matches the profile of training audio that Apple's technical documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on publicly distributed audio platforms, including Apple's first-party Apple Podcasts and Apple Books platforms.

77. Apple has not disclosed, and has refused to disclose, the sources of the voice training data used to develop its foundational voice synthesis models. The records identifying which specific voice recordings Apple ingested into the training corpora that produced the foundational voice models and the commercial voice products derived from those models are within Apple's exclusive control.

78. No named Plaintiff created an account with Apple for the purpose of contributing voice data to Apple's training pipeline. No named Plaintiff uploaded a voice recording to Apple's training pipeline. No named Plaintiff executed any terms of service authorizing Apple's use of their voice for biometric extraction or model training. No named Plaintiff received any

notification or disclosure from Apple that their voice recordings were being collected, that voiceprints or biometric information were being extracted, that their biometric data was being retained, or for what purpose or duration. No named Plaintiff executed a written release authorizing Apple's collection of their biometric data. Apple's collection of each named Plaintiff's voiceprint, and Apple's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent.

79. The injury Apple inflicted on each named Plaintiff is concrete and particular to that Plaintiff and shares the same structure across all of them. Apple extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in the foundational voice synthesis models, and continues to profit from those models and from the commercial products built on them. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The voice synthesis products Apple built using each Plaintiff's voiceprint now operate in the same professional voice markets in which the Plaintiff built and continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Yohance Lacour*

80. Plaintiff Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago whose professional work centers on storytelling about Black Chicago. Lacour is affiliated with the Invisible Institute, a Chicago-based nonprofit investigative journalism

organization. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio, in which Lacour revisits the 1997 hate-crime attack on Lenard Clark that Lacour had covered as a young community journalist, tracks down key participants in the case a quarter-century later, and examines how the case and its aftermath shaped his own life. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series. In 2024, *You Didn't See Nothin'* was awarded the Pulitzer Prize for Audio Reporting and a Peabody Award. The series was named among Apple Podcasts' "Podcasts We Love" and the "100 Best Podcasts of All Time," and received nominations at the Signal Podcasting Awards and four nominations at the Black Podcasting Awards. Lacour has also appeared as a featured guest on NPR's Fresh Air with Tonya Mosley, NPR's All Things Considered with Adrian Florido, the Canadian Broadcasting Corporation's Crime Story podcast, and the Pulitzer Prize Board's Pulitzer on the Road podcast. All of Lacour's recorded audio storytelling and journalism work was produced and recorded in Chicago, Illinois. See ¶¶ 76–79.

81. *You Didn't See Nothin'* and Lacour's interview appearances are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, Overcast, and other major podcast and digital-audio platforms, with metadata identifying Lacour as creator, host, narrator, and lead reporter. Apple Podcasts' editorial recognition of *You Didn't See Nothin'* among its "100 Best Podcasts of All Time" indicates that Apple's content systems identified the series as high-recognition audio content on Apple's first-party platform, for

which Apple maintains full crawl access to all episode metadata. The recordings have been continuously available since 2023, preceding Apple's training of multiple voice models alleged in this Complaint.

82. Lacour's injury is concrete and particular to him in the manner alleged at ¶ 79. Lacour's professional identity is defined by his work as an investigative audio storyteller and narrator from the South Side of Chicago, a market position in which authentic, place-specific Black narration is the core product. The investigative and narrative podcast markets in which Lacour earns his livelihood, including markets reaching the Black audiences and communities about whom Lacour reports, are markets Apple's voice synthesis products are designed to serve at a fraction of the cost of human production. The technology built using Lacour's voiceprint operates in the same audio markets, long-form narrative audio journalism, podcast production, and investigative storytelling, in which Lacour earns his living, and is distributed through the same Apple Podcasts platform on which *You Didn't See Nothin'* was recognized by Apple's editorial systems.

*Carol Marin*

83. Plaintiff Marin is one of the most decorated broadcast journalists in American television history, with a career spanning nearly five decades in on-air television and radio journalism conducted substantially in and from Chicago. Marin's on-air work has aired on NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, the CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel, and includes television anchoring,

investigative reporting, debate moderation, documentary narration, and long-form interviewing. Her career has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. Marin has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor. All of Marin's voice work was produced and recorded in Chicago, Illinois. See ¶¶ 76–79.

84. Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint.

85. Marin's injury is concrete and particular to her in the manner alleged at ¶ 79. The broadcast and investigative journalism markets in which Marin built her five-decade career, television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing, are the markets in which Apple's voice synthesis products now operate. The "Narrated by Apple Books" digital narration voices for non-fiction and current affairs (Helena and Mitchell) and the broadcast-quality Siri voices Apple ships in over thirty languages compete in the same audio markets, long-form non-fiction narration, broadcast-style delivery, authoritative female-voice presentation, that Marin's career anchored. The technology built using Marin's voiceprint competes in the same markets and against the same colleagues with whom she spent her career.

*Philip Rogers*

86. Plaintiff Rogers is a retired, award-winning broadcast journalist whose career spans more than four decades in radio and television news, conducted in and from Chicago. Rogers's voice-based and oral journalism work, spanning on-air radio reporting at WBBM Newsradio (CBS), on-air television reporting and anchoring at WMAQ-TV (NBC 5), and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events, has been disseminated across major broadcast platforms. His career has been recognized with multiple Emmy Awards including a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and

multiple Peter Lisagor Awards from the Chicago Headline Club. The Peter Lisagor Awards, conferred by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region. All of Rogers's voice work was produced and recorded in Chicago, Illinois. See ¶¶ 76–79.

87. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. The catalog is continuously available through the NBC Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting from war zones, mass shootings, corruption trials, the Olympic Games, and other major events. Each platform on which Rogers's recordings appear displays metadata identifying Rogers as the speaker and Chicago as the production location. Rogers's body of work has been continuously available through these channels for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint.

88. Rogers's injury is concrete and particular to him in the manner alleged at ¶ 79. The broadcast journalism market in which Rogers built his career, live broadcast reporting, on-air anchoring, and broadcast investigative journalism, is the market in which Apple's commercial voice synthesis products now operate. Apple ships Siri voices in over thirty languages marketed as broadcast-quality voice synthesis, and the "Narrated by Apple

Books" non-fiction digital narration voices Helena and Mitchell compete in the broadcast-style narration categories in which Rogers's career was built. The technology built using Rogers's voiceprint competes in the same markets and against the same colleagues with whom he spent his career, and continues to be used in products Apple ships globally.

*Robin Amer*

89. Plaintiff Amer is a journalist, podcast creator, audio producer, and on-air host with more than twenty years of experience in digital, broadcast, and print media, who has produced the substantial majority of her audio work from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the investigative podcast produced by USA Today over two seasons. Season 1 of *The City*, which focused on Chicago, peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by The New Yorker, The New York Times, Quartz, and Apple Podcasts. Amer's earlier production work for *Gravy*, the podcast produced by the Southern Foodways Alliance, contributed to that program's 2015 James Beard Award for Best Podcast. Amer subsequently spent three years as Senior Producer for Audio Features at The Washington Post, where she edited the Post Reports daily news podcast and produced the standalone narrative series *Field Trip*; during her tenure she won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for Best

Independent Non-Fiction. The substantial majority of Amer's voice recordings were produced in Chicago, Illinois. See ¶¶ 76–79.

90. *The City, Gravy, Post Reports, Field Trip, and Love + Radio: Blood Memory* are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, and other major podcast and digital-audio platforms, with metadata identifying Amer as host, narrator, producer, showrunner, or contributor. Apple Podcasts' editorial designation of *The City* as Best Podcast of the Year establishes that Amer's recordings were known to, and curated by, Apple within Apple's own content systems. Apple Podcasts is a first-party Apple platform to which Apple maintains full crawl access for all metadata associated with each episode, including episode-level speaker identification, geographic location, and production credits. Amer's body of audio work has been continuously available across these channels for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint.

91. Amer's injury is concrete and particular to her in the manner alleged at ¶ 79. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting, the market Apple's voice synthesis products are designed to serve at substantially lower cost than the human production Amer provides. Apple's recognition of *The City* on its platform establishes that Amer's recordings were known to Apple as high-value, high-recognition audio content within Apple's own content discovery and curation systems. The technology built using Amer's voiceprint, on information

and belief, now competes with her active professional work in the same long-form narrative podcasting market in which she has built her career.

*Lindsey Dorcus*

92. Plaintiff Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for many of the largest publishers in the English-language publishing industry, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a Society of Voice Arts and Sciences (SOVAS) Voice Arts Award winner, recognized in 2020 as part of the full-cast voice artist ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind*. Dorcus is also a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. AudioFile Magazine, the principal independent trade publication reviewing audiobook narration in the United States, has reviewed Dorcus's narration as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (both Dublin and Northern Irish), French, American Southern, Greek, New England, New York, German, Indian, and Russian. All of Dorcus's audiobook narration work was recorded in a professional home studio in Chicago and produced in Illinois. See ¶¶ 76–79.

93. Dorcus's audiobook narration is publicly distributed across the major audiobook and digital-audio platforms, including Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on Audible.com and Apple Books. The recordings are continuously available on these platforms and have been so available for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint. Dorcus's audiobooks have been continuously available through Apple Books, Apple's first-party audiobook distribution platform, for years preceding Apple's training of the foundational voice models at issue, and Apple Books continues to distribute Dorcus's audiobook narrations today. Apple Books is the platform on which Apple itself distributes both human-narrated audiobooks like Dorcus's and the synthetic *"Narrated by Apple Books"* digital narration audiobooks Apple sells in competition with them.

94. Dorcus's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79, and is sharpened by the closed-loop structure of Apple's audiobook commerce: the *"Narrated by Apple Books"* digital narration program operates within the same Apple Books distribution ecosystem in which Dorcus's two-hundred-plus human narrations are sold. The synthetic narration voices Apple offers, Madison and Jackson for fiction and romance, and Helena and Mitchell for non-fiction and self-development, compete directly with audiobook narrators in Dorcus's professional categories. *"Narrated by Apple Books"* digital narration is produced for a fraction of the cost of human

narration, which typically runs $200 to $400 per finished hour and takes one to three months. For Dorcus, the biometric data and the product are, at this point, the same thing: the audiobook narrations Apple distributed through Apple Books became the training material for the AI narration Apple now sells through Apple Books, displacing the human narration market from which Dorcus's recordings came.

*Victoria Nassif*

95. Plaintiff Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director. Nassif is a trained mezzo-soprano singer whose vocal performance skills extend beyond spoken narration to musical and singing capabilities developed through her classical acting training. Nassif's on-camera work includes multiple episodes of NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Nassif has recorded audiobooks for major publishers, including Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Nassif's notable audiobook narration credits include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), for which she served as solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist, which was shortlisted for the Ursula K. Le Guin Prize and named a them Best Book of the Year; Gulf by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every*

Case 1:26-cv-05436 Document #: 24-1 Filed: 07/23/26 Page 54 of 97 PageID #:51

*Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers. As a first-generation Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern characters and settings; this authentic voice work represents a distinctive professional asset in the audiobook narration industry. Nassif's professionally recognized range of accents and dialects includes General American, British (Received Pronunciation and Cockney), Persian, Arabic (Levantine dialect), and American Southern. All of Nassif's audiobook narration and voiceover work was produced and recorded in Illinois. See ¶¶ 76–79.

96. Nassif's audiobook narration is publicly distributed across major audiobook and digital-audio platforms, including Audible, Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's on-camera work for NBC's *Chicago PD* and nationally broadcast commercials is distributed across broadcast and streaming platforms, including NBC and Peacock. Nassif's audiobook recordings are continuously available on these platforms and have been so available for years preceding Apple's training of the foundational voice synthesis models alleged in this Complaint. Nassif's audiobooks have been continuously available through Apple Books, Apple's first-party audiobook distribution platform, for years preceding Apple's training of the foundational voice models at issue. Nassif's distinctive cultural and linguistic position, authentic Lebanese-Palestinian American narration with native Arabic-accent capability, is a category of

professional voice work uniquely valuable for training the multilingual and cross-accent voice synthesis capabilities Apple markets in Siri's voices across more than thirty languages.

97. Nassif's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79. Nassif occupies a distinctive market position as a Lebanese-Palestinian American narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors. Apple's voice synthesis products, including the multilingual Siri voices Apple ships in over thirty languages and the foundational voice models underlying *"Narrated by Apple Books"* digital narration, can now generate Arabic-accented English narration and Levantine Arabic-accented voice content that competes specifically with Nassif's professional niche. As for Dorcus, the audiobook narrations Apple distributed through Apple Books became the training material for the AI narration Apple now sells through Apple Books, displacing the human narration market from which Nassif's recordings came. The technology built using Nassif's voiceprint operates in the precise market, authentic Arabic-accented narration of works by Arab and Palestinian American authors, in which Nassif has built her career, in a competitive position Nassif neither chose nor authorized.

*Commercial Substitution and Economic Harm*

98. The voice products Apple built using Plaintiffs' and Class members' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods. Professional audiobook narration has

historically been performed by human narrators at industry rates of approximately $200 to $400 per finished hour, meaning a typical ten-hour novel costs $2,000 to $4,000 to narrate and takes one to three months to produce.

99. The *"Narrated by Apple Books"* digital narration program generates professional-quality narration at a fraction of those rates. The synthetic narration is produced through Apple's authorized aggregator partners (Draft2Digital, Ingram CoreSource, and PublishDrive) and approved by Apple in approximately one to two months, compared with the one to three months required for human narration. Once a manuscript is submitted, Apple's foundational voice models can render an entire audiobook in hours of compute time, compared with the dozens of hours of recording, editing, and quality control required for human production. The synthetic voices Apple offers, Madison and Jackson for fiction and romance and Helena and Mitchell for non-fiction and self-development, compete directly with the work of human audiobook narrators in those genres. Apple's commercial deployment of *"Narrated by Apple Books"* through Apple Books directly substitutes for human voice professionals in the audiobook narration market, the market in which Plaintiffs Dorcus and Nassif distribute their human narrations through the same Apple Books platform.

100. Apple's voice synthesis products directly substitute for, or threaten to substitute for, long-form investigative audio journalism, podcast hosting and narration, on-air broadcast journalism, and narrative non-fiction audio

production, the markets in which Plaintiffs Marin, Rogers, Amer, and Lacour have built their careers and continue to work. Apple's foundational voice synthesis models generate substitutable voice content in those markets at consumption-based pricing and per-character API rates orders of magnitude lower than human-talent rates. Siri's broadcast-quality voice synthesis across more than thirty languages, the *"Narrated by Apple Books"* non-fiction and current-affairs voices Helena and Mitchell, and the SFSpeechRecognizer and SpeechAnalyzer developer APIs that route Apple's voice models into third-party applications collectively cover the full range of long-form professional audio markets in which the broadcast journalist and podcaster Plaintiffs operate.

101. Apple's voice synthesis products are marketed and deployed for studio dubbing, e-learning narration, advertising voiceover, conversational AI, video-game voice acting, and customer-service voice work. Each of these markets has historically been served by professional voice actors, including Plaintiffs Dorcus and Nassif. Apple's voice synthesis products generate substitutable voice content in those markets at pricing orders of magnitude lower than human voice talent rates.

102. Apple's voice synthesis capabilities span more than thirty languages and locales. On information and belief, Apple's multilingual and accented synthesis capabilities include the capability to generate Arabic-accented English narration, Levantine Arabic narration, and other culturally and linguistically specific voice content. This capability competes specifically with the distinctive market position held by Plaintiff Nassif as a Lebanese-

Palestinian American audiobook narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors.

103. Each of Apple's voice products was built using the vocal characteristics of the human performers it now displaces. The market substitution is therefore not merely temporal but causal. The synthetic audio Apple generates is generated because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output. The product is the data; the data is the product.

*Apple Acted Willfully and Recklessly*

104. Apple's collection, retention, commercial exploitation, dissemination, and protection-failure with respect to Plaintiffs' and Class members' voiceprints and biometric information was not the result of inadvertence or unfamiliarity with BIPA. Apple acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*Apple knew its obligations under BIPA*

105. By the time Apple launched the consumer-facing voice synthesis features at issue, *"Narrated by Apple Books"* in January 2023, Personal Voice in September 2023, and the successive foundational voice models through 2024 and 2025, BIPA had been the law of Illinois for more than fifteen years and had generated some of the largest privacy settlements in American history: approximately $650 million in *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747 (N.D. Cal.); approximately $100 million in *In re Google Inc. Biometric Information Privacy Litigation*, No. 1:20-cv-04472 (N.D.

Ill.); and approximately $92 million in *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill.). Parallel state biometric statutes had produced additional billion-dollar settlements: Texas's $1.4 billion settlement with Meta in 2024 and Texas's $1.375 billion settlement with Google in 2025. The biometric-privacy obligations governing the extraction of biometric identifiers from human-source material were a matter of legislative and judicial record throughout the period during which Apple ingested Plaintiffs' voice recordings.

106. Voice-AI-specific litigation against companies in Apple's product market sharpened the notice. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.), alleging that an AI voice company commercialized unauthorized voice clones trained on the plaintiffs' recordings; the court permitted right-of-publicity claims to proceed in July 2025. In August 2024, additional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.), asserting analogous claims. By the time Apple launched the voice products at issue here, AI voice companies were active defendants in litigation alleging precisely the conduct alleged here: building commercial voice synthesis products on voice recordings ingested without speaker consent.

107. Apple's notice was not inferred from industry conditions; it was direct and adjudicated. Apple has been a BIPA defendant in Illinois since December 2019 in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty.), where plaintiffs allege that Apple's automatic speech recognition system creates and stores biometric voiceprints and feature vectors from Siri user

audio in violation of BIPA. On January 29, 2026, the Circuit Court of Cook County certified a class of approximately 2.6 to 3.9 million Illinois Siri users. Separately, in *Lopez v. Apple Inc.*, No. 4:19-cv-04577 (N.D. Cal.), Apple agreed in 2025 to pay $95 million to settle claims that Siri unintentionally recorded private conversations and shared them with third parties; final approval was granted in September 2025. Apple was a BIPA defendant in this state, and a federal voice-privacy litigant, throughout the period in which it built and deployed the commercial voice products at issue here.

108. Apple's senior leadership during the relevant training period came from organizations where biometric-privacy compliance was a core operational concern. John Giannandrea served as Apple's Senior Vice President of Machine Learning and AI Strategy from December 2018 until late 2025, joining Apple from Google, the company that paid $100 million to settle BIPA claims and $1.375 billion to Texas for parallel violations. His successor, Amar Subramanya, joined Apple in December 2025 from Microsoft, after roughly a decade at Google leading engineering for the Gemini Assistant. Apple's leadership did not lack institutional familiarity with biometric privacy law.

*Apple knew that voice training extracts biometric identifiers*

109. Apple's published research describes its voice synthesis pipeline in terms that align with BIPA's biometric definitions. Apple's 2017 description of Siri's voice synthesis describes the process as building a voice model that learns from voice-talent recordings to generate new utterances. Apple's 2021 on-device neural speech synthesis paper describes a Tacotron-style acoustic

model paired with a WaveRNN vocoder that synthesizes new speech from a learned representation of the source voice. Apple's December 2023 *Advancing Speech Accessibility with Personal Voice* research publication expressly describes "voice model pretraining and fine-tuning," a process that extracts and encodes the distinctive acoustic characteristics of source speakers. Apple's wake-word and speaker-recognition research describes "personalized embeddings" derived from a small number of target-speaker utterances. Apple built the pipeline, published the research, and shipped the products on that very capability.

110. Apple's institutional language confirms the awareness. Apple's research publication *Improving On-Device Speaker Verification Using Federated Learning With Privacy*, presented at Interspeech 2020, opens with this acknowledgement: "Information on speaker characteristics can be useful as side information in improving speaker recognition accuracy. However, such information is often private." That language is not a marketing slogan; it is a recognition, in Apple's own technical publications, that speaker-specific voice characteristics are simultaneously commercially valuable and protected. A company that characterizes a category of data as "private" in its own research, and then proceeds to extract that data from third-party recordings without notice, consent, or a written release, is not acting in ignorance of its obligations.[20]

[20] Filip Granqvist et al., *Improving On-Device Speaker Verification Using Federated Learning With Privacy*, arXiv:2008.02651 (Aug. 6, 2020), https://arxiv.org/abs/2008.02651 (last visited May 12, 2026); *see also* Apple Machine Learning Research, *Improving On-Device Speaker Verification*

Case 1:26-cv-05436 Document #: 4-1 Filed: 07/23/26 Page 59 of 97 PageID #:59

111. Apple's avoidance of biometric terminology in its public-facing voice-data disclosures — the words "voiceprint," "speaker embedding," and "biometric identifier" — despite Apple's fluency with that terminology elsewhere in its biometric documentation, as alleged at ¶¶ 48–51, reflects institutional recognition that Apple's voice processing implicates biometric privacy law and a strategic choice not to take a definitive position on that question.

*Apple chose to apply consent selectively*

112. The most direct evidence of Apple's willfulness is the contemporaneous design of Personal Voice, alleged at ¶ 44. Apple released Personal Voice as part of iOS 17 in September 2023, with on-device recording and fine-tuning, encrypted storage under Secure Enclave-class cryptographic protections, own-voice-only synthesis restrictions, and personal noncommercial-purpose restrictions. Apple describes Personal Voice publicly as a privacy-protective feature.

113. Apple's public design of Personal Voice demonstrates that Apple is institutionally capable of building voice-cloning technology with strong consent and rights protections. Apple implemented every one of those protections for the user's own voice. Apple implemented none of them, or any equivalent, for the third parties whose voices it had already used to train the foundational voice models that Personal Voice and Apple's other voice products rely upon.

---

*Using Federated Learning With Privacy*, https://machinelearning.apple.com/research/improving-on-device-speaker (last visited May 12, 2026).

The same Apple engineers, the same Apple legal department, and the same Apple product organization that designed Personal Voice's user-consent infrastructure designed the training pipeline that ingested Plaintiffs' voice recordings without notice, consent, written release, or any of the protections Apple applied to its users.

114. Apple's privacy reputation is itself probative. Apple has spent more than a decade publicly positioning privacy as a core differentiating value of its products, marketing Touch ID, Face ID, Personal Voice, on-device processing, App Tracking Transparency, and Private Cloud Compute as architectural commitments to user privacy and as a competitive differentiator that sets Apple apart from every other technology company. The asymmetry alleged here is not Apple stumbling on biometric privacy from a position of ignorance. It is Apple, the company that built the most sophisticated consumer biometric-privacy architecture in the technology industry, deliberately withholding that architecture from a category of subjects whose voices it took to build its commercial voice products. The privacy commitment Apple markets to users is the same privacy commitment Apple denied to Plaintiffs and the Class.

115. Apple's decision to apply consent infrastructure to users and to deny it to non-users was a contemporaneous, institutionally deliberate choice. BIPA-compliant collection of voice training data would have required Apple to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting the recording. With training corpora measured in tens of thousands

of hours of speech from tens of thousands of distinct speakers, that compliance burden would have constrained the speed, scale, and quality of Apple's voice synthesis development. Apple chose speed and scale over compliance. That was not an oversight. It was a business decision.

*Apple’s training-data acquisition practices confirm deliberateness*

116. Apple's training-data acquisition practices, alleged at ¶ 56, confirm that Apple's noncompliance was institutional choice rather than inadvertent oversight. Every element of the Findaway record is independently probative of willfulness: the practice existed; the contractual instrument expressly contemplated machine-learning training; Apple's agreement to halt the practice reflects Apple's recognition that the practice required correction; and the retroactive scope of the halt — "dating back to the beginning of this practice" — confirms Apple's knowledge of the scope of the conduct.

117. The Findaway halt did not repair the underlying violation. Apple has not publicly identified which audiobook files it ingested, how many narrators' voices contributed to its synthetic narration models, or whether the synthetic voices Apple now sells through Apple Books still contain biometric information derived from those files. Apple's parallel LibriTTS practice, alleged at ¶ 54, confirms the pattern: Apple ingested approximately 300 hours of speech from approximately 1,000 LibriVox volunteer narrators whose recordings were donated for audiobook listening, not for ingestion into a commercial voice-cloning product, without seeking renewed consent from any LibriVox speaker.

118. The conspicuous absence of any affirmative training-data claim for Apple's voice synthesis models, by contrast with Apple's transparency about other AI work, confirms the institutional posture. In Apple's July 2024 disclosure of its on-device and server foundation language models, Apple expressly described its text-model training data as drawn from "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot." No equivalent affirmative statement has ever been made about the corpus from which Apple's voice synthesis models were trained. If Apple's voice synthesis models had been trained on properly licensed and consented data, Apple would have an obvious commercial incentive to say so. Apple has not.

119. Apple's pattern of post-hoc corrective conduct further confirms the institutional awareness. In August 2019, after whistleblower reporting on the Siri grading program, Apple publicly apologized and restructured the program to make audio retention opt-in. In February 2023, after the Findaway exposure, Apple halted Findaway-sourced training. In May 2023, Apple announced Personal Voice as an on-device, own-voice-only feature with explicit consent protections. In June 2024, Apple introduced Applebot-Extended as a website-level opt-out for generative-AI text training. In January 2025, Apple agreed to pay $95 million to settle *Lopez* and publicly recommitted to privacy in connection with Siri. Each step was taken after the relevant harm or legal risk materialized. None was retroactive. None reached the foundational issue at the heart of this case: Apple's voice synthesis models were trained on voiceprints

and biometric information extracted without the knowledge or consent of the speakers, and those voiceprints and biometric information remain encoded in the commercial models Apple deploys today.

120. Each of the violations alleged in this Complaint was therefore committed by Apple with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026).

**CLASS ACTION ALLEGATIONS**

121. Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Apple extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of any voice synthesis, speech-recognition, or related voice-AI model, during the Class Period.

122. The Class Period runs from the earlier of (a) the date Apple first ingested any voice recording into the training, fine-tuning, or evaluation pipeline for any of its voice synthesis or voice-AI models, or (b) January 1,

2010, through the date of judgment in this action. Discovery will establish the operative start date.

123. Excluded from the Class are: (i) Apple Inc. and each of its parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Apple and its subsidiaries; (iii) Apple's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; (vi) any person who, prior to Apple's collection or use of their voice biometric identifiers or biometric information, executed a written release that, on its face, purports to authorize Apple's use of their voice for training, fine-tuning, or operation of voice synthesis models; and (vii) all natural persons whose claims arise solely from Siri or Dictation user audio and are within the scope of the certified class in *Zaluda v. Apple Inc.*, No. 2019-CH-11771 (Cir. Ct. Cook Cnty., Ill.), provided that a member of the *Zaluda* class is not excluded from this Class if Apple also extracted a voiceprint or biometric information from that person's voice recordings in connection with the development, training, fine-tuning, evaluation, or operation of any of Apple's voice synthesis, speech-recognition, or voice-AI models.

124. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

125. *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered the training, fine-tuning, or evaluation pipeline for any of Apple's foundational voice models is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, dataset-version records, source-URL records, and audio-file metadata — are within Apple's exclusive control. For recordings distributed through Apple-owned platforms (Apple Podcasts and Apple Books), Apple also maintains comprehensive distribution metadata identifying speaker identity, geographic location of production, and content catalog. Class membership can be independently confirmed through publicly available distribution metadata on third-party platforms and through voice-matching analysis comparing Apple's voice products' outputs against publicly available recordings of Class members.

126. *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into the training pipelines for the foundational voice models runs to the hundreds of thousands. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period and (b) the interviewees, guests, panelists, callers, public officials, and other speakers whose voices were captured in Illinois-produced broadcast, podcast, audiobook, and archival audio content publicly accessible on the platforms from which, on information and belief, Apple sourced training data.

The exact number is within Apple's exclusive control and will be established through discovery.

127. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Apple did not engage in any individualized notice, consent, retention-policy disclosure, written release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Apple's voice-model training pipelines. Apple's conduct was uniform: the same training pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same automated and standardized process. The questions whether Apple complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements before and after extracting Class members' voiceprints can be answered classwide because Apple's noncompliance was identical as to every Class member.

128. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics Apple extracts during voice-model training, variously described in Apple's research as speaker embeddings, personalized embeddings, and learned representations, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b) whether Apple informed Class members in writing that their biometric identifiers were being collected, of the specific purpose and length of

Case 1:26-cv-05435 Document #: 1 Filed: 05/13/26 Page 67 of 94 PageID #:67

term of collection, and obtained a written release executed by the Class member, as 740 ILCS 14/15(b) requires;

(c) whether Apple developed and made publicly available a written retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training audio, as 740 ILCS 14/15(a) requires;

(d) whether Apple sold, leased, traded, or otherwise profited from Class members' biometric identifiers and biometric information through its integrated commercial chain, including the voice products at issue, in violation of 740 ILCS 14/15(c);

(e) whether Apple disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers and biometric information across its affiliates, subsidiaries, cloud-infrastructure subprocessors, and third-party vendors and service providers, without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether Apple stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2);

(g) whether Apple's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether Apple used Class members' voices and identities for commercial purposes without prior written consent in violation of the Illinois Right of Publicity Act, 765 ILCS 1075/30(a);

(i) whether Apple's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of the Illinois Right of Publicity Act as amended by P.A. 103-836 (effective January 1, 2025), and whether Apple materially contributes to or facilitates the distribution of such replicas;

(j) whether Apple's conduct constitutes an unfair or deceptive practice within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act under *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002);

(k) whether Apple's conduct constitutes deceptive trade practices likely to cause confusion or misunderstanding as to source, sponsorship, approval, certification, affiliation, connection, or association under 815 ILCS 510/2(a)(2) and (a)(3);

(l) whether Apple was unjustly enriched by its unauthorized commercial use of Class members' voice data; and

(m) the appropriate measures of damages, restitution, and injunctive relief, including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded and the commercial products built on those models.

129. *Typicality.* The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois. Apple, on information and belief, ingested those recordings into the training pipelines for the foundational voice models without notice, consent, or written release. With respect to Plaintiffs Dorcus and Nassif, whose audiobook narrations are distributed through Apple Books, and Plaintiffs Amer and Lacour, whose work is recognized within Apple Podcasts' editorial systems, Apple maintained direct first-party access to the recordings on its own platforms. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

130. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

131. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Apple has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Apple's training pipelines operated uniformly across every Class member's voice recordings; Apple's failure to

obtain BIPA-compliant consent was uniform; Apple's failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; and Apple's continuing possession, commercial exploitation, and cross-affiliate and subprocessor dissemination of Class members' voiceprints in the foundational voice models that power Apple's commercial products is uniform. Plaintiffs seek classwide injunctive relief, including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded, and the destruction of the downstream commercial products built on those models, that necessarily applies on the same terms to every Class member.

132. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

133. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First*, whether Apple's voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer. *Second*, whether Apple complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer: Apple did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. *Third*, whether Apple's

Case 1:26-cv-05436 Document #: 24-1 Filed: 07/23/26 Page 166 of 940 PageID #:7

conduct was willful or reckless turns on Apple's institutional knowledge, decision-making, and contemporaneous conduct, all of which are common to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from Apple's own records, which include training-data manifests, ingestion logs, source-URL records, audio-file metadata, and the platform distribution metadata for the content Apple directly possesses through Apple Podcasts and Apple Books, all in Apple's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

134. *Superiority.* A class action is the superior method for adjudicating these claims.

(a) *Class members' interest in individual control.* Class members are voice professionals, journalists, audiobook narrators, podcasters, voiceover artists, voice actors, and incidental speakers whose voiceprints were extracted without their knowledge. Many remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against one of the largest publicly traded technology companies in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and

burden of independent representation. A class action is the only realistic vehicle for redress.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Apple on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train the foundational voice models. The certified *Zaluda* class concerns Siri user audio captured through customer-initiated enrollment, a category of biometric processing not present in this case and to which no Apple customer-facing disclosure applied. The claims here arise from Apple's extraction of voiceprints from non-user voice recordings that no Plaintiff or Class member submitted to Apple. The two cases address distinct categories of Apple's voice processing.

(c) *Desirability of concentration in this forum.* Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Apple conducts substantial commercial business in Illinois through retail stores, online services, subscription products, the App Store, Apple Podcasts, and Apple Books. The Northern District of Illinois has substantial expertise with BIPA litigation and is the natural forum for adjudication of Illinois residents' Illinois-statutory claims arising from Apple's commercial conduct in Illinois.

(d) *Manageability.* The case is manageable as a class action. Apple's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from Apple's records, supplemented as needed by publicly available

distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim.

135. *Tolling and continuing violations.* To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Apple's concealment of its training-data sources, by Apple's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Apple had ingested their recordings into its training pipelines, and by the continuing nature of Apple's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational voice models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 216 N.E.3d 918 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

136. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

137. Plaintiffs bring this Count individually and on behalf of the Class.

138. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

139. Apple is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

140. Apple collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class members by ingesting their voice recordings into its training pipelines and extracting from those recordings computational representations capable of identifying the speakers, as alleged at ¶¶ 38-42. The resulting representations—variously denominated as speaker embeddings, audio tokens, voice prompts, acoustic features, and the parameters encoding speaker characteristics in Apple's technical and product documentation—are voiceprints and biometric information within the meaning of BIPA.

141. Apple did not, before extracting Plaintiffs' or Class members' voiceprints and biometric information, inform any Plaintiff or Class member in

writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Apple obtained no consent of any kind, in any form, from any Plaintiff or Class member, as alleged at ¶¶ 47, 78.

142. Apple's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple's violations were negligent.

143. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member and each violation, the greater of liquidated damages of $1,000 (negligent) or $5,000 (intentional or reckless) or actual damages, on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); injunctive relief on the terms set forth in the Prayer for Relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act,**
**740 ILCS 14/15(a)**

*Brought on behalf of the Class*

144. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

145. Plaintiffs bring this Count individually and on behalf of the Class.

146. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made

available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Plaintiffs and Class members never interacted with Apple in connection with the collection of their biometric data, the operative destruction prong is that the biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

147. Apple has been, and remains, in possession of voiceprints and biometric information extracted from the voice recordings of Plaintiffs and Class members. Those voiceprints and biometric information persist in the parameters of Apple's foundational voice synthesis models and continue to be deployed in the commercial products Apple ships today, as alleged at ¶¶ 37, 42.

148. Apple has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training data and encoded in the parameters of Apple's foundational voice synthesis models, as alleged at ¶¶ 47, 51. Apple's only public retention statements address Siri user request history and opted-in audio interactions. Those categories have no application to Plaintiffs and Class members, who never made a Siri request, never opted into any Apple speech program, and never had any "last interaction" with Apple in connection with the biometric data Apple extracted from them.

149. Apple's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple's violations were negligent.

150. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

151. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

152. Plaintiffs bring this Count individually and on behalf of the Class.

153. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond selling, leasing, or trading.

154. Apple has profited, and continues to profit, from Plaintiffs' and Class members' voiceprints and biometric information through the integrated commercial chain alleged at ¶¶ 65–71, including: (i) sales of consumer devices that incorporate Apple's voice technology; (ii) sales and revenue-sharing under the "Narrated by Apple Books" digital narration program; (iii) subscription-services revenue for Apple services that incorporate Apple's voice technology; (iv) developer-ecosystem and App Store revenue derived from third-party applications that depend on Apple's voice and speech models; and (v)

audiobook distribution revenue through Apple Books, the same platform on which Apple distributes Plaintiffs Dorcus's and Nassif's human narrations and through which Apple now sells competing synthetic narration generated from their voices. Apple's profiting from Plaintiffs' and Class members' biometric identifiers does not fall within any exception to § 15(c).

155. Apple's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple's violations were negligent.

156. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

157. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

158. Plaintiffs bring this Count individually and on behalf of the Class.

159. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

160. Apple has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information in two categories of conduct, each independently sufficient to violate § 15(d) and as alleged at ¶¶ 72-75.

161. *First*, Apple has, on information and belief, transferred the foundational voice synthesis models, and the voiceprints and biometric information encoded within them, among Apple's affiliated corporate entities in the ordinary course of Apple's voice business, including Apple Operations International, Apple Distribution International Ltd., and Apple Operations Europe in connection with the international distribution of Apple's voice-enabled products and services; Apple Singapore Pte. Ltd. and Apple South Asia Pte. Ltd. in connection with regional operations; and Beats Electronics, LLC in connection with the integration of voice technology into Apple's audio hardware product line.

162. *Second*, Apple has, on information and belief, transmitted the foundational voice synthesis models, and the voiceprints and biometric information encoded within them, to vendors, service providers, and cloud-infrastructure partners, including Apple's Private Cloud Compute infrastructure, in the ordinary course of training, evaluating, deploying, and operating its commercial voice products. Each transfer, transmission, and dissemination constitutes a separate violation of § 15(d). Plaintiffs and Class members did not consent to any of these disseminations, and no enumerated exception under § 15(d) applies.

163. Apple’s violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 104–119. In the alternative, Apple’s violations were negligent.

164. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

165. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

166. Plaintiffs bring this Count individually and on behalf of the Class.

167. Section 15(e) of BIPA imposes two distinct duties on private entities in possession of biometric data: under § 15(e)(1), to store, transmit, and protect the data using the reasonable standard of care within the entity's industry; and under § 15(e)(2), to do so in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: an entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

168. Apple fails the § 15(e)(2) asymmetry test. Apple is institutionally defined in substantial part by its sophistication in biometric data handling. Apple's Touch ID, Face ID, and Personal Voice systems, alleged at ¶¶ 48–52, treat user biometric data as the most sensitive category of data Apple's systems handle: hardware-isolated within the Secure Enclave, encrypted, never

transmitted off the device, inaccessible to Apple itself and to applications, and restricted in scope to authentication or own-voice synthesis.

169. Apple's treatment of the non-user voiceprints and biometric information at issue is materially less protective. On information and belief, those voiceprints are encoded in the parameters of Apple's foundational voice synthesis models and disseminated across Apple's cross-affiliate, subprocessor, and cloud-infrastructure network, as alleged at ¶¶ 70–72, without any documented hardware isolation, cryptographic regime, on-device processing constraint, scope restriction, access control, retention schedule, destruction policy, or subject-access mechanism specifically applicable to that voice category. Apple has not publicly identified that it possesses non-user voiceprints, has not described any protections applicable to them, and has provided no mechanism by which Plaintiffs or Class members can inquire about, access, correct, or delete them, as alleged at ¶ 78. The asymmetry is, in operational terms, total: Apple treats user biometric data as the most sensitive category of data its systems handle; Apple has provided no documented protection for non-user voiceprints.

170. Independently, Apple fails the § 15(e)(1) reasonable-standard-of-care test. The reasonable standard of care in the consumer-technology, generative-AI, and biometric-authentication industries in which Apple operates includes hardware isolation, cryptographic encryption in storage and transit, documented retention and destruction policies, scope restrictions, and subject-access mechanisms. Apple itself meets each of these standards with respect to

the user biometric data it handles through Touch ID, Face ID, and Personal Voice. Apple meets none of them with respect to the non-user voiceprints at issue here. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of that data.

171. The asymmetry is reinforced by Apple's own internal selectivity: Apple built consent and protective infrastructure for the voice categories it collects with user participation but built none for the voiceprints it extracted from non-user training audio, as alleged at ¶¶ 112-115. The decision was a contemporaneous institutional choice.

172. Apple's violations of § 15(e)(1) and § 15(e)(2) were intentional or reckless, or in the alternative negligent, as alleged at ¶¶ 104–119.

173. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count VI**

**Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

174. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

175. Plaintiffs bring this Count individually and on behalf of the Class.

176. IRPA recognizes that the "right to control and to choose whether and how to use an individual's identity for commercial purposes" belongs to the individual. 765 ILCS 1075/10. "Identity" is defined to include an individual's

"voice." 765 ILCS 1075/5. IRPA prohibits using an individual's identity for commercial purposes without prior written consent. 765 ILCS 1075/30(a).

177. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

178. Apple used Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a). Apple extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' recordings and used those characteristics to develop, train, and operate commercial voice synthesis products that Apple monetizes through the integrated commercial chain alleged at ¶¶ 65–71, including Siri, Personal Voice, "Narrated by Apple Books" digital narration, Live Speech, Dictation, and the SFSpeechRecognizer and SpeechAnalyzer developer APIs. Apple holds out its products' ability to generate realistic, expressive, and diverse human-sounding voices as a core commercial feature—a capability built on the vocal identities of the individuals whose recordings were used for training.

179. Apple did not obtain written consent from Plaintiffs or Class members for any commercial use of their identities.

180. Independently and additionally, the 2024 amendments to IRPA, P.A. 103-836 (eff. Jan. 1, 2025), prohibit knowingly distributing or making available to the general public a sound recording containing an "unauthorized

digital replica"—defined as a newly created computer-generated sound recording in which an individual's voice is fixed in a manner that would cause a reasonable person to believe the individual actually performed in the sound recording, where the individual did not actually perform and did not authorize the use of his or her identity. 765 ILCS 1075/5; 765 ILCS 1075/30(b). IRPA also imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution. 765 ILCS 1075/30(d).

181. Apple's commercial voice synthesis products generate and distribute voice outputs that simulate the distinctive vocal characteristics of speakers whose recordings were ingested into Apple's training pipelines, including Plaintiffs and Class members. Apple's "Narrated by Apple Books" digital narration program distributes synthetic-narration audiobooks generated by voice models trained on the voices of human narrators. Apple's Siri text-to-speech voices, deployed across iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV, generate voice outputs whose characteristics are encoded in foundational models built from training recordings. On information and belief, the synthetic-voice outputs Apple generates and distributes include audio in which the vocal characteristics of Plaintiffs and Class members are reproduced. By generating and distributing those outputs through Apple Books, Apple Music, and other Apple commercial distribution channels, Apple, on information and belief, knowingly distributes and makes available sound recordings containing unauthorized digital replicas, and

knowingly materially contributes to and facilitates the distribution of such replicas.

182. Apple's violations of IRPA were willful and knowing. Apple launched Personal Voice in September 2023 as an on-device, own-voice-only feature with explicit consent protections designed to prevent unauthorized voice cloning of third parties, as alleged at ¶¶ 44 and 112–113. Apple implemented those consent protections for the user's own voice. It did not implement comparable consent protections for the third parties whose voices it had already used to train the foundational voice models on which Personal Voice and Apple's other voice products rely. Apple's broader willfulness with respect to its voice training data is alleged at ¶¶ 104–119.

183. Plaintiffs and the Class have suffered and continue to suffer injury, including loss of control over commercial use of their identities, dilution and commodification of their voices, displacement in the professional markets where they earn their livelihoods, and economic losses including diversion of licensing value and diminished demand for authentic vocal performances. The market substitution Apple's voice products effect against Plaintiffs and Class members is alleged at ¶¶ 98–103.

184. Plaintiffs and the Class seek all relief available under IRPA, including actual damages sustained as a result of Apple's unauthorized commercial use of their identities; the profits Apple earned from that unauthorized use to the extent not taken into account in computing actual damages; statutory minimum damages of $1,000 per violation; punitive

damages; injunctive relief on the terms set forth in the Prayer for Relief; reasonable attorneys' fees and costs under 765 ILCS 1075/55; and such other relief as the Court deems just and proper.

**Count VII**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.**

*Brought on behalf of the Class*

185. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

186. Plaintiffs bring this Count individually and on behalf of the Class.

187. Apple engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis products and services to Illinois residents and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois residents through the integrated commercial chain alleged at ¶¶ 65–71.

188. Apple's conduct is "unfair" within the meaning of ICFA under the three-part test articulated in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). *First*, Apple's conduct offends Illinois public policy as embodied in BIPA and IRPA—Illinois statutes specifically enacted to protect biometric privacy and the commercial use of personal identity.

189. *Second*, Apple's conduct causes substantial economic and privacy injury to Illinois residents, including the irreplaceable loss of control over biometric identifiers, the unauthorized commercial use of vocal identities, and

market displacement in the professional voice industries where Plaintiffs and Class members earn their livelihoods.

190. *Third*, the injury could not reasonably have been avoided by Plaintiffs and Class members, who had no knowledge that their voice recordings were being ingested into Apple's training pipelines, no notice of the extraction, no mechanism to refuse or opt out, and no mechanism even to discover whether their biometric data was in Apple's possession.

191. Apple's conduct is independently deceptive within the meaning of ICFA. Apple maintained, and continues to maintain, total opacity about the sources of its voice synthesis training data while commercially exploiting that data at scale, as alleged at ¶¶ 53–55. Apple's public-facing voice-data privacy disclosures avoid the words "voiceprint," "speaker embedding," and "biometric identifier" — terminology Apple uses fluently elsewhere in its biometric documentation — obscuring the nature of the data Apple collects and processes from non-users, as alleged at ¶¶ 51, 111.

192. Apple has affirmatively described the training-data provenance of its general-purpose Apple Intelligence text foundation models, stating that those models were trained on "data we have licensed from publishers, curated publicly available or open-sourced datasets and publicly available information crawled by our web crawler, Applebot." Apple has made no equivalent affirmative statement about the training-data provenance of its voice synthesis models. The asymmetric disclosure creates a misleading impression about Apple's commitment to training-data transparency. Apple's voice synthesis

products generate voice outputs that sound like authentic human speech without disclosure that the underlying models were built on voiceprints and biometric information collected without consent.

193. Apple's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and the Class, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Apple's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not from the mere existence of competing AI products.

194. Apple's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and the Class, as alleged at ¶¶ 104–119.

195. Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages sustained as a result of Apple's unfair and deceptive practices, punitive damages under 815 ILCS 505/10a(c), injunctive relief on the terms set forth in the Prayer for Relief, attorneys' fees and costs under 815 ILCS 505/10a, and such other relief as the Court deems just and proper.

## Count VIII

## Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class (injunctive relief only)*

196. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

Case 1:26-cv-05435 Document #: 4-1 Filed: 07/21/26 Page 184 of 940 PageID #:893

197. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

198. Apple has engaged in deceptive trade practices likely to cause confusion or misunderstanding in the marketplace within the meaning of 815 ILCS 510/2(a)(2) (causing likelihood of confusion or misunderstanding as to the source of goods or services) and 815 ILCS 510/2(a)(3) (causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another). Apple's voice synthesis products generate voice outputs that simulate authentic human speech and are distributed through Apple Books, Apple Music, Apple Podcasts, and other Apple commercial channels—distribution channels also used by authentic human voice professionals, including Plaintiffs and Class members. Once generated, these outputs can be downloaded, shared, distributed, and commercially exploited without consumer-facing disclosure that the underlying models were built on voiceprints and biometric information collected without consent, or that the speakers whose vocal characteristics are being reproduced did not authorize the use. This creates a likelihood of confusion about whether real human speakers created, endorsed, or authorized the synthetic-voice content.

199. Plaintiffs and Class members are persons likely to be damaged by Apple's deceptive practices. Apple's conduct diverts demand from licensed human voice performances, impairs attribution and provenance in the voice services markets where Plaintiffs and Class members earn their livelihoods, and creates marketplace confusion about the source and authorization status

of AI-generated voice content. Under 815 ILCS 510/3, actual confusion and actual damages need not be shown.

200. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Apple to provide adequate consumer-facing disclosure that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, together with such other corrective measures as the Court deems necessary to prevent confusion regarding the source, authorization, and consent status of AI-generated voice content distributed by Apple. Upon a finding of willfulness, Plaintiffs and the Class also seek reasonable attorneys' fees under 815 ILCS 510/3.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

201. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

202. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

203. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's

detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

204. Apple obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Apple's foundational voice synthesis models; the product capability and competitive advantage Apple captured by training its models on a diverse corpus of professional and incidental human voices, including the voices of Plaintiffs and Class members; and the revenue Apple generates and continues to generate through the integrated commercial chain alleged at ¶¶ 65–71.

205. Apple obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional or otherwise valuable recordings. Apple's unauthorized extraction of voiceprints and biometric information from those recordings diverted economic value from Plaintiffs and Class members to Apple, and Apple's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods, as alleged at ¶¶ 98–103.

206. Apple's retention of these benefits is unjust. Apple's conduct violated the Illinois statutory protections for biometric data (BIPA) and for

personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Apple's institutional practice confirms the inequity of its retention: Apple built and deployed consent infrastructure for its users—Touch ID, Face ID, Personal Voice, Siri-user consent flows, the Applebot-Extended text-content opt-out, as alleged at ¶¶ 43-47—but did not apply equivalent infrastructure to the speakers whose recordings Apple ingested for voice-synthesis training. Apple could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

207. Plaintiffs and the Class seek restitution of the benefits Apple has unjustly retained, including disgorgement of profits Apple earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and identities; an accounting of those benefits; and such other equitable relief as the Court deems just and proper, on the terms set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court:

A. *Class certification*. Certify the proposed Class under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B. *Judgment*. Enter judgment in favor of Plaintiffs and all Class members and against Defendant Apple Inc. on all Counts on which Apple is found liable;

C. *Injunctive relief*. Enter declaratory and injunctive relief, including a permanent injunction:

(1) Enjoining Apple from collecting, capturing, obtaining, ingesting, processing, or using voiceprints, biometric identifiers, or biometric information from any voice recording produced or recorded in Illinois unless Apple has first complied with 740 ILCS 14/15(b)'s notice, written-purpose-and-duration, and written-release requirements with respect to the speaker;

(2) Requiring Apple to develop, publish, and maintain a written retention and destruction policy, made available to the public, that complies with 740 ILCS 14/15(a) and that applies to all voiceprints and biometric information extracted from voice recordings ingested into Apple's voice synthesis, speech-recognition, and related voice-AI training pipelines, including all such data already in Apple's possession at the time of judgment;

(3) Requiring Apple to identify, in a court-supervised disclosure to Class counsel and to the Court, the sources, scale, provenance, and acquisition pathways of the voice data used to train each of Apple's voice synthesis, speech-recognition, and related voice-AI models during the Class Period, including each contractual instrument, platform, dataset, and corpus from which voice recordings were obtained;

(4) Requiring Apple to provide, on terms approved by the Court, a mechanism by which non-users, including Plaintiffs and Class members, can (i) request notice of whether their voice recordings were ingested into Apple's training pipelines, (ii) request access to the biometric data Apple holds derived from their recordings, (iii) request correction or deletion of that data, and (iv) opt out of further use of that data in Apple's voice synthesis models and downstream commercial products;

(5) Requiring Apple to identify and disclose every Apple subsidiary, affiliate, vendor, service provider, and third-party processor with access to the voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois, and to terminate any access by such entities that is not necessary to compliance with this Court's order;

(6) Requiring Apple to destroy, or to retrain without the unlawfully obtained data, every voice synthesis, speech-recognition, and related voice-AI model in which voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois are encoded, together with each downstream model, fine-tuned model, derivative model, and commercial product whose operation depends on or incorporates those models;

(7) Requiring Apple to implement protective measures for any voiceprints or biometric information lawfully obtained going forward that satisfy 740 ILCS 14/15(e), including, at a minimum, the storage, transmission, encryption, isolation, scope-restriction, and access-control measures Apple

applies to user biometric data through Touch ID, Face ID, and Personal Voice; and

(8) Requiring Apple to implement corrective consumer-facing disclosures, in such form as the Court approves, sufficient to inform consumers that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, and to prevent confusion under 815 ILCS 510/2(a)(2) and (a)(3) about the source, authorization, and consent status of AI-generated voice content Apple distributes;

D. *BIPA statutory damages*. Award liquidated or actual damages on a per-person, per-subsection basis under 740 ILCS 14/20, as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $5,000 per intentional or reckless violation, or in the alternative $1,000 per negligent violation, for violations of 740 ILCS 14/15(a), (b), (c), (d), and (e);

E. *IRPA damages*. Award actual damages, statutory damages of $1,000 per violation, punitive damages, and disgorgement of profits under 765 ILCS 1075/40;

F. *ICFA damages*. Award actual economic damages and punitive damages under 815 ILCS 505/10a;

G. *Disgorgement and restitution*. Award disgorgement of Apple's ill-gotten gains and restitution to Plaintiffs and the Class, including disgorgement

attributable to Apple's consumer-device sales channel, the "Narrated by Apple Books" digital narration program, Apple's subscription services that incorporate voice technology, Apple's developer-ecosystem and App Store revenue from third-party applications dependent on Apple's voice and speech models, and Apple's audiobook distribution through Apple Books;

H. *Non-duplication.* Order such relief as the Court determines necessary to ensure no duplicative recovery across statutory, common-law, and equitable claims;

I. *Attorneys' fees and costs.* Award reasonable attorneys' fees and litigation costs under 740 ILCS 14/20, 765 ILCS 1075/55, 815 ILCS 505/10a, 815 ILCS 510/3, and any other applicable provision;

J. *Pre- and post-judgment interest.* Award pre- and post-judgment interest as permitted by law;

K. *Service awards.* Award service awards to Plaintiffs in such amount as the Court deems appropriate to compensate them for their services to the Class; and

L. *Such other relief as is just and proper.* Grant such other and further relief as the Court deems just and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Case: 1:26-cv-05136 Document #: 4-1 Filed: 05/12/26 Page 97 of 99 PageID #:97

Dated: May 12, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Yohance Lacour, Carol Marin, Philip Rogers, Robin Amer, Lindsey Dorcus, and Victoria Nassif.*

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LINDSEY DORCUS, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) | |
| v. | ) | |
| ADOBE, INC., a Delaware corporation, | ) | |
| Defendant. | ) | |

**<u>COMPLAINT</u>**

Plaintiffs, Lindsey Dorcus, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Adobe Inc. ("Adobe"), allege as follows:

**<u>NATURE OF THE CASE</u>**

1. Adobe sells trust. That is the foundation of Firefly, Adobe's family of generative AI model. Adobe tells the market that its generative AI is not merely useful, but responsible; not merely creative, but commercially safe. It says its models are trained on licensed content, its outputs can be used with confidence, and its tools protect attribution, provenance, and creator choice. Adobe has thus made permission the central virtue of its AI business. It asks

customers to trust Firefly because, Adobe says, creative work is not ownerless simply because it is available. That is the promise Firefly makes.

2. Adobe kept that promise only in its marketing. Adobe treated the human voices that built Firefly as ownerless — ignoring the speakers' rights, taking their voiceprints without asking, paying them nothing, and giving them no notice that their voices were being used at all. Adobe tells customers Firefly is trained on licensed content, Adobe Stock content, and public-domain material, and its chief executive has told the market that its voice models were trained on "purchased music and voice from IP owners." Those statements market a Firefly Adobe did not build. A license to use a recording is not a license to take the speaker's voiceprint. A contract with a platform is not a written release from the human being whose biometric identifier is extracted. A purchase from an IP owner is not consent from the voice subject. Adobe built a mirage of commercial safety around products whose construction violated the one thing Illinois law requires before collecting a voiceprint: consent from the person.

3. The products at issue are Adobe Firefly's voice AI and the voice-aware features Adobe has integrated across Creative Cloud, Premiere Pro, Adobe Podcast, Frame.io, Firefly Services, and GenStudio. Firefly's Generate Speech produces lifelike voiceovers in more than twenty languages. Its Translate Audio, Translate Video, and Translate and Lip Sync tools convert uploaded speech into new-language audio while preserving the original speaker's tone, rhythm, and cadence — generating, in Adobe's product

description, audio that "replicat[es] the original speaker's voice." Adobe Podcast detects and labels distinct speakers automatically. Premiere Pro's Speech to Text, speaker labeling, and Enhance Speech features analyze, separate, and reconstruct vocal output. These are not ordinary editing functions. They are speaker-aware voice systems, designed to identify, preserve, and reproduce the features that distinguish one human voice from another.

4. Systems of that kind cannot be built from nothing. To train and operate voice models capable of generating lifelike speech, preserving speaker tone across languages, and replicating vocal identity on demand, Adobe necessarily extracted mathematical representations of real human voices: pitch, timbre, resonance, cadence, accent, articulation, and phrasing. The AI industry calls those representations speaker embeddings, acoustic tokens, or voice features. By any name, they capture a speaker's vocal identity in a form sufficient to identify the speaker and replicate the speaker's voice. BIPA calls them voiceprints.

5. Adobe's voice technology continues to extract voiceprints every time a customer uses it. Adobe states that its AI dubbing technology "preserves voice characteristics including tone, cadence, and acoustic qualities" of an input speaker, and that the Firefly Voice Model "matches the original speaker's voice" across languages. Those admissions describe a system that extracts a speaker's vocal identity from each uploaded recording, processes that identity, and outputs new audio replicating it. That runtime extraction is itself the collection of a voiceprint under BIPA, independent of the foundational training-

data ingestion alleged separately herein. Every Translate session is a separate act of biometric collection.

6. Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA"), to govern exactly this conduct. BIPA recognizes that biometric identifiers, including voiceprints, are biologically unique to the individual and that, once compromised, the individual has no recourse: a voice cannot be replaced. Before a private entity may collect a person's voiceprint, BIPA requires written notice, disclosure of the specific purpose and length of term of collection, and a written release executed by the subject. Adobe complied with none of these requirements as to Plaintiffs.

7. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields — Pulitzer winners, Peabody honorees, the recipient of the Order of Lincoln, and audiobook narrators recorded for the major American publishers. Their recordings were publicly distributed, professionally credited, and technically ideal for voice-AI training. None of them were told that their voices were being used to train Adobe's voice AI. None of them was asked. None signed a release. None of them consented.

8. Adobe has known the stakes of voice synthesis for a decade. In 2016, Adobe Research previewed Project VoCo, a technology that could edit recorded speech like text and, with a twenty-minute sample, add new words in a target speaker's voice. Adobe publicly acknowledged at the time that the technology could be used to make a person appear to say things they never said. By Firefly's 2023 launch, Adobe had built a public marketing position

around "commercially safe" generative AI but no public consent infrastructure for the non-user voice subjects whose vocal identities its models required. By 2025, Adobe was selling lifelike voice synthesis and runtime voice replication at commercial scale, still without consent infrastructure for the speakers who made those products possible. Adobe understood the technology. Adobe understood the stakes. Adobe chose not to ask.

9. Adobe's failure is not a failure of capability. For the image side of Firefly, Adobe created the Firefly Stock Contributor Bonus, which compensates Adobe Stock contributors when their licensed content is used to train Firefly's image models. For high-value voice talent, Adobe integrated with the ElevenLabs Iconic Voice Marketplace, importing consent-based licensing infrastructure for celebrity voices. For Adobe's customers, Adobe's Privacy Policy provides a deletion mechanism tied to in-product biometric processing. Adobe built consent infrastructure for image contributors. Adobe built consent infrastructure for celebrity voices. Adobe built deletion infrastructure for its own users. For the non-user Illinois speakers whose voices it took to build the voice AI it now sells, Adobe built nothing.

10. A voiceprint is not a preference, a setting, or a piece of metadata. It is a digital fingerprint of the human voice, a record of the anatomy that produces pitch and resonance and the lifetime of habit that produces accent, rhythm, and expression. A password can be changed; a credit card can be canceled; a Social Security number can be reissued. A voice cannot. The vocal

signature Adobe extracted is the same one Plaintiffs use to work, perform, report, narrate, and live.

11. Adobe monetizes the voiceprints it took through Creative Cloud, Firefly plans, Firefly Services APIs, and GenStudio. The products Adobe sells from that chain — lifelike synthetic speech, multilingual dubbing, voice preservation across languages, speaker separation, transcription, and audio enhancement — compete directly with Plaintiffs in the markets where they earn their livelihoods: audiobook narration, podcast production, broadcast journalism, documentary narration, e-learning, advertising, dubbing, and voiceover work. The same voice technology that turned Plaintiffs into training data now competes with them in the markets that depend on the voiceprints Adobe took.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), for Adobe's unlawful collection, retention, commercial exploitation, dissemination, and inadequate protection of their voiceprints. Plaintiffs also assert claims under the Illinois Right of Publicity Act ("IRPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and Illinois common law for unjust enrichment. Plaintiffs seek statutory and actual damages, restitution, disgorgement, and injunctive relief, including an order requiring Adobe to identify the sources of its voice-training data, destroy unlawfully obtained voiceprints, and destroy or retrain the voice models in which those voiceprints are encoded.

13. Adobe promised Creativity for All. Adobe delivered something different. Customers were sold commercial safety Adobe had not built. Speakers were given biometric risk they had not been told about. Adobe attached credentials to outputs but took the voices behind those outputs without the credential that matters most: permission. Plaintiffs do not ask this Court to invent a rule. They ask it to enforce one. Before a company may convert a human voice into a commercial asset, it must ask the human being.

## PARTIES

14. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her professional home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 103-104.

15. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted primarily in Chicago. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 95-96.

16. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and

WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Adobe extracted his voiceprint are described at ¶¶ 92-94, 97-98.

17. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 99-100.

18. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's The City and as Managing Editor of Love + Radio. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 101-102.

19. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist, audio storyteller, writer, and playwright from the South Side of Chicago whose investigative podcast work, including the 2024 Pulitzer Prize–winning You Didn't See Nothin', is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Adobe extracted his voiceprint are described at ¶¶ 92-94, 105-106.

20. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Adobe extracted her voiceprint are described at ¶¶ 92-94, 107-108.

21. Defendant Adobe Inc. ("Adobe") is a Delaware corporation and maintains its principal place of business at 345 Park Avenue, San Jose, California 95110-2704.

**JURISDICTION AND VENUE**

22. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, and Defendant Adobe Inc. is a Delaware corporation with its principal place of business at 345 Park Avenue, San Jose, California 95110. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

23. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and Plaintiffs may recover

those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections, § 15(a), (b), (c), (d), and (e), each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Adobe extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

24. This Court has specific personal jurisdiction over Adobe under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the Due Process Clause of the Fourteenth Amendment. Adobe has purposefully directed conduct at Illinois and into this District. Plaintiffs' claims arise out of and relate to that Illinois-directed conduct. The exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

25. Adobe maintains a continuous, substantial, and revenue-generating commercial presence in Illinois. Adobe sells the Firefly Speech Model, the Firefly Voice Model, Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and Enhance Speech — and the full range of Adobe's Creative Cloud, Document Cloud, Experience Cloud, and

Firefly products — to Illinois residents and Illinois businesses through adobe.com, firefly.adobe.com, the Creative Cloud and Firefly desktop applications, and Adobe's iOS and Android mobile applications. Adobe enters into recurring contractual relationships with Illinois residents through the Adobe General Terms of Use, the Adobe Creative Cloud Subscription Terms, the Adobe Firefly Terms, the Adobe Stock Additional Terms, and the Adobe Customer License Agreement, and accepts recurring monthly and annual subscription payments from Illinois subscribers under Firefly Standard, Firefly Pro, and Creative Cloud (Single App, All Apps, Pro, Teams, and Enterprise) plans. Each subscription renewal, each Generate Speech prompt, each Translate Video or Translate Audio upload, each Translate and Lip Sync API call, and each Enhance Speech request from an Illinois user is a separate commercial transaction with an Illinois resident or business. Adobe represents that its products are used by employees at more than seventy-five percent of Fortune 500 companies, many of which maintain principal offices or substantial operations in Illinois and in this District. Adobe could geoblock Illinois. Adobe has chosen not to. Adobe derives substantial revenue from Illinois.

26. Adobe's Illinois contacts are suit-related in four reinforcing respects, each of which independently supports specific personal jurisdiction.

27. *First,* Adobe extracted voiceprints from voice recordings produced and recorded in Illinois. The biometric source material, the human voice, is produced by the muscles, tissues, breath, and learned speech patterns of the

speaker. Each Plaintiff produced his or her voice while physically present in Illinois. The audio encoding of each Plaintiff's voice, the recording itself, was created in Illinois, in Illinois studios, by Illinois-based producers, using Illinois-based equipment, by speakers physically located in Illinois. The recordings were uploaded from Illinois to publicly accessible audio platforms. Adobe acquired those recordings from platforms — including YouTube, Spotify, Apple Podcasts, Audible, Apple Books, and Libro.fm — on which the speaker's name, professional biography, geographic location, and content catalog were publicly displayed in platform-level metadata. The identifying information was visible to Adobe at the time of acquisition. Adobe's sourcing of voice recordings from these platforms was not geographically blind: it was the deliberate acquisition of identifiable Illinois-origin biometric material from identified Illinois speakers. Adobe knew, or with the application of automated metadata-extraction tools standard in any AI laboratory operating at Adobe's scale could have known, that it was acquiring biometric material from speakers in Illinois. The biometric data Adobe ingested does not become non-Illinois biometric data because the server that processed it sits in a data center outside Illinois. The biometric source material was generated in Illinois. The biometric identifiers belong to Illinois residents. The invaded privacy interest is that of Illinois residents. The duty to provide written notice and obtain a written release under 740 ILCS 14/15(b) was owed to Illinois persons. The failure to perform that duty was localized where those persons reside and where their voices were produced and recorded. Adobe's extraction of voiceprints from voice recordings produced and

recorded in Illinois is conduct directed at Illinois irrespective of where Adobe's training infrastructure is physically located.

28. *Second*, Adobe extracts voiceprints in Illinois on a continuing, per-upload basis through Translate Video, Translate Audio, and the Translate and Lip Sync API. When an Adobe user located in Illinois uploads an audio or video file from an Illinois device to those services, Adobe receives the upload at Adobe-controlled endpoints, runs the file through the Firefly Voice Model, identifies each speaker in the recording, and extracts a representation of that speaker's distinctive vocal characteristics in order to synthesize translated speech in the same voice. The biometric extraction occurs in real time, on Adobe's command, in response to data Adobe receives from Illinois. On information and belief, Illinois users have uploaded, and continue to upload, recordings featuring the Illinois-recorded voices of Plaintiffs, of other professional voice talent who produced their recordings in Illinois, and of incidental Illinois-recorded speakers, to Translate Video, Translate Audio, and the Translate and Lip Sync API. Each upload causes Adobe to extract a fresh voiceprint of an Illinois-recorded speaker. Each extraction is Adobe's own conduct, performed by Adobe's own model, on data transmitted to Adobe from Illinois, producing biometric output Adobe retains and uses. Each runtime extraction is a discrete and separate act of biometric data collection accomplished through Adobe's commercial presence in Illinois.

29. *Third*, the voiceprints Adobe extracted are encoded in commercial products Adobe sells and delivers into Illinois every day. Adobe's commercial

activity in Illinois is the downstream monetization of the upstream biometric extraction at issue in this case. Each Generate Speech prompt submitted by an Illinois user causes Adobe's Firefly Speech Model to generate synthetic speech whose acoustic and stylistic capabilities exist because of the voiceprints encoded in the model's parameters. Each Translate Video, Translate Audio, and Translate and Lip Sync API call submitted by an Illinois user causes the Firefly Voice Model to produce voice-preserving translation output whose capability to mimic the input speaker exists because of the voiceprints encoded in the model's parameters. Each Enhance Speech request submitted by an Illinois user causes Adobe's voice models to reconstruct audio using acoustic representations the models acquired from training data. The voiceprints Adobe extracted from Plaintiffs' recordings, on information and belief, are encoded in the parameters of those commercial models. Adobe's continuing commercial deployment of those models into Illinois — every subscription payment, every API call, every Generate Speech output Adobe sends back to an Illinois device — is the continuing commercial use of the unlawfully extracted voiceprints. The Illinois sales and the Illinois extraction are two ends of a single integrated commercial chain.

30. *Fourth*, Adobe commercially exploits the voices and identities of Illinois residents in violation of IRPA by developing, marketing, and distributing voice synthesis products to Illinois customers and by disseminating voice-simulative outputs into Illinois. Adobe's voice synthesis products generate audio outputs whose vocal characteristics are derived from the foundational

voice models in which Plaintiffs' voiceprints are encoded. Adobe's distribution of those outputs into Illinois through Adobe-controlled distribution channels is the in-Illinois commercial use of Plaintiffs' protected identities. The tortious effects of Adobe's commercial exploitation are felt by Illinois residents in Illinois, in the Illinois markets where Plaintiffs work, on the Illinois platforms through which Adobe distributes its voice outputs to Illinois customers.

31. Adobe's possession of voiceprints and biometric information derived from voice recordings of Illinois residents is ongoing. BIPA § 15(a) imposes continuing obligations on entities that possess biometric identifiers, including the duty to develop and publish a written retention and destruction schedule and the duty to comply with that schedule. Adobe has been in possession of voiceprints derived from Illinois-recorded voice recordings since the date of extraction and remains in possession of those voiceprints today, encoded in the parameters of the Firefly Speech Model, the Firefly Voice Model, and the downstream commercial products built on those models. The persons whose biometric data Adobe holds are persons whose voices were produced and recorded in Illinois. Adobe's ongoing retention, ongoing commercial use, and ongoing failure to obtain consent or comply with BIPA's notice, written-release, retention-schedule, profiting, dissemination, and protection requirements are continuing wrongs directed at Illinois-recorded speakers and felt in Illinois. Each day Adobe continues to possess the unlawfully extracted voiceprints, each day Adobe continues to operate the foundational voice models in which those voiceprints are encoded, and each day Adobe continues to

deliver commercial voice products built on those models into Illinois is a separate day of Illinois-directed contact.

32. The exercise of specific personal jurisdiction over Adobe in this District is reasonable. Illinois has a strong and particularized sovereign interest in providing a forum for the redress of unlawful collection and commercial exploitation of biometric identifiers of persons whose voices were produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5, the Illinois Right of Publicity Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Illinois Uniform Deceptive Trade Practices Act. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating in their home forum. The burden on Adobe of litigating in this District is not undue. Adobe reported fiscal-year 2025 revenue of approximately $23.77 billion, employs approximately 31,360 people worldwide, and is an experienced litigant in federal courts across the United States. Adobe maintains a continuous commercial presence in Illinois through which it solicits, executes, and renews tens of thousands of subscription contracts with Illinois residents and businesses. Adobe could reasonably anticipate being haled into court in this District for claims arising from its extraction and commercial exploitation of biometric data sourced from voice recordings produced and recorded in Illinois.

33. The named Plaintiffs are Illinois residents whose voice recordings were produced and recorded in Illinois. The proposed Class is defined to

include only natural persons whose voice recordings were produced or recorded in Illinois. The claims of every Class member arise from Adobe's extraction, retention, and commercial use of voiceprints derived from Illinois-recorded voice material. Every Class member's claim has the same Illinois-located biometric source, the same Illinois-located injury, and the same Illinois-located ongoing harm.

34. Venue is proper in this District under 28 U.S.C. § 1391(b)(1). Adobe is a resident of this District within the meaning of 28 U.S.C. § 1391(c)(2) and § 1391(d) because Adobe's contacts with this District are sufficient to subject Adobe to personal jurisdiction in this District if this District were a separate State.

35. Venue is independently proper in this District under 28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Plaintiffs reside in this District. Plaintiffs' voice recordings were produced and recorded in this District. Adobe's collection, capture, extraction, and commercial exploitation of biometric identifiers belonging to residents of this District occurred without notice, consent, or written release. Adobe markets, sells, distributes, and delivers the voice synthesis products built on those biometric identifiers to residents and businesses in this District through adobe.com, firefly.adobe.com, the Creative Cloud and Firefly desktop applications, Adobe's iOS and Android mobile applications, and Adobe's enterprise sales channels. Adobe's runtime extraction of voiceprints through Translate Video, Translate Audio, and the

Translate and Lip Sync API occurs in response to uploads from this District. Adobe's ongoing possession and continuing commercial exploitation of Plaintiffs' voiceprints, through products Adobe sells and delivers into this District on a recurring subscription basis, is a continuing course of conduct giving rise to Plaintiffs' claims in this District. The economic and privacy injuries Plaintiffs and Class members have suffered, including displacement in the professional voice markets where Plaintiffs earn their livelihoods, are felt in this District.

## FACTUAL BACKGROUND

### *Adobe and Its Voice Business*

36. Adobe knows what a voiceprint is. Adobe's Privacy Policy says voiceprints are biometric identifiers protected by United States law. And for nearly a decade, Adobe has extracted voiceprints from human voice recordings, without notice, without consent, without a written release, at every stage of a research-and-product program that began in 2016 and culminated, in October 2025, in the commercial launch of voice synthesis at scale. Plaintiffs are among the speakers whose voices Adobe took.

37. Adobe has been building voice synthesis technology since 2016. Adobe Research, Adobe's in-house research division, has published research on voice and audio synthesis continuously since that year. Senior Adobe Research scientists in Adobe's Speech AI and Audio Research Groups — including Zeyu Jin, Rithesh Kumar, Jiaqi Su, Prem Seetharaman, Oriol Nieto, Justin Salamon, and Nicholas J. Bryan — have authored or co-authored peer-

reviewed papers on neural speech synthesis, neural audio coding, voice conversion, voice watermarking, and zero-shot voice synthesis. The technical mechanism at the center of this case — extracting a representation of a speaker's distinctive vocal characteristics from a recording of that speaker, and using that representation to synthesize new speech reproducing the speaker's voice — has been the explicit operating principle of Adobe's voice-synthesis research program from the start.

38. On stage at Adobe MAX in San Diego in November 2016, Adobe Research scientist Zeyu Jin demonstrated "Project VoCo." Using approximately twenty minutes of voice samples from a target speaker, Jin showed that Adobe's software could insert words the speaker had never uttered and synthesize them in the speaker's own voice, indistinguishably. The system worked by analyzing the source recording, decomposing it into phonemes, and constructing a voice model capable of generating new speech in the same speaker's voice. Adobe's contemporaneous description: "We have developed a technology called Project VoCo in which you can simply type in the word or words that you would like to change or insert into the voiceover. The algorithm does the rest and makes it sound like the original speaker said those words."[1] The biometric extraction Adobe demonstrated in 2016 is the biometric extraction at issue in this case.

---

[1] Lulu Chang, *Adobe's working on technology that's basically Photoshop for audio recordings*, Digital Trends (Nov. 4, 2016), https://www.digitaltrends.com/computing/adobe-project-voco-speech-synthesis/ (last visited on May 13, 2026).

39. Adobe's voice technology has been continuously productized since Project VoCo. Adobe presented VoCo's productized speech-enhancement descendant, internally code-named "Project Awesome Audio," at Adobe MAX in 2019. Adobe shipped speech enhancement as the Enhance Speech feature in Adobe Podcast (internally "Project Shasta") in mid-2022. Adobe demonstrated AI dubbing under the internal name "Project Dub Dub Dub" at Adobe MAX 2023. Adobe productized AI dubbing in Translate Video and Translate Audio inside Adobe Firefly in 2024 and 2025. Each of these systems is part of a continuous research program at Adobe Research devoted to building generative models of speech, including “personalized voice generation”, using acoustic samples of individual speakers.[2]

40. On October 28, 2025, at Adobe MAX 2025 in Los Angeles, Adobe launched commercial voice synthesis at scale. Adobe publicly announced the Firefly Speech Model, the Firefly Voice Model, and the public-beta launch of Generate Speech. Adobe markets the Firefly Speech Model as a "commercially safe" multilingual text-to-speech model with a library of more than seventy voices across more than twenty languages. Adobe markets the Firefly Voice Model as powering Translate Video, Translate Audio, and the enterprise Translate and Lip Sync API, and as preserving an input speaker's voice

---

[2] Adobe Research, *The Story of Project Dub Dub Dub: From Adobe MAX Sneak to cutting-edge AI translation tool inside Adobe Firefly* (July 17, 2025), https://research.adobe.com/news/the-story-of-project-dub-dub-dub/ (last visited on May 13, 2026); see also *Project Dub Dub Dub*, Adobe MAX 2023 Sneaks, https://www.adobe.com/max/2023/sessions/project-dub-dub-dub-gs6-9.html (last visited on May 13 2026).

characteristics across translated audio output. The product Adobe launched in October 2025 is the commercial culmination of the nine-year research program that began with Project VoCo.

41. Adobe's commercial voice products today span the full range of AI voice technology offered to creators and enterprises: text-to-speech synthesis through Generate Speech; cross-lingual voice synthesis through the Firefly Voice Model; AI dubbing through Translate Video and Translate Audio; AI lip-syncing through the Translate and Lip Sync API for enterprise customers; and speech enhancement through Enhance Speech in Adobe Podcast and the Firefly app. Every one of these products depends on the voice characteristics Adobe's underlying voice models, the Firefly Speech Model and the Firefly Voice Model, learned during training. Training is where voiceprints and biometric information are extracted from source recordings. Adobe sells access through Firefly Standard, Firefly Pro, and Creative Cloud subscriptions; licenses the Translate and Lip Sync API to enterprise customers; and integrates ElevenLabs' Multilingual v2 model into Generate Speech as a selectable voice generation option alongside Adobe's own Firefly Speech Model.

*How AI Voice Synthesis Works*
*and What Adobe's Privacy Policy Calls It*

42. AI voice synthesis works by extracting and encoding the distinctive acoustic features of individual speakers — timbre, pitch, resonance, cadence, articulation, phrasing, dynamics, emotional expression — from recordings of human speech. The AI research community calls these encodings "speaker

embeddings."[3] BIPA calls them voiceprints. 740 ILCS 14/10. BIPA separately defines "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." Id. The function of the encoding, to capture the biologically and behaviorally unique features that identify an individual speaker, controls the statutory classification, not the label the AI industry uses.

43. Adobe's product documentation describes its voice processing in terms aligned with BIPA's biometric definitions. Adobe represents that the Firefly Voice Model "recognizes speech and translates it into a different language while matching the original speaker's voice."[4] Adobe represents that its AI dubbing technology "preserves voice characteristics including tone, cadence, and acoustic qualities" of an input speaker.[5] Adobe Research's public account of "Project Dub Dub Dub" — the research project that became the Firefly Voice Model — expressly identifies "preservation of a speaker's identity "

---

[3] Jakubek et al., *Deep speaker embeddings for Speaker Verification: Review and experimental comparison*, 127 Eng. Appl. Artif. Intell. 107232 (2024), https://www.sciencedirect.com/science/article/abs/pii/S0952197623014161?via%3Dihub (last visited on May 13, 2026) ("The term embedding refers to a unique "fingerprint", which is a compressed representation of each utterance or recording and becomes a high-level feature for further classification. The speaker embedding is a simple but effective methodology to represent the speaker's identity in a compact way as a vector of fixed size.")

[4] Adobe, *AI Dubbing for video localization*, Adobe Firefly, https://www.adobe.com/products/firefly/features/ai-dubbing.html (last visited on May 13, 2026).

[5] Adobe, *AI Dubbing for video localization*, Adobe Firefly, https://www.adobe.com/products/firefly/features/ai-dubbing.html (FAQ: "Hw is AI dubbing different from traditional dubbing?") (last visited on May 13, 2026).

as a defining design objective. Adobe could not deliver voice-preserving translation, dubbing, or lip-sync output without first capturing the input speaker's distinctive vocal signature. The capture is the voiceprint.

44. Adobe-affiliated researchers have published peer-reviewed papers describing the underlying voice synthesis pipeline. *VoCo: Text-based Insertion and Replacement in Audio Narration* (2017) presented a system that synthesized new words in a target speaker's voice from approximately twenty to forty minutes of that speaker's recordings.[6] *GR0: Self-Supervised Global Representation Learning for Zero-Shot Voice Conversion* (2024) presented an approach to converting input audio to a different speaker's voice from only a short reference of the target speaker.[7] Each paper describes work that requires the extraction of speaker-identifying acoustic representations from voice recordings.

45. Adobe's corporate disclosures admit that its voice processing collects voiceprints. Adobe's Privacy Policy, last updated October 24, 2025, expressly enumerates "biometric identifiers or information defined under

---

[6] Zeyu Jin, Gautham J. Mysore, Stephen DiVerdi, Jingwan Lu & Adam Finkelstein, *VoCo: Text-Based Insertion and Replacement in Audio Narration*, 36 ACM Trans. Graphics 96 (Art. No. 96) (July 2017), https://doi.org/10.1145/3072959.3073702 (last visited on May 13, 2026) (three of the five authors (Mysore, DiVerdi, Lu) are listed as Adobe Research. The other two (Jin, Finkelstein) are Princeton; Jin subsequently joined Adobe Research as a Senior Research Scientist and led Project Dub Dub Dub).

[7] Yunyun Wang, Jiaqi Su, Adam Finkelstein & Zeyu Jin, *GR0: Self-Supervised Global Representation Learning for Zero-Shot Voice Conversion*, *in* Proc. 2024 IEEE Int'l Conf. on Acoustics, Speech & Signal Processing (ICASSP) 10566, https://doi.org/10.1109/ICASSP48485.2024.10448232 (last visited on May 13, 2026) (IEEE Xplore Doc. No. 10448232) (Jiaqi Su and Zeyu Jin are listed as Adobe Research, United States of America; Wang and Finkelstein are Princeton.).

United States laws or other applicable laws (e.g., faceprints and voiceprints, etc.)" among the categories of "Sensitive personal information" Adobe collects.[8] Adobe's Privacy Policy further states that Adobe's consumer features process "characteristics like face and voice" and that "such characteristics may be considered biometric identifiers or biometric information under certain US laws or other applicable privacy laws."

46. Adobe wrote those words and published them on October 24, 2025, just four days before Adobe launched the Firefly Speech Model and the Firefly Voice Model at Adobe MAX.

47. Adobe has nevertheless implemented no notice, no consent, no written release, no retention policy, no destruction policy, and no subject-access process for the voiceprints it extracts from non-users — neither for the voice professionals in its training data nor the third-party speakers captured in user-uploaded recordings at runtime.

*Adobe's Public "Commercial Safety" Representations to Congress, Investors, and the Marketplace*

48. Adobe's commercial differentiation strategy is built on a single representation: that Adobe trains its AI models on properly licensed and consented data. Adobe has made that representation to the United States Senate under oath, to investors, to enterprise customers, and to the public, for

[8] Adobe Privacy Policy (Last updated: October 24, 2025) https://www.adobe.com/privacy/policy.html {"such characteristics may be considered biometric identifiers or biometric information under certain US laws or other applicable privacy laws."; "Where we process biometric identifiers or biometric information to deliver a feature requested by you…"; "Biometric identifiers or information defined under United States laws or other applicable laws (e.g., faceprints and voiceprints, etc.);" (Last visited May 13, 2026)

years. None of those representations has ever been accompanied by disclosure of the source, scale, provenance, license, or rights status of the voice recordings used to train the Firefly Speech Model or the Firefly Voice Model.

49. Adobe's Executive Vice President, General Counsel, and Chief Trust Officer Dana Rao testified before the United States Senate Judiciary Committee's Subcommittee on Intellectual Property in 2023 that Adobe "set the expectations that we had for ourselves of trying to design a model that was going to be commercially safe"[9] and that "[e]very single AI feature that goes to market goes through the [AI Ethics] review board." Rao testified that "We trained our first Firefly model only on licensed images from our own Adobe Stock photography collection. If needed for accuracy or bias reduction, we intend to expand that dataset to include openly licensed content and public domain images where copyright has expired."[10] Rao also publicly represented that Adobe "trained our generative AI model Firefly on our own licensed Adobe

[9] Adobe's "commercially safe" representation, across its product marketing, enterprise agreements, congressional testimony, and indemnification offering, is a copyright-clearance representation: it promises that Firefly outputs do not infringe third-party copyrights. Adobe has never represented "commercial safety" to mean compliance with biometric-privacy statutes. Adobe's repeated affirmative representations about copyright safety, alongside its silence about biometric-privacy compliance, are themselves probative: Adobe knows the two questions are distinct, and Adobe chose to make affirmative representations about only one of them.

[10] Artificial Intelligence and Intellectual Property — Part II: Copyright: Hearing Before the Subcomm. on Intellectual Property of the S. Comm. on the Judiciary, 118th Cong. (2023) (statement of Dana Rao, Exec. Vice President, Gen. Counsel & Chief Trust Officer, Adobe Inc.), https://www.judiciary.senate.gov/imo/media/doc/2023-07-12_pm_-_testimony_-_rao.pdf (last visited on May 13, 2026).

Stock images, other works in the public domain, moderated generative AI content, and work that is openly licensed by the rightsholder."[11]

50. Adobe's Chair and Chief Executive Officer. Adobe's Chair and Chief Executive Officer Shantanu Narayen has publicly committed that "we have to build AI that is commercially safe and respects the rights of the creators whose work it learns from." Narayen has stated that Adobe will "respect IP" in the age of generative AI. Narayen has personally championed the Content Authenticity Initiative, the global content-provenance coalition Adobe co-founded in 2019, and the Coalition for Content Provenance and Authenticity, of which Adobe is a founding member. Narayen has made those representations on stage at industry summits, in interviews with major business and technology publications, and in Adobe's public-facing materials.

51. Adobe markets the entire Firefly family of generative-AI products, including the Firefly Speech Model and the Firefly Voice Model, as "designed to be commercially safe." Adobe's Enterprise Firefly Legal FAQs, marketing pages, and enterprise sales materials all repeat the representation. Adobe's enterprise indemnification offering for Firefly outputs is built on it. More than seventy-five percent of the Fortune 500, by Adobe's own representation, pay for Firefly in reliance on Adobe's claim that the underlying training data was properly sourced.

---

[11] Dana Rao, *The FAIR Act: A New Right to Protect Artists in the Age of AI*, Adobe Blog (Sept. 12, 2023), https://blog.adobe.com/en/publish/2023/09/12/fair-act-to-protect-artists-in-age-of-ai (last visited on May 13, 2026).

*Eleven Words: The Entirety of Adobe's Voice-Training-Data Disclosure*

52. Adobe has never disclosed the sources, scale, or provenance of the voice training data used to train its foundational voice synthesis models. Adobe has published no model card, no data sheet, no training-data manifest, and no transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented.

53. In coverage of Adobe MAX 2025, Adobe's Vice President of Generative AI Alexandru Costin told The Verge: "We purchased music and voice from IP owners, that's why we have the confidence to offer it as commercially safe."[12] That single-sentence statement — delivered to a trade publication — is the entirety of Adobe's public sourcing disclosure specific to the voice training data behind the Firefly Speech Model. Adobe has not identified the IP owners. Adobe has not published the agreements. Adobe has not named the voice talent. Adobe has not disclosed the volume of recordings purchased. Adobe has not stated whether the IP owners had the rights to license the speakers' voice biometric identifiers, or whether the speakers themselves consented. Adobe has made no comparable disclosure regarding the training data for the Firefly Voice Model, which powers Translate Audio, Translate Video, and the Translate and Lip Sync API. Moreover, Costin's statement concerns people whom Adobe

---

[12] Jess Weatherbed, *Adobe's Firefly Can Now Generate AI Soundtracks and Voiceovers*, The Verge (Oct. 28, 2025), https://www.theverge.com/news/807809/adobe-firefly-ai-audio-generate-soundtrack-speech (last visited on May 13, 2026).

characterizes as holding intellectual property rights in the recordings. BIPA regulates *biometric* identifiers, which pertain to the individual whose voice was captured, not the recording's copyright holder.[13]

54. The conspicuous absence of detailed voice-training-data disclosure stands in marked contrast to Adobe's contemporaneous transparency about its other AI training corpora. Adobe has affirmatively identified Adobe Stock, openly licensed content, and public-domain content as the sources for the Firefly image model.[14] Adobe has affirmatively identified named music-industry partners and licensed recordings as the sources for the Firefly Audio Model that powers Generate Soundtrack. Adobe has identified no sources for the Firefly Speech Model or the Firefly Voice Model. If Adobe's voice models had been trained on properly licensed and consented data, Adobe, the company that built the Content Authenticity Initiative and represented to the United States Senate that Firefly is commercially safe, would have an obvious commercial incentive to say so. It has not.

---

[13] The "IP owners" from whom Adobe purchased voice content — record labels, audiobook publishers, podcast networks, voice-talent agencies, and similar intermediaries, on information and belief, hold copyright in the sound recordings. They do not hold the biometric rights in the speakers' voiceprints. Copyright protects original expression fixed in a tangible medium. 17 U.S.C. § 102. BIPA protects the speaker's biologically and behaviorally unique vocal signature, regardless of who owns the copyright in the recording. 740 ILCS 14/10, 14/15(b). A copyright license conveys the right to reproduce and distribute the recording. It does not convey the speaker's biometric rights. Those rights are personal to the speaker and transferable only by the speaker's own written release. 740 ILCS 14/15(b). This is not a copyright case. Adobe extracted Plaintiffs' biometric identifiers without obtaining a written release from the only person who could have given one: the speaker.

[14] "Public domain" is a copyright concept. A recording enters the public domain when its copyright expires or is dedicated. 17 U.S.C. § 302. Public-domain status under copyright law has no effect on the biometric rights of the speaker captured in the recording. A 1925 audiobook recording now in the public domain still has a speaker whose voiceprint, during life, was protected by the same biometric privacy interests recognized in BIPA. Public-domain copyright status does not extinguish, transfer, or release biometric rights.

Case 1:26-cv-05435 Document #: 4-1 Filed: 05/21/26 Page 29 of 94 PageID #:293

*Adobe Has Previously Misrepresented Firefly Training Data*

55. Adobe's pattern of making "commercially safe" and "licensed" representations about training data that did not match the underlying practice documented in the public record. On April 12, 2024, Bloomberg published the results of an investigation into the training data behind Adobe's Firefly image generator.[15] The Bloomberg investigation revealed that, despite Adobe's repeated public representations that Firefly was trained on licensed Adobe Stock images, openly licensed content, and public-domain content, and despite Adobe's marketing of Firefly as a "commercially safe" alternative to image-generation competitors like Midjourney, Adobe had in fact trained the Firefly image model in part on AI-generated images produced by competing AI image generators, including Midjourney itself. Bloomberg reported that approximately 5% of the Firefly image training corpus consisted of AI-generated images, including those generated by the same scraping-based AI competitors against which Adobe positioned Firefly as the ethical alternative.

56. Adobe has now applied the identical pattern to its voice models. Adobe describes the Firefly Speech Model and the Firefly Voice Model as "commercially safe." Adobe represents, through Costin's statement that it "purchased music and voice from IP owners," that the voice training data was

[15] Rachel Metz, *Adobe's 'Ethical' Firefly AI Was Trained on Midjourney Images*, Bloomberg (Apr. 12, 2024), https://www.bloomberg.com/news/articles/2024-04-12/adobe-s-ai-firefly-used-ai-generated-images-from-rivals-for-training (last visited on May 13, 2026).

licensed. Adobe has declined to publish the underlying training-data manifests, the licenses, the rights-holders' identities, or the voice talent rosters. The pattern is the same. The representations are the same. The opacity is the same.

57. Adobe previously misled everyone. On information and belief, Adobe is doing it again.

*Adobe Built Consent Infrastructure for the Categories of Training Data Adobe Chose to Build It For. Adobe Did Not Build It for Plaintiffs*

58. Adobe operates extensive consent and compensation infrastructure for select categories of training-data subjects. Adobe knows how to obtain consent. Adobe knows how to compensate. Adobe has done both, repeatedly, for the training-data categories Adobe judged commercially or legally necessary.

59. *Adobe Stock contributors*. Adobe operates the Adobe Stock Contributor Bonus program, under which Adobe Stock contributors whose images were considered for inclusion in the Firefly image-model training corpus are eligible to receive compensation. The program is structured around explicit notice and explicit financial consideration. Adobe knows the names of the contributors. Adobe knows the licenses Adobe holds. Adobe knows the compensation Adobe has paid.

60. *ElevenLabs Iconic Marketplace integration*. Adobe integrates ElevenLabs' Multilingual v2 voice model directly into the Generate Speech feature surface in Adobe Firefly, as a selectable voice generation option

alongside Adobe's own Firefly Speech Model.[16] ElevenLabs operates a consent-and-licensing framework for the celebrity and public-figure voices distributed through its "Iconic Marketplace," under which the rights holder for each voice must affirmatively approve any commercial use, on a project-by-project basis, with explicit contract terms. ElevenLabs publicly represents that "every performer or estate signs a bespoke contract before ElevenLabs trains an AI model on their voice" and that "rights holders maintain approval authority over usage." Adobe ships ElevenLabs' performer-first consent framework alongside Adobe's own Firefly Speech Model in the same product. Adobe's customers can select between two voice-generation options inside the same Adobe interface: one paired with a documented consent framework, and one paired with no consent framework at all. The consent architecture exists. Adobe is shipping it. Adobe did not build any analogous framework for the voices used to train the Firefly Speech Model.

61. *Music-industry rights holders*. Adobe trained the Firefly Audio Model, which powers Adobe's Generate Soundtrack feature, also launched at Adobe MAX 2025, on music recordings it claims were licensed from named music-industry partners. Adobe's head of generative AI Alexandru Costin publicly stated that for music, Adobe "purchased music directly from IP owners and trained their AI model exclusively on licensed content." Adobe contrasted

---

[16] Counsel for Plaintiffs have also filed parallel putative class actions in this District against other AI developers whose models were trained on voice recordings, including *Amer v. Eleven Labs, Inc.*, No. 1:26-cv-05437 (N.D. Ill. filed May 11, 2026), as well as actions against Google, Meta, Microsoft, Apple, Amazon, Samsung, and Nvidia.

its music-licensing approach with that of Suno and Udio, two AI music startups Adobe identified as facing copyright-infringement litigation from major record labels and independent musicians. Adobe acknowledged, by its conduct and its statements, that AI music training requires affirmative licensing from rights holders. Adobe applied that principle to music after the music-industry copyright threat became unavoidable. Adobe did not apply that principle to the voice professionals whose voices it used to train the Firefly Speech Model and the Firefly Voice Model.

62. The consent infrastructure for Plaintiffs does not exist. Adobe built consent infrastructure for Adobe Stock contributors. Adobe ships consent infrastructure through its ElevenLabs integration. Adobe built consent infrastructure for music-industry rights holders. Adobe built none for the broadcast journalists, podcasters, audiobook narrators, voice actors, and other voice professionals whose recordings, on information and belief, were ingested into the training pipelines for the Firefly Speech Model and the Firefly Voice Model. The asymmetry is not the product of technical impossibility, regulatory ambiguity, or institutional unfamiliarity. It is an institutional choice.

*Adobe Knew*

63. Adobe was not operating in ignorance of biometric privacy law. BIPA has been the law of Illinois since 2008. By the time Adobe launched the Firefly Speech Model and the Firefly Voice Model at Adobe MAX 2025, BIPA had produced some of the largest privacy settlements in American history: approximately $650 million in *In re Facebook Biometric Information Privacy*

*Litigation*, No. 3:15-cv-03747 (N.D. Cal.); approximately $100 million in *In re Google Inc. Biometric Information Privacy Litigation*, No. 1:20-cv-04472 (N.D. Ill.); and approximately $92 million in *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill.). Parallel state biometric statutes had produced additional billion-dollar settlements: Texas's $1.4 billion settlement with Meta in 2024 and Texas's $1.375 billion settlement with Google in 2025.

64. Voice-AI-specific litigation against companies in Adobe's product market had sharpened the notice. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.), alleging that an AI voice company commercialized unauthorized voice clones trained on the plaintiffs' recordings. In August 2024, additional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.), asserting analogous claims. By October 2025, when Adobe launched the Firefly Speech Model and the Firefly Voice Model at Adobe MAX, AI voice companies were active defendants in litigation alleging precisely the conduct alleged here: building commercial voice synthesis products on voice recordings ingested without speaker consent.

65. Adobe's compliance infrastructure foreclosed any claim of inadvertence. Adobe operates an internal AI Ethics Review Board through which, on Adobe's Chief Trust Officer's representation to the United States Senate, "every single AI feature that goes to market" must pass before launch. Adobe operates an AI Ethics Impact Assessment process applied to new generative-AI features. Adobe maintains an in-house Chief Trust Officer, an Office of the General Counsel, and a privacy and compliance function with

decades of experience in the technology industry. Adobe's Privacy Policy, as alleged at ¶¶ 45-46, expressly identifies "voiceprints" as a category of "sensitive personal information" Adobe collects.

66. Adobe knew what a voiceprint was. Adobe knew it was sensitive. Adobe knew the law required permission. Adobe knew voice-AI companies were being sued. Adobe knew BIPA imposed notice, consent, and written-release obligations that ran to the speakers whose voiceprints Adobe extracted. Adobe shipped the Firefly Speech Model and the Firefly Voice Model anyway.

*Adobe's First Extraction: Training the Foundational Models*

67. Adobe did not source these recordings blind. On information and belief, Adobe sourced voice recordings for its foundational voice training pipeline by accessing audio content created by specific, identifiable speakers on publicly accessible platforms — YouTube, Spotify, Apple Podcasts, Audible, Apple Books, Libro.fm, and analogous services — rather than (or in addition to) purchasing pre-cleared anonymized datasets from third-party intermediaries. The platforms display creator profiles that include the creator's name, geographic location, channel or artist description, and content catalog. The recordings come tagged with their origin. Adobe acquired voice recordings tagged, on their face, to identifiable speakers in identifiable places, including Illinois.

68. The training corpora required to support the Firefly Speech Model's library of more than seventy voices across more than twenty languages and the Firefly Voice Model's voice-preserving translation, dubbing, and lip-sync

capabilities are necessarily measured in tens of thousands of hours of speech from tens of thousands of distinct speakers. The Costin statement that Adobe "purchased music and voice from IP owners" cannot, on its own, account for a training corpus of that scale. On information and belief, Adobe's voice training corpora aggregate licensed voice-talent recordings, content sourced from publicly accessible audio platforms, and other audio sources not yet publicly identified by Adobe.

*Adobe's Second Extraction: Runtime Capture from User Uploads*

69. The biometric processing that occurs in Adobe's consumer-facing voice features — Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and Enhance Speech — is the same category of processing that occurs during foundational model training. The consumer-facing features are applications of capabilities built during training. The training pipeline is where extraction of voiceprints and biometric information occurs first, at the largest scale, and on the broadest set of voice recordings. The runtime pipeline is where extraction occurs again — and to new speakers Adobe did not train on.

70. Adobe's Translate Video, Translate Audio, and Translate and Lip Sync products extract voiceprints and biometric information from voice recordings through a mechanism separate and independent from foundational model training. When an Adobe user uploads a video or audio file to one of these products, Adobe's Firefly Voice Model analyzes the recording, identifies the speaker or speakers in it, and extracts a representation of each speaker's

Case 1:26-cv-05175 Document #: 1 Filed: 05/14/26 Page 36 of 94 PageID #:36

distinctive vocal characteristics. Adobe then uses that representation to synthesize translated speech in the same speaker's voice. Adobe describes the process in its own product documentation: the Firefly Voice Model "preserves voice characteristics including tone, cadence, and acoustic qualities" of the input speaker, and "recognizes speech and translates it into a different language while matching the original speaker's voice."[17]

71. Adobe's runtime extraction is, in both function and substance, the collection of a voiceprint and biometric information within the meaning of BIPA. The acoustic representation Adobe extracts from each input speaker is biologically and behaviorally unique to that speaker; it is the representation that allows Adobe's pipeline to reproduce that speaker's voice in a different language. Whether Adobe stores the representation persistently, transiently, or as parameters of a per-job model, the extraction itself is the collection event that triggers BIPA's notice, consent, and written-release obligations under § 15(b). Each upload to Translate Video, Translate Audio, or the Translate and Lip Sync API that captures one or more speakers triggers an extraction event with respect to each speaker. Each extraction event is a discrete collection.

72. The subject whose biometric data is collected through Translate Video, Translate Audio, and Translate and Lip Sync is the speaker in the

---

[17] Adobe, *AI Dubbing for video localization*, Adobe Firefly, https://www.adobe.com/products/firefly/features/ai-dubbing.html (last visited on May 13, 2026).

uploaded recording, not the Adobe user who uploaded it. The two are frequently different people. An Adobe user who uploads a podcast episode to translate it for an international audience captures the voices of the podcast's host, guests, and any other speakers whose voices appear in the recording. An Adobe user who uploads a YouTube video, an audiobook excerpt, an interview clip, a documentary segment, or a recorded performance captures every voice present in that audio. None of the captured speakers contracted with Adobe. None received notice from Adobe. None executed a written release.

73. Adobe expressly disclaims any role in obtaining the consent of third parties whose voices are captured in user-uploaded content. Adobe's Privacy Policy states: "In certain instances, Adobe is acting only on your behalf for personal information collected and processed by our services. ... If you submit any information relating to other people to us ... in connection with your use of Adobe apps or websites, you represent that you have the authority to do so and to permit us to use the information in accordance with this policy." By that disclaimer, Adobe attempts to delegate to its uploading users the duty to obtain consent from the speakers whose voices the uploads contain. Under BIPA, the duty to provide written notice and obtain written release runs to Adobe as the entity making the collection. Adobe cannot delegate the duty to a third party by contract. Adobe's attempt to do so is itself probative of Adobe's knowledge that the runtime extraction collects biometric data requiring consent.

74. Plaintiffs' recordings are widely and continuously distributed across publicly accessible platforms. On information and belief, Adobe users have uploaded recordings containing Plaintiffs' voices to Translate Video, Translate Audio, and the Translate and Lip Sync API since those products launched. Each upload triggered an independent runtime extraction of a Plaintiff's voiceprint — without notice, without consent, without a written release.

75. Adobe's runtime-extraction theory is independent of, and supplementary to, the foundational-training-data theory. Adobe's runtime extraction occurs every time a user submits a translation or lip-sync request that includes audio featuring one or more speakers, on a per-recording, per-speaker basis, regardless of whether Adobe's foundational voice models were also trained on the same source material. Adobe's runtime-extraction obligations under BIPA arise at each extraction event, independently of any obligations arising from foundational training.

*Adobe's BIPA Non-Compliance*

76. Adobe's privacy disclosures are directed at users of its platform. They do not address, and they cannot provide notice or consent on behalf of, non-users like Plaintiffs whose voices were ingested from third-party sources without any direct interaction with Adobe.

77. With respect to Plaintiffs, who never interacted with Adobe in connection with the collection of their voiceprints, Adobe's privacy policy is entirely inapplicable. Plaintiffs never read or agreed to any Adobe privacy

policy. Plaintiffs never received any disclosure from Adobe. Adobe provided no notice of any kind to Plaintiffs before collecting their voiceprints and biometric information through training-data ingestion or through runtime extraction.

78. Adobe's consent mechanism for platform users consists of general terms-of-service acceptance and product-level feature toggles. No separate consent mechanism specifically addressing biometric data, as distinct from general terms acceptance, has been publicly identified for the foundational voice training pipeline. With respect to Plaintiffs, who are not Adobe platform users, no consent of any kind was obtained.

79. Adobe's Privacy Policy contains a deletion provision tied to the disabling of consumer-facing features: "Where we process biometric identifiers or biometric information to deliver a feature requested by you, we delete this information once you turn off the feature, unless otherwise specified in the Software or Services." That provision is facially inapplicable to Plaintiffs and the Class. Plaintiffs and the Class are not Adobe platform users, have no relationship with Adobe to terminate, have no feature toggle to disable, and have no account through which to make a deletion request. No retention or destruction policy applicable to non-user training-data subjects or non-user runtime-extraction subjects has been publicly identified.

80. Adobe's general terms of service and Generative AI User Guidelines govern user-uploaded content and user-generated outputs. Neither addresses the disposition of voiceprints and biometric information extracted from voice recordings used to train Adobe's foundational voice synthesis models, or

extracted at runtime from speakers captured in user-uploaded recordings. The question whether biometric characteristics extracted from training-data voice recordings are ever destroyed, or whether they persist indefinitely in the parameters of Adobe's commercial models, is not addressed in any policy Adobe has published.

81. On information and belief, Adobe shares voice data, including voiceprints and biometric information, with affiliates, vendors, and service providers across jurisdictions. Adobe's Privacy Policy identifies the United States and India as the principal locations where Adobe processes personal information, and discloses that Adobe transfers personal information to other countries where Adobe and its affiliates, providers, and partners operate. Adobe's Privacy Policy further provides for disclosure of personal information to "other companies in the Adobe family" and to "service providers" and "data processors." Plaintiffs and the Class did not consent to any of these disclosures.

82. No mechanism exists by which non-users, including Plaintiffs and the Class, can request access to, correction of, or deletion of their biometric data from Adobe's training datasets, model parameters, runtime processing systems, or affiliate, vendor, or service-provider transfers.

*Illinois-Origin Biometric Data*

83. Plaintiffs' voices, the biological characteristics from which their voiceprints are derived, were produced by Plaintiffs while they were physically present in Illinois. The audio recordings embodying Plaintiffs' voices were

created in Illinois. The recordings were published from Illinois to publicly accessible platforms, on which Plaintiffs display their names, professional biographies, and content catalogs, and on which Plaintiffs' association with Illinois as a production location is publicly visible.

84. The biometric data at the center of this case originated in Illinois on three independent grounds.

(a) The data was generated in Illinois. Plaintiffs' voices, the biological source from which voiceprints are derived, are produced in Illinois every time Plaintiffs speak in their professional capacity. The audio encodings of those voices, the recordings from which Adobe extracted voiceprints, were created in Illinois.

(b) Adobe's acquisition was targeted at identifiably Illinois-origin material. Adobe affirmatively accessed publicly available platforms and sourced voice recordings from them. The recordings Adobe acquired were published with metadata identifying the speaker by name and identifying Illinois as the location of production. Adobe's act of accessing and processing those recordings was the targeted acquisition of identifiably Illinois-origin biometric material from identifiable Illinois speakers, not the passive receipt of an anonymized dataset from a third-party intermediary.

(c) The ongoing exploitation is directed at Illinois. Adobe possesses, uses, and profits from voiceprints derived from Illinois-recorded voice work. Adobe markets, sells, and delivers commercial voice products powered by those voiceprints to Illinois customers on a recurring subscription basis. Adobe's

commercial monetization of the Illinois-origin biometric data continues, day after day, in Illinois.

85. BIPA's duties run to the subjects of the biometric data. Section 15(b) requires the collecting entity to inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). Section 15(a) imposes retention and destruction duties owed to the persons whose data is held. Section 15(c) prohibits profiting from those persons' data. Section 15(d) prohibits its dissemination. Section 15(e) requires its protection on terms at least as protective as the entity applies to its own confidential information. The subjects of the biometric data are Plaintiffs. The duties were owed to Illinois persons. The failures were failures with respect to Illinois persons. The continuing violations — the retention, the monetization, the cross-jurisdictional transfer, the substandard protection — are continuing violations against Illinois persons whose voices originated in Illinois.

*Adobe Monetizes Illinois-Origin Voiceprints*

86. The acts that give rise to Plaintiffs' claims are stages in a single, integrated commercial chain designed to extract commercial value from Plaintiffs' biometric data and deliver that value to Adobe through paying Illinois customers. Adobe collected voiceprints from Plaintiffs' voice recordings. Adobe used those voiceprints to train the Firefly Speech Model and the Firefly Voice Model. Adobe deployed those models to power Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature. Adobe sells and delivers those products to customers,

including Illinois customers, through subscription plans, enterprise licenses, and developer APIs. Each stage depends on the one before it. Without extracting biometric data from training recordings and from user-uploaded runtime recordings, Adobe's voice models would lack the voice quality, expressiveness, and multilingual capability that Adobe's customers pay for.

87. Adobe monetizes Plaintiffs' voiceprints through at least five distinct commercial channels:

(a) Firefly Standard and Firefly Pro subscription fees, under which Generate Speech is offered as a premium feature with commercial-use rights to outputs;

(b) Creative Cloud subscription fees across Single App, All Apps, Pro, Teams, and Enterprise tiers, under which subscribers receive access to Adobe's voice products as part of their broader Creative Cloud entitlements;

(c) enterprise Creative Cloud, enterprise voice product, and Translate and Lip Sync API licensing fees, under which enterprise customers receive expanded voice product capabilities, higher usage limits, and direct API access;

(d) Firefly Services API and other developer-platform revenue tied to Adobe's voice models; and

(e) partnership and platform value Adobe extracts by integrating partner voice models, including ElevenLabs' Multilingual v2, into the Generate Speech surface alongside Adobe's own Firefly Speech Model — positioning Adobe as a voice-AI platform aggregator rather than only a voice-AI model provider.

88. Adobe's fiscal-year 2025 Digital Media Annualized Recurring Revenue of approximately $18.59 billion derives in material part from the integrated commercial chain that monetizes the voiceprints at issue in this lawsuit. The voice quality, expressiveness, speaker similarity, and multilingual capability that Adobe's Illinois customers pay for through each of the channels enumerated above are capabilities that exist because of the voiceprints encoded in Adobe's foundational voice models. On information and belief, those voiceprints include biometric data Adobe extracted from voice recordings produced or recorded in Illinois.

*Adobe's Products Compete With the People Whose Voices Built Them*

89. Adobe's commercial voice products directly serve and threaten the professional markets in which Plaintiffs and Class members earn their livelihoods, including audiobook narration, voice acting, podcast hosting and narration, film and television dubbing, advertising voiceover, broadcast and audio journalism, e-learning narration, and related markets for professional voice work.

90. Adobe markets its commercial voice products as cost-effective substitutes for professional voice services. Adobe promotes Generate Speech to creators who, Adobe tells them, no longer need "separate text-to-speech software" or "a high quality microphone," with downloadable WAV outputs cleared for commercial use. Adobe characterizes the AI dubbing capabilities of Translate Video, Translate Audio, and the Translate and Lip Sync API as

"significantly reducing production time and costs" relative to retaining voice actors to record new dialogue.

91. Adobe trained its commercial voice products on the voices of professional narrators, journalists, podcasters, and voice actors. Adobe now sells those products into the markets where those professionals make their living. Adobe undercuts their rates with their own voices. On information and belief, the technology Adobe built using Plaintiffs' voiceprints and biometric information directly competes with Plaintiffs in their specific market niches: audiobook narration (Dorcus, Nassif), long-form investigative audio journalism (Flowers, Lacour, Amer), broadcast journalism and on-air reporting (Marin, Rogers), and authentic Arabic-accented narration of works by Arab and Palestinian American authors (Nassif). Plaintiffs and Class members have suffered, and continue to suffer, economic injury — lost and diminished licensing income, suppressed voiceover and narration rates, diverted commercial opportunities, and loss of control over their biometric data and professional identities. The product with which Adobe competes against the Plaintiffs is built from the Plaintiffs' own voices.

*Named Plaintiffs*

*Allegations Common To All Plaintiffs*

92. On information and belief, the voice recordings of each named Plaintiff were among the audio that Adobe ingested to train its foundational voice models, and voiceprints derived from those recordings are encoded in the parameters of those models and reproduced in the audio those models

generate, including the Firefly Speech Model and Firefly Voice Model that power Adobe's commercial products. Each Plaintiff's catalog of professional voice work matches the profile of training audio optimal for foundational voice models of the type Adobe develops: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on the publicly distributed audio platforms — broadcast archives, podcast directories, audiobook platforms, video platforms — from which AI voice companies have been alleged to source training data, including in *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.) (against the AI voice company whose Multilingual v2 model Adobe has integrated directly into Generate Speech). Each platform on which a Plaintiff's catalog is publicly accessible carries metadata explicitly identifying the Plaintiff by name and Illinois as the production location, so Adobe's acquisition could not have been the passive receipt of an anonymized dataset and necessarily involved acquiring biometric data tied to an identified Illinois speaker producing work in Illinois. Adobe's foundational voice models, which Adobe markets as covering more than twenty languages with a library of more than seventy voices, cannot have been produced without ingesting hundreds of thousands of hours of voice recordings from identifiable speakers, and Adobe has never publicly identified the sources, scale, or provenance of that data — facts within Adobe's exclusive control. Adobe has consistently characterized its voice models as "commercially safe" and trained on "licensed" or "responsibly sourced" content while declining to identify the licenses, sources, or rights-holders, mirroring representations

Case 1:26-cv-05435 Document #: 4-1 Filed: 05/11/26 Page 240 of 940 PageID #:392

Adobe made about its image-model training data that investigative reporting in April 2024 established were incomplete with respect to that prior dataset.

93. No named Plaintiff created an Adobe account authorizing Adobe to use his or her voice, uploaded a voice recording to any Adobe platform for that purpose, invoked any Adobe voice-AI product, or accepted any Adobe terms of service related to its voice products. No Plaintiff received notice that Adobe had collected his or her voiceprint, received any disclosure of the purpose or duration of that collection, or executed a written release. Adobe's collection of each Plaintiff's voiceprint, and Adobe's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent. The records identifying which specific voice recordings Adobe ingested are within Adobe's exclusive control.

94. The injury Adobe inflicted on each named Plaintiff is concrete and particular and shares the same structure across all of them. Adobe extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in foundational voice models, and continues to profit from those models and the commercial products built on them — including Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The commercial products Adobe built now operate in the same professional voice markets in which the Plaintiff built and, where applicable,

continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Carol Marin*

95. Plaintiff Marin is one of the most decorated broadcast journalists in American television history, with a career spanning nearly five decades in on-air television and radio journalism. Marin's voice-based and oral journalism work — spanning on-air television anchoring, investigative broadcast reporting, live debate moderation, documentary narration, and in-depth interviewing — has been disseminated across major broadcast and digital platforms including NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel. Marin's career has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, at least fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, the Sigma Delta Chi Ethics in Journalism Award, induction into the Chicago Journalism Hall of Fame, and, in 2025, the Order of Lincoln — the State of Illinois's highest civilian honor.

96. A substantial archive of Marin's on-air broadcast journalism is publicly available through the Media Burn Archive (mediaburn.org), a nonprofit digital archive in Chicago that preserves her broadcast investigative reporting, documentary work, and on-air interviews. Marin's work is also accessible through the WTTW digital archive (news.wttw.com), the NBC Chicago digital archive (nbcchicago.com), and on YouTube, where her Peabody acceptance

speeches, debate moderation, and archived broadcast segments are publicly available. Marin's voice, the biological characteristic from which a voiceprint is derived, was produced by Marin while she was physically present in Illinois; the audio recordings embodying Marin's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Marin's identity and her Illinois production location were publicly displayed.

*Philip Rogers*

97. Plaintiff Rogers is a retired, award-winning broadcast journalist whose career spans more than four decades in radio and television news. Rogers's voice-based and oral journalism work — spanning on-air radio reporting at WBBM Newsradio (CBS), on-air television reporting and anchoring at WMAQ-TV (NBC 5), and live broadcast coverage from conflict zones, disaster scenes, mass shootings, corruption trials, the Olympic Games, and other major national and international events — has been disseminated across major broadcast platforms including NBC (WMAQ-TV) and WBBM Newsradio (CBS), as well as digital platforms including the NBC Chicago online archive and YouTube. Rogers's career has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, multiple Peter Lisagor Awards from the Chicago Headline Club, and additional Emmy Awards.

98. A substantial archive of Rogers's on-air broadcast journalism is publicly available through the NBC Chicago digital platform at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories

are archived and searchable. Rogers's work is also accessible on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association. Rogers's voice, the biological characteristic from which a voiceprint is derived, was produced by Rogers while he was physically present in Illinois; the audio recordings embodying Rogers's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Rogers's identity and his Illinois production location were publicly displayed.

*Alison Flowers*

99. Plaintiff Flowers is an award-winning investigative journalist, podcast producer, and audio storyteller based in Chicago. Flowers is the founder of Spiralbound, a production company operating at the intersection of investigative journalism and immersive storytelling, and previously served as the Head of Production at the Invisible Institute, a nonprofit investigative journalism organization on the South Side of Chicago. Flowers produced and reported the seven-part investigative podcast Somebody (2020), which was a 2021 Pulitzer Prize finalist for Audio Reporting, won the National Magazine Award (Ellie) for Podcasting, the Scripps Howard Award, the IDA Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Best Serialized Story; Rolling Stone named Somebody to its list of "The 25 Best True-Crime Podcasts of All Time" and ranked it #1 on its Best Podcasts of 2020 list, and The New York Times ranked it #1 on its list of true crime podcasts at the intersection of race.

100. Flowers's voice-based and oral journalism work has been disseminated across all major digital audio platforms, including Apple Podcasts, Spotify, iHeartRadio, YouTube, and Stitcher. Somebody was also distributed via Google Podcasts prior to that service's discontinuation in 2024 — meaning Flowers's voice work was, during the relevant period, distributed through an audio platform operated by a company that itself has been the subject of public allegations of large-scale ingestion of publicly distributed audio content for AI training purposes. Flowers's voice, the biological characteristic from which a voiceprint is derived, was produced by Flowers while she was physically present in Illinois; the audio recordings embodying Flowers's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Flowers's identity and her Illinois production location were publicly displayed.

*Robin Amer*

101. Plaintiff Amer has more than twenty years of experience in digital, broadcast, and print media. Amer is the creator, host, narrator, and showrunner of USA Today's investigative podcast The City — which peaked at #6 on the Apple Podcasts charts, was named Best Podcast of the Year by The New Yorker, The New York Times, Quartz, and Apple Podcasts, and was distributed across Apple Podcasts, Spotify, iHeartRadio, and Google Podcasts prior to that service's discontinuation in 2024. Amer's earlier audio production contributions to the podcast Gravy helped that program win the 2015 James Beard Award for Best Podcast. Amer spent three years at The Washington Post

as Senior Producer for Audio Features, where she edited Post Reports and the standalone narrative podcast series Field Trip, and won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as the Managing Editor of Love + Radio, which has been described by The Guardian as one of the greatest podcasts of all time, and oversaw production of the podcast's Blood Memory, which won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction.

102. Amer's voice-based and oral journalism work has been disseminated across major digital audio platforms including Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, and WBEZ/NPR. The City and Amer's other podcast work were also distributed via Google Podcasts prior to that service's discontinuation in 2024. Amer's voice, the biological characteristic from which a voiceprint is derived, was produced by Amer while she was physically present in Illinois during the substantial majority of her recording work; the audio recordings embodying Amer's voice were primarily and substantially created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Amer's identity and her Illinois production location were publicly displayed.

*Lindsey Dorcus*

103. Plaintiff Dorcus is an established and professionally recognized voice actor, audiobook narrator, and voiceover artist whose voice-based creative work has been commercially released by most major book publishers in the English-speaking world and distributed across all major audiobook and

Case 1:26-cv-05435 Document #: 1 Filed: 05/11/26 Page 53 of 194 PageID #:53

digital audio platforms. Dorcus has recorded more than 200 audiobooks for major publishers including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a 2020 Society of Voice Arts and Sciences (SOVAS) Voice Arts Award winner (full-cast voice artist ensemble for the audiobook anthology Wild Monsters Dance About: Stories from an Unruly Mind), a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration, and the subject of favorable reviews in AudioFile Magazine, which has described her performances as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice."

104. Dorcus's audiobook narration is publicly available and distributed across the major audiobook and digital audio platforms, including Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and other major audiobook retailers and subscription services. Dorcus's complete catalog of narrated titles is searchable and accessible on Audible.com and other major audiobook platforms. Dorcus's audiobooks are distributed in part through Google Play Books — meaning Dorcus's voice work is, during the relevant period, distributed through an audiobook platform operated by a company that itself has been the subject of public allegations of large-scale ingestion of publicly distributed audio content for AI training purposes. Dorcus possesses a professionally recognized range of accents and dialects including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern), French, American Southern, Greek, New

Case: 1:26-cv-04355 Document #: 24-1 Filed: 07/21/26 Page 247 of 940 PageID #:4399

England, New York, German, Indian, and Russian. Dorcus operates a professional home recording studio in Chicago equipped with industry-standard audiobook production equipment, and all of Dorcus's audiobook work has been recorded at studios, including her home, in the City of Chicago. Dorcus's voice, the biological characteristic from which a voiceprint is derived, was produced by Dorcus while she was physically present in Illinois; the audio recordings embodying Dorcus's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Dorcus's identity and her Illinois production location were publicly displayed.

*Yohance Lacour*

105. Plaintiff Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago who has dedicated his professional work to telling stories of Black Chicago. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast You Didn't See Nothin', a production of the Invisible Institute and USG Audio. In 2024, You Didn't See Nothin' was awarded the Pulitzer Prize for Audio Reporting and a Peabody Award; the series was also named among Apple Podcasts' "Podcasts We Love" and recognized as one of the "100 Best Podcasts of All Time," and received four nominations at the Black Podcasting Awards and two nominations at the Signal Podcasting Awards. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series, conducting recorded interviews and providing oral narration. Lacour is affiliated with the

Invisible Institute, a nonprofit investigative journalism organization based on the South Side of Chicago.

106. You Didn't See Nothin' is publicly available and distributed across all major podcast and digital audio platforms, including Apple Podcasts, Spotify, iHeart Podcasts, YouTube, Amazon Music, and Overcast. Lacour has also appeared as a featured guest and interview subject on nationally distributed audio journalism programs discussing You Didn't See Nothin' and his work as a journalist and storyteller, including NPR's Fresh Air with Tonya Mosley, NPR's All Things Considered with Adrian Florido, the CBC's Crime Story podcast with Kathleen Goldhar, and the Pulitzer Prize Board's own Pulitzer on the Road podcast — interviews that are publicly available across major public radio and podcast distribution platforms. Lacour's voice, the biological characteristic from which a voiceprint is derived, was produced by Lacour while he was physically present in Illinois; the audio recordings embodying Lacour's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Lacour's identity and his Illinois production location were publicly displayed.

*Victoria Nassif*

107. Plaintiff Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois. Nassif is a trained mezzo-soprano singer. Nassif has recorded audiobooks for major publishers including Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon

& Schuster. Nassif's notable audiobook narration credits include The Next New Syrian Girl by Ream Shukairy (Hachette/Little, Brown Young Readers), for which she served as the solo narrator performing multiple characters with authentic Arabic accents in the Levantine dialect; The Skin and Its Girl by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize and named a Them Best Book of the Year; Gulf by Mo Ogrodnik (Simon & Schuster); The Jasad Crown by Sara Hashem; and Every Moment is a Life, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers. Nassif has performed on-camera in broadcast television, including multiple episodes of Chicago PD (NBC, Season 12), and has appeared in nationally broadcast commercials. Nassif possesses a professionally recognized range of accents and dialects including General American, British (Received Pronunciation and Cockney), Persian, Levantine Arabic, and American Southern. As a first-generation Lebanese-Palestinian American who speaks basic Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern and Arab characters and settings — a distinctive professional asset in the audiobook narration industry.

108. Nassif's audiobook narration is publicly available and distributed across major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's voice, the biological characteristic from which a voiceprint is

derived, was produced by Nassif while she was physically present in Illinois; the audio recordings embodying Nassif's voice were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms, where Nassif's identity and her Illinois production location were publicly displayed.

*Adobe Acted Willfully and Recklessly*

109. Adobe did not stumble into this. Adobe extracted Plaintiffs' voiceprints with full knowledge of BIPA, full knowledge of the technology, full knowledge of how to obtain consent, and full knowledge that the AI voice industry was being sued for precisely the conduct alleged here. Adobe extracted them anyway. That was not inadvertence. It was choice.

*Adobe knew the Law*

110. The law was not obscure. BIPA has been on the books since 2008 and has produced some of the largest privacy settlements in American history, as alleged at ¶ 63. Voice-AI defendants have been litigating analogous claims for two years, as alleged at ¶ 64. Adobe's Privacy Policy, last updated four days before the launch of the Firefly Speech Model and the Firefly Voice Model, expressly enumerates "voiceprints" among the "biometric identifiers" Adobe collects, as alleged at ¶¶ 45-46. Adobe operates an AI Ethics Review Board through which, on Adobe's Chief Trust Officer's sworn representation to the United States Senate, "every single AI feature that goes to market" must pass before launch, as alleged at ¶ 49, 65. A company with that infrastructure, that policy language, and that record cannot credibly claim it was unaware of BIPA's requirements.

*Adobe Knew the Technology*

111. Adobe wrote the papers and recruited the people. Adobe Research has been publishing on speaker-identity extraction since 2017 and demonstrating voice-cloning capabilities under its own brand since 2016, as alleged at ¶¶ 37-39, 44. Adobe's product documentation describes the Firefly Voice Model as "matching the original speaker's voice" and "preserving voice characteristics including tone, cadence, and acoustic qualities" — descriptions that depend, as a technical matter, on the extraction of speaker-identifying representations from input audio. Adobe Research also recruited the technical leadership of competing voice-cloning programs, including Rithesh Kumar, who joined Adobe Research from Descript Inc., where he had served as Technical Lead for Descript's Overdub voice-cloning feature — technology Descript acquired through its 2019 purchase of Lyrebird, an early voice-cloning startup. Adobe did not enter voice synthesis cold. Adobe could not credibly plead that its own pipeline does not extract speaker-identifying representations from the audio it ingests.

*Adobe Knew How to Obtain Consent*
*and Chose Not to Obtain It Here*

112. Adobe operates contemporaneous consent and compensation frameworks for three categories of training-data subjects: Adobe Stock contributors (¶ 59), the public-figure voices distributed through ElevenLabs' Iconic Marketplace and shipped inside Adobe's own product interface (¶ 60), and the music-industry rights holders whose recordings train Adobe's Firefly Audio Model (¶ 61). Three frameworks, three categories, contemporaneous with

the launch of the Firefly Speech Model. Adobe built none of them for the broadcast journalists, podcasters, audiobook narrators, and voice actors whose recordings, on information and belief, trained that model.

113. The omission was a calculation. BIPA-compliant collection would have required Adobe to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingestion. The training corpora behind the Firefly Speech Model's library of more than seventy voices across more than twenty languages comprise, on information and belief, the recordings of hundreds of thousands of distinct speakers. That compliance burden would have constrained the speed and scale of Adobe's voice AI development. Adobe chose speed and scale. Adobe added voice synthesis to a product portfolio generating approximately $23.77 billion in fiscal-year 2025 revenue on that choice. That was not an oversight. It was a business decision.

*Adobe Spent Nine Years Mitigating Voice-Synthesis Risk Without Resolving the Consent Problem*

114. Adobe's conduct between 2016 and 2025 confirms that it recognized the privacy and ethical risks of commercial voice synthesis from the start. Adobe declined to release Project VoCo as a product in 2016–2018, with Adobe's researchers publicly acknowledging misuse risks and stating they were working in parallel on watermarking to make synthesized speech detectable. Adobe co-founded the Content Authenticity Initiative in 2019. Adobe co-founded the Coalition for Content Provenance and Authenticity in 2021. Adobe published the *MaskMark* neural-watermarking research in 2024, expressly

framed as applicable to "Real and Synthetic Speech." Each step addressed a downstream risk Adobe itself recognized in the productization of voice synthesis. When Adobe finally shipped voice synthesis at commercial scale at Adobe MAX 2025, it shipped with provenance markings, with watermarking research in hand, and with "commercially safe" marketing language — and without any consent infrastructure for the speakers whose voices populated the training corpus. Adobe spent nine years mitigating the symptoms. Adobe never addressed the cause.

*Adobe's Parallel Training-Data Conduct Confirms the Pattern*

115. Adobe's noncompliance is not isolated to voice. In December 2025, an Oregon-resident author filed a putative class action in *Lyon v. Adobe Inc.*, No. 5:25-cv-10732 (N.D. Cal.), alleging that Adobe trained its SlimLM small-language-model series on copyrighted books obtained without authorization through third-party datasets including SlimPajama and the Books3 corpus. A second putative class action alleging analogous AI training-data practices was reported filed in February 2026. In April 2024, Bloomberg established that Adobe's analogous "licensed" and "commercially safe" representations about its image-model training data did not match the underlying practice, as alleged at ¶¶ 55-57. Across image, language, and voice, the institutional pattern is the same: conclusory licensure language; refusal to identify sources; non-consensual ingestion at scale.

116. Each of the violations alleged in this Complaint was therefore committed by Adobe with knowledge of, or in reckless disregard for, BIPA's

requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay*.

**CLASS ACTION ALLEGATIONS**

117. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Adobe collected, captured, extracted, derived, or otherwise obtained voiceprints or biometric information in connection with (i) the development, training, fine-tuning, evaluation, or operation of any Adobe voice synthesis, voice recognition, or related voice-AI model, including but not limited to the Firefly Speech Model, the Firefly Voice Model, and any predecessor, successor, derivative, or fine-tuned version of those models, or (ii) the runtime processing of voice recordings submitted to any of Adobe's commercial voice products, including without limitation Translate Video, Translate Audio, Translate and Lip Sync, and Enhance Speech, during the Class Period.

118. The Class Period runs from the earlier of (a) the date Adobe first ingested any voice recording into the training pipeline for any of its foundational voice synthesis models, or first extracted voice characteristics from any recording submitted to its runtime-extracting voice products, or (b)

January 1, 2016, through the date of judgment. Discovery will establish the operative start date.

119. Excluded from the Class are: (i) Adobe Inc. and each of its parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Adobe; (iii) Adobe's current and former employees, contractors, and agents during the Class Period, and counsel of record in this action; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) immediate family members (defined as spouses, domestic partners, parents, children, and siblings) of any individual excluded under clause (ii); (vi) the United States, the State of Illinois, and their respective subdivisions, agencies, and instrumentalities; and (vii) any person who executed a written release authorizing Adobe to collect, capture, or obtain their voice recordings for the specific purpose of training, evaluating, or operating Adobe's voice synthesis or voice recognition models.

120. No person is excluded from the Class by reason of having released, settled, or otherwise resolved claims arising out of separate facts or transactions, including without limitation claims arising from Adobe's training of language models or image generation models.

121. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

122. *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered Adobe's training pipeline, or was processed by Adobe's runtime-extracting voice products, is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, source-URL records, dataset-version records, runtime request logs, per-job processing records, speaker-embedding indices, and associated speaker- and file-level identifiers — are within Adobe's exclusive control. Class membership can be further confirmed through publicly available distribution metadata (audiobook platform records, podcast directory records, streaming service catalogs, broadcast archive records) and through voice-matching analysis comparing Adobe's voice model outputs against publicly available recordings of Class members.

123. *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into Adobe's training pipelines, or processed by Adobe's runtime-extracting voice products, runs to the hundreds of thousands. Building voice synthesis models of the multilingual capability for which Adobe markets the Firefly Speech Model and Firefly Voice Model — supporting more than twenty languages and a library of more than seventy voices — requires training on a correspondingly large and diverse speaker population. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period; (b) the interview subjects, guests, panelists,

witnesses, callers, public officials, and other speakers whose voices were captured in Illinois-produced or Illinois-recorded audio content publicly accessible on the platforms from which, on information and belief, Adobe sourced training data; and (c) every Illinois-recorded speaker — professional or incidental — whose voice was captured in audio submitted to Adobe's Translate Video, Translate Audio, or Translate and Lip Sync services during the Class Period. The exact number is within Adobe's exclusive control and will be established through discovery.

124. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Adobe did not engage in any individualized notice, consent, retention-policy disclosure, written-release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Adobe's training pipelines or whose voice characteristics were extracted at runtime by Adobe's voice products. The same training pipelines and the same runtime extraction pipelines processed the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same automated and standardized processes. The questions whether Adobe complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements can be answered classwide because Adobe's noncompliance was identical as to every Class member.

125. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics Adobe extracts during voice-model training, including the speaker embeddings and speaker-acoustic representations described in Adobe Research's published papers and Adobe's product documentation, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b) whether the per-job voice-characteristic representations Adobe extracts at runtime when Translate Video, Translate Audio, and Translate and Lip Sync process user-submitted recordings — representations Adobe's own product documentation describes as "preserv[ing] voice characteristics including tone, cadence, and acoustic qualities" of the input speaker — constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(c) whether Adobe informed Class members in writing that their biometric identifiers were being collected or stored, of the specific purpose and length of term of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(d) whether Adobe developed and made publicly available a written retention and destruction policy applicable to Class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(e) whether Adobe sold, leased, traded, or otherwise profited from Class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(f) whether Adobe disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers — including through transfers to Adobe's affiliates, vendors, and service providers, and to its data-processing operations

in the United States and India — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(g) whether Adobe stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information — including its source code, proprietary architecture, internal financial records, and customer data — as 740 ILCS 14/15(e)(2) requires;

(h) whether Adobe's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(i) whether Adobe used Class members' voices and identities for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a);

(j) whether Adobe's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b) and (d), as amended by P.A. 103-836, and whether Adobe materially contributes to or facilitates their distribution;

(k) whether Adobe's conduct constitutes unfair or deceptive practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

(l) whether Adobe's conduct constitutes deceptive trade practices likely to cause confusion in violation of 815 ILCS 510/2(a)(2) and (a)(3);

(m) whether Adobe was unjustly enriched by its unauthorized use of Class members' voice data; and

(n) the appropriate measures of damages, restitution, and injunctive relief.

126. *Typicality.* The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, and related voice work recorded in Chicago studios, broadcast facilities, and home recording studios in this District. Adobe, on information and belief, ingested those recordings into the training pipelines for its foundational voice synthesis models and, on information and belief, has extracted voice characteristics from those recordings at runtime when users uploaded them to Translate Video, Translate Audio, or Translate and Lip Sync, in each case without notice, consent, or written release. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

127. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy

litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

128. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Adobe has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Adobe's training pipelines operated uniformly across every Class member's voice recordings; Adobe's runtime extraction pipelines operate uniformly across every voice captured in user-uploaded recordings; Adobe's failure to obtain BIPA-compliant consent was uniform; Adobe's failure to publish a retention and destruction policy applicable to non-user training-data subjects and non-user runtime-extraction subjects was uniform; and Adobe's continuing possession and commercial exploitation of Class members' voiceprints — encoded in the Firefly Speech Model and Firefly Voice Model that power Generate Speech, Translate Video, Translate Audio, Translate and Lip Sync, and Enhance Speech — is uniform. Plaintiffs seek classwide injunctive relief, including the destruction or retraining of the foundational voice synthesis models in which Class members' voiceprints are encoded, that necessarily applies on the same terms to every Class member.

129. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims, because common questions of law and fact predominate over questions affecting only individual

Class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

130. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First*, whether Adobe's voice-model training pipeline extracts voiceprints within the meaning of BIPA is a common technical question with a common answer: Adobe's product documentation describes the underlying processing as "preserv[ing] voice characteristics including tone, cadence, and acoustic qualities" of an input speaker, and Adobe's Privacy Policy expressly enumerates "voiceprints" among the categories of biometric identifiers Adobe collects. *Second*, whether Adobe's runtime extraction pipeline extracts voiceprints is the same common technical question, answered by the same Adobe-authored descriptions. *Third*, whether Adobe complied with BIPA's notice, consent, retention, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer: Adobe did not, with respect to any non-user. *Fourth*, whether Adobe's conduct was willful or reckless turns on Adobe's institutional knowledge and decision-making, which are common to the Class. The principal individual question — whether a specific Class member's voice recording entered the training pipelines or was processed at runtime — is binary and resolvable from Adobe's own records, including training-data manifests, ingestion logs, runtime request logs, per-job processing records, and source-identifier records in Adobe's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740

ILCS 14/20, as amended by P.A. 103-769 and as construed in Clay v. Union Pacific Railroad Co., No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed.

131. *Superiority.* A class action is the superior method for adjudicating these claims.

(a) *Class members' interest in individual control.* Class members are voice professionals — broadcast journalists, audiobook narrators, podcasters, voiceover artists, voice actors — and incidental speakers whose voiceprints were extracted without their knowledge. Many remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against a major publicly traded technology company reporting approximately $23.77 billion in annual revenue, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redress.

(b) *Existing related litigation.* Two putative class actions are pending against Adobe arising from training-data practices: *Lyon v. Adobe Inc.*, No. 5:25-cv-10732 (N.D. Cal. filed Dec. 16, 2025), and a follow-on putative class action filed in February 2026. Both concern alleged training of Adobe's SlimLM small-language-model series on copyrighted books obtained without authorization through third-party datasets, and both assert claims on behalf of authors and copyright holders. Both are pending in a different district. Neither

asserts claims under BIPA, IRPA, or any analogous biometric-privacy or right-of-publicity statute, and neither concerns the voice professionals and incidental speakers whose voices were ingested into Adobe's foundational voice synthesis models or extracted at runtime by Adobe's commercial voice products. Analogous biometric-privacy and right-of-publicity allegations have been asserted against other AI voice companies, including *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024) (settled 2025), and *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y. filed May 16, 2024). No other putative class action known to Plaintiffs asserts BIPA, IRPA, or analogous Illinois claims against Adobe on behalf of the Illinois-recorded speakers whose voices were used to build and operate its commercial voice products.

(c) *Desirability of concentration in this forum.* Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Adobe conducts substantial commercial business in Illinois through Firefly Standard, Firefly Pro, Creative Cloud, enterprise, and API subscription sales of its voice products to Illinois customers. The Northern District of Illinois has substantial expertise with BIPA litigation and is the natural forum for adjudication of Illinois residents' Illinois-statutory claims arising from Adobe's commercial conduct in Illinois.

(d) *Manageability.* The case is manageable as a class action. Adobe's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be

determined from Adobe's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim.

132. *Tolling and continuing violations.* To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Adobe's concealment of its training-data sources and runtime-extraction practices, by Adobe's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Adobe had ingested their recordings into its training pipelines or processed them at runtime, and by the continuing nature of Adobe's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational voice models in which the unlawfully obtained biometric data is encoded, and each disclosure or transmission of that biometric data is a separate violation of BIPA under Cothron v. White Castle System, Inc., 216 N.E.3d 918 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

133. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

134. Plaintiffs bring this Count individually and on behalf of the Class.

135. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

136. Adobe is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

137. Adobe collected, captured, and otherwise obtained voiceprints and biometric information from Plaintiffs' and Class members' voice recordings through two distinct and independently sufficient mechanisms: (i) by ingesting voice recordings into the training pipeline for Adobe's foundational voice

synthesis models, including the Firefly Speech Model and the Firefly Voice Model, and extracting computational representations of the distinctive acoustic characteristics of those speakers' voices, as alleged at ¶¶ 67-68, 92-108; and (ii) by extracting voice characteristics at runtime, on a per-recording, per-speaker basis, from voice recordings submitted to Translate Video, Translate Audio, and Translate and Lip Sync, as alleged at ¶¶ 69-75. The resulting representations — described in Adobe's own product documentation as "preserv[ing] voice characteristics including tone, cadence, and acoustic qualities" of an input speaker and as "matching the original speaker's voice" — are voiceprints and biometric information within the meaning of BIPA.

138. Adobe did not, before extracting Plaintiffs' or Class members' voiceprints through either mechanism, inform any Plaintiff or Class member in writing that biometric identifiers were being collected or stored, inform any of them in writing of the specific purpose or length of term of collection, or receive a written release. Adobe obtained no consent of any kind, in any form, from any Plaintiff or Class member.

139. Adobe's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

140. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member and each violation, the greater of liquidated damages of $1,000 (negligent) or $5,000 (intentional or reckless) or actual damages, on a per-person, per-subsection basis consistent with the statute as amended and as construed in Clay v. Union Pacific Railroad Co., No.

25-2185 (7th Cir. Apr. 1, 2026); injunctive relief on the terms set forth in the Prayer for Relief; and reasonable attorneys' fees, costs, expert witness fees, and other litigation expenses.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**

*Brought on behalf of the Class*

141. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

142. Plaintiffs bring this Count individually and on behalf of the Class.

143. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Plaintiffs and Class members never interacted with Adobe in connection with the collection of their biometric data, the operative destruction prong is that the biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

144. Adobe has been, and remains, in possession of voiceprints and biometric information extracted from Plaintiffs' and Class members' voice recordings, both through training-data ingestion and through runtime

extraction. Those voiceprints persist in the parameters of Adobe's foundational voice synthesis models and continue to be deployed in the commercial products Adobe ships today.

145. Adobe has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training-data subjects and encoded in Adobe's foundational voice synthesis models, or applicable to voiceprints extracted at runtime from speakers captured in user-uploaded recordings. The retention provision in Adobe's Privacy Policy is tied to a user-controlled feature toggle — "we delete this information once you turn off the feature" — that is facially inapplicable to non-users, who have no account-level relationship through which to turn any feature on or off. Adobe has not provided, and on information and belief does not maintain, any mechanism by which Plaintiffs or other non-user training-data subjects or non-user runtime-extraction subjects can request access to, correction of, or deletion of their biometric data.

146. Adobe's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

147. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count III

## Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)

*Brought on behalf of the Class*

148. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

149. Plaintiffs bring this Count individually and on behalf of the Class.

150. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond selling, leasing, or trading.

151. Adobe has profited, and continues to profit, from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the voice synthesis products at issue, and by monetizing those products through the integrated commercial channels alleged at ¶¶ 86-88, including: Firefly Standard and Firefly Pro subscription fees; Creative Cloud subscription fees across Single App, All Apps, Pro, Teams, and Enterprise tiers; enterprise Creative Cloud, enterprise voice product, and Translate and Lip Sync API licensing revenue; Firefly Services API and developer-platform revenue tied to Adobe's voice models; commercial value derived from the Enhance Speech feature in Adobe Podcast and the Firefly app; partnership and platform value Adobe extracts by integrating partner voice models, including ElevenLabs Multilingual v2, into the Generate Speech

surface alongside the Firefly Speech Model; and strategic deployment value of voice synthesis capability across Adobe's broader Digital Media and Digital Experience product portfolio. The voice quality, expressiveness, speaker similarity, and multilingual capability Adobe sells through these channels exists because of the voiceprints encoded in Adobe's foundational voice synthesis models: the biometric data and the product are, at this point, the same thing. Adobe's profiting from Plaintiffs' and Class members' biometric identifiers does not fall within any exception to § 15(c).

152. Adobe's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

153. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

154. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

155. Plaintiffs bring this Count individually and on behalf of the Class.

156. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

157. On information and belief, Adobe has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information — including data embedded in Adobe's foundational voice synthesis models and data extracted at runtime by Adobe's voice products — to Adobe's affiliates, vendors, and service providers, and across the United States, India, Ireland, and other jurisdictions in which Adobe and its subsidiaries operate. Adobe's Privacy Policy expressly provides for disclosure of personal information to "other companies in the Adobe family" and to "service providers" and "data processors," and identifies the United States and India as the principal locations where Adobe processes personal information, with transfers to other countries in which Adobe and its affiliates, providers, and partners operate. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

158. Adobe's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

159. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

160. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

161. Plaintiffs bring this Count individually and on behalf of the Class.

162. Section 15(e) of BIPA imposes two distinct duties on private entities in possession of biometric data: under § 15(e)(1), to store, transmit, and protect the data using the reasonable standard of care within the entity's industry; and under § 15(e)(2), to do so in a manner the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: an entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

163. Adobe fails the § 15(e)(2) asymmetry test on three independent grounds.

164. *First*, Adobe protects its own confidential commercial information under closed-system controls materially more protective than its protection of non-user biometric data. Adobe maintains the source code for its core commercial products as closed-source proprietary information. Adobe protects its proprietary product architectures, internal financial records, employee personnel files, customer data, and business communications under strict access controls, encryption, internal classification systems, and information-security regimes. The voiceprints Adobe extracted from non-user training-data subjects and from non-user speakers captured in user-uploaded runtime-extraction recordings, by contrast, are encoded in commercial models that

Adobe distributes to subscribers and enterprise customers worldwide, embedded in product outputs delivered to any paying user, and held without access controls, audit-logging, encryption standards, or retention-and-destruction safeguards verifiable to the data subjects.

165. *Second*, Adobe maintains a structural asymmetry between how it protects biometric data of users and biometric data of non-users. Adobe's Privacy Policy provides that "[w]here we process biometric identifiers or biometric information to deliver a feature requested by you, we delete this information once you turn off the feature, unless otherwise specified in the Software or Services." That deletion mechanism is available to account-holding users who have toggled a consumer-facing voice feature on or off. Non-user training-data subjects and non-user speakers captured in user-uploaded runtime-extraction recordings — including Plaintiffs and Class members — have no account through which to engage that toggle and no equivalent deletion mechanism. Adobe protects user-subject biometric data under a documented deletion architecture and protects non-user-subject biometric data under no comparable safeguard.

166. *Third*, Adobe's transfer architecture routes personal information — including, on information and belief, biometric data extracted from non-user voice recordings — to Adobe's affiliates, vendors, service providers, and data-processing operations in the United States, India, Ireland, and other jurisdictions, without safeguards specific to non-user voiceprints verifiable to the data subjects. Other categories of confidential commercial information

Adobe handles — the source code, trade-secret, employee, and customer data identified at ¶ 158 — remain under closed-system controls, are not similarly transferred to multi-jurisdictional service-provider chains under generalized policy disclosures, and are subject to internal classification and audit regimes Adobe has not extended to non-user biometric data.

167. Adobe independently fails the § 15(e)(1) reasonable-standard-of-care test as to voiceprints extracted from non-user training data and non-user runtime-extraction subjects. The reasonable standard of care within the AI and machine learning industry for the handling of biometric training data includes documented provenance, access controls, audit logging, encryption, a documented retention and destruction schedule, and a mechanism through which data subjects may request access to, correction of, or deletion of their biometric data. As alleged at ¶¶ 47, 52, 76-82, Adobe has published none of these with respect to its voice training data, runtime-extracted voice characteristics, or the biometric characteristics encoded in its voice models, and provides no mechanism through which non-user data subjects may request access to, correction of, or deletion of their biometric data from Adobe's training datasets, model parameters, or commercial inference pipelines. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of that data, because those individuals have no ability to monitor, verify, or challenge how their data is stored, transmitted, or protected.

168. The asymmetry between Adobe's user-facing and own-data protections and Adobe's complete absence of protection for Class members' biometric data is not a function of technical limitation; it is a function of selective application.

169. Adobe's violations of § 15(e)(1) and § 15(e)(2) were intentional or reckless, as alleged at ¶¶ 109-116. In the alternative, Adobe's violations were negligent.

170. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I, including the destruction or retraining of the foundational voice synthesis models in which Class members' voiceprints are encoded.

**Count VI**

**Violation of the Illinois Right of Publicity Act,**
**765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

171. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

172. Plaintiffs bring this Count individually and on behalf of the Class.

173. IRPA provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent." 765 ILCS 1075/30(a). "Identity" is defined to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

174. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

175. Adobe used Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a). Adobe extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' recordings and used those characteristics to develop, train, and commercially operate the voice synthesis products Adobe monetizes through the integrated commercial channels alleged at ¶¶ 86-88. Adobe holds out its products' ability to generate realistic, expressive, and human-sounding voices — and, in the case of the Firefly Voice Model, its ability to preserve a speaker's voice characteristics across translated audio — as a core commercial feature, a capability built on the vocal identities of the individuals whose recordings were used to train the foundational models and from whose recordings voice characteristics are extracted at runtime.

176. IRPA, as amended by P.A. 103-836 effective January 1, 2025, separately prohibits knowingly distributing, transmitting, or otherwise making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual's voice. 765 ILCS 1075/30(b). The statute defines an "unauthorized digital replica" as a newly created, electronically generated representation of an individual's voice fixed in

a sound recording or audiovisual work in which the individual did not actually perform, made without the individual's consent. 765 ILCS 1075/5. The statute also imposes liability on any person who knowingly materially contributes to or facilitates such distribution. 765 ILCS 1075/30(d).

177. On information and belief, Adobe's voice synthesis and voice-cloning products generate, distribute, and make available to the public voice outputs that replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members — including through the Firefly Voice Model's voice-preserving translation capability and through Firefly Speech Model outputs that incorporate speaker characteristics learned during training. By generating and distributing those outputs through Firefly Standard and Firefly Pro, Creative Cloud, enterprise Creative Cloud, the Translate and Lip Sync API, the Adobe Podcast and Firefly app, and Adobe's integration of partner voice models (including ElevenLabs Multilingual v2) into Generate Speech, Adobe knowingly distributes and makes available sound recordings containing unauthorized digital replicas and knowingly materially contributes to and facilitates their distribution.

178. Adobe's violations of IRPA were willful and knowing. Adobe demonstrated through its Firefly Stock Contributor Bonus program, and through its commercial integration of ElevenLabs' consent-based Iconic Marketplace framework into Generate Speech, that Adobe knows how to design and deploy consent-and-compensation infrastructure for voice and likeness content when it chooses to do so. Adobe built that infrastructure for selected

categories of contributors. Adobe did not build it for the individuals whose voices were used to train its foundational voice models or whose voice characteristics are extracted at runtime.

179. Plaintiffs and the Class have suffered and continue to suffer injury, including loss of control over the commercial use of their identities, dilution and commodification of their voices, displacement in the professional markets where they earn their livelihoods, and economic losses including diversion of licensing value and diminished demand for authentic vocal performances.

180. Plaintiffs and the Class seek all relief available under IRPA, including actual damages, the profits Adobe earned from its unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages of $1,000 per violation under 765 ILCS 1075/40, punitive damages, injunctive relief on the terms set forth in the Prayer for Relief, and reasonable attorneys' fees and costs under 765 ILCS 1075/55.

## Count VII

## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

181. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

182. Plaintiffs bring this Count individually and on behalf of the Class.

183. Adobe engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis

services to Illinois residents and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois-recorded speakers.

184. Adobe's conduct is unfair within the meaning of ICFA under the three-part test articulated in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). *First*, Adobe's conduct offends Illinois public policy as embodied in BIPA and IRPA — Illinois statutes specifically enacted to protect biometric privacy and the commercial use of personal identity. *Second*, Adobe's conduct causes substantial economic and privacy injury to Illinois residents, including the irreplaceable loss of control over biometric identifiers, the unauthorized commercial use of vocal identities, and market displacement in the professional voice industries where Plaintiffs and Class members earn their livelihoods. *Third*, the injury could not reasonably have been avoided by Plaintiffs and Class members, who had no knowledge that their voice recordings were being ingested into Adobe's training pipelines or processed at runtime, no notice of the extraction, no mechanism to refuse, and no mechanism even to discover whether their biometric data was in Adobe's possession.

185. Adobe's conduct is independently deceptive within the meaning of ICFA. Adobe characterized its Firefly Speech Model and Firefly Voice Model as "commercially safe" and as trained on "licensed" or "responsibly sourced" content while declining to identify the licenses, sources, or rights-holders. Adobe used hedging language in some privacy disclosures ("such

characteristics may be considered biometric identifiers or biometric information under certain US laws") while expressly enumerating "voiceprints" as a category of biometric identifier Adobe collects in others. These omissions and inconsistencies were material: a reasonable person evaluating Adobe's voice products, or assessing whether their own voice recordings might have been used as training data, would attach significance to whether Adobe's training corpus was lawfully obtained. The prior Bloomberg investigative reporting establishing that Adobe's analogous representations about its image-model training data did not match the underlying training-data practices confirms the deceptive character of the same conclusory framing applied to voice.

186. Adobe's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and the Class, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Adobe's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not from the mere existence of competing AI products.

187. Adobe's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and the Class, as alleged at ¶¶ 109-116.

188. Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief on the terms set forth in the Prayer for Relief,

attorneys' fees and costs under 815 ILCS 505/10a, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class (injunctive relief only)*

189. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

190. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

191. Adobe has engaged in deceptive trade practices likely to cause confusion or misunderstanding in the marketplace within the meaning of 815 ILCS 510/2(a)(2) (likelihood of confusion or misunderstanding as to source, sponsorship, approval, or certification of goods or services) and 815 ILCS 510/2(a)(3) (likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another). Adobe's voice synthesis products generate voice outputs that simulate authentic human speech. Once generated, these outputs can be downloaded, shared, distributed, and commercially exploited without consumer-facing disclosure that the voice was AI-generated, that the underlying foundational models were built on voiceprints extracted without consent, or that the speakers whose vocal characteristics are reproduced did not authorize the use. This creates a likelihood of confusion about whether real human speakers, including Plaintiffs

and other Illinois-recorded voice professionals, created, endorsed, sponsored, or authorized the synthetic voice content.

192. Plaintiffs and Class members are persons likely to be damaged by Adobe's deceptive practices. Adobe's conduct diverts demand from licensed human voice performances, impairs attribution and provenance in the voice services markets where Plaintiffs and Class members earn their livelihoods, and creates marketplace confusion about the source and authorization status of AI-generated voice content. Under 815 ILCS 510/3, actual confusion and actual damages need not be shown.

193. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Adobe to provide adequate consumer-facing disclosure that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use. Adobe's conduct was willful within the meaning of 815 ILCS 510/3, entitling Plaintiffs and the Class to reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

194. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

195. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

196. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

197. Adobe obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Adobe's foundational voice synthesis models and processed at runtime by Adobe's voice products; the product capability and competitive advantage Adobe captured by training its models on a diverse corpus of professional and incidental human voices, including the voices of Plaintiffs and Class members; and the revenue Adobe generates and continues to generate through the commercial exploitation of those models and products, as alleged at ¶¶ 86-88.

198. Adobe obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional or otherwise valuable recordings. Adobe's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to

Adobe, and Adobe's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

199. Adobe's retention of these benefits is unjust. Adobe's conduct violated the Illinois statutory protections for biometric data (BIPA) and personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Adobe's institutional practice confirms the inequity of its retention: through the Firefly Stock Contributor Bonus program, and through Adobe's commercial integration of ElevenLabs' consent-based Iconic Marketplace framework into Generate Speech, Adobe demonstrated that it knows how to build and deploy consent-and-compensation infrastructure for selected categories of content. Adobe did not apply equivalent infrastructure to the individuals whose voices it used to train its foundational voice models or whose voice characteristics it extracts at runtime. Adobe could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

200. Plaintiffs and the Class seek restitution of the benefits Adobe has unjustly retained, including disgorgement of Adobe's profits attributable to the unauthorized exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and identities; an accounting of those benefits; and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

A. *Class Certification*. Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

B. *Judgment*. Enter judgment in favor of Plaintiffs and all Class members and against Defendant Adobe Inc. on all Counts on which Adobe is found liable.

C. *Declaratory and Injunctive Relief*. Enter declaratory and permanent injunctive relief, and where appropriate preliminary injunctive relief, requiring Adobe to:

(1) Cease collecting, capturing, purchasing, receiving through trade, or otherwise obtaining voiceprints or biometric information from voice recordings produced or recorded in Illinois unless Adobe has first complied with 740 ILCS 14/15(b)'s written-notice, written-purpose-and-duration, and written-release requirements with respect to the speaker, both as to (a) the development, training, fine-tuning, evaluation, and operation of Adobe's voice synthesis and voice recognition models, and (b) the runtime processing of voice recordings submitted to Adobe's commercial voice products, including without limitation Translate Video, Translate Audio, and Translate and Lip Sync;

(2) Cease the commercial use, sale, lease, trade, profiting from, and dissemination of voiceprints and biometric information of Plaintiffs and Class members that Adobe obtained without BIPA-compliant consent, including through the continued operation of the Firefly Speech Model, the Firefly Voice Model, Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature;

(3) Develop, publish, and maintain a written retention and destruction policy, made available to the public, that complies with 740 ILCS 14/15(a) and that applies to all voiceprints and biometric information extracted from voice recordings ingested into Adobe's voice synthesis, voice recognition, and related voice-AI training pipelines, or extracted at runtime by Adobe's commercial voice products, including all such data already in Adobe's possession at the time of judgment;

(4) Identify, in a court-supervised disclosure to Class counsel and to the Court, the sources, scale, provenance, and acquisition pathways of the voice data used to train, fine-tune, evaluate, or operate Adobe's voice synthesis and voice recognition models during the Class Period, and the sources of voice recordings processed at runtime by Adobe's voice products, including each contractual instrument, platform, dataset, and corpus from which voice recordings were obtained;

(5) Provide, on terms approved by the Court, a mechanism by which non-users, including Plaintiffs and Class members, may (i) request notice of whether their voice recordings were ingested into Adobe's training

pipelines or processed at runtime by Adobe's commercial voice products, (ii) request access to the biometric data Adobe holds derived from their recordings, (iii) request correction or deletion of that data, and (iv) opt out of further use of that data in Adobe's voice models and downstream commercial products;

(6) Identify and disclose every Adobe subsidiary, affiliate, vendor, service provider, and third-party processor with access to the voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois, and terminate any access by such entities that is not necessary to compliance with this Court's order;

(7) Destroy, or retrain without the unlawfully obtained data, every voice synthesis, voice recognition, and related voice-AI model in which voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois are encoded — including without limitation the Firefly Speech Model and the Firefly Voice Model — together with each downstream model, fine-tuned model, derivative model, and commercial product whose operation depends on or incorporates those models, including Generate Speech, Translate Video, Translate Audio, the Translate and Lip Sync API, and the Enhance Speech feature in Adobe Podcast and the Firefly app; and certify in writing that the unlawfully obtained voiceprints and biometric information no longer reside in, and cannot be reproduced by, any model or product Adobe distributes or operates;

(8) As to any open-weight, third-party, or external release of Adobe voice models in which the unlawfully obtained data is encoded, take all

reasonable measures to recall and remove the affected model parameters from public availability, including by issuing takedown requests, ceasing further distribution, and ceasing further support of derivative releases;

(9) Implement protective measures for any voiceprints or biometric information lawfully obtained going forward that satisfy 740 ILCS 14/15(e), including, at a minimum, the storage, transmission, encryption, isolation, scope-restriction, and access-control measures Adobe applies to its source code, proprietary architecture, internal financial records, customer data, and other categories of confidential commercial information;

(10) Cease using Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a); cease knowingly distributing or making available sound recordings or audiovisual works containing unauthorized digital replicas of Plaintiffs' or Class members' voices in violation of 765 ILCS 1075/30(b); and cease materially contributing to or facilitating such distribution in violation of 765 ILCS 1075/30(d); and

(11) Implement corrective consumer-facing disclosures, in such form as the Court approves, sufficient to inform consumers that voice outputs generated by Adobe's voice products are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, and to prevent confusion under 815 ILCS

510/2(a)(2) and (a)(3) about the source, authorization, and consent status of AI-generated voice content Adobe distributes.

D. *BIPA Statutory Damages*. Award liquidated or actual damages on a per-person, per-subsection basis under 740 ILCS 14/20, as amended by P.A. 103-769 (effective August 2, 2024) and as construed in Clay v. Union Pacific Railroad Co., No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $5,000 per intentional or reckless violation, or in the alternative $1,000 per negligent violation, for violations of 740 ILCS 14/15(a), (b), (c), (d), and (e).

E. *IRPA Damages*. Award actual damages, statutory damages of $1,000 per violation under 765 ILCS 1075/40, punitive damages, and disgorgement of profits Adobe earned from its unauthorized commercial use of Plaintiffs' and Class members' identities to the extent not taken into account in computing actual damages.

F. *ICFA Damages*. Award actual economic damages and punitive damages under 815 ILCS 505/10a(c).

G. *Restitution and Disgorgement*. Order restitution to Plaintiffs and the Class of the benefits Adobe has unjustly retained, and disgorgement of Adobe's profits attributable to the unauthorized collection, retention, and commercial exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and vocal identities, including profits derived from: (i) Firefly Standard and Firefly Pro subscription fees; (ii) Creative Cloud subscription fees across Single App, All Apps, Pro, Teams, and Enterprise tiers attributable to access to Adobe's voice products; (iii) enterprise Creative Cloud, enterprise

voice product, and Translate and Lip Sync API licensing revenue; (iv) Firefly Services API and other developer-platform revenue tied to Adobe's voice models; (v) commercial value derived from the Enhance Speech feature in Adobe Podcast and the Firefly app; (vi) the partnership and platform value Adobe extracts by integrating partner voice models, including ElevenLabs Multilingual v2, into the Generate Speech surface alongside the Firefly Speech Model; and (vii) strategic deployment value of voice synthesis capability across Adobe's Digital Media and Digital Experience product portfolio; together with an accounting of all such revenues and benefits.

H. *Non-Duplication*. Order such relief as the Court determines necessary to ensure no duplicative recovery across statutory, common-law, and equitable claims. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

I. *Attorneys' Fees and Costs*. Award reasonable attorneys' fees, costs, expert witness fees, and other litigation expenses under 740 ILCS 14/20, 765 ILCS 1075/55, 815 ILCS 505/10a, 815 ILCS 510/3, and any other applicable provision.

J. *Pre- and Post-Judgment Interest*. Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

Case 1:26-cv-05435 Document #: 1 Filed: 05/14/26 Page 99 of 99 PageID #:99

K. *Service Awards*. Award service awards to the named Plaintiffs in such amount as the Court deems appropriate to compensate them for their services to the Class.

*L.* *Other Relief.* Grant such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 13, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Lindsey Dorcus, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Yohance Lacour, and Victoria Nassif.*

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PHILIP ROGERS, CAROL MARIN, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| AMAZON.COM, INC., a Delaware corporation, | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs, Philip Rogers, Carol Marin, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Amazon.com, Inc. ("Amazon"), allege as follows:

## NATURE OF THE CASE

1. Amazon.com, Inc. built a global voice-AI business on the voices of real people. To train the Foundational Voice Models behind Amazon Polly, Amazon Nova Sonic, Alexa+, Audible AI narration, ACX narrator voice replicas, and Amazon's other commercial voice services, now distributed across more than 600 million Alexa devices and the AWS, Audible, and Kindle ecosystems,

Amazon ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers in those recordings. Among those speakers are some of the most accomplished broadcast journalists, investigative podcasters, audiobook narrators, and voice performers working in the United States today. Plaintiffs' voices are among them.

2. Plaintiffs are six Illinois residents whose recorded voices are among the most distinguished in their fields. They include Philip Rogers, an Emmy- and Edward R. Murrow Award-winning broadcaster whose four decades of on-air reporting were conducted from Chicago; Carol Marin, a five-decade broadcast journalist, a three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Robin Amer, the creator, host, and showrunner of USA Today's *The City* and a three-time duPont-Columbia honoree; Lindsey Dorcus, a SOVAS Voice Arts Award-winning narrator of more than two hundred audiobooks for the major American publishers; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their voice was being used to train Amazon's commercial voice AI. None of them was asked. None of them consented.

3. A voiceprint is a digital fingerprint of the human voice, a mathematical representation of the acoustic features (pitch, timbre, resonance) that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

4. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, along with a written release. 740 ILCS 14/15(b). Amazon failed to comply with any of those requirements with respect to Plaintiffs.

5. Amazon's noncompliance was not the result of misreading BIPA or unfamiliarity with its application to voice processing. Amazon's product documentation for Amazon Connect Voice ID and Amazon Chime SDK speaker search uses the BIPA statutory term "voiceprint," and the phrase "biometric identifiers and biometric information," to describe what its voice-processing systems extract. Amazon's AWS Biometric Notice and Consent Terms expressly

identify BIPA by name and require AWS customers to comply with BIPA when using covered AWS biometric services. Amazon has been a defendant in BIPA litigation in this District concerning its voice products since 2019; a class of approximately 1.2 million Illinois Alexa Voice ID users was certified against Amazon in November 2025 in *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.). In May 2023, the FTC and DOJ obtained a $25 million civil penalty and a stipulated permanent injunction against Amazon for retaining children's Alexa voice recordings, recordings the FTC characterized as providing Amazon "with a valuable database for training the Alexa algorithm." Amazon was on notice.

6. Modern AI voice synthesis works by training neural networks on recorded human speech, learning the acoustic features that make individual voices distinctive, and encoding those features as mathematical representations within the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices. The speaker-conditioned representations extracted during training are not separately stored in a database that can be deleted on request; they are encoded in the model parameters themselves. When any of the Voice Products produces speech, the synthetic speech is a mathematical reproduction of the biometric characteristics extracted from the speakers whose recordings trained the model. The product is the data; the data is the product.

7. Amazon's noncompliance was not a failure of safety capability. Amazon has the engineering and legal sophistication to build BIPA-compliant

consent workflows when it chooses to, and has done so for every voice category it collects with the data subject's participation, as alleged at ¶¶ 117-122. Amazon built none of that infrastructure for the voiceprints it took to train the Foundational Voice Models on which those very products depend.

8. Amazon's noncompliance was, instead, a deliberate institutional decision. Amazon's training corpora measure in the tens and hundreds of thousands of hours: BASE TTS alone was “trained on 100K hours of public domain speech data”; Amazon Polly's generative engine was “trained with publicly available and proprietary data”; Amazon Nova Sonic and Nova 2 Sonic were trained on “licensed, proprietary, open-source, and publicly available” data. BIPA-compliant collection would have required Amazon to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording. With corpora at this scale, comprising the recordings of hundreds of thousands of distinct speakers, BIPA compliance would have constrained the speed and scale of Amazon's voice-AI development. Amazon chose speed and scale over compliance. That was not an oversight. It was a business decision.

9. For audiobook narrators, Amazon's choice is particularly stark. Audible is the dominant commercial distributor of audiobook narration in the United States. Plaintiffs Lindsey Dorcus and Victoria Nassif distribute their human narrations through Audible, which already directly possesses and controls copies of their recordings. Amazon's commercial path from voice

ingestion to voice product is, for the audiobook market, a closed loop: Amazon distributes the human narrations through Audible, ingests them as training data for the Foundational Voice Models, and sells AI narration — through Audible AI narration, ACX narrator voice replicas, and Kindle Direct Publishing Virtual Voice — back through Audible, Kindle, and Amazon Music. The product Amazon competes against the narrators with is built from the narrators' own voices.

10. The voiceprints Amazon extracted from Plaintiffs have been disseminated across Amazon's cross-affiliate ecosystem (Audible, ACX, AWS, Amazon Music, IVONA, and others), across Amazon's global cloud-infrastructure subprocessor and vendor network, and across Amazon's named integration partners for Amazon Nova 2 Sonic, including Vonage, Twilio, AudioCodes, LiveKit, and Pipecat. They cannot be recovered or replaced.

11. Plaintiffs' injuries are concrete and particularized. Amazon extracted Plaintiffs' voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Amazon retains those voiceprints in its commercial models and continues to profit from them. Amazon has further disseminated those voiceprints, encoded in model parameters, through its cross-affiliate, subprocessor, and integration-partner networks. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living — the broadcast journalism, investigative podcast, audiobook narration,

Case 1:26-cv-04365 Document #: 24-1 Filed: 07/21/26 Page 300 of 940 PageID #:7

voiceover, and voice performance markets that the Voice Products are designed and sold to serve.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that Amazon unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that Amazon's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act ("IRPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

13. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for Amazon's BIPA violations, on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); (ii) actual damages and disgorgement of the profits Amazon has earned from the commercial exploitation of Plaintiffs' biometric data; (iii) injunctive relief requiring Amazon, among other things, to cease unconsented collection of voiceprints from Illinois-recorded voice work, to identify the sources of its voice training data, to destroy the voiceprints unlawfully obtained from Plaintiffs and the Class, and to destroy or retrain the Foundational Voice Models in which those voiceprints are encoded and the

Voice Products built on those models; and (iv) reasonable attorneys' fees, costs, and expenses.

## PARTIES

14. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago), and was recognized with a National Emmy Award and the Edward R. Murrow Award. Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Amazon extracted his voiceprint are described at ¶¶ 88-91 and 92-94.

15. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago and was recognized in 2025 with the Order of Lincoln, the State of Illinois's highest civilian honor. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 95-97.

16. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator, host, and showrunner of USA Today's *The City* and as Managing Editor of *Love + Radio*, and who has been recognized as a three-time Alfred I. duPont–Columbia University Award winner or finalist. Amer's body of

professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 98-100.

17. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for major American publishers from her home recording studio in Chicago, and is a Society of Voice Arts and Sciences Voice Arts Award winner. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 101-103.

18. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller from the South Side of Chicago whose investigative podcast *You Didn't See Nothin'*, produced through the Invisible Institute and USG Audio, was awarded the 2024 Pulitzer Prize for Audio Reporting. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Amazon extracted his voiceprint are described at ¶¶ 88-91 and 104-106.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work has been commercially released by Penguin Random House, Hachette, and Simon & Schuster and produced primarily in Illinois.

Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 107-109.

20. Defendant Amazon.com, Inc. ("Amazon") is a Delaware corporation with its principal executive offices at 410 Terry Avenue North, Seattle, Washington 98109-5210.

21. Amazon.com, Inc. is the parent enterprise that owns, operates, controls, and consolidates the financial results of the business units through which the voice synthesis and voice cloning conduct alleged in this Complaint was and continues to be carried out. Those business units include: Amazon Web Services, Inc. ("AWS"), which operates Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Bedrock (the platform on which Amazon Nova Sonic and Amazon Nova 2 Sonic are hosted), Amazon Connect Voice ID, and Amazon Chime SDK voice analytics and speaker search; Amazon's Devices & Services organization, which develops and deploys Alexa, Alexa+, and Alexa Voice ID across Echo and Alexa-enabled devices; Audible, Inc., a wholly owned Amazon subsidiary that operates the Audible audiobook distribution platform and the Audible AI narration program; Audiobook Creation Exchange ("ACX"), Audible's wholly owned audiobook production marketplace, which operates the ACX narrator voice replicas beta; Amazon Music, an Amazon-owned music and audio streaming platform; Kindle Direct Publishing, the Amazon self-publishing channel that operates the KDP audiobooks-with-Virtual-Voice program ("KDP Virtual Voice"); Amazon Science

and Amazon AGI, which conducted the BASE TTS research alleged in this Complaint; and IVONA Software sp. z o.o., the Polish text-to-speech technology company Amazon acquired in January 2013 and through which Amazon entered the text-to-speech business.

22. The voice synthesis and voice cloning services Amazon markets and sells to consumers, developers, and enterprise customers through the above business units — Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Nova Sonic, Amazon Nova 2 Sonic, Audible AI narration, ACX narrator voice replicas, Kindle Direct Publishing Virtual Voice, Alexa text-to-speech, and Alexa+ — are referred to collectively in this Complaint as the "Voice Products". The underlying voice synthesis and voice cloning models in which Plaintiffs' and Class members' voiceprints are encoded, including the BASE TTS model and the base models on which each of the Voice Products depends, are referred to collectively as the "Foundational Voice Models".

23. Amazon.com, Inc.'s direct involvement in the voice synthesis and voice cloning conduct at issue is established by Amazon's public disclosures. Amazon's Form 10-K filings identify Amazon Web Services, the Alexa and Devices & Services business, Audible, and the broader Amazon AI and voice-AI capabilities as material components of Amazon's consolidated business. Amazon's Chief Executive Officer, Andy Jassy, has personally identified generative AI, including Amazon's voice-AI capabilities, as a strategic priority of Amazon.com, Inc. in successive shareholder letters, in quarterly earnings calls

accompanying Amazon's Form 10-Q and 10-K filings, and in keynote presentations at AWS re:Invent.

24. Amazon's enterprise-level documents governing the voice business, including the Amazon.com Conditions of Use, the AWS Customer Agreement, the AWS Service Terms, the AWS Biometric Notice and Consent Terms, and the AWS Responsible AI Policy, are issued at the Amazon.com, Inc. or AWS level under Amazon.com, Inc.'s control.

25. The voice training, model development, deployment, dissemination, and ongoing commercial operation alleged in this Complaint were carried out by personnel under Amazon.com, Inc.'s direct corporate control, on infrastructure that Amazon.com, Inc. and its wholly owned subsidiaries own and operate, in the ordinary course of Amazon's business.

## JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). (a) The proposed Class includes more than 100 members. (b) The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. (c) Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, and Defendant Amazon.com, Inc. is a citizen of Delaware (where it is incorporated) and Washington (where it maintains its principal place of business). None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

27. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of

liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and Plaintiffs may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Amazon extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

28. This Court has specific personal jurisdiction over Amazon. Amazon has purposefully directed its conduct at Illinois and this District in ways that bear directly on Plaintiffs' claims, and Plaintiffs' claims arise out of or relate to those Illinois-directed contacts. Exercising jurisdiction is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Amazon's Illinois- and District-related contacts include, without limitation:

29. *Illinois market exploitation.* Amazon makes its commercial voice synthesis and voice cloning products — including the Voice Products — available to users nationwide, including Illinois residents and Illinois-based

businesses, through its websites (aws.amazon.com, amazon.com, audible.com, kdp.amazon.com, blog.acx.com), the AWS Management Console, Amazon Bedrock, Alexa devices and the Alexa app, the Audible app, the Kindle ecosystem, and Amazon mobile applications on iOS and Android. Amazon does not geoblock Illinois users from its voice products and affirmatively invites and enables Illinois residents to use them.

30. *Illinois transactional contacts.* Amazon enters into recurring contractual relationships with Illinois residents and Illinois-based businesses through its Amazon.com Conditions of Use, AWS Customer Agreement, AWS Service Terms, Audible Conditions of Use, Alexa Terms of Use, KDP Terms and Conditions, ACX Terms of Service, AWS Biometric Notice and Consent Terms, and AWS Responsible AI Policy. Amazon offers and operates tiered subscription plans, consumption-based pricing, and enterprise commitments for AWS (including Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK), Audible subscriptions, Amazon Music subscriptions, Alexa+ subscriptions, and Amazon retail commerce — accepting and processing recurring subscription payments, consumption charges, and retail purchases from Illinois users on an ongoing basis. Each Audible monthly credit, each Amazon Music subscription renewal, each Alexa+ subscription, each AWS consumption-billed API call, and each Amazon retail purchase from an Illinois customer is a new commercial transaction with an Illinois customer.

31. *Illinois operational presence.* Amazon maintains office locations and significant operational presence in Illinois, including in the City of Chicago.

Amazon owns and operates fulfillment centers, sortation centers, delivery stations, Whole Foods Market locations, and Amazon Fresh stores throughout Illinois. Amazon markets and sells AWS cloud services, including Amazon Polly, Amazon Bedrock, and Amazon Connect voice products, to Fortune 500 companies and other enterprises headquartered in Illinois, and to state and local government, healthcare, financial services, and education customers in Illinois. Amazon owns and operates global cloud infrastructure (AWS), including a content delivery network and edge infrastructure (Amazon CloudFront), that routes user traffic originating in Illinois through edge servers and data center facilities owned, operated, and configured by Amazon, including infrastructure located in or near Chicago. On information and belief, Amazon derives substantial revenue from enterprise subscriptions, retail commerce, and commercial use by entities operating in Illinois.

32. *Illinois-targeted service delivery.* Amazon's Alexa, Alexa+, Audible, Amazon Music, Kindle, and Amazon Polly platforms receive requests — voice utterances, audio streams, text prompts, transcription requests — transmitted from user devices located in Illinois to Amazon-controlled endpoints, and transmit AI-generated voice outputs and processed audio from those endpoints back to devices located in Illinois. This constitutes repeated, interactive service performance directed at and delivered into Illinois. Amazon's terms grant Amazon contractual rights to use voice and speech data submitted by Illinois users in connection with Alexa, Amazon Connect Voice ID, Amazon Chime SDK, Amazon Polly, and other Amazon voice products; once captured from its

Illinois customers, voiceprints, voice profiles, voice embeddings, and related biometric processing outputs are used by Amazon to operate and improve its products.

33. *Amazon's Illinois-origin biometric extraction.* Amazon directly collected, captured, and obtained biometric identifiers — voiceprints — from voice recordings produced or recorded in Illinois, including the recordings of Plaintiffs, without the notice, consent, or written release that BIPA requires. Amazon itself, through systems it operates and controls, accessed Plaintiffs' publicly available voice recordings on third-party platforms (including YouTube, Spotify, Apple Podcasts, iHeartRadio, SoundCloud, and others) and ingested those recordings into its training pipeline. With respect to Plaintiffs whose recordings are distributed through Audible, Amazon Music, and ACX, Amazon-owned subsidiaries, Amazon already directly possessed and controlled the recordings as a matter of corporate ownership and did not need to scrape them from third-party platforms to access them. Amazon's acquisition of Plaintiffs' voice recordings was not the passive receipt of an anonymized dataset assembled by a third party; Amazon itself accessed identifiable speakers on identified platforms displaying the speakers' names, geographic locations, professional biographies, and content catalogs. The biometric identifiers belong to persons whose recordings were produced or recorded in Illinois. The privacy interests invaded are those of Illinois-recorded speakers. Amazon's act of extracting voiceprints from Illinois-recorded voice recordings is

conduct directed at Illinois regardless of the physical location of the servers on which the extraction occurred.

34. *Continuing wrong directed at Illinois.* Amazon's ongoing possession of Plaintiffs' and Class members' voiceprints, and its continued commercial use of those voiceprints to power products sold and delivered to Illinois users, constitutes a continuing wrong directed at Illinois-recorded speakers and felt in Illinois. BIPA § 15(a) imposes ongoing obligations on entities that possess biometric identifiers, including developing and publishing a retention and destruction schedule. Amazon is in possession of voiceprints originating from Illinois-recorded voice recordings and has been since their collection. The persons whose biometric data Amazon holds without compliant safeguards are persons whose voice recordings were produced or recorded in Illinois.

35. *Illinois commercial use as downstream of Illinois extraction.* The voice products Amazon sells and delivers to Illinois customers are powered by the same Foundational Voice Models that were trained using voiceprints extracted from Illinois-recorded voice recordings, including, on information and belief, recordings of Plaintiffs and Class members. The voice quality, expressiveness, multilingual capability, and speaker similarity that Illinois customers pay for are enabled by the biometric data extracted during training. When an Illinois customer uses any of the Voice Products, the output is generated by a model whose capabilities are derived from voiceprints at issue in this lawsuit. Amazon's Illinois-directed commercial activity is not merely

incidental to Plaintiffs' claims; it is the downstream monetization of the conduct that gives rise to those claims.

36. *Suit-relatedness across the statutes invoked.* Amazon's BIPA violations are suit-related to its Illinois contacts because Amazon's commercialization of its voice products in Illinois, through subscriptions, interactive service performance, and delivery of voice outputs to Illinois users, necessarily involves the ongoing use of voiceprints extracted without BIPA-compliant notice and consent. Amazon's IRPA violations are suit-related because Amazon commercially exploits the voices and identities of Illinois-recorded speakers to develop, market, and sell its voice synthesis products to Illinois users and nationwide, and disseminates voice-simulative outputs to and within Illinois through its subscription and consumption-based services. On information and belief, Amazon further shares voice data, including biometric identifiers derived from training data, with affiliates (Audible, ACX, AWS, Amazon Music, IVONA, and others), with cloud-infrastructure subprocessors, and with named Nova 2 Sonic integration partners (Vonage, Twilio, AudioCodes, LiveKit, and Pipecat), constituting additional suit-related conduct directed at Illinois.

37. Exercising specific personal jurisdiction over Amazon in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Illinois has a strong and particularized interest in providing a forum for redressing the unlawful collection and commercial exploitation of biometric identifiers of persons whose recordings were produced or recorded in

Case 1:26-cv-05497 Document #: 1-1 Filed: 05/11/26 Page 19 of 98 PageID #:19

Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on Amazon of litigating in Illinois is not undue, given Amazon's substantial Illinois commercial activity, its resources as a publicly traded technology and retail enterprise reporting $716.9 billion in fiscal-year-2025 net sales, and its experience as an active litigant in federal courts across the United States, including as the defendant in *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.), a BIPA action concerning Amazon's voice products already pending in this District. Amazon could reasonably anticipate being haled into Illinois courts for claims arising out of its extraction and commercial exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

38. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here: Plaintiffs are residents of this District; their recorded vocal performances were produced or recorded in this District; the biometric privacy violations Plaintiffs allege occurred in this District; and the commercial exploitation of Plaintiffs' voiceprints continues through Amazon's sale and delivery of the voice AI products at issue to customers in this District. Amazon's deceptive and unfair practices in connection with Amazon's training-data acquisition and voice-data handling were directed at and received by

Illinois residents in this District through Amazon's websites, mobile and desktop applications, marketing materials, privacy disclosures, and AWS documentation. Amazon's ongoing possession of Plaintiffs' and Class members' voiceprints, and its continued use of those voiceprints to power products delivered into this District, constitutes a continuing course of conduct giving rise to Plaintiffs' claims in this District.

39. Venue is independently proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Amazon resides in this District within the meaning of 28 U.S.C. § 1391(c)(2) and § 1391(d): Amazon's contacts with this District, as alleged at ¶ 28-37, are sufficient to subject it to personal jurisdiction in this District if this District were a separate State.

## FACTUAL BACKGROUND

*Amazon's AI Business and Operative Voice Products*

40. Amazon entered the text-to-speech business in January 2013 through the acquisition of IVONA Software sp. z o.o., a Polish text-to-speech technology company whose technology powered Kindle Fire Text-to-Speech, Voice Guide, and Explore by Touch. The IVONA technology and personnel became the foundation of what would, over the next thirteen years, become one of the largest commercial voice-AI businesses in the world.

41. Amazon's voice synthesis and voice cloning business is operated across multiple corporate units, all under the ownership and control of Amazon.com, Inc. AWS operates Amazon Polly text-to-speech (with Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice (a fully

managed custom-voice service), Amazon Bedrock (the foundation-model platform that hosts Amazon Nova Sonic and Amazon Nova 2 Sonic), Amazon Connect Voice ID (biometric authentication of contact-center callers), and Amazon Chime SDK voice analytics and speaker search. Amazon's Devices & Services organization develops and deploys Alexa, Alexa+, and Alexa Voice ID across Echo and Alexa-enabled devices. Audible, Inc., an Amazon-owned subsidiary, operates the Audible audiobook distribution platform and the Audible AI narration program. ACX, Audible's wholly owned production marketplace, operates the ACX narrator voice replicas beta. Amazon Music operates an audio streaming platform on which podcast and other audio content is distributed. Kindle Direct Publishing operates the Amazon self-publishing channel and the KDP Virtual Voice program. Amazon Science and Amazon AGI conduct foundational AI research, including the BASE TTS 1-billion-parameter text-to-speech research model.

42. Amazon's commercial voice products span the full range of AI voice technology and have rolled out in a sustained sequence over more than a decade:

(a) Amazon acquired IVONA Software in January 2013, entering the text-to-speech business.

(b) Amazon Echo, the consumer voice assistant device powered by Alexa, was made generally available in June 2015, accompanied by the Alexa Skills Kit and Alexa Voice Service.

(c) Amazon Polly launched as a cloud text-to-speech service with 47 voices in 24 languages on November 30, 2016.

(d) Amazon Polly Neural Text-to-Speech and newscaster-style voices launched on July 30, 2019.

(e) Amazon Polly Brand Voice (fully managed custom-voice capability built on neural TTS) launched on February 4, 2020.

(f) Amazon Connect Voice ID launched on September 27, 2021.

(g) Kindle Direct Publishing audiobooks-with-Virtual-Voice beta launched on November 1, 2023.

(h) Amazon's BASE TTS research paper, describing a 1-billion-parameter Transformer trained on 100,000 hours of public-domain speech, was published in February 2024.

(i) Amazon Polly's generative engine became generally available on May 8, 2024.

(j) Alexa+, the next-generation generative-AI Alexa, was announced on February 26, 2025, and became available to all U.S. customers in February 2026 (free for Prime members; $19.99/month for non-Prime customers).

(k) Amazon Nova Sonic, the first unified speech-to-speech foundation model on Amazon Bedrock, launched on April 8, 2025.

(l) Audible announced AI narration and translation for publishers (more than 100 AI-generated voices) on May 13, 2025.

(m) ACX narrator voice replicas beta was publicly described in updated form on July 9, 2025.

(n) Amazon Nova 2 Sonic launched on December 2, 2025, with expressive masculine and feminine voices, polyglot voices, natural turn-taking, and integration with Amazon Connect, Vonage, Twilio, AudioCodes, LiveKit, and Pipecat.

(o) Amazon Polly bidirectional streaming (real-time speech synthesis for conversational AI) launched on March 26, 2026.

43. Amazon's scale dwarfs that of typical voice-AI defendants. Amazon reported net sales of $716.9 billion for fiscal year 2025, including $128.7 billion from AWS, and approximately 1,576,000 full-time and part-time employees as of December 31, 2025. In Amazon's February 2025 announcement of Alexa+, Amazon stated that more than 600 million Alexa devices were in use. Audible is the largest audiobook seller and producer in the United States; Amazon Music is a major music and audio streaming platform; Kindle Direct Publishing is the dominant self-publishing channel; AWS distributes Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK to enterprise customers globally. Amazon Polly offers more than 600 neural voices across more than 30 languages and locales.

44. Amazon's voice products reach Illinois residents and Illinois-based businesses through Amazon's consumer, developer, and enterprise distribution channels, without geographic restriction. The products operate under tiered pricing ranging from free trials and developer-tier consumption pricing to enterprise commitments, with paid customers receiving commercial use rights to generated audio. Amazon offers tiered subscriptions, consumption-based

Case 1:26-cv-05435-DG Document 1-1 Filed 05/12/26 Page 24 of 98 PageID #: 24

pricing, and enterprise commitments for AWS (including Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK), Audible memberships, Amazon Music subscriptions, Alexa+ subscriptions (free for Prime members; $19.99/month otherwise), KDP author distribution, ACX royalty-share or per-finished-hour narrator compensation, and Audible publisher partnerships.

*Voice Synthesis Technology and the Extraction of Voiceprints*

45. Modern AI voice synthesis works by training computational models on large quantities of recorded human speech. During training, the models learn the statistical patterns that define how human voices sound, including the acoustic features that distinguish one speaker from another and the general properties that make speech recognizable as natural human communication. The training process extracts and encodes the distinctive acoustic characteristics of individual speakers from the training recordings.[1]

46. These characteristics, commonly referred to in the AI research community as "speaker embeddings" and, in Amazon's own product documentation, as "voiceprints," "digital voiceprints," "speaker embeddings,"

---

[1] *See* Łajszczak et al., *BASE TTS: Lessons from building a billion-parameter Text-to-Speech model on 100K hours of data*, Amazon AGI / arXiv:2402.08093 (Feb. 2024), https://arxiv.org/abs/2402.08093 (last visited on May 12, 2026) (describing a 1-billion-parameter autoregressive Transformer trained on 100,000 hours of speech, using a speech tokenizer with speaker ID disentanglement and a separate speaker embedding at synthesis to produce speaker-faithful output); Amazon Web Services, *Use real-time caller authentication with Voice ID*, Amazon Connect Administrator Guide, https://docs.aws.amazon.com/connect/latest/adminguide/voice-id.html (last visited on May 12, 2026) (describing voiceprints as mathematical representations of speaker-specific acoustic features); Amazon Web Services, *UpdateVoiceProfile*, Amazon Chime SDK API Reference, https://docs.aws.amazon.com/chime-sdk/latest/APIReference/API_voice-chime_UpdateVoiceProfile.html (last visited on May 12, 2026) (describing voice processing as collecting "biometric identifiers and biometric information … in the form of a digital voiceprint").

"speechcodes," and "voice profiles," include features such as timbre, pitch, resonance, cadence, articulation, phrasing, dynamics, and emotional expression. A speaker embedding is a mathematical representation that captures the biologically and behaviorally unique features of an individual's voice. In both function and substance, it is a voiceprint and biometric information derived from a voice recording within the meaning of BIPA.

47. BIPA defines "biometric identifier" to include a "voiceprint." 740 ILCS 14/10. BIPA separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* Whether the representations Amazon extracts during voice-model training are classified as voiceprints, biometric information derived from voiceprints, or both, they fall within BIPA's scope. The label the technology industry uses for these representations does not determine the statutory classification; the function of the data does.

48. Amazon's product and research documentation confirms the extraction:

(a) AWS's Amazon Connect Voice ID administrator guide describes a "voiceprint", using the BIPA statutory term, as "a mathematical representation that implicitly captures unique aspects of an individual's voice," and states that Voice ID stores "audio files of the speaker's voice, voiceprints, and speaker identifiers."

(b) AWS's Amazon Chime SDK API reference describes the speaker-search system as collecting "biometric identifiers and biometric information … in the form of a digital voiceprint", using both the "biometric identifiers" and "biometric information" terminology that BIPA itself uses.

(c) Amazon's BASE TTS research paper describes a 1-billion-parameter Transformer that maps text to discrete "speechcodes" and demonstrates one-shot voice cloning from a 10-second reference recording, a capability that requires the extraction and encoding of speaker-specific acoustic characteristics from training audio.

(d) Amazon's AWS Biometric Notice and Consent Terms, last updated November 14, 2024, expressly identify BIPA, the Texas Capture or Use of Biometric Identifier Act, and the Washington biometric privacy statute by name, and require AWS customers using "Covered AWS Services" — including Amazon Connect Voice ID and Amazon Chime SDK speaker search, to comply with those laws and to obtain "informed written or explicit consent" from data subjects.

49. On information and belief, the same category of biometric processing that occurs in Amazon's customer-facing voice features, every one of the Voice Products, also occurs during base-model training. The customer-facing features are applications of capabilities built during training. The training pipeline is where extraction of voiceprints and biometric information occurs first, at the largest scale, and on the broadest set of voice recordings — including, on information and belief, the recordings of Plaintiffs and Class

members. The voiceprints extracted during training are encoded in the model parameters that produce the synthetic output, and every product Amazon sells through Polly, Nova Sonic, Nova 2 Sonic, Audible AI narration, ACX replicas, KDP Virtual Voice, Alexa+, and the Polly Brand Voice service depends on those parameters.

*Amazon's Training-Data Acquisition Practices*

50. Amazon has never disclosed the complete sources, scale, or provenance of the voice data used to train its commercial voice synthesis and voice cloning models. Amazon has not published a model card, data sheet, training-data manifest, licensing inventory, or transparency report that identifies the voice recordings used to train the Foundational Voice Models, including where Amazon obtained the recordings, the licensing or consent terms applicable to each, or the identities of the source speakers.

51. What Amazon has disclosed for its research and commercial models is partial and self-incriminating:

(a) Amazon's 2024 BASE TTS research paper publicly states that the model was "trained on 100,000 hours of public-domain speech data."

(b) Amazon's May 8, 2024 AWS News Blog post announcing Amazon Polly's generative engine states that the engine was "trained with publicly available and proprietary data" with a variety of voices, languages, and styles, and identifies BASE TTS as the underlying technology powering the generative engine.

(c) Amazon's AWS AI Service Cards for Amazon Nova Sonic and Amazon Nova 2 Sonic describe the training and improvement data as "licensed, proprietary, open-source, and publicly available."

(d) Technology press reporting characterized the BASE TTS training corpus as audio "scraped from the web."

52. These disclosures confirm that Amazon, in both research and commercial contexts, has ingested voice recordings of identifiable individuals at industrial scale by direct acquisition and by sourcing from publicly accessible audio platforms, without disclosing source-by-source provenance and without obtaining BIPA-compliant consent from the speakers.

53. On information and belief, Amazon sourced voice recordings for its training pipeline by accessing specific, identifiable audio content created by specific, identifiable speakers on publicly accessible platforms, including YouTube; podcast directories such as Apple Podcasts, Spotify, and iHeartRadio; audiobook platforms such as Audible (an Amazon-owned subsidiary) and LibriVox; music and audio streaming services including Amazon Music (an Amazon-owned platform) and SoundCloud; and broadcast and digital news archives.

54. Amazon's data acquisition was not limited to obtaining pre-packaged, anonymized datasets assembled by third parties. Amazon affirmatively accessed recordings attributable to individual speakers, with metadata identifying the speaker and the geographic origin of the content, on

platforms where the speaker's identity, location, and body of work were publicly associated with the recordings.

55. With respect to recordings distributed through Audible, ACX, and Amazon Music, Amazon's subsidiaries already possessed those recordings as a matter of corporate ownership. They did not need to scrape them from third-party platforms to access them.

56. Audible is the largest commercial distributor of audiobook narration in the United States, and the audiobook narrators whose recordings Audible distributes, including Plaintiffs Dorcus and Nassif, are the precise category of voice talent whose work is uniquely valuable for training audiobook-narration voice synthesis.

57. Amazon Music is a major distributor of podcasts and other audio content, and the podcast creators whose recordings it distributes, including Plaintiffs Amer and Lacour, are the precise category of voice talent whose work is uniquely valuable for training long-form narrative podcast voice synthesis.

58. Amazon has been a defendant in BIPA litigation in this District over its voice products since 2019. In *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.), Judge Valderrama certified a class on November 6, 2025, of approximately 1.2 million Illinois residents for whom Amazon created an Alexa Voice ID voiceprint. Amazon's 2025 Form 10-K acknowledges additional pending BIPA proceedings involving Alexa, AWS cloud services, and Amazon Connect.

59. Amazon's training-data acquisition practices are further documented by federal enforcement action. In May and July 2023, the Federal Trade Commission and the United States Department of Justice obtained a $25 million civil penalty and a stipulated permanent injunction against Amazon under the Children's Online Privacy Protection Act based on allegations that Amazon retained children's Alexa voice recordings indefinitely. The FTC characterized Amazon's retention of voice recordings in its public announcement as providing Amazon "with a valuable database for training the Alexa algorithm." Amazon entered the stipulated permanent injunction without disputing the characterization.

60. No publicly documented mechanism exists for third parties, individuals whose voices may appear in Amazon's training data without their knowledge, to discover that fact, withdraw consent, or request deletion. Amazon's general Privacy Notice provides certain rights to persons with an existing relationship with Amazon, but it does not address voice data used in the training of Foundational Voice Models and does not apply to non-users like Plaintiffs.

61. On information and belief, the Foundational Voice Models were trained on voice recordings obtained without the knowledge or consent of the speakers, including voice recordings of Plaintiffs and Class members. This belief is based on Amazon's public disclosures concerning the scale and sources of training data; the FTC and DOJ settlement; Amazon's refusal to disclose source-by-source provenance; the conspicuous absence of any

licensing or consent claim for Amazon's Foundational Voice Models in contrast to the consent infrastructure Amazon built for Voice ID, Polly Brand Voice, ACX replicas, and Audible AI narration; the scale of training data required to build models supporting Amazon Polly's 600+ neural voices, BASE TTS's 100,000 hours, and Nova Sonic's polyglot expressive speech generation; the public availability of Plaintiffs' voice recordings on platforms from which Amazon likely sourced training data (including Audible, Amazon Music, YouTube, Spotify, Apple Podcasts, iHeartRadio, and broadcast archives); and the absence of any mechanism for non-users to discover whether their voices were used or to opt out.

*The Biometric Data Was Generated in Illinois*

62. The conduct giving rise to Plaintiffs' claims is localized in Illinois in three independent and mutually reinforcing respects: (i) the biometric data at issue was generated in Illinois; (ii) Amazon's acquisition of that biometric data targeted material that was identifiably Illinois-origin; and (iii) Amazon's ongoing retention, dissemination, and commercial exploitation of the biometric data is directed at, or felt in, Illinois. Each ground independently supports the application of BIPA, IRPA, and the other Illinois statutes invoked in this Complaint to Amazon's conduct as to Plaintiffs and the Class.

*The Biometric Source Material Was Generated in Illinois*

63. Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois. The voice itself, as a unique

biometric signature, came into existence in Illinois. The audio recordings embodying Plaintiffs' voices, from which Amazon is alleged to have extracted voiceprints, were created in Illinois while Plaintiffs were physically present in Illinois at the time of recording. The recordings were published from Illinois to publicly accessible platforms, on which Plaintiffs' identity, geographic origin, professional biography, and content catalog were and are publicly visible.

64. The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is of Illinois origin. The biometric data Amazon is alleged to have extracted from those recordings is Illinois-origin regardless of where any subsequent processing occurred.

*Amazon's Acquisition Targeted*
*Identifiably Illinois-Origin Material*

65. Amazon accessed Plaintiffs' voice recordings from publicly accessible platforms on which the recordings were hosted with metadata identifying each Plaintiff by name and identifying the recordings' production origin. To a person with knowledge of Illinois broadcast, journalism, audiobook, podcast, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work originated from Illinois.

66. With respect to recordings distributed through Audible, ACX, and Amazon Music, Amazon-owned subsidiaries, Amazon already directly possessed and controlled the recordings, as it was the corporate owner of those subsidiaries, with complete internal metadata identifying the speakers and

Case 1:26-cv-05497 Document #: 4-1 Filed: 05/22/26 Page 33 of 98 PageID #:3478

their Illinois production location. Amazon's act of accessing and processing Plaintiffs' recordings was not the passive receipt of an anonymized dataset assembled by a third party; it was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production. The Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time Amazon accessed and processed the recordings.

*Amazon's Ongoing Exploitation Is Illinois-Directed*

67. Amazon's commercial exploitation of voiceprints and biometric information generated in Illinois is itself Illinois-directed. Amazon sells subscriptions, consumption-based API access, retail audiobooks, music streaming, and AI-generated voice outputs to Illinois subscribers and Illinois-based commercial users on a continuing basis through AWS (including Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK), Audible, Amazon Music, Kindle Direct Publishing, ACX, Alexa+, and Echo and Alexa-enabled devices. The commercial value of those subscriptions, services, and outputs derives, on information and belief, from voice models developed through unconsented extraction of biometric data, including biometric data generated in Illinois. Each Illinois transaction in those products is the exercise of commercial value Amazon derived from the same biometric extraction Plaintiffs allege is unlawful. Amazon's continuing dissemination of Foundational Voice Models to its affiliates, subprocessors, and named

integration partners, described at ¶¶ 74-79, likewise extends the biometric exploitation outward from the Illinois-recorded source material into Amazon's broader commercial ecosystem.

68. The injury suffered by Plaintiffs and the Class is felt in Illinois. The privacy interest BIPA protects, the right to control the collection, retention, and commercial use of one's biometric identity, is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their loss of the licensing and consent rights BIPA preserves, and the dilution of the commercial value of their voices in markets in which they participate are injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois.

69. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e) — each of which protects the persons from whom biometric data is taken.

70. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois. Amazon's continuing possession of voiceprints and

biometric information generated in Illinois likewise runs afoul of obligations BIPA imposes for the benefit of the subjects of that data, including Amazon's failure to publish a § 15(a)-compliant retention schedule and destruction policy covering biometric data obtained from non-user training-data sources, and Amazon's failure to provide any mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data.

*Amazon's Monetization of the Voice Models Through an Integrated Commercial Chain*

71. Amazon's commercial exploitation of its Foundational Voice Models is not limited to a single product line. Amazon monetizes the voice models through a vertically integrated commercial chain spanning AWS enterprise subscriptions, cloud-hosted inference fees, consumer subscriptions and device revenue, audiobook revenue, music streaming revenue, and the broader strategic value of voice AI as part of Amazon's consolidated business. The voice characteristics learned during training, the characteristics extracted from voice recordings, including, on information and belief, the recordings of Plaintiffs and Class members, enable each of these revenue streams.

72. Amazon monetizes the voice models through, at minimum, the following commercial channels:

*(a)* *AWS enterprise subscriptions and consumption pricing.* AWS charges enterprise customers recurring subscription fees and consumption-based fees for Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Bedrock (hosting Amazon Nova

Sonic and Amazon Nova 2 Sonic), Amazon Connect Voice ID, and Amazon Chime SDK. Each enterprise deployment generates recurring revenue Amazon captures because the voice models exist.

*(b)* *Consumer subscription and device revenue.* Amazon charges consumer subscriptions for Alexa+ ($19.99/month for non-Prime customers; free for Prime members), Audible, and Amazon Music, and sells Echo and Alexa-enabled devices that deploy Amazon's voice models. The voice quality and expressiveness of these consumer-facing products derive from the underlying voice models.

*(c)* *Audiobook revenue.* Amazon, through Audible, ACX, and Kindle Direct Publishing, generates audiobook revenue from Audible AI narration, ACX narrator voice replicas, and KDP Virtual Voice. Each AI-narrated audiobook sold or streamed is a unit of revenue Amazon captures because the Foundational Voice Models generate the synthetic narration.

*(d)* *Amazon Music revenue.* Amazon Music distributes podcast and other audio content, including AI-generated voice content; on information and belief, Amazon's voice model development supports the commercial value of Amazon Music's audio offerings.

*(e)* *Strategic and demonstration value for AWS enterprise customer acquisition.* Amazon's commercial value as a cloud-services company depends materially on its ability to demonstrate state-of-the-art AI capability. The Amazon Polly, Nova Sonic, Nova 2 Sonic, and Polly Brand Voice services serve this purpose: by demonstrating that AWS produces commercially capable voice

synthesis, Amazon supports the demand for AWS subscriptions, Bedrock platform use, and enterprise commitments that constitute a substantial portion of Amazon's $128.7 billion AWS segment revenue.

*(f) Broader strategic value of voice AI across Amazon's commercial portfolio.* Amazon deploys voice synthesis capability across its broader product portfolio, including in Alexa+ generative voice interactions across more than 600 million Alexa devices, in customer-facing demonstrations, in industry conferences such as AWS re:Invent, and in partnership integrations. The competitive and strategic value of voice AI deployment across Amazon's product portfolio is itself a benefit Amazon captures from the Foundational Voice Models.

73. Each monetization channel depends on the Foundational Voice Models. Each Foundational Voice Model depends on the training data used to build it. And the training data, on information and belief, includes the voice recordings of Plaintiffs and Class members from which Amazon extracted voiceprints without notice or consent. The commercial exploitation Amazon captures across the full chain is, in operational substance, the monetization of biometric data Amazon obtained from Plaintiffs without authorization.

*Dissemination Across Amazon's Corporate, Cloud, and Integration-Partner Infrastructure*

74. The voice synthesis and voice cloning models in which Plaintiffs' and Class members' voiceprints are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, transferred, and

disseminated across multiple categories of infrastructure Amazon operates in the ordinary course of its voice-AI business.

75. Amazon conducts its global voice business through a corporate structure that includes Amazon Web Services, Inc., Amazon.com Services LLC, Audible, Inc., Audiobook Creation Exchange (ACX), Amazon Music, IVONA Software sp. z o.o., and other Amazon affiliates. The development, training, refinement, and commercial deployment of Amazon's voice models requires the transfer of those models — and the voiceprints encoded within them — among Amazon's affiliated entities in the ordinary course of business. Audible's AI narration program runs on AWS-hosted foundational voice infrastructure. ACX's narrator voice replicas operate on the same Foundational Voice Models. Amazon Music's audio infrastructure connects to AWS cloud services. Each cross-affiliate use of the Foundational Voice Models involves the transmission of model parameters and inference outputs across Amazon's affiliated entities.

76. Amazon's voice synthesis pipeline operates within a subprocessor framework involving cloud-infrastructure providers, content-delivery-network operators, hardware partners, and other vendors. The pipeline's training, evaluation, deployment, and operation involve, on information and belief, the transmission of model parameters and the voiceprints encoded within those parameters among Amazon's vendors and service providers in the ordinary course of business. The delivery of voice synthesis services to enterprise customers, including Illinois customers, necessarily involves transmitting model parameters and inference outputs over that infrastructure.

77. In Amazon's December 2, 2025 announcement of Amazon Nova 2 Sonic, AWS publicly identified integration partners through which Nova 2 Sonic is deployed, including Vonage, Twilio, AudioCodes, LiveKit, and Pipecat, in addition to integration with Amazon Connect. Each of these integration-partner relationships involves Amazon's commercial deployment of the Nova 2 Sonic model, and the voiceprints encoded within it, into the operations of a named third-party service provider for use in customer-facing voice applications.

78. Amazon protects its own confidential and sensitive information under closed-system controls that are materially more protective than the dissemination practices applied to the voiceprints Amazon extracted from non-user training audio. Amazon protects the source code of its commercial products, its proprietary AWS infrastructure designs, its internal financial records, its employee personnel files, its enterprise customer data, and its corporate business communications under access controls, encryption, internal classification systems, and information-security regimes maintained by an information-security organization with global reach. Amazon protects technology subject to United States export controls under additional regulatory protective layers. Amazon protects AWS-customer-uploaded biometric data, including Voice ID enrollment voiceprints, under specific contractual and technical controls, with AWS Key Management Service encryption and customer-managed domain workflows. By contrast, Amazon has not published, and on information and belief does not maintain, any access-control protocol, audit-logging policy, encryption standard, retention schedule, or destruction

policy specifically applicable to voiceprints extracted from non-user training audio or to the biometric characteristics encoded in its Foundational Voice Models. Amazon protects what it values. It does not protect what it took without consent.

79. The pattern of Amazon's dissemination practices places the voiceprints and biometric information of Plaintiffs and Class members in the hands of Amazon's affiliated entities, vendors, subprocessors, service providers, and named integration partners. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception to BIPA's dissemination prohibition under 740 ILCS 14/15(d) applies.

*Commercial Substitution and Economic Harm*

80. The voice products Amazon built using Plaintiffs' and Class members' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods. Professional audiobook narration historically has been performed by human narrators at industry rates of approximately $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate.

81. The Voice Products generate professional-quality narration at a fraction of those rates and can render an entire audiobook in hours.

82. Amazon's commercial deployment of voice technology in Audible, ACX, KDP, Amazon Music, Alexa+, Amazon Connect voice deployments, and Amazon Bedrock Nova Sonic conversational AI directly substitutes for human voice professionals in the audiobook narration market.

83. Audible's May 2025 announcement of speech-to-speech translation that "preserves original narrators' voice and style across languages" demonstrates that Amazon's technology generates digital-replica synthesis on the same audiobook platform on which Plaintiffs Dorcus and Nassif distribute their human narration. For audiobook narrators like Dorcus and Nassif, Amazon distributes the human narrations through Audible, ingests them as training data for the Foundational Voice Models, and then sells AI narration trained on those models back through Audible.

84. Amazon's voice synthesis products directly substitute for, or threaten to substitute for, long-form investigative audio journalism, podcast hosting and narration, on-air broadcast journalism, and narrative non-fiction audio production — the markets in which Plaintiffs Marin, Rogers, Amer, and Lacour have built their careers and continue to work. The Voice Products generate substitutable voice content in those markets at per-character, per-audio-second, and consumption-based pricing orders of magnitude lower than human-talent rates.

85. Amazon's voice synthesis products are marketed for studio dubbing, e-learning narration, advertising voiceover, video-game voice acting, and customer-service voice work. Each of these markets has historically been served by professional voice actors, including Plaintiffs Dorcus and Nassif. Amazon's voice synthesis products generate substitutable voice content in those markets at pricing orders of magnitude lower than human voice talent rates.

86. Amazon's voice synthesis capabilities span more than 30 languages and locales, with polyglot voices in Amazon Nova Sonic and Nova 2 Sonic and the speech-to-speech translation feature in the Audible AI narration program that "preserves original narrators' voice and style across languages." On information and belief, Amazon's multilingual and accented synthesis capabilities include the capability to generate Arabic-accented English narration, Levantine Arabic narration, and other culturally and linguistically specific voice content. This capability competes specifically with the distinctive market position held by Plaintiff Nassif as a Lebanese-Palestinian American audiobook narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors.

87. Each of Amazon's voice products was built using the vocal characteristics of the human performers it now displaces. The market substitution is therefore not merely temporal but causal. The synthetic audio Amazon generates is generated because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output.

*Named Plaintiffs*

*Allegations Common to Each Named Plaintiff*

88. On information and belief, the voice recordings of each named Plaintiff were among the audio that Amazon ingested to train its Foundational Voice Models, and the voiceprints and biometric information derived from those recordings are encoded in the parameters of those models and reproduced in

the audio that those models generate. Each named Plaintiff's catalog of professional voice work matches the profile of training audio that Amazon's technical documentation identifies as optimal — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on publicly distributed audio platforms, and corresponds, in form and content, to the categories of training material identified in Amazon's published research.

89. Amazon has not disclosed, and has refused to disclose, the sources of the voice training data used to develop its Foundational Voice Models. For example, Amazon's BASE TTS paper describes that data as "100,000 hours of public domain speech data," Amazon disclosed that Amazon Polly's generative engine was "trained with publicly available and proprietary data", and Amazon Nova Sonic and Nova 2 Sonic were trained through "licensed, proprietary, open-source, and publicly available" training data. The records identifying which specific voice recordings Amazon ingested into the training corpora that produced its Foundational Voice Models and the commercial voice products derived from those models are within Amazon's exclusive control.

90. No named Plaintiff created an Amazon Web Services account for Amazon Polly Brand Voice or Amazon Connect Voice ID enrollment. No named Plaintiff uploaded a voice recording to Amazon's ACX narrator voice replicas program, Audible AI narration program, or any other Amazon voice-synthesis product. No named Plaintiff accepted Amazon's AWS Biometric Notice and Consent Terms. No named Plaintiff recorded a voice-talent acknowledgment

statement for Amazon. No named Plaintiff received any notice or disclosure from Amazon that their voiceprint or biometric information had been collected, any disclosure of the purpose or duration of that collection, or executed a written release authorizing Amazon to use their voice for voice-synthesis training. Amazon's collection of each named Plaintiff's voiceprint, and Amazon's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent.

91. The injury Amazon inflicted on each named Plaintiff is concrete and particular to that Plaintiff and shares the same structure across all of them. Amazon extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in the Foundational Voice Models, and continues to profit from those models and from the Voice Products built on them. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The Voice Products Amazon built using the Plaintiff's voiceprint now operate in the same professional voice markets in which the Plaintiff built and continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Philip Rogers*

92. Philip Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass

shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. The Lisagor Awards, conferred by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region. Rogers is a citizen and resident of Illinois and resides in this District; his voice and recordings were produced in Illinois while Rogers was physically present in Illinois.

93. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting. The platforms display metadata identifying Rogers as the speaker and Chicago as the production location. Rogers's body of work has been continuously available through these channels for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint.

94. Rogers's injury is concrete and particular to him in the manner alleged at ¶ 91. The broadcast journalism market in which Rogers built his career, live broadcast reporting, on-air anchoring, and broadcast investigative

journalism, is the market in which the Voice Products now operate, against the same colleagues with whom Rogers worked.

*Carol Marin*

95. Carol Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, the CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel, and includes television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. She has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor. Marin is a citizen and resident of Illinois and resides in this District; her voice and recordings were produced in Illinois while Marin was physically present in Illinois.

96. Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that

preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint.

97. Marin's injury is concrete and particular to her in the manner alleged at ¶ 91. The broadcast and investigative journalism markets in which Marin built her five-decade career, television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing, are the markets in which the Voice Products now operate, against the same colleagues with whom Marin worked.

*Robin Amer*

98. Robin Amer is a journalist, podcast creator, audio producer, and on-air host who has produced the substantial majority of her audio work from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the investigative podcast produced by USA Today over two seasons. Season 1 of *The City*, which focused on Chicago, peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New York Times*, *Quartz*, and Apple Podcasts. Amer's earlier production work for

*Gravy*, the podcast produced by the Southern Foodways Alliance, contributed to that program's 2015 James Beard Award for Best Podcast. Amer subsequently spent three years as Senior Producer for Audio Features at *The Washington Post*, where she edited the *Post Reports* daily news podcast and produced the standalone narrative series *Field Trip*; during her tenure she won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction and was shortlisted for the Whickers Prize at the Sheffield Documentary Festival. Amer is a citizen and resident of Illinois and resides in this District; the substantial majority of Amer's voice recordings were produced in Illinois while Amer was physically present in Illinois.

99. *The City*, *Gravy*, *Post Reports*, *Field Trip*, *Love + Radio: Blood Memory*, and Amer's contributions to *Reveal*, *The Heist*, and *Vox* are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, and other major podcast and digital-audio platforms, with metadata identifying Amer as host, narrator, producer, showrunner, or contributor. *The City* and other Amer work were also distributed through Google Podcasts before Google shut down that service in 2024. Amer's body of audio work has been continuously available across these channels for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint. Amazon Music, an Amazon-owned platform, has directly hosted and distributed several

Case 1:26-cv-0497 Document #: 1 Filed: 07/21/26 Page 49 of 98 PageID #:49

of Amer's productions, including *Love + Radio: Blood Memory*; in connection with that distribution, Amazon has directly possessed and controlled copies of those recordings.

100. Amer's injury is concrete and particular to her in the manner alleged at ¶ 91. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting — the market the Voice Products are designed to serve at substantially lower cost than the human production Amer provides. The Voice Products are distributed in part through Amazon Music, the same Amazon-owned platform on which Amer's human production has been hosted, including Love + Radio: Blood Memory.

*Lindsey Dorcus*

101. Lindsey Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for many of the largest publishers in the English-language publishing industry, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a Society of Voice Arts and Sciences (SOVAS) Voice Arts Award winner, recognized in 2020 as part of the full-cast voice artist ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind*. Dorcus is also a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. AudioFile Magazine, the principal independent trade publication reviewing audiobook narration in the United States, has reviewed Dorcus's narration as "silky," "joyful," and capable of "drawing listeners in with

the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (both Dublin and Northern Irish), French, American Southern, Greek, New England, New York, German, Indian, and Russian. Dorcus is a citizen and resident of Illinois and resides in this District; her audiobook narrations were recorded in a professional home studio in Chicago and produced in Illinois while Dorcus was physically present in Illinois.

102. Dorcus's audiobook narration is publicly distributed across the major audiobook and digital-audio platforms, including Audible (a wholly owned subsidiary of Amazon.com, Inc.), Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on Audible.com. The recordings are continuously available on these platforms and have been so available for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint. Because Audible is an Amazon-owned subsidiary and the principal commercial distributor of Dorcus's narrations, Amazon has directly possessed and controlled copies of Dorcus's audiobook recordings since they were first distributed through Audible, in many cases years before Amazon launched the voice synthesis products at issue in this Complaint. Audible's audiobook catalog is the most concentrated source of professional audiobook narration in the world.

103. Dorcus's injury is concrete, particular, and ongoing in the manner alleged at ¶ 91, and is sharpened by the closed-loop structure of Amazon's audiobook commerce: Audible AI narration, ACX narrator voice replicas, and Kindle Direct Publishing Virtual Voice operate within the same Amazon distribution ecosystem that has sold Dorcus's two-hundred-plus human narrations. For Dorcus, the biometric data and the product are, at this point, the same thing. The audiobook narrations Amazon distributed through Audible became the training material for the AI narration Amazon now sells through Audible, displacing the human narration market from which Dorcus's recordings came.

*Yohance Lacour*

104. Yohance Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago whose professional work centers on storytelling about Black Chicago. Lacour is affiliated with the Invisible Institute, a Chicago-based nonprofit investigative journalism organization on the South Side. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio. In the series, Lacour revisits the 1997 hate-crime attack on Lenard Clark that Lacour had covered as a young community journalist, tracks down key participants in the case a quarter-century later, and examines how the case and its aftermath shaped his own life. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series. In 2024, *You Didn't See Nothin'* was awarded

the Pulitzer Prize for Audio Reporting, one of the highest honors in American journalism. In the same year, *You Didn't See Nothin'* was awarded a Peabody Award. *You Didn't See Nothin'* was named among Apple Podcasts' "Podcasts We Love" and the "100 Best Podcasts of All Time," received nominations at the Signal Podcasting Awards in the categories of Limited Series & Specials – Best Host and Limited Series & Specials – Documentary, and received four nominations at the Black Podcasting Awards in the categories of Best Sound Design, Best History Podcast, Best True Crime Podcast, and Best Limited Series Podcast. Lacour has also appeared as a featured guest and interview subject on NPR's *Fresh Air* with Tonya Mosley, NPR's *All Things Considered* with Adrian Florido, the Canadian Broadcasting Corporation's *Crime Story* podcast with Kathleen Goldhar, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast. Lacour is a citizen and resident of Illinois and resides in this District; his recorded vocal performances were produced in Illinois while Lacour was physically present in Illinois.

105. *You Didn't See Nothin'* and Lacour's interview appearances are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, Overcast, and other major podcast and digital-audio platforms, with metadata identifying Lacour as creator, host, narrator, and lead reporter. The recordings are continuously available on these platforms and have been so available since 2023 (preceding Amazon's training of multiple voice models alleged in this Complaint). Amazon Music, an Amazon-owned platform, has

directly distributed *You Didn't See Nothin'*; in connection with that distribution, Amazon has directly possessed and controlled copies of the recordings.

106. Lacour's injury is concrete and particular to him in the manner alleged at ¶ 91. The investigative and narrative podcast markets in which Lacour earns his livelihood — including markets reaching the Black audiences and communities about whom Lacour reports — are markets the Voice Products are designed to serve at a fraction of the cost of human production. The Voice Products are distributed in part through Amazon Music, the same Amazon-owned platform on which Lacour's You Didn't See Nothin' is hosted.

*Victoria Nassif*

107. Victoria Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director. Nassif is a trained mezzo-soprano singer whose vocal performance skills extend beyond spoken narration to musical and singing capabilities developed through her classical acting training. Nassif's on-camera work includes multiple episodes of NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Nassif is a professional audiobook narrator who has recorded multiple audiobooks for major publishers, including Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Nassif's notable audiobook narration credits include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), for which she served as solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher

(Random House Audio), a novel featuring a queer Palestinian American protagonist, which was shortlisted for the Ursula K. Le Guin Prize and named a *Them* Best Book of the Year; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers. As a first-generation Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern characters and settings; this authentic voice work represents a distinctive professional asset in the audiobook narration industry. Nassif possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation and Cockney), Persian, Arabic (Levantine dialect), and American Southern. Nassif is a citizen and resident of Illinois and resides in this District; her recorded vocal performances were produced in Illinois while Nassif was physically present in Illinois.

108. Nassif's audiobook narration is publicly distributed across major audiobook and digital-audio platforms, including Audible (a wholly owned subsidiary of Amazon.com, Inc.), Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's on-camera work for NBC's *Chicago PD* and nationally broadcast commercials is distributed across broadcast and streaming platforms, including NBC and Peacock. Nassif's audiobook recordings are continuously available on these platforms and have been so available for years preceding Amazon's training of the

Case 1:26-cv-04354-97 Document #: 24-1 Filed: 05/22/26 Page 55 of 98 PageID #: 5500

Foundational Voice Models alleged in this Complaint. Because Audible is an Amazon-owned subsidiary and the principal commercial distributor of Nassif's audiobook narrations, Amazon has directly possessed and controlled copies of Nassif's audiobook recordings since they were first distributed through Audible. Nassif's distinctive cultural and linguistic position — authentic Lebanese-Palestinian American narration with native Arabic-accent capability — is a category of professional voice work uniquely valuable for training the polyglot and multi-accent voice capabilities Amazon markets in Amazon Polly's multilingual neural voices, Amazon Nova Sonic and Nova 2 Sonic polyglot voices, and Audible's speech-to-speech translation feature that "preserves original narrators' voice and style across languages." Amazon's commercialization of multilingual and accented voice synthesis depends on training audio from narrators with authentic accented narration capabilities.

109. Nassif's injury is concrete, particular, and ongoing in the manner alleged at ¶ 91. Nassif occupies a distinctive market position as a Lebanese-Palestinian American narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors. Audible's announced speech-to-speech translation feature, which 'preserves original narrators' voice and style across languages,' is precisely the capability that targets Nassif's distinctive professional asset for substitution by AI-generated voice content. As for Dorcus, the audiobook narrations Amazon distributed through Audible became the training material for the AI narration Amazon now sells through

Audible, displacing the human narration market from which Nassif's recordings came.

*Amazon Acted Willfully and Recklessly*

110. Amazon's collection, retention, commercial exploitation, and dissemination of Plaintiffs' and Class members' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. Amazon acted with knowledge of, or at a minimum reckless disregard for, its obligations under Illinois law.

*Amazon knew its obligations under BIPA*

111. By the time Amazon launched any of the Voice Products, see ¶ 42, BIPA had been the law of Illinois for more than fifteen years and had generated some of the largest privacy settlements in American history: approximately $650 million in In re Facebook Biometric Information Privacy Litigation, No. 3:15-cv-03747 (N.D. Cal.); approximately $100 million in Rivera v. Google LLC, No. 2019-CH-00990 (Cir. Ct. Cook Cnty.); and approximately $92 million in In re TikTok, Inc., Consumer Privacy Litigation, No. 1:20-cv-04699 (N.D. Ill.). The Illinois General Assembly enacted BIPA in 2008, and its findings on the unique vulnerability of biometric identifiers, expressly including the voiceprint, are a matter of legislative record. 740 ILCS 14/5.

112. Voice-AI-specific litigation against companies in Amazon's same product market further sharpened the notice. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y. filed May 16, 2024), alleging that an AI voice company created and commercialized unauthorized voice

clones trained on the plaintiffs' recordings. In August 2024, additional voice actors filed *Vacker v. ElevenLabs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), asserting analogous claims against another AI voice company. By the time Amazon released the products at issue in this Complaint, voice-AI companies were active defendants in litigation alleging precisely the conduct alleged here: building commercial voice synthesis products on voice recordings ingested without the speakers' consent.

113. Amazon's notice was not inferred from industry conditions; it was direct and adjudicated. Amazon was sued in this District in 2019 for BIPA violations based on Voice ID — *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.) — and the case has been active throughout the period in which Amazon launched the Voice Products. On November 6, 2025, the District Court certified a class of approximately 1.2 million Illinois residents. Wilcosky, Dkt. 278 (N.D. Ill. Nov. 19, 2025). Amazon's 2025 Form 10-K acknowledges additional pending BIPA proceedings.

114. In May 2023, the FTC and DOJ obtained a $25 million civil penalty and a stipulated permanent injunction against Amazon for retaining children's Alexa voice recordings indefinitely. The FTC characterized the retained recordings as providing Amazon "'with a valuable database for training the Alexa algorithm." Amazon entered the stipulated injunction without contesting that characterization, and in each of the four years that followed, Amazon launched additional Voice Products dependent on training data of identifiable speakers.

Case 1:26-cv-05497 Document #: 1 Filed: 05/12/26 Page 58 of 98 PageID #:58

*Amazon knew that voice training extracts biometric identifiers*

115. Amazon's product documentation describes the outputs of its voice processing pipelines in terms that align precisely with BIPA's biometric-identifier definitions. AWS's Amazon Connect Voice ID administrator guide uses the BIPA statutory term "voiceprint" and defines it as "a mathematical representation that implicitly captures unique aspects of an individual's voice." AWS's Amazon Chime SDK API reference describes its speaker-search system as collecting "biometric identifiers and biometric information … in the form of a digital voiceprint," using BIPA's own statutory language. Amazon's BASE TTS research paper describes a one-billion-parameter Transformer that demonstrates one-shot voice cloning from a ten-second reference recording. This capability requires extracting and encoding speaker-specific acoustic characteristics from training audio.

116. Amazon's AWS Biometric Notice and Consent Terms, last updated November 14, 2024, identify BIPA, the Texas Capture or Use of Biometric Identifier Act, and the Washington biometric privacy statute by name, and require AWS customers using Covered AWS Services to obtain "informed written or explicit consent." Amazon does not treat BIPA as a remote or theoretical concern. Amazon places BIPA at the center of its own customer-facing biometric compliance framework, and then built the Voice Products on the very pipelines that compliance framework would have governed.

*Amazon chose to apply consent selectively*

117. The most probative evidence of Amazon's willfulness is the contrast between the consent infrastructure Amazon built for voice categories it collects with the participation of customers, voice talent, or narrators, and the absence of any equivalent consent infrastructure for the voice category at issue in this Complaint — the voiceprints Amazon extracted from non-user training audio.

118. Amazon built BIPA-aware consent infrastructure for its customer-facing voice services. Amazon Connect Voice ID activation is conditioned on customer acceptance of a "BIPA Consent Acknowledgement." Amazon Chime SDK speaker search ships with sample BIPA-oriented written-release language for use with Illinois callers. The AWS Biometric Notice and Consent Terms, which apply not only to Voice ID and Chime SDK but also to Amazon Rekognition and Amazon One Enterprise Services, allocate BIPA, Texas CUBI, and Washington biometric-statute compliance obligations to AWS customers and require them to obtain informed written consent from data subjects.

119. Amazon built consent and approval infrastructure for the voice talent it collects with the talent's direct participation. Amazon Polly Brand Voice is a limited-access program requiring voice-talent registration and recorded acknowledgment statements. The ACX narrator voice replicas beta requires participating narrators to submit sample recordings, choose projects, and review final narration, and provides that Audible "will not separately use the narrator voice replica without approval." Audible's May 2025 AI narration

program for publishers operates on publisher consent flows for each audiobook to be AI-generated.

120. Amazon built downstream-use safeguards for the synthetic outputs of its voice products. The AWS Responsible AI Policy prohibits depicting a person's voice or likeness without consent or appropriate rights, including unauthorized impersonation. The Amazon Nova Sonic and Amazon Nova 2 Sonic service cards describe built-in content moderation, watermarking, and warnings against impersonation without consent.

121. Each of these measures was implemented because Amazon recognized that voice-based AI products require the consent of the people whose voices are used. Each was implemented at the customer-facing end of the pipeline, either where Amazon collects voice data with the data subject's participation or where Amazon governs downstream customer use of synthetic outputs. None was implemented for the upstream voice category at issue in this Complaint: the voiceprints Amazon extracted from non-user training audio to build the Foundational Voice Models on which Amazon's customer-facing products depend.

122. The same engineering organizations and the same legal department that built and drafted the customer-facing consent infrastructure also built the Foundational Voice Models, which were trained on the unconsented corpus. The decision to apply consent in one place and to withhold it in the other was a contemporaneous institutional choice.

*Amazon's allocation of BIPA compliance to its customers confirms awareness*

123. Amazon's contractual treatment of BIPA compliance independently establishes Amazon's awareness that its voice processing requires BIPA-compliant consent. The AWS Biometric Notice and Consent Terms, quoted at ¶ 117 requires AWS customers using "Covered AWS Services," including Amazon Connect Voice ID and Amazon Chime SDK speaker search, to comply with BIPA by name and to obtain informed written consent from data subjects.

124. That allocation reflects Amazon's recognition that its voice processing implicates biometric data subject to BIPA. A company that disclaims responsibility for compliance by allocating it to others has not pleaded ignorance of the obligation — it has acknowledged the obligation and pushed it downstream.

125. The allocation framework, however, does not reach the voiceprints at issue in this Complaint. It applies to voice data collected through AWS customer–controlled workflows and, on its face, cannot apply to voiceprints that Amazon itself extracted from third-party recordings to train the Foundational Voice Models — voiceprints obtained outside any AWS customer relationship, where no customer can be held responsible. As applied to those voiceprints, Amazon is the controller. Amazon is the entity that collected the data. Amazon is the entity that possesses the data. The duty Amazon's Biometric Notice and Consent Terms allocates to others falls, with respect to Plaintiffs' voiceprints, on Amazon itself.

126. On information and belief, Amazon's decision to train the Foundational Voice Models without BIPA compliance was a commercial calculation. BIPA-compliant collection would have required Amazon to identify each source speaker, provide written notice of the specific purpose and duration of collection, and obtain a written release before ingesting the recording. With corpora comprising the recordings of hundreds of thousands of distinct speakers, BIPA compliance would have constrained the speed and scale of Amazon's voice-AI development. Amazon chose speed and scale over compliance.

127. Amazon protects what it values. It does not protect what it took without consent. That was not an oversight. It was a business decision.

128. Each of the violations alleged in this Complaint was committed by Amazon with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs and Class members are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026).

## **CLASS ACTION ALLEGATIONS**

129. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings

were produced or recorded in Illinois, and from whose recordings Amazon extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of any of the Foundational Voice Models or any of the Voice Products, during the Class Period.

130. The Class Period runs from the earlier of (a) the date Amazon first ingested any voice recording into the training, fine-tuning, or evaluation pipeline for any of its voice synthesis or voice cloning models, or (b) January 1, 2013, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period.

131. Excluded from the Class are: (i) Amazon.com, Inc. and each of its parents, subsidiaries, affiliates, and controlled entities, including without limitation Amazon Web Services, Inc., Amazon.com Services LLC, A2Z Development Center, Inc., Audible, Inc., Audiobook Creation Exchange (ACX), Twitch Interactive, Inc., IMDb.com, Inc., Ring LLC, MGM Holdings Inc., and IVONA Software sp. z o.o.; (ii) all current and former officers and directors of Amazon and its subsidiaries; (iii) Amazon's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; (vi) any person who, prior to Amazon's collection or use of their voice biometric identifiers or biometric information, executed a written release that, on its face, purports to authorize Amazon's use of their voice for training, fine-tuning, or operation of voice synthesis or voice cloning models; and (vii) all natural

persons whose only voiceprint created by Amazon is the Voice ID enrollment voiceprint at issue in *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.), provided that a person who is a member of the *Wilcosky* class is not excluded from this Class if Amazon also extracted a voiceprint from that person's voice recordings in connection with the development, training, fine-tuning, evaluation, or operation of the Foundational Voice Models or the Voice Products.

132. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

133. *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered the training, fine-tuning, or evaluation pipeline for any of the Foundational Voice Models is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, dataset-version records, source-URL records, and audio-file metadata — are within Amazon's exclusive control. For recordings distributed through Amazon-owned platforms (Audible, Amazon Music, ACX, Kindle), Amazon also maintains comprehensive distribution metadata identifying speaker identity, geographic location of production, and content catalog. Class membership can be independently confirmed through publicly available distribution metadata on third-party platforms, through speaker-identification technology applied to Amazon's training corpus, and through voice-matching analysis comparing the

Voice Products' outputs against publicly available recordings of Class members.

134. *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into the training pipelines for the Foundational Voice Models runs to the hundreds of thousands. Amazon's training-data scale, alleged at ¶¶ 8, 43, 51, requires that order of magnitude. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period and (b) the interviewees, guests, panelists, callers, public officials, and other speakers whose voices were captured in Illinois-produced broadcast, podcast, audiobook, and archival audio content publicly accessible on the platforms from which, on information and belief, Amazon sourced training data. The exact number is within Amazon's exclusive control and will be established through discovery.

135. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Amazon did not engage in any individualized notice, consent, retention-policy disclosure, written release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Amazon’s voice-model training, fine-tuning, or evaluation pipelines. Amazon’s conduct was uniform: the same training pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same

automated and standardized process. The questions whether Amazon complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements before and after extracting Class members' voiceprints can be answered classwide because Amazon's noncompliance was identical as to every Class member.

136. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics Amazon extracts during voice-model training — variously described in Amazon's product and research documentation, *see* ¶¶ 45–47 — constitute 'voiceprints' or 'biometric information' within the meaning of BIPA;

(b) whether Amazon informed Class members in writing that their biometric identifiers were being collected or stored, of the specific purpose and length of term of collection, and obtained a written release executed by the Class member, as 740 ILCS 14/15(b) requires;

(c) whether Amazon developed and made publicly available a written retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training audio, as 740 ILCS 14/15(a) requires;

(d) whether Amazon sold, leased, traded, or otherwise profited from Class members' biometric identifiers and biometric information through its integrated commercial chain — including the Voice Products — in violation of 740 ILCS 14/15(c);

(e) whether Amazon disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers and biometric information to third parties — including without limitation Amazon's affiliated corporate entities (Audible, ACX, AWS, Amazon Music, IVONA, and others), Amazon's cloud-infrastructure subprocessors, and Amazon's named Nova 2 Sonic integration partners (Vonage, Twilio, AudioCodes, LiveKit, and Pipecat) — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether Amazon stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2);

(g) whether Amazon's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether Amazon used Class members' voices and identities for commercial purposes without prior written consent in violation of the Illinois Right of Publicity Act, 765 ILCS 1075/30(a);

(i) whether Amazon's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of the Illinois Right of Publicity Act as amended by P.A. 103-836 (effective January 1, 2025), and whether Amazon materially contributes to or facilitates the distribution of such replicas through the Voice Products;

(j) whether Amazon's conduct constitutes an unfair practice within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act under *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002), and independently a deceptive practice within the meaning of the same statute;

(k) whether Amazon's conduct constitutes deceptive trade practices likely to cause confusion or misunderstanding as to the source, sponsorship, approval, or certification of AI-generated voice content under 815 ILCS 510/2(a)(2), and as to affiliation, connection, or association with or certification by another under 815 ILCS 510/2(a)(3);

(l) whether Amazon was unjustly enriched by its unauthorized commercial use of Class members' voice data; and

(m) the appropriate measures of damages, restitution, and injunctive relief, including the destruction or retraining of the Foundational Voice Models in which Class members' voiceprints are encoded and the downstream commercial products built on those models.

137. *Typicality.* The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois. Amazon, on information and belief, ingested those recordings into the training pipelines for the Foundational Voice Models without notice, consent, or written release. With respect to Plaintiffs Dorcus and Nassif, whose audiobook narrations are distributed through Audible, and Plaintiffs Amer and Lacour, whose work is distributed through Amazon Music, Amazon already

directly possessed and controlled the source recordings as a corporate matter before any training-data ingestion. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

138. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief addressing the unlawful extraction of voiceprints. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

139. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Amazon has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Amazon's training pipelines operated uniformly across every Class member's voice recordings; Amazon's failure to obtain BIPA-compliant consent was uniform; Amazon's failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; and Amazon's continuing possession, commercial exploitation, and cross-affiliate and subprocessor dissemination of Class members' voiceprints — in the Foundational Voice Models that power the Voice Products — is uniform. Plaintiffs seek classwide injunctive relief under 740 ILCS 14/20,

815 ILCS 510/3 (which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining of the Foundational Voice Models in which Class members' voiceprints are encoded, and the destruction of the downstream commercial products built on those models — that necessarily applies on the same terms to every Class member.

140. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims asserted in this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

141. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First,* whether Amazon's voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer, as alleged at ¶¶ 45-49. *Second*, whether Amazon complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer — Amazon did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. *Third*, whether Amazon's conduct was willful or reckless turns on Amazon's institutional knowledge, decision-making, and contemporaneous conduct, as alleged at ¶¶ 110-128, all of which are common

to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from Amazon's own records, which include training-data manifests, ingestion logs, source-URL records, audio-file metadata, and the platform distribution metadata for the audiobooks, music, and other content Amazon directly possesses through Audible, ACX, Amazon Music, and Kindle, all in Amazon's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended by Public Act 103-769 (effective August 2, 2024) and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

142. *Superiority.* A class action is the superior method for adjudicating these claims:

*(a)* *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover artists, voice actors — and incidental speakers whose voiceprints were extracted without their knowledge. Many Class members remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against the largest publicly traded technology company in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify

the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

*(b)* *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Amazon on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train the Foundational Voice Models. The certified *Wilcosky* class, alleged at ¶ 58, 113, is composed of Alexa users who completed Amazon's in-app Voice ID enrollment, and the certification record in *Wilcosky* turns on the uniformity of Amazon's enrollment workflow, a customer-initiated biometric-capture event that is not present in this case and that has no application to non-user training-data subjects. See *Wilcosky*, Dkt. 278 (N.D. Ill. Nov. 19, 2025). The claims here arise from Amazon's extraction of voiceprints from non-user voice recordings that no Plaintiff or Class member submitted to Amazon, that no Plaintiff or Class member encountered in any Amazon enrollment workflow, and to which no Amazon customer-facing disclosure applied. The two cases address two different categories of Amazon voice processing. Amazon's 2025 Form 10-K acknowledges additional pending BIPA proceedings involving Alexa, AWS cloud services, and Amazon Connect. Voice-AI-specific litigation against other defendants, see ¶ 112, concerns AI voice companies other than Amazon and asserts overlapping but non-identical theories.

*(c)* *Desirability of concentration in this forum.* Concentrating this litigation in this District is appropriate. Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois

statutes. The injuries were suffered in Illinois. Amazon conducts substantial commercial business in Illinois, including through retail, fulfillment, AWS enterprise licensing, Audible subscriptions, Amazon Music subscriptions, Alexa device sales, and Alexa+ subscriptions sold to Illinois residents and Illinois-based businesses. This Court is already the forum for the related *Wilcosky* BIPA litigation against the same defendant and is well-suited to adjudicate BIPA and other Illinois statutory claims arising from Amazon's commercial conduct in Illinois.

*(d)* *Manageability.* The case is manageable as a class action. Amazon's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from Amazon's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

143. To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Amazon's concealment of its training-data sources, by Amazon's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Amazon had ingested their recordings into its training pipelines, and by the continuing nature of Amazon's violations. Independently,

each retention of the unlawfully obtained biometric data, each operation of the Foundational Voice Models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data, and each public release of model parameters encoding that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### *Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)*

*Brought on behalf of the Class*

144. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

145. Plaintiffs bring this Count individually and on behalf of the Class.

146. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the

specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

147. Amazon is a “private entity” within the meaning of BIPA. 740 ILCS 14/10.

148. Amazon collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class members by directly accessing their voice recordings on publicly accessible third-party platforms and on Amazon-owned distribution platforms (including Audible, Amazon Music, ACX, and Kindle), ingesting those recordings into its voice-model training pipelines, and extracting from those recordings computational representations capable of identifying the speakers, as alleged at ¶¶ 33 and ¶¶ 50–58. The resulting representations, which Amazon’s own product documentation describes as “voiceprints,” “digital voiceprints,” “voice profiles,” “speaker embeddings,” “speechcodes,” and “biometric identifiers and biometric information,” are voiceprints and biometric information within the meaning of BIPA.

149. Amazon did not, before extracting Plaintiffs’ or Class members’ voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Amazon obtained no consent of any kind, in any form, from any Plaintiff or Class member, as alleged at ¶¶ 60, 90, and 117-122.

Case 1:26-cv-05497 Document #: 24-1 Filed: 07/22/26 Page 76 of 98 PageID #:76

150. Amazon's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

151. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**

*Brought on behalf of the Class*

152. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

153. Plaintiffs bring this Count individually and on behalf of the Class.

154. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never

interacted with Amazon in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

155. Amazon has been, and remains, in possession of voiceprints and biometric information extracted from the recordings of Plaintiffs and Class members.

156. Amazon has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training audio and embedded in the parameters of Amazon's voice synthesis and voice cloning models, as alleged at ¶¶ 60 and 78. Amazon's public retention statements address only customer-controlled enrollment voiceprints in Amazon Connect Voice ID domains, governed by the AWS-customer relationship and inapplicable to non-user training-data subjects. Amazon has not provided, and on information and belief does not maintain, any mechanism by which Plaintiffs or other non-user training-data subjects can request access to, correction of, or deletion of their biometric data from the training data underlying the Foundational Voice Models.

157. Amazon's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

158. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

159. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

160. Plaintiffs bring this Count individually and on behalf of the Class.

161. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

162. Amazon has profited and continues to profit from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the Foundational Voice Models that power the Voice Products, and by monetizing the Voice Products through the integrated commercial chain alleged at ¶¶ 71-73. The voice quality, expressiveness, multilingual capability, and speaker similarity that Amazon sells through that chain exists because of the voiceprints encoded in the Foundational Voice Models, including, on information and belief, voiceprints extracted from Plaintiffs' and Class members' Illinois-recorded voice work. Amazon's commercial exploitation does not fall within any exception to § 15(c).

163. Amazon's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

164. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

165. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

166. Plaintiffs bring this Count individually and on behalf of the Class.

167. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person’s biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

168. Amazon has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information, encoded in the parameters of the Foundational Voice Models, in three categories of conduct, each independently sufficient to violate § 15(d) and each alleged at ¶¶ 74-79: (i) cross-affiliate transfers among Amazon's affiliated corporate entities, including AWS, Audible, ACX, Amazon Music, Amazon.com Services LLC, and IVONA Software sp. z o.o.; (ii) transmission to cloud-infrastructure subprocessors, vendors, and service providers in connection with training, evaluation, deployment, and operation of the Voice Products; and (iii) deployment to named integration partners for Amazon Nova 2 Sonic, including Vonage, Twilio, AudioCodes, LiveKit, and Pipecat.

169. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

170. Amazon's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

171. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

172. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

173. Plaintiffs bring this Count individually and on behalf of the Class.

174. Section 15(e) of BIPA requires a private entity in possession of biometric identifiers or biometric information to store, transmit, and protect the identifiers and information from disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies § 15(e)(2) only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

175. Amazon fails the § 15(e)(2) asymmetry test. Amazon protects its own confidential and sensitive information — and the confidential and sensitive information its AWS customers entrust to its closed services — under materially more protective controls than it applies to the voiceprints and biometric information it extracted from non-user training audio.

176. Amazon protects its own confidential information and its AWS-customer-uploaded biometric data, including Amazon Connect Voice ID enrollment voiceprints, under closed-system controls described at ¶ 78. Amazon's treatment of voiceprints extracted from non-user training audio is materially less protective: those voiceprints are encoded in the parameters of the Foundational Voice Models and disseminated across Amazon's cross-affiliate, subprocessor, and integration-partner network, as alleged at ¶¶ 74-79, without any access-control protocol, audit-logging policy, encryption standard, retention schedule, destruction policy, or subject-access mechanism specifically applicable to that voice category.

177. Independently, Amazon fails the § 15(e)(1) reasonable-standard-of-care test. The reasonable standard of care in the AI and machine-learning industry for the handling of biometric training data includes, at minimum, documented provenance, access controls, audit logging, encryption in storage and transit, a documented retention and destruction schedule, and a subject-access and deletion mechanism. Amazon has none of these, as alleged at ¶ 60 and ¶ 78. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of their data.

178. The asymmetry between Amazon's closed-system protection of its own confidential information and its AWS-customer-uploaded data, on one hand, and Amazon's undisclosed and uncontrolled dissemination of training-derived voiceprints across Amazon's cross-affiliate, subprocessor, and integration-partner network, on the other, violates § 15(e)(2)'s requirement that biometric data be protected "in a manner that is the same as or more protective than" Amazon's protection of its other confidential and sensitive information.

179. The asymmetry is reinforced by Amazon's own internal selectivity: Amazon built consent infrastructure for the voice categories it collects with customer or narrator participation, but built none for the voiceprints it extracted from non-user training audio, as alleged at ¶¶ 117-122. The decision was a contemporaneous institutional choice.

180. Amazon's violations of § 15(e) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

181. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count VI**

**Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

182. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

183. Plaintiffs bring this Count individually and on behalf of the Class.

184. The Illinois Right of Publicity Act protects an individual’s right to control commercial use of their identity. 765 ILCS 1075/30(a) provides that “[a] person may not use an individual’s identity for commercial purposes during the individual’s lifetime without having obtained previous written consent from the appropriate person.” IRPA defines “identity” to include “any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener,” and expressly enumerates “voice” among the protected attributes. 765 ILCS 1075/5.

185. Each Plaintiff and each Class member is an individual whose distinctive voice, including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression, is part of the individual’s identity within the meaning of IRPA.

186. Amazon used Plaintiffs’ and Class members’ identities for commercial purposes within the meaning of IRPA by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the commercial voice synthesis and voice cloning products that Amazon monetizes through the integrated commercial chain alleged at ¶¶ 71-73. Amazon holds out its products’ ability to generate realistic, expressive, and human-sounding voices — across the Voice Products, including Audible's speech-to-speech translation that “preserves original narrators' voice and style across languages.” — as a core commercial feature of those products. That capability was built from the vocal identities of the individuals whose recordings were used to train the

Foundational Voice Models. Amazon did not obtain previous written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

187. Independently, the Illinois Right of Publicity Act, as amended by Public Act 103-836 (effective January 1, 2025), prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative. The amended IRPA further imposes liability on any person who materially contributes to, induces, or facilitates such distribution.

188. Amazon knowingly distributes, transmits, and makes available to the general public sound recordings containing unauthorized digital replicas of voice talent within the meaning of the amended IRPA. Audible (an Amazon-owned subsidiary) publicly announced on May 13, 2025 that it would offer publishers "speech-to-speech translation that preserves original narrators' voice and style across languages" — a technology that, by its terms, generates new sound recordings of a narrator's voice performing in languages and on words the narrator did not perform. ACX's narrator voice replicas beta similarly creates AI replicas of narrators' voices capable of producing audiobooks the narrator never recorded. Amazon's Polly generative engine, Amazon Nova Sonic, Amazon Nova 2 Sonic, Kindle Direct Publishing Virtual Voice, and Audible AI narration are each architected to generate synthetic speech whose vocal characteristics derive from the voice recordings used to train the underlying

Foundational Voice Models. On information and belief, the synthetic speech generated by these systems replicates or closely simulates the distinctive vocal characteristics of Plaintiffs and Class members whose voice recordings were ingested into the training pipelines, and Amazon knowingly distributes those replicas through the Voice Products. Amazon materially contributes to, induces, and facilitates the distribution of unauthorized digital replicas by designing, deploying, and operating the platforms and APIs through which the replicas are generated and distributed.

189. Amazon's violations of IRPA were willful and knowing, as alleged at ¶¶ 110-128. Amazon built consent and approval workflows for the voice categories it collects with the participation of voice talent precisely because it understood that the commercial use of an individual's voice requires that individual's consent; it did not apply the same infrastructure to the voices it took from Plaintiffs and Class members.

190. Plaintiffs and the Class have suffered and continue to suffer injury from Amazon's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods, as alleged at ¶¶ 80-87, 91.

191. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, the profits Amazon attributed to its

unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

## Count VII

## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

192. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

193. Plaintiffs bring this Count individually and on behalf of the Class.

194. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices … in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices reaches conduct that offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002). ICFA's deceptive-practices prong reaches material misrepresentations and material omissions made in connection with trade or commerce.

195. Amazon engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis and

voice cloning services to Illinois customers, and by collecting, extracting, and commercially exploiting the biometric identifiers of Illinois persons in connection with that commerce.

196. Amazon's conduct is unfair within the meaning of ICFA. It offends Illinois public policy as expressed in BIPA, 740 ILCS 14/5, and IRPA, 765 ILCS 1075/30(a); it caused substantial injury to Plaintiffs and Class members, including diversion of licensing income and displacement in their professional voice markets, as alleged at ¶¶ 80-87, 91; and Plaintiffs and Class members could not reasonably have avoided that injury because they had no knowledge that Amazon was collecting their biometric data.

197. Amazon's conduct is independently deceptive within the meaning of ICFA in two respects. *First*, Amazon's AWS Biometric Notice and Consent Terms allocates biometric-law compliance obligations to AWS customers using "Covered AWS Services," and identifies BIPA, Texas CUBI, and the Washington biometric privacy statute by name, while remaining silent on Amazon's own collection of voiceprints from non-user training audio. The allocation framework affirmatively represents that biometric-law compliance is a customer responsibility while omitting that Amazon itself is collecting biometric identifiers, in volumes vastly exceeding the customer-side collection the terms address, without notice or consent. The omission is material because it conceals from consumers — including Illinois voice professionals whose work Amazon's commercial products now displace — that the Foundational Voice Models on which Amazon's customer-facing services depend were built using

voice recordings collected without speaker consent. *Second,* Amazon maintained material opacity about the sources of its voice training data, as alleged at ¶¶ 50, 60, while commercially exploiting the resulting Foundational Voice Models at scale.

198. Amazon's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. Amazon's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged at ¶¶ 110–128. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class (injunctive relief only)*

199. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

200. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

201. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes

likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

202. Amazon's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, streamed, embedded in Audible AI-narrated audiobooks, ACX-produced audiobooks, Kindle Direct Publishing Virtual Voice audiobooks, Alexa+ generative voice interactions, Amazon Connect contact-center deployments, and Amazon Bedrock Nova Sonic and Nova 2 Sonic conversational applications, and otherwise commercially exploited without consumer-facing disclosure that the voice was AI-generated, that the underlying models were built on voiceprints and biometric information collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding under 815 ILCS 510/2(a)(2) about the source, sponsorship, and approval of the AI-generated voice content, and under 815 ILCS 510/2(a)(3) about the affiliation, connection, or association between the speakers whose vocal characteristics are reproduced and the AI-generated content distributed through Amazon's platforms.

203. Plaintiffs and Class members are persons likely to be damaged by Amazon's deceptive practices within the meaning of 815 ILCS 510/3. Amazon's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

204. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Amazon to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that Amazon has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3 — for the reasons alleged at ¶¶ 110–128 — Plaintiffs also seek reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

205. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

206. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

207. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's

detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

208. Amazon obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without permission and without compensation. These benefits include (a) the avoided costs of licensing or obtaining consent for the voice recordings used to train Amazon's voice synthesis and voice cloning models; (b) the product capability and competitive advantage Amazon captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and (c) the revenue Amazon generates and continues to generate through the commercial exploitation of those models across the integrated commercial chain alleged at ¶¶ 71-73.

209. Amazon obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional recordings. Amazon's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Amazon, and Amazon's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods — most acutely in the audiobook-narration market, where Plaintiffs Dorcus and Nassif distribute professional narration through Audible, the same Amazon-owned platform on which Audible AI narration and ACX narrator voice replicas now operate.

210. Amazon's retention of these benefits is unjust. Amazon's retention is rooted in conduct requiring proof of elements qualitatively different from copyright's exclusive rights and therefore not preempted by federal copyright law: (a) Amazon's collection and commercial exploitation of Illinois residents' biometric identifiers without BIPA-compliant notice and written consent, and (b) Amazon's commercial use of Illinois residents' voices and identities without the written consent required by IRPA.

211. Amazon's institutional practice confirms the inequity of its retention: Amazon built consent and approval infrastructure for every voice category in which it collected with the data subject's participation, *see* ¶¶ 117-122, but did not apply equivalent infrastructure to Plaintiffs and Class members whose voices it took without consent. Amazon could have pursued a lawful licensing path; it chose not to.

212. Plaintiffs and the Class seek restitution of the benefits Amazon has unjustly retained, including disgorgement of profits Amazon earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Amazon.com, Inc. and award the following relief:

A. *Injunctive Relief.* Permanent and, where appropriate, preliminary injunctive relief requiring Amazon, its officers, agents, employees, parents, subsidiaries, affiliates (including without limitation Amazon Web Services, Inc., Audible, Inc., Audiobook Creation Exchange (ACX), Amazon Music, Amazon.com Services LLC, A2Z Development Center, Inc., and IVONA Software sp. z o.o.), and all persons acting in concert with them, to:

(1) Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers and biometric information from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2) Cease the storage, retention, commercial use, sale, lease, trade, profiting from, and dissemination of voiceprints and biometric information of Plaintiffs and Class members that Amazon has already collected without BIPA-compliant consent, including the use of such voiceprints and biometric information to operate, deploy, or improve Amazon's commercial voice synthesis and voice cloning products;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate Amazon's voice synthesis and voice cloning models, including without limitation the Voice Products and the Foundational Voice Models;

(4) Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training audio, in compliance with 740 ILCS 14/15(a);

(5) Destroy all voiceprints and biometric information of Plaintiffs and Class members that Amazon obtained without BIPA-compliant consent, including all copies, derivatives, and intermediate representations of such voiceprints and biometric information across Amazon's training datasets, Foundational Voice Model parameters, inference pipelines, cross-affiliate data stores, subprocessor systems, and integration-partner deployments;

(6) Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the Foundational Voice Models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Nova Sonic, Amazon Nova 2 Sonic, BASE TTS, Audible AI narration voices, ACX narrator voice replica base models, Kindle Direct Publishing Virtual Voice, Alexa text-to-speech, Alexa+, and any iterative, successor, or derivative models trained from those models or derived from voiceprints encoded in them; and with respect to copies of any such model parameters disseminated to Amazon's affiliated entities (including Audible, ACX, AWS, Amazon Music, and IVONA), to Amazon's cloud-infrastructure subprocessors and vendors, and to Amazon's named Nova 2 Sonic integration partners (including Vonage, Twilio,

AudioCodes, LiveKit, and Pipecat), take all reasonable measures to recall, remove, and cease further support of the disseminated parameters, and cease further dissemination to third parties of any voice synthesis or voice cloning model parameters that encode unlawfully obtained voiceprints or biometric information;

(7) Certify under oath the destruction and remediation required by subparagraphs (5) and (6), with sufficient detail to permit the Court and Plaintiffs to verify compliance, including identification of the categories of data and model parameters destroyed, the systems and storage locations from which the data and parameters were removed, the third parties to whom recall and takedown requests were directed, and the responses received from those third parties; and

(8) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a); cease the knowing distribution, transmission, or making available to the general public of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of the Illinois Right of Publicity Act as amended by Public Act 103-836 (effective January 1, 2025); cease materially contributing to, inducing, or facilitating such distribution through the Voice Products; and provide adequate consumer-facing disclosure that voice outputs generated by Amazon's commercial voice products are AI-generated, are derived from voice synthesis or voice cloning models built using voice recordings of unidentified speakers, and have not been

authorized by the individuals whose vocal characteristics are reproduced — addressing the deceptive trade practices prohibited by 815 ILCS 510/2(a)(2) and 510/2(a)(3) and the unfair and deceptive practices prohibited by 815 ILCS 505/2.

B. *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C. *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of Amazon's unauthorized commercial use of their identities and voices under 765 ILCS 1075/30(a) and Amazon's distribution of and material contribution to the distribution of unauthorized digital replicas under the Illinois Right of Publicity Act as amended by Public Act 103-836; the profits Amazon earned from that unauthorized use to the extent not taken into account in computing actual damages; the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount; and punitive damages.

D. *ICFA Damages.* Award the actual economic damages Plaintiffs and Class members sustained as a result of Amazon's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a.

E. *Restitution and Disgorgement.* Order restitution of the benefits Amazon has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities, and disgorgement of the profits Amazon has earned through the integrated commercial chain alleged at ¶¶ 71-73. Plaintiffs request an accounting of all such revenues and benefits.

F. *Non-Duplication.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendant Amazon.com, Inc. on all Counts on which Defendant is found liable.

I. *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55

(IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J. *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 12, 2026

LOEVY & LOEVY

______________________________

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Philip Rogers, Carol Marin, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBIN AMER, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) | |
| v. | ) | |
| ELEVEN LABS INC., a Delaware corporation, | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs Robin Amer, Carol Marin, Philip Rogers, Alison Flowers, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Eleven Labs Inc. (“ElevenLabs”), allege as follows:

**NATURE OF THE CASE**

1. Eleven Labs Inc. ("ElevenLabs") built an $11 billion business by taking the voices of professional voice workers — journalists, broadcasters, audiobook narrators, podcasters, voice actors, and other speakers whose recorded voices are publicly distributed — and using them to train commercial artificial-intelligence products that clone a human voice from a short audio

sample. The voiceprint is not a backstage input to those products. It is the product. ElevenLabs ingested the recorded voices of real people, including Plaintiffs. It extracted the speaker's unique biometric voiceprint from each recording. It embedded those voiceprints in foundational voice synthesis models that today power a platform reported to generate more than $500 million in annual recurring revenue. None of the speakers whose recordings supplied the substrate of those products was asked. None was told. None was paid. At this point, the biometric data and the product are the same thing.

2. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade broadcast journalist, three-time George Foster Peabody Award winner, and recipient of the 2025 Order of Lincoln, the State of Illinois's highest civilian honor; Yohance Lacour, the creator, host, writer, and lead reporter of *You Didn't See Nothin'*, awarded the 2024 Pulitzer Prize for Audio Reporting and a Peabody Award; Alison Flowers, a 2021 Pulitzer Prize finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Philip Rogers, a National Emmy and Edward R. Murrow Award–winning broadcaster who covered four decades of Chicago news at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago); Lindsey Dorcus, a SOVAS Award and Independent Audiobook Award winning narrator of more than two hundred audiobooks for Penguin Random House, Simon & Schuster, Macmillan, Hachette, Audible Studios, and the other major American publishers; and Victoria Nassif, a first-generation Lebanese-

Palestinian American audiobook narrator whose authentic Arabic-accented narrations have been commercially released by Penguin Random House, Hachette, and Simon & Schuster.

3. A voiceprint is a digital fingerprint of a person's voice. It is a mathematical signature of the acoustic features unique to that voice. It identifies the individual and cannot be changed. A Social Security number can be reissued. A password can be reset. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice; the biological and behavioral patterns that produced the voiceprint are the same ones the person uses to speak every day.

4. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, together with a written release. 740 ILCS 14/15(b). ElevenLabs satisfied none of those requirements with respect to Plaintiffs. It collected Plaintiffs' voiceprints from third-party platforms without notice, extracted biometric signatures from recordings Plaintiffs had created for journalistic, literary, and artistic purposes, and embedded those signatures in commercial AI voice models. Plaintiffs have identified no public mechanism,

policy, or process by which ElevenLabs deletes biometric data extracted from non-user training audio.

5. ElevenLabs' noncompliance was not a misreading of the statute. ElevenLabs is fully capable of obtaining consent — it does so for celebrities. In November 2025, ElevenLabs launched its "Iconic Marketplace," a licensing program under which the estates of Maya Angelou and Alan Turing, and living celebrities including Michael Caine and Matthew McConaughey, must affirmatively approve any commercial use of their voices before ElevenLabs generates audio output using those voices. ElevenLabs built that consent infrastructure. It operates that consent infrastructure today. It declined to extend that infrastructure, or any equivalent process, to the working voice professionals whose voiceprints had already been ingested into the foundational models on which the entire Iconic Marketplace and the entire company sit. ElevenLabs built consent infrastructure for the celebrities it could not avoid asking, and built none for the working voice professionals whose voiceprints constitute the substrate of every product ElevenLabs sells.

6. ElevenLabs' noncompliance was also not due to a lack of awareness. BIPA has been the law in Illinois since 2008. By the time ElevenLabs publicly released its beta platform in January 2023, BIPA had produced privacy settlements of approximately $650 million against Facebook, $100 million against Google, and $92 million against TikTok. ElevenLabs' privacy disclosures contemporaneously acknowledged that the data ElevenLabs processes is, or may be, biometric data. ElevenLabs' Privacy Policy concedes

that "applicable law may define [users'] Voice Data as biometric data." Its EU–US Data Privacy Framework Policy says the same. Its CCPA Notice at Collection describes ElevenLabs' processing as "analyz[ing] [the speaker's] speech characteristics to formulate a distinct voice model of [the speaker's] vocal traits." These admissions came years after the unconsented training that gave the company its commercial value. ElevenLabs did nothing to remediate it.

7. Nor was ElevenLabs' noncompliance a failure of notice. In August 2024, two professional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. Aug. 29, 2024), alleging that ElevenLabs had created two of its default synthetic voices, "Bella" and "Adam," by training on copyrighted audiobook narrations of their work, without their knowledge or consent. The *Vacker* complaint alleged that ElevenLabs' voice clones "mimicked the actors' distinctive vocal timbres, accents, intonation, pacing, vocal mannerisms, and speaking styles." That action settled on confidential terms in August 2025. ElevenLabs has not, to Plaintiffs' knowledge, publicly identified the speakers whose recordings it used to train its commercial voice models, nor has it offered any process by which such speakers may obtain identification or deletion of biometric data derived from their voices. ElevenLabs operated through the pendency of *Vacker*, settled it confidentially, and continued the conduct.

8. ElevenLabs' noncompliance was, instead, a deliberate institutional decision. Compliance with BIPA would have required ElevenLabs to identify the source speakers whose recordings it ingested, provide written notice of the

specific purpose and duration of collection, and obtain a written release from each speaker before ingestion. With foundational voice models trained on voice recordings of, on information and belief, hundreds of thousands of distinct speakers, that compliance burden would have constrained the speed and scale of ElevenLabs' voice AI development. ElevenLabs chose speed and scale over compliance. That was not an oversight. It was a business decision.

9. The voiceprints ElevenLabs extracted from Plaintiffs and the Class are not stored in a database that can be deleted on request. They are encoded in or operationalized through the parameters of ElevenLabs' commercial voice synthesis models — the Eleven English, Multilingual, Flash, Turbo, and v3 model families — and reproduced in the audio that those models generate when invoked through ElevenLabs' text-to-speech, Voice Cloning, AI Dubbing, Conversational AI, Voice Design, and audiobook generation products. ElevenLabs has further transmitted those models and the encoded biometric characteristics they carry to affiliates, vendors, processors, and Enterprise sub-licensees in the United States, the Netherlands, and Singapore under the sub-licensable license asserted in its Terms of Service. The product has already been distributed.

10. The technology ElevenLabs built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their livings. ElevenLabs markets its products as commercial substitutes for professional audiobook narration, voiceover work, podcast hosting and narration, AI dubbing, conversational voice agents, and other categories of professional voice

work. Traditional audiobook narration costs $250 to $400 per finished hour; ElevenLabs' Pro plan costs $99 per month and, using its AI voice technology, can generate an entire audiobook in several hours. ElevenLabs' audiobook product offers direct distribution to Spotify, InAudio, and ElevenReader, with a 60% royalty on direct sales. Each of these products is offered to commercial customers at a fraction of the cost of hiring the human professionals whose unconsented recordings made the synthesis possible.

11. Plaintiffs' injuries are concrete and particularized. ElevenLabs extracted Plaintiffs' voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. ElevenLabs retains those voiceprints in its commercial models and continues to profit from them. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that ElevenLabs unlawfully collected, retained, profited from, disseminated, and inadequately protected Plaintiffs' voiceprints, without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that ElevenLabs' commercial use of their voices and identities to build and sell AI products that replicate their distinctive vocal characteristics violates the Illinois Right of Publicity Act ("IRPA"). Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois

Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

13. Plaintiffs seek statutory and actual damages, restitution and disgorgement of profits derived from ElevenLabs' commercial exploitation of Plaintiffs' and Class members' biometric data, and consequential injunctive relief — including the identification of the sources of the voice training data used to build ElevenLabs' foundational voice synthesis models, the destruction of voiceprints unlawfully obtained from Plaintiffs and the Class, and the destruction or retraining, without the unlawfully obtained biometric data, of the foundational voice synthesis models and downstream commercial products in which the biometric data is encoded. Plaintiffs also seek reasonable attorneys' fees and costs.

**PARTIES**

14. Plaintiff Carol Marin ("Marin") is a citizen of the State of Illinois and resides in this District. Marin is a broadcast journalist whose career has been conducted primarily in Chicago for over five decades. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 67-71.

15. Plaintiff Yohance Lacour ("Lacour") is a citizen of the State of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast work, including the Pulitzer Prize–winning *You Didn't See Nothin'*, has been produced in Chicago. Lacour's body of professional

voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted his voiceprint are described at ¶¶ 72-76.

16. Plaintiff Alison Flowers ("Flowers") is a citizen of the State of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 77-81.

17. Plaintiff Robin Amer ("Amer") is a citizen of the State of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 82-86.

18. Plaintiff Philip Rogers ("Rogers") is a citizen of the State of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted his voiceprint are described at ¶¶ 87-91.

19. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of the State of Illinois and resides in this District. Dorcus is a professional audiobook narrator

Case 1:26-cv-04837 Document #: 24-1 Filed: 07/21/26 Page 10 of 194 PageID #:1054

who has recorded more than two hundred audiobooks for the major American publishers from her home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 92-96.

20. Plaintiff Victoria Nassif ("Nassif") is a citizen of the State of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 97-101.

21. Defendant Eleven Labs Inc. ("ElevenLabs") is a Delaware corporation with its principal place of business at 169 Madison Avenue, Suite 2484, New York, New York. ElevenLabs develops, trains, deploys, and commercially operates the foundational voice synthesis models at issue in this Complaint, together with the commercial voice products built on those models. ElevenLabs conducts the collection, capture, receipt through trade, retention, profiting from, and dissemination of voiceprints and biometric information alleged in this Complaint directly and through its officers, employees, agents, affiliates, vendors, and service providers, in the ordinary course of its business.

**JURISDICTION AND VENUE**

22. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and ElevenLabs is, on information and belief, a citizen of Delaware (its state of incorporation) and New York (its principal place of business). None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

23. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation, or $5,000 for an intentional or reckless violation — and may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment.

24. This Court has specific personal jurisdiction over ElevenLabs under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the due process requirements of the Fourteenth Amendment as construed in

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *Calder v. Jones*, 465 U.S. 783 (1984); *Walden v. Fiore*, 571 U.S. 277 (2014); *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017); and *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021). ElevenLabs has purposefully directed its conduct at Illinois; Plaintiffs' claims arise out of and relate to that Illinois-directed conduct; and the exercise of jurisdiction is reasonable.

25. ElevenLabs purposefully availed itself of the privilege of conducting business in Illinois. ElevenLabs markets, sells, and delivers its commercial voice synthesis products — including text-to-speech, Instant Voice Cloning, Professional Voice Cloning, AI Dubbing, Voice Design, Conversational AI, audiobook generation, and the Iconic Marketplace — to Illinois subscribers and Illinois-based commercial users through its website (https://elevenlabs.io) and its mobile applications on iOS and Android. ElevenLabs offers tiered subscription plans (free, Starter, Creator, Pro, Scale, and Enterprise) to Illinois residents as part of its ordinary commercial operations, accepts recurring subscription payments from Illinois customers, and provides ongoing interactive service performance to users located in Illinois. ElevenLabs has publicly represented that employees at over seventy-five percent of Fortune 500 companies use its technology; Illinois is the corporate home of more than thirty Fortune 500 companies, including Walgreens, Allstate, Caterpillar, Abbott Laboratories, Archer-Daniels-Midland, and McDonald's. ElevenLabs' platform identifies Illinois users through IP geolocation, the navigator.geolocation API,

and equivalent platform interfaces; segments user data by geographic location through web and mobile analytics; serves Illinois traffic through a content-delivery network with an edge node located in the Chicago/ORD region; and sends transactional communications, account confirmations, and feature announcements to Illinois users.

26. ElevenLabs could restrict its services so they could not be accessed in Illinois; it has chosen not to do so. ElevenLabs is therefore aware that it does business with Illinois residents, derives substantial revenue from Illinois subscribers, and delivers AI-generated voice outputs into Illinois on a continuous basis.

27. Plaintiffs' claims arise out of and relate to ElevenLabs' Illinois-directed conduct under both the relating-to standard of *Ford Motor Co.*, 592 U.S. at 362–66, and the effects test of *Calder v. Jones*, 465 U.S. at 789–90. The biometric data at issue was generated in Illinois: Plaintiffs' voices were produced by Plaintiffs while they were physically present in Illinois; the audio recordings embodying those voices were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms on which Plaintiffs' name and Illinois affiliation were publicly visible at all times relevant to ElevenLabs' acquisition, as alleged in ¶ 53. ElevenLabs' acquisition of those recordings was the acquisition of identifiable Illinois-origin biometric data from identifiable Illinois speakers — not the passive receipt of an anonymized dataset assembled by a third party.

28. ElevenLabs' continuing conduct is itself Illinois-directed: ElevenLabs sells subscriptions and AI-generated voice outputs to Illinois subscribers on a continuing basis through the same foundational voice models trained on the biometric data at issue; every Illinois transaction in those products monetizes the biometric extraction that gives rise to Plaintiffs' claims. ElevenLabs' Illinois-directed contacts are not incidental to this Complaint; they are the downstream commercialization of the upstream biometric extraction that gives rise to it. The notice, disclosures, and written release that BIPA required would have been directed to Plaintiffs in Illinois. The resulting invasion of biometric privacy, the loss of control over Plaintiffs' biometric data, and the ongoing harm from ElevenLabs' possession, retention, use, and commercial exploitation of that data were and are suffered in Illinois. ElevenLabs intentionally acquired the biometric data of Illinois speakers, knew or should have known that the harm from that acquisition would be felt in Illinois, and continues to direct commercial activity into Illinois that monetizes that biometric data. The conduct is expressly aimed at Illinois within the meaning of *Calder* and *Walden*.

29. Exercising specific personal jurisdiction over ElevenLabs in this District is reasonable. Illinois has a strong and particularized interest in providing a forum for redress of the unlawful collection and commercial exploitation of biometric identifiers from voice recordings produced or recorded within its borders — an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5, and that the Illinois courts have

repeatedly enforced. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois and whose recordings were produced in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on ElevenLabs of litigating in Illinois is not undue: ElevenLabs is, on information and belief, valued at approximately $11 billion and has raised approximately $850 million in venture capital across multiple rounds; conducts intentional nationwide commerce through its platform; maintains ongoing subscription relationships with Illinois customers; and has the resources to litigate in any federal forum. ElevenLabs could reasonably anticipate being haled into Illinois courts for claims arising from its extraction and commercial exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

30. Venue is proper in this District. Under 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to Plaintiffs' claims occurred in this District: Plaintiffs reside in this District; Plaintiffs' voice recordings were created, performed, and made publicly available from this District; the biometric data ElevenLabs extracted from those recordings is District-origin biometric data; the notice, disclosures, and written release that BIPA required would have been directed to Plaintiffs in this District; and ElevenLabs' ongoing commercial exploitation of the biometric data — through subscription sales, API performance, and the delivery of AI-generated voice outputs to users in this District — is a continuing course of Illinois-directed conduct giving rise to Plaintiffs' claims in this District. Independently, under 28 U.S.C. § 1391(b)(1)

and (c)(2), ElevenLabs is deemed to reside in this District because its Illinois- and District-directed contacts, as alleged in ¶¶ 25–28, are sufficient to subject it to personal jurisdiction in this District as if this District were a separate State.

## FACTUAL BACKGROUND

*ElevenLabs and Its Voice Business*

31. ElevenLabs was founded in 2022 and publicly released its beta voice platform on or about January 23, 2023. ElevenLabs has raised approximately $850 million in venture capital across multiple rounds: $2 million in pre-seed funding in January 2023; $19 million at an approximate $100 million valuation in June 2023; $80 million at a $1.1 billion valuation in January 2024; $180 million at a $3.3 billion valuation in January 2025; and $500 million at an approximately $11 billion valuation in February 2026.

32. ElevenLabs has publicly reported crossing $330 million in annual recurring revenue by early 2026 and $500 million in annual recurring revenue by May 2026. The company employs approximately 600 people. ElevenLabs has stated that employees at over 75% of Fortune 500 companies use its technology. ElevenLabs has also stated that over 1 million users registered within six months of its January 2023 public launch, and that the platform has generated over 100 years of audio.

33. ElevenLabs has released multiple generations of foundational voice synthesis models: Eleven English v1; Eleven Multilingual v1 and v2 (supporting thirty-two or more languages); Eleven Flash v2 and v2.5 (low-latency models

optimized for interactive applications); Eleven Turbo v2 and v2.5 (speed-optimized for real-time applications); and Eleven v3 (announced June 2025, described by ElevenLabs as "the most expressive Text to Speech model"). Each generation represents additional training and refinement of the underlying voice models.

34. Built on these foundational models, ElevenLabs offers a full suite of commercial voice products: text-to-speech in over seventy languages; Instant Voice Cloning from as little as thirty seconds of source audio; Professional Voice Cloning that ElevenLabs describes as producing "a near-perfect clone" of the source speaker; AI Dubbing that preserves a speaker's original voice characteristics across languages; Voice Design; Conversational AI; music generation; and audiobook generation and distribution to Spotify, InAudio, and ElevenReader. Every one of these products depends on the voice characteristics its underlying foundational models acquired during training.

35. In November 2025, ElevenLabs launched the Iconic Marketplace, a consent- and licensing-based program through which the rights-holders of named celebrity voices — including living celebrities such as Michael Caine and Matthew McConaughey, and the estates of Maya Angelou and Alan Turing — must affirmatively approve any commercial use of their voices before ElevenLabs generates audio output using them. ElevenLabs built the operational infrastructure required to identify specific speakers within its foundational voice synthesis models, track commercial use against named

rights-holders, share revenue with those rights-holders, and enforce consent at the model-output level.

36. ElevenLabs maintains a separate consent regime for platform users who upload their own voice data to ElevenLabs' platform; these users must accept ElevenLabs' Terms of Service before ElevenLabs processes their voice data.

37. ElevenLabs has not extended either regime or any equivalent process to the non-user training data subjects whose voice recordings were ingested without their knowledge in the development of the foundational models on which both consent regimes depend.

*Voice Synthesis Technology and the Extraction of Voiceprints*

38. A voiceprint is a computational representation of the acoustic features that distinguish a person's voice. A person's voice is shaped by the specific physiology of the vocal tract, larynx, oral and nasal resonators, and respiratory system, and is further refined by speech patterns developed over a lifetime, including accent, cadence, intonation, rhythm, and articulation. These traits are biologically unique to the individual. Once extracted from a speaker's recordings, a voiceprint can be embedded in or operationalized within an AI system, enabling the system to generate speech that replicates the speaker's voice characteristics indefinitely.

39. AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network identifies the acoustic features that distinguish individual voices from one another —

pitch, timbre, resonance, accent, cadence, articulation, and dynamics of emotional expression — and encodes those features as mathematical representations stored in the parameters of the trained model. The same parameters are then used to generate new speech that exhibits the acoustic features the model learned during training.

40. The training process necessarily extracts and operationalizes speaker-specific representations from the input recordings. Whether those representations take the form of explicit speaker embeddings extracted from each training recording, learned speaker-encoder networks that generate speaker representations on demand, latent speaker spaces encoded across the training corpus, or speaker information distributed across model parameters, the pipeline extracts and operationalizes the speaker-distinguishing biometric features of the voices it ingests, in a form the AI system uses to distinguish, model, and replicate individual voices.

41. BIPA defines "biometric identifier" to include a "voiceprint" and defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. The speaker representations ElevenLabs extracts during training, and any representations operationalized through ElevenLabs' models that encode the speaker-distinguishing acoustic features of individual speakers, fall within BIPA's scope — whether classified as voiceprints, as biometric information derived from

voiceprints, or as both. The label the technology industry uses does not determine the statutory classification. The function of the data does.

42. ElevenLabs' documentation confirms that its voice processing performs this extraction. ElevenLabs' CCPA Notice at Collection states that its "proprietary, AI-based technologies analyze your speech characteristics to formulate a distinct voice model of your vocal traits." ElevenLabs' Professional Voice Cloning documentation describes the cloning process as "highly accurate in cloning the samples used for its training" and as creating "a near-perfect clone of what it hears, including all the intricacies and characteristics of that voice." ElevenLabs' Privacy Policy acknowledges that "applicable law may define [users'] Voice Data as biometric data," and its EU–US Data Privacy Framework Policy states that "voice data ... may comprise biometric data under applicable data protection laws."[1]

43. A commercial customer of ElevenLabs has independently characterized the voice processing ElevenLabs performs as biometric. I-CAR, a commercial customer of ElevenLabs with a privacy-compliance interest in classifying its operations, has published a Biometric Technology Policy describing the voice processing performed through ElevenLabs' technology as follows: "The voiceprint is captured using existing recordings of a voice. Once

[1] ElevenLabs CCPA Notice at Collection, https://elevenlabs.io/ccpa-notice-at-collection (last visited on May 11, 2026; Professional Voice Cloning, ElevenLabs Documentation, https://elevenlabs.io/docs/eleven-creative/voices/voice-cloning/professional-voice-cloning (last visited on May 11, 2026); ElevenLabs Privacy Policy, https://elevenlabs.io/privacy-policy (last visited on May 11, 2026); ElevenLabs EU-US Data Privacy Framework Policy, https://elevenlabs.io/eu-us-data-privacy-framework-policy (last visited on May 11, 2026).

the recording is uploaded, speech synthesis artificial intelligence will create or replicate a voice using a mathematical algorithm." I-CAR identified the process as involving "biometric technology" and used the statutory term "voiceprint."[2]

44. The biometric processing ElevenLabs performs during foundational-model training is, on information and belief, the same category of processing it performs in its consumer-facing voice cloning features — Instant Voice Cloning and Professional Voice Cloning.

45. This belief is grounded in three independent sources. *First*, the architecture of modern multi-speaker neural text-to-speech systems, such as those operated by ElevenLabs, necessarily involves the extraction and operationalization of speaker-distinguishing features at training time. The training pipeline is where voiceprints and biometric information are first extracted at the largest scale and from the broadest set of voice recordings; the consumer-facing cloning features are applications of the capabilities it created.

46. *Second*, ElevenLabs' documentation describes the biometric processing it performs in language that is equally applicable to training and to cloning, as quoted at ¶ 42.

47. *Third*, in prior litigation against ElevenLabs, two professional voice actors alleged precisely this equivalence: that ElevenLabs created two of its default synthetic voices, "Bella" and "Adam," by training on the plaintiffs'

[2] I-CAR, Policy on Biometric Technology, https://info.i-car.com/about-us/governance/policies/biometric-technology (last visited on May 11, 2026).

audiobook narrations. *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024).

*ElevenLabs' Training Data and the Common Bases*
*for the Inference That Plaintiffs' Recordings Were Used*

48. Plaintiffs have identified no public model card, data sheet, training data manifest, transparency report, or other public disclosure from ElevenLabs that identifies the sources, scale, or provenance of the voice data used to train its foundational voice synthesis models.

49. ElevenLabs' silence about its voice training data is made all the more conspicuous by its treatment of its music model. In August 2025, ElevenLabs launched Eleven Music and explicitly stated that its music model was "trained on licensed data and suitable for commercial use," and announced partnerships with Merlin and Kobalt for licensed music content. ElevenLabs has made no equivalent representation about licensed sourcing for its foundational voice synthesis models, on which its primary commercial products are built.

50. No public mechanism exists for individuals whose voices were ingested into ElevenLabs' training data without their knowledge to discover whether their voices were used, opt out of, or seek removal of their biometric data from ElevenLabs' training datasets, foundational models, or downstream commercial products. ElevenLabs has not made any such mechanism available to Plaintiffs or, on information and belief, to any other non-user training-data subject.

51. On information and belief, ElevenLabs sourced a substantial portion of the audio used to train its foundational voice synthesis models by accessing publicly distributed long-form audio recordings of identifiable individual speakers on third-party platforms. The *Vacker* allegations, for example, describe ElevenLabs' sourcing of unconsented audiobook narrations from publicly distributed audio.

52. On information and belief, additional categories of publicly distributed audio — including podcasts, broadcast journalism, audio drama, and other narrative voice content distributed through major hosting and discovery platforms — were similarly used. ElevenLabs' data acquisition for foundational voice-model training was not limited to pre-packaged, third-party, anonymized datasets. The specific platforms, scraping or licensing methods, and dataset compositions used by ElevenLabs are within ElevenLabs' exclusive possession and control.

53. The platforms on which Plaintiffs' recordings are available — including Apple Podcasts, Spotify, Audible, iHeartRadio, Amazon Music, YouTube, Google Play Books (until that service shut down in 2024), Libro.fm, Stitcher, and the WBEZ/NPR, Media Burn, and NBC Chicago digital archives, among others — host creator profiles, channel and artist descriptions, and content metadata that publicly identify the creator's name and, in many cases, the creator's geographic affiliation. With respect to Plaintiffs specifically, the platforms on which Plaintiffs' recordings are available displayed Plaintiffs'

Case 1:26-cv-05437 Document #: 24-1 Filed: 07/21/26 Page 24 of 194 PageID #:2456

identities by name and publicly identified the recordings' association with Illinois at all times relevant to ElevenLabs' alleged data acquisition.

54. On information and belief, Plaintiffs' voice recordings were among the audio ElevenLabs used to train its foundational voice synthesis models. Voiceprints and biometric information derived from Plaintiffs' vocal performances are embedded in or operationalized through those models. The specific facts confirming whether and when any individual Plaintiff's recordings entered ElevenLabs' training pipeline — including ElevenLabs' training-data manifests, source-platform records, and model-internal provenance records — are within ElevenLabs' exclusive possession and control. Plaintiffs allege these facts on information and belief based on the following six common bases, each of which applies to every Plaintiff:

(a) *Technical scale.* As alleged in ¶¶ 38–47, foundational multi-speaker voice synthesis models of the type ElevenLabs commercially offers are built by extracting speaker-specific representations from input audio recordings — the same category of biometric processing ElevenLabs describes in its Privacy Policy and CCPA Notice as analyzing "speech characteristics to formulate a distinct voice model of [the speaker's] vocal traits." On information and belief, the production of voice models with the multilingual range and commercial quality ElevenLabs offers — generating speech in over seventy languages and used, ElevenLabs reports, by employees at over seventy-five percent of Fortune 500 companies — required ingestion of large volumes of long-form, single-speaker audio featuring identifiable individual speakers.

(b) *Plaintiffs' voice content matches the training-data profile.* Each Plaintiff's voice work matches several material dimensions of the audio that has been alleged in prior litigation against ElevenLabs to be training material for ElevenLabs' foundational voice models: a single, consistent speaker across long-form recordings; professionally produced studio-quality audio; many hours of content across broadcasts, podcast episodes, interviews, narrations, and other recorded vocal performances, providing the volume and consistency ElevenLabs' documentation identifies as optimal for voice model training; public accessibility on major distribution platforms; and professional recognition that would render the work a high-value and readily identifiable source of training audio.

(c) *Public availability through ingested channels.* Each Plaintiff's voice work has been continuously publicly available, through one or more of the categories of platforms that have been alleged in *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), as sources from which ElevenLabs is alleged to have acquired audio recordings for use in training its foundational voice models, for periods preceding ElevenLabs' January 2023 public launch and continuing thereafter, with publicly visible metadata identifying each Plaintiff by name and identifying the geographic origin of the content as Illinois.

(d) *ElevenLabs' acquisition practices.* As alleged in ¶ 51, ElevenLabs' data acquisition for foundational voice-model training included ingesting publicly distributed long-form audio recordings of identifiable speakers.

ElevenLabs' subsequent conduct — the rapid deployment of verification-based safeguards within days of its January 2023 public launch, the *Vacker* settlement, and the November 2025 launch of the Iconic Marketplace as a consent-based licensing framework for celebrities — reflects the company's recognition that its training-data acquisition practices lacked consent infrastructure for ordinary speakers whose recordings were used to train its foundational models.

(e) *Non-disclosure.* As alleged in ¶ 48, ElevenLabs has not published any model card, data sheet, training-data manifest, or transparency report disclosing the sources, scale, or provenance of the voice data used to train its foundational voice synthesis models. The identities of the speakers whose voices were ingested, the categories of sources from which those recordings were obtained, and the technical parameters of the ingestion pipeline are facts within ElevenLabs' exclusive possession and control.

(f) *Identifiably Illinois-origin material.* ElevenLabs' acquisition of Plaintiffs' recordings involved content that was identifiably Illinois-produced and that, as alleged in ¶¶ 53, 61, was publicly affiliated with Illinois at the time of acquisition. The resulting voiceprints are commercially exploited in connection with ongoing business conducted in Illinois. The Illinois affiliation of each Plaintiff and each Plaintiff's recordings was knowable to ElevenLabs from publicly visible platform metadata at the time of acquisition and remains knowable today.

*ElevenLabs' Privacy Practices and BIPA Non-Compliance*

55. ElevenLabs' privacy disclosures are directed at users of its platform. By their terms and operation, those disclosures do not provide, and cannot provide, notice or consent for non-users like Plaintiffs, whose voices were ingested from third-party sources without any direct interaction with ElevenLabs.

56. ElevenLabs' Privacy Policy uses hedging language regarding biometric data, stating that "applicable law may define [users'] Voice Data as biometric data." This language reflects ElevenLabs' acknowledgment that its voice processing may implicate biometric privacy law, including BIPA. ElevenLabs proceeded with the alleged collection and processing of voice data notwithstanding that acknowledgment, and without implementing the notice, consent, retention-policy, and other compliance measures BIPA requires.

57. ElevenLabs' Privacy Policy is, in any event, facially inapplicable to Plaintiffs. ElevenLabs' biometric retention provision states: "We will retain your biometric data until it is no longer needed for the purposes in which it was collected, or after 3 years of the termination of our relationship with you, whichever is sooner." This provision is facially inapplicable to Plaintiffs, who had no "relationship" with ElevenLabs to terminate. No retention or destruction policy applicable to non-user training-data subjects has been publicly identified. ElevenLabs' consent mechanism for platform users consists of general Terms of Service acceptance and does not provide the specific notice of purpose, duration, and biometric-data implications, or the informed written

Case: 1:26-cv-05437 Document #: 1 Filed: 05/11/26 Page 28 of 94 PageID #:28

release, that BIPA § 15(b) requires. With respect to Plaintiffs specifically, no consent of any kind was obtained.

58. ElevenLabs' Terms of Service claim "perpetual, irrevocable, royalty-free, worldwide" rights to models derived from voice data, including after deletion of the underlying source recordings. The biometric characteristics extracted from voice recordings during model training are, on information and belief, embedded in or operationalized through model parameters and persist in ElevenLabs' commercial models notwithstanding any deletion of the underlying source recordings. ElevenLabs has not publicly identified any process for the destruction of biometric data embedded in or derived from its trained models.

59. ElevenLabs' Terms of Service further grant ElevenLabs a sublicensable license to user-submitted Voice Data "through multiple tiers" of recipients, permitting dissemination to other recipients without specific consent or contractual safeguards.

60. Voice Cloning workflows are excluded from ElevenLabs' Zero Retention Mode, which is, in any event, available only to Enterprise-tier customers.

*The Biometric Data Was Generated in Illinois*

61. The voice recordings from which ElevenLabs is alleged to have extracted Plaintiffs' voiceprints are of Illinois origin in every material respect. Plaintiffs' voices were produced by Plaintiffs while they were physically present in Illinois. The recordings embodying those voices were created in Illinois and published from Illinois to publicly accessible platforms on which Plaintiffs'

name and Illinois affiliation were publicly visible at the time of ElevenLabs' acquisition. The biometric data ElevenLabs extracted from those recordings is, accordingly, Illinois-origin biometric data, regardless of where any subsequent computational processing occurred.

*BIPA's Duty Runs to the Subject of the Biometric Data*

62. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois, as alleged in ¶ 61.

63. ElevenLabs' continuing possession of voiceprints and biometric information generated in Illinois likewise runs afoul of obligations BIPA imposes for the benefit of the subjects of that data. ElevenLabs has not made publicly available a written retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from non-user training-data sources, as alleged in ¶¶ 50, 57, and has provided no mechanism by which Plaintiffs or any other non-user training-data subject may seek

removal or destruction of their biometric data, as alleged in ¶ 50. ElevenLabs' commercial agreements assert perpetual rights over voice data and over models derived from voice data, as alleged in ¶ 58, with the consequence that the biometric data of Illinois-origin training subjects is, on information and belief, retained indefinitely. These continuing failures are owed to Illinois subjects whose biometric data was generated in Illinois.

*Commercial Substitution and the Integrated Commercial Chain*

64. ElevenLabs' voice synthesis products directly serve or threaten the professional markets in which Plaintiffs and Class members earn their livelihoods, including audiobook narration, voice acting, podcast hosting and narration, film and television dubbing, advertising voiceover, broadcast and audio journalism, and other markets for professional voice work. The voice quality, expressiveness, speaker similarity, and multilingual capability that ElevenLabs sells through its subscription tiers, API and developer products, Iconic Marketplace transactions, audiobook generation products, Conversational AI and voice agent products, and AI Dubbing and Voice Design products are not separable from the voiceprints extracted during training; they are the commercial expression of those voiceprints. At this point, the biometric data and the product are the same thing.

65. ElevenLabs monetizes Plaintiffs' voiceprints and biometric information through six integrated commercial channels:

(a) *Subscription tiers.* ElevenLabs offers tiered subscription plans — free, Starter, Creator, Pro, Scale, and Enterprise — to consumers and

businesses, with Pro and higher tiers granting commercial-use rights to generated audio. Free and Growth-tier users have training data use turned on by default; opt-out requires a manual toggle and applies only prospectively.

(b) *API usage and developer integrations.* ElevenLabs charges customers per character of generated audio or per minute of generated speech through its API, with pricing tiered by voice quality and capability. Each API call generates audio whose acoustic features derive from the voiceprints encoded in ElevenLabs' foundational voice synthesis models.

(c) *The Iconic Marketplace.* As alleged in ¶ 35, ElevenLabs operates the Iconic Marketplace as a consent- and licensing-based program through which third parties pay ElevenLabs for the right to generate audio using specific licensed voiceprints, with revenue shared between ElevenLabs and the rights-holders. The Iconic Marketplace, by its operation, establishes that ElevenLabs treats voiceprints as transactable commercial assets.

(d) *Audiobook generation and distribution.* ElevenLabs offers AI-generated audiobook creation with direct distribution to Spotify, InAudio, and ElevenReader, including revenue-share arrangements with audiobook publishers and authors. Professional audiobook narration costs $250 to $400 per finished hour; a ten-hour novel costs $3,000 to $4,000 to narrate by a human professional. ElevenLabs' Pro plan, at $99 per month, can generate an entire audiobook in several hours using AI voice technology.

(e) *Conversational AI, voice agents, and enterprise contracts.* ElevenLabs offers Conversational AI and voice agent products through

Enterprise contracts that provide real-time voice synthesis for customer service, virtual assistants, telephony applications, and other enterprise use cases. Each Conversational AI session generates audio whose acoustic features derive from the foundational voice synthesis models.

(f) *AI Dubbing, Voice Design, Voice Cloning, and other downstream products.* ElevenLabs offers AI Dubbing (which preserves a speaker's original voice characteristics across languages), Voice Design (which generates new voices based on text descriptions), Instant and Professional Voice Cloning (which produce voice clones from short source-audio samples), and other commercial voice products whose commercial value is constituted by the voiceprints encoded in the underlying foundational models.

66. On information and belief, the technology ElevenLabs built using Plaintiffs' voiceprints and biometric information now directly competes with Plaintiffs in the markets in which Plaintiffs and Class members earn their livelihoods. ElevenLabs markets AI Dubbing and audiobook generation as commercial substitutes for professional audiobook narration; Conversational AI as a substitute for professional voice actors and voiceover artists; and the underlying text-to-speech and Voice Cloning capabilities as substitutes for the full range of professional voice work in which Plaintiffs and Class members are active. ElevenLabs offers these products to commercial customers at a fraction of the cost of hiring the human professionals whose unconsented recordings made the synthesis possible. Each commercial transaction in those products is

the monetization of the biometric extraction at the beginning of the commercial chain.

*Named Plaintiffs' Individual Experiences*

*Carol Marin*

67. Carol Marin is one of the most decorated broadcast journalists in American television history. Her voice-based and oral journalism work — spanning five decades of on-air television and radio reporting from Chicago — comprises broadcast investigative reporting, documentary narration, live debate moderation, in-depth interviewing, and live news anchoring. Marin's work has aired on WMAQ-TV (NBC 5 Chicago), CBS News (*60 Minutes*, *60 Minutes II*, and *CBS Evening News*), WTTW (*Chicago Tonight*), CNN, and the Discovery Channel. Her career has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, at least fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, the Sigma Delta Chi Ethics in Journalism Award, induction into the Chicago Journalism Hall of Fame, and, in 2025, the Order of Lincoln, the State of Illinois's highest civilian honor. Marin's voice-based journalism work was recorded in Illinois while she was physically present in Illinois.

68. A substantial archive of Marin's on-air broadcast journalism is publicly available through the Media Burn Archive (mediaburn.org), a Chicago-based nonprofit digital archive that preserves her broadcast investigative reporting, documentary work, and on-air interviews. Marin's work is also

Case 1:26-cv-05437 Document #: 2-1 Filed: 05/21/26 Page 34 of 104 PageID #:345

publicly accessible through the WTTW digital archive (news.wttw.com), the NBC Chicago digital archive (nbcchicago.com), and YouTube, where her Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly available. Marin's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Marin by name and identifying her work as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

69. On information and belief, Marin's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Marin's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Marin because her body of work, spanning five decades of broadcast journalism and totaling thousands of hours of single-speaker, studio-quality audio, represents an unusually high-value and readily identifiable source of long-form professional training audio of the kind ElevenLabs' foundational models require.

70. Marin has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has

never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

71. Marin has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Marin's legally protected privacy interest in her own biometric identifiers by extracting voiceprints and biometric information without notice or consent, and deprived her of the right BIPA guarantees to make an informed decision about the collection and use of her biometric data. ElevenLabs retains those voiceprints in its commercial models and continues to profit from them; Marin's biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems. Although Marin is now retired from full-time broadcast journalism, the technology ElevenLabs built using her voice now operates in the markets where her colleagues continue to work: ElevenLabs' AI Dubbing and Voice Design products are marketed to broadcast and documentary producers as commercial substitutes for the kind of broadcast investigative narration and documentary voice work Marin spent her career producing. Marin's voice has, in addition, public-record value as an instrument of journalism — a value ElevenLabs' commercial exploitation diminishes through commodification and through the dilution of authentic broadcast voice in the audio marketplace.

*Yohance Lacour*

72. Yohance Lacour is a journalist, audio storyteller, writer, playwright, and entrepreneur from the South Side of Chicago. He is the creator, host, writer, and lead reporter of the seven-part investigative podcast *You Didn't*

*See Nothin'*, which revisits the 1997 hate-crime attack on Lenard Clark, tracks down key participants in the case a quarter-century later, and examines how the case and its aftermath shaped Lacour's own life. *You Didn't See Nothin'* was awarded the 2024 Pulitzer Prize for Audio Reporting and a 2024 Peabody Award, was named among Apple Podcasts' "100 Best Podcasts of All Time," and received nominations at the Signal Podcasting Awards and four nominations at the Black Podcasting Awards. Lacour is affiliated with the Invisible Institute, the Chicago-based nonprofit investigative journalism organization through which *You Didn't See Nothin'* was produced. Lacour's voice-based journalism and podcast work, including the entirety of *You Didn't See Nothin'*, was produced in Chicago while Lacour was physically present in Illinois.

73. *You Didn't See Nothin'* is publicly available and distributed across major podcast and digital audio platforms, including Apple Podcasts, Spotify, iHeart Podcasts, YouTube, Amazon Music, and Overcast. The series has been continuously publicly available since its release, with metadata publicly identifying Lacour by name as the host and Chicago as the location of production. Lacour has appeared as a featured guest and interview subject on nationally distributed audio journalism programs discussing *You Didn't See Nothin'* and his work, including NPR's *Fresh Air* with Tonya Mosley, NPR's *All Things Considered* with Adrian Florido, the Canadian Broadcasting Corporation's *Crime Story* with Kathleen Goldhar, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast produced by Audacy's Pineapple Street

Case 1:26-cv-05437 Document #: 4-1 Filed: 05/11/26 Page 37 of 104 PageID #:3581

Studios. These interviews are publicly available across major public radio and podcast distribution platforms.

74. On information and belief, Lacour's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Lacour's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Lacour because *You Didn't See Nothin'* — awarded the 2024 Pulitzer Prize for Audio Reporting and recognized as one of the most acclaimed long-form investigative podcasts of its release year — has been continuously available across major podcast distribution platforms since its release, with metadata publicly identifying Lacour as the host and Chicago as the location of production, and with substantial public attention and critical recognition that would have rendered it a readily identifiable high-value source of training audio for a foundational voice synthesis model developer seeking long-form, narrative, single-speaker audio of the kind ElevenLabs' models depend on.

75. Lacour has never interacted with ElevenLabs. He has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. He has never been informed that ElevenLabs collected, captured, or otherwise obtained his voiceprint or any biometric information derived from his voice. He has never

consented, in writing, electronically, or otherwise, to any such collection. He was never given the opportunity.

76. Lacour has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Lacour's legally protected privacy interest in his own biometric identifiers and deprived him of the BIPA-guaranteed right to make an informed decision about the collection and use of his biometric data. The technology ElevenLabs built using Lacour's voice now operates directly in the markets where Lacour earns his living: ElevenLabs' AI-generated audiobook generation and podcast narration products, marketed by ElevenLabs as commercial substitutes for human podcast production, compete directly with the long-form investigative narrative audio journalism Lacour has spent his career developing. Lacour's distinctive voice — the instrument through which *You Didn't See Nothin'* delivered the storytelling that won the Pulitzer — is a professional asset whose commercial value ElevenLabs' unauthorized use diminishes through commodification, dilution, and the impairment of authentic-attribution premiums in the long-form narrative audio marketplace. His biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

*Alison Flowers*

77. Alison Flowers is an investigative journalist, audio producer, and audio storyteller whose voice-based and oral journalism work has been recognized with the highest honors in the field. Flowers is the founder of Spiralbound, a Chicago-based production company operating at the

intersection of investigative journalism and immersive audio storytelling. Before founding Spiralbound, Flowers served as the Head of Production at the Invisible Institute, the Chicago-based nonprofit investigative journalism organization, where she built and led journalism production teams whose work received four nominations from the Pulitzer Prize board over a four-year period. Flowers produced and reported the seven-part investigative podcast *Somebody*, which premiered on March 31, 2020, and investigated the 2016 murder of Courtney Copeland; she served as a producer, on-air journalist, and narrator alongside host Shapearl Wells. *Somebody* was a finalist for the 2021 Pulitzer Prize for Audio Reporting and received the National Magazine Award (the "Ellie") for Podcasting, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association's Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story. *Somebody* was named to *Rolling Stone*'s list of "The 25 Best True-Crime Podcasts of All Time" and topped *Rolling Stone*'s "Best Podcasts of 2020" list; was ranked first on *The New York Times*'s list of true-crime podcasts at the intersection of race; ranked second on *The Atlantic*'s "The 50 Best Podcasts of 2020"; and reached the number two position among true crime podcasts on the Apple Podcasts chart. Flowers's voice-based journalism work was produced in Chicago, including through Spiralbound, while she was physically present in Illinois.

78. *Somebody* is publicly available on Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and other major podcast platforms; until that

service shut down in 2024, *Somebody* was also publicly available on Google Podcasts. Flowers's additional voice-based reporting on *Reveal* from the Center for Investigative Reporting, *The Heist* from the Center for Public Integrity, *Vox*, *Dateline NBC*, and *Democracy Now!* is continuously available on those programs' respective platforms, including Apple Podcasts, Spotify, and other major podcast distribution services. Flowers's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Flowers by name and identifying her work as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

79. On information and belief, Flowers's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Flowers's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Flowers because *Somebody* — a 2021 Pulitzer Prize finalist that achieved unusual critical and listener recognition for long-form investigative narrative audio — has been continuously available across major podcast platforms with metadata publicly identifying Flowers as the producer-narrator and identifying the series as Chicago-produced, and because Flowers's reporting on *Reveal*, *The Heist*, *Vox*, *Dateline NBC*, and *Democracy Now!* extends the publicly available record of her single-speaker, studio-quality audio across multiple distribution platforms over a sustained period.

80. Flowers has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

81. Flowers has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Flowers's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Flowers's voice now operates directly in the markets where Flowers earns her living and operates Spiralbound: ElevenLabs' AI-generated podcast generation, audiobook generation, AI Dubbing, and Conversational AI products are marketed by ElevenLabs as commercial substitutes for the long-form investigative narrative audio production work Flowers performs both for outside clients and through Spiralbound. The technology ElevenLabs built using Flowers's voice diminishes the commercial value of Flowers's distinctive voice and of the long-form audio production Flowers's career has been devoted to. Her biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

*Robin Amer*

82. Robin Amer is a journalist, podcast creator, audio producer, and on-air host. Amer is the creator, host, narrator, and showrunner of *The City*, the critically acclaimed investigative podcast produced by USA Today; she served as on-air host and narrator for both seasons and conducted recorded interviews and field reporting throughout the series. *The City* peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New York Times*, *Quartz*, and Apple Podcasts, among other publications. Amer's contributions to the podcast *Gravy*, produced by the Southern Foodways Alliance, helped that program win the 2015 James Beard Award for Best Podcast. During three years at *The Washington Post*, Amer served as Senior Producer for Audio Features, editing enterprise and investigative audio for *Post Reports* and *Field Trip*, and was a winner or finalist for the Alfred I. duPont–Columbia University Award three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she has managed *Blood Memory*, a ten-part narrative series that won the Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction in June 2025 and was shortlisted for the Whickers Prize. Amer's voice-based and oral journalism work has been produced substantially in and from Chicago while she was physically present in Illinois; although a limited subset of her professional recordings has been created outside Illinois, the substantial majority of her voice work, and the resulting voiceprints derived from those recordings, originated from Illinois.

83. *The City* is publicly available on Apple Podcasts, Spotify, iHeartRadio, and other major podcast distribution platforms. *Gravy* is publicly available on Apple Podcasts, Spotify, and other major podcast platforms. *Post Reports* and *Field Trip* are publicly available on Apple Podcasts, Spotify, YouTube, and other major platforms. *Love + Radio: Blood Memory* is publicly available on Apple Podcasts, Spotify, Amazon Music, and other major podcast distribution platforms. Amer's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Amer by name and identifying her work substantially as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

84. On information and belief, Amer's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Amer's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Amer because her body of work as creator, host, and showrunner of *The City* — which peaked at No. 6 on the Apple Podcasts charts and won duPont-Columbia recognition — together with her contributions to *Gravy*, *Post Reports*, *Field Trip*, and *Love + Radio: Blood Memory*, comprises hundreds of hours of single-speaker, studio-quality audio publicly available across major distribution platforms for years preceding ElevenLabs' January 2023 public launch.

Case 1:26-cv-05437 Document #: 24-1 Filed: 05/11/26 Page 44 of 94 PageID #:45

85. Amer has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

86. Amer has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Amer's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Amer's voice now operates directly in the markets where Amer earns her living: ElevenLabs' AI-generated podcast generation, AI Dubbing, and Conversational AI products are marketed by ElevenLabs as commercial substitutes for the kind of long-form narrative podcast hosting, narration, and showrunning that has defined Amer's career, including in her current role as Managing Editor of *Love + Radio*. The technology ElevenLabs built using Amer's voice diminishes the commercial value of authentic human podcast hosting and narration in the markets in which Amer participates. Her biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

*Philip Rogers*

87. Philip Rogers is an established, nationally recognized broadcast journalist whose voice-based and oral journalism work spans more than four decades from Chicago. Rogers's career, conducted primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago), encompasses on-air radio reporting, on-air television reporting and anchoring, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, and major national and international events. His career has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, multiple Peter Lisagor Awards from the Chicago Headline Club, and additional Emmy Awards. Rogers's voice-based journalism work was recorded in Illinois while he was physically present in Illinois.

88. A substantial archive of Rogers's on-air broadcast journalism is publicly available on the NBC Chicago digital platform at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and is also publicly available on WBBM Newsradio's archive infrastructure and on YouTube, where his Illinois News Broadcasters Association career-retrospective interview and additional broadcast segments are publicly available. Rogers's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Rogers by name and identifying his work as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

89. On information and belief, Rogers's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Rogers's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Rogers because his more-than-four-decade on-air broadcast journalism — comprising thousands of hours of single-speaker, studio-quality audio publicly available through the NBC Chicago digital archive, WBBM Newsradio archive infrastructure, and YouTube — represents an unusually high-value and readily identifiable source of long-form professional training audio of the kind ElevenLabs' foundational models require.

90. Rogers has never interacted with ElevenLabs. He has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. He has never been informed that ElevenLabs collected, captured, or otherwise obtained his voiceprint or any biometric information derived from his voice. He has never consented, in writing, electronically, or otherwise, to any such collection. He was never given the opportunity.

91. Rogers has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Rogers's legally protected privacy interest in his own biometric identifiers and deprived him of the BIPA-guaranteed right to make an informed decision about the collection and use of

his biometric data. Although Rogers has retired from full-time broadcast journalism, the technology ElevenLabs built using his voice now operates in the markets where his colleagues continue to work: ElevenLabs' AI Dubbing, Conversational AI, and text-to-speech products are marketed by ElevenLabs as commercial substitutes for broadcast news anchoring, on-air reporting, and other live and recorded broadcast voice applications. Rogers's distinctive on-air voice, developed across four decades of broadcast journalism, retains independent professional and reputational value that ElevenLabs' commercial exploitation diminishes through commodification and dilution. His biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

*Lindsey Dorcus*

92. Lindsey Dorcus is a prolific professional audiobook narrator who has recorded over two hundred audiobooks from her professional home recording studio in Chicago. Dorcus has narrated for many of the largest and most prominent publishers in the English-language audiobook industry, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus's audiobook narration work spans numerous genres, with particular emphasis on young adult fiction, science fiction and fantasy, romance, mystery and thriller, and works featuring LGBTQ+ themes and characters. Her career has been recognized with a Society of Voice Arts and Sciences ("SOVAS") Voice Arts Award in 2020 (as part of the

full-cast ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind*) and the Independent Audiobook Award in 2021 for LGBTQ+ audiobook narration. Industry publications have published favorable reviews of her narration; *AudioFile Magazine* (now Kirkus Reviews) has described her performances as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, and Greek for main characters and narration, and New England, New York, German, Indian, and Russian for supporting characters — a range itself a professional asset reflecting years of training and practical performance experience. Dorcus also performs voice acting in fiction podcasts, performing dramatic voice work for serialized audio storytelling distributed through major podcast platforms. All of Dorcus's audiobook narration work has been recorded at studios, including her home recording studio, in Chicago, while Dorcus was physically present in Illinois.

93. Dorcus's audiobook narration is publicly available and distributed across all major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and other major audiobook retailers and subscription services; until that service shut down in 2024, Dorcus's audiobooks were also publicly available on Google Play Books. Dorcus's complete catalog of narrated titles is searchable and accessible on

Audible.com and other major audiobook platforms. Dorcus's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Dorcus by name as the narrator, for years preceding ElevenLabs' January 2023 public launch.

94. On information and belief, Dorcus's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Dorcus's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Dorcus because her audiobook catalog — exceeding two hundred commercially released narrations distributed by every major U.S. audiobook publisher — represents precisely the long-form, single-speaker, studio-quality audio that ElevenLabs' documentation identifies as optimal for voice-model training, and is continuously distributed across Audible, Libro.fm, Spotify, Apple Books, and other major platforms with metadata publicly identifying Dorcus as the narrator. The *Vacker v. Eleven Labs* allegations specifically concerned ElevenLabs' use of unconsented audiobook narrations to create default voices; Dorcus's audiobook work shares the same source category. Dorcus's accent and dialect range — twelve distinct accents across main and supporting characters — is itself a distinctive and high-value category of training material for a multilingual voice synthesis system supporting more than seventy languages.

95. Dorcus has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

96. Dorcus has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Dorcus's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Dorcus's voice now operates directly in the precise market where Dorcus earns her living: ElevenLabs offers an AI-generated audiobook generation product, with direct distribution to Spotify, InAudio, and ElevenReader, that is marketed by ElevenLabs as a commercial substitute for professional audiobook narration of exactly the kind Dorcus produces, at a small fraction of the cost. Traditional audiobook narration costs $250 to $400 per finished hour; ElevenLabs' Pro plan, at $99 per month, can generate an entire AI-narrated audiobook in several hours. Each AI-generated audiobook ElevenLabs' product distributes is, on information and belief, generated by a foundational model whose acoustic capabilities derive from voiceprints extracted during training — including, on information and belief, from Dorcus's catalog. Dorcus's biometric data was

taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems; the displacement of her professional market by the very products built on her voice represents direct, ongoing, and quantifiable economic harm.

*Victoria Nassif*

97. Victoria Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose work centers on her voice and physical performance. Nassif is a trained mezzo-soprano singer. Her audiobook narration work has been commercially released by Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Notable narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), for which Nassif served as the solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist, shortlisted for the Ursula K. Le Guin Prize and named a *Them* Best Book of the Year; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers, among others. Nassif has performed on-camera in broadcast television, including in multiple episodes of NBC's *Chicago PD* (Season 12), and has appeared in nationally broadcast commercials. Nassif possesses a professionally recognized range of accents and dialects, including

General American, British (Received Pronunciation and Cockney), Persian, Arabic (Levantine dialect), and American Southern. As a first-generation Lebanese-Palestinian American who speaks basic Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern, Arab, and Palestinian American characters and settings — a distinctive market position in the audiobook narration industry. Nassif's voice-based work was produced primarily in Illinois while she was physically present in Illinois.

98. Nassif's audiobook narration is publicly available and distributed across major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, and Libro.fm, and other major audiobook retailers and subscription services. Her on-camera work on NBC's *Chicago PD* is publicly available through NBC's broadcast distribution and digital streaming platforms. Nassif's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Nassif by name as the narrator or performer, for periods preceding ElevenLabs' January 2023 public launch and continuing thereafter.

99. On information and belief, Nassif's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Nassif's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Nassif

because her audiobook catalog — commercially released by Penguin Random House, Hachette, and Simon & Schuster — represents the long-form, single-speaker, studio-quality audio that ElevenLabs' documentation identifies as optimal for voice-model training, and because her authentic Levantine Arabic-accented narrations of works by Arab and Palestinian American authors are a distinctive and readily identifiable category of voice content particularly valuable to a multilingual voice synthesis system supporting more than seventy languages. The *Vacker v. Eleven Labs* allegations specifically concerned ElevenLabs' use of unconsented audiobook narrations to create default voices; Nassif's audiobook work shares the same source category.

100. Nassif has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

101. Nassif has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Nassif's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Nassif's voice now operates directly in the markets where Nassif earns her living and in the niche

where her distinctive market position is most acute: ElevenLabs' AI-generated audiobook generation, AI Dubbing, and multilingual text-to-speech products are marketed by ElevenLabs as commercial substitutes for human audiobook narration and multilingual voice performance, including in the Arabic-accented and Levantine narration market in which Nassif holds her distinctive professional position. The cultural and linguistic authenticity Nassif brings to her narration of works by Arab and Palestinian American authors is itself the basis of her distinctive market position; ElevenLabs' multilingual voice synthesis products purport to deliver that authenticity through synthetic means, at a fraction of the cost of hiring Nassif or other authentic-voice narrators. Her biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems; the displacement of her authentic-voice niche by AI-generated multilingual voice synthesis represents direct, ongoing, and quantifiable economic harm.

*ElevenLabs Acted Willfully and Recklessly*

102. ElevenLabs' collection, retention, commercial exploitation, and dissemination of Plaintiffs' voiceprints and biometric information without notice or consent were not the result of inadvertence or unfamiliarity with BIPA. ElevenLabs acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*ElevenLabs knew its obligations under BIPA*

103. By the time ElevenLabs publicly released its beta voice platform in January 2023, BIPA had been Illinois law for more than fourteen years and had

produced some of the largest privacy settlements in American history. Those settlements include *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747 (N.D. Cal. 2020) (approximately $650 million); *Rivera v. Google LLC*, No. 2019-CH-00990 (Cook County Cir. Ct. 2022) (approximately $100 million); and *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill. 2022) (approximately $92 million). In late 2025, Google paid $1.375 billion to the State of Texas to resolve parallel claims under Texas's biometric identifier statute, following Texas's $1.4 billion settlement with Meta in 2024 over biometric data collection. By any measure, BIPA's existence, scope, and enforcement profile were on the public record throughout the period during which ElevenLabs developed and trained the foundational voice models that power its commercial products.

104. ElevenLabs' founding team had reason to know BIPA's obligations specifically. Co-founder and Chief Technology Officer Piotr Dabkowski previously worked as a machine learning engineer at Google during the period in which Google was actively defending the BIPA litigation that would later be settled for approximately $100 million in *Rivera v. Google LLC*. On information and belief, ElevenLabs' founders were aware of BIPA's existence, its application to biometric identifiers extracted from human source material, and its enforcement history at the time ElevenLabs began ingesting voice recordings into its training pipeline.

105. Voice-AI-specific litigation sharpened the notice further. In May 2024, voice actors brought *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.

May 16, 2024), alleging that an AI voice company created and commercialized unauthorized voice clones trained on the plaintiffs' recordings. Three months later, voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), alleging that ElevenLabs created two of its default synthetic voices by training on copyrighted audiobook narrations without consent. Vacker settled on confidential terms in August 2025; the case was active on ElevenLabs' docket from August 2024 forward. ElevenLabs did not pause the training, deployment, or commercial exploitation of its foundational voice models during the pendency of Vacker. It did not publish a training-data manifest, establish a deletion mechanism for non-user training-data subjects, or extend consent infrastructure to the speakers whose recordings had already been ingested.

*ElevenLabs knew that voice training extracts biometric identifiers*

106. ElevenLabs' publicly distributed materials, quoted at ¶ 42, acknowledge that the voice data it processes is, or may be, biometric data, and describe ElevenLabs' own processing as analysis of speech characteristics to formulate a distinct voice model of the speaker's vocal traits. A company that recognizes the biometric implications of its technology in its consumer-facing privacy disclosures, that contemporaneously expands its asserted license over the same data, and that describes its own processing in those terms, cannot credibly claim ignorance that its training pipeline extracts biometric identifiers within the meaning of BIPA.

*ElevenLabs chose to apply consent selectively*

107. ElevenLabs operates three distinct consent regimes — one for celebrity rights-holders, one for platform users, and none at all for non-user training-data subjects.

108. As described in ¶ 35, ElevenLabs operates the Iconic Marketplace, a consent- and licensing-based program through which named celebrity rights-holders must affirmatively approve commercial use of their voices, and through which ElevenLabs has built and operates the infrastructure to identify specific speakers, track commercial use, share revenue, and enforce consent at the model-output level.

109. Separately, ElevenLabs operates a platform user consent regime through which users who upload their own voices to ElevenLabs' platform must accept Terms of Service before ElevenLabs processes their voice data. That regime, too, exists and operates today.

110. ElevenLabs did not extend either regime, or any equivalent process, to the working voice professionals and other speakers whose voiceprints had already been ingested into the foundational models on which the Iconic Marketplace and the platform user products both depend. The Iconic Marketplace identifies and obtains consent from celebrities ElevenLabs wishes to license, by name. The platform user regime obtains consent from users who walk through ElevenLabs' front door, by Terms of Service acceptance. The non-user training-data subjects — the population that supplied the substrate of every commercial product ElevenLabs sells — receive no notice, no opportunity

to refuse, no mechanism to discover whether their voices are in the models, no mechanism to seek removal, and no compensation. ElevenLabs built consent infrastructure for the populations it could not avoid asking, and built none for the population it preferred not to.

*ElevenLabs' post-hoc pattern of remediation confirms deliberateness*

111. Each corrective step ElevenLabs has taken in connection with its voice synthesis products was undertaken after the relevant legal or reputational risk had materialized, and none addressed the foundational consent failure that gave the company its commercial value. ElevenLabs added voice-cloning verification rules within days of its January 2023 public launch only after exposure of misuse cases. ElevenLabs settled *Vacker* only after a year of litigation; the settlement was confidential, did not identify the speakers whose recordings had been used, and did not establish any non-user mechanism for identification or removal of biometric data. ElevenLabs made the "trained on licensed data and suitable for commercial use" representation for its Eleven Music model in August 2025 — and announced partnerships with Merlin and Kobalt for licensed music content — while making no equivalent representation for its foundational voice models, which were already deployed, monetized, and generating recurring revenue. ElevenLabs launched the Iconic Marketplace in November 2025 only after the rights-of-publicity risk for celebrity voices had become acute.

112. Each step was a downstream patch on an upstream conduct that ElevenLabs continued to engage in without remediation. ElevenLabs collected,

retained, and commercially exploited the biometric voiceprints of working voice professionals while operating in a legal environment in which the unlawfulness of that conduct in Illinois was settled, publicized, pleaded directly against ElevenLabs in *Vacker*, and acknowledged in ElevenLabs' corporate disclosures. ElevenLabs' core voice synthesis models were trained on voiceprints extracted from speakers who never knew, never consented, and were never given any meaningful opportunity to refuse. Those voiceprints remain in those models today. ElevenLabs chose speed and scale over compliance and built a company currently valued at approximately $11 billion on that choice. That was not an oversight. It was a business decision. Plaintiffs are accordingly entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1).

## CLASS ACTION ALLEGATIONS

113. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings ElevenLabs extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of ElevenLabs' foundational voice synthesis models, during the Class Period.

114. The Class Period runs from the earlier of (a) the date ElevenLabs first ingested any voice recording into the training pipeline for any of its foundational voice synthesis models, or (b) January 1, 2022, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period. ElevenLabs was founded in 2022 and publicly released its beta voice platform on or about January 23, 2023; on information and belief, the foundational voice models that power ElevenLabs' current commercial products — including but not limited to Eleven English v1, Eleven Multilingual v1 and v2, Eleven Flash v2 and v2.5, Eleven Turbo v2 and v2.5, and Eleven v3 — were developed by ingesting voice recordings during this period and continuing thereafter.

115. Excluded from the Class are: (i) ElevenLabs and its parents, subsidiaries, affiliates, and controlled entities; (ii) the officers, directors, employees, agents, and counsel of ElevenLabs; (iii) the Court, the Court's staff, and any jurors assigned to this action; (iv) the immediate family members of the Court, the Court's staff, and the officers, directors, and controlling persons of ElevenLabs; (v) any individual whose voice is included in ElevenLabs' Iconic Marketplace pursuant to a written licensing agreement, but only with respect to the voice recordings covered by that agreement; (vi) any individual who executed a written release authorizing the alleged collection that complies with 740 ILCS 14/15(b); (vii) any individual who registered for an ElevenLabs account, accepted ElevenLabs' Terms of Service, and affirmatively consented to the use of their submitted voice data for training purposes, but only with

respect to the voice data so submitted and so consented to; and (viii) any individual who has previously released their claims against ElevenLabs through a final, non-appealable judgment or a written settlement agreement.

116. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

117. *Ascertainability*. Class membership is defined by objective criteria and can be determined from records that exist or will be produced in discovery. Whether a particular voice recording entered ElevenLabs' training pipeline is a binary factual question — the recording is either in the pipeline's ingestion logs or it is not — and the records that answer it are within ElevenLabs' exclusive control. ElevenLabs' November 2025 launch of the Iconic Marketplace, in which ElevenLabs licenses specific named voices on behalf of identified rights-holders, demonstrates that ElevenLabs maintains the infrastructure to identify the specific speakers whose vocal characteristics are encoded in the foundational voice models that power the Iconic Marketplace itself. The same categories of pipeline metadata — training-data manifests, ingestion logs, source-URL records, dataset-version records, voice-model fine-tuning records, and associated speaker- and file-level identifiers — exist for the voice training data on which ElevenLabs built the foundational voice synthesis models identified at ¶ 33. Class membership can be further confirmed through publicly available distribution metadata for voice recordings — audiobook platform records,

podcast directory records, streaming service catalogs, and broadcast archive records — through speaker-identification technology applied to ElevenLabs' training corpus, and through voice-matching analysis comparing ElevenLabs' voice model outputs against publicly available recordings of Class members.

118. *Numerosity*. Joinder of all members of the Class is impracticable. Fed. R. Civ. P. 23(a)(1). ElevenLabs has publicly disclosed that its platform has generated over 100 years of audio output, that employees at over seventy-five percent of Fortune 500 companies use its technology, and that its commercial models support speech generation in over seventy languages. Building voice synthesis models of that scale, quality, and multilingual range required ingestion of a correspondingly large volume of long-form, single-speaker voice training data, drawn from a correspondingly large population of distinct speakers.

119. On information and belief, ElevenLabs' training data includes voice recordings from hundreds of thousands of distinct individual speakers. The Class — limited to natural persons whose voice recordings were produced or recorded in Illinois — includes not only the professional broadcast journalists, audiobook narrators, podcasters, voice actors, voiceover artists, and other voice professionals who have produced work in Illinois during the Class Period — themselves a population numbering in the thousands — but also the interviewees, guests, panelists, witnesses, callers, public officials, and other persons whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, archival, and other publicly distributed audio

Case 1:26-cv-05437 Document #: 4-1 Filed: 05/21/26 Page 455 of 940 PageID #:607

content, and whose recordings are accessible on the publicly distributed audio platforms from which, on information and belief, ElevenLabs sourced training data. On information and belief, the Illinois Class population numbers in the hundreds of thousands or more. The exact number is within ElevenLabs' exclusive control and will be established through discovery.

120. *Commonality*. Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). ElevenLabs did not engage in any individualized notice, consent, retention-policy disclosure, release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into ElevenLabs' foundational voice training pipelines. ElevenLabs' conduct was uniform: the same training pipelines ingested the same categories of publicly distributed voice recordings under the same absent-consent posture, applied to all Class members through the same automated and standardized process. The questions whether ElevenLabs complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and protection requirements before and after extracting Class members' voiceprints can be answered classwide because ElevenLabs' compliance, or noncompliance, was identical as to every Class member.

121. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics that ElevenLabs extracts during voice-model training — including speaker embeddings, voice-model parameters that encode speaker-specific acoustic features, and the "distinct voice model of [the speaker's] vocal traits" described

in ElevenLabs' own CCPA Notice at Collection — constitute "voiceprints" or "biometric information" within the meaning of 740 ILCS 14/10;

(b) whether ElevenLabs informed Class members in writing that their biometric identifiers or biometric information were being collected, informed them of the specific purpose and length of term of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c) whether ElevenLabs developed and made publicly available a written retention and destruction policy applicable to the voiceprints and biometric information of non-user training-data subjects, as 740 ILCS 14/15(a) requires;

(d) whether ElevenLabs sold, leased, traded, or otherwise profited from Class members' biometric identifiers in violation of 740 ILCS 14/15(c), including through subscription tiers, API and developer integrations, the Iconic Marketplace, and the integrated commercial chain through which ElevenLabs' foundational voice models are monetized;

(e) whether ElevenLabs disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers to third parties — including through cloud-infrastructure providers, machine-learning pipeline processors, EU–US Data Privacy Framework recipients in the United States, the Netherlands, and Singapore, and the sub-licensable transfers contemplated by ElevenLabs' Terms of Service — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether ElevenLabs stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care within ElevenLabs' industry, as 740 ILCS 14/15(e)(1) requires;

(g) whether ElevenLabs stored, transmitted, and protected Class members' biometric identifiers in a manner that is the same as or more protective than the manner in which ElevenLabs stores, transmits, and protects other confidential and sensitive information — including the audio data of Enterprise customers protected under ElevenLabs' Zero Retention Mode — as 740 ILCS 14/15(e)(2) requires;

(h) whether ElevenLabs' conduct was intentional, willful, reckless, or negligent within the meaning of 740 ILCS 14/20, 765 ILCS 1075/55, and 815 ILCS 505/10a;

(i) whether ElevenLabs used Class members' voices and identities for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a);

(j) whether ElevenLabs' commercial voice products generate, distribute, or make available sound recordings containing "unauthorized digital replicas" of Class members' voices on or after January 1, 2025, and whether ElevenLabs materially contributes to or facilitates such distribution, in violation of 765 ILCS 1075/30 as amended by P.A. 103-836;

(k) whether ElevenLabs' conduct is "unfair" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/2, under the framework of *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002);

(l) whether ElevenLabs' privacy disclosures, and its material omissions regarding training-data provenance, constitute deceptive practices within the meaning of 815 ILCS 505/2;

(m) whether ElevenLabs' conduct causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of voice content generated by ElevenLabs' commercial voice products, in violation of 815 ILCS 510/2(a)(2), and likelihood of confusion or misunderstanding as to affiliation, connection, or association, in violation of 815 ILCS 510/2(a)(3);

(n) whether ElevenLabs was unjustly enriched by its unauthorized use of Class members' voice data, voiceprints, and biometric information; and

(o) the appropriate measures of damages, restitution, disgorgement, and injunctive relief, including the model-destruction and retraining remedies sought in the Prayer for Relief.

122. *Typicality*. The claims of the named Plaintiffs are typical of the claims of the Class. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, and related professional voice work, recorded in Chicago studios, broadcast facilities, and home recording studios in this District. ElevenLabs, on information and belief, ingested those recordings into the training pipelines for its foundational voice synthesis models and extracted voiceprints from them without notice, consent, or written release. The

voiceprints are now embedded in or operationalized through ElevenLabs' commercial voice models identified at ¶ 33 — and reproduced in the audio that those models generate when invoked through ElevenLabs' text-to-speech, Voice Cloning, AI Dubbing, Conversational AI, and Voice Design products.

123. The legal theories asserted on behalf of the Class — that ElevenLabs' extraction, retention, profiting from, dissemination, and inadequate protection of voiceprints violate BIPA; that ElevenLabs' commercial use of voices and identities without prior written consent violates IRPA; that ElevenLabs' unfair and deceptive practices violate ICFA; that ElevenLabs' conduct causes confusion in violation of IUDTPA; and that ElevenLabs has been unjustly enriched at the expense of Class members — apply equally to the named Plaintiffs and to every Class member.

124. *Adequacy*. The named Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). The named Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the Class. The named Plaintiffs have no conflicts of interest with the Class. The named Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

125. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because ElevenLabs has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Fed. R. Civ. P. 23(b)(2). ElevenLabs'

training pipelines operated uniformly across every Class member's voice recordings; ElevenLabs' failure to obtain BIPA-compliant consent was uniform; ElevenLabs' failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; ElevenLabs' failure to apply biometric-specific protection commensurate with the Zero Retention Mode regime it offers to Enterprise customers was uniform; and ElevenLabs' continuing possession and commercial exploitation of Class members' voiceprints — through subscriptions, the API, the Iconic Marketplace, and the integrated commercial chain alleged in the Factual Background — is uniform. Plaintiffs seek classwide injunctive relief under 740 ILCS 14/20, 815 ILCS 510/3 (IUDTPA, which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining of the foundational voice synthesis models in which Class members' voiceprints are encoded — that necessarily applies on the same terms to every Class member.

126. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate for the Class on the damages and restitutionary claims asserted in this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

127. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. Whether ElevenLabs'

voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer, grounded in ElevenLabs' own descriptions of its processing as quoted at ¶ 42. Whether ElevenLabs complied with BIPA's notice, consent, retention, profiting, dissemination, and protection requirements is a common legal question with a common answer — ElevenLabs did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. Whether ElevenLabs' conduct was willful or reckless turns on ElevenLabs' institutional knowledge, decision-making, and conduct, all of which are common to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from ElevenLabs' own records, including the training-data manifests, ingestion logs, source-URL records, and dataset-version records in ElevenLabs' exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

128. *Superiority*. A class action is the superior method for adjudicating these claims.

(a) *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover artists — and incidental speakers whose voiceprints were extracted without

their knowledge. Many Class members are unaware their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against a privately held technology company of the scale described at ¶ 31. Statutory damages amounts that are meaningful in the aggregate are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

(b) *Existing related litigation*. Plaintiffs are unaware of any other action asserting these claims against ElevenLabs on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train ElevenLabs' foundational voice synthesis models. *Vacker v. Eleven Labs, Inc.*, settled on confidential terms in August 2025 without classwide adjudication of the conduct, without classwide adjudication of any remedy, and without any public mechanism through which other non-user training-data subjects could obtain identification or removal of biometric data extracted from their recordings. The continued absence of any classwide adjudication of ElevenLabs' training-data conduct as it relates to Illinois biometric privacy law makes a class action in this forum particularly appropriate.

(c) *Desirability of concentration in this forum*. Concentration of this litigation in this District is appropriate. Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes — BIPA, IRPA, ICFA, and IUDTPA — that the Illinois General Assembly enacted to protect the biometric, identity, and consumer interests of persons in

Illinois. The injuries were and are suffered in Illinois. ElevenLabs conducts substantial commercial business in Illinois, including through subscription, API, and enterprise licensing of its voice AI products to Illinois-based customers and Illinois-headquartered Fortune 500 companies, as alleged in the Jurisdiction and Venue section. This Court is well-suited to adjudicate BIPA and other Illinois statutory claims arising from ElevenLabs' commercial conduct in Illinois.

(d) *Manageability*. The case is manageable as a class action. ElevenLabs' conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from ElevenLabs' records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

129. To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by ElevenLabs' concealment of its training-data sources, by its failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that ElevenLabs had ingested their recordings into its training pipelines, and by the continuing nature of ElevenLabs' violations.

Case 1:26-cv-05437 Document #: 2-1 Filed: 05/11/26 Page 72 of 140 PageID #:72

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

130. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

131. Plaintiffs bring this Count individually and on behalf of the Class.

132. BIPA defines "biometric identifier" to include a "voiceprint," and defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first (i) informs the subject in writing that a biometric identifier or biometric information is being collected or stored, (ii) informs the subject in writing of the specific purpose and length of term for which the biometric identifier or biometric information is being collected, stored, and used, and (iii) receives a written release executed by the subject. 740 ILCS 14/15(b).

133. ElevenLabs is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

134. ElevenLabs collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class

members by ingesting their voice recordings into its training pipeline and extracting from those recordings computational representations capable of identifying the speakers, as alleged in detail in the Factual Background. The resulting representations — speaker embeddings, voice-model parameters that encode speaker-specific acoustic features, and the "distinct voice model of [the speaker's] vocal traits" described in ElevenLabs' CCPA Notice at Collection — are voiceprints and biometric information within the meaning of BIPA.

135. ElevenLabs did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored; did not inform any of them in writing of the specific purpose or length of term of collection, storage, and use; and did not receive a written release executed by any of them. ElevenLabs obtained no consent of any kind, in any form, from any Plaintiff or Class member.

136. ElevenLabs' violations of § 15(b) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

137. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

## Count II

## Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)

*Brought on behalf of the Class*

138. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

139. Plaintiffs bring this Count individually and on behalf of the Class.

140. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied, or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with ElevenLabs in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers and biometric information be destroyed when the initial purpose for their collection has been satisfied.

141. ElevenLabs has been, and remains, in possession of voiceprints and biometric information extracted from the voice recordings of Plaintiffs and Class members.

142. ElevenLabs has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training-data subjects and embedded in

or operationalized through the parameters of ElevenLabs' foundational voice synthesis models, as alleged in the Factual Background. ElevenLabs' published privacy policy ties biometric data retention to "the termination of our relationship with you," a provision facially inapplicable to Plaintiffs, who had no "relationship" with ElevenLabs to terminate. ElevenLabs has not made any other retention or destruction policy applicable to non-user training-data subjects publicly available, and has not provided any mechanism by which Plaintiffs or other non-user training-data subjects may seek access to, correction of, or removal of their biometric data.

143. ElevenLabs' Terms of Service assert perpetual, irrevocable, royalty-free, worldwide rights to models derived from voice data, including after deletion of the underlying source recordings. As alleged at ¶ 58, the biometric characteristics extracted during training persist in the parameters of ElevenLabs' commercial models notwithstanding any deletion of the underlying recordings. ElevenLabs has not publicly identified any process for the destruction of biometric data encoded in or operationalized through those models.

144. ElevenLabs' violations of § 15(a) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

145. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

146. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

147. Plaintiffs bring this Count individually and on behalf of the Class.

148. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

149. ElevenLabs has sold, leased, traded, and otherwise profited from the voiceprints and biometric information of Plaintiffs and Class members through the integrated commercial chain alleged in the Factual Background. The commercial value of ElevenLabs' subscription tiers, API and developer offerings, Iconic Marketplace licensing transactions, audiobook generation and distribution products, Conversational AI and voice agent enterprise contracts, and AI dubbing and Voice Design products is constituted by the voiceprints and biometric information encoded in or operationalized through ElevenLabs' foundational voice synthesis models. The voice quality, expressiveness, speaker similarity, and multilingual capability that ElevenLabs sells through these

channels exists because of the voiceprints and biometric information extracted during training.

150. ElevenLabs' Professional Voice Cloning documentation describes the cloning process as creating "a near-perfect clone of what it hears, including all the intricacies and characteristics of [the] voice." The "intricacies and characteristics" that ElevenLabs' commercial products reproduce are the biometric features ElevenLabs extracted during training. The voiceprint is not a backstage input to ElevenLabs' product line; it is the product. At this point, the biometric data and the product are the same thing.

151. ElevenLabs' November 2025 launch of the Iconic Marketplace confirms ElevenLabs' treatment of voiceprints as transactable commercial assets. The Iconic Marketplace, by its operation, sells third parties the right to generate audio using the voiceprints of named rights-holders, in exchange for consideration shared between ElevenLabs and the rights-holder. Plaintiffs' voiceprints sit inside the same foundational voice synthesis models that power the Iconic Marketplace, and ElevenLabs profits from those models in the same way it profits from the Iconic Marketplace — through the sale of voice synthesis capability whose value is constituted by the voiceprints encoded in the underlying models. No enumerated exception under § 15(c) applies.

152. ElevenLabs' violations of § 15(c) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

153. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

Case 1:26-cv-05437 Document #: 4-1 Filed: 05/11/26 Page 78 of 104 PageID #:822

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

154. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

155. Plaintiffs bring this Count individually and on behalf of the Class.

156. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

157. ElevenLabs has disclosed, redisclosed, and otherwise disseminated voiceprints and biometric information derived from Plaintiffs' and Class members' voice recordings in three categories of conduct, each independently sufficient to violate § 15(d), and as alleged in the Factual Background.

158. *First*, ElevenLabs has, on information and belief, transmitted voiceprints and biometric information — encoded in or operationalized through its foundational voice synthesis models — to cloud-infrastructure providers, machine-learning pipeline processors, and other vendors and service providers that operate the training, fine-tuning, evaluation, and inference systems on which ElevenLabs' commercial products run.

159. *Second*, ElevenLabs has, on information and belief, transmitted voiceprints and biometric information across jurisdictions, including to

affiliates, vendors, and processors in the United States, the Netherlands, and Singapore, as reflected in ElevenLabs' Terms of Service and EU–US Data Privacy Framework Policy.

160. *Third*, ElevenLabs' Terms of Service grant ElevenLabs a sub-licensable license through "multiple tiers" of recipients, and ElevenLabs has, on information and belief, exercised that sub-licensing authority in connection with Enterprise on-premises model deployments, fine-tuning and customization arrangements, and API integration arrangements through which the encoded biometric characteristics of Plaintiffs and Class members are transmitted to recipients outside ElevenLabs' direct control.

161. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

162. ElevenLabs' violations of § 15(d) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

163. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

164. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

165. Plaintiffs bring this Count individually and on behalf of the Class.

166. Section 15(e) of BIPA imposes two independent and conjunctive obligations on a private entity in possession of biometric identifiers or biometric information. *First*, the entity must store, transmit, and protect biometric identifiers and biometric information from disclosure using the reasonable standard of care within the entity's industry. 740 ILCS 14/15(e)(1). *Second*, the entity must do so in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e)(2). A failure of either obligation is a violation.

167. ElevenLabs possesses voiceprints and biometric information derived from Plaintiffs' and Class members' voice recordings, embedded in or operationalized through ElevenLabs' foundational voice synthesis models, training-data caches, fine-tuning pipelines, default voice library, and inference systems, as alleged in ¶¶ 9, 40, 58.

168. The reasonable standard of care for the handling of biometric voice data within the AI voice synthesis industry and the broader industry of biometric-data handlers is reflected in established information-security and privacy frameworks, including NIST Special Publication 800-53 (controls for information systems, including asset management, access control, audit and accountability, and information handling), NIST Special Publication 800-63B (digital identity guidelines applicable to the handling of biometric template data), ISO/IEC 27001 (information-security management systems), and ISO/IEC 24745 (biometric information protection).

169. Each of these frameworks requires that an entity in possession of biometric data, at minimum, (a) maintain an inventory of the biometric data in its possession, including the identity of the data subjects to whom that data pertains; (b) implement access controls and audit-logging capabilities tied to specific data subjects; (c) apply protections against unauthorized disclosure commensurate with the sensitivity of biometric data; (d) maintain capabilities to honor data-subject rights, including access, correction, and deletion on request; and (e) impose recipient-side controls on biometric data transmitted to third parties, including contractual deletion obligations, audit rights, and provenance tracking.

170. ElevenLabs has failed to satisfy the § 15(e)(1) standard with respect to both storage and transmission of biometric data. On information and belief, and as alleged at ¶¶ 48, 50, ElevenLabs does not maintain a record identifying which voiceprints, biometric information, speaker embeddings, or model parameters in its possession derive from which individual training-data subjects; has not published any model card, data sheet, training-data manifest, or transparency report describing those subjects or the provenance of speaker-specific representations within its models; and has not implemented any opt-out, removal, or data-subject-rights process for non-users whose voice recordings may have been used in training. An entity that does not know which biometric data it possesses, which data subjects that data pertains to, or where that data resides within its systems cannot meaningfully store, transmit, or protect that data using the reasonable industry standard of care. Such an

Case 1:26-cv-05437 Document #: 4-1 Filed: 05/11/26 Page 474 of 940 PageID #:826

entity cannot apply differential access controls based on data subject; cannot generate audit trails tied to specific data subjects; cannot detect unauthorized internal access to a particular subject's biometric data; cannot respond to lawful subpoenas, deletion requests, or correction requests directed at a particular subject's data; and cannot ensure that biometric data is removed when retention obligations expire.

171. ElevenLabs has further failed the § 15(e)(1) standard with respect to the transmission of biometric data. Reasonable industry care for biometric-data transmission requires recipient-side controls — including contractual deletion obligations, audit rights, technical access restrictions, deletion-on-revocation requirements, and provenance tracking — imposed on recipients of biometric template data. On information and belief, ElevenLabs imposes none of these controls on the recipients of its models, model-derived outputs, or biometric-encoding-bearing parameters transmitted through Enterprise on-premises deployments, fine-tuning and customization arrangements, API integrations, or cross-jurisdictional data transfers. ElevenLabs' Terms of Service grant ElevenLabs a sub-licensable license through "multiple tiers" of recipients without imposing biometric-specific recipient-side obligations. Under reasonable industry standards for biometric template data, those omissions are protection failures.

172. Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally

adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

173. ElevenLabs fails the § 15(e)(2) asymmetry test. ElevenLabs offers a "Zero Retention Mode" feature for Enterprise customers' confidential audio data, under which ElevenLabs commits not to retain user-submitted audio after processing, to preserve no record of input data once a request is processed, and to remove the data from its systems continuously. Zero Retention Mode is, in substance, a heightened-protection regime for confidential and sensitive customer information that ElevenLabs has built and deploys. ElevenLabs has demonstrated the technical capability to apply such a heightened-protection regime to voice and audio data within its systems. ElevenLabs has elected, however, to limit Zero Retention Mode to Enterprise-tier customers and to exclude voice cloning workflows — which involve the processing of biometric voiceprints — from Zero Retention treatment.

174. ElevenLabs applies no comparable heightened-protection regime to the biometric data extracted from Plaintiffs' and Class members' voice recordings. Plaintiffs are not parties to ElevenLabs' commercial agreements; they have no Enterprise contract, no Zero Retention election available to them, and no contractual or technical assurance that their biometric data is treated with even the protection ElevenLabs offers to its paying customers' confidential audio inputs. ElevenLabs' decision to apply Zero Retention Mode to its Enterprise customers' confidential audio while applying no comparable protection to the biometric data of the non-user training subjects whose

voiceprints constitute the substrate of ElevenLabs' commercial products is a structural § 15(e)(2) violation. Section 15(e)(2) requires biometric data to be protected in a manner that is the same as or more protective than the manner in which the entity protects other confidential and sensitive information; ElevenLabs treats Enterprise customers' audio data as confidential and sensitive, and protects it accordingly; it does not extend that protection to Plaintiffs' biometric voice data.

175. ElevenLabs' failures under each of the theories alleged in this Count have caused, and continue to cause, concrete injury to Plaintiffs and the Class. Plaintiffs' biometric data is in ElevenLabs' possession in a state of inadequate inventory, inadequate access control, and inadequate transmission control. As a consequence, Plaintiffs cannot ascertain the disposition of their biometric data; Plaintiffs cannot exercise meaningful control over its retention, transmission, or deletion; Plaintiffs' biometric data is exposed to disclosure, transmission, and use by third parties without the biometric-specific safeguards reasonable industry care requires; and Plaintiffs bear the ongoing risk of unauthorized disclosure, replication, or commercial reuse of their irreplaceable biometric voice signatures.

176. ElevenLabs' violations of § 15(e) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

177. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

Case: 1:26-cv-05437 Document #: 4-1 Filed: 05/11/26 Page 85 of 104 PageID #:5

## Count VI

## Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.

*Brought on behalf of the Class*

178. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

179. Plaintiffs bring this Count individually and on behalf of the Class.

180. The Illinois Right of Publicity Act protects an individual's right to control commercial use of their identity. IRPA defines "identity" to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5. IRPA establishes two distinct liabilities relevant to this Count: a prohibition on the commercial use of an individual's identity without prior written consent under 765 ILCS 1075/30(a), and, as amended by P.A. 103-836 effective January 1, 2025, a prohibition on the knowing distribution, transmission, or making available of sound recordings containing "unauthorized digital replicas" of an individual's voice, together with liability for material contribution to such distribution.

181. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

182. ElevenLabs used Plaintiffs' and Class members' identities for commercial purposes within the meaning of 765 ILCS 1075/30(a). ElevenLabs

Case: 1:26-cv-04537 Document #: 24-1 Filed: 07/21/26 Page 478 of 940 PageID #:630

extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' voice recordings and used those characteristics to develop, train, and operate the commercial voice synthesis products that ElevenLabs monetizes through the integrated commercial chain alleged in the Factual Background, including its subscription tiers, API and developer offerings, Iconic Marketplace, audiobook generation and distribution products, Conversational AI and voice agent products, and AI dubbing and Voice Design products. ElevenLabs holds out its products' ability to generate realistic, expressive, and multilingual human-sounding voices — and, in the case of its Voice Cloning products, their ability to produce "a near-perfect clone ... including all the intricacies and characteristics of [the] voice" — as a core commercial feature, a capability built from the identities of the individuals whose recordings supplied the training data. ElevenLabs did not obtain prior written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

183. As amended by P.A. 103-836 effective January 1, 2025, IRPA further prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent, and imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution with actual knowledge that the other person is infringing upon an individual's rights. An "unauthorized digital replica" includes a newly created, computer-generated electronic representation of an

Case 1:26-cv-04037 Document 24-1 Filed 07/21/26 Page 479 of 940 PageID #: 8763

individual's voice fixed in a sound recording in which the individual did not actually perform.

184. ElevenLabs creates, names, catalogs, and distributes a library of default voices made available to all users of its platform. ElevenLabs' Professional Voice Cloning documentation describes the cloning process used to create such voices as producing "a near-perfect clone of what it hears, including all the intricacies and characteristics of that voice." On information and belief, one or more of the default voices distributed by ElevenLabs through its platform replicates the distinctive vocal characteristics of one or more Plaintiffs or Class members, was generated from voiceprints derived from their recordings, and was distributed without their consent. In *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), two of ElevenLabs' default voices, "Bella" and "Adam," were alleged to have been derived from unconsented audiobook narrations, establishing that ElevenLabs' default voice library has historically been built from voiceprints extracted from unconsented training data. The identification of specific default voices that replicate particular Plaintiffs requires forensic comparison and the production of ElevenLabs' internal records linking default voices to source training audio; specific identifications will be developed through discovery and supplemental pleading.

185. Independent of the default voice library, ElevenLabs operates Voice Cloning, Voice Design, Professional Voice Cloning, AI Dubbing, Conversational AI, and API products that enable users to generate, on demand, audio outputs

Case 1:26-cv-05437 Document #: 24-1 Filed: 05/11/26 Page 88 of 194 PageID #:86

replicating the voice of any individual whose recordings the user can supply. ElevenLabs' Instant Voice Cloning product produces voice clones from as little as thirty seconds of source audio. Plaintiffs' recordings are publicly available across major distribution platforms in quantities that exceed this technical threshold by orders of magnitude. On information and belief, ElevenLabs has, on or after January 1, 2025, knowingly facilitated the generation and distribution of unauthorized digital replicas of Plaintiffs' and Class members' voices by third-party users of ElevenLabs' platform, in violation of IRPA as amended.

186. ElevenLabs maintains internal records of every voice cloning, generation, and API call performed on its platform, including the audio used to seed each clone, the user who initiated each generation, and the disposition of each output. The factual basis for the on-information-and-belief allegation in ¶ 185 includes:

(a) ElevenLabs' Voice Cloning tools designed for and marketed as enabling voice replication of any speaker;

(b) ElevenLabs' user base exceeding one million registered users and over one hundred years of audio generated on the platform;

(c) Plaintiffs' publicly available recordings, comprising hundreds or thousands of hours of single-speaker, studio-quality audio readily usable as cloning source material;

(d) ElevenLabs' acknowledgment of voice cloning misuse on its platform;

(e) documented use of ElevenLabs' tools to clone the voices of public figures, including the January 2024 deployment in which an AI-generated clone of President Biden's voice, reported in multiple published sources to have been created using ElevenLabs' technology, was used in robocalls to suppress voter turnout in the New Hampshire presidential primary, resulting in a $6 million FCC forfeiture; and

(f) ElevenLabs' commercial incentive to continue offering tools that produce such outputs notwithstanding such misuse. The identification of specific third-party users who cloned the voices of Plaintiffs or Class members, the specific outputs they generated, and the recipients of such outputs are facts within ElevenLabs' exclusive possession and control.

187. ElevenLabs' provision of these tools, its operation of the platform on which they run, and its retention of the resulting outputs constitute material contribution to and facilitation of the distribution of unauthorized digital replicas within the meaning of IRPA as amended by P.A. 103-836.

188. ElevenLabs' violations of IRPA were willful and knowing, as alleged in ¶¶ 102-112. ElevenLabs' November 2025 launch of the Iconic Marketplace — a consent-based licensing framework for celebrity voices — demonstrates that ElevenLabs understood that voice-based AI products require consent from the people whose voices are used. ElevenLabs implemented consent for celebrity voices it wished to license but did not implement consent for the individuals whose voices it had already used to train its foundational models.

189. Plaintiffs and the Class have suffered and continue to suffer injury from ElevenLabs' IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harm — including the diversion of licensing value and diminished demand for authentic vocal performances — in the markets where Plaintiffs and Class members earn their livelihoods.

190. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to ElevenLabs' unauthorized use of their identities and voices, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are less than that amount, punitive damages where ElevenLabs' violations are found willful, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

## Count VII

## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

191. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

192. Plaintiffs bring this Count individually and on behalf of the Class.

193. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices … in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices reaches

conduct that, even absent affirmative misrepresentation, (i) offends Illinois public policy, (ii) is immoral, unethical, oppressive, or unscrupulous, or (iii) causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). The three factors need not all be satisfied; a sufficiently strong showing on any one may suffice.

194. ElevenLabs engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis products and services to Illinois consumers and Illinois-based businesses, and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois persons in connection with that commerce.

195. ElevenLabs' conduct is unfair within the meaning of ICFA under each of the three Robinson factors. *First*, ElevenLabs' collection and commercial exploitation of the biometric identifiers and biometric information of Illinois persons without their knowledge, consent, or opportunity to refuse offends established Illinois public policy as expressed in BIPA — the Illinois statute the General Assembly enacted specifically to protect biometric privacy, 740 ILCS 14/5 — and as expressed in IRPA — the Illinois statute the General Assembly enacted specifically to protect commercial use of personal identity, 765 ILCS 1075/30. ElevenLabs' conduct is the precise category of conduct these statutes were enacted to prohibit.

196. *Second*, ElevenLabs' conduct is immoral, unethical, oppressive, and unscrupulous. ElevenLabs commercially exploited the irreplaceable biometric identifiers of Illinois voice professionals without notice, consent, compensation, or any mechanism through which the affected speakers could even discover that their voices had been taken. ElevenLabs simultaneously built and deployed consent infrastructure — the Iconic Marketplace, the Voice Cloning verification rules — for the celebrity voices and the platform users it could not avoid asking, while withholding any equivalent process from the working voice professionals whose voiceprints had already been ingested into the foundational models on which the entire company depends.

197. *Third*, ElevenLabs' conduct caused substantial injury to Plaintiffs and Class members — including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities — and Plaintiffs and Class members could not reasonably have avoided this injury, because they had no knowledge that ElevenLabs was collecting their biometric data and no public mechanism existed through which they could have discovered the collection or sought its cessation.

198. ElevenLabs' conduct is also independently deceptive within the meaning of ICFA. ElevenLabs' privacy disclosures use hedging language regarding the biometric nature of the voice data ElevenLabs processes — stating that "applicable law may define [users'] Voice Data as biometric data" and that voice data "may comprise biometric data under applicable data

protection laws" — to obscure the categorical nature of the processing ElevenLabs actually performs. ElevenLabs' CCPA Notice at Collection contemporaneously describes that same processing as "analyz[ing] [the speaker's] speech characteristics to formulate a distinct voice model of [the speaker's] vocal traits," a description that, by its terms, is the description of biometric processing. The hedging language is materially misleading because it presents as conditional what ElevenLabs' own technical descriptions confirm is categorical.

199. ElevenLabs has further maintained total opacity about the sources of its voice training data while commercially exploiting that data at scale. ElevenLabs has not published any model card, data sheet, training-data manifest, transparency report, or other disclosure identifying the speakers whose recordings were ingested into its foundational voice synthesis models, even as ElevenLabs has separately and contemporaneously represented that its music model was "trained on licensed data and suitable for commercial use" and announced licensing partnerships with Merlin and Kobalt for music content. The asymmetry between ElevenLabs' affirmative licensing representation for its music model and its silence regarding its voice models is itself a material omission — a representation by negative implication that the voice models were licensed in a manner ElevenLabs has not and cannot substantiate.

200. ElevenLabs' unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished

licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from ElevenLabs' decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not merely from the existence of competing AI products.

201. ElevenLabs' conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged in ¶¶ 102-112.

202. Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class (injunctive relief only)*

203. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

204. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

205. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes

Case 1:26-cv-05037 Document #: 4-1 Filed: 07/21/26 Page 95 of 104 PageID #:95

likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

206. ElevenLabs' commercial voice products generate voice outputs that sound like real human speakers, including, on information and belief, voice outputs that replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, and commercially exploited by ElevenLabs' subscribers and end users without consumer-facing disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content, in violation of both 815 ILCS 510/2(a)(2) and 815 ILCS 510/2(a)(3).

207. Plaintiffs and Class members are persons likely to be damaged by ElevenLabs' deceptive practices within the meaning of 815 ILCS 510/3. ElevenLabs' conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

208. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3 to prevent ElevenLabs' ongoing deceptive trade practices, including such corrective disclosures and provenance measures as the Court deems necessary to prevent confusion regarding the source, authorization, and consent status of AI-generated voice content. If the Court finds that ElevenLabs willfully engaged in deceptive trade practices, Plaintiffs also seek reasonable attorneys' fees under 815 ILCS 510/3.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

209. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

210. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

211. ElevenLabs obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and associated identity attributes without permission and without compensation. These benefits include the avoided costs of licensing and consent for the voice recordings used in training; the product capability, voice quality, expressiveness, and multilingual range derived from training on a diverse corpus of identifiable human voices; the competitive advantage of an AI voice product that would not otherwise exist; and the revenue from the

commercialization of voice synthesis products built on that foundation. As alleged in the Factual Background, the voiceprint is not a backstage input to ElevenLabs' product line; it is the product.

212. ElevenLabs received these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invest time, talent, training, and resources to develop their voices and to create the professional voice recordings ElevenLabs has used without consent. ElevenLabs' conduct diverted value from Plaintiffs by building commercial products on their voices without authorization and deploying those products to compete with and displace Plaintiffs in the same professional markets in which Plaintiffs earn their livelihoods.

213. ElevenLabs' retention of these benefits is unjust because it is rooted in conduct that constitutes (a) the collection and commercial exploitation of Illinois residents' biometric identifiers and biometric information without the notice, consent, and other safeguards BIPA requires, and (b) the commercial use of Illinois residents' voices and identities without the prior written consent IRPA requires. Each of these wrongs independently renders ElevenLabs' retention of benefits inequitable. ElevenLabs could have pursued lawful licensing, as it did for its music model and as it does for its Iconic Marketplace celebrity voices, and chose not to.

214. Plaintiffs and the Class seek restitution of the benefits unjustly obtained by ElevenLabs, including disgorgement of profits, an accounting of all revenues and benefits derived from ElevenLabs' unauthorized use of their voice

data and biometric identifiers, and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Eleven Labs Inc. and award the following relief:

A. *Injunctive Relief.* Permanently enjoin ElevenLabs, its officers, directors, employees, agents, affiliates, successors, assigns, and all persons acting in concert with them, and award such further injunctive and equitable relief as is necessary to remediate the conduct alleged in this Complaint, including the following:

(1) Cease, with respect to natural persons whose voice recordings were produced or recorded in Illinois, the collection, capture, purchase, receipt through trade, or other obtaining of voiceprints or biometric information without first providing the written notice of the specific purpose and duration of collection and obtaining the written release that 740 ILCS 14/15(b) requires;

(2) Cease the commercial use, sale, lease, trade, profiting from, dissemination, or other commercial exploitation of voiceprints and biometric information of Plaintiffs and Class members that ElevenLabs has already collected without BIPA-compliant consent;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data — including individual

recordings, source platforms, source URLs, dataset names and versions, licensors, and source-attributed metadata — used to develop, train, fine-tune, evaluate, or operate ElevenLabs' foundational voice synthesis models, including without limitation Eleven English v1, Eleven Multilingual v1 and v2, Eleven Flash v2 and v2.5, Eleven Turbo v2 and v2.5, and Eleven v3, together with any successor or derivative models;

(4) Develop, implement, and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information obtained from non-user training-data subjects, in compliance with 740 ILCS 14/15(a), and establish a publicly accessible mechanism through which non-user training-data subjects may request access to, correction of, or deletion of their biometric data and may verify whether their biometric data is in ElevenLabs' possession;

(5) Destroy all voiceprints and biometric information of Plaintiffs and Class members that ElevenLabs obtained without BIPA-compliant consent, including all copies retained in training-data caches, fine-tuning datasets, evaluation corpora, model checkpoints, and downstream inference systems, and certify the destruction;

(6) Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational voice synthesis models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation Eleven English v1, Eleven Multilingual v1 and v2,

Eleven Flash v2 and v2.5, Eleven Turbo v2 and v2.5, Eleven v3, the default voice library distributed through ElevenLabs' platform, and the commercial products built on those models, including text-to-speech, Instant Voice Cloning, Professional Voice Cloning, AI Dubbing, Voice Design, Conversational AI, audiobook generation, the Iconic Marketplace, and the API and Studio products, together with any iterative or successor models trained from those models or derived from voiceprints or biometric information encoded in them; and require ElevenLabs to take all reasonable measures, including contractual takedown demands and termination of downstream license rights, to recall and remove the unlawfully encoded model parameters from sub-licensees, affiliates, vendors, processors, and other third parties to whom ElevenLabs has transmitted those parameters;

(7) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution, transmission, or making available of sound recordings or audiovisual works containing unauthorized digital replicas of Plaintiffs' and Class members' voices, in violation of 765 ILCS 1075/30 as amended by P.A. 103-836 effective January 1, 2025, including by implementing technical and operational controls within ElevenLabs' Voice Cloning, Voice Design, AI Dubbing, and Conversational AI products to prevent the generation of unauthorized digital replicas of identifiable individuals; and

(8) Provide adequate consumer-facing disclosure that voice outputs generated by ElevenLabs' commercial voice products are AI-generated, that the foundational voice synthesis models that produce those outputs were developed using voice recordings of speakers whose identities ElevenLabs has not disclosed, and that the individuals whose vocal characteristics are reproduced have not, except where licensed through the Iconic Marketplace or other BIPA-compliant written-consent program, authorized the use of their voices.

B. *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C. *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of ElevenLabs' unauthorized commercial use of their identities, including their voices; the profits ElevenLabs earned from that unauthorized use to the extent not taken into account in computing actual damages; the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are less than that amount; and punitive damages where ElevenLabs' violations are found to be willful.

D. *ICFA Damages.* Award the actual economic damages Plaintiffs and Class members sustained as a result of ElevenLabs' unfair and deceptive practices, and punitive damages as permitted by 815 ILCS 505/10a.

E. *Restitution and Disgorgement.* Order restitution of the benefits ElevenLabs has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and vocal identities; disgorgement of the profits ElevenLabs has earned through the integrated commercial chain alleged in this Complaint, including without limitation revenue from (i) ElevenLabs' free, Starter, Creator, Pro, Scale, and Enterprise subscription tiers; (ii) ElevenLabs' API usage and developer-tier fees; (iii) ElevenLabs' Iconic Marketplace licensing revenue and revenue-share arrangements with rights-holders; (iv) ElevenLabs' audiobook generation and distribution products, including direct distribution to Spotify, InAudio, and ElevenReader and the associated royalty arrangements; (v) ElevenLabs' Conversational AI, voice agent, and enterprise-deployment contracts; and (vi) ElevenLabs' AI dubbing, Voice Design, Voice Cloning, and other commercial voice products whose commercial value is constituted by the voiceprints embedded in the underlying foundational models; and an accounting of all such revenues and benefits.

F. *Non-Duplication of Recovery.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and

theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendant Eleven Labs Inc. on all Counts on which Defendant is found liable.

I. *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), and 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and under any other applicable fee-shifting provision.

J. *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 11, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Robin Amer, Carol Marin, Philip Rogers, Alison Flowers, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| META PLATFORMS, INC., a Delaware corporation, | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Meta Platforms, Inc. ("Meta"), allege as follows:

**NATURE OF THE CASE**

1. Meta built a suite of commercial voice AI products using the voices of real people, including some of the most accomplished broadcast journalists, investigative podcasters, audiobook narrators, and voice performers working in the United States today. To build the foundational audio models that now power voice features integrated across Facebook, Instagram, WhatsApp, Messenger, Threads, Meta AI, AI Studio, the Reels AI voice translation feature,

and Ray-Ban Meta smart glasses — including Voicebox, Audiobox, the Massively Multilingual Speech model, and SeamlessM4T — Meta ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers from those recordings. Plaintiffs' voices are among them.

2. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade investigative broadcast journalist, three-time Peabody winner, and 2025 recipient of the Order of Lincoln — Illinois's highest civilian honor; Philip Rogers, an Emmy- and Murrow Award-winning broadcaster who covered four decades of Chicago news at WBBM Newsradio and WMAQ-TV; Alison Flowers, a 2021 Pulitzer finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Lindsey Dorcus, a SOVAS and Independent Audiobook Award–winning narrator of more than two hundred audiobooks for the major American publishers; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their voice was being used to train Meta's commercial voice AI. None of them was asked. None of them consented.

3. A voiceprint is a digital fingerprint of the human voice. It is a mathematical representation of the acoustic features — pitch, timbre, resonance — that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

4. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, along with a written release. 740 ILCS 14/15(b). Meta failed to comply with any of these requirements with respect to Plaintiffs.

5. No defendant in any biometric-privacy matter pending in the United States has had more direct, more sustained, or more financially consequential notice of BIPA than Meta. Meta has paid the three largest biometric-privacy settlements in American history: $650 million to resolve BIPA claims arising from Facebook's Tag Suggestions facial-recognition feature, *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747-JD (N.D. Cal.) (final

approval Feb. 2021); $68.5 million to resolve BIPA claims arising from Instagram's biometric processing, *In re Instagram BIPA Consumer Privacy Litig.*, No. 1:20-cv-08208 (N.D. Ill.) (2023); and $1.4 billion to the State of Texas in 2024 to resolve claims under Texas's Capture or Use of Biometric Identifier Act — a statute that, like BIPA, expressly enumerates voiceprints as a covered biometric identifier — making the Texas settlement, at the time, the largest privacy settlement any state had ever obtained from any company. Meta is also presently defending an active BIPA voiceprint class action in the Northern District of California, *Delgado v. Meta Platforms, Inc.*, No. 3:23-cv-04181-SI, in which the court denied part of Meta's motion to dismiss in February 2024. By the time Meta released Voicebox in June 2023, MMS in May 2023, and SeamlessM4T in August 2023, Meta had been a BIPA defendant for nearly a decade and had paid more than $2 billion in biometric-privacy settlements.

6. Meta's noncompliance was not a failure of safety capability. When Meta determined that its Voicebox model posed risks of misuse, Meta declined to release the model weights publicly. Meta's Llama community license imposes a commercial-use threshold requiring licensees with more than 700 million monthly active users to obtain a separate commercial license from Meta. In September 2024, Meta executed formal voice-licensing contracts with Awkwafina, Dame Judi Dench, John Cena, Keegan-Michael Key, and Kristen Bell, reportedly paying millions of dollars per celebrity to license their voices for Meta AI. In August 2024, Meta and Universal Music Group jointly announced an expanded multi-year licensing agreement specifically to address

"unauthorized AI-generated content." Meta knows how to identify biometric-derived AI artifacts of particular sensitivity and withhold them from release. Meta knows how to draw the lines its products require. Meta knows how to obtain consent for the commercial use of human voices. Meta deployed each of those capabilities for the commercial uses that served Meta's interests. Meta deployed none of them for the speakers whose voiceprints Meta extracted to train its foundational audio models in the first place.

7. Meta's noncompliance was, instead, a deliberate institutional decision. Compliance with BIPA would have required Meta to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording into the training pipeline. With foundational audio models trained on corpora measured in hundreds of thousands of hours of speech and millions of distinct speakers, that compliance burden would have constrained the speed and scale of Meta's voice AI development. Meta chose speed and scale over compliance. The choice is documented in the contrast between Meta's robust consent infrastructure for the celebrity voices Meta wished to license and the complete absence of consent infrastructure for the speakers whose voices Meta took to train the foundational models. It is documented in the contrast between Meta's specifically licensed music training data for MusicGen and the absence of any analogous licensing or consent infrastructure for the speech training data that powers Voicebox, Audiobox, MMS, and SeamlessM4T. And it is documented in Meta's deliberate exclusion

of Illinois and Texas — and only Illinois and Texas — from the geographic availability of Meta's Reels AI voice translation feature, on grounds widely reported as state biometric and voice-rights regulation. That choice was not an oversight. It was a business decision.

8. The voiceprints Meta extracted from Plaintiffs are not stored in a database that can be deleted on request. They are encoded in the parameters of Meta's foundational audio models and reproduced in the audio those models generate. The biometric data and the product are, at this point, the same thing. Meta protects the product, including by withholding Voicebox model weights, gating commercial use of Llama at the 700-million-user threshold, and imposing Acceptable Use Policies on licensees, more carefully than Meta protected the biometric data from which the product was built.

9. The technology Meta built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their living. Voicebox can produce high-quality speech in a target voice from a two-second audio prompt, and Audiobox extends that capability with voice-style prompting from audio as short as three seconds — directly displacing the audiobook narration Plaintiffs Dorcus and Nassif provide and the long-form investigative audio journalism Plaintiffs Marin, Rogers, Flowers, Lacour, and Amer have spent their careers developing. The Meta AI assistant, deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, serving nearly a billion monthly active users, generates voice content in the same broadcast journalism and conversational audio markets in which Plaintiffs Marin and Rogers built their

Case 1:26-cv-05436 Document #: 24 Filed: 07/21/26 Page 7 of 94 PageID #:7

careers. The Reels AI voice translation feature generates synthesized voice content mimicking the sound and tone of source voices in the same markets in which Plaintiffs Flowers, Amer, and Lacour produce their work. Meta's Massively Multilingual Speech model, trained on speech data spanning more than 1,100 languages, generates Arabic-accented and Levantine-language voice content in the precise market — culturally authentic Arabic-accented narration — in which Plaintiff Nassif has built her career. Each of these products was built using the vocal characteristics of the human performers it now displaces — including, on information and belief, the vocal characteristics of every Plaintiff in this case.

10. Plaintiffs' injuries are concrete and particularized. Meta extracted Plaintiffs' voiceprints and biometric information without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Meta retains those voiceprints in its commercial models and continues to profit from them. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their livelihoods.

11. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that Meta unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs

also assert that Meta's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act ("IRPA"), including the 2025 amendments prohibiting unauthorized digital replicas. Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

12. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for violations of BIPA's notice, consent, retention, profiting, dissemination, and protection requirements, on the per-person, per-subsection basis as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); (ii) actual damages, statutory damages, and disgorgement of profits Meta has earned from the commercial exploitation of Plaintiffs' biometric data and identities under IRPA, ICFA, IUDTPA, and the common law of unjust enrichment; (iii) injunctive relief requiring Meta to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its foundational audio models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the Class, and (d) destroy or retrain, without the unlawfully obtained data, the foundational audio models — and the downstream commercial products built on those models — in which the unlawfully obtained biometric data are encoded; and (iv) reasonable attorneys' fees, costs, and expenses.

**PARTIES**

13. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago and whose recognitions include three George Foster Peabody Awards and, in 2025, the Order of Lincoln — Illinois's highest civilian honor. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 80-84.

14. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago), and whose recognitions include a National Emmy Award and the Edward R. Murrow Award. Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Meta extracted his voiceprint are described at ¶¶ 75-79.

15. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound, and whose investigative podcast *Somebody* was a 2021 Pulitzer Prize finalist for Audio Reporting. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 85-89.

16. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 90-94.

17. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for the major American publishers from her professional home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 95-99.

18. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast work, including the 2024 Pulitzer Prize– and Peabody Award–winning *You Didn't See Nothin'*, is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Meta extracted his voiceprint are described at ¶¶ 100-104.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American

actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois and whose narrations for Penguin Random House, Hachette, and Simon & Schuster include culturally and linguistically authentic Levantine Arabic-accented narrations of works by Arab and Palestinian American authors. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Meta extracted her voiceprint are described at ¶¶ 105-109.

20. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal executive offices at 1 Hacker Way, Menlo Park, California 94025. The artificial intelligence research and product development at issue — including the development and deployment of the foundational audio models Voicebox, Audiobox, the Massively Multilingual Speech model, and SeamlessM4T, and the deployment of those models and their derivatives in Meta's commercial voice products across Facebook, Instagram, WhatsApp, Messenger, Threads, Meta AI, AI Studio, and Ray-Ban Meta smart glasses — is conducted within Meta Platforms, Inc. itself rather than through a separate operating subsidiary. The Meta corporate functions whose knowledge and conduct are at issue in this Complaint, including legal, policy, compliance, executive, artificial intelligence research, and artificial intelligence product, are functions of Meta Platforms, Inc.

**JURISDICTION AND VENUE**

21. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy

exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in California. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

22. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay*, No. 25-2185. Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment.

23. This Court has specific personal jurisdiction over Meta on multiple, independently sufficient grounds. Meta has purposefully directed its conduct toward Illinois and this District in ways that directly bear on Plaintiffs' claims.

24. Meta maintains business operations in Illinois, including a Chicago office in this District at which Meta's engineering, sales, and operations personnel work in support of Meta's commercial product portfolio. Meta sells

Ray-Ban Meta and Oakley Meta smart glasses in Illinois through LensCrafters, Sunglass Hut, and other authorized retailers in this District, including the dedicated Ray-Ban Meta retail presence at locations on or near North Michigan Avenue. Meta derives substantial advertising revenue from Illinois businesses and Illinois consumers across Meta's consumer applications, and Meta sells enterprise services — including, following Meta's July 2025 acquisition of PlayAI, enterprise voice-agent services — to Illinois-based commercial customers.

25. Meta deploys to Illinois users, on a continuing daily basis, the voice AI products at issue in this Complaint: the Meta AI assistant integrated across Facebook, Instagram, WhatsApp, Messenger, and Threads; AI Studio's voice-enabled character and creator products; the Reels AI voice translation feature (subject to the Illinois carve-out alleged at ¶¶ 56-60, the very existence of which is itself evidence that Meta directs the underlying products at Illinois users absent the carve-out); and Ray-Ban Meta and Oakley Meta smart glasses, which Meta sells and operates in Illinois. Meta's family of applications reaches approximately 3.58 billion daily active users worldwide; Meta's Chief Executive Officer has publicly identified Meta AI as approaching one billion monthly active users. On information and belief, a substantial share of those users is in Illinois, consistent with Illinois's population and consumer technology market share. Each of those Illinois deployments encodes or deploys capabilities derived from Meta's foundational audio models, in which Plaintiffs' and Class members' biometric data is encoded.

26. Meta has previously appeared in Illinois federal courts in BIPA matters concerning the collection of biometric identifiers from Illinois residents, including In re Instagram BIPA Consumer Privacy Litigation, No. 1:20-cv-08208 (N.D. Ill.), which Meta settled for $68.5 million. Meta has not, in those actions, contested the propriety of an Illinois forum for BIPA claims arising from Meta's commercial conduct involving Illinois residents' biometric data.

27. Meta's deliberate carve-out of Illinois (and only Illinois and Texas) from the geographic availability of the Reels AI voice translation feature, as alleged at ¶¶ 56-60, is itself a Meta admission that Meta's voice AI products are otherwise directed at Illinois users and that Meta is subject to Illinois jurisdiction with respect to those products.

28. Plaintiffs' claims arise directly from Meta's Illinois-directed conduct. Meta extracted the voiceprints of Plaintiffs and the Class — persons whose voice recordings were produced or recorded in Illinois — without the notice, consent, or written release BIPA requires. The voiceprints are now encoded in the parameters of Meta's foundational audio models, which Meta deploys, markets, sells, delivers, and (through research-community releases) disseminates to Illinois customers, Illinois users, and the Illinois developer ecosystem through the channels identified above. Every Illinois deployment, sale, and release of a Voicebox-, Audiobox-, MMS-, or SeamlessM4T-derived capability monetizes or further disseminates the biometric data Meta obtained from Plaintiffs and the Class without their consent. Meta's Illinois contacts are not incidental to this Complaint; they are the downstream commercialization

and continuing dissemination of the upstream biometric extraction that gives rise to this Complaint, as more fully alleged in the Illinois nexus subsections at ¶¶ 63-74.

29. Exercising specific personal jurisdiction over Meta in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with the requirements of due process. Illinois has a strong interest in providing a forum for the redress of unlawful biometric data collection from voice recordings produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois and whose recordings were produced or recorded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on Meta of litigating in Illinois is not undue, given Meta's substantial Illinois commercial activity, its resources as a publicly traded technology company with FY2025 revenue of approximately $200.97 billion and market capitalization of approximately $1.81 trillion, and its experience as a federal-court litigant in BIPA matters — including the $650 million BIPA settlement in *In re Facebook Biometric Information Privacy Litigation*, the $68.5 million BIPA settlement in *In re Instagram BIPA Consumer Privacy Litigation* in this District, and Meta's ongoing defense of the *Delgado* BIPA voiceprint class action in the Northern District of California. Meta could reasonably anticipate being haled into Illinois courts for claims like Plaintiffs' that arise from Meta's extraction and commercial

exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here: Plaintiffs are residents of this District, their recorded vocal performances were produced and distributed from this District, the biometric privacy violations Plaintiffs allege occurred in this District, and the commercial exploitation of Plaintiffs' voiceprints continues through Meta's sale and delivery of the voice AI products at issue to customers in this District. Venue is independently proper under 28 U.S.C. § 1391(b)(1) because Defendant Meta is subject to personal jurisdiction in this District for the reasons set forth above and therefore "resides" in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

## FACTUAL BACKGROUND

*Meta's Training-Data Acquisition Practices*

31. Meta's artificial intelligence research and product divisions train foundational audio models — including Voicebox[1], Audiobox, the Massively Multilingual Speech ("MMS") model, SeamlessM4T, and their successors — on large corpora of audio recordings drawn from multiple sources. Those sources include, on information and belief, audio scraped from public-facing websites

[1] Meta, *Introducing Voicebox: The Most Versatile AI for Speech Generation* (June 16, 2023), https://about.fb.com/news/2023/06/introducing-voicebox-ai-for-speech-generation/ (last visited May 12, 2026); *see also* Meta AI, *Introducing Voicebox: The first generative AI model for speech to generalize across tasks with state-of-the-art performance* (June 16, 2023), https://ai.meta.com/blog/voicebox-generative-ai-model-speech/ (last visited May 12, 2026).

and audio-distribution platforms; licensed and unlicensed research datasets containing speech recordings from broadcast media, podcast distribution, audiobook production, and similar professional and amateur audio sources; user-generated audio content uploaded to Meta-operated platforms; and audio acquired through third-party data vendors and research partnerships.

32. Meta has not publicly disclosed the complete provenance of any of the foregoing training corpora. Meta has, at various times during the Class Period, characterized its training-data sources in general or aggregate terms — as "publicly available," "licensed where appropriate," "diverse," or "multilingual", without identifying the specific datasets, the specific sources within those datasets, or the specific individuals whose biometric source material has been ingested.

33. The aggregate scale of Meta's audio training corpora reaches into the hundreds of thousands of hours of recorded human speech, drawn from millions of individual speakers. A substantial portion of that material — the precise portion is not presently knowable to Plaintiffs because Meta has not disclosed it and maintains it under its exclusive control — consists of voice recordings produced or recorded in Illinois.

*How Meta's Voice AI Extracts and Encodes Voiceprints*

34. Modern AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network learns to identify and reproduce the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, and the

dynamics of emotional expression. The network encodes those features as mathematical representations and stores them in the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices. The capacity of the resulting model to generate speech that sounds like a specific human speaker is the operational signature of voiceprint extraction at scale.

35. Meta's published research and product documentation describe this process in technical detail. In the June 2023 Voicebox paper and announcement, Meta described Voicebox as a non-autoregressive flow-matching generative model that produces audio conditioned on a text transcript and an audio prompt as short as two seconds.[2] Voicebox operates on discrete acoustic tokens produced by a neural audio codec (EnCodec) that, in Meta's own description, compress raw audio waveforms into a token sequence preserving the speaker-distinctive acoustic features of the input audio.[3] The flow-matching network is trained to reconstruct masked portions of token sequences, and at inference time can be conditioned on a brief audio prompt to generate continuations that match the speaker's vocal characteristics. The operational capability Meta sells through Voicebox, zero-shot text-to-speech in

[2] Matthew Le et al., *Voicebox: Text-Guided Multilingual Universal Speech Generation at Scale*, arXiv:2306.15687 (June 23, 2023), https://arxiv.org/abs/2306.15687 (last visited May 12, 2026).

[3] Alexandre Défossez et al., *High Fidelity Neural Audio Compression*, arXiv:2210.13438 (Oct. 24, 2022), https://arxiv.org/abs/2210.13438 (last visited May 12, 2026).

a target voice from a two-second prompt, is the direct consequence of voiceprint extraction at scale during pretraining.

36. Audiobox, announced in November 2023, extends the Voicebox architecture by separately conditioning generation on a voice prompt and a description of speech style, with reference audio durations as short as 3 seconds.[4] The technical capability Audiobox sells — generating new speech that combines the voice of a reference speaker with a designated speech style — is a direct consequence of disentangling speaker-identity representations from style representations during training. The Massively Multilingual Speech model, released in May 2023, builds on the wav2vec 2.0 self-supervised speech-representation architecture and produces speaker-conditioned speech across more than 1,100 languages.[5] SeamlessM4T, released in August 2023, builds on a multimodal encoder that produces SONAR sentence embeddings together with a text-to-unit (T2U) decoder that synthesizes speech in target voices across languages, including the cross-lingual preservation of source-speaker characteristics that drives the Reels AI voice translation feature.[6]

---

[4] Apoorv Vyas et al., *Audiobox: Unified Audio Generation with Natural Language Prompts*, arXiv:2312.15821 (Dec. 25, 2023), https://arxiv.org/abs/2312.15821 (last visited May 12, 2026).

[5] Vineel Pratap et al., *Scaling Speech Technology to 1,000+ Languages*, arXiv:2305.13516 (May 22, 2023), https://arxiv.org/abs/2305.13516 (last visited May 12, 2026).

[6] Seamless Communication et al., *SeamlessM4T: Massively Multilingual & Multimodal Machine Translation*, arXiv:2308.11596 (Aug. 22, 2023), https://arxiv.org/abs/2308.11596 (last visited May 12, 2026).

37. In each of these models, the speaker-identifying features of the training audio, the unique combination of physiological vocal characteristics and learned speech behaviors that distinguish one human voice from another, are extracted during training and encoded in the parameters of the resulting model. Meta's product documentation for Voicebox describes the capability of producing speech in the target voice from a short reference audio prompt as a property of the trained model. That capability does not exist unless the model has learned, during training, to represent speaker identity with sufficient fidelity to reproduce it from a brief example. The speaker-identifying representations the model uses to do so, variously denominated in Meta's technical materials as speaker embeddings, audio prompts, discrete acoustic tokens, voice-style prompts, and SONAR embeddings, are voiceprints in any operational sense of the term.

38. BIPA's definitions confirm the legal classification. The statute defines "biometric identifier" to include "voiceprint." 740 ILCS 14/10. It separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." Id. The speaker embeddings, acoustic tokens, voice prompts, and SONAR embeddings produced by Meta's voice synthesis pipeline fall within both definitions. The label the AI research community uses for these representations does not determine their statutory classification; the function of the data does. The function of these representations — to encode the unique acoustic signature of

a human speaker in a form that the trained model can use to reproduce that signature — is precisely the function BIPA places under the consent regime of § 15(b) and the protective regime of § 15(a), (c), (d), and (e).

*The Chronology of Meta's Public Disclosures*

39. Throughout the Class Period, Meta has made a sequence of public statements, research publications, and Securities and Exchange Commission disclosures that, taken together, establish that Meta's account of its training-data sources has evolved as public and regulatory scrutiny of AI training practices has intensified.

40. In or about May 2023, Meta released the MMS research paper, which described training on speech data spanning more than 1,100 languages. The MMS disclosure identified certain religious audio sources for the multilingual training data, but did not identify the full provenance of the English-language training data.

41. In or about June 2023, Meta released the Voicebox research paper and announcement, describing Voicebox as having been trained on more than 50,000 hours of English speech, and a separate large-scale dataset of approximately 50,000 hours of multilingual audiobooks. The announcement did not identify the speakers, the source platforms, or the consent status of the underlying recordings.

42. In or about September 2024, Meta publicly acknowledged for the first time, in connection with regulatory inquiries in the European Union and the United Kingdom, that Meta had used publicly posted content from

Facebook and Instagram users to train Meta's generative AI systems. Meta thereafter provided EU users with a mechanism to object to such use. Meta did not provide U.S. users with a comparable mechanism.

43. Across these disclosures, Meta has never publicly identified the specific audio datasets ingested for training of Voicebox, Audiobox, MMS, SeamlessM4T, or their successors; the consent status of the speakers whose recordings were ingested; the geographic origin of the recordings; or the retention status of the underlying biometric data after training. The sequence and content of Meta's disclosures establish that Meta treats the provenance of its audio training data as competitively and legally sensitive and has made affirmative choices about which categories of training-data information to disclose and which to withhold.

*Meta's Terms of Service Cannot Supply BIPA-Compliant Consent*

44. During the Class Period, Meta amended the Terms of Service governing Meta's consumer platforms — Facebook, Instagram, WhatsApp, Messenger, and Threads — on multiple occasions, in ways that purportedly authorized Meta's use of user-uploaded content (including audio content) for training artificial intelligence systems. These amendments share three operative characteristics. Each amendment was retroactive in practical effect: by the time any given amendment took effect, Meta had already ingested user-uploaded content into training pipelines. Each amendment relied on the continued use of the platform as the mechanism for acceptance, without an affirmative opt-in. And the amendments applied only to users who had created

accounts on Meta's platforms — users who had never created such accounts were neither presented with the amendments nor bound by them.

45. The retroactive Terms of Service amendments cannot supply BIPA-compliant consent for three independent reasons. *First*, BIPA § 15(b) requires written release executed prior to the collection, storage, or use of biometric identifiers; retroactive consent is not consent within the meaning of the statute.

46. *Second*, BIPA § 15(b) requires that the individual be informed in writing of the specific purpose and length of term for which the biometric identifier or biometric information is being collected, stored, and used; generalized ToS language about "improving services" or "training models" does not satisfy this requirement.

47. *Third*, the named Plaintiffs and the Class never accepted any version of Meta's Terms of Service related to the use of their voiceprints for training foundational models, and were never presented with any consent mechanism.

48. In or about June 2024, Meta announced changes to its privacy policies in the European Union and United Kingdom that would enable Meta to use publicly available content from EU and UK users to train generative AI systems. Following objections from the Irish Data Protection Commission and other European regulators, Meta paused the rollout in June 2024 and subsequently implemented an opt-out mechanism for EU and UK users. Meta did not pause, did not implement an opt-out, and did not seek comparable regulatory clearance for the use of U.S.-origin content, including content

produced or recorded in Illinois. The asymmetric treatment is itself evidence of Meta's actual knowledge that AI training implicates privacy and biometric statutes, and that Meta deliberately chose not to extend the protections offered in regulated jurisdictions to Illinois-origin source material.

*Meta Built Consent Infrastructure for the Voices It Wanted, and No Consent Infrastructure for the Voices It Took*

49. Meta's development and deployment of voice AI is the story of an institution that understands precisely when the commercial use of a human voice requires consent, possesses the operational capability to implement consent infrastructure at scale, and has chosen — repeatedly, deliberately, and contemporaneously — to apply that infrastructure selectively. The selectivity follows a single pattern: Meta obtained consent for the voices that served Meta's commercial interests, and obtained no consent for the voices Meta took to build the foundational models on which those commercial interests depend.

50. Meta obtained consent for the celebrity voices it wanted to license. In September 2024, Meta executed formal voice-licensing contracts with Awkwafina, Dame Judi Dench, John Cena, Keegan-Michael Key, and Kristen Bell, reportedly paying millions of dollars per celebrity, to license those celebrities' voices for use in Meta AI. Meta did so because the celebrities' identifiable voices created identifiable commercial liability; because the legal departments on both sides of those negotiations understood that the use of a person's voice in a commercial AI product requires that person's consent; and because Meta concluded that paying for consent was the path Meta wished to follow as to those individuals.

51. Meta obtained consent for the musical works it wanted to use. In August 2024, Meta and Universal Music Group jointly announced an expanded multi-year licensing agreement specifically extending UMG's rights to address "unauthorized AI-generated content." Meta has publicly identified its MusicGen training corpus as comprising licensed music. Meta did so because the alternative, training on unlicensed musical recordings, created identifiable commercial liability that Meta concluded was not worth incurring.

52. Meta built an operational infrastructure to identify, restrict, and withhold AI artifacts that Meta deems too sensitive for public release. In June 2023, Meta announced Voicebox and simultaneously declined to release the Voicebox model weights, inference code, or full technical specifications, citing, in Meta's own words, the potential for misuse of generative voice technology. Meta likewise designed the Llama community license to impose a 700-million-monthly-active-user threshold above which licensees must obtain a separate commercial license from Meta, demonstrating that Meta knows how to draw jurisdictional, scale, and use-case lines around AI artifacts when doing so serves Meta's commercial interests. And Meta produced selective provenance disclosures in the May 2023 MMS release that identified certain religious audio components of the MMS training corpus while withholding the provenance of the English-language Voicebox and Audiobox training corpora.

53. Meta drew no analogous line and built no analogous consent infrastructure for the speakers whose voices populated the hundreds of thousands of hours of audio Meta ingested to train Voicebox, Audiobox, MMS,

SeamlessM4T, and their derivatives. Meta did not identify the speakers. Meta did not provide written notice of the purpose or duration of collection. Meta did not obtain a written release. Meta did not exclude Illinois-origin recordings from training corpora. Meta did not condition downstream licensee deployments on biometric compliance review.

54. The same engineering organization that designed the Voicebox non-release and the Llama 700-million-MAU threshold designed the foundational training pipeline. The same legal department that papered the celebrity contracts and the UMG license drafted the consumer Terms of Service that Meta now invokes as the purported consent baseline. The choice to apply consent infrastructure to the voices Meta paid for, rather than to the voices Meta took, was a contemporaneous, institutionally coherent decision made by Meta with full operational capability and full legal knowledge.

55. The decision was a commercial calculation. BIPA-compliant collection of voice training data would have required Meta to identify the source speakers, provide written notice of the specific purpose and duration of the collection, and obtain a written release from each speaker before ingesting the recording into the training pipeline. With training corpora measured in the hundreds of thousands of hours of audio — comprising, on information and belief, the recordings of millions of distinct speakers — that compliance burden would have constrained the speed and scale of Meta's voice AI development. Meta chose speed and scale over compliance. The decision is documented in the contrast between the robust consent infrastructure Meta deployed for the

celebrity voices it paid to license and the complete absence of consent infrastructure for the voices Meta took to train the foundational models. It is documented in the contrast between Meta's expressly licensed MusicGen training corpus and the unidentified, unlicensed, and unconsented audio corpus underlying Voicebox, Audiobox, MMS, and SeamlessM4T. And, as alleged at ¶¶ 56-60, it is documented in Meta's deliberate exclusion of the two U.S. states — Illinois and Texas, and only those two — whose biometric statutes Meta has previously been adjudicated and required to pay to satisfy.

*Meta's Deliberate Geographic Carve-Out of Illinois and Texas From the Reels Translation Feature*

56. The Reels AI voice translation feature is a Meta product, built on Meta's foundational audio models, that automatically generates dubbed audio in other languages while preserving the source speaker's vocal characteristics across the translation. The feature's commercial value depends entirely on the cross-lingual speaker-similarity capability that exists in Meta's foundational audio models because, on information and belief, those models were trained on the unconsented voice recordings of speakers including Plaintiffs and the Class. The feature is, in operational substance, a real-time act of generating an unauthorized digital replica of a creator's voice in a different language.

57. At the launch of the Reels AI voice translation feature and continuing through the filing of this Complaint, Meta has deliberately excluded the U.S. states of Illinois and Texas, and only those two states, out of all fifty, from the geographic availability of the feature. Persons in Illinois are blocked from accessing the feature's voice translation output. Creators based in Illinois

are blocked from publishing through the feature. The carve-out is jurisdictional, intentional, and persistent.

58. Public reporting and Meta's communications identify the reason for the carve-out as state biometric and voice-rights regulation. Illinois and Texas are the two U.S. jurisdictions in which Meta has been adjudicated, settled, and required to pay for the unconsented commercial use of biometric identifiers — Illinois under BIPA, where Meta paid $650 million in *In re Facebook Biometric Information Privacy Litigation* and $68.5 million in *In re Instagram BIPA Consumer Privacy Litigation*; and Texas under the Capture or Use of Biometric Identifier Act, where Meta paid $1.4 billion in 2024. Meta did not exclude any other state. Meta excluded the two states whose biometric statutes Meta has been forced, in prior litigation, to take seriously.

59. The Illinois/Texas carve-out is relevant to three propositions material to this Complaint. *First*, Meta has actual, present knowledge that BIPA reaches Meta's voice AI products: Meta's conduct in carving Illinois out of the Reels feature is an admission that Meta cannot lawfully deploy the feature to Illinois users on the same terms as users in jurisdictions without comparable biometric statutes. *Second*, Meta possesses the operational capability to identify and exclude Illinois users, Illinois content, and Illinois-origin material from its product offerings when Meta concludes that doing so serves Meta's interests. *Third*, Meta's decision to exclude Illinois users at the consumer endpoint of the product chain, while continuing to train its foundational audio models on Illinois-origin voice recordings at the input end of that same chain,

reflects a deliberate institutional choice: Meta will accept the marginal commercial cost of denying Illinois users access to the Reels feature to avoid Illinois liability for the downstream deployment, but Meta will not accept the marginal training-data cost of excluding Illinois-origin voice recordings from the foundational models to avoid Illinois liability for the upstream extraction. The same statute that the carve-out shows Meta to have understood at the consumer endpoint applies, with equal force, at the training-data endpoint.

60. Meta's exclusion of the Reels translation feature in Illinois is the geographic mirror image of the Illinois-origin training data on which the models powering the Reels feature were built. Meta knew enough to keep Illinois users from receiving the output of those models. Meta knew enough to keep the models out of Illinois at the consumer end. Meta deliberately and contemporaneously chose to ingest Illinois-origin voice recordings at the training end. That choice is the conduct on which this Complaint rests.

*Meta's Commercial Deployment and Monetization of the Foundational Audio Models*

61. The voiceprints, voice embeddings, and biometric representations encoded in the parameters of Meta's foundational audio models — Voicebox, Audiobox, MMS, SeamlessM4T, and their successors — supply the voice quality, expressiveness, speaker similarity, multilingual range, and cross-accent capability that drive the commercial value of Meta's voice-enabled products. Meta monetizes those capabilities through an integrated commercial chain that includes, without limitation:

(a) advertising revenue and user-engagement gains attributable to the Meta AI assistant, which Meta has integrated across Facebook, Instagram, WhatsApp, Messenger, and Threads, and which Meta's Chief Executive Officer has publicly identified as approaching one billion monthly active users, and to the Reels AI voice translation feature, which generates synthesized voice output mimicking the sound and tone of source voices;

(b) revenue and platform value attributable to AI Studio's voice-enabled character and creator products;

(c) hardware revenue and product differentiation attributable to Ray-Ban Meta and Oakley Meta smart glasses, which Meta sells in Illinois through LensCrafters, Sunglass Hut, and other authorized retailers in this District;

(d) API, cloud, and partner-channel revenue attributable to commercial deployment of Meta's foundational audio models and to the enterprise voice agent technology Meta acquired through its July 2025 acquisition of PlayAI, including deployments to Illinois-based commercial customers;

(e) developer-ecosystem value, platform reach, and commercial-moat value generated through Meta's selective open-weight, gated, and research-community releases of its foundation-model families, governed by the Llama community license alleged at ¶¶ 6, 52; and

(f) strategic deployment value of voice synthesis and audio generation capability across Meta's broader commercial product portfolio.

62. The scale of Meta's commercial deployment of those capabilities is substantial. Meta's family of applications reaches approximately 3.58 billion daily active users worldwide; Meta reported revenue of approximately $200.97 billion for fiscal year 2025; and Meta carries a market capitalization of approximately $1.81 trillion. The voice quality and capability that Meta monetizes through each of the channels identified above is not severable from the biometric source material on which the underlying models were trained: the products' ability to generate realistic, expressive, and human-sounding voices, and to do so in target voices from short audio prompts, exists because of, and only because of, the voiceprints and biometric representations encoded in the models, including the voiceprints and biometric representations extracted from Plaintiffs and Class members. Every commercial deployment of a Voicebox-, Audiobox-, MMS-, or SeamlessM4T-derived capability through any of these channels therefore monetizes the unconsented biometric data Meta extracted from Plaintiffs and Class members, and continues to do so each day Meta retains and operates the foundational audio models in which that data is encoded.

*The Biometric Data Was Generated in Illinois*

63. The conduct giving rise to Plaintiffs' claims is localized in Illinois in four independent and mutually reinforcing respects:

(i) the biometric source material was generated in Illinois;

(ii) Meta's acquisition of that biometric source material was targeted at identifiably Illinois-origin content;

(iii) BIPA's duties under § 15(a)–(e) run to the subjects of the biometric data, Plaintiffs and the Class, whose voices are Illinois-origin, irrespective of where Meta's computational infrastructure sits; and

(iv) Meta's ongoing retention, dissemination, and commercial exploitation of the resulting biometric data is itself directed at, and felt in, Illinois.

Each of these grounds independently supports the application of BIPA, IRPA, ICFA, IUDTPA, and the common-law claims pled in this Complaint to Meta's conduct as to Plaintiffs and the Class.

64. Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois. The voice itself, as a unique biometric signature, came into existence in Illinois.

65. The audio recordings embodying Plaintiffs' voices, from which Meta is alleged to have extracted voiceprints and biometric information, were created in Illinois. Plaintiffs were physically present in Illinois at the time of the recordings, the recordings captured the biometric characteristics of speakers who were in Illinois at the time of recording, and, as alleged with specificity in ¶¶ 75-109, the recordings were produced in Illinois studios, broadcast facilities, professional home recording studios in Chicago, and other Illinois-based production environments.

66. The recordings were published from Illinois to publicly accessible platforms — broadcast-affiliated digital archives, audiobook distribution platforms, podcast distribution platforms, video distribution platforms, and similar channels — on which Plaintiffs' identities, geographic origin, professional biographies, and content catalogs were and are publicly visible to any person accessing the recordings. The metadata, descriptions, and contextual information accompanying the recordings publicly identified each Plaintiff as an Illinois-based speaker and identified the recordings as Illinois-origin content at the time the recordings were made and continuously thereafter.

67. The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is therefore of Illinois origin. The biometric data Meta is alleged to have extracted from those recordings is Illinois-origin, regardless of where any subsequent computational processing occurred.

*Meta's Acquisition Was Targeted at Identifiably Illinois-Origin Material*

68. Meta accessed Plaintiffs' voice recordings from publicly accessible platforms on which the recordings were hosted with metadata identifying each Plaintiff by name and identifying the recordings' origin, as alleged with specificity in ¶¶ 75-109. To any person with knowledge of Illinois broadcast journalism, podcast production, audiobook narration, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work originated from Illinois.

69. Meta's act of accessing and processing those recordings was therefore not the passive receipt of an anonymized dataset assembled by a third party. It was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production, as alleged in ¶¶ 75-109. The Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time Meta accessed and processed the recordings. Meta's research practice, including its provenance-tracking capability demonstrated by the partial disclosures accompanying MMS (¶¶ 40, 52), confirms that Meta possessed the technical capability to identify and screen Illinois-origin recordings out of its training corpora. Meta chose not to apply that capability.

*BIPA's Duties Run to the Subject of the Biometric Data*

70. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), the profiting prohibitions of § 15(c), the dissemination prohibitions of § 15(d), and the reasonable-care obligations of § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint are Plaintiffs and the Class,

persons whose voices and recordings were generated in Illinois, as alleged in ¶¶ 64-67.

71. Meta's continuing possession of voiceprints and biometric information generated in Illinois likewise runs afoul of obligations BIPA imposes for the benefit of the subjects of that data. Meta has not made publicly available a written retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from non-user training-data sources, as alleged at Count II below. Meta has provided no mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data, in contrast to the opt-out mechanism Meta extended to EU and UK users following regulatory objections, as alleged at ¶ 48. Meta's commercial deployments operate on a perpetual basis, resulting in the biometric data of Illinois-origin training subjects being, on information and belief, retained indefinitely. These continuing failures are owed to Illinois subjects whose biometric data was generated in Illinois.

*Ongoing Retention, Dissemination, and Commercial Exploitation Is Directed at Illinois*

72. Meta deploys, on a continuing daily basis, to Illinois users and Illinois customers each of the voice AI products identified at ¶¶ 24–25, each of which encodes or deploys capabilities derived from Meta's foundational audio models in which Plaintiffs' biometric data is encoded.

73. Meta's research community, partner, and open-weight releases of components of MMS, SeamlessM4T, and other foundational audio models are continuing acts of dissemination of Illinois-origin biometric data into a

downstream ecosystem that includes Illinois developers, Illinois enterprises, and Illinois researchers. Each public-release act is a unilateral, irreversible act of dissemination by Meta into Illinois. Each such release is independent of, and additional to, the commercial deployments alleged in ¶ 61.

74. The injury suffered by Plaintiffs and the Class is felt in Illinois. The privacy interest BIPA protects — the right to control the collection, retention, dissemination, and commercial use of one's biometric identity — is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their loss of the licensing and consent rights BIPA and IRPA preserve, and the dilution of the commercial value of their voices in the markets in which they participate are all injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois, as more fully alleged in ¶¶ 75-109. Together with the Illinois origin of the biometric data, the Illinois-targeted nature of Meta's acquisition, and the running of BIPA's duties to the Illinois subjects of the biometric data, this Illinois-localized harm establishes that the operative conduct giving rise to this case occurred, and continues to occur, primarily and substantially in Illinois.

*Named Plaintiffs' Individual Experiences*

*Philip Rogers*

75. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast

coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club — the awards conferred by Chicago's professional journalism organization for excellence in journalism conducted within the Chicago metropolitan region.

76. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting. These platforms display metadata identifying Rogers as the speaker and Chicago as the location of production. Rogers's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

77. On information and belief, Rogers's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from his recordings are encoded in those models' parameters. Rogers's broadcast catalog matches the profile of training audio Meta's research describes — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source — as alleged

at ¶¶ 31-38, 41. The recordings are accessible through the same categories of publicly distributed platforms (broadcast-affiliated digital archives, YouTube) that Meta and other AI companies use to acquire audio training data. Meta has refused to disclose the sources of the audio training data powering its commercial voice products, placing the specific records of training-data ingestion under Meta's exclusive control.

78. Rogers never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of his professional voice work for AI training. He never received notice that Meta had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release. Meta's collection of Rogers's voiceprint, and Meta's continuing possession and commercial exploitation of that voiceprint, occurred and continues without his knowledge or consent.

79. Rogers's injury is concrete and particular to him. Meta extracted his voiceprint from recordings he produced over four decades of professional work, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Rogers used to speak every day during his career. The technology Meta built using Rogers's voiceprint — including the Meta AI assistant deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, and the Voicebox and

Audiobox generative audio capabilities that produce broadcast-style narration from short audio prompts — now operates in the same broadcast journalism market in which Rogers built his career, against the same colleagues with whom he worked, in a competitive position Rogers neither chose nor authorized.

*Carol Marin*

80. Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, the CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel, and spans television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, at least fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, the Sigma Delta Chi Ethics in Journalism Award, induction into the Chicago Journalism Hall of Fame, and, in 2025, the Order of Lincoln — Illinois's highest civilian honor.

81. Marin's broadcast catalog is publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit digital archive of her broadcast investigative reporting, documentary work, and on-air interviews; the WTTW digital archive at news.wttw.com; the NBC Chicago digital archive at nbcchicago.com; and YouTube, where her Peabody

acceptance speeches, debate moderation, and archived broadcast segments are publicly available. These platforms display metadata identifying Marin as the speaker and Chicago as the location of production. Marin's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

82. On information and belief, Marin's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Marin's broadcast catalog matches the profile of training audio Meta's own research describes — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source — as alleged at ¶¶ 31-38, 41. The recordings are accessible through the same categories of publicly distributed platforms from which Meta and other AI companies acquire audio training data. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

83. Marin never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

84. Marin's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Meta AI assistant deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, the Voicebox generative audio model capable of producing authoritative narration from short audio prompts, and the Audiobox documentary-narration capabilities Meta has built — now operates in the same investigative broadcast journalism market in which Marin built her career, against the same colleagues with whom she worked, and in the documentary narration market in which Marin's voice is itself a recognized professional asset. Marin's voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature on which her career and recognized authority were built.

*Alison Flowers*

85. Flowers is an investigative journalist and audio producer based in Chicago. She is the founder of Spiralbound, a production company at the intersection of investigative journalism and immersive storytelling, and previously served as Head of Production at the Invisible Institute. Flowers produced and reported the seven-part investigative podcast *Somebody*, a 2021 Pulitzer Prize finalist for Audio Reporting, winner of the National Magazine Award (the Ellie) for Podcasting, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association award for Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival award for Best Serialized Story. *Somebody* topped *Rolling Stone*'s Best Podcasts of 2020 list, was ranked first on

*The New York Times*'s list of true-crime podcasts at the intersection of race, and was ranked second on *The Atlantic*'s 50 Best Podcasts of 2020.

86. *Somebody* and Flowers's other audio reporting are publicly available across major podcast distribution platforms, including Apple Podcasts, Spotify, iHeartRadio, YouTube, and Stitcher. Flowers's work was also distributed through Google Podcasts before Google shut down that service in 2024. Flowers's audio reporting also airs on Reveal from the Center for Investigative Reporting, *The Heist* from the Center for Public Integrity, *Vox*, *Dateline NBC*, *Democracy Now!*, and other broadcast and digital outlets. These platforms display metadata identifying Flowers as the speaker and Chicago as the location of production. Flowers's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

87. On information and belief, Flowers's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Flowers's investigative podcast catalog — long-form, single-speaker or small-ensemble, studio-quality, professionally produced, identifiable by name and source, distributed through the major public-facing podcast platforms — matches the profile of training audio Meta's research describes, as alleged at ¶¶ 31-38, 41. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

88. Flowers never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

89. Flowers's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Voicebox and Audiobox generative audio models capable of producing investigative-podcast-style narration and dialogue from short audio prompts, the Reels AI voice translation feature that produces synthesized voice output mimicking the sound and tone of source voices, and the voice AI capabilities of PlayAI (which Meta acquired) used to power enterprise voice products — now operates in the same investigative audio journalism market in which Flowers built her career, in a competitive position Flowers neither chose nor authorized.

*Robin Amer*

90. Amer is a journalist, podcast creator, audio producer, and on-air host with more than twenty years of experience in digital, broadcast, and print media, the substantial majority of which has been produced in and from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the USA Today investigative podcast that peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New*

*York Times*, *Quartz*, and Apple Podcasts. Her earlier work for *Gravy* contributed to that program's 2015 James Beard Award for Best Podcast. During three years at *The Washington Post* as Senior Producer for Audio Features, Amer won or was a finalist for the duPont–Columbia Award three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, whose ten-part series *Blood Memory* won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction.

91. *The City*, *Gravy*, *Post Reports*, *Field Trip*, *Love + Radio: Blood Memory*, and Amer's other audio work are publicly available across major podcast distribution platforms, including Apple Podcasts, Spotify, iHeartRadio, Amazon Music, and YouTube. Amer's work was also distributed through Google Podcasts before Google shut down that service in 2024. These platforms display metadata identifying Amer as the speaker and Chicago as the principal location of production. Amer's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

92. On information and belief, Amer's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Amer's podcast catalog — long-form, single-speaker host-narrator, studio-quality, professionally produced, identifiable by name and source, distributed through the major public-facing podcast platforms — matches the profile of training audio Meta's research describes, as

alleged at ¶¶ 31-38, 41. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

93. Amer never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

94. Amer's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Voicebox and Audiobox generative audio models capable of producing single-host investigative-narrative podcast-style audio from short audio prompts, the Reels AI voice translation feature, and the voice AI capabilities of PlayAI (which Meta acquired) used to power enterprise voice products — now operates in the same investigative audio journalism and podcast production markets in which Amer built her career, in a competitive position Amer neither chose nor authorized.

*Lindsey Dorcus*

95. Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for the major American publishers, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a 2020 Society of Voice Arts and

Sciences (SOVAS) Voice Arts Award winner (full-cast ensemble for *Wild Monsters Dance About*) and a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. *AudioFile Magazine* has reviewed her narration as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Her professional range includes General American, British (Received Pronunciation, Estuary, Cockney), Scottish, Irish (Dublin and Northern), French, American Southern, Greek, New England, New York, German, Indian, and Russian dialects. Dorcus records from a professional home recording studio in Chicago.

96. Dorcus's audiobook narration is publicly available across the major audiobook and digital audio platforms, including Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on those platforms. These platforms display metadata identifying Dorcus as the narrator and embodying her continuous, studio-quality, single-speaker, long-form audio recordings. Dorcus's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

97. On information and belief, Dorcus's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Dorcus's audiobook catalog matches the profile of training audio Meta's own research describes — long-form, single-speaker,

studio-quality, professionally produced, identifiable by name and source — as alleged at ¶¶ 31-38, 41. Meta has publicly stated that Voicebox was trained on more than 50,000 hours of English audiobook narration and approximately 50,000 hours of multilingual audiobook narration, as alleged at ¶ 41, thereby placing audiobook narration squarely within Meta's training data scope. Meta has refused to disclose the specific audiobook titles, narrators, or audio sources used to train its foundational audio models.

98. Dorcus never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

99. Dorcus's injury is concrete and particular to her. The technology Meta built using her voiceprint — including the Voicebox generative audio model, which Meta has stated was trained on tens of thousands of hours of audiobook narrations and which is capable of producing high-quality speech in a target voice from short audio prompts; the Audiobox extension of that capability; and the voice AI capabilities of PlayAI (which Meta acquired), which Meta has integrated into enterprise voice products — now operates in the same audiobook narration market in which Dorcus built her career, in a competitive position Dorcus neither chose nor authorized. Major American audiobook

publishers — including the publishers for whom Dorcus has narrated more than two hundred audiobooks — have begun to integrate AI-generated narration into their commercial offerings, displacing professional human narrators including Dorcus from the market in which she earns her livelihood.

*Yohance Lacour*

100. Lacour is a journalist, audio storyteller, writer, and playwright from the South Side of Chicago whose professional work centers on telling stories of Black Chicago. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio. *You Didn't See Nothin'* was awarded the 2024 Pulitzer Prize for Audio Reporting and the 2024 Peabody Award, was named one of Apple Podcasts' 100 Best Podcasts of All Time, and received four nominations at the Black Podcasting Awards and two nominations at the Signal Podcasting Awards. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series.

101. *You Didn't See Nothin'* is publicly available across major podcast and digital audio platforms, including Apple Podcasts, Spotify, iHeart Podcasts, YouTube, Amazon Music, and Overcast. Lacour has also appeared as a featured guest and interview subject on NPR's *Fresh Air* with Tonya Mosley, NPR's *All Things Considered* with Adrian Florido, the CBC's *Crime Story* podcast, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast. These platforms display metadata identifying Lacour as the speaker and Chicago as the location of production. Lacour's body of work has been continuously

available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

102. On information and belief, Lacour's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from his recordings are encoded in those models' parameters. Lacour's investigative-podcast catalog — long-form, single-speaker host-narrator, studio-quality, professionally produced, identifiable by name and source, distributed through the major public-facing podcast platforms — matches the profile of training audio Meta's own research describes, as alleged at ¶¶ 31-38, 41. Meta has refused to disclose the sources of the audio training data powering its commercial voice products.

103. Lacour never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of his professional voice work for AI training. He never received notice that Meta had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

104. Lacour's injury is concrete and particular to him. The technology Meta built using his voiceprint — including the Voicebox and Audiobox generative audio models capable of producing investigative-podcast-style narration from short audio prompts, the Reels AI voice translation feature that produces synthesized voice output mimicking the sound and tone of source

voices, and the voice AI capabilities of PlayAI (which Meta acquired) — now operates in the same investigative audio storytelling and podcast journalism markets in which Lacour built his career, in a competitive position Lacour neither chose nor authorized.

*Victoria Nassif*

105. Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois. Nassif's audiobook narration has been commercially released by Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Her notable narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette), in which she performed multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa. Nassif has also performed on-camera in NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Nassif's professional range spans General American, British (Received Pronunciation, Cockney), Persian, Levantine Arabic, and American Southern, among others. As a Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle

Case 1:26-cv-05435 Document #: 24-1 Filed: 07/21/26 Page 54 of 97 PageID #:51

Eastern and Arab American characters and settings — a distinctive professional asset in the audiobook narration market.

106. Nassif's audiobook narration is publicly available across major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, and Libro.fm. These platforms display metadata identifying Nassif as the narrator and embodying her continuous, studio-quality, single-speaker, long-form audio recordings. Nassif's body of work has been continuously available through these channels for years preceding Meta's training of the foundational audio models alleged in this Complaint.

107. On information and belief, Nassif's voice recordings were among the audio that Meta ingested to train its foundational audio models, and voiceprints and biometric information derived from her recordings are encoded in those models' parameters. Nassif's audiobook catalog matches the profile of training audio Meta's own research describes — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source — as alleged at ¶¶ 31-38, 41, and the multilingual and culturally-specific dimension of her work falls within the categories Meta has emphasized in its public training-data disclosures, including Meta's statement that Voicebox was trained on approximately 50,000 hours of multilingual audiobook narrations and that the Massively Multilingual Speech model was trained on speech data spanning more than 1,100 languages, as alleged at ¶¶ 40-41. Meta has refused to disclose the specific audiobook titles, narrators, multilingual sources, or

Case: 1:26-cv-05438 Document #: 1 Filed: 05/12/26 Page 52 of 94 PageID #:52

culturally specific narration sources used to train its foundational audio models.

108. Nassif never created an account with Meta for the purpose of contributing voice training data, never uploaded any voice recording to Meta's platforms in connection with voice training, and never accepted any Meta terms of service authorizing Meta's use of her professional voice work for AI training. She never received notice that Meta had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

109. Nassif's injury is concrete and particular to her. The cultural and linguistic specificity of Nassif's professional voice work — authentic Levantine Arabic-accented narration of works by Arab and Palestinian American authors — is itself the basis of her distinctive market position. The technology Meta built using her voiceprint — including the Massively Multilingual Speech model trained on speech data spanning more than 1,100 languages including Arabic, the SeamlessM4T model designed for cross-lingual speech generation, the multilingual capabilities of Voicebox, and the Reels AI voice translation feature that produces synthesized voice output in multiple languages — can now generate Arabic-accented English narration and Levantine Arabic-accented voice content that competes specifically with Nassif's professional niche. That competitive capability exists because voice characteristics encoded in Meta's foundational audio models include the characteristics of speakers like Nassif whose recordings supplied the multilingual and cross-accent training data on

which the models were built. The technology Meta built using Nassif's voiceprint now operates in the precise market — culturally authentic Arabic-accented narration — in which Nassif has built her career, in a competitive position Nassif neither chose nor authorized.

*The Voice Products Compete With the People Whose Voices Built Them*

110. The voice AI products built on Plaintiffs' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods. The competitive substitution is not abstract, future, or speculative. It is operational, present, and rapidly accelerating, and in each instance, it is enabled by, and only by, the vocal characteristics Meta extracted from human performers without their consent.

111. Audiobook narration is one of the markets most directly affected. Professional audiobook narration has historically been performed by human narrators at industry rates of $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate. Meta's Voicebox model, which Meta has stated was trained on more than 50,000 hours of English audiobook narrations and approximately 50,000 hours of multilingual audiobook narrations, can produce high-quality speech in a target voice from a two-second audio prompt. Audiobox extends that capability to controllable narration with voice-style prompting from audio as short as three seconds. The major American audiobook publishers — including Penguin Random House, Hachette, Simon & Schuster, and Macmillan, each of whom has commissioned Plaintiffs Dorcus and Nassif to narrate audiobooks — have begun to integrate

AI-generated narration into their commercial offerings. The technology Meta built using Plaintiffs Dorcus's and Nassif's voiceprints is now, on information and belief, deployed in the same audiobook narration market in which Dorcus and Nassif earn their livelihoods, at a cost per finished hour that is orders of magnitude lower than human narrator rates, as a direct substitute for the human narration Plaintiffs provide.

112. Long-form investigative audio journalism is similarly affected. Meta's Voicebox and Audiobox models generate single-host narrative and conversational audio in the formats and at the production quality that Plaintiffs Marin, Rogers, Flowers, Amer, and Lacour have spent their careers developing. The Meta AI assistant, deployed across Facebook, Instagram, WhatsApp, Messenger, and Threads, and identified by Meta's Chief Executive Officer as approaching one billion monthly active users, generates spoken audio content in the same broadcast journalism and conversational audio markets in which Plaintiffs Marin and Rogers built their careers, and in the same investigative podcasting market in which Plaintiffs Flowers, Amer, and Lacour produce their work.

113. Localization voiceover is similarly affected. The Reels AI voice translation feature, built on SeamlessM4T and the multilingual capabilities of Voicebox, automatically generates dubbed audio in other languages while preserving the source speaker's vocal characteristics. The product replaces the localization voiceover work that voice actors have historically performed, and is offered to creators at no marginal cost.

114. The culturally specific niche in which Plaintiff Nassif practices is similarly affected. The MMS model is trained on speech data spanning more than 1,100 languages, including Levantine Arabic. SeamlessM4T is designed for cross-lingual speech generation. Voicebox's multilingual capabilities include Arabic. The combination produces a technical capability — culturally authentic Arabic-accented English narration and Levantine Arabic-accented voice content — that competes specifically with Nassif's professional niche, and that competitive capability exists because the vocal characteristics encoded in Meta's foundational audio models include the characteristics of speakers like Nassif whose recordings supplied the multilingual and cross-accent training data on which the models were built.

115. Enterprise voice deployment is similarly affected. Meta's July 2025 acquisition of PlayAI extends the enterprise reach of Meta's foundational audio models to commercial customers, including Illinois-based commercial customers, who now obtain voice-agent capabilities derived from the same models in which Plaintiffs' voiceprints are encoded.

116. Each of these products was built using the vocal characteristics of the human performers it now displaces. Plaintiffs allege, on information and belief, that the voiceprints of every Plaintiff in this case are among the voiceprints encoded in the foundational audio models on which these products depend. The market substitution is therefore not merely temporal but causal: the machines generate the audio they generate because the performers' voiceprints were extracted from their recordings and embedded in the model

parameters that produce the output. That is the operational definition of biometric exploitation under BIPA, of unauthorized use of identity under IRPA, of unfair conduct under ICFA, and of unjust enrichment at common law.

*Meta's Dissemination of the Foundational Audio Models and the Voiceprints Encoded Within Them*

117. The voiceprints and biometric information in which Plaintiffs' and Class members' biometric identifiers are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, retrained, and disseminated across Meta's corporate, cloud, and ecosystem infrastructure, in the ordinary course of Meta's voice AI business and through Meta's deliberate public-release decisions, in three categories of dissemination, each of which independently violates 740 ILCS 14/15(d).

118. Meta's global product, research, engineering, and infrastructure organizations are operated by, or in coordination with, Meta-affiliated entities and subsidiaries across multiple jurisdictions. The development, evaluation, deployment, and operation of Voicebox, Audiobox, MMS, SeamlessM4T, and their derivatives requires the transmission of model parameters — and, on information and belief, of the voiceprints and biometric information encoded within those parameters — among Meta-affiliated entities in the ordinary course of Meta's integrated enterprise. Plaintiffs and Class members did not consent to any such transmission. No enumerated exception under 740 ILCS 14/15(d) applies.

119. Meta's commercial voice products are operated, in part, on cloud infrastructure provided by Meta's service-provider counterparties, and Meta

engages third-party annotators, reviewers, and contractors in the training, evaluation, and refinement of its foundational audio models. Meta's Ray-Ban Meta AI Glasses Voice Privacy Notice acknowledges that third-party reviewers evaluate voice recordings collected through Meta's products. Each transmission of model parameters or voice data to a service-provider counterparty, or to a third-party reviewer, is a transmission of the voiceprints and biometric information encoded within those parameters and recordings. Plaintiffs and Class members did not consent. No enumerated exception under 740 ILCS 14/15(d) applies.

120. Meta has affirmatively published the parameters of foundational audio models — including, on information and belief, components and successor releases of the Massively Multilingual Speech model and the SeamlessM4T model — under research-community and gated-release licenses that make those parameters available, in whole or in part, to any party in the world. Each such release is a unilateral, irreversible act of dissemination by Meta. The parameters of these models encode the voiceprints and biometric information that Meta extracted from the training recordings, including, on information and belief, the voiceprints and biometric information of Plaintiffs and Class members. By releasing the parameters, Meta has disseminated the encoded biometric data into the global research, developer, and commercial ecosystems. Meta's June 2023 decision to decline to release the Voicebox model weights confirms that Meta understands the dissemination implications of publishing model parameters trained on speaker-identifying audio: Meta

declined to publish Voicebox precisely because Meta concluded that public release would expose Meta to unacceptable risk. The risk Meta declined to incur with Voicebox is the risk Meta affirmatively incurred — with respect to Plaintiffs' and Class members' biometric data — through the public releases of other foundational audio models. Plaintiffs and Class members did not consent to any of these public releases. No enumerated exception under 740 ILCS 14/15(d) applies.

121. Each of the three categories above constitutes an independent violation of § 15(d). The third category, affirmative public release, is the most consequential, because it is irreversible. Once the parameters are published, the encoded biometric data falls into the hands of any party worldwide who downloads the model. The continuing nature of Meta's exposure to liability for those public releases, and the continuing nature of the dissemination, are addressed in the prayer for relief, including the request for an order requiring Meta to take all reasonable measures to recall and remove the unlawfully encoded model parameters from public and partner availability.

*Meta Acted Willfully and Recklessly*

122. Meta's collection, retention, commercial exploitation, and dissemination of Plaintiffs' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. Meta acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*No Defendant Has Had More Direct Notice of BIPA Than Meta*

123. No defendant in any BIPA matter pending in the United States has had more direct, more sustained, or more financially consequential notice of BIPA's requirements than Meta.

124. In April 2015, Illinois Facebook users filed a putative class action against Facebook, Inc. (now Meta Platforms, Inc.) alleging that the company's Tag Suggestions feature extracted facial geometry from user-uploaded photographs in violation of BIPA. *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747-JD (N.D. Cal.). In May 2018, the United States District Court for the Northern District of California certified a class of Illinois Facebook users. In August 2019, the Ninth Circuit affirmed class certification, holding that the BIPA violations alleged were sufficient to confer Article III standing because BIPA "protect[s] concrete privacy interests" and that "the development of a face template using facial-recognition technology without consent ... invades an individual's private affairs and concrete interests." *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273–74 (9th Cir. 2019). The Supreme Court denied Meta's petition for certiorari in January 2020. *Facebook, Inc. v. Patel*, 140 S. Ct. 937 (2020).

125. In February 2021, the District Court granted final approval of a settlement under which Meta paid $650 million to the Illinois Facebook users on whose biometric data Meta had built its facial-recognition products without consent. The settlement was at that time the largest privacy settlement in United States history.

126. Meta was on actual, adjudicated, and paid-for notice, by no later than 2019 and unambiguously by 2021, that BIPA imposes statutory liability on the unconsented extraction of biometric identifiers from Illinois-origin source material; that statutory damages under BIPA can reach aggregate amounts in the hundreds of millions of dollars in classwide actions; that federal courts in both Illinois and California will enforce BIPA against Meta; and that the extraction of biometric identifiers from publicly available source material does not extinguish BIPA's consent requirements. With full knowledge of each of these propositions, Meta thereafter acquired the voice recordings of Plaintiffs and the Class — voice recordings produced or recorded in Illinois — extracted voiceprints and derived biometric representations from those recordings without consent, incorporated those biometric representations into commercial AI products, and has continued to do so through the date of this Complaint.

127. Meta's noncompliance was deliberate. As alleged in the factual background above, Meta possesses the operational capability to withhold sensitive AI artifacts (the Voicebox non-release), to draw jurisdictional and scale lines around AI artifacts when Meta's interests require (the Llama community license), and to disclose training-data provenance when Meta chooses (the partial MMS provenance disclosure). Meta built robust consent infrastructure for the celebrity voices Meta paid to license and the musical works Meta paid to license, and built none for the speakers whose voiceprints Meta took to train its foundational models. Meta deliberately carved Illinois and

Texas — the two jurisdictions whose biometric statutes Meta has been adjudicated and required to satisfy — out of the consumer endpoint of the Reels translation feature, while continuing to train on Illinois-origin recordings at the training endpoint. And Meta extended an opt-out mechanism to EU and UK users under regulatory pressure while withholding the same from U.S. users. Each of these is independent evidence that Meta's failure to obtain BIPA-compliant consent for the speakers whose voiceprints Meta extracted was a contemporaneous, institutionally coherent choice, made with full operational capability and full legal knowledge.

128. The knowledge of BIPA's requirements, the Facebook BIPA litigation, the *Patel* decision, the $650 million settlement, the selective release practices, the Llama license terms, and the MMS dataset disclosures resides at the level of Meta's legal, policy, compliance, and executive functions. Those functions span all of Meta's product divisions, including the artificial intelligence research and product divisions that developed and deployed Voicebox, Audiobox, MMS, SeamlessM4T, and the foundational audio models on which Meta's commercial voice products are built. Meta cannot disclaim the knowledge of the parent corporation by reference to the organizational separation of any operating division or research unit. And Meta cannot disclaim willfulness by reference to industry practice: BIPA's standard is not industry custom but the statute's text, and Meta should not be allowed to invoke industry practice as a defense to willfulness when Meta is itself among the largest contributors to whatever industry practice exists, when Meta's

Facebook BIPA litigation and $650 million settlement helped define the industry's notice of BIPA's reach, and when Meta's internal capabilities establish that compliance was operationally feasible.

129. Each of the violations alleged in this Complaint was therefore committed by Meta with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay*.

**CLASS ACTION ALLEGATIONS**

130. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Meta extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of one or more of Meta's foundational audio models or commercial voice products derived from those models.

131. The Class Period extends from the earlier of (i) the date of Meta's first ingestion of voice recordings into any training corpus for any of the foundational audio models, or (ii) January 1, 2014, through the date of final judgment in this action.

132. Excluded from the Class are Meta, its officers, directors, agents, employees, affiliates, parents, and subsidiaries; the Court and its staff and immediate family members; and counsel of record for any party in this action and their immediate family members. Further excluded is any person who, prior to Meta's extraction of biometric identifiers or biometric information from that person's voice recordings, executed a written release that (a) was specifically directed to Meta, (b) specifically authorized Meta's use of the person's voiceprint or voice embedding for the training, fine-tuning, evaluation, or operation of one or more of Meta's foundational audio models, and (c) satisfied the notice and release requirements of 740 ILCS 14/15(b).

133. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

134. *Numerosity — Rule 23(a)(1).* Meta has publicly stated that Voicebox was trained on more than 50,000 hours of English speech and accompanying transcripts and a separate dataset of approximately 50,000 hours of multilingual audiobook narrations; that MMS was trained on speech data spanning more than 1,100 languages; and that SeamlessM4T was trained on a multilingual speech corpus of comparable scale. The speakers represented in those corpora number in the hundreds of thousands or more, of whom a substantial share — quantifiable only through discovery of Meta's training-data manifests — produced or recorded the relevant audio in Illinois. Illinois has

been a center of broadcast journalism, podcast production, audiobook narration, and voice performance throughout the Class Period, and on information and belief, Illinois-produced or Illinois-recorded audio content during the Class Period includes tens of thousands of hours of broadcast and cable journalism produced from Chicago-based newsrooms including WMAQ-TV, WBBM, WTTW, CBS Chicago, NBC Chicago, ABC 7 Chicago, and WGN; thousands of hours of podcast content produced by Illinois-based producers and distributed through public-facing platforms; thousands of audiobooks narrated by Illinois-based voice performers and distributed through Audible, Apple Books, Google Play Books, Spotify, Libro.fm, and similar platforms; and substantial volumes of public-affairs, sports, entertainment, and live-event broadcast content. Each of these categories contains both professional speakers and incidental speakers — interview subjects, panel guests, members of the public captured in broadcast contexts, secondary performers in audiobook ensembles, sources in long-form journalism — whose voices appear in publicly accessible recordings and whose voiceprints, if ingested by Meta, are subject to BIPA. Joinder of all such persons is impracticable for reasons including the size of the Class, the distribution of Class members across multiple jurisdictions of present residence, and the inability of individual Class members to identify themselves as such absent classwide discovery of Meta's training-data provenance.

135. *Commonality — Rule 23(a)(2).* There are questions of law and fact common to the Class, including without limitation:

(a) whether Meta extracted voiceprints, voice embeddings, or other biometric identifiers or biometric information from voice recordings produced or recorded in Illinois;

(b) whether Meta's extraction occurred without the informed written consent required by 740 ILCS 14/15(b);

(c) whether Meta developed and made publicly available a written policy for retention and destruction of biometric identifiers and biometric information as required by 740 ILCS 14/15(a);

(d) whether Meta profited from the biometric data they extracted, within the meaning of 740 ILCS 14/15(c);

(e) whether Meta disclosed, redisclosed, or otherwise disseminated biometric data without the consent required by 740 ILCS 14/15(d);

(f) whether Meta protected biometric identifiers and biometric information using the reasonable standard of care within Meta's industry, as required by 740 ILCS 14/15(e)(1);

(g) whether Meta protected biometric identifiers and biometric information in a manner the same as or more protective than Meta's protection of other confidential and sensitive information, as required by 740 ILCS 14/15(e)(2), including whether Meta's withholding of Voicebox model weights from public release demonstrates a comparative-protection standard that Meta did not apply to the underlying biometric source material;

(h) whether Meta's use of voiceprints and voice embeddings for the training, fine-tuning, evaluation, and operation of commercial voice products

constitutes commercial use of an individual's identity within the meaning of 765 ILCS 1075/30(a);

(i) whether Meta's commercial voice products constitute or generate digital replicas within the meaning of 765 ILCS 1075/30(b), as amended by Public Act 103-836 effective January 1, 2025;

(j) whether Meta's acquisition, retention, and commercial exploitation of biometric data extracted from Illinois-origin recordings without consent constitute unfair practices within the meaning of 815 ILCS 505/2, as construed in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002);

(k) whether Meta's public representations concerning training-data sources, consent, and the protection of biometric data constitute deceptive practices within the meaning of 815 ILCS 505/2;

(l) whether Meta's conduct constitutes deceptive trade practices within the meaning of 815 ILCS 510/2(a)(2) and 510/2(a)(3);

(m) whether Meta has been unjustly enriched at the expense of Plaintiffs and the Class;

(n) whether Meta's violations were committed intentionally or recklessly within the meaning of 740 ILCS 14/20(2); and

(o) the appropriate scope of injunctive relief, including the destruction or retraining, without the unlawfully obtained biometric data, of the foundational audio models and downstream commercial products in which the unlawfully obtained biometric data are encoded.

136. *Typicality — Rule 23(a)(3).* The named Plaintiffs' claims are typical of the claims of the Class. Each named Plaintiff is a person whose voice recordings were produced or recorded in Illinois; from whom Meta, on information and belief, extracted voiceprints or voice embeddings for use in training Meta's foundational audio models; who did not provide the informed written consent required by BIPA, IRPA, or any other applicable statute; and who has been injured by Meta's unlawful conduct in the same manner as every other Class member. The named Plaintiffs' claims arise from the same operative facts and rest on the same legal theories as the claims of the absent Class members.

137. *Adequacy — Rule 23(a)(4).* The named Plaintiffs will fairly and adequately protect the interests of the Class. The named Plaintiffs have no interests adverse to those of the Class. Each named Plaintiff has retained counsel experienced in complex class action litigation, biometric privacy litigation, and Illinois consumer protection litigation. Class counsel have the resources and commitment necessary to prosecute this action vigorously on behalf of the Class.

138. *Rule 23(b)(2) Certification.* Meta has acted, and continues to act, on grounds generally applicable to the Class, by acquiring, retaining, and commercially exploiting biometric data extracted from Illinois-origin recordings without the consent of Plaintiffs and Class members. Final injunctive and declaratory relief is appropriate respecting the Class as a whole, including injunctive relief requiring the destruction or retraining, without the unlawfully

obtained biometric data, of the foundational audio models and downstream commercial products in which the unlawfully obtained biometric data are encoded; injunctive relief requiring Meta to cease ongoing collection, retention, and commercial exploitation of biometric data extracted from Illinois-origin recordings without BIPA § 15(b)-compliant consent; declaratory relief establishing Meta's violations of BIPA, IRPA, ICFA, and IUDTPA; and such other injunctive and declaratory relief as the Court deems just. Certification of the Class under Rule 23(b)(2) is therefore appropriate.

139. *Predominance.* Common questions predominate because Meta's BIPA compliance (or non-compliance) was uniform and classwide. Meta did not engage in individualized notice or consent processes with any class member. The question of whether Meta's training pipeline extracted voiceprints and/or biometric information is a common technical question. The question of whether Meta complied with § 15(a), (b), (c), (d), and (e) before extracting those voiceprints and/or biometric information is a common legal question with a common answer. The question of willfulness versus negligence turns on Meta's corporate knowledge and decision-making, which is classwide. Individual questions, primarily whether a specific class member's voice appears in the training data, are binary, objective, and determinable from Meta's own records, and they do not predominate over the common questions that drive the resolution of the litigation.

140. *Superiority.* A class action is the superior method for adjudicating these claims. The relevant factors confirm this conclusion:

(a) *Interest of individual class members in controlling prosecution*. Individual class members, many of whom are voice actors, narrators, podcasters, and journalists who may be unaware that their voiceprints and/or biometric information were extracted, are unlikely to have the resources or incentive to prosecute individual BIPA actions against a company with a market capitalization of approximately $1.81 trillion. Individual statutory damages, while significant in the aggregate, may be modest for any single class member, making individual litigation economically impractical. A class action is the only realistic vehicle for redressing these widespread violations.

(b) *Extent and nature of existing litigation*. The *Delgado* action in the Northern District of California asserts BIPA voiceprint claims arising from Meta's collection of voice data from individuals who interact with Meta's consumer products (Facebook, Messenger). The present action is independent of Delgado: it focuses on Meta's extraction of voiceprints from third-party-sourced training-data recordings of professional voice talent who never created a Meta account for the purpose of contributing voice training data, never agreed to any Meta terms governing AI training use of their professional voice work, and never had any contractual relationship with Meta governing the use of their professionally produced and distributed voice content. No other class action asserting these claims against Meta on behalf of Illinois residents whose professional voice recordings were used as training data is known to Plaintiffs at this time.

Case 1:26-cv-05435 Document #: 24-1 Filed: 07/21/26 Page 70 of 94 PageID #:719

(c) *Desirability of concentration in this forum.* Concentrating this litigation in this District promotes efficiency. Plaintiffs are Illinois residents. The claims arise under Illinois statutes. The injuries were suffered in Illinois. This Court is well suited to adjudicate BIPA and other Illinois statutory claims.

(d) *Likely difficulties in managing the class action.* This case is manageable as a class action. Meta's conduct was uniform and automated. The common questions identified above are susceptible to common proof. Class membership can be determined from Meta's own records. The damages framework under BIPA provides for per-violation liquidated damages that do not require individualized proof of actual damages. No unusual management difficulties are anticipated.

141. To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Meta's concealment of its training-data sources, by Meta's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Meta had ingested their recordings into its training pipelines, and by the continuing nature of Meta's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational audio models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data, and each public release of model parameters encoding that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (Ill. 2023), each

accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

142. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

143. Plaintiffs bring this Count individually and on behalf of the Class.

144. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

145. Meta is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

146. Meta collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class

members by ingesting their voice recordings into the training pipelines for Voicebox, Audiobox, the Massively Multilingual Speech model, SeamlessM4T, and the foundational audio models on which Meta's commercial voice products are built, and extracting from those recordings computational representations capable of identifying the speakers, as alleged at ¶¶ 31-38, 41 and ¶¶ 75-109. The resulting representations — variously denominated in Meta's technical and product documentation as speaker embeddings, audio tokens, voice prompts, and acoustic representations — are voiceprints and biometric information within the meaning of BIPA.

147. Meta did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Meta obtained no consent of any kind, in any form, from any Plaintiff or Class member, as alleged at ¶¶ 78, 83, 88, 93, 98, 103, 108. Meta's retroactive Terms of Service amendments cannot supply BIPA-compliant consent for the reasons alleged at ¶¶ 44-47.

148. Meta's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

149. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay*, in the amount of $1,000 per

negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**

*Brought on behalf of the Class*

150. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

151. Plaintiffs bring this Count individually and on behalf of the Class.

152. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with Meta in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

153. Meta has been, and remains, in possession of voiceprints and biometric information extracted from recordings of Plaintiffs and Class members, as alleged at ¶¶ 31-38, 41, and ¶¶ 75-109.

154. Meta has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training data and embedded in the parameters of Meta's foundational audio models. Meta's consumer-facing privacy notices contain retention provisions tied to consumer interaction with Meta's products. Those provisions are facially inapplicable to Plaintiffs and Class members, who had no consumer interaction with the Meta products that gave rise to the use of their voice recordings as training data. Meta has not provided, and on information and belief does not maintain, any mechanism by which non-user training-data subjects can request access to, correction of, or deletion of their biometric data.

155. Meta has developed and made publicly available retention and destruction schedules and policies governing other categories of confidential and sensitive information, including user account data, advertising data, and the personally identifiable information of authenticated users. Meta has done so because its legal and compliance functions understand the statutory and regulatory expectations that attach to those categories of data. Meta's failure to develop and publish an analogous policy for the biometric data encoded in its foundational audio models — biometric data that Meta retains indefinitely, that Meta cannot recover or destroy by deleting a row in a database because the data is encoded in commercial model weights, and that Meta has affirmatively disseminated through research-community releases — is conduct measured against Meta's own published practice for comparable categories of data.

156. Meta's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

157. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

158. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

159. Plaintiffs bring this Count individually and on behalf of the Class.

160. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier may sell, lease, trade, or otherwise profit from a person's biometric identifier. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

161. Meta has profited and continues to profit from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the foundational audio models that power Meta's commercial voice products, and by monetizing those products through the integrated commercial chain, including (i) advertising revenue and engagement gains attributable to Meta AI assistant deployments across Facebook, Instagram, WhatsApp, Messenger, and Threads; (ii) revenue and platform value attributable to AI Studio's voice-enabled character products; (iii)

hardware revenue and product differentiation attributable to Ray-Ban Meta smart glasses; (iv) API, cloud, and partner-channel revenue attributable to commercial deployment of Meta's foundational audio models; (v) developer-ecosystem and commercial-moat value generated through open-weight and gated releases of Meta's foundation-model families; and (vi) strategic deployment value across Meta's broader product portfolio. The voice quality, expressiveness, speaker similarity, and multilingual capability that Meta monetizes through these channels exists because of the voiceprints and biometric information encoded in Meta's foundational audio models. Meta's commercial exploitation of Plaintiffs' and Class members' voiceprints does not fall within any exception to § 15(c).

162. Meta's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

163. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count IV

## Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)

*Brought on behalf of the Class*

164. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

165. Plaintiffs bring this Count individually and on behalf of the Class.

166. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier may disclose, redisclose, or otherwise disseminate a

person's biometric identifier unless an enumerated exception applies. 740 ILCS 14/15(d).

167. Meta has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information in three categories of conduct, each independently sufficient to violate § 15(d): (a) transmission among Meta-affiliated corporate entities; (b) transmission to vendors, service providers, third-party reviewers, and cloud-infrastructure partners; and (c) affirmative public release of model parameters encoding the biometric data. Each category is alleged in detail at ¶¶ 118-120. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

168. Meta's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

169. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

170. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

171. Plaintiffs bring this Count individually and on behalf of the Class.

172. Section 15(e) of BIPA requires a private entity in possession of biometric identifiers to store, transmit, and protect the identifiers from

disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

173. Meta is a "private entity" within the meaning of BIPA. 740 ILCS 14/10. The voiceprints, voice embeddings, and derived biometric representations Meta extracted from Plaintiffs' and Class members' recordings are "biometric identifiers" within the meaning of 740 ILCS 14/10, and the information derived from those identifiers is "biometric information" within the same definition.

174. The reasonable standard of care for the storage, transmission, and protection from disclosure of biometric identifiers in the AI-research industry, throughout the Class Period, requires at minimum: affirmative provenance review of audio training corpora to identify recordings whose acquisition, redistribution, or commercial use requires consent under applicable biometric privacy statutes; exclusion of such recordings absent documented consent, or alternatively the obtaining of consent prior to ingestion; maintenance of records sufficient to permit downstream auditing of training-data provenance; and

Case 1:26-cv-05435 Document #: 4-1 Filed: 05/12/26 Page 79 of 94 PageID #:79

implementation of access controls, encryption, and retention limits commensurate with the irrevocability of biometric identifiers.

175. Meta has had actual, adjudicated notice of BIPA's requirements since no later than 2019, as alleged at ¶¶ 123-126.

176. Despite this notice, Meta failed to implement any of the foregoing standard-of-care measures with respect to the voice recordings ingested for the training of Voicebox, Audiobox, MMS, SeamlessM4T, and the foundational audio models on which Meta's commercial voice products are built. Meta did not conduct a provenance review for Illinois-origin recordings. Meta did not exclude such recordings. Meta did not obtain consent. Meta did not maintain records sufficient to permit auditing of which Illinois-origin recordings were ingested. Meta implemented none of the access, retention, or use limitations that a reasonable AI-research entity with actual notice of BIPA would have implemented. Meta's conduct falls below the reasonable standard of care in its industry under § 15(e)(1).

177. Meta fails the § 15(e)(2) asymmetry test. Meta's established institutional practice with respect to its foundational voice models is to retain the encoded biometric data within model weights, training corpora, internal storage, and derivative embeddings without consent, without provenance documentation, and without the access controls Meta applies to its other confidential and sensitive information. Meta does not protect biometric identifiers in the same manner.

178. Meta treats its own commercial AI artifacts as confidential and sensitive information. Meta restricts access to its trained model weights, training configurations, evaluation datasets, and research methodologies through access controls, internal classification regimes, non-disclosure agreements with employees and contractors, and selective external release. Meta likewise protects its advertising data, enterprise customer data, internal financial information, employee personal information, and the personally identifiable information of users who have authenticated accounts on Meta's consumer platforms through layered technical, contractual, and policy safeguards.

179. Meta's withholding of Voicebox, alleged at ¶ 52, is a concrete instance of the protective regime Meta applies when Meta perceives reputational or legal exposure. Voicebox's capabilities are directly derived from, and encode, biometric identifiers extracted from voice recordings, and Meta has acknowledged that Voicebox is sufficiently sensitive that it would not be exposed through an open release.

180. The asymmetry is structural and operative. The same biometric data Meta treats as too sensitive to expose through model weight release is biometric data Meta did not adequately protect at the points of acquisition, storage, transmission, and incorporation into commercial products. Meta acquired the voice recordings without consent and without provenance review. Meta ingested the recordings into training pipelines without access controls calibrated to the sensitivity of biometric identifiers. Meta extracted voiceprints,

voice embeddings, and derived biometric representations and incorporated them into model weights that Meta itself regards as too sensitive to release publicly. Meta retains the underlying biometric data and the derivative models without consent, without retention limits, and without the comparative-protection regime that § 15(e)(2) requires. Meta has, moreover, affirmatively published the parameters of foundational audio models in which the unlawfully obtained biometric data of Plaintiffs and Class members is encoded, as alleged at ¶ 120. Open release is publication, not protection, and it is the operative violation of § 15(e)(2)'s asymmetry requirement.

181. Meta's violations of § 15(e)(1) and § 15(e)(2) are continuing. Every day Meta retains the unlawfully obtained biometric data in its training corpora, internal storage systems, derivative embeddings, and trained model weights without the standard of care required by § 15(e)(1) and without the comparative protection required by § 15(e)(2), Meta commits fresh violations of § 15(e).

182. Meta's violations of § 15(e) were intentional or reckless, as alleged at ¶¶ 122-129. In the alternative, Meta's violations were negligent.

183. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I, and the injunctive and equitable relief set forth in the Prayer for Relief, including the destruction or retraining, without the unlawfully obtained biometric data, of the foundational models and downstream commercial products in which the unlawfully obtained biometric data are encoded.

**Count VI**

**Violation of the Illinois Right of Publicity Act,
765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

184. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

185. Plaintiffs bring this Count individually and on behalf of the Class.

186. The Illinois Right of Publicity Act protects an individual's right to control the commercial use of the individual's identity. 765 ILCS 1075/30(a) provides that a person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the individual. IRPA defines "identity" to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

187. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

188. Meta used Plaintiffs' and Class members' identities for commercial purposes within the meaning of IRPA, by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the commercial voice products that Meta monetizes through the integrated commercial channels. Meta holds

out its products' ability to generate realistic, expressive, and human-sounding voices — and, in the case of Voicebox and Audiobox, the ability to generate speech in a target voice from short audio prompts — as a core commercial feature, a capability built from the identities of the individuals whose recordings were used to train the foundational models. Meta did not obtain written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

189. Voicebox is capable, by Meta's own description, of producing high-quality speech in a target voice from an audio prompt as short as two seconds; Audiobox extends that capability with voice-style prompting from audio as short as three seconds. The professional vocal performances of every Plaintiff in this case include continuous, studio-quality audio of materially greater duration than the threshold Meta's own models require to produce a recognizable replica. The technical capability to produce an unauthorized digital replica of each Plaintiff within the meaning of 765 ILCS 1075/30(b) is therefore not contingent or hypothetical. It is operational and present, and it exists because Plaintiffs' voiceprints are, on information and belief, encoded in the foundational audio models on which Voicebox and Audiobox are built.

190. Independently, the Illinois Right of Publicity Act, as amended by P.A. 103-836 effective January 1, 2025, prohibits the knowing distribution, transmission, or making available to the general public of a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative.

765 ILCS 1075/30(b). The amended IRPA further imposes liability on any person who materially contributes to, induces, or facilitates such distribution. *Id.* Meta's Voicebox and Audiobox models — together with the foundational audio models on which Meta's commercial voice products are built — are designed to and do generate, transmit, and make available voice outputs that constitute unauthorized digital replicas of the individuals whose voice recordings comprised the training data, including Plaintiffs and Class members. Meta materially contributes to and facilitates the distribution of such replicas through the integrated commercial channels, including Meta AI assistant deployments across Facebook, Instagram, WhatsApp, Messenger, and Threads; AI Studio's voice-enabled character products; Ray-Ban Meta smart glasses; and Meta's Reels AI voice translation feature, which expressly mimics the sound and tone of a creator's voice in synthesized output.

191. Meta's violations of IRPA were willful and knowing, as alleged at ¶¶ 122-129. Meta's institutional capability to obtain consent for the commercial use of human voices is confirmed by Meta's conduct, as alleged at ¶¶ 50-51 (celebrity voice licensing and Universal Music Group) and ¶¶ 56-60 (Illinois/Texas carve-out of the Reels translation feature). Meta therefore knows how to obtain consent for the commercial use of human voices, and knows that Illinois law constrains the commercial use of human voices, and applied that knowledge to celebrity voices Meta wished to license while declining to apply it to the voices of Plaintiffs and Class members whose recordings Meta had already used to train its foundational models.

192. Plaintiffs and the Class have suffered concrete injury from Meta's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms, including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods.

193. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to Meta's unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

**Count VII**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.**

*Brought on behalf of the Class*

194. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

195. Plaintiffs bring this Count individually and on behalf of the Class.

196. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices ... in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices is broader than its prohibition of deceptive practices and reaches conduct that, even

absent affirmative misrepresentation, offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002).

197. Meta engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice-enabled products and services to Illinois customers, and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois persons in connection with that commerce.

198. Meta's conduct is unfair within the meaning of ICFA. Meta's collection and commercial exploitation of the biometric identifiers and biometric information of Illinois persons, without their knowledge or consent, offends Illinois public policy as expressed in BIPA — the Illinois statute enacted specifically to address the unauthorized collection of biometric identifiers, 740 ILCS 14/5 — and as expressed in IRPA — the Illinois statute enacted specifically to address the unauthorized commercial use of personal identity, 765 ILCS 1075/30. Meta's conduct caused substantial injury to Plaintiffs and Class members, including the diversion of licensing income they would otherwise have earned for the use of their voices and the displacement of their professional voice work in the markets where they earn their livelihoods, as alleged at ¶¶ , 79, 84, 89, 94, 99, 104, 109. Plaintiffs and Class members could not reasonably have avoided this injury because they had no knowledge that Meta was collecting their biometric data.

199. Meta's conduct is also independently deceptive within the meaning of ICFA. Meta has, throughout the Class Period, characterized the sources of its AI training data in general or aggregate terms — as "publicly available," "licensed where appropriate," "diverse," or "multilingual" — without disclosing that the training data included biometric voice identifiers extracted from voice recordings of identifiable individuals without consent, as alleged at ¶ 32. Meta's asymmetric disclosure to European Union and United Kingdom users — to whom Meta disclosed the use of publicly posted content for AI training and provided an opt-out mechanism, while withholding the equivalent disclosure and opt-out from U.S. users including Illinois persons, as alleged at ¶ 48 — is itself a deceptive omission within the meaning of ICFA. Meta maintained substantial opacity about the sources of its voice training data while commercially exploiting that data at scale.

200. Meta's unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Meta's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, and not merely from the existence of competing AI products.

201. Meta's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged at ¶¶ 122-129.

202. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a, injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class (injunctive relief only)*

203. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

204. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

205. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

206. Meta's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, and commercially exploited without consumer-facing

disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. While Meta labels Reels-translated content as translated by Meta AI, no equivalent disclosure attaches to the underlying voice models Meta trained on Plaintiffs' and Class members' voices. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content.

207. Plaintiffs and Class members are persons likely to be damaged by Meta's deceptive practices within the meaning of 815 ILCS 510/3. Meta's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

208. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Meta to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that Meta has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3, Plaintiffs also seek reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

209. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

210. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

211. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

212. Meta obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Meta's foundational audio models; the product capability and competitive advantage Meta captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and the revenue Meta generates and continues to generate through the commercial exploitation of those models.

213. Meta obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and

resources to develop their voices and create professional recordings. Meta's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Meta, and Meta's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

214. Meta's retention of these benefits is unjust. Meta's conduct rests on proof of elements qualitatively different from copyright's exclusive rights — including the absence of biometric consent under BIPA, the absence of identity-rights consent under IRPA, and the unauthorized commercial extraction of biometric and identity-related personal attributes — and the unjust enrichment claim is therefore not preempted by federal copyright law. Meta's conduct violated the Illinois statutory protections for biometric data (BIPA) and for personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Meta's institutional practice confirms the inequity of its retention: Meta pursued lawful licensing where Meta found commercial value in obtaining consent, including Meta's MusicGen model and the celebrity and UMG licensing agreements alleged at ¶¶ 6, 50-51. Meta could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

215. Plaintiffs and the Class seek restitution of the benefits Meta has unjustly retained, including disgorgement of profits Meta earned from the

unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Meta Platforms, Inc. and award the following relief:

A. *Injunctive Relief.* Permanent and, where appropriate, preliminary injunctive relief requiring Meta to:

(1) Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2) Cease the commercial use, sale, lease, trade, profiting from, or dissemination of voiceprints and biometric information of Plaintiffs and Class members that Meta has already collected without BIPA-compliant consent;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate Meta's foundational audio models, including without limitation Voicebox, Audiobox, the Massively Multilingual Speech model, SeamlessM4T, and their successors;

(4) Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information of non-users, in compliance with 740 ILCS 14/15(a);

(5) Destroy all voiceprints and biometric information of Plaintiffs and Class members that Meta obtained without BIPA-compliant consent, and certify the destruction;

(6) Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational audio models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation Voicebox, Audiobox, the Massively Multilingual Speech model, SeamlessM4T, and their successors, together with any iterative or successor models trained from those models or derived from voiceprints encoded in them; and as to any gated, open-weight, research-community, or other public or partner releases of those models or components thereof, take all reasonable measures to recall and remove the unlawfully encoded model parameters from public and partner availability, including by issuing takedown requests, ceasing further distribution, revoking licenses, and providing notice to known downstream licensees;

(7) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution, transmission,

or making available of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b); and

(8) Provide adequate consumer-facing disclosure that voice outputs generated by Meta's commercial voice products are AI-generated, are derived from foundational audio models built using voice recordings of unidentified speakers, and have not been authorized by the individuals whose vocal characteristics are reproduced.

B. *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C. *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of Meta's unauthorized commercial use of their identities and voices, the profits Meta earned from that unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages where applicable, and punitive damages under 765 ILCS 1075/40.

D. *ICFA Damages.* Award the actual economic damages Plaintiffs and Class members sustained as a result of Meta's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a.

Case 1:26-cv-05438 Document #: 24-1 Filed: 07/22/26 Page 592 of 940 PageID #:9744

E. *Restitution and Disgorgement.* Order restitution of the benefits Meta has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities; disgorgement of the profits Meta has earned through the integrated commercial chain alleged in this Complaint, including without limitation revenue and value from (i) advertising revenue and user-engagement gains attributable to Meta AI assistant deployments across Facebook, Instagram, WhatsApp, Messenger, and Threads; (ii) AI Studio's voice-enabled character and creator products; (iii) hardware revenue and product differentiation attributable to Ray-Ban Meta smart glasses; (iv) API, cloud, and partner-channel revenue attributable to commercial deployment of Meta's foundational audio models; (v) developer-ecosystem and commercial-moat value generated through open-weight, gated, and research-community releases of Meta's foundation-model families; and (vi) strategic deployment value of voice synthesis and audio generation capability across Meta's broader commercial product portfolio; and an accounting of all such revenues and benefits.

F. *Non-Duplication.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendant Meta Platforms, Inc. on all Counts on which Defendant is found liable.

I. *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J. *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Case: 1:26-cv-05435 Document #: 24-1 Filed: 05/12/26 Page 594 of 940 PageID #:746

Dated: May 12, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALISON FLOWERS, PHILIP ROGERS, CAROL MARIN, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) | |
| v. | ) | |
| MICROSOFT CORPORATION, a Washington corporation, | ) | |
| Defendant. | ) | |

**<u>COMPLAINT</u>**

Plaintiffs, Alison Flowers, Philip Rogers, Carol Marin, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Microsoft Corporation ("Microsoft"), allege as follows:

**<u>NATURE OF THE CASE</u>**

1. Microsoft Corporation built a suite of commercial voice AI products using the voices of real people, including some of the most accomplished broadcast journalists, investigative podcasters, audiobook narrators, and voice actors working in the United States today. To build the foundational voice

synthesis models that now power Microsoft's Azure AI Speech, Microsoft Foundry, Microsoft Copilot, and Dynamics 365 Contact Center voice offerings — and the speech assets Microsoft acquired through its $19.7 billion acquisition of Nuance Communications — Microsoft ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers from those recordings. Plaintiffs' voices are among them. The full inventory of Microsoft's voice products and underlying foundational models at issue is at ¶ 31.

2. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade broadcast journalist, a three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; Alison Flowers, a 2021 Pulitzer finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Philip Rogers, an Emmy- and Murrow Award–winning broadcaster who covered four decades of Chicago news; Lindsey Dorcus, a SOVAS and Independent Audiobook Award–winning narrator of more than two hundred audiobooks for the major American publishers; and Victoria Nassif, a first-generation Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their

voice was being used to train Microsoft's commercial voice AI. None of them was asked. None of them consented.

3. A voiceprint is a digital fingerprint of the human voice. It is a mathematical representation of the acoustic features — pitch, timbre, resonance — that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

4. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, along with a written release. 740 ILCS 14/15(b). Microsoft failed to comply with any of those requirements with respect to the Plaintiffs.

5. Microsoft's noncompliance was not a misreading of the statute. Microsoft's product documentation, published research, and corporate disclosures describe its voice synthesis pipeline in biometric terms,

acknowledging that its systems "process biometric voice signatures," form "unique voice signatures" from extracted features, and process "Biometric Data" within the meaning of applicable data protection law, as alleged at ¶¶ 33-41. Microsoft built the pipeline, published the research, and shipped its products on that very capability.

6. Microsoft's noncompliance was, instead, selective. Microsoft built a consent infrastructure for the speakers with whom it had a commercial relationship and built nothing for the speakers it did not. For its customer-facing voice features, Microsoft built Limited Access registration, voice-talent acknowledgment workflows, speaker-verification checks, and contractual allocations of biometric-compliance duties to its customers. For its most powerful research models, Microsoft elected to keep the technology research-only with recommended speaker-approval protocols. Each of those measures, set forth at ¶¶ 42-48, reflects Microsoft's recognition that voice-AI products require speaker consent. Microsoft built each safeguard for the downstream uses of its products. Microsoft built none of them for the upstream voices, the recordings of Plaintiffs and Class members that Microsoft itself ingested to build the foundational voice models on which every Microsoft voice product depends.

7. Microsoft's noncompliance was a deliberate institutional decision. The scale of the unconsented corpus is documented in Microsoft's published research, cited at ¶ 50, and reflects training corpora measured in hundreds of thousands of hours and comprising the recordings of hundreds of thousands of

distinct speakers. Compliance with BIPA would have required Microsoft to identify the source speakers, provide written notice, and obtain a written release before ingesting each recording. That compliance burden would have constrained the speed and scale of Microsoft's voice AI development and the $281.7 billion in annual revenue and $75-billion-plus Azure cloud business that depend on it. Microsoft chose speed and scale over compliance. That was not an oversight. It was a business decision.

8. The voiceprints Microsoft extracted from Plaintiffs are not stored in a database that can be queried, redacted, and deleted on request. They are encoded in the parameters of Microsoft's commercial voice models and reproduced in the audio that those models generate. Those models, in turn, are deployed at global scale: through Azure AI Speech and the Microsoft Foundry Model Catalog to enterprise customers worldwide; through Microsoft Copilot to hundreds of millions of Microsoft 365 users; through Microsoft Teams, which is used by a substantial majority of the Fortune 500 and which has hundreds of millions of monthly active users globally; through Dynamics 365 Contact Center deployments; through Microsoft Copilot Daily and Copilot Podcasts experiences powered by MAI-Voice-1; and through the Voice Live API for real-time voice agents. Microsoft cannot delete Plaintiffs' voiceprints from these systems without destroying or retraining the products themselves. The biometric data and the product are, at this point, the same thing.

9. The technology Microsoft built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their living. Microsoft's

commercial voice products generate professional-quality narration, broadcast voice work, podcast hosting, and contact-center voice services at per-character and per-minute rates orders of magnitude lower than the cost of the human performers whose recordings built those products. The market substitution is not coincidental. Each of Microsoft's voice products, as alleged at ¶¶ 75-82, was built using the vocal characteristics of the human performers it now displaces, including, on information and belief, the vocal characteristics of every Plaintiff in this case.

10. Plaintiffs' injuries are concrete and particularized. Microsoft extracted Plaintiffs' voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Microsoft retains those voiceprints in its commercial models and continues to profit from them. Microsoft has further disseminated those voiceprints, encoded in model parameters, across its global Azure infrastructure, through its acquired Nuance speech services business, and to third-party affiliates, vendors, subprocessors, and service providers that operate Microsoft's voice products at scale. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

11. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that Microsoft unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly

available retention and destruction policy applicable to non-users. Plaintiffs also assert that Microsoft's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 et seq., including its prohibitions on commercial use of identity and on the knowing distribution of unauthorized digital replicas. Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

12. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for violations of BIPA's notice, consent, retention, profiting, dissemination, and protection requirements, computed on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); (ii) actual damages and disgorgement of profits Microsoft has earned from the commercial exploitation of Plaintiffs' biometric data; (iii) injunctive relief requiring Microsoft to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its foundational voice synthesis models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the Class, and (d) destroy or retrain, without the unlawfully obtained biometric data, the foundational voice synthesis models, and the downstream commercial products built on those models, in which the

unlawfully obtained biometric data are encoded; and (iv) reasonable attorneys' fees, costs, and expenses.

**PARTIES**

13. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound and was a 2021 Pulitzer finalist for the investigative podcast *Somebody*. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Microsoft extracted her voiceprint are described at ¶¶ 83-88.

14. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Microsoft extracted his voiceprint are described at ¶¶ 83-85, 89-91.

15. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade broadcast journalist whose career has been conducted primarily in Chicago, who has won three Peabody Awards (including a Personal Peabody), and who received the Order of Lincoln — Illinois's highest civilian honor — in 2025. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Microsoft extracted her voiceprint are described at ¶¶ 83-85, 92-94.

16. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Microsoft extracted her voiceprint are described at ¶¶ 83-85, 95-97.

17. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for major American publishers from her home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Microsoft extracted her voiceprint are described at ¶¶ 83-85, 98-100.

18. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist, audio storyteller, writer, and playwright whose investigative podcast *You Didn't See Nothin'* — produced in Chicago through the Invisible Institute — won the 2024 Pulitzer Prize for Audio Reporting. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Microsoft extracted his voiceprint are described at ¶¶ 83-85, 101-103.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American

actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced in Illinois, including Arabic-accented narrations of works by Arab and Palestinian American authors released by Penguin Random House, Hachette, and Simon & Schuster. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Microsoft extracted her voiceprint are described at ¶¶ 83-85, 104-106.

20. Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal executive offices at One Microsoft Way, Redmond, Washington 98052.

**JURISDICTION AND VENUE**

21. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and Defendant Microsoft Corporation is a Washington corporation with its principal place of business in Washington. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

22. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and may recover those

statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Microsoft extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals, including a substantial number whose recordings were produced or recorded in Illinois. The aggregate damages across the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's jurisdictional threshold.

23. This Court has specific personal jurisdiction over Microsoft. Microsoft has purposefully directed its conduct at Illinois and this District in ways that bear directly on Plaintiffs' claims. Microsoft markets, sells, and delivers to Illinois customers the voice AI products at issue in this Complaint — including the prebuilt Azure neural voice catalog, Azure neural HD voices, Custom Neural Voice, Personal Voice, the Voice Live API, MAI-Voice-1, the Speaker Recognition API, Microsoft Teams voice attribution and transcription, and the voice products distributed through Azure AI Speech, Microsoft Foundry, Microsoft Copilot, Microsoft 365, and Dynamics 365 Contact Center — through subscription, consumption-based, and enterprise commercial

channels. Microsoft enters into recurring contractual relationships with Illinois residents and Illinois-based businesses through the Microsoft Services Agreement, the Microsoft Customer Agreement, Azure subscription terms, Microsoft 365 enterprise agreements, and the Custom Neural Voice and Personal Voice limited-access registration terms; accepts subscription and consumption payments from Illinois customers; and provides ongoing interactive service performance — including delivery of voice synthesis outputs in response to user requests — to users located in Illinois. Microsoft maintains office locations and a substantial operational presence in Illinois, including in the City of Chicago. On information and belief, Microsoft has substantial enterprise customer relationships in Illinois, including with Fortune 500 companies headquartered in this District and other Illinois-based enterprises across state and local government, healthcare, financial services, and education sectors, generating substantial Illinois revenue from Microsoft's $281.7 billion fiscal-year-2025 commercial operations.

24. Plaintiffs' claims arise directly from Microsoft's Illinois-directed conduct. Microsoft extracted the voiceprints of Plaintiffs and the Class — persons whose voice recordings were produced or recorded in Illinois — without the notice, consent, or written release BIPA requires. The voiceprints are now encoded in the parameters of Microsoft's commercial voice synthesis models, which Microsoft sells, delivers, and disseminates to Illinois customers and Illinois users through the channels identified above. Every commercial transaction Microsoft completes in Illinois involving those products monetizes

the biometric data Microsoft obtained from Plaintiffs and the Class without their consent. Microsoft's act of extracting voiceprints from voice recordings produced or recorded in Illinois is conduct directed at Illinois, regardless of the physical location of the servers on which the extraction occurred; Microsoft's continuing possession of those voiceprints, and its dissemination of them through its global Azure infrastructure and acquired Nuance speech-services business, is a continuing course of conduct directed at Illinois persons. Microsoft's Illinois contacts are not incidental to this Complaint; they are the downstream commercialization and ongoing dissemination of the upstream biometric extraction that gives rise to this Complaint.

25. Exercising specific personal jurisdiction over Microsoft in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process requirements. Illinois has a strong interest in providing a forum for redress of unlawful biometric data collection from voice recordings produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois and whose recordings were produced or recorded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on Microsoft of litigating in Illinois is not undue, given the resources alleged at ¶ 23 and Microsoft’s experience as an active litigant in federal courts across the United States. Microsoft could reasonably anticipate being haled into Illinois courts for claims

like Plaintiffs' that arise from its extraction and commercial exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

26. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here: Plaintiffs are residents of this District; their recorded vocal performances were produced and distributed from this District; the biometric privacy violations Plaintiffs allege occurred in this District; and the commercial exploitation of Plaintiffs' voiceprints continues through Microsoft's sale and delivery of the voice AI products at issue to customers in this District. Venue is independently proper under 28 U.S.C. § 1391(b)(1) because Defendant Microsoft is subject to personal jurisdiction in this District for the reasons set forth above and therefore "resides" in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

## FACTUAL BACKGROUND

*Microsoft and Its Voice-Synthesis Business*

27. Microsoft is one of the largest publicly traded technology companies in the world and one of the dominant suppliers of commercial AI products and infrastructure. Microsoft's commercial AI business spans cloud-platform subscriptions, enterprise software licensing, consumer software integrations, agent and assistant products, and an integrated portfolio of foundational AI models.

28. Microsoft's voice AI research, development, and commercial deployment are conducted across multiple internal organizations and one

wholly owned subsidiary, all operating under Microsoft Corporation. Microsoft Research operates the Text to Speech research project, established November 1, 2018, whose published outputs include the FastSpeech, AdaSpeech, NaturalSpeech, VALL-E, SpeechX, LiveSpeech, ELaTE, and DeepSinger model families. Azure AI Speech, a business unit of Azure within Microsoft Corporation, operates the commercial Speech service, which provides Microsoft's prebuilt Azure neural voice catalog, Azure neural HD voices, Custom Neural Voice, Personal Voice, the Voice Live API, and the Speaker Recognition API. Microsoft AI operates the MAI-Voice-1 model, which is deployed in Microsoft Copilot Daily, Copilot Podcasts, and Copilot Labs. Microsoft 365 includes Microsoft Teams, which implements speaker diarization and voice attribution features through its meeting transcription pipeline. Nuance Communications, Inc., a wholly owned subsidiary acquired by Microsoft in March 2022 in a $19.7 billion transaction, contributes additional speech-recognition and conversational-AI assets to Microsoft's voice-AI portfolio, including the Dragon family of dictation and conversational systems integrated into Microsoft's healthcare and contact-center offerings.

29. Microsoft has identified AI generally, and its voice and conversational-AI capabilities specifically, as core components of its commercial strategy in disclosures to the United States Securities and Exchange Commission and in public statements by its Chief Executive Officer, Satya Nadella. Microsoft publishes an annual Responsible AI Standard and an annual Responsible AI Transparency Report describing the company's claimed

approach to AI deployment, including voice technologies. Nadella has personally identified Microsoft Copilot, which integrates Microsoft's voice synthesis capabilities through MAI-Voice-1, Copilot Daily, and Copilot Podcasts, as the strategic centerpiece of Microsoft's AI commercialization in quarterly earnings calls, keynote presentations at Microsoft Ignite and Microsoft Build, and Microsoft's published corporate communications.

30. Microsoft distributes its commercial voice AI products and the underlying foundational voice synthesis models through an integrated commercial channel that Microsoft operates from the United States, including through Azure AI Speech (a paid Azure service available on subscription and consumption-based pricing); Microsoft Foundry and the Microsoft Foundry Model Catalog (Microsoft's AI development and deployment platform); Microsoft Copilot (integrated into Microsoft 365, Windows, GitHub, and Dynamics 365); Microsoft Teams (Microsoft's communications and collaboration platform, used by a substantial majority of the Fortune 500 and reported to have hundreds of millions of monthly active users globally); Dynamics 365 Contact Center (Microsoft's contact-center-as-a-service offering); and Microsoft 365 Copilot (Microsoft's productivity-suite AI agent). The voice AI research, model training, and commercial deployment alleged in this Complaint were carried out by Microsoft personnel in the United States, on infrastructure operated by Microsoft and its affiliated entities, in the ordinary course of Microsoft's business.

31. Microsoft's commercial voice AI products at issue in this Complaint include the following:

(a) The prebuilt Azure neural voice catalog and Azure neural HD voices, which provide commercial text-to-speech in over 150 languages and locales through Azure AI Speech.

(b) Custom Neural Voice, released in general availability in February 2021 and expanded into Dynamics 365 Contact Center in March 2026, a Limited Access feature that allows customers to train custom voice models from voice-talent recordings.

(c) Personal Voice, a Limited Access feature within Azure AI Speech that synthesizes replications of an individual's voice from short audio prompts in over 90 languages.

(d) The Voice Live API, announced in public preview at Microsoft Build in May 2025, provides low-latency speech-to-speech voice agent capabilities.

(e) MAI-Voice-1, announced by Microsoft AI on August 28, 2025, and made generally available in the Microsoft Foundry Model Catalog by April 2026, an expressive single- and multi-speaker voice generation model deployed in Microsoft Copilot Daily, Copilot Podcasts, and Copilot Labs.

(f) The Speaker Recognition API, which provides text-dependent and text-independent speaker verification and identification through Azure AI Speech.

(g) Microsoft Teams voice attribution and transcription, which deploys speaker-diarization technology in Microsoft's Teams meeting pipeline.

(h) The VALL-E, VALL-E X, VALL-E 2, NaturalSpeech, NaturalSpeech 2, NaturalSpeech 3, SpeechX, LiveSpeech, ELaTE, and DeepSinger research model families developed by Microsoft Research, certain of which (including VALL-E 2 and ELaTE) Microsoft has elected to retain on a research-only basis.

(i) The Dragon family and associated conversational and speech-recognition assets acquired through Microsoft's 2022 acquisition of Nuance Communications.

32. On information and belief, the training of Microsoft's foundational voice synthesis models occurred on Microsoft-operated computing infrastructure in the United States, including Azure GPU clusters owned and operated by Microsoft, and AI training infrastructure provisioned by Microsoft for its OpenAI partnership and Microsoft AI division. The production voice models that Microsoft deploys through its commercial products are hosted on Microsoft-controlled cloud infrastructure and served to United States users, including users in Illinois, from Azure data center facilities operated by Microsoft and its cloud and content-delivery partners. Microsoft reports its voice AI revenue within the Microsoft Cloud and Productivity and Business Processes segments of its consolidated financials.

*How Microsoft's Voice AI Extracts and Encodes Voiceprints*

33. Modern AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network learns to identify and reproduce the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, and the

dynamics of emotional expression. The network encodes those features as mathematical representations and stores them in the parameters of the trained model. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices.[1]

34. Microsoft's published research and product documentation describe this process in technical detail, using terminology that aligns with the BIPA biometric definitions. Microsoft's data, privacy, and security documentation for Azure AI Speech states that Microsoft "may process biometric voice signatures" from a recorded acknowledgment statement and from "randomized audio from the training dataset(s)" to confirm same-speaker identity using Azure AI Speaker Verification. Microsoft's Speaker Recognition

[1] Microsoft's published research describes the architecture by which voice characteristics are extracted from speech recordings and encoded into the parameters of its voice models. Microsoft Research's Text to Speech project page describes the project's outputs across FastSpeech, AdaSpeech, NaturalSpeech, VALL-E, and DeepSinger; the underlying papers describe the architectures by which input audio is tokenized, encoded, and conditioned upon to produce speaker-faithful synthesis output. *See* Microsoft Research, Text to Speech, https://www.microsoft.com/en-us/research/project/text-to-speech/ (last visited on May 12, 2026); Yi Ren et al., *FastSpeech: Fast, Robust and Controllable Text to Speech*, arXiv:1905.09263 (May 22, 2019), https://arxiv.org/abs/1905.09263 (last visited on May 12, 2026); Mingjian Chen et al., *AdaSpeech: Adaptive Text to Speech for Custom Voice*, arXiv:2103.00993 (Mar. 2, 2021), https://arxiv.org/abs/2103.00993 (last visited on May 12, 2026); Zeqian Ju et al., *NaturalSpeech 3: Zero-Shot Speech Synthesis with Factorized Codec and Diffusion Models*, arXiv:2403.03100 (Mar. 5, 2024), https://arxiv.org/abs/2403.03100 (last visited on May 12, 2026); Chengyi Wang et al., *Neural Codec Language Models are Zero-Shot Text to Speech Synthesizers*, arXiv:2301.02111 (Jan. 5, 2023), https://arxiv.org/abs/2301.02111 (last visited on May 12, 2026); Yi Ren et al., *DeepSinger: Singing Voice Synthesis with Data Mined From the Web*, arXiv:2007.04590 (July 9, 2020), https://arxiv.org/abs/2007.04590 (last visited on May 12, 2026). Plaintiffs allege on information and belief that the same architecture and processing pipeline was applied to the voice training data ingested for the foundational models that power Microsoft's commercial voice products.

API documentation states that “Voice features are extracted from the audio recording to form a unique voice signature."[2]

35. Microsoft's VALL-E paper describes converting speech waveforms into discrete audio codec codes and treating text-to-speech as conditional language modeling on those codes such that, from a three-second enrolled recording, the system can synthesize personalized speech preserving "the speaker's emotion and acoustic environment of the acoustic prompt."[3]

36. Microsoft's NaturalSpeech 3 paper describes a factorized neural codec that disentangles speech into distinct attribute representations, including a "timbre" representation specifically capturing speaker identity, which the model conditions on at inference time to produce speech in a target voice.[4]

37. Microsoft's DeepSinger paper describes a singing-voice synthesis pipeline trained on data "mined from the web" — specifically, a self-built crawl-and-extract system that ingested vocal recordings from music websites, separated vocals from instrumental accompaniment, aligned lyrics with audio,

---

[2] *See* Microsoft, *Data, privacy, and security for text to speech*, Microsoft Learn, https://learn.microsoft.com/en-us/legal/cognitive-services/speech-service/text-to-speech/data-privacy-security (last visited on May 12, 2026); Microsoft, *Speaker recognition overview*, Microsoft Learn, https://learn.microsoft.com/en-us/azure/ai-services/speech-service/speaker-recognition-overview (last visited on May 12, 2026).

[3] *See* Chengyi Wang et al., *Neural Codec Language Models are Zero-Shot Text to Speech Synthesizers*, arXiv:2301.02111 (Jan. 5, 2023), https://arxiv.org/abs/2301.02111 (last visited on May 12, 2026).

[4] *See* Zeqian Ju et al., *NaturalSpeech 3: Zero-Shot Speech Synthesis with Factorized Codec and Diffusion Models*, arXiv:2403.03100 (Mar. 5, 2024), https://arxiv.org/abs/2403.03100 (last visited on May 12, 2026).

Case 1:26-cv-05491 Document #: 24-1 Filed: 05/21/26 Page 21 of 194 PageID #:2768

and filtered samples. The DeepSinger architecture is built to learn singer-specific acoustic characteristics from training audio and to reproduce those characteristics in synthesized output.[5]

38. Microsoft's disclosure-for-voice-and-avatar-talent documentation acknowledges that Microsoft products are used to "process Biometric Data" within the meaning of applicable data protection requirements, and defines "Biometric Data" by reference to Article 4 of the General Data Protection Regulation — a definition that expressly includes "personal data resulting from specific technical processing relating to the physical, physiological or behavioural characteristics of a natural person, which allow or confirm the unique identification of that natural person, such as facial images or dactyloscopic data," and which the European Data Protection Board has confirmed includes voiceprints.[6]

39. BIPA's definitions confirm the legal classification. The statute defines "biometric identifier" to include "voiceprint." 740 ILCS 14/10. It separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an

---

[5] *See* Yi Ren et al., *DeepSinger: Singing Voice Synthesis with Data Mined From the Web*, arXiv:2007.04590 (July 9, 2020), https://arxiv.org/abs/2007.04590 (last visited on May 12, 2026).

[6] *See* Microsoft, *Disclosure for voice and avatar talent*, Microsoft Learn, https://learn.microsoft.com/en-us/azure/ai-foundry/responsible-ai/speech-service/text-to-speech/disclosure-voice-talent (last visited on May 12, 2026); Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 (General Data Protection Regulation), art. 4(14), 2016 O.J. (L 119) 1, https://eur-lex.europa.eu/eli/reg/2016/679/oj; European Data Protection Board, *Guidelines 02/2021 on Virtual Voice Assistants* (Version 2.0, adopted July 7, 2021), https://www.edpb.europa.eu/system/files/2021-07/edpb_guidelines_202102_on_vva_v2.0_adopted_en.pdf (last visited on May 12, 2026).

individual's biometric identifier used to identify an individual." *Id.* The biometric voice signatures, voice signatures, audio tokens, factorized timbre representations, speaker embeddings, and other speaker-acoustic-signature representations produced by Microsoft's voice synthesis pipeline fall within both definitions. The label Microsoft and the AI research community use for these representations does not determine their statutory classification; the function of the data does.

40. Microsoft's Custom Neural Voice transparency note confirms this functional understanding. The note describes Custom Neural Voice as enabling the customer to "create a synthetic voice that sounds like" the voice talent and, in its Pro configuration, to produce a voice that "even more closely resembles your voice talent's voice." It further requires Microsoft's customers to "obtain explicit written permission from voice talent" before creating a synthetic voice.[7] Microsoft's contractual treatment of voice-talent recordings acknowledges that Microsoft's voice cloning capability is built on the extraction and encoding of speaker-identifying acoustic characteristics — exactly the capability the Azure AI Speech, Personal Voice, Voice Live API, and MAI-Voice-1 documentation describes, and exactly the capability that BIPA's voiceprint and biometric-information definitions reach.

41. On information and belief, the same category of biometric processing that occurs in Microsoft's customer-facing voice features — Custom

---

[7] *See* Microsoft, *Transparency note and use cases for Custom Neural Voice*, Microsoft Learn, https://learn.microsoft.com/en-us/legal/cognitive-services/speech-service/custom-neural-voice/transparency-note-custom-neural-voice (last visited on May 12, 2026).

Neural Voice, Personal Voice, the Voice Live API, MAI-Voice-1, the Speaker Recognition API, and Microsoft Teams voice attribution and transcription — also occurs during base-model training. The customer-facing features are applications of capabilities built during training. The training pipeline is where extraction of voiceprints and biometric information occurs first, at the largest scale, and on the broadest set of voice recordings — including, on information and belief, the recordings of Plaintiffs and the Class.

*Microsoft Built Safeguards Against Misuse,*
*Not Consent for the Voices It Took*

42. Microsoft understands that voice synthesis technology built on human voice data creates the categories of harm that BIPA was enacted to prevent. Microsoft has built and publicly deployed five categories of safeguard measures over the period 2018-2026, each directed at the downstream misuse of Microsoft's commercial voice products. Microsoft built none of those measures for the upstream voices it took to construct those products in the first place.

43. Microsoft operates Custom Neural Voice as a Limited Access feature. Customers must apply for access, identify approved use cases, and warrant that they have obtained explicit written permission from voice talent before training a voice model. Each Custom Neural Voice voice talent must record a Microsoft-provided acknowledgment statement, and Microsoft uses Azure AI Speaker Verification to confirm that the same person who recorded the acknowledgment is the source of the customer-provided training data.

44. Microsoft operates Personal Voice as a Limited Access feature within Azure AI Speech, requiring each voice talent to record a verbal consent acknowledgment statement and pass a speaker-verification check before Microsoft will synthesize speech in that voice.

45. Microsoft's Enterprise AI Services Code of Conduct conditions external-user voice-model training on a recorded acknowledgment statement evidencing the speaker's consent. Microsoft's Custom Neural Voice transparency note instructs customers to "obtain explicit written permission from voice talent" before training a model on that talent's voice.

46. Microsoft Research elected to retain VALL-E 2 and ELaTE on a research-only basis. VALL-E 2's project page expressly states: "VALL-E 2 is purely a research project. Currently, we have no plans to incorporate VALL-E 2 into a product or expand access," and recommends a "speaker approval" protocol if speaker-conditioned voice synthesis is ever generalized to unseen speakers. ELaTE's project page contains a similar acknowledgment.

47. Microsoft's disclosure-for-voice-and-avatar-talent documentation expressly allocates BIPA-equivalent compliance obligations to Microsoft's customers. The documentation states: "If you are using Microsoft products or services to process Biometric Data, you are responsible for: (i) providing notice to data subjects, including with respect to retention periods and destruction; (ii) obtaining consent from data subjects; and (iii) deleting the Biometric Data, all as appropriate and required under applicable Data Protection Requirements."

48. Each of the five measures described in ¶¶ 43-47 is a constraint at the downstream end of Microsoft's commercial pipeline, intended to restrict how customers use Microsoft's products or to impose the upstream-rights obligation on Microsoft's customers. None is directed at the upstream issue: that Microsoft's foundational voice synthesis models — including the prebuilt Azure neural voice catalog, Azure neural HD voices, MAI-Voice-1, and the VALL-E and NaturalSpeech research models — were trained on voiceprints extracted without the knowledge or consent of the speakers whose voice recordings were ingested during training. Microsoft built each of these safeguards to prevent downstream misuse of its products and to protect the customers and voice talent with whom it had a commercial relationship. It built none of them for the people whose voices it took to train those products in the first place.

*Microsoft Trained on Data It Knew It Had No Right to Use*

49. Microsoft has never published a comprehensive disclosure of the sources, scale, or provenance of the voice data used to train its commercial voice synthesis models. It has not published a model card, data sheet, training data manifest, licensing inventory, or transparency report identifying all of the voice recordings used to train the prebuilt Azure neural voice catalog, the Azure neural HD voices, MAI-Voice-1, the Voice Live API foundational models, or the foundational models underlying Custom Neural Voice and Personal Voice, where it obtained those recordings, or whether any of the speakers consented.

50. What Microsoft has disclosed for some of its research models is partial and self-incriminating. Microsoft's VALL-E paper publicly states that the model was "trained with LibriLight, a corpus consisting of 60K hours of English speech with over 7000 unique speakers", a corpus derived from LibriVox audiobook recordings without speaker-by-speaker consent. Microsoft's NaturalSpeech 2 paper reports training on approximately 44,000 hours of speech and singing data. Microsoft's NaturalSpeech 3 paper reports a 1-billion-parameter model trained on approximately 200,000 hours of data. Microsoft's DeepSinger paper expressly identifies the training data as "data mined from the web" through a self-built pipeline that crawled music websites, separated vocals from instrumental accompaniment, aligned lyrics, and filtered audio samples.

51. Microsoft's silence about the bulk of its commercial voice training data is made more conspicuous by the contrast with these research-model disclosures. If Microsoft's prebuilt Azure neural voices, Azure neural HD voices, and MAI-Voice-1 were trained entirely on properly licensed or consented data, Microsoft would have an obvious commercial incentive to say so. It has not.

52. The contemporaneous public record establishes that Microsoft obtained substantial portions of its training data, across multiple foundational-model families, from publicly accessible sources without the consent of the source speakers, authors, or content creators, and that Microsoft did so at industrial scale.

53. Microsoft is a defendant in two pending putative class actions concerning the training-data provenance of its other foundational AI models. In *The New York Times Co. v. Microsoft Corp.*, No. 1:23-cv-11195 (S.D.N.Y. filed Dec. 27, 2023), The New York Times alleges that Microsoft trained large language models, including the models that power Microsoft Copilot, on Times journalism without notice, consent, or compensation. In *Doe v. GitHub, Inc.*, No. 4:22-cv-06823 (N.D. Cal.), software developers allege that Microsoft, its GitHub subsidiary, and OpenAI trained the GitHub Copilot code-generation model on millions of public code repositories in violation of the open-source licensing terms under which the code was distributed.[8]

54. A parallel BIPA action concerning Microsoft's voice-biometric practices is pending in the Western District of Washington. *Basich et al. v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash. filed Feb. 5, 2026), alleges that Microsoft Teams' speaker-diarization and transcription features capture and analyze voiceprints from meeting participants in violation of BIPA, and that Microsoft's collection and storage of those voiceprints occurred without the notice, written consent, or publicly available retention policy that BIPA requires.[9]

55. Microsoft's DeepSinger paper, taken on its own public terms, demonstrates that Microsoft maintains the infrastructure for the large-scale

---

[8] Plaintiffs cite the public allegations in *The New York Times* and *Doe v. GitHub* as circumstantial evidence of Microsoft's training-data acquisition practices across its foundational model families, not as adjudicated fact.

[9] Plaintiffs cite the *Basich* allegations as circumstantial evidence relating to Microsoft's voice-data practices, not as adjudicated fact.

ingestion and processing of human voice audio from publicly accessible platforms; that Microsoft has willingly ingested identifiable voice recordings from those platforms without obtaining the consent of the speakers whose voices appear in the recordings; and that Microsoft's voice-audio acquisition pipeline operates at a scale and on a category of source material, music recordings drawn from the public web, that aligns with the long-form, single-speaker, professionally produced audio on which Microsoft's commercial voice synthesis models depend.

56. Microsoft has not published, and on information and belief does not maintain, any mechanism that would allow speakers like Plaintiffs, whose voices were ingested into Microsoft's foundational voice synthesis models, to discover that fact, withdraw consent, or request deletion. Microsoft's general Privacy Policy provides certain rights to users with an existing relationship with Microsoft, but it does not address voice data used in AI model training and does not apply to non-users like Plaintiffs.

57. Microsoft's contemporaneous training-data acquisition practices, documented in published research, internal disclosures, and pending litigation across multiple foundational-model families, reflect a sustained institutional pattern of ingesting identifiable source material at industrial scale without the consent of the people whose work the source material represents. Microsoft operates the infrastructure required to do so for voice audio, has used it for the DeepSinger corpus, and has provided no mechanism by which the speakers whose voices were ingested can verify, withdraw consent, or request deletion.

Plaintiffs allege, on the basis of these public facts, that Microsoft trained its foundational voice synthesis models on voice recordings that included Plaintiffs' recordings, obtained from publicly accessible platforms, and extracted voiceprints from those recordings without the knowledge or consent of the speakers.

*The Biometric Data Was Generated in Illinois*

58. The conduct giving rise to Plaintiffs' claims is localized in Illinois in three independent and mutually reinforcing respects: (i) the biometric data at issue was generated in Illinois; (ii) Microsoft's acquisition of that biometric data targeted material that was identifiably Illinois-origin; and (iii) Microsoft's ongoing retention, dissemination, and commercial exploitation of the biometric data is directed at, or felt in, Illinois. Each ground supports the application of BIPA, IRPA, and the related Illinois statutes invoked in this Complaint to Microsoft's conduct as to Plaintiffs and the Class.

59. Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois. Each voice came into existence in Illinois, in the body of an Illinois person speaking in Illinois. The audio recordings embodying Plaintiffs' voices, from which Microsoft is alleged to have extracted voiceprints and biometric information, were created in Illinois: Plaintiffs were physically present in Illinois at the time of the recordings, and the recordings captured the biometric characteristics of speakers who were in Illinois at the time of recording.

60. The recordings were published from Illinois to publicly accessible platforms. The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is therefore of Illinois origin, and the biometric data Microsoft is alleged to have extracted from those recordings is Illinois-origin biometric data regardless of the physical location of the servers on which Microsoft's extraction occurred.

61. Microsoft accessed Plaintiffs' voice recordings from publicly accessible third-party platforms — including YouTube, Spotify, Apple Podcasts, Audible, iHeartRadio, Amazon Music, and similar major audio distribution platforms — on which the recordings were hosted with metadata identifying each Plaintiff by name and identifying the recordings' Illinois origin. Each of those platforms displays creator profile information including the creator's name, geographic location, channel or artist description, and content catalog. This information was visible and accessible to Microsoft at the time of data acquisition. To a person with knowledge of Illinois broadcast, journalism, audiobook, podcast, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work originated from Illinois.

62. Microsoft's act of accessing and processing those recordings was therefore not the passive receipt of an anonymized dataset assembled by a third party. It was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production. The

Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time Microsoft accessed and processed the recordings.

63. Microsoft sells subscriptions and AI-generated voice outputs to Illinois subscribers and Illinois-based commercial users on a continuing basis through Azure AI Speech, Microsoft Foundry, Microsoft Copilot, Microsoft Teams, Dynamics 365 Contact Center, the Voice Live API, MAI-Voice-1 deployments, Custom Neural Voice and Personal Voice services, and acquired Nuance speech offerings. The commercial value of those subscriptions and outputs derives, on information and belief, from voice models developed through unconsented extraction of biometric data, including biometric data generated in Illinois. Each Illinois transaction in those products is an exercise of commercial value that Microsoft derived from the same biometric extraction Plaintiffs allege is unlawful.

64. Microsoft's continuing dissemination of the foundational voice models — encoded in model parameters and deployed across Microsoft's global Azure infrastructure, through Microsoft's acquired Nuance speech-services business, and through the third-party affiliates, vendors, subprocessors, and service providers that operate Microsoft's voice products at scale — is likewise Illinois-directed. The injury suffered by Plaintiffs and the Class is felt in Illinois: the privacy interest BIPA protects — the right to control the collection, retention, and commercial use of one's biometric identity — is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their

loss of the licensing and consent rights BIPA preserves, and the dilution of the commercial value of their voices in markets in which they participate are all injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois.

65. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure.

66. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois. Microsoft's continuing possession of voiceprints and biometric information generated in Illinois runs afoul of obligations BIPA imposes for the benefit of the subjects of that data, including Microsoft's failure to publish a retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from non-user training-data sources, and Microsoft's failure to provide any mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data.

*Microsoft's Monetization of the Voice Models*

67. Microsoft's commercial exploitation of the foundational voice synthesis models is not limited to a single product line. Microsoft monetizes the voice models through a vertically integrated commercial chain spanning Azure cloud subscriptions and consumption-based pricing, Microsoft Foundry deployments, Microsoft Copilot integrations across Microsoft 365 and Windows, Microsoft Teams premium licensing tiers and meeting-transcription features, Dynamics 365 Contact Center deployments, real-time voice agent licensing through the Voice Live API, Limited Access deployments of Custom Neural Voice and Personal Voice, and the conversational and speech-recognition assets of Microsoft's acquired Nuance Communications subsidiary. The voice characteristics learned during training, the same characteristics extracted from Plaintiffs' and Class members' voice recordings, enable each of these revenue streams.

68. Microsoft monetizes the voice models through, among other channels:

(a) *Azure AI Speech subscription and consumption revenue.* Azure AI Speech is a paid Azure service available on tiered consumption-based pricing, with enterprise commitments and committed-use discounts for high-volume customers. Microsoft charges Illinois customers and enterprises worldwide for Azure AI Speech text-to-speech, custom voice training, and speaker verification on a per-character, per-API-call, and per-deployed-model basis. Each

transaction generates revenue that Microsoft captures because the voice models exist.

(b) *Microsoft Foundry deployment revenue.* The Microsoft Foundry Model Catalog distributes Microsoft's voice synthesis models — including MAI-Voice-1 — to enterprise customers for production deployment on Azure. Microsoft charges enterprise customers for Foundry deployments and the associated compute consumption.

(c) *Microsoft Copilot subscription revenue.* Microsoft Copilot, into which Microsoft's voice synthesis capabilities are integrated through MAI-Voice-1 (powering Copilot Daily and Copilot Podcasts), is licensed to Microsoft 365 customers on per-user subscription pricing as part of Microsoft 365 Copilot, Copilot Pro, and Copilot for individual products. Microsoft's voice synthesis capabilities are a marketed component of the Copilot subscription value proposition.

(d) *Microsoft Teams premium licensing.* Microsoft Teams Premium and the Microsoft Teams voice and transcription features generate licensing revenue across Microsoft's enterprise customer base. Microsoft Teams' speaker-diarization and voice-attribution features rely on the foundational speaker-recognition and voice-processing capabilities at issue in this Complaint.

(e) *Dynamics 365 Contact Center revenue.* Microsoft launched custom neural voices for Dynamics 365 Contact Center in March 2026, integrating Microsoft's voice synthesis capabilities into enterprise contact-center deployments on a per-seat and per-deployment licensing basis.

(f) *Voice Live API consumption revenue.* The Voice Live API, launched in public preview at Microsoft Build in May 2025 with pricing announced June 30, 2025, generates per-minute and per-session revenue for real-time speech-to-speech voice agent deployments.

(g) *Custom Neural Voice and Personal Voice Limited Access revenue.* Limited-access deployments of Custom Neural Voice and Personal Voice generate per-deployment, per-voice-model, and per-character synthesis fees for customer-trained custom voices, all of which rely on the same foundational voice-synthesis architecture at issue in this Complaint.

(h) *Acquired Nuance speech-services revenue.* Microsoft's acquired Nuance Communications business operates enterprise speech-recognition and conversational-AI offerings — including the Dragon dictation and conversational families integrated into Microsoft's healthcare, customer-service, and contact-center products — that contribute additional revenue to Microsoft's consolidated voice-AI business. Microsoft paid $19.7 billion to acquire this business, completed in March 2022.

69. Each monetization channel depends on the foundational voice models. Each foundational voice model depends on the training data used to build it. And the training data, on information and belief, includes the voice recordings of Plaintiffs and Class members from which Microsoft extracted voiceprints without notice or consent. The commercial exploitation Microsoft captures across the full chain is, in operational substance, the monetization of biometric data Microsoft obtained from Plaintiffs without authorization.

*Microsoft's Dissemination of the Voice Models*
*Across Its Corporate, Cloud, and Acquired-Entity Infrastructure*

70. The voice synthesis models in which Plaintiffs' and Class members' voiceprints are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, processed, and transferred across multiple categories of infrastructure Microsoft operates in the ordinary course of its voice AI business.

71. Microsoft conducts its global voice AI business through a corporate structure that includes its wholly owned subsidiary Nuance Communications, Inc. and additional international affiliates including Microsoft International Holdings B.V. and Microsoft Ireland Operations Limited. The development, training, refinement, and commercial deployment of Microsoft's voice models requires, on information and belief, the transfer of those models — and the voiceprints encoded within them — among Microsoft's affiliated entities and acquired Nuance entities in the ordinary course of business. Plaintiffs and Class members did not consent to any such transfer.

72. Microsoft's voice synthesis pipeline operates within a global subprocessor framework that includes Azure cloud infrastructure providers, content delivery network operators, hardware partners, and third-party vendors. The pipeline's training, evaluation, deployment, and operation involve, on information and belief, the transmission of model parameters — and of the voiceprints encoded within those parameters — among Microsoft's vendors and service providers in the ordinary course of business. The delivery of voice synthesis services to enterprise customers, including Illinois customers,

necessarily involves transmitting model parameters and inference outputs over that infrastructure.

73. Microsoft Research distributes certain of its speech-synthesis research outputs through GitHub and similar platforms, including reference implementations and demonstration code associated with the VALL-E, NaturalSpeech, and DeepSinger model families. To the extent such research releases include or enable the reconstruction of model parameters trained on Plaintiffs' voice recordings, those releases constitute additional dissemination of biometric data encoded in those parameters.

74. The pattern of Microsoft's dissemination practices, taken together, places the voiceprints and biometric information of Plaintiffs and Class members in the hands of Microsoft's affiliated entities, acquired Nuance entities, vendors, subprocessors, service providers, and, to the extent any research-model release exposes the underlying parameters, third parties who may have downloaded such releases. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception to BIPA's dissemination prohibition under 740 ILCS 14/15(d) applies to the disseminations described in this subsection.

*The Voice Products Compete With the People Whose Voices Built Them*

75. The voice AI products built on Plaintiffs' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods.

76. Professional audiobook narration historically has been performed by human narrators at industry rates of approximately $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate. Microsoft's voice synthesis products, including Custom Neural Voice, Personal Voice, the prebuilt Azure neural voice catalog, and the Azure neural HD voices, generate professional-quality narration at a fraction of those rates and can render an entire audiobook in hours. The major American audiobook publishers, including Penguin Random House, Hachette, Simon & Schuster, and Macmillan, for whom Plaintiffs Dorcus and Nassif have narrated books, have begun to integrate AI-generated narration into their production pipelines.

77. Microsoft's MAI-Voice-1 generates expressive single- and multi-speaker speech at scale and is deployed by Microsoft in Copilot Daily (an automated daily news briefing experience) and Copilot Podcasts (an AI-generated podcast feature within Microsoft Copilot). These deployments substitute for the long-form audio journalism, podcast hosting, narrative non-fiction production, and on-air reporting that Plaintiffs Marin, Rogers, Lacour, Flowers, and Amer have spent their careers developing and producing, until now, by human reporters and narrators at substantial professional cost.

78. Microsoft's Voice Live API and Custom Neural Voice deployments into Dynamics 365 Contact Center provide real-time, multilingual, AI-generated voice agents and contact-center voices for enterprise customers at per-character and per-minute pricing orders of magnitude lower than the cost of human voice talent. These deployments substitute directly for the broadcast,

contact-center, advertising voiceover, and customer-service voice work for which Plaintiffs Marin and Rogers built their careers and for which Plaintiffs Dorcus and Nassif provide their voice acting and voiceover services.

79. Microsoft's prebuilt Azure neural voice catalog and Azure neural HD voices provide commercial text-to-speech in over 150 languages and locales. Microsoft's Custom Neural Voice and Personal Voice support synthesized speech in over 90 languages. Microsoft's voice synthesis capability across multiple languages and accents includes, on information and belief, the capability to generate Arabic-accented English narration, Levantine Arabic narration, and other culturally and linguistically specific voice content. This capability competes specifically with Plaintiff Nassif's distinctive professional market position as a Lebanese-Palestinian American audiobook narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors.

80. Microsoft's voice synthesis products are marketed for podcast and audiobook production, studio dubbing, e-learning narration, advertising voiceover, contact-center voice work, and conversational-AI deployments. Each of these markets historically has been served by professional voice actors, narrators, journalists, and broadcasters — including Plaintiffs. Microsoft's products substitute for that human work at per-character and per-audio-second pricing that is orders of magnitude lower than human voice talent rates.

81. Microsoft has publicly demonstrated the use of its voice synthesis models for commercial applications that historically required human voice talent, including in Microsoft Copilot Daily, Copilot Podcasts, Copilot Labs experiences, and enterprise contact-center deployments. Each of these deployments converts work that historically commanded professional voice talent rates into output produced at machine-scale costs.

82. Each of Microsoft's voice products was built using the vocal characteristics of the human performers it now displaces. Plaintiffs allege, on information and belief, that the voiceprints of every Plaintiff in this case are among the voiceprints encoded in the foundational voice synthesis models on which these products depend. The market substitution is therefore not merely temporal but causal. The machines generate the audio they generate because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output.

*Named Plaintiffs*

*Allegations Common to Each Named Plaintiff*

83. On information and belief, the voice recordings of each named Plaintiff were among the audio that Microsoft ingested to train its foundational voice synthesis models, and the voiceprints and biometric information derived from those recordings are encoded in the parameters of Microsoft's commercial voice models and reproduced in the audio those models generate. Each named Plaintiff's catalog of professional voice work matches the profile of training audio that Microsoft's technical documentation identifies as optimal — long-

form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on publicly distributed audio platforms, and corresponds, in form and content, to the categories of training material identified in Microsoft's published research, including the audiobook narration corpus on which Microsoft's VALL-E paper specifically reports training (60,000 hours of single-speaker audiobook narration drawn from LibriVox via the LibriLight corpus, comprising over 7,000 unique speakers).

84. Microsoft has not disclosed, and has refused to disclose, the sources of the voice training data used to develop its commercial voice synthesis models. Microsoft's DeepSinger paper publicly describes the self-built crawl-and-extract pipeline Microsoft maintains for the large-scale ingestion of human voice audio from publicly accessible platforms. The records identifying which specific voice recordings Microsoft ingested into the training corpora that produced the prebuilt Azure neural voice catalog, the Azure neural HD voices, MAI-Voice-1, and the foundational models underlying Custom Neural Voice and Personal Voice are within Microsoft's exclusive control.

85. No named Plaintiff created an account with Microsoft for the purpose of voice synthesis. No named Plaintiff uploaded a voice recording to Azure AI Speech, Speech Studio, Microsoft Foundry, Custom Neural Voice, Personal Voice, the Voice Live API, or any other Microsoft voice-synthesis product. No named Plaintiff accepted Microsoft's Custom Neural Voice or Personal Voice limited-access registration terms, and no named Plaintiff recorded a voice-talent acknowledgment statement for Microsoft. No named

Plaintiff received notice that Microsoft had collected his or her voiceprint, any disclosure of the specific purpose or duration of that collection, or executed a written release. Microsoft's collection of each named Plaintiff's voiceprint, and Microsoft's continuing possession and commercial exploitation of those voiceprints, occurred and continues without that Plaintiff's knowledge or consent.

*Alison Flowers*

86. Alison Flowers is an investigative journalist, podcast producer, and audio storyteller whose career has been conducted in Chicago. Flowers is the founder of Spiralbound, a Chicago-based production company operating at the intersection of investigative journalism and immersive storytelling, and previously served as Head of Production at the Invisible Institute, a nonprofit investigative journalism organization on the South Side of Chicago. Flowers was producer and reporter of the seven-part investigative podcast *Somebody*, which premiered March 31, 2020 and investigated the 2016 murder of Courtney Copeland. *Somebody* was a 2021 Pulitzer Prize finalist for Audio Reporting, won the National Magazine Award (Ellie) for Podcasting, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association's Best Audio Documentary award, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story; it was named the No. 1 true-crime podcast of all time by Rolling Stone, ranked first on The New York Times' list of true-crime podcasts at the intersection of race, ranked second on The

Atlantic's "The 50 Best Podcasts of 2020," and reached the number-two position among true-crime podcasts on the Apple Podcasts chart. Flowers's reporting and on-air work additionally appear on Reveal from the Center for Investigative Reporting, The Heist from the Center for Public Integrity, Vox, Dateline NBC, and Democracy Now!.

87. Flowers's audio catalog comprises hundreds of hours of single-speaker, studio-quality recorded vocal performance — investigative narration, on-air reporting, and recorded interviews — continuously available through Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and the major podcast distribution platforms on which *Somebody* and Flowers's other audio work has been published. *Somebody* was additionally distributed through Google Podcasts before Google shut that service down in 2024. The platforms display metadata identifying Flowers as the producer, reporter, and on-air voice; identifying Chicago and Spiralbound (or, for earlier work, the Invisible Institute) as the production origin; and identifying the date and series of publication. Flowers's body of work has been continuously available through these channels for years preceding Microsoft's training of the foundational voice synthesis models alleged in this Complaint.

88. Flowers's injury is concrete and particular to her. Microsoft extracted her voiceprint from recordings she produced over the course of her career as an investigative journalist, podcast producer, and audio storyteller in Chicago, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its

operational form, it is the same biological and behavioral signature Flowers uses to speak every day. The technology Microsoft built using Flowers's voiceprint — including MAI-Voice-1 deployed in Microsoft Copilot Daily and Copilot Podcasts, the Voice Live API, Custom Neural Voice, and Personal Voice — now operates in the same long-form investigative audio journalism and podcast-production market in which Flowers continues to work, against the same colleagues with whom she collaborates, in a competitive position Flowers neither chose nor authorized.

*Philip Rogers*

89. Philip Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. The Lisagor Awards, conferred by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region.

90. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC 5 Chicago digital archive at nbcchicago.com, where his on-air reports,

investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting from war zones, mass shootings, corruption trials, the Olympic Games, and other major events. The platforms display metadata identifying Rogers as the speaker and Chicago as the location of production. Rogers's body of work has been continuously available through these channels for years preceding Microsoft's training of the foundational voice synthesis models alleged in this Complaint.

91. Rogers's injury is concrete and particular to him. Microsoft extracted his voiceprint from recordings he produced over four decades of professional broadcast work, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Rogers used to speak every day during his career. Although Rogers is now retired, the technology Microsoft built using Rogers's voiceprint — including the prebuilt Azure neural voice catalog, Azure neural HD voices, MAI-Voice-1 deployed in Microsoft Copilot Daily and Copilot Podcasts, and custom neural voices deployed in Dynamics 365 Contact Center — now operates in the same broadcast journalism, contact-center, and voiceover markets where he built his career, against the same colleagues with whom he worked, in a competitive position Rogers neither chose nor authorized.

*Carol Marin*

92. Carol Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, the CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel, and includes television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. She has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor.

93. Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC 5 Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying

Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding Microsoft's training of the foundational voice synthesis models alleged in this Complaint.

94. Marin's injury is concrete and particular to her. Microsoft extracted her voiceprint from recordings she produced over five decades of professional broadcast and documentary work in Chicago, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Marin used to speak every day during her career. Although Marin is no longer producing daily on-air work, the technology Microsoft built using Marin's voiceprint — including the prebuilt Azure neural voice catalog, Azure neural HD voices, MAI-Voice-1 deployed in Microsoft Copilot Daily and Copilot Podcasts, and custom neural voices deployed in Dynamics 365 Contact Center — now operates in the same broadcast journalism, investigative reporting, and documentary narration markets where she built her career, against the same colleagues with whom she worked, in a competitive position Marin neither chose nor authorized.

*Robin Amer*

95. Robin Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago. Amer is the creator, host, narrator, and showrunner of USA Today's *The City*, a critically acclaimed investigative podcast whose first season peaked at No. 6 on

the Apple Podcasts charts and was named Best Podcast of the Year by The New Yorker, The New York Times, Quartz, and Apple Podcasts. Amer was a producer for WBEZ Chicago Public Media, the NPR affiliate in Chicago; contributed to the podcast *Gravy*, produced by the Southern Foodways Alliance, which won the 2015 James Beard Award for Best Podcast; served three years as Senior Producer for Audio Features at The Washington Post, where she edited *Post Reports* and the standalone narrative series *Field Trip* and won or was a finalist for the Alfred I. duPont–Columbia University Award three consecutive years; and currently serves as Managing Editor of *Love + Radio*, whose ten-part narrative series *Blood Memory* won the Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction in June 2025 and was shortlisted for the Whickers Prize. Amer's audio reporting and production work has also aired on Reveal from the Center for Investigative Reporting, The Heist from the Center for Public Integrity, and Vox.

96. Amer's audio catalog comprises hundreds of hours of single-speaker and multi-speaker, studio-quality recorded vocal performance — on-air hosting, recorded interviews, podcast narration, and field reporting — continuously available through Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, and the major podcast distribution platforms on which *The City*, *Blood Memory*, *Gravy*, *Post Reports*, *Field Trip*, and Amer's other audio work has been published. *The City* and certain of Amer's other work were additionally distributed through Google Podcasts before Google shut that service down in 2024. The platforms display metadata identifying Amer as the

host, producer, and narrator; the producing organization; the date and series of publication; and the Chicago or Washington production location for the relevant segments. Amer's body of work has been continuously available through these channels for years preceding Microsoft's training of the foundational voice synthesis models alleged in this Complaint.

97. Amer's injury is concrete and particular to her. Microsoft extracted her voiceprint from recordings she produced over more than twenty years of professional audio journalism and podcast production work, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Amer uses to speak every day. The technology Microsoft built using Amer's voiceprint — including MAI-Voice-1 deployed in Microsoft Copilot Daily and Copilot Podcasts, the Voice Live API for real-time voice agents, Custom Neural Voice, and Personal Voice — now operates in the same long-form audio journalism, podcast hosting, and audio production market in which Amer continues to work, against the same colleagues with whom she collaborates, in a competitive position Amer neither chose nor authorized.

*Lindsey Dorcus*

98. Lindsey Dorcus is a professional audiobook narrator and voice actor based in Chicago. Dorcus has recorded more than two hundred audiobooks for major American publishers including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios,

Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd, working from a professional home recording studio in Chicago equipped with industry-standard audiobook production equipment. Dorcus won the Society of Voice Arts and Sciences (SOVAS) Voice Arts Award in 2020 as part of the full-cast voice artist ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind*, and the Independent Audiobook Award in 2021 for LGBTQ+ audiobook narration. AudioFile Magazine has reviewed Dorcus's narration favorably. Dorcus's professional range spans General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, and Greek for main characters and narration, and New England, New York, German, Indian, and Russian for supporting characters.

99. Dorcus's audiobook catalog comprises thousands of hours of single-speaker, studio-quality, professionally produced narration, continuously available through Audible (a subsidiary of Amazon), Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and the other major audiobook retailers and subscription services that distribute her work. Her complete catalog of narrated titles is searchable and accessible on Audible.com and the other major audiobook platforms. The platforms display metadata identifying Dorcus as the narrator, the publisher, the title and series, and the publication date for each title. Dorcus's body of work has been continuously available through these channels for years preceding Microsoft's training of the foundational voice synthesis models alleged in this Complaint.

100. Dorcus's injury is concrete and particular to her. Microsoft extracted her voiceprint from recordings she produced over a career narrating more than two hundred audiobooks for the major American publishers, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Dorcus uses to speak and to perform every day. The technology Microsoft built using Dorcus's voiceprint — including the prebuilt Azure neural voice catalog (over 150 languages and locales), Azure neural HD voices, Custom Neural Voice, Personal Voice (over 90 languages), and MAI-Voice-1 — now operates in the same audiobook narration market where Dorcus earns her livelihood, generating synthetic narration that the major American audiobook publishers for whom Dorcus works have begun to integrate into their production pipelines, in direct competition with the human narration Dorcus provides and at per-character pricing orders of magnitude lower than the industry rates that have historically supported professional audiobook narration.

*Yohance Lacour*

101. Yohance Lacour is a journalist, audio storyteller, writer, playwright, and entrepreneur from the South Side of Chicago who has dedicated his professional work to telling stories of Black Chicago. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio in which Lacour revisits the 1997 hate-crime attack on Lenard

Clark, which he had covered as a young community journalist, tracks down key players in the case a quarter-century later, and examines how the case and its aftermath shaped his own life. *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting and the 2024 Peabody Award; was named to Apple Podcasts' "100 Best Podcasts of All Time" and "Podcasts We Love" lists; received nominations at the Signal Podcasting Awards in the categories of Limited Series & Specials – Best Host and Limited Series & Specials – Documentary; and received four nominations at the Black Podcasting Awards. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series, conducting recorded interviews and providing oral narration. Lacour has additionally appeared as a featured guest and interview subject on NPR's Fresh Air with Tonya Mosley, NPR's All Things Considered with Adrian Florido, the Canadian Broadcasting Corporation's Crime Story podcast with Kathleen Goldhar, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast produced by Audacy's Pineapple Street Studios.

102. Lacour's audio catalog comprises hundreds of hours of single-speaker, studio-quality recorded vocal performance — investigative narration, on-air reporting, recorded interviews, and broadcast guest appearances — continuously available through Apple Podcasts, Spotify, iHeart Podcasts, YouTube, Amazon Music, Overcast, and the major podcast and public-radio distribution platforms on which *You Didn't See Nothin'* and Lacour's other audio work has been published. The platforms display metadata identifying Lacour as the host, narrator, and reporter; the producing organization (the Invisible

Institute and USG Audio for the podcast itself); the date and series of publication; and the Chicago production location. Lacour's body of work has been continuously available through these channels for years preceding Microsoft's training of the foundational voice synthesis models alleged in this Complaint.

103. Lacour's injury is concrete and particular to him. Microsoft extracted his voiceprint from recordings he produced over the course of a career as a journalist, audio storyteller, and podcast creator focused on telling stories of Black Chicago, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Lacour uses to speak every day. The technology Microsoft built using Lacour's voiceprint — including MAI-Voice-1 deployed in Microsoft Copilot Daily and Copilot Podcasts, the Voice Live API, Custom Neural Voice, and Personal Voice — now operates in the same long-form investigative audio journalism and podcast-production market in which Lacour continues to work, against the same colleagues with whom he collaborates, in a competitive position Lacour neither chose nor authorized.

*Victoria Nassif*

104. Victoria Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced in Illinois. Nassif is a trained mezzo-soprano singer whose audiobook narration has been commercially released by

Penguin Random House (through its Random House Audio imprint), Hachette Book Group (through its Little, Brown Young Readers imprint), and Simon & Schuster. Her notable narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), for which she served as the solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize and named a Best Book of the Year by *them* magazine; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa. Nassif's on-camera work includes multiple episodes of *Chicago PD* on NBC (Season 12) and nationally broadcast commercials. Her professional range spans General American, British (Received Pronunciation and Cockney), Persian, Arabic (Levantine dialect), and American Southern. As a first-generation Lebanese-Palestinian American who speaks basic Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern characters and settings — a distinctive professional asset in the audiobook narration industry.

105. Nassif's audiobook catalog comprises dozens of hours of single-speaker, studio-quality, professionally produced narration, continuously available through Audible, Apple Books, Spotify, Libro.fm, and the other major audiobook retailers and subscription services that distribute her work. Her broadcast television work is continuously available through NBC's distribution

channels for *Chicago PD*. The platforms display metadata identifying Nassif as the narrator or performer, the publisher or production company, the title and series, and the publication date. Nassif's body of work has been continuously available through these channels for years preceding Microsoft's training of the foundational voice synthesis models alleged in this Complaint.

106. Nassif's injury is concrete and particular to her. Microsoft extracted her voiceprint from recordings she produced over the course of a career as a professional actor, audiobook narrator, and voiceover artist whose distinctive market position depends on authentic Arabic-accented narration of works by Arab and Palestinian American authors. Microsoft encoded that voiceprint in commercial models and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Nassif uses to speak, sing, and perform every day. The technology Microsoft built using Nassif's voiceprint — including the prebuilt Azure neural voice catalog (over 150 languages and locales), Personal Voice (over 90 languages), Custom Neural Voice, MAI-Voice-1, and Microsoft's multilingual voice synthesis capabilities marketed for audiobook narration, dubbing, advertising voiceover, and contact-center voice work — now operates in the same audiobook narration, voice acting, and on-camera commercial markets where Nassif earns her livelihood, generating synthetic narration in Microsoft's expansive language and locale catalog that includes the capability to produce Arabic-accented English narration and other culturally and linguistically specific voice content in direct competition with the

distinctive professional market position Nassif has built as a Lebanese-Palestinian American narrator providing authentic Arabic-accented performance of works by Arab and Palestinian American authors.

*Microsoft Acted Willfully and Recklessly*

107. Microsoft's collection, retention, commercial exploitation, and dissemination of Plaintiffs' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. Microsoft acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

108. By the time Microsoft commercialized Custom Neural Voice in February 2021, deployed VALL-E in January 2023, and announced MAI-Voice-1 in August 2025, BIPA had been the law of Illinois for more than fifteen years and had generated some of the largest privacy settlements in American history. Those settlements include *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747 (N.D. Cal.) (approximately $650 million); *Rivera v. Google LLC*, Cook County Cir. Ct. No. 2019-CH-00990 (approximately $100 million); and *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill.) (approximately $92 million). In late 2025, Google paid $1.375 billion to the State of Texas to resolve parallel claims under Texas's biometric identifier statute, following Texas's $1.4 billion settlement with Meta in 2024. By any measure, Microsoft was on notice of the biometric-privacy obligations that govern the extraction of biometric identifiers from human source material

throughout the period in which it ingested Plaintiffs' voiceprints into its foundational voice synthesis models.

109. Voice-AI-specific litigation sharpened the notice further. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y. filed May 16, 2024), alleging that an AI voice company created and commercialized unauthorized voice clones trained on the plaintiffs' recordings. In August 2024, additional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), asserting analogous claims against another AI voice company. Microsoft itself was a prior BIPA defendant in *Vance v. Microsoft Corp.*, No. 2:20-cv-01082 (W.D. Wash.). And on February 5, 2026, while Microsoft continued to deploy and expand its voice products, Illinois residents filed *Basich et al. v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash.), alleging that Microsoft Teams' speaker-diarization and transcription features capture and analyze voiceprints from meeting participants in violation of BIPA. By the time Microsoft expanded Custom Neural Voice into Dynamics 365 Contact Center in March 2026 and made MAI-Voice-1 generally available in the Microsoft Foundry Model Catalog by April 2026, AI voice companies were active defendants in litigation alleging the same conduct: building commercial voice synthesis products on voice recordings ingested without the speakers' consent. Microsoft was itself one of those defendants.

110. Microsoft is one of the largest publicly traded technology companies in the world, with a global privacy and compliance apparatus that includes a Chief Privacy Officer, dedicated privacy teams, an annual

Responsible AI Standard, and an annual Responsible AI Transparency Report. Microsoft's own product and research documentation describes its voice synthesis pipeline in biometric terms, as alleged at ¶¶ 33-41. A company that publicly acknowledges the biometric implications of its technology in its own documentation, while proceeding without implementing the notice, consent, retention, and destruction measures that Illinois law requires, has, at a minimum, acted with reckless disregard.

111. Microsoft cannot credibly plead ignorance that its voice synthesis pipeline extracts and stores speaker-specific representations capable of identifying the source speakers. Microsoft built the pipeline, published the research, and shipped the products on that very capability.

112. Microsoft has, moreover, confirmed its understanding that voice synthesis training implicates the legal rights of source speakers in two distinct ways: first, by building safeguards against the downstream misuse of its own voice synthesis products; second, by placing on its enterprise customers the upstream-rights obligation that Microsoft failed to discharge with respect to its own training data.

113. Microsoft built each of the downstream safeguards described at ¶¶ 42-48 because Microsoft understood that voice-AI products require speaker consent. Each safeguard operates at the downstream end of Microsoft's commercial pipeline, constraining how end users use Microsoft's products. None addresses the upstream issue: that Microsoft's foundational voice models were trained on voiceprints extracted without the knowledge or consent of the

speakers whose recordings were ingested. The selective application of consent infrastructure across Microsoft's product line is itself the willfulness fact. Microsoft's knowledge that voice-AI products require speaker consent, proven by the downstream infrastructure it built for some products and the research-only status it preserved for others, applies with equal force to the foundational training pipeline for which Microsoft built no consent infrastructure at all.

114. Microsoft's contractual allocation of biometric-compliance obligations to its customers, alleged at ¶ 47, and Microsoft's instruction to customers that they must "obtain explicit written permission from voice talent," alleged at ¶ 40, are Microsoft's own acknowledgments that the commercial use of an individual's voice to generate synthetic speech requires that individual's consent. Microsoft imposed those obligations on its downstream enterprise customers. Microsoft did not discharge the same obligation, in symmetric form, with respect to its own ingestion of training data.

115. The pattern of Microsoft's conduct between 2014 and 2026 reflects a deliberate, contemporaneous choice. Microsoft built and publicly deployed customer-facing consent and rights-acknowledgment infrastructure for its voice products. It built none of the corresponding upstream consent infrastructure for the speakers whose voices populated the training corpora — corpora documented in Microsoft's own research disclosures as measured in tens and hundreds of thousands of hours, as alleged at ¶ 50. The same Microsoft Research organization, Azure AI Speech business, Microsoft AI division, and acquired Nuance Communications business that developed the

customer-facing consent infrastructure also developed the foundational voice models trained on those unconsented corpora. The same legal and privacy apparatus that drafted the Custom Neural Voice limited-access terms, the Personal Voice acknowledgment workflow, and the talent-disclosure documentation also presided over the absence of corresponding consent for non-user training audio.

116. Microsoft's allocation of biometric-compliance obligations to its customers is itself probative of awareness, and at the same time underscores Microsoft's own breach. As to the voiceprints Microsoft itself extracted from third-party voice recordings, including those of Plaintiffs and Class members, there is no customer in the chain to assume the allocated responsibility. Microsoft is the controller, the entity that collected the data, and the entity in possession of the data. The duty Microsoft's talent-disclosure documentation allocates to others falls, with respect to Plaintiffs' voiceprints, on Microsoft itself. No contractual allocation between Microsoft and its customers can run to, or relieve Microsoft of duties owed to, the non-user speakers from whose recordings Microsoft extracted voiceprints. Microsoft's obligation to Plaintiffs arises directly from BIPA and cannot be discharged by reassignment to downstream parties who have no operational relationship with Plaintiffs.

117. Microsoft's contemporaneous training-data acquisition practices across multiple foundational-model families, alleged at ¶¶ 53-57, confirm that Microsoft's noncompliance reflects a sustained institutional pattern of ingesting identifiable source material at an industrial scale without the consent of the

people whose work the source material represents. Microsoft operates the infrastructure required to do so for voice audio, has used it for the DeepSinger corpus, has provided no mechanism by which the speakers whose voices were ingested can verify, withdraw consent, or request deletion, and has chosen that path over the available alternative — licensed or consented voice data — that would have constrained the speed and scale of its voice AI commercialization.

118. Each of the violations alleged in this Complaint was therefore committed by Microsoft with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended by P.A. 103-769 effective August 2, 2024 and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026).

**CLASS ACTION ALLEGATIONS**

119. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Microsoft extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of Microsoft's foundational voice synthesis models, or commercial voice products derived from those models, during the Class Period.

120. The Class Period runs from the earlier of (a) the date Microsoft first ingested any voice recording into the training pipeline for any of its foundational voice synthesis models, or (b) January 1, 2014, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period.

121. Excluded from the Class are: (i) Microsoft Corporation and each of its parents, subsidiaries, affiliates, and controlled entities, including without limitation Nuance Communications, Inc., Microsoft International Holdings B.V., and Microsoft Ireland Operations Limited; (ii) all current and former officers and directors of Microsoft; (iii) Microsoft's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; and (vi) any person who executed a written release authorizing Microsoft's use of their voice recordings to train, fine-tune, or operate Microsoft's foundational voice synthesis models, in compliance with 740 ILCS 14/15(b), including registered Custom Neural Voice voice talent who provided voice data pursuant to Microsoft's voice-talent acknowledgment workflow, and registered Personal Voice users who provided voice data pursuant to a written or recorded acknowledgment statement.

122. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

123. *Ascertainability.* Class membership is defined by objective criteria and can be determined from records that exist or will be produced in discovery. Whether a particular voice recording entered Microsoft's training pipeline is a binary factual question — the recording is either in the pipeline's ingestion logs or it is not — and the records that answer the question are within Microsoft's exclusive control. Microsoft's published documentation establishes the existence of these records. Microsoft's Speech Studio architecture organizes voice work into projects that contain version-controlled datasets, training runs, and model versions, with file-level identifiers and provenance tracking. Microsoft's data, privacy, and security documentation for Azure AI Speech describes data flow, processing, and retention for voice data within Microsoft's pipelines, and confirms that Microsoft "may process biometric voice signatures" from "randomized audio from the training dataset(s)" — a representation that necessarily implies dataset-level identification of the audio so processed. Microsoft's Speaker Recognition API documentation describes enrollment as the formation of a "unique voice signature" from extracted voice features, and Microsoft's Speech service release notes track dataset and model versions over time. On information and belief, the training-data manifests, ingestion logs, source-URL records, dataset-version records, and associated speaker- and file-level identifiers for the foundational voice models that power the prebuilt Azure neural voice catalog, Azure neural HD voices, Custom Neural Voice, Personal Voice, the Voice Live API, MAI-Voice-1, and Microsoft's research models — including the VALL-E and NaturalSpeech families — exist in Microsoft's

pipeline records and are within its exclusive control. Class membership can be further confirmed through publicly available distribution metadata for voice recordings (audiobook platform records, podcast directory records, streaming service catalogs, and broadcast archive records), through speaker-identification technology applied to Microsoft's training corpus, and through voice-matching analysis comparing Microsoft's voice model outputs against publicly available recordings of class members.

124. *Numerosity.* Joinder of all members of the Class is impracticable. Fed. R. Civ. P. 23(a)(1). Microsoft has publicly disclosed, in research papers describing models built within the same research enterprise that produced its commercial voice products, that VALL-E was trained on approximately 60,000 hours of English speech from over 7,000 unique speakers; that NaturalSpeech 2 was trained on approximately 44,000 hours of data; that NaturalSpeech 3 was trained on approximately 200,000 hours of data; and that DeepSinger was trained on singing-voice data "mined from the web" through a crawl-and-extract pipeline that crawled music websites, separated vocals from accompaniment, aligned lyrics, and filtered samples. The number of distinct individuals whose voice recordings were produced or recorded in Illinois and ingested into the training pipelines that produced Microsoft's commercial voice products plainly satisfies the threshold for numerosity. The Class includes not only the professional broadcast journalists, audiobook narrators, podcasters, voice actors, voiceover artists, and other voice professionals who have produced work in Illinois during the Class Period — themselves a population numbering

in the thousands — but also the interviewees, guests, panelists, witnesses, callers, public officials, and other persons whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, archival, and other publicly distributed audio content, and whose recordings are accessible on the publicly distributed audio platforms from which Microsoft, on information and belief, sourced training data. On information and belief, the Class population numbers in the hundreds of thousands or more. The exact number is within Microsoft's exclusive control and will be established through discovery.

125. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Microsoft did not engage in any individualized notice, consent, retention-policy disclosure, release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Microsoft's foundational voice training pipelines. Microsoft's conduct was uniform: the same training pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to all class members through the same automated and standardized process. The questions whether Microsoft complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and privacy-protection requirements before and after extracting the voiceprints of class members can be answered classwide because Microsoft's compliance, or noncompliance, was identical as to every class member.

126. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics that Microsoft extracts during voice model training, including representations Microsoft itself describes in its own product and research documentation as "biometric voice signatures," "voice signatures," and speaker embeddings, constitute "voiceprints" or "biometric information" within the meaning of 740 ILCS 14/10;

(b) whether Microsoft informed class members in writing that their biometric identifiers were being collected, of the specific purpose and duration of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c) whether Microsoft developed and made publicly available a written retention and destruction policy applicable to class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(d) whether Microsoft sold, leased, traded, or otherwise profited from class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(e) whether Microsoft disclosed or disseminated class members' biometric identifiers to third parties — including affiliates, vendors, subprocessors, and service providers across the multiple jurisdictions in which Microsoft operates its global cloud business, and through Microsoft's acquired Nuance Communications speech-services business — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether Microsoft stored, transmitted, and protected class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its

protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2), including in light of (i) the asymmetry between Microsoft's robust safeguards for customer-uploaded acknowledgment recordings under Custom Neural Voice and Personal Voice limited-access controls and the absence of corresponding safeguards for the biometric identifiers Microsoft itself extracted from non-user training audio, and (ii) the asymmetry between Microsoft's protection of its own confidential and proprietary commercial information — including source code, enterprise customer data, and trade secrets — under closed-system controls, restricted access, encryption at rest and in transit, and customer-managed encryption keys, and the absence of corresponding protections for the biometric identifiers Microsoft extracted from non-user training audio;

(g) whether Microsoft's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether Microsoft used class members' voices and identities for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a);

(i) whether Microsoft's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b), as amended by P.A. 103-836 effective January 1, 2025, and whether Microsoft materially contributes to or facilitates their distribution within the meaning of 765 ILCS 1075/30(d);

(j) whether Microsoft's conduct constitutes deceptive trade practices likely to cause confusion in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2(a)(2) and 510/2(a)(3);

(k) whether Microsoft's conduct constitutes an unfair practice under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, under the test articulated in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002);

(l) whether Microsoft was unjustly enriched by its unauthorized use of class members' voice data; and

(m) the appropriate measures of damages, restitution, and injunctive relief.

127. *Typicality.* The claims of the named Plaintiffs are typical of the claims of the Class. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, voice acting, and related professional voice work, recorded in Chicago broadcast facilities, podcast and audio production studios, and home recording studios in this District. Microsoft, on information and belief, ingested those recordings into the training pipelines for its foundational voice synthesis models and extracted voiceprints and/or biometric information from them without notice, consent, or written release. The voiceprints are now embedded in Microsoft's foundational voice models and commercial voice products alleged at ¶ 31— and reproduced in the audio those models generate. The legal theories asserted on behalf of the Class —

that Microsoft's extraction, retention, commercial exploitation, and dissemination of voiceprints from Illinois-recorded voice work without BIPA-compliant consent violates 740 ILCS 14/15(a)–(e), and that Microsoft's commercial use of voices and identities without consent violates the Illinois Right of Publicity Act — apply with equal force to each named Plaintiff and to every other class member. Each named Plaintiff has the same interest as every other class member in establishing Microsoft's liability and obtaining the relief sought in this Complaint.

128. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent class members; each named Plaintiff has the same incentive as every other class member to maximize recovery and to obtain comprehensive injunctive relief addressing the unlawful extraction of voiceprints. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

129. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Microsoft has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Microsoft's training pipelines operated uniformly across every class member's voice recordings; Microsoft's failure to obtain BIPA-compliant consent was uniform; Microsoft's failure to publish a retention and destruction policy applicable to non-user training data subjects

was uniform; and Microsoft's continuing possession and commercial exploitation of class members' voiceprints in commercial models — and ongoing deployment of those voiceprints through the deployment channels alleged at ¶ 31, ¶ 68(a)-(h), and ¶ 8 — is uniform. Plaintiffs seek classwide injunctive relief under 740 ILCS 14/20, 815 ILCS 510/3 (IUDTPA, which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining, without the unlawfully obtained voiceprints and biometric information, of the foundational voice synthesis models in which class members' voiceprints are encoded — that necessarily applies on the same terms to every class member.

130. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate for the Class on the damages and restitutionary claims asserted in this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

131. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. Whether Microsoft's voice model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer — Microsoft's own data, privacy, and security documentation for Azure AI Speech describes the pipelines as processing "biometric voice signatures" from "randomized audio

Case 1:26-cv-05454 Document #: 4-1 Filed: 07/21/26 Page 666 of 940 PageID #:718

from the training dataset(s)"; Microsoft's Speaker Recognition API documentation describes enrollment as "extract[ing] voice features to form a unique voice signature"; and Microsoft's VALL-E paper describes the system as preserving "the speaker's emotion and acoustic environment" from input audio. Whether Microsoft complied with BIPA's notice, consent, retention, profiting, dissemination, and privacy-protection requirements is a common legal question with a common answer — Microsoft did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. Whether Microsoft's conduct was willful or reckless turns on Microsoft's institutional knowledge, decision-making, and conduct, all of which are common to the Class. The principal individual question — whether a specific class member's voice recordings entered the training pipelines — is binary and resolvable from Microsoft's own records, including the training-data manifests, ingestion logs, pipeline metadata, and source-identifier records in Microsoft's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended and as construed in *Clay*, do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

132. *Superiority.* A class action is the superior method for adjudicating these claims:

(a) *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover

artists — and incidental speakers whose voiceprints were extracted without their knowledge. Many class members are unaware their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against one of the largest publicly traded technology companies in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Microsoft on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train Microsoft's foundational voice synthesis models. One related action concerning Microsoft's biometric voice practices is currently pending in the Western District of Washington: *Basich et al. v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash. filed Feb. 5, 2026), in which Illinois residents allege that Microsoft Teams' speaker-diarization and transcription features capture and analyze voiceprints from meeting participants in violation of BIPA. *Basich* arises from a different Microsoft product feature unrelated to foundational voice synthesis models, Microsoft Teams' real-time voice attribution. The two actions involve different products, data sources, biometric-processing pipelines, alleged uses, proof, and have non-overlapping class definitions. Microsoft was previously a BIPA defendant in *Vance v. Microsoft Corp.*, No. 2:20-cv-01082 (W.D. Wash.). Neither *Basich* nor *Vance* asserts claims on behalf of voice professionals —

broadcast journalists, podcasters, audiobook narrators, voiceover artists, and other speakers — whose voice recordings were ingested into Microsoft's foundational voice synthesis training pipelines.

(c) *Desirability of concentration in this forum.* Concentrating this litigation in this District is appropriate. Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Microsoft conducts substantial commercial business in Illinois, including through enterprise licensing of its voice AI products to Illinois-based customers and through office locations and operational presence in the City of Chicago. This Court is well-suited to adjudicate BIPA and other Illinois statutory claims arising from Microsoft's commercial conduct in Illinois.

(d) *Manageability*. The case is manageable as a class action. Microsoft's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; class membership can be determined from Microsoft's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

133. To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Microsoft's

concealment of its training-data sources, by Microsoft's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Microsoft had ingested their recordings into its training pipelines, and by the continuing nature of Microsoft's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational audio models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data, and each public release of model parameters encoding that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## **CLAIMS FOR RELIEF**

### **Count I**

### **Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)**

*Brought on behalf of the Class*

134. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

135. Plaintiffs bring this Count individually and on behalf of the Class.

136. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving

through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

137. Microsoft is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

138. Microsoft collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class members by ingesting their voice recordings into its training pipelines and extracting from those recordings computational representations capable of identifying the speakers, as alleged in detail at ¶¶ 33-41. The resulting representations, described in Microsoft's product and research documentation as "biometric voice signatures," "voice signatures," speaker embeddings, audio tokens, and factorized timbre representations, are voiceprints and biometric information within the meaning of BIPA.

139. Microsoft did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Microsoft obtained no consent of any kind, in any form, from any Plaintiff or Class member.

140. Microsoft's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 107-118. In the alternative, Microsoft's violations were negligent.

141. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended by P.A. 103-769 effective August 2, 2024 and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**

*Brought on behalf of the Class*

142. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

143. Plaintiffs bring this Count individually and on behalf of the Class.

144. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with Microsoft in connection with the

collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

145. Microsoft has been, and remains, in possession of voiceprints and biometric information extracted from recordings of Plaintiffs and Class members, encoded in the parameters of the foundational voice synthesis models that power Microsoft's commercial voice products.

146. Microsoft has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training data and embedded in the parameters of Microsoft's foundational voice synthesis models, as alleged at ¶¶ 49-57. Microsoft's Azure AI Speech privacy documentation addresses customer-provided acknowledgment recordings used for Azure AI Speaker Verification ("retained only as long as necessary to perform speaker verification"); it does not address voiceprints extracted from non-user training audio. Microsoft's general Privacy Policy does not address voice data used in AI model training and does not apply to non-users like Plaintiffs. Microsoft has not provided, and on information and belief does not maintain, any mechanism by which Plaintiffs or other non-user training-data subjects can request access to, correction of, or deletion of their biometric data.

147. Microsoft's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 107-118. In the alternative, Microsoft's violations were negligent.

148. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

149. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

150. Plaintiffs bring this Count individually and on behalf of the Class.

151. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier may sell, lease, trade, or otherwise profit from a person's biometric identifier. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

152. Microsoft has profited, and continues to profit, from Plaintiffs' and Class members' voiceprints by using those voiceprints to develop, train, and commercially operate the foundational voice synthesis models that power Microsoft's commercial voice products, and by monetizing those products through each of the channels alleged at ¶ 68(a)-(h), which are incorporated here. The voice quality, expressiveness, multilingual capability, speaker similarity, and realism that Microsoft sells through those channels exist because of the voiceprints encoded in Microsoft's foundational voice synthesis models. Microsoft's commercial exploitation of Plaintiffs' and Class members' voiceprints does not fall within any exception to § 15(c).

153. Microsoft's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 107-118. In the alternative, Microsoft's violations were negligent.

154. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

155. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

156. Plaintiffs bring this Count individually and on behalf of the Class.

157. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier may disclose, redisclose, or otherwise disseminate a person's biometric identifier unless an enumerated exception applies. 740 ILCS 14/15(d).

158. Microsoft has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints in three categories of conduct, each independently sufficient to violate § 15(d) and as alleged at ¶¶ 70-74.

159. *First*, Microsoft has, on information and belief, transferred the foundational voice synthesis models — and the voiceprints encoded within them — among Microsoft's affiliated corporate entities, including Nuance Communications, Inc., Microsoft International Holdings B.V., and Microsoft Ireland Operations Limited, in the ordinary course of Microsoft's global voice AI business.

Case 1:26-cv-05491 Document #: 24-1 Filed: 07/21/26 Page 675 of 940 PageID #:3827

160. *Second*, Microsoft has, on information and belief, transmitted the foundational voice synthesis models — and the voiceprints encoded within them — to Azure cloud-infrastructure subprocessors, content-delivery-network operators, hardware partners, and other vendors in the ordinary course of training, evaluating, deploying, and operating its commercial voice products. The delivery of Microsoft's voice synthesis services to enterprise and consumer customers, including Illinois customers, necessarily involves transmitting model parameters and inference outputs over that infrastructure.

161. *Third*, to the extent Microsoft Research has published reference implementations or model artifacts associated with the VALL-E, NaturalSpeech, DeepSinger, or other research model families on GitHub or similar platforms that enable the reconstruction of or downstream training on model parameters trained on Plaintiffs' voice recordings, those releases constitute additional dissemination of the biometric data encoded in those parameters.

162. Plaintiffs and Class members did not consent to any of the disseminations alleged in this Count. No enumerated exception under § 15(d) applies.

163. Microsoft's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 107-118. In the alternative, Microsoft's violations were negligent.

164. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

165. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

166. Plaintiffs bring this Count individually and on behalf of the Class.

167. Section 15(e) of BIPA requires a private entity in possession of biometric identifiers to store, transmit, and protect the identifiers from disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

168. Microsoft fails the § 15(e)(2) asymmetry test on two independent grounds.

169. *First asymmetry — confidential customer and proprietary data vs. non-user biometric data.* Microsoft contemporaneously protects its own confidential and proprietary information, and the confidential information of its commercial customers, under closed-system controls that are among the most

rigorous in the technology industry. Microsoft maintains the source code for its core commercial products — including Windows, Microsoft Office, Microsoft 365, Microsoft Teams, Azure, GitHub Enterprise, and Microsoft's AI training stack — as closed-source proprietary information under strict access controls, internal classification systems, encryption at rest and in transit, and information-security regimes that are subject to extensive internal audit. Microsoft offers its enterprise customers FedRAMP High and DoD Impact Level 5 authorized Azure environments, SOC 1/2/3 attestations, ISO 27001/27017/27018 certifications, customer-managed encryption keys, Azure Confidential Computing, and contractual data-processing protections through the Microsoft Customer Agreement and the Microsoft Products and Services Data Protection Addendum. Microsoft's published Responsible AI Standard and Responsible AI Transparency Report describe an extensive internal review apparatus for high-risk AI deployments. Microsoft protects customer-uploaded acknowledgment recordings for Custom Neural Voice and Personal Voice under Limited Access registration, speaker verification, and explicit retention statements stating that those recordings are "retained only as long as necessary to perform speaker verification."

170. Microsoft's protection of non-user biometric data — the voiceprints extracted from Plaintiffs' and Class members' voice recordings and encoded in the parameters of Microsoft's commercial voice synthesis models — is the inverse of those protections. Microsoft has not published a retention or destruction policy applicable to non-user training-data biometric identifiers.

Microsoft has not provided a mechanism by which non-users can request access to, correction of, or deletion of their biometric data. Microsoft has not disclosed the sources of the voice recordings used to train its prebuilt Azure neural voices, Azure neural HD voices, MAI-Voice-1, or the foundational models underlying Custom Neural Voice and Personal Voice. The biometric data is encoded permanently in the parameters of models continuously deployed across Azure AI Speech, Microsoft Foundry, Microsoft Copilot, Microsoft Teams, Dynamics 365 Contact Center, the Voice Live API, and acquired Nuance speech offerings. As alleged at ¶¶ 49-57, Microsoft has, by its own published disclosures, refused to identify or destroy this data, and has built none of the safeguards it routinely builds for the confidential information of its commercial customers.

171. The asymmetry violates § 15(e)(2). Microsoft protects its source code, its enterprise customer data, its commercial trade secrets, its employee personnel files, its internal financial records, and its customer-uploaded acknowledgment recordings under materially more protective regimes than it applies to the biometric identifiers of Plaintiffs and Class members. The biometric data is the least protected category of sensitive data Microsoft holds — not because the data is unimportant, but because the Plaintiffs and Class members are non-parties to whom Microsoft chose not to disclose the collection.

172. *Second asymmetry — customer-uploaded biometric data vs. non-user training-audio biometric data.* Microsoft has demonstrated, through the

safeguards alleged at ¶¶ 42-48, that it possesses the operational capability to protect biometric voice data, the contractual infrastructure to define retention and destruction terms, and the technical infrastructure to enforce access and deletion. Microsoft deploys that capability for the speakers with whom it has a commercial relationship and withholds it from the non-user speakers whose recordings Microsoft itself ingested into the training pipeline.

173. The asymmetry between Microsoft's robust protection of customer-uploaded biometric data and the absence of any equivalent protection for non-user biometric data extracted from training audio is itself a § 15(e)(2) violation. A private entity that knows how to protect biometric data, and demonstrably does so for some categories of data subjects, but withholds equivalent protection from another category of data subjects to whom the same statutory duty runs, fails § 15(e)(2)'s requirement that biometric data be protected "in a manner that is the same as or more protective than" the entity's protection of other confidential and sensitive information.

174. Independently, Microsoft fails the § 15(e)(1) reasonable-standard-of-care test as to voiceprints extracted from non-user training data. The reasonable standard of care within the AI and machine learning industry for the handling of biometric training data includes documented provenance for training data, access controls, audit logging, encryption, a documented retention and destruction schedule, and a mechanism through which data subjects may request access to, correction of, or deletion of their biometric data. Microsoft has not published documented provenance for the bulk of the

voice training data used to build its commercial voice synthesis models, as alleged at ¶¶ 49-57; has not published any access-control protocol, audit-logging policy, encryption standard, or retention and destruction schedule specifically applicable to non-user voice training data or to the biometric characteristics encoded in its voice models; and has not provided any mechanism through which non-user data subjects may request access to, correction of, or deletion of their biometric data from Microsoft's training datasets, model parameters, or commercial inference pipelines. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of their data, because those individuals have no ability to monitor, verify, or challenge how their data is stored, transmitted, or protected. The reasonable industry standard of care for biometric data presupposes some mechanism by which the data subject can verify the integrity of the protection; Microsoft has provided none.

175. Microsoft's violations of § 15(e) were intentional or reckless, as alleged at ¶¶ 107-118. In the alternative, Microsoft's violations were negligent.

176. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count VI**

**Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

177. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

178. Plaintiffs bring this Count individually and on behalf of the Class.

179. The Illinois Right of Publicity Act protects an individual's right to control commercial use of their identity. 765 ILCS 1075/30(a) provides that a person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the individual. IRPA defines "identity" to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

180. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

181. Microsoft used Plaintiffs' and Class members' identities for commercial purposes within the meaning of IRPA, by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the commercial voice synthesis products that Microsoft monetizes through the integrated commercial chain alleged at ¶¶ 68(a)-(h). Microsoft holds out its products' ability to generate realistic, expressive, and human-sounding voices — and, in the case of Custom Neural Voice and Personal Voice, their ability to synthesize speech that sounds "nearly identical to" a source human voice — as a core commercial feature of those products, a capability built from the identities of the

individuals whose recordings were used to train the foundational models. Microsoft did not obtain written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

182. Independently, the Illinois Right of Publicity Act, as amended by P.A. 103-836 effective January 1, 2025, prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative. 765 ILCS 1075/30(b). The amended IRPA further imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution. 765 ILCS 1075/30(d). On information and belief, Microsoft's commercial voice products — including the prebuilt Azure neural voice catalog, Azure neural HD voices, Custom Neural Voice, Personal Voice, MAI-Voice-1, and the Voice Live API — generate, distribute, and make available to the public voice outputs that constitute unauthorized digital replicas of Plaintiffs and Class members within the meaning of the amended IRPA. Microsoft materially contributes to and facilitates the distribution of such replicas through its integrated commercial channels, including Azure AI Speech, Microsoft Foundry, Microsoft Copilot, Microsoft Teams, Dynamics 365 Contact Center, and the deployment of MAI-Voice-1 in Microsoft Copilot Daily and Copilot Podcasts.

183. Microsoft's violations of IRPA were willful and knowing, as alleged at ¶¶ 107-118. Microsoft's customer-facing safeguards and contractual allocations, alleged at ¶¶ 40, 45, and 47, are Microsoft's own acknowledgments

that the commercial use of an individual's voice to generate synthetic speech requires that individual's consent. Microsoft imposed those obligations on its downstream customers and end users. Microsoft chose not to apply equivalent consent infrastructure to Plaintiffs and Class members, whose voices Microsoft itself extracted to train the foundational models.

184. Plaintiffs and the Class have suffered concrete injury from Microsoft's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods, as alleged at ¶¶ 75-82.

185. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to Microsoft's unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

## Count VII

## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

186. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

187. Plaintiffs bring this Count individually and on behalf of the Class.

188. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices ... in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices is broader than its prohibition of deceptive practices and reaches conduct that, even absent affirmative misrepresentation, offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417-18 (2002).

189. Microsoft engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis services to Illinois customers through the integrated commercial chain alleged at ¶¶ 68(a)-(h), and by collecting, extracting, and commercially exploiting the biometric identifiers of Illinois persons in connection with that commerce.

190. Microsoft's conduct is unfair within the meaning of ICFA. Microsoft's collection and commercial exploitation of the biometric identifiers of Illinois persons without their knowledge or consent offends Illinois public policy as expressed in BIPA — the Illinois statute enacted specifically to address the unauthorized collection of biometric identifiers, 740 ILCS 14/5 — and as expressed in IRPA — the Illinois statute enacted specifically to address the unauthorized commercial use of personal identity, 765 ILCS 1075/30. Microsoft's conduct caused substantial injury to Plaintiffs and Class members, including the diversion of licensing income they would otherwise have earned

for the use of their voices and the displacement of their professional voice work in the markets where they earn their livelihoods, as alleged at ¶¶ 75-82. Plaintiffs and Class members could not reasonably have avoided this injury because they had no knowledge that Microsoft was collecting their biometric data.

191. Microsoft's conduct is also independently deceptive within the meaning of ICFA. Microsoft's data, privacy, and security documentation for Azure AI Speech uses hedging language ("may process biometric voice signatures") to obscure the nature and extent of the biometric processing Microsoft performs during training. Microsoft's disclosure-for-voice-and-avatar-talent documentation, alleged at ¶ 47, attempts to push Microsoft's own statutory obligations onto downstream customers who have no operational relationship with Plaintiffs and cannot satisfy those obligations as to Plaintiffs. Microsoft has maintained total opacity about the sources of its prebuilt voice training data, the Azure neural HD voices training data, and the MAI-Voice-1 training data while commercially exploiting that data at scale across its products. The omissions and the obligation-shifting are materially misleading to consumers and to the public, including to voice professionals whose work Microsoft's products commercially substitute for, about whether Microsoft's voice products are built from biometric data collected with appropriate consent.

192. Microsoft's unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted

opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Microsoft's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, and not merely from the existence of competing AI products.

193. Microsoft's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged at ¶¶ 107-118.

194. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class (injunctive relief only)*

195. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

196. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

197. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes

likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

198. Microsoft's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, embedded in Microsoft Copilot Daily and Copilot Podcasts experiences, integrated into Dynamics 365 Contact Center deployments, and otherwise commercially exploited by Microsoft's customers and end users without consumer-facing disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content.

199. Plaintiffs and Class members are persons likely to be damaged by Microsoft's deceptive practices within the meaning of 815 ILCS 510/3. Microsoft's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

200. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Microsoft to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that Microsoft has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3, Plaintiffs also seek reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

201. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

202. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

203. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

204. Microsoft obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train

Microsoft's foundational voice synthesis models; the product capability and competitive advantage Microsoft captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and the revenue Microsoft generates and continues to generate through the commercial exploitation of those models across the integrated commercial chain alleged at ¶¶ 68(a)-(h).

205. Microsoft obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional recordings. Microsoft's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Microsoft, and Microsoft's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods, as alleged at ¶¶ 75-82.

206. Microsoft's retention of these benefits is unjust. Microsoft's conduct violated the Illinois statutory protections for biometric data (BIPA) and for personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Microsoft's institutional practice confirms the inequity of its retention: Microsoft built and deployed customer-facing rights-acknowledgment infrastructure (Custom Neural Voice, Personal Voice, Enterprise AI Services Code of Conduct, talent-disclosure documentation, the VALL-E 2 and ELaTE research-only retention) for the speakers with whom it

has a commercial relationship, but did not apply equivalent infrastructure to the voices of Plaintiffs and Class members from whom Microsoft itself took voiceprints without consent. Microsoft could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

207. Plaintiffs and the Class seek restitution of the benefits Microsoft has unjustly retained, including disgorgement of profits Microsoft earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Microsoft Corporation and award the following relief:

A. *Injunctive Relief*. Permanent and, where appropriate, preliminary injunctive relief requiring Microsoft to:

(1) Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2) Cease the commercial use, sale, lease, trade, profiting from, or dissemination of voiceprints and biometric information of Plaintiffs and

Class members that Microsoft has already collected without BIPA-compliant consent;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate Microsoft's foundational voice synthesis models, including without limitation the prebuilt Azure neural voice catalog, the Azure neural HD voices, Custom Neural Voice, Personal Voice, the Voice Live API, MAI-Voice-1, the Speaker Recognition API, the VALL-E, VALL-E X, VALL-E 2, NaturalSpeech, NaturalSpeech 2, NaturalSpeech 3, SpeechX, LiveSpeech, ELaTE, and DeepSinger research model families, and the conversational and speech-recognition models distributed through Microsoft's wholly-owned subsidiary Nuance Communications, Inc.;

(4) Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information of non-users, in compliance with 740 ILCS 14/15(a), and provide a mechanism through which non-user data subjects may request access to, correction of, or deletion of their biometric data from Microsoft's training datasets, model parameters, and commercial inference pipelines;

(5) Destroy all voiceprints and biometric information of Plaintiffs and Class members that Microsoft obtained without BIPA-compliant consent, and certify the destruction;

(6) Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational voice synthesis models

— and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation the prebuilt Azure neural voice catalog, the Azure neural HD voices, Custom Neural Voice, Personal Voice, the Voice Live API, MAI-Voice-1, the Speaker Recognition API, the VALL-E, NaturalSpeech, and DeepSinger research models, the conversational and speech-recognition models distributed through Nuance Communications, Inc., and any iterative or successor models trained from those models or derived from voiceprints encoded in them. To the extent Microsoft Research has published, on GitHub or any comparable platform, any model artifacts, reference implementations, weights, or other releases that include or enable the reconstruction of model parameters trained on the unlawfully obtained voiceprints, take all reasonable measures to recall and remove the unlawfully encoded model parameters from public availability, including by issuing takedown requests, ceasing further distribution, and ceasing further support of derivative releases. To the extent foundational voice synthesis models containing the unlawfully obtained voiceprints have been transferred to or are deployed through Nuance Communications, Inc., Microsoft International Holdings B.V., Microsoft Ireland Operations Limited, or any other Microsoft affiliated entity, this remedy extends to all such instances;

(7) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution or making

available of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b); and

(8) Provide adequate consumer-facing disclosure that voice outputs generated by Microsoft's commercial voice products — including without limitation MAI-Voice-1 outputs deployed in Microsoft Copilot Daily and Copilot Podcasts, Custom Neural Voice and Personal Voice outputs, Voice Live API outputs, Dynamics 365 Contact Center voice outputs, and prebuilt Azure neural voice and Azure neural HD voice outputs — are AI-generated, are derived from foundational voice synthesis models built using voice recordings of unidentified speakers, and have not been authorized by the individuals whose vocal characteristics are reproduced.

B. *BIPA Damages*. Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended by P.A. 103-769 (effective August 2, 2024) and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C. *IRPA Damages*. Award the actual damages Plaintiffs and Class members sustained as a result of Microsoft's unauthorized commercial use of their identities and voices; the profits Microsoft earned from that unauthorized use to the extent not taken into account in computing actual damages;

statutory minimum damages of $1,000 per violation where applicable under 765 ILCS 1075/40; and punitive damages under 765 ILCS 1075/40.

D. *ICFA Damages*. Award the actual economic damages Plaintiffs and Class members sustained as a result of Microsoft's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a(c).

E. *Restitution and Disgorgement*. Order restitution of the benefits Microsoft has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities; disgorgement of the profits Microsoft has earned through each of the commercial channels alleged at ¶ 68(a)-(h); and an accounting of all such revenues and benefits.

F. *Non-Duplication*. Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification*. Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment*. Enter judgment in favor of Plaintiffs and all Class members and against Defendant Microsoft Corporation on all Counts on which Defendant is found liable.

I. *Attorneys' Fees and Costs*. Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J. *Interest*. Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Further Relief*. Award such other and further relief as the Court deems just, equitable, and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 12, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com

LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Alison Flowers, Carol Marin, Philip Rogers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PHILIP ROGERS, CAROL MARIN, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| v. | ) | |
| NVIDIA CORPORATION, a Delaware corporation, | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs, Philip Rogers, Carol Marin, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant NVIDIA Corporation ("NVIDIA"), allege as follows:

## NATURE OF THE CASE

1. NVIDIA built a suite of commercial voice AI products using the voices of real people, including some of the most accomplished broadcast journalists, investigative podcasters, and audiobook narrators working in the United States today. To build the foundational voice synthesis models that now power Magpie TTS Multilingual, Magpie TTS Zeroshot, Magpie TTS Flow, FUGATTO, PersonaPlex, Nemotron 3 VoiceChat, and the Canary and Parakeet

speech models — and to power the commercial voice services NVIDIA distributes through NVIDIA AI Enterprise, the NVIDIA API Catalog, NVIDIA NIM microservices, and open-weight model releases on Hugging Face — NVIDIA ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers from those recordings. Plaintiffs' voices are among them.

2. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade broadcast journalist, a three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; Alison Flowers, a 2021 Pulitzer finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Philip Rogers, an Emmy- and Murrow Award–winning broadcaster who covered four decades of Chicago news; Lindsey Dorcus, a SOVAS and Independent Audiobook Award–winning narrator of more than two hundred audiobooks for the major American publishers; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their voice was being used to train NVIDIA's commercial voice AI. None of them was asked. None of them consented.

3. A voiceprint is a digital fingerprint of the human voice. It is a mathematical representation of the acoustic features — pitch, timbre, resonance — that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

4. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, along with a written release. 740 ILCS 14/15(b). NVIDIA failed to comply with any of those requirements with respect to the Plaintiffs.

5. NVIDIA's noncompliance was not a misreading of BIPA. Its commercial terms, model cards, and public statements show that it understood that voice synthesis training implicates the legal rights of the source speakers. NVIDIA's Product Specific Terms for AI Products define a "Custom TTS Application" as "a custom text-to-speech application that enables the creation of synthetic voice output that resembles an input voice," and require NVIDIA's

enterprise customers to "have sufficient rights and licenses for content used with a Custom TTS Application to generate new content." NVIDIA's October 2025 Magpie TTS launch advised users that voice cloning should be used only with "target speakers who have consented to such use." NVIDIA's Trustworthy AI terms, incorporated by reference into the licenses under which NVIDIA distributes its open-weight voice models, expressly prohibit use of those models for "unlawful biometric data collection." NVIDIA placed the consent obligation on its downstream customers and end users, and built nothing comparable for itself regarding the voices it used to train the foundational models in the first place.

6. Nor was NVIDIA's noncompliance a failure of safety capability. When NVIDIA recognized that its FUGATTO audio model — a 2.5-billion-parameter generative model trained on more than 50,000 hours of audio and capable of generating and transforming human voices — posed risks of voice impersonation and deepfake misuse, it withheld the model from public release. When NVIDIA released Magpie TTS Zeroshot and Magpie TTS Flow in October 2025, it announced a collaboration with Pindrop, a voice-fraud detection company, to develop deepfake-detection capabilities for NVIDIA's models. When NVIDIA released PersonaPlex in January 2026, it architecturally restricted the model to a fixed set of eighteen pre-packaged voice embeddings rather than supporting arbitrary voice cloning from user-supplied audio. NVIDIA built each of these safeguards to prevent the downstream misuse of its products. It built

none of them for the people whose voices it took to train those products in the first place.

7. NVIDIA's noncompliance was, instead, a deliberate institutional decision. NVIDIA had every commercial reason to know that voice training extracts biometric identifiers. NVIDIA's published research and product documentation confirm this. NVIDIA's Magpie TTS Flow model card describes the model as analyzing "a speaker's voice" to "replicate voice qualities such as pitch, timbre and speech rate" and as "[m]aintain[ing] the original characteristics that capture unique voice audio signature." NVIDIA's PersonaPlex model card describes the system as conditioned on "a voice prompt" consisting of "audio tokens that establish the target vocal characteristics and speaking style." Compliance with BIPA would have required NVIDIA to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording into the training pipeline. With foundational models trained on a corpus measured in hundreds of thousands of hours of speech and millions of distinct speakers, that compliance burden would have constrained the speed and scale of NVIDIA's voice AI development. NVIDIA chose speed and scale over compliance. That was not an oversight. It was a business decision.[1]

[1] NVIDIA's published research describes the architecture by which voice characteristics are extracted from speech recordings and encoded into the parameters of its voice models. NVIDIA's NeMo and Riva pipelines tokenize audio waveforms into discrete representations that Magpie's documentation describes as capturing "speaker characteristics," and Magpie's preference-alignment training uses "speaker verification (SV) models within a reward system to create a preference dataset" — that is, computational comparison of speaker acoustic

8. The voiceprints NVIDIA extracted from Plaintiffs are not stored in a database that can be deleted on request. They are encoded in the parameters of NVIDIA's commercial voice models and reproduced in the audio those models generate. NVIDIA has also published the parameters of several of those models — including PersonaPlex, Canary, and Parakeet — as open-weight releases on Hugging Face under the NVIDIA AI Open Model License and the NVIDIA Nemotron Open Model License, available for download by any party worldwide. At this point, the biometric data and the product are the same thing. The product has already been distributed.

9. The technology NVIDIA built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their living. NVIDIA markets Magpie TTS Flow as "ideal for studio dubbing and podcast narration" — directly displacing the audiobook narration Plaintiffs Dorcus and Nassif provide and the long-form investigative audio journalism Plaintiffs Lacour, Flowers, and Amer have spent their careers developing. Magpie TTS Zeroshot can replicate a target speaker's voice from a five-second audio sample. Each of these products is offered to enterprise customers at a fraction of the cost of human narration. Each was built using the vocal characteristics of the human performers it now

---

signatures during training. *See* NVIDIA, *Magpie TTS Flow Model Card*, https://web.archive.org/web/20260414085841/https://build.nvidia.com/nvidia/magpie-tts-flow/modelcard (last visited May 12, 2026); NVIDIA, *PersonaPlex Model Card*, https://huggingface.co/nvidia/personaplex-7b-v1 (last visited May 12, 2026); NVIDIA Developer Blog, *Enhancing Multilingual Human-Like Speech and Voice Cloning with NVIDIA Riva TTS* (Oct. 9, 2025), https://developer.nvidia.com/blog/enhancing-multilingual-human-like-speech-and-voice-cloning-with-nvidia-riva-tts/ (last visited May 12, 2026). Plaintiffs allege on information and belief that the same architecture and processing pipeline was applied to the voice training data ingested for the foundational models that power NVIDIA's commercial voice products.

displaces, including, on information and belief, the vocal characteristics of every Plaintiff in this case.

10. Plaintiffs' injuries are concrete and particularized. NVIDIA extracted Plaintiffs' voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. NVIDIA retains those voiceprints in its commercial models and continues to profit from them. NVIDIA has further disseminated those voiceprints, encoded in model parameters, through its open-weight model releases on Hugging Face. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

11. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that NVIDIA unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that NVIDIA's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act ("IRPA"). Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

12. Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for violations of BIPA's notice, consent, retention, profiting, dissemination, and

protection requirements; (ii) actual damages and disgorgement of profits NVIDIA has earned from the commercial exploitation of Plaintiffs' biometric data; (iii) injunctive relief requiring NVIDIA to (a) cease collecting biometric identifiers from voice recordings produced or recorded in Illinois without BIPA-compliant consent, (b) identify the sources of the voice training data used to build its foundational voice synthesis models, (c) destroy all voiceprints and biometric information unlawfully obtained from Plaintiffs and the class, and (d) destroy or retrain, without the unlawfully obtained data, the foundational voice models and downstream commercial products that contain that data; and (iv) reasonable attorneys' fees, costs, and expenses.

**PARTIES**

13. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that NVIDIA extracted his voiceprint are described at ¶¶ 89-94.

14. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a broadcast journalist whose career has been conducted primarily in Chicago. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that NVIDIA extracted her voiceprint are described at ¶¶ 95-99.

15. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that NVIDIA extracted her voiceprint are described at ¶¶ 100-104.

16. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that NVIDIA extracted her voiceprint are described at ¶¶ 105-109.

17. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that NVIDIA extracted her voiceprint are described at ¶¶ 110-114.

18. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast work, including the Pulitzer Prize–winning *You Didn't See Nothin'*, is produced in Chicago. Lacour's body of professional voice work, the

public availability of his recordings, and the basis for Plaintiffs' allegation that NVIDIA extracted his voiceprint are described at ¶¶ 115-119.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that NVIDIA extracted her voiceprint are described at ¶¶ 120-124.

20. Defendant NVIDIA Corporation ("NVIDIA") is a Delaware corporation with its principal executive offices at 2788 San Tomas Expressway, Santa Clara, California 95051.

**JURISDICTION AND VENUE**

21. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and Defendant NVIDIA Corporation is a Delaware corporation with its principal place of business in California. None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

22. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of

liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment.

23. This Court has specific personal jurisdiction over NVIDIA. NVIDIA has purposefully directed its conduct at Illinois and this District in ways that bear directly on Plaintiffs' claims. NVIDIA markets, sells, and delivers to Illinois customers the voice AI products at issue in this Complaint — including Magpie TTS Multilingual, Magpie TTS Zeroshot, Magpie TTS Flow, FUGATTO, PersonaPlex, Nemotron 3 VoiceChat, Canary, and Parakeet — through NVIDIA AI Enterprise (a paid enterprise software subscription), the NVIDIA API Catalog at build.nvidia.com (a cloud-hosted inference service offered on a pay-for-use basis), NVIDIA NIM containerized microservices (for production deployment by enterprise customers), the NVIDIA NeMo open-source toolkit on GitHub, and open-weight model releases on Hugging Face. NVIDIA enters into recurring enterprise license agreements with Illinois-based businesses for these products, accepts subscription and API usage payments from Illinois customers, and provides ongoing service performance — including delivery of

voice synthesis outputs in response to user requests — to users located in Illinois. On information and belief, NVIDIA has substantial enterprise customer relationships in Illinois, including with Fortune 500 companies headquartered in this District and other Illinois-based enterprises, generating substantial Illinois revenue.

24. Plaintiffs' claims arise directly from NVIDIA's Illinois-directed conduct. NVIDIA extracted the voiceprints of Plaintiffs and the Class, persons whose voice recordings were produced or recorded in Illinois, without the notice, consent, or written release BIPA requires. The voiceprints are now encoded in the parameters of NVIDIA's commercial voice synthesis models, which NVIDIA sells, delivers, and disseminates to Illinois customers and Illinois users through the channels identified above. Every commercial transaction NVIDIA completes in Illinois involving those products monetizes the biometric data NVIDIA obtained from Plaintiffs and the Class without their consent. Each open-weight model release that places NVIDIA's voice synthesis models on Hugging Face for download by any party — including Illinois developers, Illinois enterprises, and Illinois users — constitutes a continuing dissemination of biometric data originating in Illinois. NVIDIA's Illinois contacts are not incidental to this Complaint; they are the downstream commercialization and the continuing dissemination of the upstream biometric extraction that gives rise to it.

25. Exercising specific personal jurisdiction over NVIDIA in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and

with due process requirements. Illinois has a strong interest in providing a forum for redress of unlawful biometric data collection from voice recordings produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois and whose recordings were produced or recorded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on NVIDIA of litigating in Illinois is not undue, given NVIDIA's substantial Illinois commercial activity, its resources as a publicly traded technology company with fiscal-year-2026 revenue of approximately $215.94 billion and market capitalization exceeding $5.4 trillion, and its experience as an active litigant in federal courts across the United States. NVIDIA could reasonably anticipate being haled into Illinois courts for claims like Plaintiffs' that arise from its extraction and commercial exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

26. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here: Plaintiffs are residents of this District, their recorded vocal performances were produced and distributed from this District, the biometric privacy violations Plaintiffs allege occurred in this District, and the commercial exploitation of Plaintiffs' voiceprints continues through NVIDIA's sale and delivery of the voice AI products at issue to customers in this District. Venue is independently proper under 28 U.S.C. § 1391(b)(1) because Defendant NVIDIA

is subject to personal jurisdiction in this District for the reasons set forth above and therefore "resides" in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

## **FACTUAL BACKGROUND**

*NVIDIA and Its Voice Business*

27. NVIDIA is the world's largest publicly traded technology company by market capitalization, and is the dominant supplier of the graphics processing units, AI accelerators, and AI computing platforms that power large-scale machine learning, including the training and deployment of generative AI models. NVIDIA's commercial AI business spans GPU and hardware sales, AI Enterprise software subscriptions, cloud-hosted inference services, containerized microservice deployments, and open-weight model releases.

28. NVIDIA's voice AI research is conducted principally through its Applied Deep Learning Research group ("ADLR"), an internal research organization that has specialized in generative models for audio, speech, language, and vision since at least 2018. ADLR and affiliated NVIDIA research groups have published peer-reviewed research and released a sustained line of voice synthesis, voice cloning, and voice-conversion models, beginning with WaveGlow (2018) and continuing through Mellotron (2019), Flowtron (2020), FastPitch (2020), RAD-TTS (2021–2022), Mixer-TTS (2022), Incremental FastPitch (2023–2024), and the commercial models at issue in this Complaint. ADLR's sustained focus on voice synthesis research, extending back more than seven years before NVIDIA's October 2025 release of Magpie TTS Zeroshot and

Magpie TTS Flow, demonstrates that NVIDIA's entry into commercial voice cloning was not incidental but the product of a deliberate, long-term institutional investment.

29. NVIDIA has identified its voice AI products and the underlying foundational voice synthesis models as core components of its commercial AI strategy in disclosures to the United States Securities and Exchange Commission and in public statements by its Chief Executive Officer, Jensen Huang. Huang has personally identified NVIDIA's commercial voice AI capabilities, including the Magpie TTS family and PersonaPlex, in NVIDIA's quarterly earnings calls and in keynote presentations at the GPU Technology Conference, NVIDIA's global AI conference.

30. NVIDIA distributes its commercial voice AI products and the underlying foundational voice synthesis models through an integrated commercial channel that NVIDIA operates from the United States, including through NVIDIA AI Enterprise (a paid enterprise software subscription), the NVIDIA API Catalog at build.nvidia.com (a cloud-hosted inference service offered on a pay-for-use basis), NVIDIA NIM containerized microservices (for production deployment by enterprise customers), the NVIDIA NeMo open-source toolkit on GitHub, and open-weight model releases on Hugging Face under the NVIDIA AI Open Model License and the NVIDIA Nemotron Open Model License. The voice AI research, model training, and commercial deployment alleged in this Complaint were carried out by NVIDIA personnel in

the United States, on infrastructure operated by NVIDIA and its affiliated entities, in the ordinary course of NVIDIA's business.

31. NVIDIA's commercial voice AI products at issue in this Complaint include the following:

(a) The Magpie TTS family, released in October 2025, comprising Magpie TTS Multilingual (which synthesizes speech in multiple languages with emotion control), Magpie TTS Zeroshot (which enables voice cloning from a five-second audio sample, achieving "speaker similarity of over 70%"), and Magpie TTS Flow (a higher-fidelity voice cloning and synthesis model NVIDIA describes as "ideal for studio dubbing and podcast narration" and which NVIDIA trained on approximately 70,000 hours of paired speech data).

(b) FUGATTO, announced in November 2024, a 2.5-billion-parameter foundational audio generative model trained on more than 50,000 hours of audio and capable of generating and transforming human voices, including by modifying accent and emotion. NVIDIA withheld FUGATTO from public release in part because of concerns about misuse, including voice impersonation and deepfake generation.

(c) PersonaPlex, released in January 2026, a real-time full-duplex speech-to-speech model with voice and persona control, distributed as an open-weight model on Hugging Face under the NVIDIA AI Open Model License.

(d) Nemotron 3 VoiceChat, a 12-billion-parameter end-to-end full-duplex voice model integrating a conformer audio encoder, a Nemotron Nano V2 9B language model backbone, and a TTS decoder.

(e) Canary-1b-v2 and Parakeet-tdt-0.6b-v3, speech models trained on the Granary speech corpus and distributed as open-weight models on Hugging Face.

32. On information and belief, the training of NVIDIA's foundational voice synthesis models occurred on NVIDIA-operated computing infrastructure in the United States, including on GPU clusters owned and operated by NVIDIA. The production voice models that NVIDIA deploys through its commercial products are hosted on NVIDIA-controlled cloud infrastructure and served to United States users, including users in Illinois, from data center facilities operated by NVIDIA and its cloud and content-delivery partners. NVIDIA's voice AI revenue is reported in the Data Center segment of its consolidated financials.

*How NVIDIA's Voice AI Extracts and Encodes Voiceprints*

33. Modern AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network learns to identify and reproduce the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, and the dynamics of emotional expression. The network encodes those features as mathematical representations and stores them in the model’s parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices.

34. NVIDIA's published research describes this process in technical detail. NVIDIA's WaveGlow paper, published in 2018, introduced a flow-based

generative network for raw audio waveform synthesis, trained directly on speech recordings.[2]

35. NVIDIA's RAD-TTS line of research, published in 2021–2022, introduced the disentanglement of voice characteristics from linguistic content — the technical mechanism by which the same model can generate the same words in different speakers' voices, and the same speaker's voice saying different words.[3]

36. NVIDIA's October 2025 Riva TTS blog post, describing the Magpie TTS training pipeline, states that Magpie's training process uses "speaker verification (SV) models within a reward system to create a preference dataset" — that is, computational comparison of speaker acoustic signatures during training.[4]

---

[2] Ryan Prenger, Rafael Valle & Bryan Catanzaro, WaveGlow: A Flow-based Generative Network for Speech Synthesis, arXiv:1811.00002 (Oct. 31, 2018), https://arxiv.org/abs/1811.00002 (last visited May 12, 2026); see also NVIDIA Applied Deep Learning Research, WaveGlow: A Flow-based Generative Network for Speech Synthesis, https://nv-adlr.github.io/WaveGlow (last visited May 12, 2026); NVIDIA, waveglow (GitHub repository), https://github.com/NVIDIA/waveglow (last visited May 12, 2026).

[3] Kevin J. Shih, Rafael Valle, Rohan Badlani, Adrian Łańcucki, Wei Ping & Bryan Catanzaro, RAD-TTS: Parallel Flow-Based TTS with Robust Alignment Learning and Diverse Synthesis, ICML Workshop on Invertible Neural Networks, Normalizing Flows, and Explicit Likelihood Models (2021), https://openreview.net/forum?id=0NQwnnwAORi (last visited May 12, 2026); see also NVIDIA Applied Deep Learning Research, RAD-TTS: Parallel Flow-Based TTS with Robust Alignment Learning and Diverse Synthesis, https://nv-adlr.github.io/RADTTS (last visited May 12, 2026); Rohan Badlani, Rafael Valle, Kevin J. Shih, João Felipe Santos, Siddharth Gururani & Bryan Catanzaro, Multilingual Multiaccented Multispeaker TTS with RADTTS, arXiv:2301.10335 (Jan. 24, 2023), https://arxiv.org/abs/2301.10335 (last visited May 12, 2026); NVIDIA Applied Deep Learning Research, RADMMM: Multilingual Multiaccented Multispeaker TTS with RADTTS, https://research.nvidia.com/labs/adlr/projects/radmmm/ (last visited May 12, 2026).

[4] NVIDIA, Enhancing Multilingual Human-Like Speech and Voice Cloning with NVIDIA Riva TTS, NVIDIA Technical Blog (Oct. 9, 2025), https://developer.nvidia.com/blog/enhancing-multilingual-human-like-speech-and-voice-cloning-with-nvidia-riva-tts/ (last visited May 12, 2026).

37. NVIDIA's product documentation confirms that the speaker-identifying output of this pipeline is, in form and substance, a voiceprint. NVIDIA's Magpie TTS Flow model card describes the model as analyzing "a speaker's voice" to "replicate voice qualities such as pitch, timbre and speech rate to achieve a speaker similarity of over 70%" from a five-second audio prompt, and as "[m]aintain[ing] the original characteristics that capture unique voice audio signature."[5]

38. NVIDIA's PersonaPlex model card describes the system as conditioned on "a voice prompt" consisting of "audio tokens that establish the target vocal characteristics and speaking style." A representation of voice data sufficient to clone the speaker's voice and to maintain the speaker's unique audio signature is, in any ordinary understanding of the term, a voiceprint.[6]

39. BIPA's definitions confirm the legal classification. The statute defines "biometric identifier" to include "voiceprint." 740 ILCS 14/10. It separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an

---

[5] NVIDIA, Magpie TTS Flow Model Card, https://web.archive.org/web/20260414085841/https://build.nvidia.com/nvidia/magpie-tts-flow/modelcard (last visited May 12, 2026); see also NVIDIA, Speech Synthesis: Multilingual Zero-shot Voice Characterization — A2-Flow Model Overview, https://developer.download.nvidia.com/assets/ace/model_card/Riva_TTS_A2-Flow_for_Nv_IGI_SDK.pdf (last visited May 12, 2026) (technical model card for the A2-Flow architecture deployed in production as Magpie TTS Flow, describing the model's analysis of a speaker's voice, replication of pitch, timbre, and speech rate, speaker similarity exceeding 70% from a five-second audio prompt, and retention of the speaker's unique audio signature).

[6] NVIDIA, PersonaPlex-7B-v1 Model Card, Hugging Face, https://huggingface.co/nvidia/personaplex-7b-v1 (last visited May 12, 2026); see also NVIDIA, personaplex-7b-v1 README.md, https://huggingface.co/nvidia/personaplex-7b-v1/blob/main/README.md (last visited May 12, 2026).

individual's biometric identifier used to identify an individual." *Id.* The audio tokens, speaker embeddings, voice prompts, and speaker-acoustic-signature representations produced by NVIDIA's voice synthesis pipeline fall within both definitions. The label the AI research community uses for these representations does not determine their statutory classification; the function of the data does.

40. NVIDIA's Product Specific Terms for AI Products confirm this functional understanding. Those terms define a "Custom TTS Application" as "a custom text-to-speech application that enables the creation of synthetic voice output that resembles an input voice." NVIDIA's contractual definition acknowledges that NVIDIA's voice cloning capability is built on the extraction and encoding of speaker-identifying acoustic characteristics — exactly the capability the Magpie TTS Flow and PersonaPlex documentation describes, and exactly the capability that BIPA's voiceprint and biometric information definitions reach.

41. On information and belief, the same category of biometric processing that occurs in NVIDIA's consumer-facing voice-cloning features — Magpie TTS Zeroshot, Magpie TTS Flow, and PersonaPlex — also occurs during base-model training. The consumer-facing features are applications of capabilities built during training. The training pipeline is where extraction of voiceprints and biometric information occurs first, at the largest scale, and on the broadest set of voice recordings — including, on information and belief, the recordings of Plaintiffs and the Class.

Case 1:26-cv-05456 Document #: 24-1 Filed: 05/11/26 Page 71 of 194 PageID #:2370

*NVIDIA Built Safeguards Against Misuse, Not Consent for the Voices It Took*

42. NVIDIA understands that voice synthesis technology built on human voice data creates the categories of harm that BIPA was enacted to prevent. NVIDIA has built and publicly deployed five distinct categories of safeguard measures over the period 2024–2026, each directed at the downstream misuse of NVIDIA's commercial voice products. NVIDIA built none of those measures for the upstream voices it took to construct those products in the first place.

43. In November 2024, NVIDIA announced FUGATTO, a 2.5-billion-parameter foundational audio generative model trained on more than 50,000 hours of audio and capable of generating and transforming human voices, including by modifying accent and emotion. NVIDIA did not release FUGATTO publicly. Industry reporting, citing NVIDIA, confirms that NVIDIA withheld public release in part because of concerns about misuse, including voice impersonation and deepfake generation.

44. In October 2025, when NVIDIA released Magpie TTS Zeroshot and Magpie TTS Flow — voice cloning models that can replicate a target speaker's voice from a five-second audio sample — NVIDIA simultaneously announced a collaboration with Pindrop, a voice-fraud detection company, to develop deepfake detection capabilities against NVIDIA's voice models. NVIDIA further advised users that voice cloning should be used only with "target speakers who have consented to such use."

45. In January 2026, when NVIDIA released the PersonaPlex conversational voice model, NVIDIA architecturally restricted the model to a fixed set of eighteen pre-packaged voice embeddings rather than supporting arbitrary voice cloning from user-supplied audio.

46. NVIDIA's Product Specific Terms for AI Products define a "Custom TTS Application" as "a custom text-to-speech application that enables the creation of synthetic voice output that resembles an input voice," and require NVIDIA's enterprise customers to "have sufficient rights and licenses for content used with a Custom TTS Application to generate new content."

47. NVIDIA's Trustworthy AI terms, incorporated by reference into the licenses under which NVIDIA distributes its open-weight voice models, expressly prohibit use of NVIDIA's models for "unlawful biometric data collection."

48. Each of the five measures described in ¶¶ 42 through 47 is a constraint at the downstream end of NVIDIA's commercial pipeline, directed at restricting how end users use NVIDIA's products, or at imposing the upstream-rights obligation on NVIDIA's enterprise customers. None of the measures is directed at the upstream issue: that NVIDIA's foundational voice synthesis models were trained on voiceprints extracted without the knowledge or consent of the speakers whose voice recordings were ingested during training. NVIDIA built each of these safeguards against the downstream misuse of its products. It built none of them for the people whose voices it took to train those products in the first place.

*NVIDIA Trained on Data It Knew It Had No Right to Use*

49. NVIDIA has never published a comprehensive disclosure of the sources, scale, or provenance of the voice data used to train its commercial voice synthesis models.

50. It has not published a model card, data sheet, training data manifest, licensing inventory, or transparency report identifying all of the voice recordings used to train Magpie TTS Flow (approximately 70,000 hours of paired speech data), FUGATTO (more than 50,000 hours of audio), or Nemotron 3 VoiceChat (unquantified in publicly available materials), where it obtained those recordings, or whether any of the speakers consented.

51. Although NVIDIA has identified certain narrower datasets — including LJSpeech, LibriTTS, Hi-Fi TTS, Mozilla Common Voice, and the Fisher English Corpus — in specific model cards and research papers, no equivalent public-domain or licensed-sourcing claim has been made for the much larger corpora on which NVIDIA's commercial voice models were trained.

52. NVIDIA's silence about the bulk of its voice training data is made more conspicuous by the contrast with its disclosures for narrower and smaller voice datasets. In April 2021, NVIDIA published a research paper describing its Hi-Fi TTS dataset as drawn from LibriVox audiobooks and Project Gutenberg texts, public-domain sources that NVIDIA specifically identified.

53. NVIDIA's Magpie TTS Multilingual model card identifies LibriTTS, an open, publicly available speech dataset, as one of the datasets used to train the model.[7]

54. But no equivalent public-domain or licensed-sourcing claim has ever been made for the approximately 70,000 hours of paired speech data on which the released Magpie TTS Flow model was trained, or for the more than 50,000 hours of audio on which FUGATTO was trained. If NVIDIA's commercial voice models were trained entirely on properly licensed or consented data, NVIDIA would have an obvious commercial incentive to say so. It has not.

55. The contemporaneous public record establishes that NVIDIA obtained substantial portions of its training data, across multiple foundational-model families, from publicly accessible internet sources without the consent of the source speakers, authors, or content creators, and that NVIDIA did so at industrial scale.

56. In August 2024, 404 Media reported on internal NVIDIA communications describing a company-wide initiative to aggregate "a huge curated video dataset" for generative modeling that processed approximately "a human lifetime" of video content per day. The communications describe a sustained, systematized effort to ingest internet-accessible video content at industrial scale, conducted across NVIDIA's research and engineering organizations.

[7] https://build.nvidia.com/nvidia/magpie-tts-multilingual/modelcard (last visited on May 12, 2026)

57. NVIDIA is the defendant in two pending putative class actions concerning the training-data provenance of its other foundational AI models. In *Nazemian v. NVIDIA Corp.*, No. 4:24-cv-01454-JST (N.D. Cal. filed Mar. 8, 2024), three professional authors allege that NVIDIA trained its NeMo Megatron large language models on the Books3 dataset, a collection of approximately 196,640 pirated e-books drawn from the Bibliotik shadow library, without notice, consent, or compensation. The court permitted leave to file an amended complaint adding additional NeMo Megatron model families in January 2026. In *Ted Entertainment, Inc. v. NVIDIA Corp.*, No. 5:25-cv-10287 (N.D. Cal. filed Nov. 26, 2025), the operators of YouTube channels including H3H3 Productions and MrShortGame Golf, and Golfholics, Inc., allege that NVIDIA bypassed YouTube's technical protections to scrape millions of YouTube videos to train its Cosmos foundational video model, in violation of YouTube's terms of service and the anti-circumvention provisions of the Digital Millennium Copyright Act.[8]

58. In August 2025, NVIDIA publicly released the Granary dataset, an approximately one-million-hour corpus of speech audio assembled by processing pre-existing open-source corpora — including YODAS and YouTube-Commons (both YouTube-derived), VoxPopuli (European Parliament proceedings), and LibriLight (LibriVox audiobooks) — through NVIDIA's NeMo Speech Data Processor pipeline. NVIDIA used Granary to train its Canary-1b-

[8] Plaintiffs cite the public allegations in *Nazemian* and *Ted Entertainment* as circumstantial evidence of NVIDIA's training-data acquisition practices across its foundational model families, not as adjudicated fact.

v2 and Parakeet-tdt-0.6b-v3 speech models, which NVIDIA distributes as open-weight models on Hugging Face.

59. The Granary release demonstrates, in NVIDIA's public documentation, that NVIDIA maintains the infrastructure for the large-scale ingestion and processing of human voice audio from publicly accessible platforms; that NVIDIA willingly ingests identifiable voice recordings from those platforms without obtaining the consent of the speakers whose voices appear in the recordings; and that NVIDIA's voice-audio processing pipeline operates at a scale, approximately one million hours, well in excess of what is necessary to produce the commercial voice cloning models at issue in this case.

60. NVIDIA has not published, and on information and belief does not maintain, any mechanism that would allow speakers like Plaintiffs, whose voices were ingested into NVIDIA's foundational voice synthesis models, to discover that fact, withdraw consent, or request deletion. NVIDIA's general Privacy Policy provides certain rights to users with an existing relationship with NVIDIA, but it does not address voice data used in AI model training and does not apply to non-users like Plaintiffs.

61. NVIDIA trained its foundational voice models on a training corpus it has refused to identify. NVIDIA's contemporaneous training-data acquisition practices, documented in internal communications and pending litigation across multiple foundational-model families, reflect a sustained institutional pattern of ingesting identifiable source material at industrial scale without the consent of the people whose work the source material represents. NVIDIA

operates the infrastructure required to do so for voice audio, has used it for the open-source-derived Granary corpus, and has provided no mechanism by which the speakers whose voices were ingested can verify, withdraw consent, or request deletion. Plaintiffs allege, on the basis of these public facts, that NVIDIA trained its foundational voice synthesis models on voice recordings that included Plaintiffs' recordings, obtained from publicly accessible platforms, and extracted voiceprints from those recordings without the knowledge or consent of the speakers.

*The Biometric Data Was Generated in Illinois*

62. The conduct giving rise to Plaintiffs' claims is localized in Illinois in three independent and mutually reinforcing respects: (i) the biometric data at issue was generated in Illinois; (ii) NVIDIA's acquisition of that biometric data targeted material that was identifiably Illinois-origin; and (iii) NVIDIA's ongoing retention, dissemination, and commercial exploitation of the biometric data is directed at, or felt in, Illinois. Each ground supports the application of BIPA, IRPA, and the related Illinois statutes invoked in this Complaint to NVIDIA's conduct as to Plaintiffs and the Class.

63. Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois.

64. The voice itself, as a unique biometric signature, came into existence in Illinois.

65. The audio recordings embodying Plaintiffs' voices, from which NVIDIA is alleged to have extracted voiceprints and biometric information, were created in Illinois — Plaintiffs were physically present in Illinois at the time of the recordings, and the recordings captured the biometric characteristics of speakers who were in Illinois at the time of recording.

66. The recordings were published from Illinois to publicly accessible platforms, including platforms on which Plaintiffs' identity, geographic origin, professional biography, and content catalog were and are publicly visible to any person accessing the recordings. The metadata, descriptions, and contextual information accompanying the recordings publicly identified Plaintiffs as Illinois-based speakers and identified the recordings as Illinois-origin content at the time the recordings were made and continuously thereafter.

67. The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is therefore of Illinois origin. The biometric data NVIDIA is alleged to have extracted from those recordings is Illinois-origin, regardless of where any subsequent processing occurred.

68. NVIDIA accessed Plaintiffs' voice recordings from publicly accessible third-party platforms on which the recordings were hosted with metadata identifying each Plaintiff by name and identifying the recordings' origin. To a person with knowledge of Illinois broadcast, journalism, audiobook, podcast, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work

originated from Illinois. NVIDIA's act of accessing and processing those recordings was therefore not the passive receipt of an anonymized dataset assembled by a third party. It was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production. The Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time NVIDIA accessed and processed the recordings.

69. NVIDIA's commercial exploitation of voiceprints and biometric information generated in Illinois is itself Illinois-directed. NVIDIA sells subscriptions and AI-generated voice outputs to Illinois subscribers and Illinois-based commercial users on a continuing basis through NVIDIA AI Enterprise, the NVIDIA API Catalog, NVIDIA NIM microservices, NeMo, and open-weight model releases on Hugging Face and GitHub. The commercial value of those subscriptions and outputs derives, on information and belief, from voice models developed through unconsented extraction of biometric data, including biometric data generated in Illinois. Each Illinois transaction in those products is therefore an exercise of commercial value that NVIDIA derived from the same biometric extraction Plaintiffs allege is unlawful.

70. NVIDIA's continuing dissemination of the foundational voice models — including through the open-weight releases of PersonaPlex, Canary, and Parakeet on Hugging Face, available for download by any person in Illinois or worldwide — is likewise Illinois-directed. The injury suffered by Plaintiffs

and the Class is felt in Illinois: the privacy interest BIPA protects — the right to control the collection, retention, and commercial use of one's biometric identity — is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their loss of the licensing and consent rights BIPA preserves, and the dilution of the commercial value of their voices in markets in which they participate are all injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois.

71. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure.

72. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois. NVIDIA's continuing possession of voiceprints and biometric information generated in Illinois likewise runs afoul of obligations BIPA imposes for the benefit of the subjects of that data, including NVIDIA's failure to publish a retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from

non-user training-data sources, and NVIDIA's failure to provide any mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data.

*NVIDIA's Monetization of the Voice Models*

73. NVIDIA's commercial exploitation of the foundational voice synthesis models is not limited to a single product line. NVIDIA monetizes voice models through a vertically integrated commercial chain spanning enterprise software subscriptions, cloud-hosted inference services, containerized microservice deployments, hardware and platform sales, open-weight model distribution, and the broader strategic value of voice AI as part of NVIDIA's Data Center segment. The voice characteristics learned during training, the same characteristics extracted from Plaintiffs' and Class members' voice recordings, enable each of these revenue streams.

74. NVIDIA monetizes the voice models through, among other channels:

(a) *Enterprise software subscriptions.* NVIDIA AI Enterprise is a paid enterprise software subscription that includes Riva, the speech AI platform that packages Magpie TTS Multilingual, Magpie TTS Zeroshot, and Magpie TTS Flow. NVIDIA charges enterprise customers recurring subscription fees for AI Enterprise access. The voice synthesis capabilities bundled into AI Enterprise are derived from the foundational voice models.

(b) *Cloud-hosted inference fees.* The NVIDIA API Catalog at build.nvidia.com provides cloud-hosted inference access to NVIDIA's voice

models — including Magpie TTS, PersonaPlex, and Nemotron 3 VoiceChat — on a pay-for-use basis. Each inference request processed through the API Catalog generates revenue that NVIDIA captures because the voice models exist.

(c) *Containerized microservice deployments.* NVIDIA NIM provides containerized voice synthesis microservices for production deployment by enterprise customers. NVIDIA charges enterprise customers for NIM deployments, including the Riva TTS NIM that packages the Magpie TTS models. NIM customer deployments are recurring commercial transactions, the value of which depends on the underlying voice synthesis capabilities.

(d) *Hardware sales supported by demonstrated voice AI capability.* NVIDIA's commercial value as a hardware company depends materially on its ability to demonstrate, through state-of-the-art AI software, the value of NVIDIA-architecture compute for AI workloads. NVIDIA's voice AI products serve this purpose: by demonstrating that NVIDIA-architecture compute produces commercially capable voice synthesis, NVIDIA supports the demand for the GPUs, AI accelerators, and DGX systems that NVIDIA sells to enterprise and hyperscale customers. NVIDIA's GPU and AI hardware sales generated approximately $197.3 billion of NVIDIA's $215.94 billion fiscal year 2026 revenue in the Data Center segment, of which the voice AI products are an integral demonstration component.

(e) *Open-weight model distribution and ecosystem value.* NVIDIA distributes several of its voice synthesis models — including PersonaPlex, Canary, and Parakeet — as open-weight models on Hugging Face under the

NVIDIA AI Open Model License or the NVIDIA Nemotron Open Model License. Open-weight distribution is itself a monetization channel: it builds developer adoption of NVIDIA's voice AI stack, drives downstream demand for NVIDIA-architecture compute for inference and fine-tuning, supports NVIDIA's positioning as the dominant commercial AI platform, and reinforces the commercial value of NVIDIA's paid AI Enterprise tier through demonstrated capability of the underlying foundational models.

(f) *Strategic deployment value across NVIDIA's commercial footprint.* NVIDIA deploys voice synthesis capability across its broader product portfolio, including in customer-facing demonstrations, partnership integrations, developer-relations programming, and industry conferences such as the GPU Technology Conference. The competitive and strategic value of best-in-class voice AI deployment across NVIDIA's product portfolio is itself a benefit NVIDIA captures from the foundational voice models.

75. Each monetization channel depends on the foundational voice models. Each foundational voice model depends on the training data used to build it. And the training data, on information and belief, includes the voice recordings of Plaintiffs and Class members from which NVIDIA extracted voiceprints without notice or consent. The commercial exploitation NVIDIA captures across the full chain is, in operational substance, the monetization of biometric data NVIDIA obtained from Plaintiffs without authorization.

*NVIDIA's Dissemination of the Voice Models Across Its Corporate, Cloud, and Open-Weight Distribution Infrastructure*

76. The voice synthesis models in which Plaintiffs' and Class members' voiceprints are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, processed, transferred, and — in the case of NVIDIA's open-weight model releases — published worldwide, across multiple categories of infrastructure NVIDIA operates in the ordinary course of its voice AI business.

77. NVIDIA conducts its global voice AI business through a corporate structure that includes multiple subsidiaries. NVIDIA's Form 10-K identifies, as significant subsidiaries, NVIDIA International, Inc. (Delaware), NVIDIA Singapore Pte. Ltd. (Singapore), and Mellanox Technologies, Ltd. (Israel), among others. The development, training, refinement, and commercial deployment of NVIDIA's voice models requires, on information and belief, the transfer of those models, and the voiceprints encoded within them, among NVIDIA's affiliated entities in the ordinary course of business. Plaintiffs and Class members did not consent to any such transfer.

78. NVIDIA's voice synthesis pipeline operates within a sub-processor framework involving cloud-infrastructure providers, content-delivery-network operators, hardware partners, and other vendors. The pipeline's training, evaluation, deployment, and operation involve, on information and belief, the transmission of model parameters, and of the voiceprints encoded within those parameters, among NVIDIA's vendors and service providers in the ordinary course of business. The delivery of voice synthesis services to enterprise

customers, including Illinois customers, necessarily involves transmitting model parameters and inference outputs over that infrastructure.

79. NVIDIA distributes several of its voice and speech synthesis models as open-weight model releases on Hugging Face under the NVIDIA AI Open Model License or the NVIDIA Nemotron Open Model License. Through Hugging Face, NVIDIA makes the parameters of those models — including PersonaPlex (released January 2026), Canary-1b-v2, Parakeet-tdt-0.6b-v3, and other speech models, available for download by any party in the world. The biometric characteristics extracted from training-data speakers are encoded in those parameters and persist in every downloaded copy. Once a model's weights have been published on Hugging Face under a permissive license, the encoded biometric data has been disseminated to a downstream ecosystem that NVIDIA cannot retract. NVIDIA cannot recall the downloaded copies. NVIDIA cannot prevent third parties from redistributing, modifying, or fine-tuning them on additional data while preserving the underlying biometric encodings. The open-weight release is a unilateral, irreversible act of dissemination by NVIDIA.

80. Taken together, the pattern of NVIDIA's dissemination practices places the voiceprints and biometric information of Plaintiffs and Class members in the hands of NVIDIA's affiliated entities, vendors, service providers, and any party worldwide who downloads NVIDIA's open-weight voice synthesis models. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception to BIPA's dissemination prohibition

under 740 ILCS 14/15(d) applies to the disseminations described in this subsection.

*The Voice Products Compete With the People Whose Voices Built Them*

81. The voice AI products built on Plaintiffs' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods.

82. Professional audiobook narration historically has been performed by human narrators at industry rates of approximately $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate. NVIDIA's voice cloning models, available to enterprise customers through NVIDIA AI Enterprise and to developers through the NVIDIA API Catalog, can generate synthetic speech in a target voice at a fraction of that cost. NVIDIA's October 2025 marketing describes Magpie TTS Flow as "ideal for studio dubbing and podcast narration," and Magpie TTS Zeroshot can replicate a target speaker's voice from a five-second audio sample. The major American audiobook publishers, including Penguin Random House, Hachette, Simon & Schuster, and Macmillan, for whom Plaintiffs Dorcus and Nassif have narrated books, have begun to integrate AI-generated narration into their production pipelines.

83. NVIDIA's commercial voice products generate podcast-format audio outputs at scale. Magpie TTS Flow, as marketed by NVIDIA itself, is "ideal for…podcast narration." Magpie TTS Multilingual generates expressive

multilingual speech with emotion control. PersonaPlex enables real-time conversational voice generation.

84. NVIDIA has publicly demonstrated the use of its voice synthesis models to replace human narration in its own creative production, including converting a male producer's recorded speech into a female narrator's voice using RAD-TTS for the "I AM AI" video series previously narrated by a human voice actor.

85. NVIDIA's voice synthesis products directly substitute for the long-form investigative audio journalism, podcast hosting, narrative non-fiction production, and on-air reporting that Plaintiffs Marin, Rogers, Lacour, Flowers, and Amer have spent their careers developing — produced, until now, by human reporters and narrators at substantial professional cost.

86. NVIDIA's voice synthesis products are marketed for studio dubbing, e-learning narration, advertising voiceover, video game voice acting, and customer service voice work. Each of these markets historically has been served by professional voice actors, including Plaintiffs Dorcus and Nassif. NVIDIA's voice synthesis products generate substitutable voice content in those markets at per-character and per-audio-second pricing that is orders of magnitude lower than human voice talent rates.

87. NVIDIA's Magpie TTS Multilingual generates speech in multiple languages with emotion control, and the released paired training corpus covers, by NVIDIA's own description, "23 of 25 languages." NVIDIA's voice synthesis capability, on information and belief, across multiple languages and

accents includes generating Arabic-accented English narration, Levantine Arabic narration, and other culturally and linguistically specific voice content. This capability competes specifically with Plaintiff Nassif's distinctive professional market position as a Lebanese-Palestinian American audiobook narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors.

88. Each of NVIDIA's voice products was built using the vocal characteristics of the human performers it now displaces. Plaintiffs allege, on information and belief, that the voiceprints of every Plaintiff in this case are among the voiceprints encoded in the foundational voice synthesis models on which these products depend. The market substitution is therefore not merely temporal but causal. The machines generate the audio they generate because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output.

*Named Plaintiffs' Individual Experiences*

*Philip Rogers*

89. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R.

Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. The Lisagor Awards, conferred by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region.

90. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC 5 Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting. The platforms display metadata identifying Rogers as the speaker and Chicago as the location of production. Rogers's body of work has been continuously available through these channels for years preceding NVIDIA's training of the foundational voice synthesis models alleged in this Complaint.

91. On information and belief, Rogers's voice recordings were among the audio that NVIDIA ingested to train its foundational voice synthesis models, and voiceprints derived from his recordings are encoded in those models' parameters. Rogers's broadcast catalog matches the profile of training audio NVIDIA's documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source. The volume and continuity of his on-air work — four decades of single-speaker

professional broadcasting — represents a category of source material particularly valuable for voice synthesis training.

92. NVIDIA's released Granary speech corpus, assembled through NVIDIA's NeMo Speech Data Processor pipeline, was drawn in substantial part from YouTube-derived corpora (YODAS and YouTube-Commons), and Rogers's broadcast work, including the INBA career-retrospective interview, is publicly accessible on YouTube. NVIDIA has refused to disclose the sources of the training corpus powering its commercial voice products, placing the specific records of training data ingestion under NVIDIA's exclusive control.

93. Rogers never created an account with NVIDIA, downloaded an NVIDIA voice model, invoked an NVIDIA voice AI through any API, or accepted any NVIDIA terms of service related to its voice products. He never received notice that NVIDIA had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release. NVIDIA's collection of Rogers's voiceprint, and NVIDIA's continuing possession and commercial exploitation of that voiceprint, occurred and continues without his knowledge or consent.

94. Rogers's injury is concrete and particular to him. NVIDIA extracted his voiceprint from recordings he produced over four decades of professional work, encoded that voiceprint in commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Rogers used to speak every day during his career. The technology NVIDIA built using

Rogers's voiceprint — including Magpie TTS Multilingual, Magpie TTS Zeroshot, and Magpie TTS Flow, the last of which NVIDIA itself markets as "ideal for studio dubbing and podcast narration" — now operates in the same broadcast journalism market in which Rogers built his career, against the same colleagues with whom he worked, in a competitive position Rogers neither chose nor authorized.

*Carol Marin*

95. Carol Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (*60 Minutes*, *60 Minutes II*, the *CBS Evening News*), WTTW (*Chicago Tonight*), CNN, and the Discovery Channel, and includes television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. She has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor.

96. Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent

Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC 5 Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding NVIDIA's training of the foundational voice synthesis models alleged in this Complaint.

97. On information and belief, Marin's voice recordings were among the audio that NVIDIA ingested to train its foundational voice synthesis models, and voiceprints derived from her recordings are encoded in those models' parameters and reproduced in the audio they generate. Marin's body of work matches, on every material dimension, the profile of training audio that NVIDIA's technical documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source. Her recordings are publicly accessible on the same categories of platforms — broadcast archives, YouTube, streaming video — from which NVIDIA, on information and belief, sourced training data, including through its Granary pipeline drawn substantially from YouTube-derived corpora (YODAS and YouTube-Commons). And NVIDIA has refused to disclose the sources of

the training corpus that powers its commercial voice products, placing the specific records of training-data ingestion under NVIDIA's exclusive control.

98. Marin never created an account with NVIDIA, downloaded an NVIDIA voice model, invoked an NVIDIA voice AI through any API, or accepted any NVIDIA terms of service related to its voice products. She never received notice that NVIDIA had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release. NVIDIA's collection of Marin's voiceprint, and NVIDIA's continuing possession and commercial exploitation of that voiceprint, occurred and continues without her knowledge or consent.

99. Marin's injury is concrete and particular to her. NVIDIA extracted her voiceprint from recordings she produced over five decades of professional work, encoded it into commercial models, and continues to profit from those models. The voiceprint cannot be recovered or replaced; in its operational form, it is the same biological and behavioral signature Marin uses to speak every day. The technology NVIDIA built using Marin's voiceprint — including the Magpie TTS family that NVIDIA itself markets as "ideal for studio dubbing and podcast narration" — now operates in the same broadcast and journalism markets in which Marin built her career, against the same colleagues with whom she worked, in a competitive position Marin neither chose nor authorized.

*Alison Flowers*

100. Alison Flowers is an investigative journalist and audio producer based in Chicago. Before founding her Chicago-based production company Spiralbound, Flowers served as Head of Production at the Invisible Institute, a Chicago nonprofit investigative journalism organization on the South Side, where she built and led journalism production teams whose work received four nominations from the Pulitzer Prize Board over a four-year period. Flowers produced and reported the seven-part investigative podcast *Somebody*, which premiered on March 31, 2020, investigates the 2016 murder of Courtney Copeland in Chicago, and was a 2021 Pulitzer Prize finalist for Audio Reporting. *Somebody* received the National Magazine Award (the "Ellie") for Podcasting from the American Society of Magazine Editors, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association award for Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story. *Rolling Stone* named *Somebody* to "The 25 Best True-Crime Podcasts of All Time" and ranked it first on its "Best Podcasts of 2020" list; *The New York Times* ranked it first on its list of true crime podcasts at the intersection of race; *The Atlantic* ranked it second on its "50 Best Podcasts of 2020"; and the podcast reached the number two position among true crime podcasts on the Apple Podcasts chart.

101. *Somebody* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and other major podcast platforms, with

metadata identifying Flowers as a producer and on-air journalist and Chicago as the location of production. Flowers's additional audio reporting on *Reveal* (from the Center for Investigative Reporting), *The Heist* (from the Center for Public Integrity), *Vox*, *Dateline NBC*, and *Democracy Now!* is likewise continuously available on those programs' respective platforms. Flowers's body of audio work has been continuously available across these channels for years preceding NVIDIA's training of the foundational voice synthesis models alleged in this Complaint.

102. On information and belief, Flowers's voice recordings were among the audio NVIDIA ingested to train its foundational voice synthesis models, and voiceprints derived from her recordings are encoded in the parameters of those models. Flowers's audio reporting matches the profile of training audio NVIDIA's documentation identifies as optimal — long-form, single-speaker, studio-quality, professionally produced. Her Pulitzer-finalist work was a readily identifiable high-value source of professional audio journalism, recognized commercially as among the best podcasts of its release year by *Rolling Stone*, *The New York Times*, and *The Atlantic*. Her recordings are distributed on the same podcast platforms — Apple Podcasts, Spotify, YouTube, and others — from which NVIDIA, on information and belief, sourced training data, including through its Granary pipeline drawn substantially from YouTube-derived corpora. NVIDIA has refused to disclose the sources of the training corpus that powers its commercial voice products.

103. Flowers never created an account with NVIDIA, downloaded an NVIDIA voice model, invoked an NVIDIA voice AI through any API, or accepted any NVIDIA terms of service related to its voice products. She never received notice that NVIDIA had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

104. Flowers's injury is concrete and particular to her. Flowers continues to produce investigative audio journalism through Spiralbound, and the long-form audio markets in which she earns her livelihood — investigative podcast journalism, narrative audio documentary — are precisely the markets that NVIDIA's Magpie TTS Flow, marketed by NVIDIA as "ideal for studio dubbing and podcast narration," is designed to serve. The technology NVIDIA built using Flowers's voiceprint now competes with Flowers in her own active markets, with the capabilities of her own voice contributing to the products that compete against her.

*Robin Amer*

105. Robin Amer is a journalist, podcast creator, audio producer, and on-air host who has produced the substantial majority of her audio work from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the investigative podcast produced by USA Today over two seasons. Season 1 of *The City*, which focused on Chicago, peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New York Times*, *Quartz*, and Apple Podcasts. Amer's earlier production work for

*Gravy*, the podcast produced by the Southern Foodways Alliance, contributed to that program's 2015 James Beard Award for Best Podcast. Amer subsequently spent three years as Senior Producer for Audio Features at *The Washington Post*, where she edited the *Post Reports* daily news podcast and produced the standalone narrative series *Field Trip*. During her tenure at *The Washington Post*, Amer won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction and was shortlisted for the Whickers Prize at the Sheffield Documentary Festival.

106. *The City* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, and other major podcast platforms, with metadata identifying Amer as the host, narrator, and showrunner. *Post Reports*, *Field Trip*, *Love + Radio: Blood Memory*, and Amer's contributions to *Reveal*, *The Heist*, *Vox*, and *Gravy* are likewise continuously available on the respective programs' platforms. Amer's audio work has been continuously available across these channels for years preceding NVIDIA's training of the foundational voice synthesis models alleged in this Complaint. The substantial majority of Amer's voice work was recorded in Chicago while Amer was an Illinois resident, and Amer has been an Illinois resident at all times relevant to this Complaint.

107. On information and belief, Amer's voice recordings were among the audio NVIDIA ingested to train its foundational voice synthesis models, and

voiceprints derived from her recordings are encoded in the parameters of those models. Amer's hosted, narrated, and showrun audio work — totaling hundreds of hours of single-speaker, studio-quality audio — matches the profile of training audio NVIDIA's documentation identifies as optimal. *The City*'s commercial peak position on the Apple Podcasts charts and Amer's three-time duPont–Columbia recognition established her work as a readily identifiable high-value source of professional audio journalism. Her recordings are distributed on the same podcast platforms — Apple Podcasts, Spotify, YouTube, and others — from which NVIDIA, on information and belief, sourced training data, including through its Granary pipeline drawn substantially from YouTube-derived corpora. NVIDIA has refused to disclose the sources of the training corpus that powers its commercial voice products.

108. Amer never created an account with NVIDIA, downloaded an NVIDIA voice model, invoked an NVIDIA voice AI through any API, or accepted any NVIDIA terms of service related to its voice products. She never received notice that NVIDIA had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

109. Amer's injury is concrete and particular to her. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting — directly the market that NVIDIA's Magpie TTS Flow, marketed by NVIDIA as "ideal for studio dubbing and podcast narration," is designed to serve at substantially lower cost than the human production Amer provides.

The technology NVIDIA built using Amer's voiceprint now competes with Amer in her own active market.

*Lindsey Dorcus*

110. Lindsey Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. She is a 2020 Society of Voice Arts and Sciences Voice Arts Award winner (as part of the full-cast ensemble for *Wild Monsters Dance About: Stories from an Unruly Mind*) and a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. Her narration spans young adult fiction, science fiction and fantasy, romance, mystery and thriller, and works featuring LGBTQ+ themes and characters. *AudioFile Magazine*, the principal independent trade publication reviewing audiobook narration in the United States, has reviewed her work favorably, describing her performances as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects used across her narration work, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, and Greek for main characters and narration, and New England, New York, German, Indian, and Russian for supporting characters. Dorcus operates a professional home recording studio in Chicago, where she records the audiobooks at issue in this

Complaint to broadcast-quality, professionally edited specifications that meet the technical requirements of the major audiobook publishers.

111. Dorcus's audiobook catalog is continuously distributed across Audible, Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and other major audiobook platforms. Each platform displays metadata identifying Dorcus as the narrator, the publisher, and the title. The complete catalog is searchable on Audible.com. Dorcus has also appeared as a voice actor in multiple fiction podcasts performing dramatic voice work for serialized audio storytelling distributed through major podcast platforms. Dorcus's narrated catalog has been continuously available through these channels for years preceding NVIDIA's training of the foundational voice synthesis models alleged in this Complaint.

112. On information and belief, Dorcus's voice recordings were among the audio NVIDIA ingested to train its foundational voice synthesis models, and voiceprints derived from her recordings are encoded in the parameters of those models. Dorcus's catalog represents precisely the long-form, single-speaker, studio-quality audio that NVIDIA's own documentation identifies as optimal training material — more than two hundred audiobooks, each comprising hours of consistent single-speaker narration, professionally produced, publicly searchable by narrator, distributed on major commercial audio platforms. Few professional voice catalogs match NVIDIA's training-data profile more directly than Dorcus's does. The technical sophistication of her voice work — including her professionally recognized range across more than a dozen accents and

dialects — represents an additional category of training-data value to a multilingual voice synthesis system designed to generate speech across dozens of languages and accents. NVIDIA's published Granary speech corpus — assembled through NVIDIA's NeMo Speech Data Processor pipeline at approximately one million hours of audio, drawn in substantial part from the LibriLight corpus of LibriVox audiobooks and used to train NVIDIA's Canary-1b-v2 and Parakeet-tdt-0.6b-v3 models — demonstrates that NVIDIA actively ingests audiobook-format speech audio into its voice training pipelines. NVIDIA has refused to disclose whether commercial-publisher audiobook content was likewise ingested into the Magpie TTS family or other commercial voice synthesis models, placing the specific records of training-data ingestion under NVIDIA's exclusive control.

113. Dorcus never created an account with NVIDIA, downloaded an NVIDIA voice model, invoked an NVIDIA voice AI through any API, or accepted any NVIDIA terms of service related to its voice products. She never received notice that NVIDIA had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

114. Dorcus's injury is concrete, particular to her, and direct. NVIDIA's Magpie TTS Flow — which NVIDIA itself markets as "ideal for studio dubbing and podcast narration" and which can replicate a target speaker's voice from a five-second audio sample at "speaker similarity of over 70%" — is licensed to enterprise customers, including audiobook publishers, at per-character and

per-audio-second fees that are orders of magnitude lower than human narrator rates. The market displacement is not abstract. The technology NVIDIA built using Dorcus's voiceprint, on information and belief, is now sold to the same publishers that have historically paid Dorcus to narrate audiobooks, as a substitute for the human narration she provides. Dorcus's voiceprint, taken without her consent, is now part of the commercial product that competes against her in her own market.

*Yohance Lacour*

115. Yohance Lacour is a journalist, audio storyteller, writer, and playwright from the South Side of Chicago whose work centers on the lives and stories of Black Chicago. He is affiliated with the Invisible Institute, a nonprofit investigative journalism organization based on Chicago's South Side. Lacour is the creator, host, writer, and lead reporter of *You Didn't See Nothin'*, a seven-part investigative podcast produced by the Invisible Institute and USG Audio that revisits the 1997 hate-crime attack on Lenard Clark on the South Side of Chicago, tracks down key players in the case a quarter-century later, and examines how the case shaped Lacour's own life. The series was awarded the 2024 Pulitzer Prize for Audio Reporting and a 2024 Peabody Award. It was named to Apple Podcasts' "Podcasts We Love" and recognized as one of Apple Podcasts' "100 Best Podcasts of All Time," received nominations at the Signal Podcasting Awards in the Limited Series & Specials – Best Host and Limited Series & Specials – Documentary categories, and received four nominations at the Black Podcasting Awards in the Best Sound Design, Best History Podcast,

Best True Crime Podcast, and Best Limited Series Podcast categories. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series.

116. *You Didn't See Nothin'* is publicly distributed across Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, Overcast, and other major podcast platforms, with metadata identifying Lacour as the host and Chicago as the location of production. Lacour's interview appearances on NPR's *Fresh Air* with Tonya Mosley, NPR's *All Things Considered* with Adrian Florido, the Canadian Broadcasting Corporation's *Crime Story* with Kathleen Goldhar, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast (produced by Audacy's Pineapple Street Studios) are likewise continuously available across major public-radio and podcast platforms. The series has been continuously available since its 2023 release, and Lacour's interview appearances have been continuously available since their respective publications, in each case for periods that precede NVIDIA's training of the foundational voice synthesis models at issue in this Complaint and continue thereafter.

117. On information and belief, Lacour's voice recordings were among the audio that NVIDIA ingested to train its foundational voice synthesis models, and voiceprints derived from his recordings are encoded in those models' parameters. Lacour's catalog matches the profile of training audio NVIDIA's documentation identifies as optimal — long-form, single-speaker, studio-quality, professionally produced — and his Pulitzer-honored audio work was, by virtue of its public recognition, a readily identifiable high-value source of training audio. His recordings are distributed on the same podcast platforms —

Apple Podcasts, Spotify, YouTube, and others — from which NVIDIA, on information and belief, sourced training data, including through its Granary pipeline drawn substantially from YouTube-derived corpora. NVIDIA has refused to disclose the sources of the training corpus powering its commercial voice products, placing the specific records of training data ingestion under NVIDIA's exclusive control.

118. Lacour never created an account with NVIDIA, downloaded an NVIDIA voice model, invoked an NVIDIA voice AI through any API, or accepted any NVIDIA terms of service related to its voice products. He never received notice that NVIDIA had collected his voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

119. Lacour's injury is concrete and particular to him. NVIDIA's Magpie TTS Flow, the voice cloning model NVIDIA itself markets as "ideal for studio dubbing and podcast narration," generates podcast-format audio from a target speaker's voice with "speaker similarity of over 70%" from a five-second audio sample. That product is directly in the format and the market of *You Didn't See Nothin'* and Lacour's other audio journalism. The technology NVIDIA built using Lacour's voiceprint now operates in the same long-form audio investigative-journalism market in which Lacour earns his livelihood, with the capabilities of his own voice contributing to the products that compete against him.

*Victoria Nassif*

120. Victoria Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois. Nassif is a trained mezzo-soprano singer whose vocal performance skills extend beyond spoken narration to include musical and singing capabilities developed through classical acting training. Nassif's audiobook narration work has been commercially released by Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster, and her on-camera work includes multiple episodes of NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Her notable audiobook narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), in which she serves as the solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist that was shortlisted for the Ursula K. Le Guin Prize and named a *them* magazine Best Book of the Year; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by bestselling author Susan Abulhawa featuring stories from Palestinian writers. Nassif possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation and Cockney), Persian, Levantine Arabic, and American Southern.

121. Nassif's audiobook catalog is continuously distributed across Audible, Apple Books, Spotify, Libro.fm, and other major audiobook platforms, with metadata identifying Nassif as the narrator, the publisher, and the title. Her on-camera work is continuously available through NBC and other broadcast distribution channels. Her audiobook catalog has been continuously available through these platforms for years preceding NVIDIA's training of the foundational voice synthesis models alleged in this Complaint.

122. On information and belief, Nassif's voice recordings were among the audio NVIDIA ingested to train its foundational voice synthesis models, and voiceprints derived from her recordings are encoded in the parameters of those models. Nassif's audiobook catalog matches the profile of training audio NVIDIA's documentation identifies as optimal, and her authentic Levantine Arabic-accented narrations are a distinctive and readily identifiable category of voice content particularly valuable for a multilingual voice synthesis system. NVIDIA's released Magpie TTS Multilingual model, by NVIDIA's own description, generates speech with "preference alignment" training across "23 of 25 languages," and NVIDIA's published Granary speech corpus — used to train NVIDIA's Canary-1b-v2 and Parakeet-tdt-0.6b-v3 multilingual speech models — was assembled in substantial part from open-source corpora that include LibriVox audiobooks. As a first-generation Lebanese-Palestinian American with native cultural and linguistic familiarity with Arabic-language and Levantine speech patterns, Nassif brings to her narration of works featuring Middle Eastern characters and settings an authenticity that

represents a category of training-data value NVIDIA's foundational voice models depend on capturing for their cross-language and cross-accent generative capability. NVIDIA has refused to disclose whether commercial-publisher audiobook content, multilingual voice content, or culturally-specific narration was ingested into the foundational models that power its commercial voice products, placing the specific records of training-data ingestion under NVIDIA's exclusive control.

123. Nassif never created an account with NVIDIA, downloaded an NVIDIA voice model, invoked an NVIDIA voice AI through any API, or accepted any NVIDIA terms of service related to its voice products. She never received notice that NVIDIA had collected her voiceprint, never received any disclosure of the purpose or duration of that collection, and never executed a written release.

124. Nassif's injury is concrete and particular to her. The cultural and linguistic specificity of Nassif's professional voice work — authentic Arabic-accented narration of works by Arab and Palestinian American authors — is itself the basis of her distinctive market position. NVIDIA's Magpie TTS Multilingual and related multilingual voice synthesis products, on information and belief, can now generate Arabic-accented English narration and Levantine Arabic-accented voice content that competes specifically with Nassif's professional niche, and that competitive capability exists because voice characteristics encoded in NVIDIA's foundational models include the characteristics of speakers like Nassif whose recordings supplied the

multilingual and cross-accent training data on which the models were built. The technology NVIDIA built using Nassif's voiceprint now operates in the precise market, culturally authentic Arabic-accented narration, in which Nassif has built her career, in a competitive position Nassif neither chose nor authorized.

*NVIDIA Acted Willfully and Recklessly*

125. NVIDIA's collection, retention, commercial exploitation, and dissemination of Plaintiffs' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. NVIDIA acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*NVIDIA knew its obligations under BIPA*

126. By the time NVIDIA released its most capable commercial voice cloning products — Magpie TTS Zeroshot and Magpie TTS Flow in October 2025, PersonaPlex in January 2026, and Nemotron 3 VoiceChat in 2026 — BIPA had been the law of Illinois for more than fifteen years and had generated some of the largest privacy settlements in American history. Those settlements include *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747 (N.D. Cal.) (approximately $650 million); *Rivera v. Google LLC,* Cook County Cir. Ct. No. 2019-CH-00990 (approximately $100 million); and *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill.) (approximately $92 million). In late 2025, Google paid $1.375 billion to the State of Texas to resolve parallel claims under Texas's biometric identifier statute, following Texas's $1.4 billion settlement with Meta in 2024 over

biometric data collection — two of the largest privacy settlements any state has ever obtained. By any measure, NVIDIA was on notice of the biometric-privacy obligations that govern the extraction of biometric identifiers from human source material throughout the period in which it ingested Plaintiffs' voiceprints into its foundational voice synthesis models.

127. Voice-AI-specific litigation further sharpened the notice. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y. filed May 16, 2024), alleging that an AI voice company created and commercialized unauthorized voice clones trained on the plaintiffs' recordings. In August 2024, additional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), asserting analogous claims against another AI voice company. By the time NVIDIA released Magpie TTS Zeroshot, Magpie TTS Flow, and PersonaPlex, AI voice companies were active defendants in litigation alleging the same conduct: building commercial voice synthesis products on voice recordings ingested without the speakers' consent.

128. NVIDIA's corporate disclosures recognized that biometric data collection is a relevant concern for its AI models. NVIDIA's Trustworthy AI terms, incorporated by reference into the licenses under which NVIDIA distributes several of its open-weight voice models, including the NVIDIA AI Open Model License and the NVIDIA Nemotron Open Model License, expressly prohibit use of NVIDIA's models for "unlawful biometric data collection." At the same time, NVIDIA's general Privacy Policy categorically states that NVIDIA "does not use, sell, or share 'sensitive personal information' as defined by

California law", a category that expressly includes biometric information. A company that recognizes the biometric implications of its technology in one public document while categorically denying them in another, and proceeds without implementing the notice, consent, retention, and destruction measures Illinois law requires, has, at a minimum, acted with reckless disregard.

*NVIDIA knew that voice training extracts biometric identifiers*

129. NVIDIA's published research and product documentation describe the voice synthesis pipeline in terms that align with BIPA's biometric definitions. NVIDIA's Magpie TTS Flow model card describes the model as analyzing "a speaker's voice" to "replicate voice qualities such as pitch, timbre and speech rate" and as "[m]aintain[ing] the original characteristics that capture unique voice audio signature."

130. NVIDIA's PersonaPlex model card describes the system as conditioned on "a voice prompt" consisting of "audio tokens that establish the target vocal characteristics and speaking style."

131. NVIDIA's July 2025 Riva TTS blog post describes Magpie TTS training as using "speaker verification (SV) models within a reward system to create a preference dataset" — that is, computational comparison of speaker acoustic signatures during training.

132. NVIDIA has not pleaded ignorance, and could not credibly plead ignorance, of the proposition that its voice synthesis pipeline extracts and stores speaker-specific representations capable of identifying the source

Case 1:26-cv-05456 Document #: 1 Filed: 05/21/26 Page 61 of 104 PageID #:61

speakers. NVIDIA built the pipeline, published the research, and shipped the product on that very capability.

133. NVIDIA has confirmed its understanding that voice synthesis training implicates the legal rights of source speakers in two distinct ways. First, by building safeguards against the downstream misuse of its own voice synthesis products. Second, by placing on its enterprise customers the upstream-rights obligation that NVIDIA failed to discharge with respect to its own training data.

134. In November 2024, NVIDIA announced FUGATTO, a 2.5-billion-parameter foundational audio generative model trained on more than 50,000 hours of audio and capable of generating and transforming human voices, including by modifying accent and emotion. NVIDIA did not release FUGATTO publicly. NVIDIA cited concerns about misuse, including voice impersonation and deepfake generation.

135. In October 2025, when NVIDIA released Magpie TTS Zeroshot and Magpie TTS Flow — voice cloning models that can replicate a target speaker's voice from a five-second audio sample — NVIDIA simultaneously announced a collaboration with Pindrop, a voice-fraud detection company, to develop deepfake detection capabilities against NVIDIA's voice models.

136. In January 2026, when NVIDIA released PersonaPlex, NVIDIA architecturally restricted that model to a fixed set of eighteen pre-packaged voice embeddings rather than supporting arbitrary voice cloning from user-supplied audio. Each of these measures was implemented at the downstream

end of NVIDIA's commercial pipeline, to constrain how end users use NVIDIA's products. None addressed the upstream issue: that NVIDIA's foundational voice models were trained on voiceprints extracted without the knowledge or consent of the speakers whose voice recordings were ingested at training time. NVIDIA built each of these safeguards against the downstream misuse of its products. It built none of them for the people whose voices it took to train those products in the first place.

137. NVIDIA's Product Specific Terms for AI Products define a "Custom TTS Application" as "a custom text-to-speech application that enables the creation of synthetic voice output that resembles an input voice," and require NVIDIA's enterprise customers to "have sufficient rights and licenses for content used with a Custom TTS Application to generate new content."

138. NVIDIA's October 2025 Magpie TTS launch documentation advised users to use voice cloning only with "target speakers who have consented to such use."

139. Each of these contractual and advisory provisions is NVIDIA's acknowledgment that the commercial use of an individual's voice to generate synthetic speech requires that individual's consent. NVIDIA imposed that obligation on its downstream enterprise customers. NVIDIA did not discharge the same obligation, in symmetric form, with respect to its own ingestion of training data, even though the foundational voice models on which the customer applications depend were built by ingesting voice recordings at training time without the speakers' notice, consent, or written release.

*NVIDIA chose to apply consent selectively*

140. The pattern of NVIDIA's conduct between 2024 and 2026 reflects a deliberate, contemporaneous choice. NVIDIA built and publicly deployed customer-facing consent and rights-acknowledgment infrastructure in connection with its voice cloning products. It built none of the corresponding upstream consent infrastructure for the speakers whose voices populated the training corpora that those same products depend on.

141. NVIDIA's Magpie TTS Flow training corpus, by NVIDIA's own disclosure, comprises approximately 70,000 hours of paired speech data; its FUGATTO training corpus comprises more than 50,000 hours of audio; and the Granary speech corpus assembled through NVIDIA's NeMo Speech Data Processor pipeline comprises approximately one million hours of audio.

142. The same engineering organization, ADLR, developed both the customer-facing voice cloning products with their downstream consent and rights-acknowledgment infrastructure and the foundational voice models trained on the unconsented training corpus. The same legal department drafted the customer-facing terms and the model licenses. The decision to apply consent and rights-acknowledgment to the downstream uses NVIDIA monetizes through its commercial customers, and not to the upstream voices NVIDIA took to build those products in the first place, was a contemporaneous, institutionally deliberate choice made with the consent infrastructure already in place.

143. The decision was a commercial calculation. BIPA-compliant collection of voice training data would have required NVIDIA to identify the source speakers, provide written notice of the specific purpose and duration of the collection, and obtain a written release from each speaker before ingesting the recording into the training pipeline. With foundational training corpora measured in the tens of thousands and hundreds of thousands of hours, comprising, on information and belief, the recordings of hundreds of thousands of distinct speakers and likely more, that compliance burden would have constrained the speed and scale of NVIDIA's voice AI development. NVIDIA chose speed and scale over compliance. The decision is documented in the contrast between NVIDIA's robust consent and rights-acknowledgment infrastructure for the downstream uses it monetizes and the complete absence of corresponding consent infrastructure for the upstream voices it took. That was not an oversight. It was a business decision.

*NVIDIA's training-data acquisition practices confirm deliberateness*

144. NVIDIA's training-data acquisition practices, taken on the public record, confirm that NVIDIA's noncompliance was a deliberate institutional choice rather than inadvertent oversight. As alleged at ¶ 57, NVIDIA is presently a defendant in two pending putative class actions, *Nazemian v. NVIDIA Corp.* and *Ted Entertainment, Inc. v. NVIDIA Corp.,* alleging non-consensual ingestion of pirated e-books and scraped YouTube videos, respectively, into the training corpora of NVIDIA's foundational language and video models. Together with the internal NVIDIA communications described at

¶ 56, documenting a company-wide initiative that processed approximately "a human lifetime" of video content per day, those actions establish a pattern of non-consensual ingestion of identifiable source material at a massive scale across NVIDIA's foundational model families. These actions concern language and video models, not voice models. But the same pattern, applied to a different category of source material, is what this Complaint alleges regarding NVIDIA's foundational voice synthesis models.

145. NVIDIA's August 2025 release of the Granary dataset confirms that NVIDIA operates the infrastructure required to ingest voice audio at the scale alleged here. NVIDIA publicly described Granary as an approximately one-million-hour corpus of speech audio assembled by processing pre-existing open-source corpora — including YODAS and YouTube-Commons (both YouTube-derived), VoxPopuli (European Parliament proceedings), and LibriLight (LibriVox audiobooks) — through NVIDIA's NeMo Speech Data Processor pipeline.

146. NVIDIA used Granary to train its Canary-1b-v2 and Parakeet-tdt-0.6b-v3 speech models, which NVIDIA distributes as open-weight models on Hugging Face.

147. The Granary pipeline demonstrates, in NVIDIA's own public documentation, that NVIDIA maintains infrastructure for the large-scale ingestion and processing of human voice audio from publicly accessible platforms; that NVIDIA willingly ingests identifiable voice recordings from those platforms without obtaining the consent of the speakers whose voices appear in

the recordings; and that NVIDIA's voice-audio processing pipeline operates at a scale, approximately one million hours, well in excess of what is necessary to produce the commercial voice synthesis and voice cloning models at issue in this case.

148. Each of the violations alleged in this Complaint was therefore committed by NVIDIA with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026).

## CLASS ACTION ALLEGATIONS

149. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings NVIDIA extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of NVIDIA's foundational voice synthesis models, or commercial voice products derived from those models, during the Class Period.

150. The Class Period runs from the earlier of (a) the date NVIDIA first ingested any voice recording into the training pipeline for any of its

foundational voice synthesis models, or (b) January 1, 2018, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period.

151. Excluded from the Class are: (i) NVIDIA Corporation and each of its parents, subsidiaries, affiliates, and controlled entities, including without limitation NVIDIA International, Inc., NVIDIA Singapore Pte. Ltd., and Mellanox Technologies, Ltd.; (ii) all current and former officers and directors of NVIDIA; (iii) NVIDIA's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; and (vi) any person who executed a written release authorizing NVIDIA's use of their voice recordings to train, fine-tune, or operate NVIDIA's foundational voice synthesis models, in compliance with 740 ILCS 14/15(b).

152. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

153. *Ascertainability.* Class membership is defined by objective criteria and can be determined from records that exist or will be produced in discovery. Whether a particular voice recording entered NVIDIA's training pipeline is a binary factual question — the recording is either in the pipeline's ingestion logs or it is not — and the records that answer the question are within NVIDIA's exclusive control. NVIDIA itself has publicly described, in connection with its

Case 1:26-cv-05478 Document #: 4-1 Filed: 05/12/26 Page 68 of 103 PageID #:917

August 2025 release of the Granary dataset, the operation of a NeMo Speech Data Processor pipeline that ingests, processes, and tracks the provenance of approximately one million hours of speech audio. The same category of pipeline metadata — training-data manifests, ingestion logs, source-URL records, dataset-version records, and associated speaker- and file-level identifiers — exists for the voice training data on which NVIDIA built Magpie TTS Multilingual, Magpie TTS Zeroshot, Magpie TTS Flow, FUGATTO, PersonaPlex, Nemotron 3 VoiceChat, Canary, and Parakeet. Class membership can be further confirmed through publicly available distribution metadata for voice recordings (audiobook platform records, podcast directory records, streaming service catalogs, broadcast archive records), through speaker-identification technology applied to NVIDIA's training corpus, and through voice-matching analysis comparing NVIDIA's voice model outputs against publicly available recordings of class members.

154. *Numerosity.* Joinder of all members of the Class is impracticable. Fed. R. Civ. P. 23(a)(1). NVIDIA has disclosed that Magpie TTS Flow was trained on approximately 70,000 hours of paired speech data, that FUGATTO was trained on more than 50,000 hours of audio, and that the Granary speech corpus assembled through NVIDIA's NeMo Speech Data Processor pipeline comprises approximately one million hours of audio. The number of distinct individuals whose voice recordings were produced or recorded in Illinois and ingested into the training pipelines that produced NVIDIA's commercial voice products plainly satisfies the threshold for numerosity. The Class includes not

only the professional broadcast journalists, audiobook narrators, podcasters, voice actors, and other voice professionals who have produced work in Illinois during the Class Period — themselves a population numbering in the thousands — but also the interviewees, guests, panelists, witnesses, callers, public officials, and other persons whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, archival, and other publicly distributed audio content, and whose recordings are accessible on the publicly distributed audio platforms from which NVIDIA, on information and belief, sourced training data. On information and belief, the Class population numbers in the hundreds of thousands or more. The exact number is within NVIDIA's exclusive control and will be established through discovery.

155. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). NVIDIA did not engage in any individualized notice, consent, retention-policy disclosure, release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into NVIDIA's foundational voice training pipelines. NVIDIA's conduct was uniform: the same training pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to all class members through the same automated and standardized process. The questions whether NVIDIA complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and privacy-protection requirements before and after extracting the voiceprints of class members can be answered

classwide because NVIDIA's compliance, or noncompliance, was identical as to every class member.

156. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics that NVIDIA extracts during voice model training, including speaker embeddings, audio tokens, voice prompts, and the speaker-acoustic-signature representations described in NVIDIA's model documentation, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b) whether NVIDIA informed class members in writing that their biometric identifiers were being collected, of the specific purpose and duration of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c) whether NVIDIA developed and made publicly available a written retention and destruction policy applicable to class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(d) whether NVIDIA sold, leased, traded, or otherwise profited from class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(e) whether NVIDIA disclosed or disseminated class members' biometric identifiers to third parties — including through the open-weight release of voice synthesis models on Hugging Face under the NVIDIA AI Open Model License and the NVIDIA Nemotron Open Model License — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether NVIDIA stored, transmitted, and protected class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2), including in light of NVIDIA's open-weight release of voice models that encode the biometric characteristics extracted from class members' recordings;

(g) whether NVIDIA's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether NVIDIA used class members' voices and identities for commercial purposes without prior written consent in violation of the Illinois Right of Publicity Act;

(i) whether NVIDIA's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(c), and NVIDIA materially contributes to or facilitates their distribution;

(j) whether NVIDIA's conduct constitutes deceptive trade practices likely to cause confusion in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2(a)(2) and 510/2(a)(3);

(k) whether NVIDIA was unjustly enriched by its unauthorized use of class members' voice data; and

(l) the appropriate measures of damages, restitution, and injunctive relief.

157. *Typicality.* The claims of the named Plaintiffs are typical of the claims of the Class. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, and related professional voice work, recorded in Chicago studios, broadcast facilities, and home recording studios in this District. NVIDIA, on information and belief, ingested those recordings into the training pipelines for its foundational voice synthesis models and extracted voiceprints from them without notice, consent, or written release. The voiceprints are now embedded in NVIDIA's commercial voice models — including Magpie TTS Multilingual, Magpie TTS Zeroshot, Magpie TTS Flow, FUGATTO, PersonaPlex, and Nemotron 3 VoiceChat — and reproduced in the audio those models generate. The legal theories asserted on behalf of the Class — that NVIDIA's extraction, retention, commercial exploitation, and dissemination of voiceprints from Illinois-recorded voice work without BIPA-compliant consent violates 740 ILCS 14/15(a)–(e), and that NVIDIA's commercial use of voices and identities without consent violates the Illinois Right of Publicity Act — apply with equal force to each named Plaintiff and to every other class member. Each named Plaintiff has the same interest as every other class member in establishing NVIDIA's liability and obtaining the relief sought in this Complaint.

158. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent class members; each named

Plaintiff has the same incentive as every other class member to maximize recovery and to obtain comprehensive injunctive relief addressing the unlawful extraction of voiceprints. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

159. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because NVIDIA has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. NVIDIA's training pipelines operated uniformly across every class member's voice recordings; NVIDIA's failure to obtain BIPA-compliant consent was uniform; NVIDIA's failure to publish a retention and destruction policy applicable to non-user training data subjects was uniform; and NVIDIA's continuing possession and commercial exploitation of class members' voiceprints in commercial models — and ongoing distribution of those voiceprints through open-weight model releases on Hugging Face — is uniform. Plaintiffs seek classwide injunctive relief under 740 ILCS 14/20, 815 ILCS 510/3 (IUDTPA, which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining of the foundational voice synthesis models in which class members' voiceprints are encoded — that necessarily applies on the same terms to every class member.

160. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate for the Class on the damages and restitutionary claims asserted in

this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

161. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. Whether NVIDIA's voice model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer — NVIDIA's model documentation describes the pipelines as analyzing a speaker's voice to "replicate voice qualities such as pitch, timbre and speech rate" and to "[m]aintain[] the original characteristics that capture unique voice audio signature," and as conditioned on "voice prompts" consisting of "audio tokens that establish the target vocal characteristics and speaking style." Whether NVIDIA complied with BIPA's notice, consent, retention, profiting, and dissemination requirements is a common legal question with a common answer — NVIDIA did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. Whether NVIDIA's conduct was willful or reckless turns on NVIDIA's institutional knowledge, decision-making, and conduct, all of which are common to the Class. The principal individual question — whether a specific class member's voice recordings entered the training pipelines — is binary and resolvable from NVIDIA's own records, which include the training-data manifests, ingestion logs, NeMo Speech Data

Processor pipeline metadata, and source-identifier records in NVIDIA's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

162. *Superiority.* A class action is the superior method for adjudicating these claims:

(a) *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover artists — and incidental speakers whose voiceprints were extracted without their knowledge. Many class members are unaware their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against the largest publicly traded technology company in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against NVIDIA on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train NVIDIA's foundational voice synthesis models. Two related actions are pending against

NVIDIA in the Northern District of California, both arising from related training-data practices within NVIDIA's foundational model families: *Nazemian v. NVIDIA Corp.*, No. 4:24-cv-01454-JST (N.D. Cal. filed Mar. 8, 2024), in which authors allege NVIDIA trained its NeMo Megatron large language models on the Books3 dataset of pirated e-books; and *Ted Entertainment, Inc. v. NVIDIA Corp.*, No. 5:25-cv-10287 (N.D. Cal. filed Nov. 26, 2025), in which YouTube content creators allege NVIDIA bypassed YouTube's technical protections to scrape millions of videos to train its Cosmos foundational video model. Both actions arise from training-data practices within the same NVIDIA research enterprise but assert claims on behalf of authors and copyright holders, not the voice professionals — broadcast journalists, podcasters, audiobook narrators, voiceover artists, and other speakers — whose voices were ingested into NVIDIA's foundational voice synthesis models. Both actions are pending in a different district. Neither asserts claims under BIPA or any analogous biometric-privacy statute.

(c) *Desirability of concentration in this forum.* Concentrating this litigation in this District is appropriate. Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. NVIDIA conducts substantial commercial business in Illinois, including through enterprise licensing of its voice AI products to Illinois-based customers. This Court is well-suited to adjudicate BIPA and other Illinois statutory claims arising from NVIDIA's commercial conduct in Illinois.

(d) *Manageability.* The case is manageable as a class action. NVIDIA's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; class membership can be determined from NVIDIA's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

163. To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by NVIDIA's concealment of its training-data sources, by NVIDIA's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that NVIDIA had ingested their recordings into its training pipelines, and by the continuing nature of NVIDIA's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational audio models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data, and each public release of model parameters encoding that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

164. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

165. Plaintiffs bring this Count individually and on behalf of the Class.

166. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

167. NVIDIA is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

168. NVIDIA collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class members by ingesting their voice recordings into its training pipelines and extracting from those recordings computational representations capable of

identifying the speakers, as alleged in detail at ¶¶ 33-41. The resulting representations — variously denominated as speaker embeddings, audio tokens, voice prompts, and speaker-acoustic-signature representations in NVIDIA's technical and product documentation — are voiceprints and biometric information within the meaning of BIPA.

169. NVIDIA did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. NVIDIA obtained no consent of any kind, in any form, from any Plaintiff or Class member.

170. NVIDIA's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 125-148. In the alternative, NVIDIA's violations were negligent.

171. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)**

*Brought on behalf of the Class*

172. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

173. Plaintiffs bring this Count individually and on behalf of the Class.

174. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with NVIDIA in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

175. NVIDIA has been, and remains, in possession of voiceprints extracted from recordings of Plaintiffs and Class members.

176. NVIDIA has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training data and embedded in the parameters of NVIDIA's foundational voice synthesis models, as alleged at ¶ 60. NVIDIA's general Privacy Policy does not address the retention or destruction of biometric data extracted from non-user

voice recordings, and applies only to persons with an existing relationship with NVIDIA. NVIDIA has not provided, and on information and belief does not maintain, any mechanism by which Plaintiffs or other non-user training-data subjects can request access to, correction of, or deletion of their biometric data.

177. NVIDIA's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 125-148. In the alternative, NVIDIA's violations were negligent.

178. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)**

*Brought on behalf of the Class*

179. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

180. Plaintiffs bring this Count individually and on behalf of the Class.

181. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier may sell, lease, trade, or otherwise profit from a person's biometric identifier. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

182. NVIDIA has profited and continues to profit from Plaintiffs' and Class members' voiceprints by using them to develop, train, and commercially operate the voice synthesis models that power NVIDIA's commercial voice products, and by monetizing those products through the integrated commercial

channels alleged at ¶¶ 73-80, including (i) NVIDIA AI Enterprise subscription fees; (ii) NVIDIA API Catalog cloud-hosted inference fees; (iii) NVIDIA NIM containerized microservice deployments; (iv) the strategic and demonstration value supporting NVIDIA's GPU and AI-hardware sales; (v) developer-ecosystem and commercial-moat value generated through open-weight model distribution on Hugging Face; and (vi) strategic deployment value across NVIDIA's broader product portfolio. The voice quality, expressiveness, speaker similarity, and multilingual capability that NVIDIA sells through these channels exists because of the voiceprints encoded in NVIDIA's foundational voice synthesis models. NVIDIA's commercial exploitation of Plaintiffs' and Class members' voiceprints does not fall within any exception to § 15(c).

183. NVIDIA's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 125-148. In the alternative, NVIDIA's violations were negligent.

184. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

185. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

186. Plaintiffs bring this Count individually and on behalf of the Class.

187. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier may disclose, redisclose, or otherwise disseminate a

person's biometric identifier unless an enumerated exception applies. 740 ILCS 14/15(d).

188. NVIDIA has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints in three categories of conduct, each independently sufficient to violate § 15(d) and as alleged at ¶¶ 77-80.

189. *First*, NVIDIA has, on information and belief, transferred the foundational voice synthesis models and the voiceprints encoded within them, among NVIDIA's affiliated corporate entities, including NVIDIA International, Inc., NVIDIA Singapore Pte. Ltd., and Mellanox Technologies, Ltd.

190. *Second*, NVIDIA has, on information and belief, transmitted the foundational voice synthesis models and the voiceprints encoded within them to vendors, service providers, and cloud-infrastructure partners in the ordinary course of training, evaluating, deploying, and operating its commercial voice products.

191. *Third*, NVIDIA has publicly released the parameters of multiple voice synthesis models, including PersonaPlex, Canary, and Parakeet, as open-weight releases on Hugging Face under the NVIDIA AI Open Model License and the NVIDIA Nemotron Open Model License, making the encoded biometric characteristics available for download by any party worldwide. The open-weight release is a unilateral, irreversible act of dissemination by NVIDIA. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

192. NVIDIA's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 125-148. In the alternative, NVIDIA's violations were negligent.

193. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)**

*Brought on behalf of the Class*

194. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

195. Plaintiffs bring this Count individually and on behalf of the Class.

196. Section 15(e) of BIPA requires a private entity in possession of biometric identifiers to store, transmit, and protect the identifiers from disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

197. NVIDIA fails the § 15(e)(2) asymmetry test. NVIDIA's established institutional practice with respect to a substantial portion of its voice and

speech synthesis models is open-weight release on Hugging Face, while NVIDIA simultaneously protects its other confidential and sensitive information under strict closed-system controls.

198. NVIDIA's open-weight release of voice and speech synthesis models is sustained, public, and intentional. NVIDIA distributes its PersonaPlex conversational voice model, released January 2026, as an open-weight model on Hugging Face under the NVIDIA AI Open Model License. NVIDIA distributes its Canary-1b-v2 and Parakeet-tdt-0.6b-v3 speech models, trained on the approximately one-million-hour Granary speech corpus, as open-weight models on Hugging Face. NVIDIA's NeMo open-source toolkit, distributed on GitHub under the Apache 2.0 license, packages the underlying voice and speech model architectures. NVIDIA's broader Nemotron family of open-weight foundational models is distributed under the NVIDIA Nemotron Open Model License. NVIDIA's AI Open Model License and NVIDIA Nemotron Open Model License are both, in NVIDIA's own description, intended to make NVIDIA's foundational AI models broadly available to the developer ecosystem.

199. The voice synthesis and speech models NVIDIA has distributed as open-weight releases encode the biometric characteristics extracted from training data. Once a model's weights have been published on Hugging Face under a permissive license, the encoded biometric characteristics persist in every downloaded copy. NVIDIA cannot recall the downloaded copies. NVIDIA cannot prevent third parties from redistributing, modifying, or fine-tuning them

on additional data while preserving the underlying biometric encodings. The open-weight release is, by design, an irreversible publication.

200. NVIDIA contemporaneously protects its other confidential and sensitive information under closed-system controls that are materially more protective than open release. NVIDIA maintains the source code for its core commercial products as closed-source proprietary information. NVIDIA protects its proprietary GPU architecture and integrated-circuit designs, its internal financial records, its employee personnel files, its customer data, and its business communications under strict access controls, encryption, internal classification systems, and information-security regimes. NVIDIA protects technology subject to United States export controls administered by the Department of Commerce under additional regulatory protective layers. NVIDIA's decision to withhold FUGATTO from public release in November 2024, based on NVIDIA's recognition of misuse risks associated with the model's voice generation and voice transformation capabilities, is one example of the protective measures NVIDIA applies to its own model weights when it perceives reputational or legal exposure.

201. The asymmetry between NVIDIA's open-weight release of voice and speech synthesis model parameters, including, on information and belief, model parameters derived from training data containing voiceprints and biometric information from non-consenting individuals, and NVIDIA's closed-system protection of its other confidential and sensitive information violates § 15(e)(2)'s requirement that biometric data be protected "in a manner that is

the same as or more protective than" NVIDIA's protection of its other confidential and sensitive information. Open-weight release is publication, not protection. NVIDIA's institutional pattern of open-weight release applies to and has been applied to speech synthesis models that ingested Class members' voice recordings; at minimum, those production models are not protected with the same level of care that NVIDIA applies to its other confidential and sensitive information, because NVIDIA's established public practice with respect to comparable voice and speech models is open-weight release rather than closed protection.

202. Independently, NVIDIA fails the § 15(e)(1) reasonable-standard-of-care test as to voiceprints extracted from non-user training data. The reasonable standard of care within the AI and machine learning industry for the handling of biometric training data includes documented provenance for training data, access controls, audit logging, encryption, a documented retention and destruction schedule, and a mechanism through which data subjects may request access to, correction of, or deletion of their biometric data. As alleged at ¶¶ 49-61, NVIDIA has not published documented provenance for the bulk of the voice training data used to build its commercial voice synthesis models; has not published any access-control protocol, audit-logging policy, encryption standard, or retention and destruction schedule specifically applicable to voice training data or to the biometric characteristics encoded in its voice models; and has not published any mechanism through which non-user data subjects may request access to, correction of, or deletion

of their biometric data from NVIDIA's training datasets, model parameters, or commercial inference pipelines. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of their data, because those individuals have no ability to monitor, verify, or challenge how their data is stored, transmitted, or protected. The reasonable industry standard of care for biometric data presupposes some mechanism by which the data subject can verify the integrity of the protection; NVIDIA has provided none.

203. NVIDIA's violations of § 15(e) were intentional or reckless, as alleged at ¶¶ 125-148. In the alternative, NVIDIA's violations were negligent.

204. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count VI**

**Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

205. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

206. Plaintiffs bring this Count individually and on behalf of the Class.

207. The Illinois Right of Publicity Act protects an individual's right to control commercial use of their identity. 765 ILCS 1075/30(a) provides that a person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the individual. IRPA defines "identity" to include "any attribute of an individual that

serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

208. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

209. NVIDIA used Plaintiffs' and Class members' identities for commercial purposes within the meaning of IRPA, by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the commercial voice synthesis products that NVIDIA monetizes through the integrated commercial channels alleged at ¶¶ 73-80. NVIDIA holds out its products' ability to generate realistic, expressive, and human-sounding voices — and, in the case of Magpie TTS Zeroshot and Magpie TTS Flow, their ability to achieve "speaker similarity of over 70%" from a five-second voice prompt — as a core commercial feature of those products, a capability built from the identities of the individuals whose recordings were used to train the foundational models. NVIDIA did not obtain written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

210. Independently, the Illinois Right of Publicity Act, as amended by P.A. 103-836 effective January 1, 2025, prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or

audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative. 765 ILCS 1075/30(b). The amended IRPA further imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution. *Id.* On information and belief, NVIDIA's commercial voice products generate, distribute, and make available to the public voice outputs that constitute unauthorized digital replicas of Plaintiffs and Class members within the meaning of the amended IRPA, and NVIDIA materially contributes to and facilitates the distribution of such replicas through its integrated commercial channels — including NVIDIA AI Enterprise, NVIDIA API Catalog cloud-hosted inference services, NVIDIA NIM microservice deployments, and open-weight model releases on Hugging Face that enable any downloader to generate unauthorized digital replicas.

211. NVIDIA's violations of IRPA were willful and knowing, as alleged at ¶¶ 125-148. NVIDIA's Product Specific Terms for AI Products require its enterprise customers to "have sufficient rights and licenses for content used with a Custom TTS Application to generate new content," and NVIDIA's October 2025 Magpie TTS launch documentation advised users that voice cloning should be used only with "target speakers who have consented to such use." NVIDIA imposed those obligations on its downstream customers and end users specifically because NVIDIA understood that the commercial use of an individual's voice requires that individual's consent. NVIDIA chose not to apply

the same consent infrastructure to Plaintiffs and Class members, whose voices NVIDIA itself extracted to train the foundational models.

212. Plaintiffs and the Class have suffered concrete injury from NVIDIA's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods, as alleged at ¶¶ 81-88.

213. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to NVIDIA's unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

**Count VII**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.**

*Brought on behalf of the Class*

214. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

215. Plaintiffs bring this Count individually and on behalf of the Class.

216. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices ... in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices is broader than its prohibition of deceptive practices and reaches conduct that, even absent affirmative misrepresentation, offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002).

217. NVIDIA engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis services to Illinois customers, and by collecting, extracting, and commercially exploiting the biometric identifiers of Illinois persons in connection with that commerce.

218. NVIDIA's conduct is unfair within the meaning of ICFA. NVIDIA's collection and commercial exploitation of the biometric identifiers of Illinois persons without their knowledge or consent offends Illinois public policy as expressed in BIPA — the Illinois statute enacted specifically to address the unauthorized collection of biometric identifiers, 740 ILCS 14/5 — and as expressed in IRPA — the Illinois statute enacted specifically to address the unauthorized commercial use of personal identity, 765 ILCS 1075/30. NVIDIA's conduct caused substantial injury to Plaintiffs and Class members, including the diversion of licensing income they would otherwise have earned for the use of their voices and the displacement of their professional voice work

in the markets where they earn their livelihoods, as alleged at ¶¶ 81-88. Plaintiffs and Class members could not reasonably have avoided this injury because they had no knowledge that NVIDIA was collecting their biometric data.

219. NVIDIA's conduct is also independently deceptive within the meaning of ICFA. NVIDIA's general Privacy Policy categorically states that NVIDIA "does not use, sell, or share 'sensitive personal information' as defined by California law," even though biometric information is expressly included within that definition under California law. That representation is materially misleading because, on information and belief, NVIDIA was simultaneously ingesting tens of thousands of hours of voice recordings from non-users and extracting biometric voice representations from those recordings without the speakers' knowledge. NVIDIA maintained total opacity about the sources of its voice training data while commercially exploiting that data at scale.

220. NVIDIA's unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from NVIDIA's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, and not merely from the existence of competing AI products.

221. NVIDIA's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged at ¶¶ 125-148.

222. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a, injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class (injunctive relief only)*

223. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

224. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

225. The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

226. NVIDIA's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of

Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, and commercially exploited by NVIDIA's enterprise customers and end users without consumer-facing disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content.

227. Plaintiffs and Class members are persons likely to be damaged by NVIDIA's deceptive practices within the meaning of 815 ILCS 510/3. NVIDIA's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

228. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring NVIDIA to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that NVIDIA has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3, Plaintiffs also seek reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Class*

229. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

230. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

231. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

232. NVIDIA obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train NVIDIA's foundational voice synthesis models; the product capability and competitive advantage NVIDIA captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and the revenue NVIDIA generates and continues to generate through the commercial exploitation of those models, as alleged at ¶¶ 73-80.

233. NVIDIA obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and

resources to develop their voices and create professional recordings. NVIDIA's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to NVIDIA, and NVIDIA's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

234. NVIDIA's retention of these benefits is unjust. NVIDIA's conduct violated the Illinois statutory protections for biometric data (BIPA) and for personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. NVIDIA's institutional practice confirms the inequity of its retention: NVIDIA built and deployed customer-facing rights-acknowledgment infrastructure for the downstream uses of its voice products that NVIDIA monetizes through enterprise customers, but did not apply equivalent infrastructure to the voices of Plaintiffs and Class members from whom NVIDIA itself took voiceprints without consent. NVIDIA could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

235. Plaintiffs and the Class seek restitution of the benefits NVIDIA has unjustly retained, including disgorgement of profits NVIDIA earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant NVIDIA Corporation and award the following relief:

A. *Injunctive Relief*. Permanent and, where appropriate, preliminary injunctive relief requiring NVIDIA to:

(1) Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2) Cease the commercial use, sale, lease, trade, profiting from, or dissemination of voiceprints and biometric information of Plaintiffs and Class members that NVIDIA has already collected without BIPA-compliant consent;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate NVIDIA's foundational voice synthesis models, including without limitation Magpie TTS Multilingual, Magpie TTS Zeroshot, Magpie TTS Flow, FUGATTO, PersonaPlex, Nemotron 3 VoiceChat, Canary, and Parakeet;

(4) Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information of non-users, in compliance with 740 ILCS 14/15(a);

(5) Destroy all voiceprints and biometric information of Plaintiffs and Class members that NVIDIA obtained without BIPA-compliant consent, and certify the destruction;

(6) Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational voice synthesis models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation Magpie TTS Multilingual, Magpie TTS Zeroshot, Magpie TTS Flow, FUGATTO, PersonaPlex, Nemotron 3 VoiceChat, Canary, and Parakeet, together with any iterative or successor models trained from those models or derived from voiceprints encoded in them; and as to NVIDIA's open-weight model releases on Hugging Face and other public distribution platforms, take all reasonable measures to recall and remove the unlawfully encoded model parameters from public availability, including by issuing takedown requests, ceasing further distribution under permissive licenses, and ceasing further support of derivative releases;

(7) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution or making

available of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b); and

(8) Provide adequate consumer-facing disclosure that voice outputs generated by NVIDIA's commercial voice products are AI-generated, are derived from foundational voice synthesis models built using voice recordings of unidentified speakers, and have not been authorized by the individuals whose vocal characteristics are reproduced.

B. *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended by P.A. 103-769 (effective August 2, 2024) and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C. *IRPA Damages*. Award the actual damages Plaintiffs and Class members sustained as a result of NVIDIA's unauthorized commercial use of their identities and voices, the profits NVIDIA earned from that unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages where applicable, and punitive damages under 765 ILCS 1075/40.

D. *ICFA Damages*. Award the actual economic damages Plaintiffs and Class members sustained as a result of NVIDIA's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a(c).

E. *Restitution and Disgorgement.* Order restitution of the benefits NVIDIA has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities; disgorgement of the profits NVIDIA has earned through the integrated commercial chain alleged in this Complaint, including without limitation revenue from (i) NVIDIA AI Enterprise subscription fees; (ii) NVIDIA API Catalog cloud-hosted inference fees; (iii) NVIDIA NIM containerized microservice deployments; (iv) GPU and AI-hardware sales supported by the demonstrated commercial capability of NVIDIA's voice synthesis products; (v) developer-ecosystem and commercial-moat value generated through open-weight model distribution on Hugging Face under the NVIDIA AI Open Model License and the NVIDIA Nemotron Open Model License; and (vi) strategic deployment value of voice synthesis capability across NVIDIA's broader commercial product portfolio; and an accounting of all such revenues and benefits.

F. *Non-Duplication.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification*. Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment*. Enter judgment in favor of Plaintiffs and all Class members and against Defendant NVIDIA Corporation on all Counts on which Defendant is found liable.

I. *Attorneys' Fees and Costs*. Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J. *Interest*. Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Further Relief*. Award such other and further relief as the Court deems just, equitable, and proper.

**<u>JURY TRIAL REQUESTED</u>**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 12, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Philip Rogers, Carol Marin, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VICTORIA NASSIF, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, LINDSEY DORCUS, ROBIN AMER, and YOHANCE LACOUR, each individually and on behalf of all others similarly situated, | ) | Case No. |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) | |
| v. | ) | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, and SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, | ) | |
| Defendants. | ) | |

**<u>COMPLAINT</u>**

Plaintiffs, Victoria Nassif, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, and Yohance Lacour, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung"), allege as follows:

**<u>NATURE OF THE CASE</u>**

1. "AI for All." That is how Samsung introduced Galaxy AI to the world at CES 2024, the largest consumer-technology trade show in the United States, under a Samsung Newsroom headline that read "Samsung's 'AI for All'

Vision Unveiled at CES 2024." Samsung Research, the parent corporation's global R&D organization, adopted the same phrase as its institutional mission: "Under the vision of 'AI for All,' Samsung plans to integrate AI services across all product lines, enabling users to enjoy a more convenient and enriched daily life." Two years later, at CES 2026, Samsung unveiled a Brain Health voice-biomarker service that uses Samsung's foundational voice-AI models to assess users' cognitive health from short audio samples. AI for All. From mobile translation to medical screening. Samsung says so itself.

2. But the AI Samsung built was not for all. To the users of its Galaxy phones, tablets, watches, and earbuds, Samsung built a consent infrastructure: the Bixby Custom Voice Creator lets a user record prompted sentences on-device and authorize the cloning of the user's own voice. Samsung's U.S. Privacy Policy tells those users that "certain Services may use your biometric data" — voiceprint data — to create a customized Bixby Voice wake-up command. Samsung's consumer-facing privacy webpage tells those users that "Voice data is encrypted and sent to the server only for general learning purposes with your permission." Samsung uses the word "voiceprint." Samsung uses the word "biometric." Samsung asks for permission. Samsung knows what voiceprints are. Samsung knows its voice products process them. Samsung knows that processing requires permission. Samsung says so itself.

3. But Samsung said nothing to the people whose voices Samsung actually used to build the underlying technology — the broadcast journalists, investigative podcasters, audiobook narrators, voice actors, and incidental

speakers whose recordings populate the public audio web. The same Samsung that asked permission of its users did not ask permission of Plaintiffs. Samsung did not tell Plaintiffs their voiceprints were being taken. Not before. Not after. Not now. Samsung did not tell them what was being built with them. Samsung did not ask.

4. Behind that silence, Samsung built a commercial voice-AI business. Samsung's foundational voice synthesis and voice recognition models now power Bixby Voice, the Bixby Custom Voice Creator base model, the Samsung TTS engine, Galaxy AI Live Translate, Interpreter, and Transcript Assist, the speaker-verification systems supporting Hi Bixby wake-word personalization, and the Brain Health voice-biomarker service unveiled at CES 2026 (together, "The Voice Products"). Those models were not built from nothing. They were built on voiceprints, taken from recordings of real human voices, fed into a training pipeline that extracted each speaker's distinctive vocal signature, and used to develop commercial products that ship to the owners of 300+ million Galaxy devices. Samsung's published research describes the pipeline. Samsung's regulatory filings to California acknowledge the corpus. Samsung's acquisitions document the methodology. What Samsung has never described, never acknowledged, and never documented is the consent of the people whose voices made all of it possible. Plaintiffs' voiceprints are among them.

5. The biometric data and the Voice Products are the same thing. The voice characteristics encoded in Samsung's foundational voice models are what

enable those products to function. Samsung extracted the data. Samsung shipped the product.

6. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields — Pulitzer winners, Peabody honorees, the recipient of the Order of Lincoln, and audiobook narrators recorded for the major American publishers. None of them was told that their voice was being used to train Samsung's commercial voice AI. None of them was asked. None of them consented.

7. A voiceprint is a digital fingerprint of the human voice. It is a mathematical representation of the acoustic features — pitch, timbre, resonance — that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice. The biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

8. The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before a private entity may collect a voiceprint, BIPA requires written notice that biometric data is being

collected or stored, written notice of the specific purpose and duration of collection, and a written release executed by the subject. 740 ILCS 14/15(b). Samsung complied with none of these requirements with respect to Plaintiffs or the Class. It did not notify Plaintiffs that their voiceprints were being collected. It did not tell them why. It did not tell them for how long. It did not obtain a written release. It did not develop or publish a retention and destruction policy applicable to the voiceprints it extracted from non-users. Samsung treated the voices of real people as unencumbered raw material for commercial products, without a word to the people whose voices made the products possible, and without permission or compensation.

9. Plaintiffs and the Class have suffered concrete, particularized injuries. Samsung invaded their legally protected privacy interest in their own biometric identifiers by extracting voiceprints and biometric information without notice or consent. Samsung deprived them of the right, guaranteed by BIPA, to make an informed decision about whether a private entity may collect, store, and use their biometric data. Samsung retains their biometric data in its commercial voice models and continues to profit from it. The voiceprints cannot be recovered or replaced. The technology Samsung built using their voices now operates in the markets where they earn their livelihoods — broadcast journalism, audiobook narration, podcast production, voice acting, voiceover work — in a competitive position they neither chose nor authorized.

10. Plaintiffs assert claims under BIPA § 15(a)–(e), the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq. (“IRPA”), the Illinois Consumer Fraud

and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (“ICFA”), the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq. (“IUDTPA”), and Illinois common law for unjust enrichment.

11. Plaintiffs seek statutory and actual damages; restitution and disgorgement of the profits Samsung has earned from the commercial exploitation of Plaintiffs' biometric data; classwide injunctive relief including the destruction or retraining of the foundational voice models in which Plaintiffs' voiceprints are encoded; and reasonable attorneys' fees, costs, and expenses.

12. Samsung promised "AI for All." Samsung delivered AI for some, built on the voiceprints of others. Samsung used the word "voiceprint" when it spoke to its users. Samsung did not use it when it spoke to Plaintiffs, because Samsung did not speak to Plaintiffs at all. Plaintiffs bring this action to recover for that silence, the products built behind it, and the promise Samsung made to everyone but did not keep.

**PARTIES**

13. Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound, and whose investigative podcast Somebody was a 2021 Pulitzer Prize finalist for Audio Reporting. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 80-82.

14. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted primarily in Chicago and whose work was recognized in 2025 with the Order of Lincoln, the State of Illinois's highest civilian honor. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 83-85.

15. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Samsung extracted his voiceprint are described at ¶¶ 77-79, 86-88.

16. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's The City and as Managing Editor of Love + Radio. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 89-91.

17. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her

home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 92-94.

18. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast work, including the 2024 Pulitzer Prize–winning You Didn't See Nothin', is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Samsung extracted his voiceprint are described at ¶¶ 77-79, 95-97.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 98-100.

20. Defendants Samsung Electronics Co., Ltd. ("Samsung Electronics") and Samsung Electronics America, Inc. ("Samsung America") (together, "Samsung") engaged jointly in the conduct alleged in this Complaint. Samsung Electronics conducts the voice-AI research through Samsung Research, its global R&D organization; Samsung Electronics owns the foundational voice models that emerge from that research; and Samsung America deploys those

models to U.S. consumers, including in Illinois, through the Voice Products. Samsung Electronics is directly liable for the conduct alleged in this Complaint. Samsung America is directly liable for its own U.S.-facing conduct. In the alternative, Samsung America acted as Samsung Electronics' agent.

21. Samsung Electronics is a corporation organized under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi-do, Republic of Korea. Samsung Electronics is publicly traded on the Korea Exchange. For fiscal year 2025, Samsung Electronics reported consolidated revenue of KRW 333.6 trillion (approximately US$240 billion). The Voice Products are commercial products of the Samsung Electronics enterprise and contribute to its consolidated revenue.

22. Samsung Research is the institutional home of Samsung's voice-AI work and the advanced research and development hub of Samsung Electronics' SET (End-Products) Business. Samsung Research operates a global network of AI Centers and R&D Institutes — including AI Center–Seoul (the flagship), AI Center–Mountain View, AI Center–Toronto, AI Center–Cambridge, AI Center–Warsaw, Samsung R&D Institute India–Bangalore, Samsung R&D Institute Poland, Samsung R&D Institute China–Beijing, and Samsung R&D Institute China–Nanjing — each operated by Samsung Electronics. Samsung Research's voice-AI publications, including the nine-paper series presented at INTERSPEECH 2025, are authored by Samsung Research employees and form the technical foundation of the Voice Products.

23. Samsung Electronics' senior leadership directs the voice-AI work at parent-corporation level. Daniel D. Lee, Executive Vice President of Samsung Electronics, leads Samsung Research's Global AI Center; Daehyun Kim is Executive Vice President of Samsung Research Global AI Center; YoungJip Kim is Executive Vice President and Head of the Artificial Intelligence Team within Samsung's Mobile eXperience Business; and Jisun Park is Corporate Executive Vice President and head of Samsung's Language AI team. Each holds an executive office in Samsung Electronics Co., Ltd. Samsung Electronics has not delegated voice-AI development or commercialization to a subsidiary: the parent develops the technology, publishes the research, owns the foundational models, holds out the Voice Products as Samsung Electronics products, and books the resulting revenue on its consolidated financial statements. Samsung Electronics, through Samsung Research's voice-AI training pipelines and the executive direction of its officers, obtained the voiceprints of Plaintiffs and the Class.

24. Samsung Electronics America is a corporation organized under the laws of the State of New York, with its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660. Samsung America is a wholly-owned subsidiary of Samsung Electronics and serves as Samsung's principal U.S. operating arm. Samsung America markets, sells, and supports Samsung Galaxy mobile devices, Samsung Smart TVs, home appliances, and other consumer electronics in the United States, including in Illinois. Samsung America also operates Samsung Research America ("SRA"), with its principal

research office in Mountain View, California, which contributes voice-AI research, model development, and product engineering to the foundational voice models at issue.

25. Samsung America is directly liable for its own U.S.-facing conduct. Samsung America (a) sells Galaxy devices to U.S. consumers, including Illinois residents, preloaded with Bixby and Galaxy AI features that depend on Samsung Electronics' foundational voice models — the same models trained on Plaintiffs' voiceprints; (b) operates the U.S.-facing infrastructure through which Bixby voice data, Galaxy AI feature data, and Brain Health voice samples are processed; (c) collects voice data from U.S. users, including Illinois users, pursuant to the U.S. Privacy Policy Samsung America publishes and administers; (d) holds itself out to U.S. consumers as the contracting entity for Samsung consumer electronics in the United States; and (e) earns substantial U.S. revenue from the sale and operation of the Voice Products.

26. In the alternative, Samsung America acted as Samsung Electronics' agent. Samsung Electronics holds Samsung America out, through Samsung's consumer-facing privacy notices, terms of service, product warranties, and corporate disclosures, as Samsung's authorized U.S. operating arm. Samsung America undertook to market, distribute, support, and operate the Voice Products in the United States and to operate Samsung Research America as the U.S. research extension of Samsung Research. Samsung Electronics retains and exercises the right of control through its complete ownership of Samsung America, its control over Samsung America's senior

management, and its continuous direction of the voice-AI product development, release, and feature roadmaps that Samsung America executes in the United States. The benefits of Samsung America's U.S. operations are consolidated into Samsung Electronics' financial reporting and flow to Samsung Electronics and its shareholders.

27. Plaintiffs refer to Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. collectively as "Samsung" throughout this Complaint. The Samsung Defendants are jointly and severally liable for the conduct alleged in this Complaint.

**JURISDICTION AND VENUE**

28. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, Defendant Samsung Electronics Co., Ltd. is a citizen of the Republic of Korea, and Defendant Samsung Electronics America, Inc. is a citizen of New York (state of incorporation) and New Jersey (principal place of business). None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

29. The aggregate amount in controversy substantially exceeds $5,000,000. Plaintiffs seek statutory or actual damages under five distinct BIPA subsections, § 15(a)–(e), on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific*

*Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in addition to recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Samsung extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

30. This Court has specific personal jurisdiction over Samsung Electronics America under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the Due Process Clause of the Fourteenth Amendment. Samsung America has purposefully directed substantial commercial conduct at Illinois and into this District, and Plaintiffs' claims arise out of and relate to that conduct.

31. Samsung America maintains a continuous, substantial commercial presence in Illinois. Samsung America sells Samsung Galaxy mobile devices, Samsung Smart TVs, home appliances, and the full range of Samsung consumer electronics to Illinois residents through national carrier partners (Verizon, AT&T, T-Mobile) operating throughout Illinois, through major retailers (Best Buy, Costco, Target, Walmart) with Illinois store networks, through Samsung Experience Stores operated within Best Buy locations in this District, and through Samsung America's direct online store at samsung.com/us. Samsung America accepts recurring payments from Illinois subscribers for Samsung services, including Samsung Care+, Samsung Health, Samsung TV

Plus, and Bixby-enabled services. Each Galaxy device, Smart TV, accessory, subscription, and service interaction with an Illinois customer is a separate commercial transaction between Samsung America and an Illinois resident. Samsung America derives substantial revenue from Illinois.

32. Samsung America's Illinois contacts are suit-related. The U.S.-facing Voice Products at issue in this Complaint are deployed by Samsung America to Illinois consumers through the Galaxy devices and other Samsung products Samsung America sells in Illinois. Each Galaxy device sold in Illinois ships with software, controlled by Samsung America, that invokes Samsung's foundational voice synthesis and voice recognition models, which are the models alleged in this Complaint to have been trained on Plaintiffs' voiceprints. Samsung America also collects voice data from Illinois users pursuant to the U.S. Privacy Policy and the consumer-facing privacy notices Samsung America publishes and administers, including the statement that "Voice data is encrypted and sent to the server only for general learning purposes with your permission." On information and belief, the same Bixby system through which Samsung America obtains Illinois users' consent processes Illinois voice data through the foundational voice models at issue.

33. Samsung America was actively defending biometric-privacy litigation in this District (see ¶ 106) at the same time it was deploying to Illinois consumers the very Bixby and Galaxy AI products that depend on the foundational voice models at issue here.

34. This Court has specific personal jurisdiction over Samsung Electronics Co., Ltd. under the Illinois long-arm statute, 735 ILCS 5/2-209. Samsung Electronics' extraction of voiceprints from Illinois-produced recordings and its continuing commercial exploitation of those voiceprints in Illinois are conduct purposefully directed at this State, for the reasons set forth at ¶¶ 68-71, and are independently supported by Samsung Electronics' direction and control of Samsung America's Illinois operations.

35. Samsung Electronics directs Samsung America's Illinois operations. As alleged at ¶¶ 23, 26, Samsung Electronics retains and exercises control over Samsung America's senior management, voice-AI product development, release schedules, software updates, feature roadmaps, and the commercial deployment of the foundational voice models in Illinois. Samsung America's Illinois contacts are attributable to Samsung Electronics under settled agency principles.

36. Samsung Electronics' conduct independently satisfies the effects test for specific personal jurisdiction. Samsung Electronics committed intentional acts: the extraction of voiceprints from human voice recordings and the encoding of those voiceprints in commercial voice models. Those acts were expressly aimed at Illinois: Samsung Electronics targeted identifiably Illinois-origin recordings and continues to deliver the resulting commercial products into Illinois. And Samsung Electronics knew, or reasonably should have known, that the brunt of the harm — to Plaintiffs' biometric privacy and commercial identity — would be suffered in Illinois by Illinois residents whose

voices, recordings, and professional careers are based here. Samsung Electronics, a publicly traded global corporation with continuous U.S. operations through Samsung America and Samsung Research America, could reasonably anticipate being haled into court in this District for claims arising from its extraction of biometric data from voice recordings produced or recorded in Illinois.

37. The exercise of specific personal jurisdiction over Samsung Electronics in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Illinois has a strong and particularized interest in providing a forum for redressing the unlawful collection and commercial exploitation of biometric identifiers of persons whose voices were produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA. 740 ILCS 14/5. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating in their home forum. The burden on Samsung Electronics of litigating in this District is not undue. Samsung Electronics is a publicly traded global corporation that reported approximately US$240 billion in consolidated revenue for fiscal year 2025; conducts continuous U.S. operations through Samsung America; operates Samsung Research America's principal U.S. research office in Mountain View, California; and is an experienced litigant in U.S. federal courts. Samsung Electronics could reasonably anticipate being haled into court in this District for claims arising from its extraction and

commercial exploitation of biometric data sourced from voice recordings produced or recorded in Illinois.

38. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Plaintiffs reside in this District. Plaintiffs' voice recordings were produced and recorded in this District. Samsung's collection, capture, extraction, and commercial exploitation of biometric identifiers belonging to residents of this District occurred without notice, consent, or written release. Samsung sells, distributes, and delivers the voice-AI products built on those biometric identifiers to residents of this District through Samsung America's retail, carrier, and online distribution channels. The economic and privacy injuries Plaintiffs and Class members suffered are felt in this District, where Plaintiffs work, perform, and earn their livelihoods.

39. Venue is independently proper as to Samsung America under 28 U.S.C. § 1391(b)(1) and § 1391(c)(2), because Samsung America is subject to personal jurisdiction in this District and therefore "resides" in this District for venue purposes.

40. Venue is independently proper as to Samsung Electronics under 28 U.S.C. § 1391(c)(3), which provides that "a defendant not resident in the United States ... may be sued in any judicial district." As a foreign corporation domiciled in the Republic of Korea, Samsung Electronics may be sued in this District regardless of the residency-based venue provisions applicable to domestic defendants.

## **FACTUAL BACKGROUND**

*Samsung's Voice-AI Business and Its Global Reach into American Voice Content*

41. Samsung is one of the world's largest consumer electronics companies, with approximately 268,000 employees, more than 230 subsidiaries, and approximately US$21.4 billion in annual research and development spending, the second-highest globally. The Voice Products operate on 300+ million Galaxy devices, including tens of millions in the United States, in over 70 countries and more than 40 languages. To build the foundational voice synthesis and voice recognition models on which the Voice Products depend, Samsung needed voice training data at a corresponding scale — tens of thousands of hours of speech across the languages, accents, recording conditions, and speaking styles Samsung's products must reproduce. English-language audio recorded in the United States was, and is, central to that training base.

42. Samsung is structurally oriented toward American voice content. Samsung Research operates AI Centers on three continents, including in Mountain View, California. Samsung's voice-AI research is published in English in international venues, including the nine-paper INTERSPEECH 2025 series. Samsung's commercial voice products launched in English alongside Korean — Bixby in May 2017 (Korean) and July 2017 (English); the Bixby Custom Voice Creator in February 2023 (Korean) and August 2023 (English) — and Samsung's largest single market for voice-enabled Galaxy devices is the United States. A Korean parent operating a Mountain View AI center,

publishing in English-language venues, selling English-language voice products to American consumers, and competing against U.S. voice-AI providers (Google, Apple, Amazon) is not geographically constrained from accessing English-language American audio. It is structurally compelled to do so.

43. The Voice Products depend on that orientation. Bixby Voice generates and recognizes speech in over twenty languages. The Samsung TTS engine produces broadcast-quality voice output. Galaxy AI Live Translate provides real-time two-way translation between English and twenty-plus other languages. Galaxy AI Interpreter provides split-screen translation for face-to-face conversation. Galaxy AI Transcript Assist provides speaker-separated, summarized transcription. The Bixby Custom Voice Creator clones a user's voice from short on-device samples. The Brain Health voice-biomarker service, unveiled at CES 2026, assesses cognitive health from short voice samples. Each product requires substantial English-language voice training data. Samsung has never disclosed where it got that data.

44. Samsung distributes the Galaxy AI feature suite at no separate charge to users of its Galaxy devices and confirmed in early 2026 that core Galaxy AI features would continue to be offered without a separate subscription. Samsung monetizes voice-AI through device sales, ecosystem lock-in, enterprise mobility licensing, and the related channels alleged below — not through stand-alone subscription fees. Samsung does not geographically restrict the Voice Products' availability in Illinois or any other U.S. jurisdiction.

Each Bixby request, each Live Translate session, each Interpreter conversation, each Transcript Assist generation by an Illinois Galaxy user is a transaction Samsung captures the commercial value of, using voice models trained, on information and belief, on voice recordings Samsung obtained without consent.

*How Samsung's Voice-AI Pipeline*
*Extracts and Encodes Voiceprints*

45. Modern AI voice synthesis and voice recognition technology works by training neural networks on large quantities of recorded human speech. During training, the network learns the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, phrasing, dynamics, and emotional expression — and encodes those features as mathematical representations stored in the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices. The technical term of art for these representations is "speaker embedding"; the legal term, under BIPA, is "voiceprint."

46. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Whether the extracted representations are classified as voiceprints, biometric information derived from voiceprints, or both, they fall within BIPA's scope. The label the technology industry uses does not determine the statutory classification. The function of the data does.

47. Samsung Research's published research describes the technical pipeline in detail. Samsung's INTERSPEECH 2025 publications on dysarthric speech synthesis describe voice cloning systems that, with "just a few seconds of audio," "generate speech that mimics a person's voice tone, rhythm, and style."[1] Samsung's INTERSPEECH 2025 publication on robust neural codec language modeling for zero-shot text-to-speech describes the technical mechanism: a target speaker's recording is encoded by a pre-trained neural audio codec into discrete acoustic codes; an autoregressive transformer predicts those acoustic codes conditioned on a phoneme sequence; and the predicted codes are decoded into synthesized speech that reproduces the target speaker's voice from a brief enrollment recording.[2] Samsung Research evaluates the closeness of synthetic speech to reference speakers using speaker-embedding cosine similarity computed via WavLM-based speaker-verification models.[3] Each step in this published technical pipeline extracts

---

[1] Gurugubelli Krishna, "[INTERSPEECH 2025 Series #9] Fairness in Dysarthric Speech Synthesis: Understanding Intrinsic Bias in Dysarthric Speech Cloning using F5-TTS," Samsung Research Blog (Aug. 22, 2025), https://research.samsung.com/blog/-INTERSPEECH-2025-Fairness-in-Dysarthric-Speech-Synthesis-Understanding-Intrinsic-Bias-in-Dysarthric-Speech-Cloning-using-F5-TTS (last visited May 12, 2026); *see also* Anuprabha M., Krishna Gurugubelli & Anil Kumar Vuppala, *Fairness in Dysarthric Speech Synthesis: Understanding Intrinsic Bias in Dysarthric Speech Cloning using F5-TTS*, arXiv:2508.05102 (Aug. 2025), https://arxiv.org/pdf/2508.05102 (last visited on May 12, 2026), Samsung R&D Institute–Bengaluru author affiliation.

[2] Chunhui Lu & Xue Wen, *Robust Neural Codec Language Modeling with Phoneme Position Prediction for Zero-shot TTS*, in Proc. INTERSPEECH 2025, https://www.isca-archive.org/interspeech_2025/lu25e_interspeech.pdf (last visited on May 12, 2026) (Samsung R&D Institute China–Beijing author affiliation); *see also* Chunhui Lu & Xue Wen, *Robust neural codec language modeling with phoneme position prediction for zero-shot TTS*, Samsung Research Blog (Aug. 28, 2025), https://research.samsung.com/blog/Robust-neural-codec-language-modeling-with-phoneme-position-prediction-for-zero-shot-TTS (last visited on May 12, 2026).

[3] Anuprabha M. et al., *supra* note 1.

speaker-specific biometric representations from input audio recordings. Each extraction is, within the meaning of BIPA, the capture of a voiceprint.

48. Samsung's materials describe its voice processing in BIPA's statutory terms. Samsung's U.S. Privacy Policy uses the word "voiceprint" to describe data Samsung's services process, telling users that "certain Services may use your biometric data that is stored on your device" "[e.g., to use] your voiceprint data to create a customized Bixby Voice wake-up command." Samsung's consumer-facing privacy webpage acknowledges that "Voice data is encrypted and sent to the server only for general learning purposes with your permission." Samsung does not use BIPA's vocabulary by accident. Samsung uses it because Samsung's voice systems process the biometric data BIPA's vocabulary describes.

49. The biometric data and the product are the same thing. Bixby's speaker-aware wake-word personalization works because speaker characteristics are encoded in Samsung's models. Live Translate and Interpreter produce natural English voice output because English-language voice characteristics are encoded in Samsung's models. Transcript Assist separates and labels speakers because speaker-distinguishing characteristics are encoded in Samsung's models. The Samsung TTS engine generates broadcast-quality voices because broadcast-quality voice characteristics are encoded in Samsung's models. The Bixby Custom Voice Creator clones a user's voice in seconds because the base model already encodes the acoustic dimensions a human voice can span. The Brain Health voice-biomarker service

detects cognitive markers because the model already encodes the baselines against which deviations register. The extraction is not incidental to Samsung's voice products. It is the product.

*Samsung Knows How to Build Consent.*
*Samsung Chose Not To.*

50. Samsung's voice-AI development from 2012 to the present shows a clear pattern: Samsung built consent and protection infrastructure where commercial or reputational incentives demanded it, and not where they did not. The non-user speakers whose voice recordings Samsung ingested to train the foundational voice models fell into the second category.

51. In 2015, Samsung's Smart TV product line transmitted users' living-room speech to a third-party speech-to-text vendor. Samsung's privacy policy warned consumers that the system could capture and transmit conversations. The Electronic Privacy Information Center filed a formal Federal Trade Commission complaint, and public criticism was widespread. Samsung's response — modifying its disclosures, adding in-UI microphone indicators, and emphasizing on-device processing for sensitive voice features — confirms that by 2015 Samsung understood that voice data collection carried biometric-privacy implications. The lesson Samsung learned from the Smart TV episode was applied to user-facing voice features. It was not applied to non-user training data.

52. In July 2017, Samsung acquired Innoetics, a text-to-speech voice synthesis company spun out of the Athena Research and Innovation Center / Institute for Language and Speech Processing in Greece. At acquisition,

Innoetics had developed and deployed 29 synthetic voices across 15 languages, and its signature commercial capability was a voice-to-speech technology that could mimic a target speaker's voice after training on the speaker's recordings. Samsung integrated the Innoetics team into Samsung Electronics Greece, where Innoetics co-founder Aimilios Chalamandaris currently serves as Head of R&D.

53. Innoetics's published methodology, three years before Samsung acquired it, was the use of publicly available audiobook recordings as training material for synthetic-voice creation. In *Using Audio Books for Training a Text-to-Speech System*, Proc. LREC 2014, the Innoetics founders described an automated pipeline for converting publicly available audiobook recordings into a spoken corpus for unit-selection text-to-speech synthesis. The paper characterized "[u]sing publicly available audiobooks as the raw material of a spoken corpus for such systems" as "creat[ing] new perspectives regarding the possibility of creating new synthetic voices quickly and with limited effort."[4] The Innoetics acquisition gave Samsung in-house voice-cloning intellectual property, a multilingual TTS engineering team, and a documented institutional

[4] Aimilios Chalamandaris, Pirros Tsiakoulis, Sotiris Karabetsos & Spyros Raptis, *Using Audio Books for Training a Text-to-Speech System*, in *Proceedings of the Ninth International Conference on Language Resources and Evaluation (LREC 2014)* 3076–80, http://www.lrec-conf.org/proceedings/lrec2014/pdf/838_Paper.pdf (last visited May 13, 2026). All four authors were affiliated with Innoetics Ltd. The training corpus consisted of 21 commercially produced audiobooks totaling "over 140 hours" of speech, "all recorded by a professional American English native female speaker," pruned to a 97-hour synthetic-voice training corpus drawn from that single narrator's recordings. *Id.* at 3077 & Table 1. The paper does not name the narrator, does not address speaker consent, and does not describe any mechanism by which she authorized the use of her commercial recordings as training feedstock.

methodology for treating publicly available audiobook recordings as synthetic-voice training feedstock. On information and belief, Samsung's foundational voice models carry forward that methodology, adopted by acquisition and developed thereafter without disclosed consent from the narrators whose recordings constitute the methodology's raw material.

54. In March 2017, Samsung announced Bixby, which launched in Korean in May 2017 and English in July 2017. Throughout the period in which Samsung built and trained Bixby's underlying foundation models, Samsung obtained no notice, consent, or written release from non-users whose voice recordings Samsung ingested into its training pipelines. In November 2018, Samsung opened Bixby to third-party developers, expanding the surface area for commercial deployment of the underlying voice models without changing the consent posture for the speakers whose voices trained those models. At CES 2020, Samsung's STAR Labs subsidiary publicly debuted Neon, an "artificial human" platform purportedly capable of generating realistic human-like virtual beings. Samsung was pursuing artificial human voice and likeness reproduction at the same time it was, on information and belief, training the foundation models on real human voices taken without consent.

55. On February 22, 2023, Samsung announced the Bixby Custom Voice Creator: "Using the new Bixby Custom Voice Creator, users can record different sentences for Bixby to analyze and create an AI generated copy of their voice and tone." The product is explicitly designed around speaker consent: the user records prompted sentences on-device, the user authorizes

the cloning, the user retains the resulting voice for personal use. The product confirms that Samsung's organization — the same Samsung Research engineering team, the same Samsung legal department — is fully capable of designing voice-cloning workflows around informed, opt-in consent. Samsung built that infrastructure for the user's own voice. Samsung did not build it for the voices on which Samsung's foundational voice models were trained.

56. On November 8, 2023, Samsung introduced Samsung Gauss, its proprietary generative AI suite, at the Samsung AI Forum. Samsung publicly represented that the Gauss Image model "was learned from safe data that does not infringe on licenses or personal information." Samsung made no comparable representation about its voice synthesis or voice recognition models — not for Gauss, not for Gauss2 in 2024, not since. If Samsung's voice models had been trained on safely sourced data, Samsung would have said so. Samsung has not.

57. On January 17, 2024, Samsung launched the Galaxy S24 series and introduced Galaxy AI. Samsung also introduced visible watermarks on AI-edited images, a measure addressing the consumer-deception and provenance risks of generative image AI. Samsung built no corresponding measure for voice content generated by foundational models built on non-consenting speakers' voiceprints. The pattern repeats: when commercial or reputational incentives push Samsung to address an AI risk, Samsung addresses it. Voice training-data provenance did not push.

58. At CES in January 2026, Samsung unveiled the Brain Health voice-biomarker service. The product uses voice analysis as a diagnostic biomarker for cognitive decline — Samsung's institutional confirmation that voice is a biologically meaningful identifier of individual condition and identity. On March 31, 2026, Samsung disclosed that Bixby had transitioned to an LLM-powered "callable agents" architecture resting on the same foundational voice-AI models trained on the data at issue here. Samsung's commercial use of Plaintiffs' biometric data is not historical. It is ongoing.

*Samsung's Training-Data Acquisition Practices*

59. Samsung has never publicly disclosed the sources, scale, or provenance of the voice training data behind its foundational voice synthesis and voice recognition models. Samsung has not published a model card, a data sheet, a training-data manifest, or any transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented. The disclosure absence covers every Voice Product.

60. The only voice-training data Samsung Research has publicly identified appears in its peer-reviewed publications, and the disclosures are partial. These admissions are Samsung's own, published under Samsung Research's institutional banner, attributed to Samsung Electronics employees, and reflecting the same enterprise of generative AI Samsung disclosed to California regulators under AB 2013 (see ¶ 62). In its 2019 publication "End-to-End Training of a Large Vocabulary End-to-End Speech Recognition System," arXiv:1912.11040, Samsung Research disclosed training and

evaluating its Bixby ASR system on the LibriSpeech corpus and on a "10,000-hour anonymized Bixby English dataset."[5] In its 2021 submission to the VoxCeleb Speaker Recognition Challenge, arXiv:2109.13518, Samsung Research America's North America Bixby Lab disclosed evaluating its speaker-diarization system on the VoxConverse dataset, which Samsung Research itself described as "natural conversations of multiple talkers collected from YouTube."[6] In its 2022 publication "SOMOS: The Samsung Open MOS Dataset," arXiv:2204.03040, Samsung Research disclosed building a 20,000-utterance MOS dataset on the LJ Speech voice, a public-domain LibriVox-derived corpus.[7] In its 2025 INTERSPEECH publication on multi-task Korean

---

[5] Chanwoo Kim, Sungsoo Kim, Kwangyoun Kim, Mehul Kumar, Jiyeon Kim, Kyungmin Lee, Changwoo Han, Abhinav Garg, Eunhyang Kim, Minkyoo Shin, Shatrughan Singh, Larry Heck & Dhananjaya Gowda, *End-to-End Training of a Large Vocabulary End-to-End Speech Recognition System*, arXiv:1912.11040 (Dec. 23, 2019), https://arxiv.org/abs/1912.11040 (last visited May 13, 2026). The paper states: "We evaluated the effectiveness of our system on the standard Librispeech corpus and the 10,000-hr anonymized Bixby English dataset." *Id.* at Abstract. Author Chanwoo Kim was Corporate Executive Vice President at Samsung Research and Head of the Language and Voice Team through 2023; author Larry Heck previously led Google Assistant and Microsoft Cortana before joining Samsung Research.

[6] Myungjong Kim, Taeyeon Ki, Aviral Anshu & Vijendra Raj Apsingekar, *North America Bixby Speaker Diarization System for the VoxCeleb Speaker Recognition Challenge 2021*, arXiv:2109.13518 (Sept. 28, 2021), https://arxiv.org/abs/2109.13518 (last visited May 13, 2026). The paper states: "This paper describes the submission to the speaker diarization track of VoxCeleb Speaker Recognition Challenge 2021 done by North America Bixby Lab of Samsung Research America. . . . We evaluated our system on the VoxConverse dataset and the challenge evaluation set, which contain natural conversations of multiple talkers collected from YouTube." *Id.* at Abstract.

[7] Georgia Maniati, Alexandra Vioni, Nikolaos Ellinas, Karolos Nikitaras, Konstantinos Klapsas, June Sig Sung, Gunu Jho, Aimilios Chalamandaris & Pirros Tsiakoulis, *SOMOS: The Samsung Open MOS Dataset for the Evaluation of Neural Text-to-Speech Synthesis*, arXiv:2204.03040 (Apr. 6, 2022, last revised Aug. 24, 2022), https://arxiv.org/abs/2204.03040 (last visited May 13, 2026); presented at INTERSPEECH 2022. The paper states: "[The dataset] consists of 20K synthetic utterances of the LJ Speech voice, a public domain speech dataset which is a common benchmark for building neural acoustic models and vocoders. . . . We collect MOS naturalness evaluations on 3 English Amazon Mechanical Turk locales." *Id.* at Abstract. Authors Chalamandaris and Tsiakoulis are co-founders of Innoetics, the TTS company Samsung acquired in 2017, *see* ¶¶ 52-53; Chalamandaris currently serves as Head of R&D at

speech-to-text modeling, Samsung Research disclosed training on 40,000 hours of Korean speech drawn from ten enumerated AIHub corpora, including broadcast-content dialogue voice recognition, broadcast news anchor voice data, conference voice data, and other archival sources.[8] In its 2025 INTERSPEECH publication on streaming TTS in a Mamba framework, Samsung Research disclosed training and evaluating its zero-shot text-to-speech acoustic model on the LibriTTS corpus — 585 hours of audiobook narration derived from the LibriVox project, used across all three training subsets (train-clean-100, train-clean-360, and train-other-500).[9] In its 2025 INTERSPEECH publication on speech emotion recognition, Samsung Research

---

Samsung Electronics Greece.

[8] Samsung Research Blog, *[INTERSPEECH 2025] Beyond Hard Sharing: Efficient Multi-Task Speech-to-Text Modeling with Supervised Mixture of Experts*, https://research.samsung.com/blog/-INTERSPEECH-2025-Beyond-Hard-Sharing-Efficient-Multi-Task-Speech-to-Text-Modeling-with-Supervised-Mixture-of-Experts (last visited May 13, 2026). The blog post describes training on 40,000 hours of Korean speech from the AIHub corpus and enumerates the specific AIHub dataset identifiers used: Korean voice data (dataSetSn=123), broadcast-content dialogue voice recognition (463), Korean-language college lecture data (71627), conference voice data (132), broadcasting Korean-European and Korean-English interpretation/translation voice (71384 and 71379), conference voice recognition by major area (464), noise-environment voice recognition (568), news script and anchor voice (71557), and Korean-English mixed recognition (71260). AIHub (https://aihub.or.kr) is the open-data platform operated by the National Information Society Agency (NIA) under the Republic of Korea's Ministry of Science and ICT.

[9] Samsung Research Blog, *[INTERSPEECH 2025] Efficient Streaming TTS Acoustic Model with Depthwise RVQ Decoding Strategies in a Mamba Framework*, https://research.samsung.com/blog/-INTERSPEECH-2025-Efficient-Streaming-TTS-Acoustic-Model-with-Depthwise-RVQ-Decoding-Strategies-in-a-Mamba-Framework (last visited May 13, 2026). The publication states: "We conducted comprehensive evaluations on the LibriTTS dataset under strict zero-shot conditions. . . . [W]e used all of the training subsets (train-clean-100, train-clean-360, train-other-500) for training and the test-clean subset for evaluation." The LibriTTS corpus, comprising approximately 585 hours of speech at 24 kHz from approximately 2,456 speakers, is derived from the LibriVox audiobook project and Project Gutenberg texts. *See* Heiga Zen et al., *LibriTTS: A Corpus Derived from LibriSpeech for Text-to-Speech*, arXiv:1904.02882 (Apr. 5, 2019), https://arxiv.org/abs/1904.02882 (last visited May 13, 2026).

disclosed training on the MSP-Podcast corpus, 119,421 samples drawn from commercially distributed podcast recordings, labeled through Amazon Mechanical Turk crowdsourcing.[10]

61. The corpora Samsung has admitted using cannot account for the foundational voice models Samsung deploys today. LibriTTS consists of 585 hours of English-only audiobook narration from approximately 2,456 LibriVox volunteer narrators reading public-domain texts from Project Gutenberg. LibriTTS contains no Korean, no Spanish, no French, no Mandarin, no Arabic, no Hindi, and none of the more than twenty other languages Samsung's voice products generate. LibriTTS contains no Levantine Arabic accent of the kind Plaintiff Nassif provides as a professional asset; no podcast-style narrative delivery of the kind Plaintiffs Flowers, Amer, and Lacour produce; no broadcast-journalism delivery of the kind Plaintiffs Marin and Rogers anchored across four and five decades of on-air work; and no contemporary commercially produced audiobook narration of the kind Plaintiffs Dorcus and Nassif record for the major American publishers. The LibriVox volunteers who recorded LibriTTS did not consent to extraction of their voiceprints for commercial voice-AI; were not informed by Samsung of any such use; and were not paid for it. And the 585 hours of LibriTTS, the 24 hours of LJ Speech, the 119,421 podcast samples of MSP-Podcast, and the 40,000 hours of Korean AIHub data cannot produce the multilingual, accent-diverse, broadcast-quality voice

[10] Samsung Research Blog, *Multi-task Learning for Speech Emotion Recognition in Naturalistic Conditions*, https://research.samsung.com/blog/Multi-task-Learning-for-Speech-Emotion-Recognition-in-Naturalistic-Conditions (last visited May 13, 2026).

capability Samsung sells across 300+ million Galaxy devices. On information and belief, Samsung's foundational voice training corpora aggregate to tens of thousands of additional hours of speech from tens of thousands of additional speakers, sourced through pathways Samsung has not publicly identified.

62. On January 1, 2026, Samsung published the disclosure required by California's Generative Artificial Intelligence Training Data Transparency Act, Cal. Bus. & Prof. Code §§ 22757–22757.4 (AB 2013). Samsung admitted that it trains its generative AI on three categories of data: "publicly available data," defined as "open-source materials and publicly accessible information"; "licensed/purchased data," defined as "content acquired through agreements with third-party providers"; and "synthetic data." Samsung admitted that its training corpus comprises "approximately 1 trillion data points," that "[t]he datasets may include data subject to copyright, trademark, or patent protection," that the datasets may contain "personal information" within the meaning of the California Consumer Privacy Act, and that "[t]he datasets were first used in 2023 during the development phase of Samsung's generative AI systems and services." Samsung did not identify a single specific dataset, name a single licensor, or describe any consent mechanism applicable to the speakers whose voices populate the "publicly available" and "licensed/purchased" categories.[11] The AB 2013 disclosure governs the same enterprise of generative-AI systems on which every Voice Product operates. It is

[11] https://www.samsung.com/us/ai-products/generative-ai-training-data-summary/ (last visited on May 13, 2026).

Samsung's first and only regulatory-level acknowledgment of how its generative AI is trained — and it confirms three propositions at the heart of this Complaint: (a) Samsung's generative AI is trained on a vast corpus of publicly available and third-party-licensed content; (b) the training corpus contains personal information; and (c) Samsung has not obtained, and does not contend it has obtained, the informed written consent of the persons whose biometric information is contained in that corpus.

63. The unidentified portion of Samsung's training corpus, on information and belief, was sourced through three convergent pathways. First, Samsung ingested industry-standard public speech corpora derived from identifiable, attributed recordings: the audiobook category (LibriSpeech, LibriTTS, LibriTTS-R, Libri-Light, Multilingual LibriSpeech, LJ Speech), the YouTube category (VoxCeleb, VoxCeleb2, VoxConverse, YODAS, YODAS2, YouTube-Commons, GigaSpeech), the crowdsourced-voice category (Mozilla Common Voice), the podcast category (MSP-Podcast, GigaSpeech in part), and the broadcast-conversation category (AIHub broadcast corpora). Each of these datasets aggregates the recordings of identifiable human speakers, indexed in publicly available metadata to the original platform, channel, broadcaster, narrator, or speaker. Samsung Research has publicly admitted using at least LibriSpeech, LibriTTS, LJ Speech, VoxConverse, MSP-Podcast, and the AIHub Korean broadcast and news corpora. Second, on information and belief, Samsung directly accessed identifiable, attributed audio content on publicly accessible platforms — YouTube, podcast directories (Apple Podcasts, Spotify,

Case 1:26-cv-05435 Document #: 24-1 Filed: 05/13/26 Page 33 of 94 PageID #:3986

iHeartRadio), audiobook platforms (Audible, Apple Books, Libro.fm, Scribd/Everand), broadcast archives (NBC 5 Chicago, WTTW, Media Burn), and streaming services. These platforms display creator profiles with name, geographic location, and content catalog visible at the time of acquisition. Third, on information and belief, Samsung obtained voice recordings through commercial licensed-data arrangements characterized in Samsung's AB 2013 disclosure as "data licensed or purchased from third parties," and through synthetic augmentation using voice cloning as alleged below.

64. No commercial license or third-party purchase, however structured, can supply the consent BIPA requires. BIPA § 15(b) requires that the private entity collecting biometric data first inform "the subject" in writing of the collection and its purpose and duration, and obtain a written release executed by "the subject" or the subject's "legally authorized representative." 740 ILCS 14/15(b). The statutory duty runs to the individual whose voiceprint is to be extracted. It is non-delegable. No copyright holder, distribution platform, audiobook publisher, podcast network, broadcast employer, recording aggregator, or data vendor can give consent on the speaker's behalf. A license from a copyright owner conveys copyright rights, not biometric-privacy rights. A platform's terms of service may bind the platform's users; they do not bind speakers whose voices appear in content uploaded by others. A data vendor's representations about the lawfulness of its corpus may shift contractual risk among commercial parties; they do not satisfy BIPA's notice and written-release requirements as to the individual speakers from whose

recordings biometric data is extracted. The biometric-consent duty is owed to the speaker. Only the speaker can perform it. BIPA-compliant collection would have required Samsung to identify each source speaker, provide written notice of the specific purpose and duration of collection, and obtain a written release before ingesting the recording — a compliance burden Samsung has nowhere alleged to have performed.

65. Samsung's institutional approach is documented in the contemporaneous work of Samsung Research's external research partnerships. Samsung Research's 2024 collaboration with Adam Mickiewicz University and Samsung R&D Institute Poland — *Spoken Language Corpora Augmentation with Domain-Specific Voice-Cloned Speech*, arXiv:2406.07090, under the Samsung-funded CAIMAC project — describes the use of VALL-E X voice cloning to expand speech-recognition training corpora through synthesized speech generated from existing speaker recordings. Samsung uses voice cloning to multiply the training value of voice recordings Samsung has already obtained. The voices Samsung clones to expand its corpora are voices Samsung obtained without consent in the first place.

66. No publicly documented mechanism exists for non-user speakers to opt out of or request removal from Samsung's training datasets or models. Samsung's privacy disclosures are directed at users of its devices and services. They do not address, and cannot provide notice or consent on behalf of, the non-users from whose third-party-sourced recordings Samsung extracted biometric data.

67. On information and belief, Samsung's foundational voice models were trained on voice recordings obtained without the knowledge or consent of the speakers, including Plaintiffs' and Class members' recordings. The bases for this allegation include Samsung's partial dataset disclosures in its published research; the arithmetic inadequacy of those disclosed corpora to produce Samsung's deployed multilingual voice products; Samsung's regulatory admission under AB 2013 of training on publicly available and third-party-licensed data; Samsung's three-pathway acquisition through public corpora, direct platform access, and commercial licensed-data arrangements; Samsung's contemporaneous funding of voice-cloning data augmentation; the disjunction between Samsung's "safe data" claim for Gauss Image and its silence as to voice; and Samsung's failure to provide any mechanism by which non-users can discover or opt out of inclusion. This conclusion is reinforced by the industry-wide pattern alleged in *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill.); *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.); *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.); *Basich v. Microsoft Corp.*, No. 2:26-cv-00163 (W.D. Wash.); and *Cruz v. Fireflies.AI Corp.*, No. 1:25-cv-13783 (N.D. Ill.), in which voice-AI defendants in Samsung's product market are alleged to have built commercial voice products on voice recordings ingested without speaker consent.

*The Biometric Data Was Generated in Illinois*

68. Plaintiffs' and Class members' biometric data is Illinois-origin biometric data on three independent grounds. *First,* the biometric data was

generated in Illinois. Plaintiffs' and Class members' voices were produced while physically present in Illinois. The audio encodings were created in Illinois — in Chicago broadcast studios, recording facilities, home recording studios, podcast production studios, theatrical venues, and other Illinois locations — and published from Illinois to publicly accessible platforms. The voice itself originated in Illinois; the audio embodiment was created in Illinois; the voiceprint Samsung extracted is a derivative of Illinois-origin biometric material. Samsung's ingestion of those recordings necessarily involved acquiring Illinois-origin biometric data, regardless of the physical location of the servers on which Samsung's training pipeline operated.

69. *Second*, Samsung's acquisition targeted identifiably Illinois-origin material. As alleged at ¶ 63, Samsung sourced training data from publicly accessible platforms that display speaker metadata identifying the speaker by name and the geographic origin of the content. Plaintiffs' and Class members' Illinois identities and recording locations were publicly visible on the platforms from which, on information and belief, Samsung obtained their recordings — including YouTube, broadcast archives (NBC 5 Chicago, WTTW, Media Burn), podcast directories (Apple Podcasts, Spotify, iHeartRadio), and audiobook platforms (Audible, Apple Books). Samsung's acquisition was not the passive receipt of an anonymized dataset; it involved the affirmative acquisition of recordings whose Illinois origin and identifiable Illinois speakers were apparent to Samsung at the time of acquisition.

70. *Third*, Samsung's ongoing commercial exploitation of the resulting voice models is directed at Illinois continuously. The Voice Products are preinstalled on Galaxy devices sold in Illinois and continuously operated for Illinois consumers. The voice characteristics encoded in Samsung's foundational voice models, including, on information and belief, voiceprints derived from Plaintiffs' and Class members' Illinois-produced recordings, are continuously deployed to and operated for Illinois consumers each time those consumers use a Voice Product.

71. Each ground independently anchors Samsung's liability to Illinois. BIPA's consent obligation under § 15(b) is a duty that runs to "the subject." 740 ILCS 14/15(b). Plaintiffs and Class members were and are in Illinois. The duty to inform and obtain consent was owed to Illinois persons. The failure to perform that duty is an omission with respect to Illinois persons, localized where those persons reside and where their voices were produced. Samsung's ongoing possession of those voiceprints is a continuing § 15(a) obligation; Samsung's commercial exploitation under § 15(c) is the monetization of Illinois-origin biometric assets belonging to Illinois persons.

*Samsung Monetizes the Voice Models Through an Integrated Commercial Chain*

72. Samsung monetizes the foundational voice models through an integrated commercial chain comprising at least six channels: (a) Galaxy mobile device sales — phones, tablets, watches, and earbuds — to which the Galaxy AI feature suite and Bixby Voice are bundled as ecosystem features; (b) Smart TVs, home appliances, and automotive systems incorporating

Samsung's voice capabilities; (c) enterprise mobility licensing and Samsung Knox–related enterprise services for Fortune 500 companies, hospitals, universities, and government agencies operating in Illinois; (d) the Samsung TTS engine, licensed across Samsung's product ecosystem and to third-party platforms; (e) the Brain Health voice-biomarker service unveiled at CES 2026; and (f) strategic deployment value across Samsung's broader product portfolio and developer ecosystem, including arrangements with third-party AI providers (Google's Gemini and Perplexity AI for cloud-based Galaxy AI processing) that themselves rely on Samsung's voice-processing infrastructure.

73. Each channel depends on the foundational voice models. The voice quality, expressiveness, multilingual capability, speaker-aware transcription, real-time translation, voice-cloning capability, and voice-biomarker functionality Samsung sells exist, on information and belief, because Samsung extracted biometric characteristics from training recordings, including, on information and belief, the recordings of Plaintiffs and Class members. The Illinois-directed commercial activity at the downstream end is the monetization of the biometric extraction at the upstream beginning.

*Samsung Disseminates Class Members' Voiceprints Across Its Corporate and Cloud Infrastructure*

74. Samsung's foundational voice models, and the voiceprints encoded in those models' parameters, are disseminated across Samsung's global corporate and cloud infrastructure. The voice models are operated by Samsung Electronics and its global subsidiaries and AI Centers and deployed to consumers and enterprise customers through Samsung Electronics America

and Samsung's other regional operating subsidiaries. Samsung's U.S. Data Privacy Framework Consumer Privacy Policy reflects ongoing cross-affiliate data sharing across Samsung's global affiliate network, including the United States, the Republic of Korea, Poland, India, China, the United Kingdom, and Canada. On information and belief, Samsung shares voice data — including voiceprints derived from Plaintiffs' and Class members' recordings — with affiliates, vendors, and service providers across these jurisdictions in the ordinary course of Samsung's voice-AI development, training, evaluation, and commercial deployment.

75. Samsung's Galaxy AI relies, for cloud-based features, on third-party AI providers including Google's Gemini and Perplexity AI. On information and belief, Samsung's cloud-based voice-processing arrangements with those providers involve transmitting Samsung-extracted voice data to third-party infrastructure. Samsung's terms of service additionally claim broad sub-licensable rights to data Samsung uses to develop its products, permitting Samsung to disseminate biometric information derived from Class members' recordings to an indefinite chain of recipients without the specific consent that BIPA § 15(d) requires.

76. No enumerated exception under § 15(d) authorizes Samsung's dissemination. Plaintiffs and Class members did not consent; no financial transaction or fraud investigation triggered the disclosure; no court order or law authorized it. Samsung's dissemination is, on information and belief, a continuing classwide violation of § 15(d).

*Named Plaintiffs*

*Allegations Common to Each Named Plaintiff*

77. On information and belief, the voice recordings of each named Plaintiff were among the audio that Samsung ingested to train its foundational voice synthesis and voice recognition models, and voiceprints derived from those recordings are encoded in the parameters of those models and reproduced in the audio those models generate. Each Plaintiff's catalog of professional voice work matches the profile of training audio Samsung's technical documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on the publicly distributed audio platforms — broadcast archives, podcast directories, audiobook platforms, video platforms — from which Samsung, on information and belief, sourced training data. Each platform on which a Plaintiff's catalog is publicly accessible carries metadata explicitly identifying the Plaintiff by name and Illinois as the production location, so Samsung's acquisition could not have been the passive receipt of an anonymized dataset and necessarily involved acquiring biometric data tied to an identified Illinois speaker producing work in Illinois.

78. No named Plaintiff created a Samsung Account authorizing Samsung to use his or her voice, uploaded a voice recording to any Samsung platform for that purpose, invoked any Samsung voice-AI product, or accepted any Samsung terms of service related to its voice products. No Plaintiff received notice that Samsung had collected his or her voiceprint, received any

disclosure of the purpose or duration of that collection, or executed a written release. Samsung's collection of each Plaintiff's voiceprint, and Samsung's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent. The records identifying which specific voice recordings Samsung ingested are within Samsung's exclusive control.

79. The injury Samsung inflicted on each named Plaintiff is concrete and particular and shares the same structure across all of them. Samsung extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in foundational voice models, and continues to profit from those models and the Voice Products built on them. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The Voice Products now operate in the same professional voice markets in which the Plaintiff built and continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Alison Flowers*

80. Plaintiff Flowers is an investigative journalist, podcast producer, and audio storyteller based in Chicago. She is the founder of Spiralbound, a production company operating at the intersection of investigative journalism and immersive storytelling. Before founding Spiralbound, Flowers served as Head of Production at the Invisible Institute, a nonprofit investigative journalism organization based on the South Side of Chicago. Flowers is best

known as the producer and reporter of *Somebody*, the seven-part investigative podcast that investigated the 2016 murder of Courtney Copeland in Chicago. *Somebody* was a 2021 Pulitzer Prize finalist for Audio Reporting; won the National Magazine Award (Ellie) for Podcasting, the Scripps Howard Award, the International Documentary Association's Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story; topped Rolling Stone's "Best Podcasts of 2020" list; was ranked first on The New York Times' list of true-crime podcasts at the intersection of race; and ranked second on The Atlantic's "50 Best Podcasts of 2020." Flowers also co-produced the 2019 SHOWTIME documentary *16 Shots*, examining the police killing of Laquan McDonald in Chicago, which won the Emmy Award for Outstanding Investigative Documentary. All of Flowers's voice work was produced in Illinois. *See* ¶¶ 68-71.

81. *Somebody* and Flowers's other audio reporting are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and other major podcast and digital-audio platforms, with metadata identifying Flowers as the producer and on-air journalist and Chicago as the production location. Flowers's additional audio reporting on Reveal (from the Center for Investigative Reporting), The Heist (from the Center for Public Integrity), Vox, Dateline NBC, and Democracy Now! is likewise continuously available on those programs' respective platforms. *Somebody* was also distributed through Google Podcasts before Google's discontinuation of that service in 2024. Flowers's

body of audio work has been continuously available across these channels for years preceding Samsung's training of the foundational voice synthesis and voice recognition models alleged in this Complaint. *Somebody*'s recognition — Pulitzer finalist, National Magazine Award, top-of-list rankings in Rolling Stone, The New York Times, and The Atlantic — would have made Flowers's recordings high-value and readily identifiable source material for voice-model training.

82. Flowers's injury is concrete and particular to her in the manner alleged at ¶ 79. Flowers continues to produce investigative audio journalism through Spiralbound. The long-form audio markets in which she earns her livelihood — investigative podcast journalism, narrative audio documentary — are precisely the markets that Samsung TTS and Bixby Voice are designed to serve at substantially lower cost than the human production Flowers provides. Samsung TTS and Bixby Voice generate podcast-style narrative voice content competing with Flowers's on-air narration in *Somebody* and her other investigative podcast work. The Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to generate voice outputs trained on the same foundational models that ingested Flowers's voice, extending the unauthorized commercial use of her voiceprint into derivative outputs the Samsung product ecosystem enables. The technology Samsung built using Flowers's voiceprint now competes with Flowers in her own active market.

*Carol Marin*

83. Plaintiff Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on WMAQ-TV (NBC 5 Chicago), CBS News (*60 Minutes*, *60 Minutes II*, the *CBS Evening News*), WTTW (*Chicago Tonight*), CNN, and the Discovery Channel, and encompasses television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award, and has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and conferred upon her the Order of Lincoln, the State of Illinois's highest civilian honor. All of Marin's voice work relevant in this case was produced in Illinois. *See* ¶¶ 68-71.

84. Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio produced over five decades of professional work. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC 5 Chicago digital archive at nbcchicago.com;

and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, archived broadcast segments, and career retrospectives are publicly accessible. Each platform displays metadata identifying Marin, the producing program, the date of recording, and Chicago as the production location. The five-decade duration and cross-platform breadth of Marin's catalog supplies an unusually large and consistent single-speaker corpus from one identifiable Illinois speaker.

85. Marin's injury is concrete and particular to her in the manner alleged at ¶ 79. The broadcast and investigative journalism markets in which Marin built her five-decade career — television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing — are the markets in which Samsung's voice synthesis products now operate. Samsung TTS and Bixby Voice generate broadcast-quality voice content competing with Marin's on-air anchoring, debate moderation, and documentary narration. Galaxy AI Transcript Assist automates speaker-separated transcription of recorded interviews — a step in the investigative newsgathering workflow central to Marin's career — reducing the production cost of competing voice-AI products built on the same foundational models. And Samsung's Brain Health voice-biomarker service repurposes recorded human voice as input to a Samsung-commercialized diagnostic product, an additional unauthorized commercial use particularly pointed for a journalist whose recorded broadcast catalog spans five decades and is preserved in archival form for that exact reason.

*Philip Rogers*

86. Plaintiff Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS Radio's all-news station in Chicago) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. All of Rogers's voice work was produced in Illinois. *See* ¶¶ 68-71.

87. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio in both radio and television formats. Substantial portions of that catalog are continuously and publicly available through the NBC 5 Chicago digital archive at nbcchicago.com, where Rogers's on-air reports, investigative segments, and broadcast news stories are archived and searchable with metadata identifying Rogers, the producing program, the date of broadcast, and Chicago as the location of production; and on YouTube, where Rogers's on-air work is publicly accessible, including a career-retrospective interview produced by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting from Chicago. The cross-platform breadth of his catalog — four decades of single-speaker

professional broadcasting across both radio and television, from one identifiable Illinois speaker — represents a category of source material particularly valuable for voice synthesis training.

88. Rogers's injury is concrete and particular to him in the manner alleged at ¶ 79. The broadcast radio and television markets in which Rogers built his career are the markets in which Samsung's Samsung TTS engine, Bixby Voice, Galaxy AI Live Translate, and Interpreter now operate. Samsung TTS and Bixby Voice generate broadcast-quality voice content competing with the on-air radio and television voice work that defined Rogers's career. Galaxy AI Transcript Assist automates speaker-separated transcription of recorded interviews — a step in the broadcast newsgathering workflow Rogers performed throughout his career — reducing the production cost of competing voice-AI products built on the same foundational models. And Samsung's Brain Health voice-biomarker service, unveiled at CES 2026, is a separate and pointed harm for a journalist whose recorded broadcast catalog spans four decades and is preserved in archival form for that exact reason: Samsung's commercial repurposing of that catalog as input to a diagnostic product is an unauthorized commercial use of the same voice Rogers spent his career placing in the public broadcast record.

*Robin Amer*

89. Plaintiff Amer is an investigative journalist, audio producer, podcast creator, and on-air host with more than twenty years of experience in digital, broadcast, and print media. Amer holds an undergraduate degree from

Brown University and a Master's degree from the Medill School of Journalism at Northwestern University. After Medill, Amer served as an investigative reporting fellow at Medill Watchdog, contributing to a yearlong collaboration with the *Chicago Tribune* that was a finalist for the Pulitzer Prize. Amer is the creator, host, narrator, and showrunner of *The City*, USA Today's investigative podcast, which in Season 1 peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker, The New York Times*, *Quartz*, and Apple Podcasts. Amer subsequently served as Senior Producer for Audio Features at *The Washington Post*, where she edited *Post Reports* and produced *Field Trip*; her *Post* work won or was a finalist for the Alfred I. duPont–Columbia University Award three consecutive years, and Amer was a finalist for the Pulitzer Prize as part of the *Washington Post* staff for the paper's environmental-justice coverage. Amer's contributions to the *Gravy* podcast helped that program win the 2015 James Beard Award for Best Podcast. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction and was shortlisted for the Whickers Prize. The substantial majority of Amer's voice work was produced in Illinois. *See* ¶¶ 68-71.

90. *The City*, *Gravy*, *Post Reports*, *Field Trip*, and *Love + Radio: Blood Memory* are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, and other major podcast and digital-audio platforms, with metadata identifying Amer as host, narrator, producer, showrunner, or

contributor. *The City* and other Amer-produced work were also distributed through Google Podcasts before Google's discontinuation of that service in 2024. Apple Podcasts' editorial designation of *The City* as Best Podcast of the Year, Amer's three duPont–Columbia honors, and *Blood Memory*'s 2025 Tribeca audio prize would have made Amer's recordings high-value and readily identifiable source material for voice-model training. Amer's body of audio work has been continuously available across these channels for years preceding Samsung's training of the foundational voice synthesis and voice recognition models alleged in this Complaint.

91. Amer's injury is concrete and particular to her in the manner alleged at ¶ 79. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting — the market Samsung's voice synthesis products are designed to serve at substantially lower cost than the human production Amer provides. Samsung TTS and Bixby Voice generate podcast-style narrative voice content competing with Amer's on-air hosting and narration. The Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to generate voice outputs trained on the same foundational models that ingested Amer's voice, extending the unauthorized commercial use of her voiceprint into derivative outputs the Samsung product ecosystem enables. The technology Samsung built using Amer's voiceprint now competes with her active professional work in the same long-form narrative podcasting market in which she has built her career.

Case 1:26-cv-05435 Document #: 24-11 Filed: 07/21/26 Page 50 of 94 PageID #:1003

*Lindsey Dorcus*

92. Plaintiff Dorcus is a professional audiobook narrator and voiceover artist whose livelihood and artistic practice are centered on the use of her voice. Dorcus has recorded more than 200 audiobooks for many of the major American publishers, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. She is a 2020 Society of Voice Arts and Sciences Voice Arts Award winner, as part of the full-cast voice artist ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind,* and a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. AudioFile Magazine has reviewed her narration as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, Greek, New England, New York, German, Indian, and Russian. All of Dorcus's audiobook narration work was recorded in a professional home studio in Chicago and produced in Illinois. *See* ¶¶ 68-71.

93. Dorcus's audiobook narration is publicly distributed across the major audiobook and digital-audio platforms, including Audible (a subsidiary of Amazon.com, Inc.), Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on Audible.com. Audiobook narration is, by published industry and

academic consensus, among the most valuable categories of training audio for voice synthesis models: it provides hours of consistent, professionally produced single-speaker speech with extensive prosodic and emotional variation. Dorcus's body of work has been continuously available through these channels for years preceding Samsung's training of the foundational voice models alleged in this Complaint.

94. Dorcus's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79. Samsung's voice synthesis products generate the same category of long-form single-speaker voice content that Dorcus produces commercially for major publishers. The voice characteristics encoded in Samsung's foundational models include the range of accents and dialects that constitute Dorcus's professional asset, learned in part, on information and belief, from Dorcus's own recordings. Samsung's Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to clone target voices from short audio samples — including, on information and belief, audio samples drawn from Dorcus's publicly available audiobook catalog — extending the unauthorized commercial use of her voiceprint into derivative outputs the Samsung product ecosystem enables.

*Yohance Lacour*

95. Plaintiff Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago whose professional work centers on storytelling about Black Chicago. Lacour began his journalism career in 1997 reporting for *The South Street Journal*, a Black-owned

community newspaper in Chicago. Lacour is affiliated with the Invisible Institute, a Chicago-based nonprofit investigative journalism organization. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio, in which Lacour revisits the 1997 hate-crime attack on Lenard Clark he had covered as a young community journalist. In 2024, *You Didn't See Nothin'* was awarded the Pulitzer Prize for Audio Reporting and a Peabody Award. The series was named among Apple Podcasts' "100 Best Podcasts of All Time," received nominations at the Signal Podcasting Awards, and received four nominations at the Black Podcasting Awards. All of Lacour's recorded audio storytelling and journalism work was produced and recorded in Chicago, Illinois. *See* ¶¶ 68-71.

96. *You Didn't See Nothin'* and Lacour's interview appearances are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, Overcast, and other major podcast and digital-audio platforms, with metadata identifying Lacour as creator, host, narrator, and lead reporter. Lacour has also appeared as a featured guest on NPR's *Fresh Air with Tonya Mosley*, NPR's *All Things Considered* with Adrian Florido, the Canadian Broadcasting Corporation's *Crime Story* podcast, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast. *You Didn't See Nothin'*'s recognition — Pulitzer Prize, Peabody Award, Apple Podcasts' "100 Best Podcasts of All Time" — would have made Lacour's recordings high-value and readily identifiable source material for voice-model training. The recordings have been continuously

available since 2023, preceding Samsung's training of the foundational voice models alleged in this Complaint.

97. Lacour's injury is concrete and particular to him in the manner alleged at ¶ 79. Lacour's professional identity is defined by his work as an investigative audio storyteller and narrator from the South Side of Chicago, a market position in which authentic, place-specific Black narration is the core product. The investigative and narrative podcast markets in which Lacour earns his livelihood, including markets reaching the Black audiences and communities about whom Lacour reports, are markets Samsung's voice synthesis products are designed to serve at a fraction of the cost of human production. Samsung TTS and Bixby Voice generate podcast-style narrative voice content competing with Lacour's on-air narration in *You Didn't See Nothin'* and his other audio storytelling work. The technology Samsung built using Lacour's voiceprint operates in the same audio markets — long-form narrative audio journalism, podcast production, and investigative storytelling — in which Lacour earns his living.

*Victoria Nassif*

98. Plaintiff Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois, and a classically trained mezzo-soprano singer. Nassif has performed on-camera in multiple episodes of NBC's *Chicago P.D.* (Season 12) and in nationally broadcast commercials. As a professional audiobook narrator, Nassif has recorded audiobooks for Penguin Random House (Random House Audio),

Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster, with notable narration credits including *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), in which Nassif performed multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist, shortlisted for the Ursula K. Le Guin Prize and named a *them* Best Book of the Year; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa. Nassif's professionally recognized range of accents and dialects includes General American, British (Received Pronunciation and Cockney), Persian, Levantine Arabic, and American Southern. As a first-generation Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern characters and settings — a distinctive professional asset in the audiobook narration industry. All of Nassif's audiobook narration and voiceover work was produced and recorded in Illinois. *See* ¶¶ 68-71.

99. Nassif's audiobook narration is publicly distributed across major audiobook and digital-audio platforms, including Audible, Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's on-camera work for NBC's *Chicago P.D.* and nationally broadcast commercials is distributed across broadcast and streaming platforms, including NBC and Peacock. Nassif's distinctive cultural and

linguistic position — authentic Lebanese-Palestinian American narration with native Arabic-accent capability — is a category of professional voice work uniquely valuable for training the multilingual and cross-accent voice synthesis capabilities Samsung markets in Galaxy AI Live Translate and Interpreter, which Samsung deploys across more than twenty languages and dialects including Arabic. Nassif's recordings have been continuously available on these platforms for years preceding Samsung's training of the foundational voice models alleged in this Complaint.

100. Nassif's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79. Nassif occupies a distinctive market position as a Lebanese-Palestinian American narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors. Samsung's Galaxy AI Live Translate and Interpreter products, which support voice synthesis and voice recognition across more than twenty languages and dialects including Arabic, compete specifically with Nassif's professional niche; the multilingual voice capability that makes those products commercially valuable to Samsung depends on training data of precisely the category Nassif's authentic Levantine Arabic-accented narration supplies. Samsung's Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to clone target voices from short audio samples — including, on information and belief, samples drawn from Nassif's publicly available audiobook catalog — generating derivative outputs that strip the cultural authenticity (the lived experience of a first-generation Lebanese-Palestinian American voicing Arab and Palestinian

American authors' work) on which Nassif's professional market position depends, while replicating the surface vocal characteristics of her performance.

*Commercial Substitution and Economic Harm*
*to Plaintiffs and Class Members*

101. Samsung's voice products operate in the professional markets in which Plaintiffs and Class members earn their livelihoods: audiobook narration, voice acting, podcast production and hosting, broadcast journalism, advertising voiceover, e-learning narration, video-game voice acting, and live multilingual interpretation.

102. Samsung's specific voice products map onto specific categories of that work. The Samsung TTS engine generates the long-form, single-speaker voice content that audiobook narrators, voiceover artists, and podcast hosts produce commercially. Galaxy AI Live Translate and Interpreter generate real-time multilingual voice output comparable to that of professional interpreters. The Bixby Custom Voice Creator base model, and the zero-shot voice-cloning capability Samsung Research has publicly demonstrated, generate synthetic voice content from short audio samples in place of studio recording work. Galaxy AI Transcript Assist automates speaker-separated transcription. And the Brain Health voice-biomarker service repurposes recorded human voice as input to a Samsung-commercialized diagnostic product, opening a separate commercial market in which Samsung deploys voiceprints extracted without notice or consent.

103. Samsung offers these capabilities at a fraction of the cost of hiring human performers. Galaxy AI features are bundled with Galaxy devices at no

separate charge. Samsung TTS and the Bixby Custom Voice Creator base model generate audio at compute-time cost rather than the per-finished-hour rates ($200 to $400 per finished hour for professional audiobook narration; comparable per-project rates for voiceover, e-learning, and game voice work) that Plaintiffs and Class members earn for human production. Each unit of synthetic voice content Samsung generates is a unit of demand diverted from licensed human performance in the same market.

104. The market substitution is not merely temporal but causal. Samsung's voice products generate the audio they generate because the voiceprints encoded in Samsung's foundational models, including, on information and belief, voiceprints derived from Plaintiffs' and Class members' recordings, produce that output. The product is the data; the data is the product. The competitive position Samsung has placed Plaintiffs and Class members in is one Samsung built using Plaintiffs' and Class members' own voices, and one Plaintiffs and Class members neither chose nor authorized.

*Samsung Acted Willfully and Recklessly*

105. Samsung's collection, retention, commercial exploitation, dissemination, and inadequate protection of Class members' voiceprints was not the result of inadvertence or unfamiliarity with BIPA. Samsung acted with knowledge of, or at a minimum reckless disregard for, its obligations under Illinois law. Each violation of § 15(a), (b), (c), (d), and (e) is a discrete, classwide breach of duty, supporting recovery on a per-person, per-subsection basis of $5,000 per intentional or reckless violation under 740 ILCS 14/20(2), or, in the

alternative, $1,000 per negligent violation under 740 ILCS 14/20(1), consistent with the statute as amended and as construed in *Clay*.

106. Samsung knew. BIPA has been the law of Illinois since 2008. By the time Samsung built and deployed the voice-AI pipeline alleged here, BIPA had produced some of the largest privacy settlements in American history — Facebook ($650 million), Google ($100 million), TikTok/ByteDance ($92 million) — and voice-AI-specific litigation was active against comparable defendants in *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.), *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.), and *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill.), each alleging that AI voice companies built commercial products on recordings ingested without speaker consent. Samsung itself was actively defending biometric-privacy litigation in this District at the same time. *G.T. v. Samsung Electronics America, Inc.*, No. 21-cv-4976 (N.D. Ill.) (alleging Samsung's Gallery photo application extracted biometric facial geometry from users' photos in violation of BIPA). Samsung was litigating BIPA compliance for facial geometry in this District at the same time it was extracting voiceprints from voice recordings without compliance.

107. Samsung described its own voice processing in BIPA's statutory terms. Samsung's U.S. Privacy Policy uses the words "voiceprint" and "biometric data." Samsung's consumer-facing privacy webpage acknowledges that voice recordings flow from Samsung devices to Samsung servers and are used "for general learning purposes" — that is, to train Samsung's voice models. Samsung Research's published technical pipeline encodes target-

speaker recordings into discrete acoustic tokens, reproduces them as synthesized speech, and evaluates the result using speaker-embedding cosine similarity. Samsung built the pipeline, published the research, and shipped the Voice Products on the very capability — voiceprint extraction — at issue in this Complaint. Samsung does not use BIPA's vocabulary by accident. Samsung uses it because Samsung's voice systems process the data the vocabulary describes.

108. Samsung knows how to build voice products around consent — and chose not to, for Plaintiffs. The contemporaneous design of the Bixby Custom Voice Creator confirms it: Samsung built that product around informed, opt-in consent for the user's own voice, deploying the same Samsung Research engineering team and the same Samsung legal department that built the foundational voice models on which Bixby Voice, Samsung TTS, Live Translate, Interpreter, Transcript Assist, the Custom Voice Creator base model, and the Brain Health voice-biomarker service depend. Samsung built consent for the user's own voice. Samsung did not build it for the voices its products were built on. The same selectivity runs across Samsung's broader AI representations. Samsung's affirmative "safe data" representation for the Gauss Image model is conspicuous in its absence from Samsung's voice models. Samsung's visible watermarks on AI-edited images at the Galaxy S24 launch are conspicuous in the absence of a corresponding measure for voice provenance. Samsung's Knox enterprise security platform protects Samsung's own proprietary data with defense-grade controls; no equivalent infrastructure

protects the biometric data Samsung extracted from Class members' recordings. Samsung addresses the AI risks it chooses to address. Samsung does not address the ones it does not.

109. Samsung chose speed and scale over compliance. Samsung Research funds external research that augments training data through voice cloning, using one set of speakers' voiceprints to synthesize additional inputs to expand the corpus further. The institutional approach treats speakers' voices as inputs to be sourced, cloned, and reproduced at scale, not as biometric identifiers requiring notice and consent. If Samsung had sufficient consented or licensed training data, it would have had no incentive to augment its corpora through synthetic speech — and every incentive to say so. With foundational voice training corpora at the scale required to support Galaxy AI in more than twenty languages, Bixby deployed across the owners of more than 300 million Galaxy devices, and the Brain Health voice-biomarker service Samsung unveiled at CES 2026, BIPA-compliant collection would have constrained the speed and scale of Samsung's voice-AI development. Samsung did not let it. Samsung promised "AI for All." Samsung delivered AI for some — at the expense of others. That was not an oversight. It was a business decision.

**CLASS ACTION ALLEGATIONS**

135. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Samsung

extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of voice synthesis or voice recognition models, or commercial voice products derived from those models, during the Class Period.

136. The Class Period runs from the earlier of (a) the date Samsung first ingested any voice recording into the training pipeline for any of its foundational voice synthesis or voice recognition models, or (b) January 1, 2012, through the date of judgment. Discovery will establish the operative start date.

137. Excluded from the Class are: (i) Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and each of their parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Samsung; (iii) Samsung's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; and (vi) any person who executed a written release authorizing Samsung's use of their voice recordings to train, fine-tune, evaluate, or operate Samsung's voice synthesis or voice recognition models, in compliance with 740 ILCS 14/15(b).

138. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

139. *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered Samsung's training pipeline is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, source-URL records, dataset-version records, speaker-embedding indices, and associated speaker- and file-level identifiers — are within Samsung's exclusive control. Class membership can be further confirmed through publicly available distribution metadata (audiobook platform records, podcast directory records, streaming service catalogs, broadcast archive records) and through voice-matching analysis comparing Samsung's voice model outputs against publicly available recordings of Class members.

140. *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into Samsung's training pipelines runs to the hundreds of thousands. As alleged at ¶¶ 41-44 and ¶ 65, Samsung's foundational voice models support Galaxy AI's twenty-plus languages and dialects, power voice products deployed across more than 300 million Galaxy devices, and have been augmented through Samsung-funded voice-cloning research operating at industrial scale, capabilities that require a correspondingly large and diverse training population. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period and (b) the interview subjects, guests, panelists, witnesses, callers, public

officials, and other speakers whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, and archival audio content publicly accessible on the platforms from which, on information and belief, Samsung sourced training data. The exact number is within Samsung's exclusive control and will be established through discovery.

141. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Samsung did not engage in any individualized notice, consent, retention-policy disclosure, written-release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Samsung's voice training pipelines. The same pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same automated and standardized process. The questions whether Samsung complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements can be answered classwide because Samsung's noncompliance was identical as to every Class member.

142. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics Samsung extracts during voice-model training, variously described in Samsung Research's published documentation as speaker embeddings, acoustic tokens, semantic tokens, and neural-codec representations, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b) whether Samsung informed Class members in writing that their biometric identifiers were being collected, of the specific purpose and length of term of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c) whether Samsung developed and made publicly available a written retention and destruction policy applicable to Class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(d) whether Samsung sold, leased, traded, or otherwise profited from Class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(e) whether Samsung disclosed or disseminated Class members' biometric identifiers — including, on information and belief, to third-party AI providers and across Samsung's global affiliate network — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether Samsung stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information, as 740 ILCS 14/15(e)(2) requires;

(g) whether Samsung's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether Samsung used Class members' voices and identities for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a);

(i) whether Samsung's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b) and (d), as amended by P.A. 103-836, and Samsung materially contributes to or facilitates their distribution;

(j) whether Samsung's conduct constitutes unfair or deceptive practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

(k) whether Samsung's conduct constitutes deceptive trade practices likely to cause confusion in violation of 815 ILCS 510/2(a)(2) and (a)(3);

(l) whether Samsung was unjustly enriched by its unauthorized use of Class members' voice data; and

(m) the appropriate measures of damages, restitution, and injunctive relief.

143. *Typicality.* The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois. Samsung, on information and belief, ingested those recordings into the training pipelines for its foundational voice models without notice, consent, or written release. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

144. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named

Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

145. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Samsung has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Samsung's training pipelines operated uniformly across every Class member's voice recordings; Samsung's failure to obtain BIPA-compliant consent was uniform; Samsung's failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; and Samsung's continuing possession and commercial exploitation of Class members' voiceprints, encoded in the foundational voice models Samsung deploys to more than 300 million Galaxy devices, is uniform. Plaintiffs seek classwide injunctive relief — including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded — that necessarily applies on the same terms to every Class member.

146. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims, because common questions of law and fact predominate over questions affecting only individual

Class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

147. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First*, whether Samsung's voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer, as alleged at ¶¶ 45-49. *Second*, whether Samsung complied with BIPA's notice, consent, retention, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer: Samsung did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. *Third*, whether Samsung's conduct was willful or reckless turns on Samsung's institutional knowledge and decision-making, including the asymmetry between Samsung's consent infrastructure for the Bixby Custom Voice Creator and the absence of consent infrastructure for the voices on which Samsung's foundational models depend — all of which are common to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from Samsung's own records. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended by P.A. 103-769 and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed.

148. *Superiority.* A class action is the superior method for adjudicating these claims.

(a) *Class members' interest in individual control.* Class members are voice professionals — broadcast journalists, audiobook narrators, podcasters, voiceover artists, voice actors — and incidental speakers whose voiceprints were extracted without their knowledge. Many remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against one of the largest publicly traded technology companies in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redress.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Samsung on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train Samsung's foundational voice models.

(c) *Desirability of concentration in this forum.* Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Samsung conducts substantial commercial business in Illinois through Galaxy device sales, the Galaxy AI feature suite preinstalled on those devices, and ongoing service performance to Illinois residents. The Northern District of Illinois has substantial expertise with BIPA litigation and is the natural forum for

adjudication of Illinois residents' Illinois-statutory claims arising from Samsung's commercial conduct in Illinois.

(d) *Manageability*. The case is manageable as a class action. Samsung's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from Samsung's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim.

149. *Tolling and continuing violations.* To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Samsung's concealment of its training-data sources, by Samsung's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Samsung had ingested their recordings into its training pipelines, and by the continuing nature of Samsung's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational voice models in which the unlawfully obtained biometric data is encoded, and each disclosure or transmission of that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 216 N.E.3d 918 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

150. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

151. Plaintiffs bring this Count individually and on behalf of the Class.

152. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

153. Each Samsung Defendant is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

154. Samsung collected, captured, and otherwise obtained voiceprints and biometric information from Class members' voice recordings by ingesting those recordings into its training pipeline and extracting computational representations of the distinctive acoustic characteristics of Class members'

voices, as alleged at ¶¶ 45-49. The resulting representations — variously denominated as speaker embeddings, acoustic tokens, semantic tokens, and neural-codec representations in Samsung Research's technical and product documentation — are voiceprints and biometric information within the meaning of BIPA.

155. Samsung did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that biometric identifiers were being collected or stored, inform any of them in writing of the specific purpose or length of term of collection, or receive a written release. Samsung obtained no consent of any kind, in any form, from any Plaintiff or Class member.

156. Samsung's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

157. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member and each violation, the greater of liquidated damages of $1,000 (negligent) or $5,000 (intentional or reckless) or actual damages, on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); injunctive relief on the terms set forth in the Prayer for Relief; and reasonable attorneys' fees, costs, expert witness fees, and other litigation expenses.

**Count II**

**Violation of the Illinois Biometric Information Privacy Act,**

**740 ILCS 14/15(a)**

*Brought on behalf of the Class*

158. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

159. Plaintiffs bring this Count individually and on behalf of the Class.

160. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Plaintiffs and Class members never interacted with Samsung in connection with the collection of their biometric data, the operative destruction prong is that the biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

161. Samsung has been, and remains, in possession of voiceprints and biometric information extracted from Plaintiffs' and Class members' voice recordings. Those voiceprints and biometric information persist in the parameters of Samsung's foundational voice synthesis and voice recognition

models and continue to be deployed in the commercial products Samsung ships today.

162. Samsung has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training data and encoded in Samsung's foundational voice models. The retention provisions in Samsung's privacy policy are keyed to user-controlled deletion of biometric data "stored on your device" and to user-accessible settings — both facially inapplicable to Class members, who have no Samsung device containing their biometric data and no settings to navigate.

163. Samsung's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

164. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count III**

**Violation of the Illinois Biometric Information Privacy Act,**

**740 ILCS 14/15(c)**

*Brought on behalf of the Class*

165. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

166. Plaintiffs bring this Count individually and on behalf of the Class.

167. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or

otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond selling, leasing, or trading.

168. Samsung has profited, and continues to profit, from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the voice synthesis and voice recognition products at issue, as alleged at ¶¶ 72-73. Samsung's profiting flows through Galaxy device sales, the Galaxy AI feature suite bundled with those devices, enterprise mobility licensing, the Samsung TTS engine, the Brain Health voice-biomarker service, and Samsung's broader integrated commercial chain. The voice characteristics encoded in Samsung's foundational voice models are what enable those products to function: the biometric data and the product are, at this point, the same thing. Samsung's profiting from Plaintiffs' and Class members' biometric identifiers does not fall within any exception to § 15(c).

169. Samsung's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

170. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

Case 1:26-cv-05435 Document #: 1-1 Filed 07/21/26 Page 75 of 92 PageID #:75

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act,**

**740 ILCS 14/15(d)**

*Brought on behalf of the Class*

171. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

172. Plaintiffs bring this Count individually and on behalf of the Class.

173. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

174. On information and belief, Samsung has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information across Samsung's global affiliate network — including in the Republic of Korea, the United States, Poland, India, China, the United Kingdom, and Canada — in the ordinary course of training, evaluating, deploying, and operating its commercial voice products, as alleged at ¶¶ 74-76. On information and belief, Samsung has additionally disseminated voice data to third-party AI providers, including Google's Gemini and Perplexity AI, in connection with cloud-based Galaxy AI processing. Plaintiffs and Class members did not consent to any of these disseminations, and no enumerated exception under § 15(d) applies.

175. Samsung's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

176. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count V**

**Violation of the Illinois Biometric Information Privacy Act,**

**740 ILCS 14/15(e)**

*Brought on behalf of the Class*

177. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

178. Plaintiffs bring this Count individually and on behalf of the Class.

179. Section 15(e) of BIPA imposes two distinct duties on private entities in possession of biometric data: under § 15(e)(1), to store, transmit, and protect the data using the reasonable standard of care within the entity's industry; and under § 15(e)(2), to do so in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: an entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information.

180. Samsung fails the § 15(e)(2) asymmetry test. Samsung markets and deploys the Samsung Knox enterprise security platform as a defense-grade solution for Samsung's own proprietary data, intellectual property, source

code, internal communications, and enterprise systems across Samsung's global enterprise environment. Samsung's consumer-facing Bixby Voice infrastructure separately protects user-supplied biometric data through on-device processing, with Samsung's privacy policy assuring users that biometric data stored on the user's own device is "not accessible by Samsung." Samsung has built no equivalent infrastructure for Class members' biometric data extracted from training recordings: no inventory, no notification, no opt-out mechanism, no destruction protocol, no access controls comparable to Knox, no on-device protection comparable to the protections Samsung provides for its own users. Samsung's treatment of Class members' biometric data is materially less protective than its treatment of its other confidential and sensitive information.

181. Samsung independently fails the § 15(e)(1) reasonable-standard-of-care test. The reasonable standard of care for biometric data presupposes some mechanism by which the data subject can monitor, verify, or challenge how the data is stored, transmitted, and protected. Samsung has provided none. Class members have no mechanism to request access to, correction of, or deletion of their biometric data from Samsung's training datasets or models; no contractual or other relationship with Samsung that would create any such mechanism; and no ability to learn whether Samsung possesses their biometric data at all. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of that data.

182. The asymmetry between Samsung's user-facing and own-data protections and Samsung's complete absence of protection for Class members' biometric data is not a function of technical limitation; it is a function of selective application, as alleged at ¶¶ 50, 108.

183. Samsung's violations of § 15(e)(1) and § 15(e)(2) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

184. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I, including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded.

**Count VI**

**Violation of the Illinois Right of Publicity Act,**

**765 ILCS 1075/1 et seq.**

*Brought on behalf of the Class*

185. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

186. Plaintiffs bring this Count individually and on behalf of the Class.

187. IRPA provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent." 765 ILCS 1075/30(a). "Identity" is defined to include an individual's "voice." 765 ILCS 1075/5.

188. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

189. Samsung used Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a). Samsung extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' recordings and used those characteristics to develop, train, and commercially operate the voice synthesis and voice recognition products Samsung monetizes through Galaxy device sales, the Galaxy AI feature suite, enterprise mobility licensing, the Samsung TTS engine, the Brain Health voice-biomarker service, and Samsung's broader integrated commercial chain, as alleged at ¶¶ 72-73. Samsung holds out its products' ability to generate realistic, expressive, multilingual, and speaker-aware voice content as core commercial features — capabilities built on the vocal identities of the individuals whose recordings were used to train the models.

190. IRPA, as amended by P.A. 103-836 effective January 1, 2025, separately prohibits knowingly distributing, transmitting, or otherwise making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual's voice. 765 ILCS 1075/30(b). The statute defines an "unauthorized digital replica" as a newly created, electronically generated representation of an individual's voice fixed in

a sound recording or audiovisual work in which the individual did not actually perform, made without the individual's consent. 765 ILCS 1075/5. The statute also imposes liability on any person who knowingly materially contributes to or facilitates such distribution. 765 ILCS 1075/30(d).

191. On information and belief, Samsung's voice synthesis and voice cloning products generate and distribute voice outputs that replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. By generating and distributing those outputs through Galaxy devices, the Galaxy AI feature suite, the Samsung TTS engine, the Bixby Custom Voice Creator, and related products, Samsung knowingly distributes and makes available sound recordings containing unauthorized digital replicas, and knowingly materially contributes to and facilitates the distribution of such replicas through the foundational voice models Samsung deploys to the owners of more than 300 million Galaxy devices.

192. Samsung's violations of IRPA were willful and knowing. As alleged at ¶ 108, Samsung's design of the Bixby Custom Voice Creator around explicit speaker consent for cloning the user's own voice confirms Samsung's understanding that voice-based AI products require consent from the people whose voices are used. Samsung implemented that requirement for the user's own voice and did not implement it for the voices on which Samsung's foundational voice models were trained.

193. Plaintiffs and the Class have suffered and continue to suffer injury, including loss of control over commercial use of their identities, dilution and

commodification of their voices, displacement in the professional markets where they earn their livelihoods, and economic losses including diversion of licensing value and diminished demand for authentic vocal performances.

194. Plaintiffs and the Class seek all relief available under IRPA, including actual damages, the profits Samsung earned from its unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages of $1,000 per violation under 765 ILCS 1075/40, punitive damages, injunctive relief on the terms set forth in the Prayer for Relief, and reasonable attorneys' fees and costs under 765 ILCS 1075/55.

**Count VII**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**

**815 ILCS 505/1 et seq.**

*Brought on behalf of the Unjust Enrichment Subclass*

195. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

196. Plaintiffs bring this Count individually and on behalf of the Class.

197. Samsung engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, distributing, and selling Galaxy devices and voice-AI services to Illinois residents, and by collecting, extracting, and commercially exploiting Illinois residents' biometric data through those products.

198. Samsung's conduct is unfair within the meaning of ICFA under the three-part test articulated in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d

403, 417–18 (2002). First, Samsung's conduct offends Illinois public policy as embodied in BIPA and IRPA — Illinois statutes specifically enacted to protect biometric privacy and the commercial use of personal identity. Second, Samsung's conduct causes substantial economic and privacy injury to Illinois residents, including the irreplaceable loss of control over biometric identifiers, the unauthorized commercial use of vocal identities, and market displacement in the professional voice industries where Plaintiffs and Class members earn their livelihoods. Third, the injury could not reasonably have been avoided by Plaintiffs and Class members, who had no knowledge that their voice recordings were being ingested into Samsung's training pipelines, no notice of the extraction, no mechanism to refuse, and no mechanism even to discover whether their biometric data was in Samsung's possession.

199. Samsung's conduct is independently deceptive within the meaning of ICFA. Samsung represented to the public, in connection with the November 2023 launch of its Gauss generative AI suite, that the Gauss Image model "was learned from safe data that does not infringe on licenses or personal information." Samsung made no comparable representation about its voice synthesis or voice recognition models. The asymmetric disclosure conveyed the misleading implication that Samsung's other generative AI products were sourced on equivalent terms — when in fact, on information and belief, Samsung's voice models were trained on voiceprints extracted without consent.

200. Samsung's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and the Class, including lost and

diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Samsung's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not from the mere existence of competing AI products.

201. Samsung's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and the Class, as alleged at ¶¶ 105-109.

202. Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief on the terms set forth in the Prayer for Relief, attorneys' fees and costs under 815 ILCS 505/10a, and such other relief as the Court deems just and proper.

**Count VIII**

**Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.**

*Brought on behalf of the Class (injunctive relief only)*

203. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

204. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

205. Samsung has engaged in deceptive trade practices likely to cause confusion or misunderstanding in the marketplace within the meaning of 815 ILCS 510/2(a)(2) (causing likelihood of confusion or misunderstanding as to source, sponsorship, approval, or certification of goods or services) and 815

ILCS 510/2(a)(3) (causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another). Samsung's voice synthesis products generate voice outputs that simulate authentic human speech. Once generated, these outputs can be downloaded, shared, distributed, and commercially exploited without consumer-facing disclosure that the underlying foundational models were built on voiceprints extracted without consent, or that the speakers whose vocal characteristics are reproduced did not authorize the use. This creates a likelihood of confusion about whether real human speakers, including Plaintiffs and Class members, created, endorsed, or authorized the synthetic voice content.

206. Plaintiffs and Class members are persons likely to be damaged by Samsung's deceptive practices. Samsung's conduct diverts demand from licensed human voice performances, impairs attribution and provenance in the voice services markets where Plaintiffs and Class members earn their livelihoods, and creates marketplace confusion about the source and authorization status of AI-generated voice content. Under 815 ILCS 510/3, actual confusion and actual damages need not be shown.

207. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Samsung to provide adequate consumer-facing disclosure that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use. Samsung's conduct

was willful within the meaning of 815 ILCS 510/3, entitling Plaintiffs and the Class to reasonable attorneys' fees.

**Count IX**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Unjust Enrichment Subclass*

208. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

209. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

210. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

211. Samsung obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Samsung's foundational voice models; the product capability and competitive advantage Samsung captured by training its models on a diverse corpus of professional and incidental human voices, including those of Plaintiffs and Class members; and the revenue Samsung generates

and continues to generate through the commercial exploitation of those models.

212. Samsung obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional or otherwise valuable recordings. Samsung's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Samsung, and Samsung's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

213. Samsung's retention of these benefits is unjust. Samsung's conduct violated the Illinois statutory protections for biometric data (BIPA) and personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Samsung could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

214. Plaintiffs and the Class seek restitution of the benefits Samsung has unjustly retained, including disgorgement of Samsung's profits attributable to the unauthorized exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and identities; an accounting of those benefits; and such other equitable relief as the Court deems just and proper.

CasCa1s2:61c2v6-0c5v4-3055567cDuomcuemnte#n:t 2#4:-11 FFileile 0d7:/2017/3/2/626 PPaaggee 888 of 9240 PaPgaeIgDe #ID:1 #0:4807

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

A. *Class Certification*. Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

B. *Judgment*. Enter judgment in favor of Plaintiffs and all Class members and against the Samsung Defendants, jointly and severally, on all Counts on which Samsung is found liable.

C. *Injunctive Relief*. Enter declaratory and injunctive relief, including a permanent injunction:

(1) Enjoining Samsung from collecting, capturing, obtaining, ingesting, processing, or using voiceprints, biometric identifiers, or biometric information from any voice recording produced or recorded in Illinois unless Samsung has first complied with 740 ILCS 14/15(b)'s notice, written-purpose-and-duration, and written-release requirements with respect to the speaker;

(2) Requiring Samsung to develop, publish, and maintain a written retention and destruction policy, made available to the public, that complies with 740 ILCS 14/15(a) and that applies to all voiceprints and biometric information extracted from voice recordings ingested into Samsung's voice synthesis, voice recognition, and related voice-AI training pipelines,

including all such data already in Samsung's possession at the time of judgment;

(3) Requiring Samsung to identify, in a court-supervised disclosure to Class counsel and to the Court, the sources, scale, provenance, and acquisition pathways of the voice data used to train each of Samsung's voice synthesis and voice recognition models during the Class Period, including each contractual instrument, platform, dataset, and corpus from which voice recordings were obtained;

(4) Requiring Samsung to provide, on terms approved by the Court, a mechanism by which non-users, including Plaintiffs and Class members, can (i) request notice of whether their voice recordings were ingested into Samsung's training pipelines, (ii) request access to the biometric data Samsung holds derived from their recordings, (iii) request correction or deletion of that data, and (iv) opt out of further use of that data in Samsung's voice models and downstream commercial products;

(5) Requiring Samsung to identify and disclose every Samsung subsidiary, affiliate, vendor, service provider, and third-party processor — including any third-party AI providers receiving voice data in connection with cloud-based Galaxy AI processing — with access to the voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois, and to terminate any access by such entities that is not necessary to compliance with this Court's order;

(6) Requiring Samsung to destroy, or to retrain without the unlawfully obtained data, every voice synthesis, voice recognition, and related voice-AI model in which voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois are encoded — including without limitation the foundational models on which Samsung's Voice Products depend — together with each downstream model, fine-tuned model, derivative model, and commercial product whose operation depends on or incorporates those models;

(7) Requiring Samsung, as to any open-weight, third-party, or external release of Samsung voice models in which the unlawfully obtained data is encoded, to take all reasonable measures to recall and remove the affected model parameters from public availability, including by issuing takedown requests, ceasing further distribution, and ceasing further support of derivative releases;

(8) Requiring Samsung to implement protective measures for any voiceprints or biometric information lawfully obtained going forward that satisfy 740 ILCS 14/15(e), including, at a minimum, the storage, transmission, encryption, isolation, scope-restriction, and access-control measures Samsung applies to its own confidential and sensitive information through Samsung Knox and to its users' on-device biometric data through Bixby's on-device protections;

(9) Enjoining Samsung from using Plaintiffs' or Class members' identities, including their voices, for commercial purposes without prior written

consent in violation of 765 ILCS 1075/30(a); from knowingly distributing or making available sound recordings or audiovisual works containing unauthorized digital replicas of Plaintiffs' or Class members' voices in violation of 765 ILCS 1075/30(b); and from materially contributing to or facilitating such distribution in violation of 765 ILCS 1075/30(d); and

(10) Requiring Samsung to implement corrective consumer-facing disclosures, in such form as the Court approves, sufficient to inform consumers that voice outputs generated by Samsung's voice products are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, and to prevent confusion under 815 ILCS 510/2(a)(2) and (a)(3) about the source, authorization, and consent status of AI-generated voice content Samsung distributes.

D. *BIPA Statutory Damages*. Award liquidated or actual damages on a per-person, per-subsection basis under 740 ILCS 14/20, as amended by P.A. 103-769 and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $5,000 per intentional or reckless violation, or in the alternative $1,000 per negligent violation, for violations of 740 ILCS 14/15(a), (b), (c), (d), and (e).

E. *IRPA Damages*. Award actual damages, statutory damages of $1,000 per violation, punitive damages, and disgorgement of profits under 765 ILCS 1075/40.

F. *ICFA Damages*. Award actual economic damages and punitive damages under 815 ILCS 505/10a.

G. *Disgorgement and Restitution***.** Award disgorgement of Samsung's ill-gotten gains and restitution to Plaintiffs and the Class, including disgorgement attributable to Samsung's Galaxy mobile device sales, Samsung Smart TV and home appliance sales, enterprise mobility licensing and Knox-related enterprise services, the Samsung TTS engine, the Brain Health voice-biomarker service, and Samsung's strategic deployment of voice-AI capability across Samsung's product portfolio and developer ecosystem.

H. *Non-Duplication*. Order such relief as the Court determines necessary to ensure no duplicative recovery across statutory, common-law, and equitable claims.

I. *Attorneys' Fees and Costs*. Award reasonable attorneys' fees and litigation costs under 740 ILCS 14/20, 765 ILCS 1075/55, 815 ILCS 505/10a, 815 ILCS 510/3, and any other applicable provision.

J. *Pre- and Post-Judgment Interest.* Award pre- and post-judgment interest as permitted by law.

K. *Service Awards*. Award service awards to Plaintiffs in such amount as the Court deems appropriate to compensate them for their services to the Class.

L. *Other Relief*. Grant such other and further relief as the Court deems just and proper.

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 13, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Yohance Lacour, Philip Rogers, Carol Marin, Robin Amer, Lindsey Dorcus, and Victoria Nassif.*

# EXHIBIT J

JANTZ

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
# CIVIL DOCKET FOR CASE #: 1:26-cv-05436

Marin et al v. Alphabet, Inc. et al
Assigned to: Honorable April M. Perry
Demand: $9,999,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/11/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Carol Marin** represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Rogers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alison Flowers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Amer** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lindsey Dorcus** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yohance Lacour** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Victoria Nassif**
*each individually and on behalf of all others similarly situated*
represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Alphabet, Inc.** | represented by | **Andrew H. Schapiro**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>191 N. Wacker Dr.<br>Suite 2700<br>Chicago, IL 60606<br>312-705-7400<br>Fax: Active<br>Email: andrewschapiro@quinnemanuel.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Eli Pales**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa St.<br>10th FL<br>Los Angeles, CA 90017<br>(213) 443-3745<br>Fax: Pro Hac Vice<br>Email: elipales@quinnemanuel.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Moon Hee Lee**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street, 10th FL<br>90017<br>Los Angeles, CA 90017<br>213-443-3627<br>Email: moonheelee@quinnemanuel.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Tyler C Murray**<br>Quinn Emanuel Urquhart & Sullivan<br>Quinn Emanuel Urquhart & Sullivan<br>191 N. Wacker Drive<br>Suite 2700<br>60606<br>Chicago, IL 60606<br>312-705-7418<br>Fax: Active<br>Email: tylermurray@quinnemanuel.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Viola Trebicka**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street<br>10th Floor<br>Los Angeles, CA 90017<br>(310) 600-9747<br>Fax: Pro Hac Vice |

Email: violatrebicka@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Google LLC** represented by

**Andrew H. Schapiro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eli Pales**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Moon Hee Lee**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyler C Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Viola Trebicka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2026 | 1 | COMPLAINT filed by Yohance Lacour, Alison Flowers, Victoria Nassif, Philip Rogers, Robin Amer, Carol Marin, Lindsey Dorcus; Jury Demand. Filing fee $ 405, receipt number AILNDC-25102571. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) (Kimbarovsky, Ross) (Entered: 05/11/2026) |
| 05/12/2026 | | CASE ASSIGNED to the Honorable April M. Perry. Designated as Magistrate Judge the Honorable Beth W. Jantz. Case assignment: Random assignment. (Civil Category 1). (pjj, ) (Entered: 05/12/2026) |
| 05/12/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (pjj, ) (Entered: 05/12/2026) |
| 05/13/2026 | 2 | ATTORNEY Appearance for Plaintiffs Robin Amer, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/19/2026 | 5 | SUMMONS Issued (Court Participant) as to Defendants Alphabet, Inc., Google LLC (Attachments: # 1 Summons)(pjj, ) (Entered: 05/19/2026) |

| | | |
|---|---|---|
| 05/27/2026 | 6 | SUMMONS Returned Executed by Lindsey Dorcus, Philip Rogers, Carol Marin, Yohance Lacour, Robin Amer, Victoria Nassif, Alison Flowers as to Alphabet, Inc. on 5/26/2026, answer due 6/16/2026. (Kimbarovsky, Ross) (Entered: 05/27/2026) |
| 05/27/2026 | 7 | SUMMONS Returned Executed by Carol Marin, Yohance Lacour, Robin Amer, Philip Rogers, Victoria Nassif, Lindsey Dorcus, Alison Flowers as to Google LLC on 5/26/2026, answer due 6/16/2026. (Kimbarovsky, Ross) (Entered: 05/27/2026) |
| 05/27/2026 | 8 | STATUS Report *Joint Initial Status Report* by Robin Amer, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers<br><br>(Kimbarovsky, Ross) (Entered: 05/27/2026) |
| 05/28/2026 | 9 | MINUTE entry before the Honorable April M. Perry: The Court acknowledges receipt of the joint initial status report 8 and grants the request for any opening and opposition motion to dismiss brief to be up to 35 pages in length. Any motion to stay discovery should be made contemporaneously to the filing of a motion to dismiss; a response will be due 7 days thereafter. To the extent a motion to dismiss is filed, the parties should also submit a joint proposed briefing schedule at that time, consistent with Judge Perry's standing order. Mailed notice. (jcc,) (Entered: 05/28/2026) |
| 05/28/2026 | 10 | MINUTE entry before the Honorable April M. Perry: The Court has been advised by counsel that the Joint Initial Status Report 8 was filed in error and was intended for a separate matter. Accordingly, the Joint Initial Status Report 8 is hereby withdrawn, and the Court's subsequent order 9 is vacated. Plaintiff's counsel is directed to file the document in the correct case. Mailed notice. (jcc,) (Entered: 05/28/2026) |
| 06/10/2026 | 11 | ATTORNEY Appearance for Defendants Alphabet, Inc., Google LLC by Andrew H. Schapiro (Schapiro, Andrew) (Entered: 06/10/2026) |
| 06/10/2026 | 12 | MOTION by Defendants Alphabet, Inc., Google LLC for extension of time *to respond to complaint, 1 (Unopposed)*<br><br>(Schapiro, Andrew) (Entered: 06/10/2026) |
| 06/10/2026 | 13 | NOTICE of Motion by Andrew H. Schapiro for presentment of extension of time 12 before Honorable April M. Perry on 6/16/2026 at 10:00 AM. (Schapiro, Andrew) (Entered: 06/10/2026) |
| 06/11/2026 | 14 | MINUTE entry before the Honorable April M. Perry: Motion for extension of time 12 is granted. Defendants to answer or otherwise plead to the Complaint by 7/27/2026. There is no need for the parties to appear at the motion hearing scheduled for 6/16/2026. Mailed notice. (jcc,) (Entered: 06/11/2026) |
| 06/23/2026 | 15 | ATTORNEY Appearance for Defendants Alphabet, Inc., Google LLC by Tyler C Murray (Murray, Tyler) (Entered: 06/23/2026) |
| 06/23/2026 | 16 | MOTION for Leave to Appear Pro Hac Vice on behalf of Alphabet, Inc., Google LLC by Viola Trebicka; Filing fee $ 150, receipt number AILNDC-25286266.<br><br>(Trebicka, Viola) (Entered: 06/23/2026) |
| 06/23/2026 | 17 | MOTION for Leave to Appear Pro Hac Vice on behalf of Alphabet, Inc., Google LLC by Moon Hee Lee; Filing fee $ 150, receipt number AILNDC-25286425.<br><br>(Lee, Moon Hee) (Entered: 06/23/2026) |
| 06/23/2026 | 18 | MOTION for Leave to Appear Pro Hac Vice on behalf of Alphabet, Inc., Google LLC by Eli Pales; Filing fee $ 150, receipt number AILNDC-25286556. |

| | | |
|---|---|---|
| | | (Pales, Eli) (Entered: 06/23/2026) |
| 06/24/2026 | 19 | MINUTE entry before the Honorable April M. Perry: Motions for Leave to Appear Pro Hac Vice on behalf of Alphabet, Inc. and Google LLC 16 , 17 , and 18 are granted. Mailed notice. (jcc,) (Entered: 06/24/2026) |
| 06/26/2026 | 20 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Alphabet, Inc., Google LLC (Schapiro, Andrew) (Entered: 06/26/2026) |
| 07/20/2026 | 21 | MOTION by Defendants Alphabet, Inc., Google LLC to enlarge page limits and set briefing schedule (Unopposed)<br><br>(Schapiro, Andrew) (Entered: 07/20/2026) |
| 07/20/2026 | 22 | NOTICE of Motion by Andrew H. Schapiro for presentment of motion for miscellaneous relief 21 before Honorable April M. Perry on 7/23/2026 at 10:00 AM. (Schapiro, Andrew) (Entered: 07/20/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/20/2026 19:27:21 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05436 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# EXHIBIT K

**Query** **Reports** **Utilities** **Help** **Log Out**

McSHAIN

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
# CIVIL DOCKET FOR CASE #: 1:26-cv-05536

Lacour et al v. Apple Inc.
Assigned to: Honorable Sharon Johnson Coleman
Demand: $9,999,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/13/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Yohance Lacour**
*individually and on behalf of all others similarly situated*

represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Marin**
*individually and on behalf of all others similarly situated*

represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Rogers**
*individually and on behalf of all others similarly situated*

represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Amer**
*individually and on behalf of all others similarly situated*

represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lindsey Dorcus**
*individually and on behalf of all others similarly situated*

represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Victoria Nassif**
*individually and on behalf of all others similarly situated*

represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Apple Inc.**
*a California corporation*

represented by

**Lauren R Goldman**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
212-351-4000
Email: LGoldman@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Jenkins Sterling**
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
202-887-3773
Email: asterling@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew Gordon May**
Neal Gerber & Eisenberg LLP
225 W. Randolph St.
Ste 2800
Chicago, IL 60606
312-827-1473
Fax: Active
Email: amay@nge.com
*ATTORNEY TO BE NOTICED*

**Andrew William Robb**
Gibson, Dunn & Crutcher LLP
310 University Ave
Palo Alto, CA 94301
650-849-5334
Fax: Not a member
Email: arobb@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Diana Michelle Feinstein**
Gibson Dunn & Crutcher LLP
2000 Avenue of the Stars
Suite 1200n
Los Angeles, CA 90067
310-551-8705
Email: dfeinstein@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Brandon**
Gibson, Dunn & Crutcher LLP

200 Park Ave.
New York, NY 10166-0193
212-351-2414
Fax: Not a member
Email: mbrandon@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/13/2026 | 1 | COMPLAINT filed by Victoria Nassif, Yohance Lacour, ROBIN AMER, Philip Rogers, Carol Marin, Lindsey Dorcus; Jury Demand. Filing fee $ 405, receipt number AILNDC-25111087. (Attachments: # 1 Civil Cover Sheet)(Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/13/2026 | | CASE ASSIGNED to the Honorable Sharon Johnson Coleman. Designated as Magistrate Judge the Honorable Heather K. McShain. Case assignment: Random assignment. (Civil Category 1). (emc, ) (Entered: 05/13/2026) |
| 05/13/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (emc, ) (Entered: 05/13/2026) |
| 05/13/2026 | 2 | ATTORNEY Appearance for Plaintiffs ROBIN AMER, Lindsey Dorcus, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/14/2026 | 3 | MINUTE entry before the Honorable Sharon Johnson Coleman: This case has been assigned to the calendar of Judge Sharon Johnson Coleman. Status hearing is set for 7/29/2026 at 10:15 AM as an in-person hearing. Plaintiff(s) is directed to advise the defendant(s) of the status hearing forthwith. The parties are directed to discuss settlement, and whether they consent to proceed before the Magistrate Judge. If the parties agree to consent jurisdiction before the Magistrate Judge, all parties must sign the consent form and electronically file the signed form on the case docket. The court encourages the parties to review this court's website for its standing orders prior to contacting chambers. Mailed notice. (ym) (Entered: 05/14/2026) |
| 05/19/2026 | 5 | SUMMONS Issued (Court Participant) as to Defendant Apple Inc. (pjj, ) (Entered: 05/19/2026) |
| 05/27/2026 | 6 | SUMMONS Returned Executed by Philip Rogers, Carol Marin, Victoria Nassif, Robin Amer, Yohance Lacour, Lindsey Dorcus as to Apple Inc. on 5/26/2026, answer due 6/16/2026. (Kimbarovsky, Ross) (Entered: 05/27/2026) |
| 06/11/2026 | 7 | ATTORNEY Appearance for Defendant Apple Inc. by Lauren R Goldman (Goldman, Lauren) (Entered: 06/11/2026) |
| 06/11/2026 | 8 | MOTION by Defendant Apple Inc. for extension of time *TO RESPOND TO THE COMPLAINT*<br><br>(Goldman, Lauren) (Entered: 06/11/2026) |

| | | |
|---|---|---|
| 06/11/2026 | 9 | NOTICE of Motion by Lauren R Goldman for presentment of extension of time 8 before Honorable Sharon Johnson Coleman on 6/17/2026 at 10:00 AM. (Goldman, Lauren) (Entered: 06/11/2026) |
| 06/11/2026 | 10 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Apple Inc. (Goldman, Lauren) (Entered: 06/11/2026) |
| 06/11/2026 | 11 | MOTION for Leave to Appear Pro Hac Vice on behalf of Apple Inc. by Amanda Jenkins Sterling; Filing fee $ 150, receipt number AILNDC-25242573.<br><br>(Sterling, Amanda) (Entered: 06/11/2026) |
| 06/11/2026 | 12 | MOTION for Leave to Appear Pro Hac Vice on behalf of Apple Inc. by Michael Brandon; Filing fee $ 150, receipt number AILNDC-25242661.<br><br>(Brandon, Michael) (Entered: 06/11/2026) |
| 06/11/2026 | 13 | MOTION for Leave to Appear Pro Hac Vice on behalf of Apple Inc. by Andrew William Robb; Filing fee $ 150, receipt number AILNDC-25242708.<br><br>(Robb, Andrew) (Entered: 06/11/2026) |
| 06/11/2026 | 14 | MOTION for Leave to Appear Pro Hac Vice on behalf of Apple Inc. by Diana Michelle Feinstein; Filing fee $ 150, receipt number AILNDC-25242786.<br><br>(Feinstein, Diana) (Entered: 06/11/2026) |
| 06/15/2026 | 15 | ATTORNEY Appearance for Defendant Apple Inc. by Andrew Gordon May (May, Andrew) (Entered: 06/15/2026) |
| 06/16/2026 | 16 | MINUTE entry before the Honorable Sharon Johnson Coleman: Defendant's unopposed motion for an extension of time to respond to the complaint 8 is granted. Responsive pleading shall be filed by 8/17/2026. No appearance necessary on 6/17/2026. The in-person status hearing set for 7/29/2026 is stricken and reset to 8/24/2026 at 9:45 AM. The parties are to file a joint status report in the format described on the court's website at www.ilnd.uscourts.gov at least 3 business days prior to the status. Attorneys Amanda Sterling, Michael Brandon, Andrew Robb, and Diana M. Feinstein's motions for leave to appear pro hac vice 11 , 12 , 13 , and 14 are granted. Mailed notice. (ym) (Entered: 06/16/2026) |
| 06/17/2026 | 17 | ATTORNEY Appearance for Defendant Apple Inc. by Diana Michelle Feinstein (Feinstein, Diana) (Entered: 06/17/2026) |
| 06/17/2026 | 18 | ATTORNEY Appearance for Defendant Apple Inc. by Andrew William Robb (Robb, Andrew) (Entered: 06/17/2026) |
| 06/17/2026 | 19 | ATTORNEY Appearance for Defendant Apple Inc. by Michael Brandon (Brandon, Michael) (Entered: 06/17/2026) |
| 06/17/2026 | 20 | ATTORNEY Appearance for Defendant Apple Inc. by Amanda Jenkins Sterling (Sterling, Amanda) (Entered: 06/17/2026) |
| 07/02/2026 | 21 | MOTION by Defendant Apple Inc. for leave to file excess pages *Unopposed Motion for Leave to File an Oversized Brief in Excess of the Page Limit*<br><br>(May, Andrew) (Entered: 07/02/2026) |
| 07/02/2026 | 22 | *Notice of Motion* NOTICE of Motion by Andrew Gordon May for presentment of motion for leave to file excess pages 21 before Honorable Sharon Johnson Coleman on 7/15/2026 |

| | | |
|---|---|---|
| | | at 10:00 AM. (May, Andrew) (Entered: 07/02/2026) |
| 07/06/2026 | 23 | MINUTE entry before the Honorable Sharon Johnson Coleman: Defendant's unopposed motion for leave to file an oversized brief in excess of the page limit 21 is granted. Defendant's initial brief in support of its motion to dismiss shall be 30 pages and the page limit for plaintiffs' brief in opposition to the motion to dismiss shall be 30 pages. No appearance necessary on 7/15/2026. Mailed notice. (ym) (Entered: 07/06/2026) |

---



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/20/2026 19:17:48 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05536 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# EXHIBIT L

McSHAIN

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
## CIVIL DOCKET FOR CASE #: 1:26-cv-05575

Dorcus et al v. Adobe, Inc.
Assigned to: Honorable John Robert Blakey
Demand: $9,999,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/14/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Lindsey Dorcus** represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Marin** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Rogers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alison Flowers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Amer** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yohance Lacour** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Victoria Nassif**<br>*each individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Adobe, Inc.**<br>*a Delaware corporation,* | represented by | **Kathleen Louise Carlson**<br>Sidley Austin LLP<br>1 S. Dearborn Street<br>Chicago, IL 60603<br>312-853-7000<br>Email: kathleen.carlson@sidley.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Andrew Flynn Rodheim**<br>Sidley Austin Llp<br>1 South Dearborn St.<br>Chicago, IL 60603<br>(312) 853-7000<br>Fax: Not a member<br>Email: arodheim@sidley.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Lawrence P Fogel**<br>Sidley Austin LLP<br>One S. Dearborn<br>Chicago, IL 60603<br>(312) 853-6892<br>Fax: Not a member<br>Email: lawrence.fogel@sidley.com<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 05/14/2026 | 1 | COMPLAINT filed by Yohance Lacour, Philip Rogers, Victoria Nassif, Carol Marin, Lindsey Dorcus, Alison Flowers, ROBIN AMER; Jury Demand. Filing fee $ 405, receipt number AILNDC-25114809. (Attachments: # 1 Civil Cover Sheet)(Kimbarovsky, Ross) (Entered: 05/14/2026) |
| 05/14/2026 | 2 | ATTORNEY Appearance for Plaintiffs ROBIN AMER, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/14/2026) |
| 05/14/2026 | | CASE ASSIGNED to the Honorable Charles P. Kocoras. Designated as Magistrate Judge the Honorable Heather K. McShain. Case assignment: Random assignment. (Civil Category 1). (pjj, ) (Entered: 05/14/2026) |
| 05/14/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to |

| | | |
|---|---|---|
| | | have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (pjj, ) (Entered: 05/14/2026) |
| 05/19/2026 | 4 | SUMMONS Issued (Court Participant) as to Defendant Adobe, Inc. (pjj, ) (Entered: 05/19/2026) |
| 05/22/2026 | 5 | SUMMONS Returned Executed by Yohance Lacour, Philip Rogers, Victoria Nassif, Carol Marin, Lindsey Dorcus, Alison Flowers, Robin Amer as to Adobe, Inc. on 5/22/2026, answer due 6/12/2026. (Kimbarovsky, Ross) (Entered: 05/22/2026) |
| 05/27/2026 | 6 | MINUTE entry before the Honorable Charles P. Kocoras: Initial joint status report is due by 6/22/2026. Mailed notice (ags) (Entered: 05/27/2026) |
| 06/04/2026 | 7 | ATTORNEY Appearance for Defendant Adobe, Inc. by Kathleen Louise Carlson (Carlson, Kathleen) (Entered: 06/04/2026) |
| 06/04/2026 | 8 | ATTORNEY Appearance for Defendant Adobe, Inc. by Lawrence P Fogel (Fogel, Lawrence) (Entered: 06/04/2026) |
| 06/04/2026 | 9 | ATTORNEY Appearance for Defendant Adobe, Inc. by Andrew Flynn Rodheim (Rodheim, Andrew) (Entered: 06/04/2026) |
| 06/04/2026 | 10 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Adobe, Inc. (Carlson, Kathleen) (Entered: 06/04/2026) |
| 06/04/2026 | 11 | MOTION by Defendant Adobe, Inc. for extension of time to file answer regarding complaint, 1 *And To Vacate Initial Joint Status Report Deadline (Unopposed)*<br><br>(Carlson, Kathleen) (Entered: 06/04/2026) |
| 06/04/2026 | 12 | NOTICE of Motion by Kathleen Louise Carlson for presentment of motion for extension of time to file answer 11 before Honorable Charles P. Kocoras on 6/9/2026 at 09:50 AM. (Carlson, Kathleen) (Entered: 06/04/2026) |
| 06/05/2026 | 13 | MINUTE entry before the Honorable Charles P. Kocoras: Defendant's unopposed motion for an extension of time 11 is granted. Defendant must answer the complaint or otherwise plead by 7/22/2026. The presentment hearing noticed for 6/9/2026 is stricken with no appearance necessary. The joint status report ordered due on 6/22/2026 is now due 7/29/2026. Mailed notice (ags) (Entered: 06/05/2026) |
| 06/05/2026 | 14 | MINUTE entry before the Executive Committee: Case reassigned to the Honorable John Robert Blakey for all further proceedings pursuant to Local Rule IOP 13(f)(1). Mailed notice (Attachments: # 1 Request for Reassignment) (emc, ) (Entered: 06/05/2026) |
| 06/05/2026 | 15 | MINUTE entry before the Honorable Charles P. Kocoras: Minute entry 13 is vacated. Mailed notice (ags) (Entered: 06/05/2026) |
| 06/09/2026 | 16 | MINUTE entry before the Honorable John Robert Blakey: This case has been reassigned to the calendar of the Honorable John Robert Blakey. During the course of the litigation, the attorneys must appear at all hearing dates set by the Court or noticed by the parties. If an attorney has a conflict with a set court date, the attorney must notify Judge Blakey's Courtroom Deputy, Emily Wirtz (emily_wirtz@ilnd.uscourts.gov). If appropriate, the Court will then reset the matter. Advising opposing counsel of a scheduling conflict is not a substitute for communicating directly with the Court. The litigants are ordered to review and fully comply with all of this Court's own standing orders, which are available on Judge |

| | | |
|---|---|---|
| | | Blakey's information page on the Court's official website: http://www.ilnd.uscourts.gov/. The Court grants the motion by Defendant Adobe, Inc. for an extension of time to file responsive pleading 11 . Defendants shall respond to the complaint by 7/22/2026, and the parties shall file a joint status report by 7/29/2026, using the model template set forth in this Court's standing order regarding Initial (or Reassignment) Status Conferences. Mailed notice. (evw, ) (Entered: 06/09/2026) |
| 07/09/2026 | 17 | MOTION by Defendant Adobe, Inc. for leave to file excess pages *(Unopposed Motion)*<br><br>(Carlson, Kathleen) (Entered: 07/09/2026) |
| 07/09/2026 | 18 | NOTICE of Motion by Kathleen Louise Carlson for presentment of motion for leave to file excess pages 17 before Honorable John Robert Blakey on 7/15/2026 at 11:00 AM. (Carlson, Kathleen) (Entered: 07/09/2026) |
| 07/13/2026 | 19 | MINUTE entry before the Honorable John Robert Blakey: The Court grants Defendant's unopposed motion for leave to file excess pages 17 , and strikes the 7/15/26 Notice of Motion date. Defendant may file a brief in support if its motion to dismiss not to exceed 25 pages, and Plaintiffs may file a brief in opposition to Defendant's motion dismiss not to exceed 25 pages. Mailed notice. (exr, ) (Entered: 07/13/2026) |
| 07/17/2026 | 20 | MOTION by Defendant Adobe, Inc. for extension of time *to respond to Plaintiffs' complaint*<br><br>(Carlson, Kathleen) (Entered: 07/17/2026) |
| 07/17/2026 | 21 | NOTICE of Motion by Kathleen Louise Carlson for presentment of extension of time 20 before Honorable John Robert Blakey on 7/22/2026 at 11:00 AM. (Carlson, Kathleen) (Entered: 07/17/2026) |
| 07/17/2026 | 22 | MINUTE entry before the Honorable John Robert Blakey: The Court grants in part Defendant's motion for an extension of time 20 , over objection. The Court declines to extend Defendant's responsive pleading indefinitely based upon a reassignment motion that has not yet been filed. But the Court hereby extends Defendant's responsive pleading deadline to 8/31/26 to allow the parties time to pursue reassignment if appropriate. The Court also extends the parties' initial status report deadline to 9/8/26. Mailed notice. (exr, ) (Entered: 07/17/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/20/2026 19:24:38 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05575 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT M

Query Reports Utilities Help Log Out

JANTZ

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
# CIVIL DOCKET FOR CASE #: 1:26-cv-05497

Rogers et al v. Amazon.Com, Inc.
Assigned to: Honorable Jorge L. Alonso
Demand: $75,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/12/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Philip Rogers** represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Marin** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Amer** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lindsey Dorcus** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yohance Lacour** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Victoria Nassif** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Amazon.Com, Inc.**<br>*a Delaware corporation* | represented by | **Elizabeth Brooke Herrington**<br>Morgan, Lewis & Bockius LLP<br>110 N. Wacker Dr.<br>Suite 2800<br>Chicago, IL 60606<br>(312) 324-1000<br>Fax: Active<br>Email: beth.herrington@morganlewis.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Alborz Hassani**<br>Morgan, Lewis & Bockius Llp<br>110 North Wacker Drive<br>Suite 2800<br>Chicago, IL 60606-1511<br>(312) 324-1711<br>Fax: Not a member<br>Email: al.hassani@morganlewis.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Benjamin Kabe**<br>Morgan Lewis & Bockius LLP<br>110 N. Wacker Drive<br>Suite 2800<br>Chicago, IL 60606<br>312-324-1707<br>Email: benjamin.kabe@morganlewis.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Zachary Ryan Lazar**<br>Morgan, Lewis & Bokius, Llp<br>77 W. Wacker Drive<br>Chicago, IL 60601<br>(312) 324-1492<br>Fax: Not a member<br>Email: zachary.lazar@morganlewis.com<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2026 | 1 | COMPLAINT filed by Victoria Nassif, Philip Rogers, Lindsey Dorcus, ROBIN AMER, Carol Marin, Yohance Lacour; Jury Demand. Filing fee $ 405, receipt number AILNDC-25108545. (Attachments: # 1 Civil Cover Sheet)(Kimbarovsky, Ross) (Entered: 05/12/2026) |
| 05/13/2026 | | CASE ASSIGNED to the Honorable Charles P. Kocoras. Designated as Magistrate Judge the Honorable Beth W. Jantz. Case assignment: Random assignment. (Civil Category 2). (jks, ) (Entered: 05/13/2026) |
| 05/13/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties |

| | | |
|---|---|---|
| | | must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (jks, ) (Entered: 05/13/2026) |
| 05/13/2026 | 2 | MINUTE entry before the Executive Committee: Case reassigned to the Honorable Jorge L. Alonso for all further proceedings pursuant to IOP 13(f)(1).Mailed notice (Attachments: # 1 Request for Reassignment) (man, ) (Entered: 05/13/2026) |
| 05/13/2026 | 3 | ATTORNEY Appearance for Plaintiffs Robin Amer, Lindsey Dorcus, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/19/2026 | 4 | MINUTE entry before the Honorable Jorge L. Alonso: The Court sets a telephonic status hearing for 7/30/26 at 9:30 a.m. By 7/27/26, the parties shall file a joint initial status report. A template for the Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Alonso's name and then again on the link entitled 'Initial Status Hearings.' If defendants have not entered appearances or been served, plaintiff must file a status report advising the court of the status of service of process or any communication with defendants. Members of the public and media will be able to call in to listen to this hearing. The call-in number is 650-479-3207 and the access code is 1804010308. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Notice mailed by Judge's staff (lf, ) (Entered: 05/19/2026) |
| 05/19/2026 | 6 | SUMMONS Issued (Court Participant) as to Defendant Amazon.Com, Inc. (pjj, ) (Entered: 05/19/2026) |
| 05/27/2026 | 7 | SUMMONS Returned Executed by Philip Rogers, Robin Amer, Lindsey Dorcus, Victoria Nassif, Carol Marin, Yohance Lacour as to Amazon.Com, Inc. on 5/26/2026, answer due 6/16/2026. (Kimbarovsky, Ross) (Entered: 05/27/2026) |
| 06/08/2026 | 8 | ATTORNEY Appearance for Defendant Amazon.Com, Inc. by Elizabeth Brooke Herrington (Herrington, Elizabeth) (Entered: 06/08/2026) |
| 06/08/2026 | 9 | ATTORNEY Appearance for Defendant Amazon.Com, Inc. by Alborz Hassani (Hassani, Alborz) (Entered: 06/08/2026) |
| 06/08/2026 | 10 | ATTORNEY Appearance for Defendant Amazon.Com, Inc. by Benjamin Kabe (Kabe, Benjamin) (Entered: 06/08/2026) |
| 06/08/2026 | 11 | ATTORNEY Appearance for Defendant Amazon.Com, Inc. by Zachary Ryan Lazar (Lazar, Zachary) (Entered: 06/08/2026) |
| 06/08/2026 | 12 | MOTION by Defendant Amazon.Com, Inc. for extension of time *to Respond to Complaint (Unopposed)*<br><br>(Herrington, Elizabeth) (Entered: 06/08/2026) |
| 06/08/2026 | 13 | NOTICE of Motion by Elizabeth Brooke Herrington for presentment of extension of time 12 before Honorable Jorge L. Alonso on 6/11/2026 at 09:30 AM. (Herrington, Elizabeth) (Entered: 06/08/2026) |
| 06/08/2026 | 14 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Amazon.Com, Inc. (Herrington, Elizabeth) (Entered: 06/08/2026) |

| | | |
|---|---|---|
| 06/08/2026 | 15 | MINUTE entry before the Honorable Jorge L. Alonso: Defendant's Unopposed Motion for extension of time to respond to complaint 12 is granted to 8/17/26. Motion hearing date of 6/11/26 is stricken. Telephonic status hearing previously set for 7/30/26 is stricken and reset to 8/20/26 at 9:30 a.m. By 8/17/26, the parties shall file a joint initial status report. A template for the Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Alonso's name and then again on the link entitled 'Initial Status Hearings.' If defendants have not entered appearances or been served, plaintiff must file a status report advising the court of the status of service of process or any communication with defendants. Members of the public and media will be able to call in to listen to this hearing. The call-in number is 650-479-3207 and the access code is 1804010308. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Notice mailed by Judge's staff (lf, ) (Entered: 06/08/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/20/2026 19:23:00 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05497 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT N

Query Reports Utilities Help Log Out

McSHAIN

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
# CIVIL DOCKET FOR CASE #: 1:26-cv-05437

| | |
|---|---|
| Amer et al v. Eleven Labs Inc.<br>Assigned to: Honorable Steven C. Seeger<br>Demand: $9,999,000<br>Cause: 28:1332 Diversity-Personal Injury | Date Filed: 05/11/2026<br>Jury Demand: Plaintiff<br>Nature of Suit: 360 P.I.: Other<br>Jurisdiction: Diversity |

**Plaintiff**

| | | |
|---|---|---|
| **Robin Amer**<br>*Individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>246 Larkspur Dr.<br>Highland Park, IL 60035<br>847-275-9004<br>Email: ross@loevy.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Carol Marin**<br>*Individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Philip Rogers**<br>*Individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Alison Flowers**<br>*Individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Lindsey Dorcus**<br>*Individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Yohance Lacour**<br>*Individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Victoria Nassif**<br>*Individually and on behalf of all others similarly situated* | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

**Eleven Labs Inc.**
*a Delaware corporation*

represented by **Gary Feinerman**
Latham & Watkins LLP
330 N Wabash Ave
Suite 2800
Chicago, IL 60611
312-876-7700
Fax: Active
Email: gary.feinerman@lw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Collins , III**
Latham & Watkins LLP
330 N. Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
Fax: Active
Email: robert.collins@lw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2026 | 1 | COMPLAINT filed by Yohance Lacour, Philip Rogers, Victoria Nassif, Carol Marin, ROBIN AMER, Alison Flowers, Lindsey Dorcus; Jury Demand. Filing fee $ 405, receipt number AILNDC-25102587. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) (Kimbarovsky, Ross) (Entered: 05/11/2026) |
| 05/12/2026 | | CASE ASSIGNED to the Honorable Steven C. Seeger. Designated as Magistrate Judge the Honorable Heather K. McShain. Case assignment: Random assignment. (Civil Category 1). (pjj, ) (Entered: 05/12/2026) |
| 05/12/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (pjj, ) (Entered: 05/12/2026) |
| 05/13/2026 | 2 | ATTORNEY Appearance for Plaintiffs Robin Amer, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/15/2026 | 3 | MINUTE entry before the Honorable Steven C. Seeger: An initial status report is due by jULY 29, 2026. Counsel must read the Standing Order entitled "Initial Status Conferences and Joint Initial Status Reports" on the Court's website. The parties must confer as required by Rule 26(f) about the nature, scope, and duration of discovery. The parties must submit two documents to the Court. First, the parties must file the Joint Initial Status Report under Rule 26(f) on the docket. A Word version of the Joint Initial Status Report is available on |

| | | |
|---|---|---|
| | | the Court's website. All parties must participate in the preparation and filing of the Joint Initial Status Report. The Court requires a joint report, so a filing by one side or the other is not sufficient. Second, the parties must email a Word version of a proposed Scheduling Order under Rule 16(b) to the Court's proposed order inbox. Lead counsel for the parties must participate in filing the initial status report. Plaintiff must serve this Order on all other parties. If the defendant has not been served with process, plaintiff's counsel must contact the Courtroom Deputy at jessica_j_ramos@ilnd.uscourts.gov to reschedule the initial status report deadline. Plaintiff should not file the Joint Initial Status Report before the defendant(s) has been served with process. The parties must discuss settlement in good faith and make a serious attempt to resolve this case amicably. All counsel of record must read and comply with this Court's Standing Orders on its webpage. Please pay special attention to the Standing Orders about Depositions and Discovery. Mailed notice. (jjr, ) (Entered: 05/15/2026) |
| 05/15/2026 | 4 | MINUTE entry before the Honorable Steven C. Seeger: There is no need for a certificate of service for a court filing when all parties of record receive a copy through CM/ECF. Under the Local Rules, "[a] certificate of service is required only when service of a document filed on the Court's E-Filing system is made on a recipient who is not an E-Filer listed on the docket of the proceeding." See L.R. 5.5(a); see also Fed. R. Civ. P. 5(d)(1)(B) ("No certificate of service is required when a paper is served by filing it with the court's electronic-filing system."). The Court handles service through CM/ECF. In effect, the CM/ECF header is the certificate of service. Save yourself the work, and the trouble. Mailed notice. (jjr, ) (Entered: 05/15/2026) |
| 05/19/2026 | 6 | SUMMONS Issued (Court Participant) as to Defendant Eleven Labs Inc. (pjj, ) (Entered: 05/19/2026) |
| 06/01/2026 | 7 | SUMMONS Returned Executed by Victoria Nassif, Robin Amer, Philip Rogers, Yohance Lacour, Alison Flowers, Carol Marin, Lindsey Dorcus as to Eleven Labs Inc. on 5/28/2026, answer due 6/18/2026. (Kimbarovsky, Ross) (Entered: 06/01/2026) |
| 06/12/2026 | 8 | ATTORNEY Appearance for Defendant Eleven Labs Inc. by Gary Feinerman (Feinerman, Gary) (Entered: 06/12/2026) |
| 06/12/2026 | 9 | ATTORNEY Appearance for Defendant Eleven Labs Inc. by Robert Collins, III (Collins, Robert) (Entered: 06/12/2026) |
| 06/12/2026 | 10 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Eleven Labs Inc. (Feinerman, Gary) (Entered: 06/12/2026) |
| 06/12/2026 | 11 | MOTION by Defendant Eleven Labs Inc. for extension of time *to Respond to Plaintiffs' Complaint (Unopposed)*<br><br>(Feinerman, Gary) (Entered: 06/12/2026) |
| 06/15/2026 | 12 | MINUTE entry before the Honorable Steven C. Seeger: Defendant's unopposed motion for extension of time (Dckt. No. 11 ) is hereby granted. Defendant shall respond to plaintiffs' complaint by August 17, 2026. Mailed notice. (jjr, ) (Entered: 06/15/2026) |



## PACER Service Center

### Transaction Receipt

| | | | |
|---|---|---|---|
| 07/20/2026 19:15:08 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05437 |

| | | | |
|---|---|---|---|
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT O

WEISMAN

**United States District Court**
**Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)**
**CIVIL DOCKET FOR CASE #: 1:26-cv-05438**

Marin et al v. Meta Platforms, Inc.
Assigned to: Honorable Steven C. Seeger
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/11/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Carol Marin** represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Rogers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alison Flowers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Amer** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lindsey Dorcus** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yohance Lacour** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Victoria Nassif** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**
*a Delaware corporation*

represented by **Gary Feinerman**
Latham & Watkins LLP
330 N Wabash Ave
Suite 2800
Chicago, IL 60611
312-876-7700
Fax: Active
Email: gary.feinerman@lw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathryn K. George**
Latham & Watkins LLP
330 N. Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
Fax: Not a member
Email: kathryn.george@lw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2026 | 1 | COMPLAINT filed by Yohance Lacour, Alison Flowers, Victoria Nassif, Philip Rogers, ROBIN AMER, Carol Marin, Lindsey Dorcus; Jury Demand. Filing fee $ 405, receipt number AILNDC-25105368. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) (Kimbarovsky, Ross) (Entered: 05/12/2026) |
| 05/12/2026 | | CASE ASSIGNED to the Honorable Steven C. Seeger. Designated as Magistrate Judge the Honorable M. David Weisman. Case assignment: Random assignment. (Civil Category 2). (pjj, ) (Entered: 05/12/2026) |
| 05/12/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (pjj, ) (Entered: 05/12/2026) |
| 05/13/2026 | 2 | ATTORNEY Appearance for Plaintiffs Robin Amer, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/15/2026 | 3 | MINUTE entry before the Honorable Steven C. Seeger: An initial status report is due by jULY 29, 2026. Counsel must read the Standing Order entitled "Initial Status Conferences and Joint Initial Status Reports" on the Court's website. The parties must confer as required by Rule 26(f) about the nature, scope, and duration of discovery. The parties must submit two documents to the Court. First, the parties must file the Joint Initial Status Report under Rule 26(f) on the docket. A Word version of the Joint Initial Status Report is available on |

| | | |
|---|---|---|
| | | the Court's website. All parties must participate in the preparation and filing of the Joint Initial Status Report. The Court requires a joint report, so a filing by one side or the other is not sufficient. Second, the parties must email a Word version of a proposed Scheduling Order under Rule 16(b) to the Court's proposed order inbox. Lead counsel for the parties must participate in filing the initial status report. Plaintiff must serve this Order on all other parties. If the defendant has not been served with process, plaintiff's counsel must contact the Courtroom Deputy at jessica_j_ramos@ilnd.uscourts.gov to reschedule the initial status report deadline. Plaintiff should not file the Joint Initial Status Report before the defendant(s) has been served with process. The parties must discuss settlement in good faith and make a serious attempt to resolve this case amicably. All counsel of record must read and comply with this Court's Standing Orders on its webpage. Please pay special attention to the Standing Orders about Depositions and Discovery. Mailed notice. (jjr, ) (Entered: 05/15/2026) |
| 05/15/2026 | 4 | MINUTE entry before the Honorable Steven C. Seeger: There is no need for a certificate of service for a court filing when all parties of record receive a copy through CM/ECF. Under the Local Rules, "[a] certificate of service is required only when service of a document filed on the Court's E-Filing system is made on a recipient who is not an E-Filer listed on the docket of the proceeding." See L.R. 5.5(a); see also Fed. R. Civ. P. 5(d)(1)(B) ("No certificate of service is required when a paper is served by filing it with the court's electronic-filing system."). The Court handles service through CM/ECF. In effect, the CM/ECF header is the certificate of service. Save yourself the work, and the trouble. Mailed notice. (jjr, ) (Entered: 05/15/2026) |
| 05/19/2026 | 6 | SUMMONS Issued (Court Participant) as to Defendant Meta Platforms, Inc. (pjj, ) (Entered: 05/19/2026) |
| 05/22/2026 | 7 | SUMMONS Returned Executed by Yohance Lacour, Alison Flowers, Victoria Nassif, Philip Rogers, Robin Amer, Carol Marin, Lindsey Dorcus as to Meta Platforms, Inc. on 5/21/2026, answer due 6/11/2026. (Kimbarovsky, Ross) (Entered: 05/22/2026) |
| 06/08/2026 | 8 | ATTORNEY Appearance for Defendant Meta Platforms, Inc. by Gary Feinerman (Feinerman, Gary) (Entered: 06/08/2026) |
| 06/08/2026 | 9 | ATTORNEY Appearance for Defendant Meta Platforms, Inc. by Kathryn K. George (George, Kathryn) (Entered: 06/08/2026) |
| 06/08/2026 | 10 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Meta Platforms, Inc. (Feinerman, Gary) (Entered: 06/08/2026) |
| 06/08/2026 | 11 | MOTION by Defendant Meta Platforms, Inc. for extension of time *to Respond to Plaintiffs' Complaint (Unopposed)*<br><br>(Feinerman, Gary) (Entered: 06/08/2026) |
| 06/09/2026 | 12 | MINUTE entry before the Honorable Steven C. Seeger: Defendant's unopposed motion for extension of time to respond (Dckt. No. 11 ) is granted. Defendant shall respond by July 20, 2026. Mailed notice. (jjr, ) (Entered: 06/09/2026) |
| 07/06/2026 | 13 | MOTION by Defendant Meta Platforms, Inc. for extension of time *to respond to Plaintiffs' Complaint and for leave to file brief in excess of page limit (Unopposed)*<br><br>(Feinerman, Gary) (Entered: 07/06/2026) |
| 07/16/2026 | 14 | MINUTE entry before the Honorable Steven C. Seeger: Defendant's second unopposed motion for extension of time to respond and leave to file a brief in excess of the page limit (Dckt. No. 13 ) is granted. Defendant shall respond to plaintiff's complaint by July 30, 2026. Mailed notice. (jjr, ) (Entered: 07/16/2026) |

# PACER Service Center

## Transaction Receipt

| | | | |
|---|---|---|---|
| 07/20/2026 19:20:40 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05438 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT P

McSHAIN

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
## CIVIL DOCKET FOR CASE #: 1:26-cv-05491

Flowers et al v. Microsoft Corporation
Assigned to: Honorable Steven C. Seeger
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/12/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Alison Flowers** represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Rogers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Marin** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBIN AMER** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lindsey Dorcus** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yohance Lacour** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Victoria Nassif** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Microsoft Corporation**

represented by **David Charles Layden**
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312)222-9350
Fax: Active
Email: dlayden@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Savannah E.B. McNeily**
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
312-840-7434
Email: sberger@jenner.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2026 | 1 | COMPLAINT filed by Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers, ROBIN AMER, Alison Flowers, Lindsey Dorcus; Jury Demand. Filing fee $ 405, receipt number AILNDC-25108289. (Attachments: # 1 Civil Cover Sheet)(Kimbarovsky, Ross) (Entered: 05/12/2026) |
| 05/13/2026 | | CASE ASSIGNED to the Honorable Steven C. Seeger. Designated as Magistrate Judge the Honorable Heather K. McShain. Case assignment: Random assignment. (Civil Category 2). (jks, ) (Entered: 05/13/2026) |
| 05/13/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (jks, ) (Entered: 05/13/2026) |
| 05/13/2026 | 2 | ATTORNEY Appearance for Plaintiffs ROBIN AMER, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/15/2026 | 3 | MINUTE entry before the Honorable Steven C. Seeger: An initial status report is due by July 29, 2026. Counsel must read the Standing Order entitled "Initial Status Conferences and Joint Initial Status Reports" on the Court's website. The parties must confer as required by Rule 26(f) about the nature, scope, and duration of discovery. The parties must submit two documents to the Court. First, the parties must file the Joint Initial Status Report under Rule 26(f) on the docket. A Word version of the Joint Initial Status Report is available on the Court's website. All parties must participate in the preparation and filing of the Joint Initial Status Report. The Court requires a joint report, so a filing by one side or the other is not sufficient. Second, the parties must email a Word version of a proposed Scheduling |

| | | |
|---|---|---|
| | | Order under Rule 16(b) to the Court's proposed order inbox. Lead counsel for the parties must participate in filing the initial status report. Plaintiff must serve this Order on all other parties. If the defendant has not been served with process, plaintiff's counsel must contact the Courtroom Deputy at jessica_j_ramos@ilnd.uscourts.gov to reschedule the initial status report deadline. Plaintiff should not file the Joint Initial Status Report before the defendant(s) has been served with process. The parties must discuss settlement in good faith and make a serious attempt to resolve this case amicably. All counsel of record must read and comply with this Court's Standing Orders on its webpage. Please pay special attention to the Standing Orders about Depositions and Discovery. Mailed notice. (jjr, ) (Entered: 05/15/2026) |
| 05/15/2026 | 4 | MINUTE entry before the Honorable Steven C. Seeger: There is no need for a certificate of service for a court filing when all parties of record receive a copy through CM/ECF. Under the Local Rules, "[a] certificate of service is required only when service of a document filed on the Court's E-Filing system is made on a recipient who is not an E-Filer listed on the docket of the proceeding." See L.R. 5.5(a); see also Fed. R. Civ. P. 5(d)(1)(B) ("No certificate of service is required when a paper is served by filing it with the court's electronic-filing system."). The Court handles service through CM/ECF. In effect, the CM/ECF header is the certificate of service. Save yourself the work, and the trouble. Mailed notice. (jjr, ) (Entered: 05/15/2026) |
| 05/19/2026 | 6 | SUMMONS Issued (Court Participant) as to Defendant Microsoft Corporation (pjj, ) (Entered: 05/19/2026) |
| 05/22/2026 | 7 | SUMMONS Returned Executed by Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers, ROBIN AMER, Alison Flowers, Lindsey Dorcus as to Microsoft Corporation on 5/21/2026, answer due 6/11/2026. (Kimbarovsky, Ross) (Entered: 05/22/2026) |
| 06/10/2026 | 8 | ATTORNEY Appearance for Defendant Microsoft Corporation by David Charles Layden (Layden, David) (Entered: 06/10/2026) |
| 06/10/2026 | 9 | ATTORNEY Appearance for Defendant Microsoft Corporation by Savannah E. Berger (Berger, Savannah) (Entered: 06/10/2026) |
| 06/10/2026 | 10 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Microsoft Corporation (Layden, David) (Entered: 06/10/2026) |
| 06/10/2026 | 11 | MOTION by Defendant Microsoft Corporation for extension of time to file response/reply as to complaint, 1 *(Unopposed)*<br><br>(Layden, David) (Entered: 06/10/2026) |
| 06/29/2026 | 12 | MINUTE entry before the Honorable Steven C. Seeger: Defendant Microsoft's motion for more time (Dckt. No. 11 ) is hereby granted. As proposed, a response to the complaint is due by August 10, 2026. Mailed notice. (jjr, ) (Entered: 06/29/2026) |



| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/20/2026 19:21:35 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05491 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT Q

Query Reports Utilities Help Log Out

BERRY

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
# CIVIL DOCKET FOR CASE #: 1:26-cv-05478

Rogers et al v. Nvidia Corporation
Assigned to: Honorable Thomas M. Durkin
Demand: $9,999,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/12/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Philip Rogers** represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Marin** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alison Flowers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Amer** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lindsey Dorcus** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yohance Lacour** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Victoria Nassif** represented by **Ross Edward Kimbarovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Nvidia Corporation**
*Delaware corporation*

represented by

**Sharif Jacob**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: Pro Hac Vice
Email: sjacob@keker.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suyash Agrawal**
Massey & Gail LLP
50 E Washington Street
Suite 400
Chicago, IL 60602
(312)379-0949
Fax: Active
Email: sagrawal@masseygail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew S Gove**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
415-391-5400
Fax: 415-397-7188
Email: agove@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carlos Cristobal Martinez**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400
Fax: Pro Hac Vice
Email: cmartinez@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christina Lee**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: Pro Hac Vice
Email: clee@keker.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Constance Grieves**
Massey & Gail Llp
50 East Washington
Suite 400
Chicago, IL 60602
(312) 809-0183
Fax: Not a member
Email: cgrieves@masseygail.com
*ATTORNEY TO BE NOTICED*

**Katie Lynn Joyce**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: Pro Hac Vice
Email: kjoyce@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan James Hayward**
Keker, Van Nest & Peters Llp
633 Battery St.
San Francisco, CA 94111
(415) 962-8886
Fax: Not a member
Email: rhayward@keker.com
*ATTORNEY TO BE NOTICED*

**Sarah Salomon**
Keker, Van Nest & Peters, LLP
633 Battery St.
San Francisco, CA 94111
(415) 391-5400
Fax: Pro Hac Vice
Email: ssalomon@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie J Goldberg**
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
Fax: Pro Hac Vice
Email: sgoldberg@keker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 05/12/2026 | 1 | COMPLAINT filed by Yohance Lacour, Alison Flowers, Victoria Nassif, Carol Marin, ROBIN AMER, Philip Rogers, Lindsey Dorcus; Jury Demand. Filing fee $ 405, receipt number AILNDC-25106307. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) (Kimbarovsky, Ross) (Entered: 05/12/2026) |
| 05/13/2026 | | CASE ASSIGNED to the Honorable Thomas M. Durkin. Designated as Magistrate Judge the Honorable Albert Berry, III. Case assignment: Random assignment. (Civil Category 2). (jks, ) (Entered: 05/13/2026) |
| 05/13/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (jks, ) (Entered: 05/13/2026) |
| 05/13/2026 | 2 | ATTORNEY Appearance for Plaintiffs Robin Amer, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/19/2026 | 4 | SUMMONS Issued (Court Participant) as to Defendant Nvidia Corporation (pjj, ) (Entered: 05/19/2026) |
| 05/21/2026 | 5 | MINUTE entry before the Honorable Thomas M. Durkin: By 7/30/2026, the parties are to file a joint status report. The parties may refer to the format detailed on the Court's website under New and Reassigned cases. Mailed notice. (ecw, ) (Entered: 05/21/2026) |
| 06/01/2026 | 6 | SUMMONS Returned Executed by Victoria Nassif, Alison Flowers, Philip Rogers, Yohance Lacour, Lindsey Dorcus, Carol Marin, Robin Amer as to Nvidia Corporation on 5/29/2026, answer due 6/22/2026. (Kimbarovsky, Ross) (Entered: 06/01/2026) |
| 06/09/2026 | 7 | ATTORNEY Appearance for Defendant Nvidia Corporation by Ryan James Hayward (Hayward, Ryan) (Entered: 06/09/2026) |
| 06/09/2026 | 8 | MOTION for Leave to Appear Pro Hac Vice on behalf of Nvidia Corporation by Christina Lee; Filing fee $ 150, receipt number AILNDC-25231353.<br><br>(Lee, Christina) (Entered: 06/09/2026) |
| 06/09/2026 | 9 | MOTION for Leave to Appear Pro Hac Vice on behalf of Nvidia Corporation by Stephanie J Goldberg; Filing fee $ 150, receipt number AILNDC-25231373.<br><br>(Goldberg, Stephanie) (Entered: 06/09/2026) |
| 06/09/2026 | 10 | MOTION for Leave to Appear Pro Hac Vice on behalf of Nvidia Corporation by Katie Lynn Joyce; Filing fee $ 150, receipt number BILNDC-25231431.<br><br>(Joyce, Katie Lynn) (Entered: 06/09/2026) |
| 06/09/2026 | 11 | MOTION for Leave to Appear Pro Hac Vice on behalf of Nvidia Corporation by Carlos Cristobal Martinez; Filing fee $ 150, receipt number AILNDC-25231486.<br><br>(Martinez, Carlos) (Entered: 06/09/2026) |
| 06/09/2026 | 12 | MOTION for Leave to Appear Pro Hac Vice on behalf of Nvidia Corporation by Andrew S Gove; Filing fee $ 150, receipt number AILNDC-25231514. |

| | | |
|---|---|---|
| | | (Gove, Andrew) (Entered: 06/09/2026) |
| 06/09/2026 | 13 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Nvidia Corporation *CORPORATE DISCLOSURE STATEMENT OF NVIDIA CORPORATION* (Hayward, Ryan) (Entered: 06/09/2026) |
| 06/09/2026 | 14 | MOTION by Defendant Nvidia Corporation for extension of time *to Respond to Plaintiffs' Complaint (Unopposed)*<br><br>(Hayward, Ryan) (Entered: 06/09/2026) |
| 06/10/2026 | 15 | MINUTE entry before the Honorable Thomas M. Durkin: Motions to appear pro hac vice 8 , 9 , 10 , 11 , 12 are granted. Attorneys Christina Lee, Stephanie J. Goldberg, Katie Lynn Joyce, Carlos Cristobal Martinez and Andrew S. Gove for Nvidia Corporation added. Mailed notice. (ecw, ) (Entered: 06/10/2026) |
| 06/10/2026 | 16 | MINUTE entry before the Honorable Thomas M. Durkin: Unopposed motion for extension of time 14 is granted. NVIDIA is to respond to Plaintiffs' Complaint by 8/21/2026. The 7/30/2026 deadline for the parties to file a joint status report is extended to 9/4/2026. Mailed notice. (ecw, ) (Entered: 06/10/2026) |
| 06/10/2026 | 17 | MOTION for Leave to Appear Pro Hac Vice on behalf of Nvidia Corporation by Sharif Jacob; Filing fee $ 150, receipt number AILNDC-25234313.<br><br>(Jacob, Sharif) (Entered: 06/10/2026) |
| 06/10/2026 | 18 | MINUTE entry before the Honorable Thomas M. Durkin: Motion to appear pro hac vice 17 is granted. Attorney Sharif Jacob for Nvidia Corporation added. Mailed notice. (ecw, ) (Entered: 06/10/2026) |
| 06/23/2026 | 19 | MOTION for Leave to Appear Pro Hac Vice on behalf of Nvidia Corporation by Sarah Salomon; Filing fee $ 150, receipt number AILNDC-25285306.<br><br>(Salomon, Sarah) (Entered: 06/23/2026) |
| 06/23/2026 | 20 | MINUTE entry before the Honorable Thomas M. Durkin: Motion to appear pro hac vice 19 is granted. Attorney Sarah Salomon for Nvidia Corporation added. Mailed notice. (ecw, ) (Entered: 06/23/2026) |
| 07/09/2026 | 21 | ATTORNEY Appearance for Defendant Nvidia Corporation by Suyash Agrawal (Agrawal, Suyash) (Entered: 07/09/2026) |
| 07/09/2026 | 22 | ATTORNEY Appearance for Defendant Nvidia Corporation by Constance Grieves (Grieves, Constance) (Entered: 07/09/2026) |
| 07/16/2026 | 23 | MOTION by Defendant Nvidia Corporation for leave to file - *Defendant NVIDIA Corporations's Unopposed Motion for Leave to Exceed Page Limits on Motion to Dismiss Briefing*<br><br>(Agrawal, Suyash) (Entered: 07/16/2026) |
| 07/16/2026 | 24 | MINUTE entry before the Honorable Thomas M. Durkin: Unopposed motion for leave to file excess pages 23 is granted. NVIDIA may file a brief in support of its motion to dismiss not to exceed 25 pages. Plaintiffs may file a brief in opposition to NVIDIA's motion to dismiss not to exceed 25 pages. NVIDIA may file a reply brief in support of its motion to dismiss not to exceed 15 pages. Mailed notice. (ecw, ) (Entered: 07/16/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/20/2026 19:22:17 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05478 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# EXHIBIT R

BERRY

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.9 (rev. 1.9) (Chicago)
# CIVIL DOCKET FOR CASE #: 1:26-cv-05567

Nassif et al v. Samsung Electronics Co., LTD. et al
Assigned to: Honorable Jeremy C. Daniel
Demand: $9,999,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/13/2026
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Victoria Nassif** represented by **Ross Edward Kimbarovsky**
246 Larkspur Dr.
Highland Park, IL 60035
847-275-9004
Email: ross@loevy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Marin** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Rogers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alison Flowers** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lindsey Dorcus** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Amer** represented by **Ross Edward Kimbarovsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Yohance Lacour** | represented by | **Ross Edward Kimbarovsky**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

**Samsung Electronics Co., LTD.**

**Defendant**

| | | |
|---|---|---|
| **Samsung Electronics America, Inc.** | represented by | **Gregory Edward Ostfeld**<br>Greenberg Traurig, LLP<br>360 North Green Street<br>Suite 1300<br>Chicago, IL 60607<br>312-456-8400<br>Fax: Active<br>Email: ostfeldg@gtlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Henry Lay**<br>Greenberg Traurig, P.A<br>360 N. Green Street<br>Suite. 1300<br>Chicago, IL 60607<br>812-350-8271<br>Email: Henry.Lay@gtlaw.com<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 05/13/2026 | 1 | COMPLAINT filed by ROBIN AMER, Philip Rogers, Yohance Lacour, Carol Marin, Alison Flowers, Victoria Nassif, Lindsey Dorcus; Jury Demand. Filing fee $ 405, receipt number AILNDC-25114228. (Attachments: # 1 Civil Cover Sheet)(Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/13/2026 | 2 | ATTORNEY Appearance for Plaintiffs ROBIN AMER, Lindsey Dorcus, Alison Flowers, Yohance Lacour, Carol Marin, Victoria Nassif, Philip Rogers by Ross Edward Kimbarovsky (Kimbarovsky, Ross) (Entered: 05/13/2026) |
| 05/13/2026 | | CASE ASSIGNED to the Honorable Jeremy C. Daniel. Designated as Magistrate Judge the Honorable Albert Berry III. Case assignment: Random assignment. (Civil Category 1). (nh, ) (Entered: 05/14/2026) |
| 05/13/2026 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to |

| | | |
|---|---|---|
| | | jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (nh, ) (Entered: 05/14/2026) |
| 05/19/2026 | 5 | SUMMONS Issued (Court Participant) as to Defendants Samsung Electronics America, Inc., Samsung Electronics Co., LTD. (Attachments: # 1 Summons)(pjj, ) (Entered: 05/19/2026) |
| 05/22/2026 | 6 | SUMMONS Returned Executed by Robin Amer, Philip Rogers, Yohance Lacour, Carol Marin, Alison Flowers, Victoria Nassif, Lindsey Dorcus as to Samsung Electronics America, Inc. on 5/22/2026, answer due 6/12/2026. (Kimbarovsky, Ross) (Entered: 05/22/2026) |
| 06/10/2026 | 7 | ATTORNEY Appearance for Defendant Samsung Electronics America, Inc. by Gregory Edward Ostfeld (Ostfeld, Gregory) (Entered: 06/10/2026) |
| 06/10/2026 | 8 | MOTION by Defendant Samsung Electronics America, Inc. for extension of time to file response/reply as to complaint, 1 *(Unopposed)*<br><br>(Ostfeld, Gregory) (Entered: 06/10/2026) |
| 06/10/2026 | 9 | NOTICE of Motion by Gregory Edward Ostfeld for presentment of motion for extension of time to file response/reply 8 before Honorable Jeremy C. Daniel on 6/17/2026 at 09:30 AM. (Ostfeld, Gregory) (Entered: 06/10/2026) |
| 06/10/2026 | 10 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Samsung Electronics America, Inc. (Ostfeld, Gregory) (Entered: 06/10/2026) |
| 06/10/2026 | 11 | ATTORNEY Appearance for Defendant Samsung Electronics America, Inc. by Henry Lay (Lay, Henry) (Entered: 06/10/2026) |
| 06/11/2026 | 12 | MINUTE entry before the Honorable Jeremy C. Daniel: Defendant Samsung Electronics America, Inc.'s motion for an extension of time 9 is granted. The movant shall respond to the complaint on or before July 24, 2026. Mailed notice. (vcf, ) (Entered: 06/11/2026) |
| 06/17/2026 | 13 | MOTION by Defendants Samsung Electronics America, Inc., Samsung Electronics Co., LTD. for extension of time to file response/reply as to complaint, 1 *(Unopposed)*<br><br>(Ostfeld, Gregory) (Entered: 06/17/2026) |
| 06/17/2026 | 14 | NOTICE of Motion by Gregory Edward Ostfeld for presentment of motion for extension of time to file response/reply 13 before Honorable Jeremy C. Daniel on 6/23/2026 at 09:30 AM. (Ostfeld, Gregory) (Entered: 06/17/2026) |
| 06/18/2026 | 15 | MINUTE entry before the Honorable Jeremy C. Daniel: The defendants' motion for an extension of time 13 is granted. The defendants shall respond to the complaint on or before September 14, 2026. Given the length of this extension, the Court will not extend this deadline any further. The motion hearing is stricken. Mailed notice. (vcf, ) (Entered: 06/18/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/20/2026 19:24:07 | | | |
| **PACER Login:** | gd0026LA | **Client Code:** | 03290-00352 |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-05567 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |