**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>ALPHABET, INC., a Delaware corporation, and GOOGLE LLC, a Delaware limited liability company,<br><br>    Defendants. | Case No. 1:26-cv-05436<br><br><br>Honorable April M. Perry |

**MEMORANDUM OF LAW IN SUPPORT OF GOOGLE'S
<u>MOTION TO DISMISS COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................1

ALLEGATIONS OF THE COMPLAINT.................................................................3

ARGUMENT ..............................................................................................................7

I.  PLAINTIFFS FAIL TO STATE ANY BIPA CLAIM (COUNTS I–V) ............................7

    A.  The BIPA Claims Fail Because the Alleged Violations Did Not Occur Primarily and Substantially in Illinois ................................................................7

        1.  BIPA Does Not Apply Extraterritorially to Reach Google's Conduct. ......................................................................................................7

        2.  The Dormant Commerce Clause Confirms Plaintiffs' Application of BIPA Is Impermissible. ..............................................................................9

    B.  Plaintiffs Fail to Allege the Extraction of a Voiceprint, Much Less One that Identifies Them ...........................................................................................11

        1.  Plaintiffs Do Not Allege Google Extracted "Voiceprints." .......................12

        2.  Plaintiffs Fail to Allege the Challenged Data Could Identify Them. ........13

    C.  Plaintiffs' BIPA Claims Fail for Additional Reasons............................................14

II.  PLAINTIFFS' REMAINING CLAIMS ALSO FAIL (COUNTS VI–IX).........................16

    A.  Plaintiffs Fail to State an Illinois Right of Publicity Act Claim (Count VI)..........16

        1.  Plaintiffs' Section 30(a) Claim Fails...........................................................16

        2.  Plaintiffs' Section 30(b) Claim Fails. .........................................................18

    B.  Plaintiffs Fail to State an ICFA or UDTPA Claim (Counts VII and VIII)............19

    C.  Plaintiffs' Unjust Enrichment Claim Fails Because It Is Not an Independent Cause of Action Under Illinois Law (Count IX)..............................20

III.  THE COPYRIGHT ACT PREEMPTS PLAINTIFFS' CLAIMS (ALL COUNTS).........20

IV.  THE FIRST AMENDMENT BARS PLAINTIFFS' LAWSUIT (ALL COUNTS) .........24

    A.  Google's Voice-Generation Models, the Speech They Produce, and the Expression They Enable Are Constitutionally Protected Speech.........................24

    B.  The First Amendment Bars Plaintiffs' Claims......................................................27

    C.  IRPA Section 30(b) Is Unconstitutional as Applied.............................................29

CONCLUSION...........................................................................................................30

**TABLE OF CASES**

**Page**

*AAVN, Inc. v. WestPoint Home, Inc.*,
2019 WL 1168102 (N.D. Ill. Mar. 13, 2019)..................................................................19

*Am. C.L. Union of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .......................................................................................24

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) .....................................................................................26

*Angelilli v. Activision Blizzard, Inc.*,
781 F. Supp. 3d 691 (N.D. Ill. 2025) ...........................................................24, 26, 27, 28

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002).....................................................................................................30

*Avery v. State Farm Mut. Auto. Ins. Co.*,
835 N.E.2d 801 (Ill. 2005).............................................................................................7

*Balele v. Olmanson*,
2015 WL 4774107 (W.D. Wis. Aug. 13, 2015)..........................................................11

*Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*,
805 F.2d 663 (7th Cir. 1986) .......................................................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................13

*Bovinett v. HomeAdvisor, Inc.*,
2018 WL 1234963 (N.D. Ill. Mar. 9, 2018)..............................................................20

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) .........................................................................................3

*Campana v. Nuance Commc'ns, Inc.*,
2024 WL 2809838 (N.D. Ill. Mar. 8, 2024)................................................................8

*CardioNet, Inc. v. LifeWatch Corp.*,
2008 WL 567031 (N.D. Ill. Feb. 27, 2008) ...............................................................19

*Carter v. Pallante*,
256 F. Supp. 3d 791 (N.D. Ill. 2017) .....................................................................21, 23

*Castelaz v. Estée Lauder Cos.*,
2024 WL 136872 (N.D. Ill. Jan. 10, 2024)................................................................14

*Central Hudson Gas & Elec. Corp. v. PSC*,
447 U.S. 557 (1980)..................................................................................................29

*Chiles v. Salazar*,
146 S. Ct. 1023 (2026)..............................................................................................26

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994)....................................................................................................30

*Clarke v. Aveda Corp.*,
704 F. Supp. 3d 863 (N.D. Ill. 2023) ......................................................................14

*Cohen v. California*,
403 U.S. 15 (1971)....................................................................................................26

*Comedy III Productions v. Gary Saderup, Inc.*,
21 P. 3d 797 (Cal. 2001) ..........................................................................................27

*Commonwealth v. Cabral*,
866 N.E.2d 429 (Mass. App. Ct. 2007) ...................................................................11

*CustomGuide v. CareerBuilder, LLC*,
813 F. Supp. 2d 990 (N.D. Ill. 2011) .......................................................................23

*Cyber Websmith v. Am. Dental Ass'n*,
2010 WL 3075726 (N.D. Ill. Aug. 4, 2010) ............................................................23

*D'Ambrosio v. Meta Platforms Inc.*,
176 F.4th 928 (7th Cir. 2026) ..................................................................................16

*D'Ambrosio v. Rajala*,
783 F. Supp. 3d 1077 (N.D. Ill. 2025) .....................................................................16

*Daichendt v. CVS Pharmacy, Inc.*,
2022 WL 17404488 (N.D. Ill. Dec. 2, 2022)...........................................................14

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) .............................................................................16, 17

*Davis v. e.l.f. Cosms., Inc.*,
2024 WL 2722663 (N.D. Ill. May 28, 2024).............................................................15

*Davis v. Jumio Corp.*,
2023 WL 2019048 (N.D. Ill. Feb. 14, 2023) .............................................................7

*DeFilippo v. Nat'l Broad. Co.*,
446 A.2d 1036 (R.I. 1982)........................................................................................28

iii

*deGrasse v. Hyundai Motor Am.*,
  2025 WL 1413177 (N.D. Ill. May 15, 2025) ........................................................................14

*Dobrowolski v. Intelius, Inc.*,
  2017 WL 3720170 (N.D. Ill. Aug. 29, 2017) ........................................................................17

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988)..............................................................................................................28

*G.T. v. Samsung Elecs. Am. Inc.*,
  742 F. Supp. 3d 788 (N.D. Ill. 2024) ...........................................................................11, 14

*Gonzales v. Carhart*,
  550 U.S. 124 (2007)..............................................................................................................29

*Hamilton v. Speight*,
  827 F. App'x 238 (3d Cir. 2020) ..........................................................................................27

*Havoco of Am., Ltd. v. Hollobow*,
  702 F.2d 643 (7th Cir. 1983) ................................................................................................28

*Heard v. Becton, Dickinson & Co.*,
  440 F. Supp. 3d 960 (N.D. Ill. 2020) ...............................................................13, 15, 16, 18

*Hooks v. CloudSpotter Techs. Inc.*,
  2026 WL 1045734 (N.D. Ill. Apr. 17, 2026) ........................................................................13

*Horn v. Method Prods., PBC*,
  2022 WL 1090887 (N.D. Ill. Apr. 12, 2022) ........................................................................15

*Huston v. Hearst Commc'ns, Inc.*,
  53 F.4th 1097 (7th Cir. 2022) ...............................................................................................16

*In re Jackson*,
  972 F.3d 25 (2d Cir. 2020)...............................................................................................21, 22

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) ................................................................................................28

*Jones v. Microsoft Corp.*,
  649 F. Supp. 3d 679 (N.D. Ill. 2023) ...................................................................................14

*Love v. Simmons*,
  2024 WL 809107 (N.D. Ill. Feb. 27, 2024) .........................................................................18

*Marchman v. Kovel-Fuller, LLC*,
  2007 WL 9811116 (N.D. Ill. July 9, 2007).........................................................................17

iv

*Marsh v. CSL Plasma Inc.*,
    503 F. Supp. 3d 677 (N.D. Ill. 2020) ...................................................................................8

*Martell v. X Corp.*,
    2024 WL 3011353 (N.D. Ill. June 13, 2024) ...............................................................13, 22

*Mashallah, Inc. v. W. Bend Mut. Ins. Co.*,
    20 F.4th 311 (7th Cir. 2021) ...............................................................................................20

*McGoveran v. Amazon Web Servs., Inc.*,
    2021 WL 4502089 (D. Del. Sept. 30, 2021) .........................................................................8

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981) ............................................................................................................26

*Midler v. Ford Motor Co.*,
    849 F.2d 460 (9th Cir. 1988) ..............................................................................................17

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ......................................................................................................25, 26

*Morley-Murphy Co. v. Zenith Elecs. Corp.*,
    142 F.3d 373 (7th Cir. 1998) ................................................................................................9

*N.A.A.C.P. v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ............................................................................................................28

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ..............................................................................................................9

*Neals v. PAR Tech. Corp.*,
    419 F. Supp. 3d 1088 (N.D. Ill. 2019) .................................................................................8

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) ..............................................................................................19

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ..............................................................................................................24

*Patel v. Zillow, Inc.*,
    2017 WL 3620812 (N.D. Ill. Aug. 23, 2017) .....................................................................11

*People v. Williams*,
    518 N.E.2d 136 (Ill. 1987) ...............................................................................................9, 28

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ..............................................................................................................9

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ...................................................................................20

*Reed v. Gilbert*,
576 U.S. 155 (2015).................................................................................................29

*Reno v. ACLU*,
521 U.S. 844 (1997).................................................................................................30

*Retail Digital Network, LLC v. Prieto*,
861 F.3d 839 (9th Cir. 2017) ...................................................................................26

*Rodriguez v. ByteDance, Inc.*,
2025 WL 672951 (N.D. Ill. Mar. 3, 2025)...............................................................15

*Rosenbach v. Six Flags Ent. Corp.*,
129 N.E.3d 1197 (Ill. 2019) ......................................................................................8

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989).................................................................................................30

*Sanders v. Acclaim Entm't, Inc.*,
188 F. Supp. 2d 1264 (D. Colo. 2002).....................................................................28

*Sarver v. Chartier*,
813 F.3d 891 (9th Cir. 2016) ...................................................................................29

*Seng-Tiong Ho v. Taflove*,
648 F.3d 489 (7th Cir. 2011) ...................................................................................21

*Smith v. California*,
361 U.S. 147 (1959).................................................................................................26

*Snyder v. Phelps*,
562 U.S. 443 (2011).................................................................................................27

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011).................................................................................................24

*Springfield v. Allphin*,
384 N.E.2d 310 (Ill. 1978).......................................................................................12

*Stanley v. Georgia*,
394 U.S. 557 (1969).................................................................................................26

*Thompson v. Getty Images (US), Inc.*,
2013 WL 3321612 (N.D. Ill. July 1, 2013)..............................................................16

*Thornley v. Clearview AI, Inc.*,
    984 F.3d 1241 (7th Cir. 2021) .......................................................................................15

*Toney v. L'Oréal USA, Inc.*,
    406 F.3d 905 (7th Cir. 2005) .........................................................................................21

*Toulon v. Cont'l Cas. Co.*,
    877 F.3d 725 (7th Cir. 2017) .........................................................................................20

*Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*,
    241 N.E.3d 454 (Ill. 2024) ............................................................................................19

*Turner v. Nuance Commc'ns, Inc.*,
    735 F. Supp. 3d 1169 (N.D. Cal. 2024) .........................................................................12

*United States v. Gines-Perez*,
    214 F. Supp. 2d 205 (D.P.R. 2002)................................................................................11

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)........................................................................................................30

*United States v. Stevens*,
    559 U.S. 460 (2010)........................................................................................................30

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001)...........................................................................................24

*Vance v. Google LLC*,
    2024 WL 1141007 (N.D. Cal. Mar. 15, 2024)..................................................................8

*Vance v. Microsoft Corp.*,
    534 F. Supp. 3d 1301 (W.D. Wash. 2021)......................................................................15

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988)........................................................................................................26

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)........................................................................................................26

*Watson v. Legacy Healthcare Fin. Servs., LLC*,
    196 N.E.3d 571 (Ill. Ct. App. 2021) ..............................................................................11

*X Corp. v. Bright Data Ltd.*,
    733 F. Supp. 3d 832 (N.D. Cal. 2024) ...........................................................................21

*Zellmer v. Meta Platforms, Inc.*,
    104 F.4th 1117 (9th Cir. 2024) ......................................................................................14

**INTRODUCTION**

Google's voice-generation models—the result of years of sustained research—support the AI tools that expand ordinary citizens' speech capabilities.[1] They allow, for example, people to communicate with those who are visually impaired through narration of written text (Google Cloud Text-to-Speech) or to those who speak a different language (YouTube auto-dub). Plaintiffs are seven Illinois-based voice professionals who claim that they are harmed by this innovation. They seek to make a swath of Google's speech-related AI technology unlawful and to destroy the foundational models supporting them. Each of their nine sweeping claims is defective:

*BIPA Claims* (**Counts I–V**)**.** The claims founder at the threshold because Plaintiffs fail to allege the challenged conduct—that Google supposedly extracted Plaintiffs' "voiceprints" from recordings and embedded them in the AI models it trained—occurred in Illinois, as BIPA requires. On the merits, Plaintiffs do not plausibly allege that Google extracted any identifiable voiceprint from anyone. They rely on conclusory "information and belief" allegations that fail to establish the creation of Plaintiffs' voiceprints. But Plaintiffs must plead *facts* to proceed with their sprawling case challenging nearly every AI audio product Google provides. Each BIPA count separately falls flat: Plaintiffs fail to allege Google possessed Plaintiffs' voiceprints for the Section 15(a) claim (Count II); any affirmative act to collect or obtain Plaintiffs' voiceprints for the Section 15(b) claim (Count I); any sale, lease, or trade of the voiceprints themselves for the Section 15(c) claim (Count III); the recipient, manner, or purpose of any disclosure for the Section 15(d) claim (Count IV); or the applicable standard of care or how Google's practices fell short of it for the Section 15(e) claim (Count V).

*IRPA and Other Claims* (**Counts VI–IX**)**.** The remaining claims fare no better. The right-

---

[1]  For convenience, Defendants Alphabet, Inc. and Google LLC are referred to together as "Google." However, neither Defendant concedes participation in any particular conduct alleged.

1

of-publicity claim (Count VI) fails because Plaintiffs allege no use of their identities to sell anything. They allege only that Google used their voices to build and operate its products, but identify no output that an ordinary listener would recognize as any Plaintiff's voice. Nor would that allegation be plausible. It is impossible for a particular audio output—for example, the female voice in the NotebookLM Audio Overviews podcasts—to be recognized simultaneously as the voice of every class member. The consumer-fraud and deceptive-trade-practices claims (Counts VII–VIII) similarly fail because Plaintiffs plead no misrepresentation with particularity, no deception-based injury, and no likelihood of confusion. And unjust enrichment (Count IX) fails because it is not an independent cause of action under Illinois law.

Beyond these pleadings deficiencies, Plaintiffs' claims run headlong into the First Amendment and Copyright Act preemption.

***Copyright Preemption* (All Counts).** Plaintiffs concede they do not own the recordings in which their voices appear. Instead, the employers, publishers, and production companies with whom Plaintiffs presumably contracted own the recordings and licensed them to Google. Plaintiffs' claims would let an individual featured in a copyrighted work veto the owner's decision to license it, after the fact. That is a conflict the Copyright Act forbids.

***First Amendment* (All Counts).** The First Amendment also bars every claim. Google's voice-generation models are tools of expressive creation, and the speech they generate, together with the speech they let ordinary people create, is protected speech. Plaintiffs would impose liability for that protected activity based on an asserted privacy interest in recordings Plaintiffs (or their employers) chose to make public. Worse, Plaintiffs demand that the models themselves be destroyed—an injunction that would silence an entire medium of expression to purportedly remedy a hypothetical sound-alike, nowhere identified in the Complaint despite the public availability of

every product about which Plaintiffs complain. And, as applied to these general-purpose voice-generation models, IRPA's digital-replica provision—Section 30(b)—is an unconstitutional content-based restriction on protected speech that cannot survive strict scrutiny.

The Court should dismiss the Complaint.

## ALLEGATIONS OF THE COMPLAINT

***Plaintiffs' Employers and Other Third Parties Publicly Disseminated the Recordings in Which Plaintiffs' Voices Appear.*** Plaintiffs are seven Illinois voice professionals. Compl. ¶¶ 3, 14-20. They claim that Google trained AI models using recordings of their voices uploaded to YouTube. *Id.* ¶¶ 54-59. Plaintiffs concede that their "voices appear in YouTube content uploaded by other parties." *Id.* ¶ 56. Those other parties—Plaintiffs' employers and production companies—agreed to the YouTube Terms of Service in exchange for YouTube's worldwide distribution and monetization of their content. *See id*. ¶¶ 56, 130. The TOS explains that Google LLC, which provides the YouTube service, is based in California and organized under Delaware law. *See* YouTube Terms of Service ("License to YouTube").[2] Plaintiffs' employers and production companies also granted YouTube and its affiliates (*i.e.*, both Defendants) a "worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use" the uploaded content, including to "reproduce, distribute, [and] prepare derivative works." *Id.* at 8.

***Google Continues to Innovate Tools that Enable Speech.*** Years of "artificial intelligence research" led to the "develop[ment of] the foundational voice synthesis models on which Google's commercial voice products depend," including "the WaveNet, Tacotron, SoundStream, AudioLM, and SoundStorm model families" and the multi-speaker dialogue model behind Google's products.

---

[2]  *See* Trebicka Decl. Ex. A (YouTube Terms of Service) ("License to YouTube"). The Court may consider the TOS on this motion because the Complaint incorporates them by reference. Compl. ¶¶ 55–56, 130–132; *see Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

Compl. ¶ 38. Training these predictive models necessarily required a large volume of recorded speech. *Id.* ¶¶ 41, 49. Google's multi-speaker model, for example, was allegedly "pretrained … on hundreds of thousands of hours of speech data." *Id.* ¶ 49 (cleaned up).

*The Accused Products Enhance Speech Possibilities.* Plaintiffs allege that these foundational models support certain Google voice products, including Gemini Live, NotebookLM Audio Overviews, YouTube auto-dubbing, Google Cloud Text-to-Speech, and Google Assistant. *E.g.*, *id.* ¶¶ 1, 10, 27, 38. These products serve a wide range of expressive uses. For example, Gemini Live "lets you have free-flowing conversations." *Id.* ¶ 25 (internal quotes omitted). NotebookLM Audio Overviews "generate[] podcast-format audio from written sources" uploaded by a user. *Id.* ¶ 117. YouTube auto-dubbing "generates dubbed audio in other languages" enabling "cross-language access to … video content." *Id.* ¶ 70(f), 118. Through these products, Google provides everyday consumers, and not just professional studios, with tools for the generation of natural speech—conversation, narration, and cross-language audio. *Id.* ¶¶ 25, 39, 70(f), 117.

*Plaintiffs Do Not Plausibly Allege That Google Creates, Embeds, or Extracts Any Voiceprint, Much Less Plaintiffs'.* Plaintiffs' own pleading concedes they do not know whether Google ever used their recordings or whether voiceprints were derived from them. Plaintiffs allege that their "voice recordings were among the audio Google ingested to train its foundational voice models, and voiceprints derived from [Plaintiffs'] recordings are encoded in the parameters of those models," but admit that "the basis for [that] allegation" is solely "information and belief." *Id.* ¶¶ 14, 81 (Marin); 15, 87 (Lacour); 16, 92 (Flowers); 17, 97 (Amer); 18, 102 (Rogers); 19, 107 (Dorcus); 20, 112 (Nassif). Plaintiffs do not attempt to fill the "information and belief" gap with the extensive public record. Google has published wide-ranging and detailed literature regarding its model-development process, including a variety of sources Plaintiffs cite in their Complaint.

*See, e.g., id.* ¶¶ 9 n.1; 42 n.3. The products about which Plaintiffs complain are publicly available and free to use. Plaintiffs also concede Google has released a number of open-source models, including the Magenta and Gemma model families. *Id.* ¶¶ 180-82. Despite all of the detailed, publicly available material, Plaintiffs fail to allege how these models capture or embed Plaintiffs' voiceprints,[3] *see id.* ¶ 187, or a step or process in which the alleged voiceprint extraction occurs.

What is more, Plaintiffs' factual allegations tell a story inconsistent with voiceprint extraction. They allege that Google separates publicly available recordings into compact pieces of code, called "tokens," which capture "the details of the audio waveform," *id.* ¶ 42 (internal quotes omitted), but stop short of alleging, as they must, that these tokens can accurately identify a speaker. Through exposure to a vast number of tokens, Google's voice-generation models allegedly learn to predict sequences of tokens—*i.e.*, what sounds are likely to go together. *See id.* ¶ 9 n.1. This process teaches the model the acoustic features that go into speech generally—*e.g.*, "pitch, timbre, resonance, accent, cadence, articulation, and the dynamics of emotional expression"—and encodes those general acoustic features in its parameters. *Id.* ¶ 41. Using tokens teaches the model to speak naturally—*e.g.*, the difference in how to say the declarative statement, "you're good," and the question, "you're good?" *See* Trebicka Decl. Ex. B (AudioLM: a Language Modeling Approach to Audio Generation) (detailing how tokens teach models to recognize prosody, semantics, intonation, etc.); Compl. ¶ 42 n.3 (incorporating Ex. B). Plaintiffs do not allege that the accused models identify, index, or reproduce the voice of any particular Plaintiff. *See id.* ¶ 41. Rather, they allege Google used "the same automated and standardized process" to train its

---

[3] Plaintiffs craft a deceptive catch-22. If Google keeps model weights and training data confidential, Plaintiffs claim that permits them to bring baseless claims solely on information and belief. *See, e.g.*, Compl. ¶¶ 52, 59. On the other hand, if Google publishes this information for an open-source model (debunking Plaintiffs' conclusory allegations), Plaintiffs likewise blame Google for failing to "protect[]" that information. *Id.* ¶ 187. The truth is that the open weights Google freely made available for AI research do not contain voiceprints and do not implicate BIPA.

voice-generation models, relying on "the same categories of voice recordings." *Id.* ¶ 140.

Plaintiffs' inability to allege voiceprint extraction is unsurprising. Voiceprints are neither necessary nor relevant to the accused products. Plaintiffs concede that the goal of the accused products is to create a natural-sounding AI voice—not a voice modeled on that of a particular speaker. *See id*. ¶ 195 (alleging Google "holds out its products' ability to generate realistic, expressive, and human-sounding voices as a core commercial feature of those products"); *id.* ¶ 25 (Gemini Live allows users to "have free-flowing conversations") (internal quotes omitted). They do not allege that Google's goal in training a model to generate speech is to identify anyone.

Plaintiffs' repeated invocation of "voice cloning," *id.* ¶¶ 7, 9 n.1, 43, 44, 50, cannot supply the missing facts about voiceprint extraction. Tellingly, Plaintiffs do not challenge Google's alleged voice-cloning products at all. Those products—Google Cloud Custom Voice and Chirp 3 Instant Custom Voice—do something fundamentally different from the products at issue here: they allow a user to create a "synthetic voice model" of the user's own voice, from the user's own reference audio, and only after the user records an express statement affirming ownership of the voice and consenting to its use. *Id.* ¶¶ 7, 43, 50. Plaintiffs concede that Google built exactly that consent flow for those products. *Id.* ¶ 7. And Plaintiffs affirmatively disclaim any connection to them: each Plaintiff alleges that he or she never uploaded any recording to a Google voice-cloning product and never created a Custom Voice account. *Id.* ¶¶ 82, 88, 93, 98, 103, 108, 113. Plaintiffs likewise exclude from the putative class everyone who consented to Google's use of their voices through the Custom Voice and Chirp 3 processes.[4] *Id.* ¶ 136.

---

4    Plaintiffs' sole bridge from these unchallenged, consent-based cloning products to the accused foundational models is a footnote alleging only "on information and belief" that the "same architecture and processing pipeline" was applied to the voice training data ingested for the foundational models, Compl. ¶ 9 n.1—yet the research papers and Chirp 3 documentation cited there do not say anything about using voice cloning technology to train the challenged models.

At bottom, Plaintiffs allege only that Google trains AI models on publicly available YouTube content to which Google has a license, and that such training allows Google to create AI voice products that speak in a natural way, but not like any particular plaintiff. What is missing from Plaintiffs' complaint is any non-conclusory factual allegation that Google extracts Plaintiffs' voiceprints or produces an AI voice that the public recognizes as any Plaintiff's voice.

***No Allegations that Google's Model Development and Training Occurred in Illinois.*** Plaintiffs allege that their voices "were produced by Plaintiffs while they were physically present in Illinois," *id.* ¶ 61, that the recordings "were created in Illinois," *id.* ¶ 62, and that the harm they suffered "is felt in Illinois," *id.* ¶ 78. But Plaintiffs do not allege that *Google*'s conduct occurred in Illinois, and they concede that Google's "subsequent processing" may have occurred elsewhere in the United States. *Id.* ¶ 64; *id.* ¶ 40 (Google's training "occurred, in substantial part, … in the United States"); *id.* ¶ 38 (Google's research and model-development work "was performed, in substantial part, in the United States"). Plaintiffs do not even allege that third parties who uploaded the recordings to YouTube did so in Illinois, nor could they feasibly make this showing on a classwide basis. Compl. ¶ 56 ("Their voices appear in YouTube content uploaded by other parties . . . over which Plaintiffs have no contractual control."). Plaintiffs, moreover, ignore that their employers uploaded their voices to YouTube, a service provided by a California-based company, subject to a California choice-of-law clause, further distancing any connection to Illinois. *See* License to YouTube at 3, 15.

## ARGUMENT

### I. PLAINTIFFS FAIL TO STATE ANY BIPA CLAIM (COUNTS I-V)

#### A. The BIPA Claims Fail Because the Alleged Violations Did Not Occur Primarily and Substantially in Illinois

##### 1. BIPA Does Not Apply Extraterritorially to Reach Google's Conduct.

7

BIPA does not apply extraterritorially. Illinois statutes are presumed to have no extraterritorial effect "unless a clear intent in this respect appears from the express provisions of the statute." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005). BIPA contains no such provision, so it applies only where the circumstances relating to the alleged BIPA violation occur "primarily and substantially in Illinois." *Davis v. Jumio Corp.*, 2023 WL 2019048, at *6 (N.D. Ill. Feb. 14, 2023); *see also McGoveran v. Amazon Web Servs., Inc.*, 2021 WL 4502089, at *4 (D. Del. Sept. 30, 2021) ("plaintiff's residency is not enough to establish an Illinois connection in order to survive a motion to dismiss based on extraterritoriality"). Accordingly, Plaintiffs cannot state a BIPA claim unless they allege that the violation actually occurred in Illinois. *See Neals v. PAR Tech. Corp.*, 419 F. Supp. 3d 1088, 1091–92 (N.D. Ill. 2019) (dismissing BIPA claims where the plaintiff failed to allege she scanned her fingerprints into the system in Illinois); *Campana v. Nuance Commc'ns, Inc.*, 2024 WL 2809838, at *2–3 (N.D. Ill. Mar. 8, 2024) (dismissing BIPA claims where the plaintiffs failed to allege their biometric information was actually collected in Illinois); *see also Vance v. Google LLC*, 2024 WL 1141007, at *3–4 (N.D. Cal. Mar. 15, 2024) (dismissing BIPA claims for lack of any "indication that Google did anything in Illinois," because Illinois residency alone cannot establish that the challenged conduct occurred "primarily and substantially" in Illinois).

Although Plaintiffs allege that their voices were produced and their recordings were created in Illinois, Compl. ¶¶ 60–64, they do not allege that the purported BIPA violations—*i.e.*, the extraction and storage of their voiceprints and the training of the models—took place in Illinois. *Supra* p. 7.[5] To the contrary, Plaintiffs allege that the training "occurred, in substantial part," on

---

[5] This case bears little resemblance to the typical BIPA suit, which involves a company's own customers directly providing their biometric data to that company, in Illinois, for the specific purpose of identification. *See, e.g., Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1200 (Ill. 2019) (customer required to scan his thumbprint, in person at an Illinois amusement park, to obtain and use a season pass); *Marsh v. CSL*

Google infrastructure *somewhere* "in the United States." Compl. ¶ 40; *id.* ¶ 64 (claiming Plaintiffs' biometric data is of Illinois origin "regardless of where any subsequent processing occurred"). Plaintiffs fail to allege any facts that might tie the alleged violation to Illinois, such as that their recordings were distributed only in Illinois (rather than posted for a worldwide audience on YouTube) or that Google specifically targeted speakers in Illinois (it did not). Because Plaintiffs do not locate the alleged violation in Illinois, they fail to allege that the circumstances of the violation occurred primarily and substantially in Illinois, which is fatal to the BIPA claims.

2. The Dormant Commerce Clause Confirms Plaintiffs' Application of BIPA Is Impermissible.

That Plaintiffs' BIPA claims fail on extraterritoriality grounds is reinforced by the canon of constitutional avoidance. Illinois law must be construed to avoid raising a "substantial question as to its constitutionality." *People v. Williams*, 518 N.E.2d 136, 137 (Ill. 1987). Plaintiffs' interpretation of BIPA would allow Illinois to regulate conduct occurring outside Illinois and impose a substantial and unjustified burden on interstate commerce, raising a "substantial question as to [BIPA's] constitutionality" under the dormant Commerce Clause, as applied in this case. *See id.* The Court should avoid such a question and instead construe BIPA not to reach Google's conduct in developing and training the models.

The dormant Commerce Clause bars state statutes that impose a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits."[6] *Pike v. Bruce*

---

*Plasma Inc.*, 503 F. Supp. 3d 677, 679 (N.D. Ill. 2020) (plasma donors at Illinois locations required to provide fingerprint each time they donated). Plaintiffs allege no such relationship with Google, no private submission of biometric data for an identification purpose, and no Illinois-based transaction at all.

[6] In *Nat'l Pork Producers Council v. Ross*, six justices reaffirmed that the "longstanding *Pike* balancing test" remains good law. 598 U.S. 356, 403 (2023) (Kavanaugh, J., concurring in part and dissenting in part). Notably, a majority of the Court also confirmed that *Pike* balancing remains available even absent a showing of discrimination against out-of-state commerce. *See id.* at 395-397 (Roberts, C.J., concurring in part and dissenting in part, joined by Alito, Kavanaugh, and Jackson, JJ.); *id.* at 392-93 (Sotomayor, J., concurring in part, joined by Kagan, J.).

*Church, Inc.*, 397 U.S. 137, 142 (1970). Plaintiffs' BIPA claims require an application of BIPA that would be unconstitutional. *See Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998) (construing state statute not to apply extraterritorially, to avoid reading that "would, at the very least, raise significant questions under the Commerce Clause"). Under Plaintiffs' theory, Illinois' BIPA statute would require the destruction of a voice-generation model built outside Illinois and released nationwide—an order that would not regulate conduct within Illinois at all but would instead dictate the development and availability of Google's models in every other State. *See* Compl. Prayer ¶¶ A(6)–(7) (seeking an injunction requiring destruction of the models).

Plaintiffs assert that BIPA governs because Plaintiffs spoke and recorded their performances in Illinois (Compl. ¶¶ 60–64)—even though third parties made the recordings publicly available worldwide, the owners of the videos licensed them to Google for any use, including model training, and the alleged extraction of voiceprints and model training occurred outside Illinois (*see id.* ¶¶ 38, 40, 64). Plaintiffs allege no facts showing that Google could parse out all Illinois residents speaking in content posted to YouTube by third parties or somehow obtain the consents required under BIPA from those non-user speakers. Given the insurmountable burden on AI companies of conducting a jurisdictional analysis for every speaker in content uploaded by third parties to worldwide-distribution platforms, Plaintiffs' reading of BIPA would seriously hinder, if not entirely eliminate, the development and availability of AI models outside the state.[7]

The burden that Plaintiffs' reading of BIPA would impose clearly exceeds any purported local benefit in protecting any privacy interest in material voluntarily uploaded, for profit, to a

---

[7] Plaintiffs' theory is particularly problematic given the threat it poses to the vital national security and economic interest—as voiced by Congress and the executive—in maintaining American dominance in AI development. *See, e.g.*, 15 U.S.C. § 9411(a)(1)–(3) (recognizing American leadership in AI research and development as vital across many industries); 42 U.S.C. § 19107(c)(1) (designating AI as a key technology focus area); S. Rep. No. 116-300 (2020) (describing artificial intelligence as a key industry which will drive the American economy in the coming decades).

platform available to the public across the world. *See, e.g.,* Compl. ¶¶ 59, 91, 106. Individuals generally are held to have *no* privacy interest in publicly available material.[8] And Plaintiffs' asserted privacy interest in content willingly posted by third parties (without Plaintiffs' objection) to a public, worldwide platform is far afield from the animating concern of the Illinois legislature when it enacted BIPA. *Watson v. Legacy Healthcare Fin. Servs., LLC*, 196 N.E.3d 571, 582 (Ill. Ct. App. 2021) ("impetus" for BIPA "was to allay the fears of and provide protections" for "*people who had provided their biometric data for use as identifiers*" in private transactions (emphasis added)). Plaintiffs' theory would, at the very least, raise serious questions regarding BIPA's constitutionality. The Court need not resolve whether that application would in fact violate the dormant Commerce Clause; it need only recognize that Plaintiffs' theory raises the question, which is itself sufficient reason to reject the application of BIPA Plaintiffs request here.

### B. Plaintiffs Fail to Allege the Extraction of a Voiceprint, Much Less One that Identifies Them

Plaintiffs' claims are predicated on the supposed extraction of their "voiceprints" from public recordings of their voices, but, beyond bare conclusory assertions, they fail to allege the creation of any voiceprint. BIPA does not define "voiceprint." But like all BIPA-covered biometric information, a voiceprint must be "capable of [allowing someone to] recogniz[e] an individual's identity, not simply an individual's feature." *G.T. v. Samsung Elecs. Am. Inc.*, 742 F. Supp. 3d 788, 800 (N.D. Ill. 2024). That makes it like an "audible 'fingerprint.'" *See Turner v. Nuance*

---

[8]  *Patel v. Zillow, Inc.*, 2017 WL 3620812, at *8 (N.D. Ill. Aug. 23, 2017) (holding that Plaintiffs failed to plead an intrusion into private matters where shared information was "based on public and user-submitted information, not private information"); *United States v. Gines-Perez*, 214 F. Supp. 2d 205, 225 (D.P.R. 2002) ("[A] claim to privacy is unavailable to someone who places information on an indisputably[] public medium, such as the Internet, *without taking any measures to protect the information*." (emphasis added)), *vacated on other grounds*, 90 F. App'x 3 (1st Cir. 2004); *Balele v. Olmanson*, 2015 WL 4774107, at *18 (W.D. Wis. Aug. 13, 2015) ("[A] search for comments made on a public website is not an invasion of plaintiff's privacy."); *Commonwealth v. Cabral*, 866 N.E.2d 429, 433 (Mass. App. Ct. 2007) (no expectation of privacy in saliva discarded in public and later analyzed for DNA).

*Commc'ns, Inc.*, 735 F. Supp. 3d 1169, 1187 (N.D. Cal. 2024). Accordingly, a voiceprint both (1) details the physical attributes of an individual's voice at a sufficient level of detail as to distinguish it from anyone else's—like a fingerprint—and (2) can be used to identify the individual to whom it belongs. *See id.*; *see also* Voiceprint, Black's Law Dictionary (12th ed. 2024) (defining the term as a "distinctive pattern of curved lines and whorls made by a machine that measures human vocal sounds for the purpose of identifying an individual speaker"). Similarly, the Illinois Office of the Attorney General—highly persuasive authority when interpreting undefined statutory terms— defines a voiceprint as a "record of mechanical measurement" and, like other biometric identifiers, it is a "physical or behavioral characteristic that identifies a person."[9] Ill. Att'y Gen. Pub. Access Op. No. 17-011, 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017).

### 1.    Plaintiffs Do Not Allege Google Extracted "Voiceprints."

Plaintiffs fail to allege that Google isolated their unique voice characteristics in the first place, much less "for the purpose of identifying an individual speaker" or in a way that can reliably identify someone like a fingerprint. They instead allege that the process of using ingested recordings to train AI models created "speaker embeddings, acoustic tokens, or voice cloning keys" that Plaintiffs simply assert "are" voiceprints. Compl. ¶ 153. But Plaintiffs fail to plead any facts about how that process isolates or stores an identifier unique to any Plaintiff. *See supra* pp. 4–5; *see also* Compl. ¶¶ 41–45 (describing a general training pipeline and failing to allege extraction of any voiceprint). Instead, Plaintiffs acknowledge that the training process does not refer to individualized data, but teaches the model through "the same automated and standardized process" for every recording in the alleged "hundreds of thousands of hours of speech data."

---

[9] *Springfield v. Allphin*, 384 N.E.2d 310, 316 (Ill. 1978) ("a well-reasoned opinion of the Attorney General is entitled to considerable weight in resolving a question of first impression in this State regarding the construction of an Illinois statute").

Compl. ¶¶ 139–40. A model that learns the general acoustic features of human speech from pooled audio has not isolated and stored any individual's unique vocal signature.

Plaintiffs allege that Google's open-source models are developed similarly to those underlying its commercial products, *id.* ¶ 182, which further underscores the implausibility of their claims. Despite Google's transparent release of open-source models that Plaintiffs cite, *see supra* pp. 4–5, Plaintiffs identify no feature or structural element consistent with their voiceprint theory. *See* Compl. ¶ 182. Plaintiffs cannot allege that voiceprints were extracted "upon information and belief" where public information is capable of supporting (or as here, debunking) their theory. *Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960, 969 (N.D. Ill. 2020).

The alleged preparation of datasets similarly rules out that Google isolated or extracted any individual's biometrics—Plaintiffs fail to allege any step or process by which Google extracted voiceprints. *See supra* pp. 4–6. The court in *Martell v. X Corp.*, 2024 WL 3011353, at *2–3 (N.D. Ill. June 13, 2024), held that the creation of a per-photo "hash" did "not necessarily imply" that the defendant was "scanning for an individual's facial geometry," and left "open the question" whether the representation was "a unique representation of the entire photo or specific to the faces of the people in the picture." Likewise, a model's ability to synthesize realistic speech alone says nothing about whether Google extracted a "voiceprint" from any Plaintiff. *See Hooks v. CloudSpotter Techs. Inc.*, 2026 WL 1045734, at *3 (N.D. Ill. Apr. 17, 2026) (dismissing BIPA claims that failed to explain how software "actually operates" to collect biometric information). At the very least, Plaintiffs must allege concrete facts that plausibly give rise to their theory of voiceprint extraction; they come nowhere close. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (complaint must have "enough factual matter . . . to suggest" alleged conduct occurred).

2.    Plaintiffs Fail to Allege the Challenged Data Could Identify Them.

Plaintiffs also fail to allege facts supporting "the most foundational aspect of a BIPA

13

claim": that any challenged data could identify them. *Clarke v. Aveda Corp.*, 704 F. Supp. 3d 863, 866 (N.D. Ill. 2023). A biometric "identifier" must be "capable of recognizing an individual's identity, not simply an individual's feature." *G.T. v. Samsung Elecs. Am. Inc*., 742 F. Supp. 3d 788, 800 (N.D. Ill. 2024); *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1124–26 (9th Cir. 2024) (a "face signature" was not a biometric identifier where it could not be used to identify the plaintiff). Plaintiffs' conclusory parroting of the statutory requirement that Google was "capable of identifying the speakers," Compl. ¶ 153, is insufficient. *See Daichendt v. CVS Pharmacy, Inc.*, 2022 WL 17404488, at *5 (N.D. Ill. Dec. 2, 2022) (dismissing BIPA claim for failure to allege the collection of data capable of identifying the plaintiff); *Castelaz v. Estée Lauder Cos.*, 2024 WL 136872, at *7 (N.D. Ill. Jan. 10, 2024) (same).

## C.   Plaintiffs' BIPA Claims Fail for Additional Reasons

*Section 15(a)* **(Count II).** Section 15(a) imposes a duty to adopt and comply with a retention-and-destruction policy on an entity "in possession of" biometric identifiers. Plaintiffs' failure to plausibly allege Google possesses their biometrics, *see supra* pp. 11-13, dooms the claim.

*Section 15(b)* **(Count I).** Section 15(b) requires an affirmative act of collecting or obtaining a biometric identifier, not mere possession of data from which one could be derived. *See deGrasse v. Hyundai Motor Am.*, 2025 WL 1413177, at *3 (N.D. Ill. May 15, 2025) ("[A]n entity must undertake some effort to collect or obtain biometric identifiers or information." (internal quotation marks and citations omitted)); *Jones v. Microsoft Corp.*, 649 F. Supp. 3d 679, 683 (N.D. Ill. 2023) (same). But despite extensive citation to Google's publications detailing model development, Plaintiffs fail to identify any voiceprint-extraction step.

*Section 15(c)* **(Count III).** Section 15(c) "prohibit[s] the operation of a market in biometric identifiers"—not building a commercial product that at some point used such data. *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1247 (7th Cir. 2021); *see, e.g.*, *Vance v. Microsoft Corp.*, 534

14

F. Supp. 3d 1301, 1309 (W.D. Wash. 2021) (dismissing a Section 15(c) claim where plaintiffs alleged only that the defendant used their biometric data to improve its products, not that it shared access to that data in return for value). In other words, a plaintiff must allege that the defendant used its biometric data "in a commercial transaction with a third party," not merely that it profited from a product. *Davis v. e.l.f. Cosms., Inc.*, 2024 WL 2722663, at *8 n.4 (N.D. Ill. May 28, 2024). Because the Complaint lacks facts about any alleged sale, lease, or trade of the voiceprints themselves, it fails to state a claim.

**Section 15(d) (Count IV).** A Section 15(d) claim requires specific facts identifying the recipient of any disclosure, the manner in which it occurred, and its purpose. Plaintiffs allege only, "[o]n information and belief," that Google disclosed their voiceprints to "affiliated Alphabet subsidiaries, vendors, and service providers," Compl. ¶ 173, without naming a single recipient. Pleading "on information and belief" does not permit Plaintiffs to bypass the requirements of Rule 8. Even where a plaintiff contends that relevant facts are held exclusively by a defendant (which Plaintiffs have not even alleged here), a plaintiff must still plead "allegations of fact" giving "any basis to even *suspect*" that a disclosure occurred. *Heard*, 440 F. Supp. 3d at 969. *See also Horn v. Method Prods., PBC*, 2022 WL 1090887, at *3 (N.D. Ill. Apr. 12, 2022) (dismissing Section 15(d) claim for failure to allege the recipient or manner of any disclosure). Plaintiffs fail to do so.

**Section 15(e) (Count V).** A Section 15(e) claim "must, at the very least, allege what the industry standard of care is and how a defendant's practices fell short of that standard." *Rodriguez v. ByteDance, Inc.*, 2025 WL 672951, at *20 (N.D. Ill. Mar. 3, 2025). Plaintiffs never identify any recognized industry standard of care, much less explain how Google's practices departed from it. They offer instead an "asymmetry" theory—that "[o]pen-sourcing model weights is publication, not protection" and is less protective than Google's treatment of its other confidential information.

15

Compl. ¶¶ 178–187. That makes little sense because Plaintiffs fail to identify any part of the open-source models' publicly available parameters containing anyone's voiceprint, much less *theirs*. If Google shared Plaintiffs' voiceprints publicly, "information and belief" allegations do not cut it— Plaintiffs must provide the basis for that conclusion. *Heard*, 440 F. Supp. 3d at 969. They cannot.

## II. PLAINTIFFS' REMAINING CLAIMS ALSO FAIL (COUNTS VI–IX)

### A. Plaintiffs Fail to State an Illinois Right of Publicity Act Claim (Count VI)

#### 1. Plaintiffs' Section 30(a) Claim Fails.

A Section 30(a) claim requires the appropriation of the plaintiff's identity "for commercial purposes," and a use that identifies the plaintiff to an "ordinary, reasonable" listener. *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1006, 1008 (7th Cir. 2019). Plaintiffs satisfy neither requirement.

***Plaintiffs Do Not Allege Any Use of Their Identity for a Commercial Purpose.*** Section 30(a) reaches only the use of an identity to effectuate a commercial transaction—to "help sell something"—not a "free-floating profit motive." *D'Ambrosio v. Meta Platforms, Inc.*, 176 F.4th 928, 935–36 (7th Cir. 2026); *see Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1102 (7th Cir. 2022) ("Her identity must help sell something—whether it is that product or a separate product or service."). Plaintiffs allege only that Google used recordings with their voices to "develop, train, and operate" its monetized products, Compl. ¶ 195, not to advertise or sell anything. That fails to state a Section 30(a) claim. *See D'Ambrosio v. Rajala*, 783 F. Supp. 3d 1077, 1087–88 (N.D. Ill. 2025) (dismissing IRPA claim despite allegation that the use "necessarily drove user engagement and therefore Meta's advertising revenue"); *Thompson v. Getty Images (US), Inc.*, 2013 WL 3321612, at *1–3 (N.D. Ill. July 1, 2013) (dismissing claim where defendant made revenue from licensing photos of plaintiff).

***Plaintiffs Fail to Plausibly Allege the Appropriation of Their Identity***. The Complaint contains no plausible allegation that Google ever used Plaintiffs' identities in the first place.

Although Plaintiffs allege in conclusory fashion that Google used their voices to train its models, they point to no instance where Google identifies Plaintiffs, much less in connection with its products. *See Dancel*, 949 F.3d at 1008–09 (IRPA claim requires that challenged use identify a particular plaintiff); *Dobrowolski v. Intelius, Inc.*, 2017 WL 3720170, at *7 (N.D. Ill. Aug. 29, 2017) (no IRPA claim where the "complaints do not suggest that the ads identify the plaintiffs in any manner except for name").

**Plaintiffs Do Not Allege a Use That Would Identify Plaintiffs to an "Ordinary, Reasonable Listener."** To assert an IRPA claim, Plaintiffs must allege that the use would identify each Plaintiff to an "ordinary, reasonable viewer or listener." *Dancel*, 949 F.3d at 1006 (quoting 765 ILCS 1075/5, 30). For example, even the use of an individual's actual name is not "sufficient to identify an individual" if the complaint fails to "alleg[e] that [the plaintiff] has the kind of celebrity or public status to be identified by name alone." *Dobrowolski*, 2017 WL 3720170, at *6–7 (no IRPA claim where nothing in the complaint "suggest[s] that the ads identify [plaintiffs] over any other person bearing [the same] name[s]"). Thus, there is no voice-based publicity claim unless the plaintiff's voice is so distinctive and widely known that its deliberate imitation would identify that individual to the public. *See Marchman v. Kovel-Fuller, LLC*, 2007 WL 9811116, at *2–3 (N.D. Ill. July 9, 2007) (acknowledging this standard for right-of-publicity claims arising out of misappropriation of voice); *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988) (same). Plaintiffs do not meet this demanding standard, falling twice over. First, Plaintiffs fail to allege that any Plaintiff's voice is known to the relevant public. Second, Plaintiffs fail to identify a particular output they contend reproduced any Plaintiff's voice. Plaintiffs' assertion of this claim on a class basis proves the point: if a generic female voice in NotebookLM Audio Overviews podcasts stands in for the voice of every class member, then no particular plaintiff's identity is

17

discernible from the accused sounds. The output cannot sound like every class member at once.

***The Audiovisual-Work Exemption Categorically Bars Plaintiffs' Section 30(a) Claim.***
Finally, Plaintiffs' theory also runs headlong into IRPA's audiovisual-work exemption, which generally precludes claims based on the use of an identity to "portray, describe, or impersonate th[e] individual in . . . [a] musical work, film, radio, television, or other audio, visual, or audio-visual work." *Love v. Simmons*, 2024 WL 809107, at *7–9 (N.D. Ill. Feb. 27, 2024) (quoting 765 ILCS 1075/35(b)(1)). Because that exemption is construed broadly "to prevent First Amendment problems," *id.* at *9, the audio outputs of Google's models—podcast-format audio, dubbed video, and spoken conversation, Compl. ¶¶ 25, 70(f), 117—fall within it.

2. Plaintiffs' Section 30(b) Claim Fails.

Section 30(b) is narrow; it reaches only the knowing distribution to the general public of a sound recording containing an "unauthorized digital replica"—an AI-generated recording that a "reasonable person would believe is that particular individual's voice." 765 ILCS 1075/5, 30(b). Plaintiffs fail each element of this statutory claim: They fail to plead (1) the existence of any recording containing their AI-generated voices, (2) that Google knew that any such recording contained Plaintiffs' AI-generated voices, and (3) that Google knowingly distributed any such recordings to the public. Instead, they merely offer a conclusory allegation, "on information and belief," that Google's products "generate, distribute, and make available to the public" such replicas. Compl. ¶ 197. Plaintiffs' information-and-belief pleading is particularly inappropriate given the statute's requirement for public distribution—*i.e.*, by definition, if any unauthorized digital replicas existed, Plaintiffs would have access to them. *See Heard*, 440 F. Supp. 3d at 969. That failure also confirms why Plaintiffs' Section 30(b) theory, like their Section 30(a) theory, cannot be reconciled with class treatment. No single distributed output, such as the podcast voices generated by NotebookLM Audio Overviews, could be an unauthorized digital replica of every

18

class member's voice at once.

### B.     Plaintiffs Fail to State an ICFA or UDTPA Claim (Counts VII and VIII)

*First*, Plaintiffs fail to plead deception with the requisite particularity. ICFA and UDTPA deception claims sound in fraud and must satisfy Rule 9(b), which requires Plaintiffs to specify precisely which representations are misleading, the method by which any such misrepresentations were communicated, and the reason they are misleading. *See CardioNet, Inc. v. LifeWatch Corp.*, 2008 WL 567031, at *3 (N.D. Ill. Feb. 27, 2008). The only alleged deception Plaintiffs identify is Google's Privacy Policy statement that it collects biometric information when users "choose to provide it," which they say is "materially misleading" as to non-users. Compl. ¶ 207. That single, general representation does not satisfy Rule 9(b) because it does not identify who was deceived, how, or when.

Nor could Plaintiffs have been deceived, as they do not allege that they use the service— or any Google service. The statement they identify addresses Google's users and describes what Google collects when a user "choose[s] to provide" biometric information in connection with their use of Google's services, Compl. ¶ 207, which does not apply to Plaintiffs. *See Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 465 (Ill. 2024) (Illinois caselaw is "irreconcilable" with any argument that ICFA claims may be brought by parties who are not "the intended target of the alleged deception."); *see id.* at 460 (UDTPA provides no private right of action for damages).

*Second*, Plaintiffs do not allege that the alleged deception harmed them. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (plaintiffs must show deception harmed them). A consumer-fraud theory requires injury flowing directly from the alleged deception, not from competition generally by an AI product. *See AAVN, Inc. v. WestPoint Home, Inc.*, 2019 WL 1168102, at *3 (N.D. Ill. Mar. 13, 2019) (no claim where a plaintiff contended only that defendant's conduct "is likely to influence the purchasing decisions of [defendant's] customers").

19

Plaintiffs allege that their lost licensing income and displaced voice work "flow directly" from the unauthorized *collection* of their biometric data, Compl. ¶ 208, which is the alleged BIPA violation, rather than any misrepresentation.

*Third*, the claims independently fail because Plaintiffs do not assert any plausible, nonconclusory factual allegations of likely confusion as to source, sponsorship, approval, or affiliation tied to a specific output. *See Bovinett v. HomeAdvisor, Inc.*, 2018 WL 1234963, at *6 (N.D. Ill. Mar. 9, 2018) (dismissing ICFA and UDTPA claims for failure to plausibly allege a likelihood of consumer confusion). Plaintiffs' "information and belief" allegation that outputs "replicate or closely simulate" their voices without identifying any specific output or any instance of actual confusion is fatal to this claim. *See* Compl. ¶ 214. Plaintiffs' invocation of "information and belief" is plainly inappropriate here, where the outputs of Google's AI products are public.

Finally, Plaintiffs ground their ICFA unfairness and deception allegations in the same purportedly unconsented biometric collection. Compl. ¶¶ 205, 207–208. Because those claims rise and fall with the biometric-collection allegations, the deficiencies in the BIPA claims require dismissal here as well.

### C. Plaintiffs' Unjust Enrichment Claim Fails Because It Is Not an Independent Cause of Action Under Illinois Law (Count IX)

Plaintiffs' unjust-enrichment claim fails because, under Illinois law, "unjust enrichment is not a separate cause of action." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011); *see Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021) (an unjust-enrichment claim premised on other claims cannot survive the dismissal of those claims); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 741–42 (7th Cir. 2017) (affirming dismissal of an unjust-enrichment claim where the claims on which it was based failed).

### III. THE COPYRIGHT ACT PREEMPTS PLAINTIFFS' CLAIMS (ALL COUNTS)

The Copyright Act expressly preempts a state-law claim where the work underlying it is an original work of authorship and the state-law rights asserted are "equivalent to the exclusive rights under the Copyright Act." *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 500–01 (7th Cir. 2011) (citing 17 U.S.C. § 301(a)). To avoid express preemption, "a state law must regulate conduct that is qualitatively distinguishable from that governed by federal copyright law—*i.e.*, conduct other than reproduction, adaptation, publication, performance, and display." *Id.* at 501 (quoting *Toney v. L'Oréal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005)). A state-law right is not saved merely because it requires additional elements if those "additional elements do not differ in kind from those necessary for copyright infringement." *Carter v. Pallante*, 256 F. Supp. 3d 791, 803 (N.D. Ill. 2017). Thus, in *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 676–79 (7th Cir. 1986), the Seventh Circuit held that professional baseball players' right-of-publicity claims in their game-time performances were preempted, because those performances were embodied in copyrighted telecasts owned by the clubs—not the players—and the right the players asserted, to control the reproduction and broadcast of those works, was equivalent to the exclusive rights under the Copyright Act.

The Copyright Act also preempts state-law claims through conflict preemption wherever their enforcement "undermines federal copyright law"—whether or not the asserted rights are formally equivalent to those in Section 106—including where recognizing the claim would obstruct a copyright owner's or licensee's exploitation of its exclusive rights. *X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 850–53 (N.D. Cal. 2024); *In re Jackson*, 972 F.3d 25, 34–35 (2d Cir. 2020). Plaintiffs' claims are preempted on both express and conflict grounds.

Here, as in *Baltimore Orioles*, Plaintiffs do not own the copyrights in the recordings at issue. Plaintiffs' recordings were created through their employers and other third parties, who then

21

uploaded them to YouTube. Compl. ¶¶ 16–18, 56, 91, 106, 116. In doing so, those third-party owners granted Google a "worldwide, non-exclusive, royalty-free, sublicensable and transferable license" to "reproduce, distribute, [and] prepare derivative works" from the content. License to YouTube; *see* Compl. ¶¶ 70(f), 91.[10] Plaintiffs' claims seek to override that license. But that would empower individuals who own no copyright to veto, after the fact, the copyright owners' decision to authorize Google's reproduction and adaptation of the works. That is a conflict that copyright preemption forbids.

*X Corp.* is instructive. There, the court found preempted state-law claims that would have allowed one party to override the broad license the copyright owners had granted and thereby "exclude others from reproducing, adapting, distributing, and displaying" the licensed content. 733 F. Supp. 3d at 851–52. Plaintiffs' claims would likewise "impair the ability of a copyright holder or licensee to exploit the rights guaranteed under the Copyright Act." *In re Jackson*, 972 F.3d at 35; *see Balt. Orioles*, 805 F.2d at 676–79 (publicity claims preempted where they arose from the exploitation of copyrighted broadcasts featuring the plaintiffs).

*BIPA Claims* (**Counts I–V**). Plaintiffs' BIPA claims seek to undo Google's licensed use of the recordings to train its models—conduct at the core of the Copyright Act's reproduction and derivative-work rights. Allowing those claims to proceed notwithstanding the copyright owners' license would let non-owners interfere with Google's licensed reproduction of the works. This is the same interference that rendered the claims in *X Corp.*, 733 F. Supp. 3d at 851–52, and *Balt.*

---

[10] Plaintiffs allege that in a supposed September 2024 amendment to the TOS, those employers, publishers, and production companies granted Google the right to use uploaded content for "machine learning and AI applications." *Id.* ¶¶ 55–56, 130. YouTube's TOS does not contain the language the Complaint attributes to it. *Compare* YouTube TOS (granting a license to "use that Content," including to "reproduce, distribute, [and] prepare derivative works") *with* Compl. ¶¶ 55–56. In any event, the broad grant Plaintiffs' employers, publishers, and production companies provided Google to "use that Content" uploaded to YouTube likewise confirms that the claims are preempted.

*Orioles*, 805 F.2d at 676–79, preempted. Plaintiffs' own allegations, *i.e.*, "a YouTube uploader cannot license to Google rights the uploader does not possess," confirm the conflict; the claims are based on the theory that Plaintiffs may now retract the license their employers granted Google. Compl. ¶ 56. That is precisely the veto over a copyright owner's licensing decision that preemption forecloses.

*IRPA Claim* **(Count VI).** Federal copyright law preempts a claim for misappropriation of a voice "when the entirety of the allegedly misappropriated vocal performance is contained within a copyrighted medium." *Laws v. Sony Music Entm't*, 448 F.3d 1134, 1141 (9th Cir. 2006). The publicity claim alleges the impermissible use of Plaintiffs' voices as embodied in copyrighted recordings and identifies no conduct qualitatively different from copying. Compl. ¶ 195. Plaintiffs allege nothing that "extend[s] beyond the use of the copyrighted material"—*e.g.*, any allegation that Google used their names, ran any advertisement, or sold any separate product. It is thus preempted. *See Laws*, 448 F.3d at 1142–43; *Balt. Orioles*, 805 F.2d at 676–79.

*ICFA Claim* **(Count VII).** Plaintiffs' ICFA claim turns on the same alleged conduct as their BIPA claims and is therefore preempted for the same reason. Compl. ¶¶ 205–07.

*UDTPA Claim* **(Count VIII).** Claims arising from a defendant's passing off of the plaintiff's copyrighted works as its own—known as "reverse passing off"—are preempted by the Copyright Act. *Carter*, 256 F. Supp. 3d at 805. Plaintiffs' UDTPA claim arises from the alleged failure to disclose that outputs are AI-generated or that they resemble Plaintiffs' voices. *See* Compl. ¶¶ 214–215. Like any other reverse passing off claim, therefore, it is preempted. *See id.* (passing off theory for music was preempted); *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 999 (N.D. Ill. 2011) (dismissing claim where defendant "actively promoted and misrepresented [plaintiff's] products" as its own); *Cyber Websmith v. Am. Dental Ass'n*, 2010 WL

3075726, at *3 (N.D. Ill. Aug. 4, 2010) (same).

*Unjust Enrichment* **(Count IX).** The unjust-enrichment claim rests on the benefit Google allegedly obtained by avoiding the cost of licensing the recordings used to train its models, *see* Compl. ¶¶ 220, 222, and is preempted.

## IV. THE FIRST AMENDMENT BARS PLAINTIFFS' LAWSUIT (ALL COUNTS)

### A. Google's Voice-Generation Models, the Speech They Produce, and the Expression They Enable Are Constitutionally Protected Speech

The First Amendment protects the freedom of speech, which includes the right to "creat[e] and disseminat[e] information." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). Necessarily, the First Amendment also protects the underlying speech-creation process, *see Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (protecting the right to record audio), and the tools used to create and share expression, *see Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (right to access social media); *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 701 (N.D. Ill. 2025) (Perry, J.) ("The First Amendment protects the dissemination of tools used for the preservation of information and ideas."). These principles compel a conclusion that Google's voice-generation models are tools for creating new protected expression and the outputs they generate are protected speech.

*First*, Google's voice-generation models are protected as "tool[s] … to engage in expressive creation, as is paint to a painter or paper to an author." *Angelilli*, 781 F. Supp. 3d at 702 n.6. That is exactly how this Court and others have treated the analogous code, algorithms, and other expressive tools. *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001) ("Mathematical formulae and musical scores are written in 'code,' *i.e.*, symbolic notations not comprehensible to the uninitiated, and yet both are covered by the First Amendment."); *Alvarez*, 679 F.3d at 596 (the First Amendment protects intermediate steps in the speech process,

24

not just the end results). Accordingly, the First Amendment protects Google's voice-generation models as expressive tools.

*Second*, the voice-generation models are themselves protected because they embody and carry out Google's editorial choices in designing these foundational models. First Amendment protection extends to algorithms that carry out the editorial choices of those who build them. In *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024), for example, the Supreme Court held that choosing which third-party speech to include in or exclude from a compilation—and then organizing and presenting it—is itself expressive activity that yields a distinctive expressive product. An algorithm does not lose that protection because it implements the developer's editorial standards automatically and at scale. *Id.* at 735. Accordingly, a platform that curates a feed of voices creates a distinctive expressive offering of its own. *Id.* at 738.

Plaintiffs' allegations establish that, in building its models, Google made many of the same curatorial, editorial decisions that *Moody* held to be protected expression. Indeed, Plaintiffs allege that Google used "precise speaker annotations" to decide which acoustic qualities—"pitch, timbre, resonance, accent, cadence, articulation, and the dynamics of emotional expression" (Compl. ¶ 41)—the model should learn. *Id.* ¶ 49 (quoting Google DeepMind). For example, Google trained the model underlying NotebookLM to recognize "realistic disfluencies—the 'umm's and 'aah's of real conversation"—to create a feature that "turns uploaded documents into engaging and lively dialogue." Trebicka Decl. Ex. C (Pushing the frontiers of audio generation); Compl. ¶ 49 n.6 (incorporating Ex. C). That curation ensures the audio conveys information and emotion more effectively than if, for instance, the AI voices screamed at each other, spoke like robots, or incorrectly placed emphases in words and sentences.

The First Amendment protects the editorial choices inherent to creating these "emotive"

25

elements of expression, "which practically speaking, may often be the more important element of the overall message sought to be communicated." *Cohen v. California*, 403 U.S. 15, 26 (1971). The models likewise carry out "expressive choices" about what to generate and what to suppress— *i.e.*, what content the model "will display, or how the display will be ordered and organized." *Moody*, 603 U.S. at 740. Just as different social media platforms may order the same content differently due to underlying editorial decisions, *see id.*, so too may underlying editorial choices cause different AI models to produce varying outputs in response to the same prompt.

*Third*, the *public's* use of voice-generation models as tools for creating and receiving speech is also constitutionally protected.[11] The First Amendment protects the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Google's voice-generation models enable users to watch videos in new languages, to have written text read aloud to a listener who is visually impaired, to engage in a conversation, and to summarize complex documents. *See* Compl. ¶¶ 10, 25, 118. Each of these activities is constitutionally protected.[12]

*Finally*, to the extent Plaintiffs' claims arise from the contested use of their voices, Courts

---

[11]  Google may assert not only its own rights but those of its users and the public. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988) (a party may assert the free-expression rights of others); *Smith v. California*, 361 U.S. 147, 154 (1959). This principle extends to providers of expressive tools. *See, e.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 496 (1981) (billboards); *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 842 (9th Cir. 2017) (in-store digital advertising displays); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) (tattooing).

[12] There is no question that the activity challenged here would be constitutionally protected if performed by an individual. For example, musical genres themselves are born of the idea that individuals, after listening to enough music, can create new songs with thematically similar elements. *See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) (music protected by First Amendment). To the extent Plaintiffs seek to bar people from creating a piece of technology that can perform the same constitutionally protected activities as people, that distinction has no legal basis. *See, e.g.*, *Moody*, 603 U.S. at 726 (ranking algorithm protected by First Amendment because it carries out creators' editorial and content-moderation choices); *Angelilli*, 781 F. Supp. 3d at 702 ("Given that the algorithms of which Plaintiffs complain were developed by humans and generated words and images its human creators intended, the First Amendment applies."). Speech generated by the challenged models is protected, just as it would be if spoken by the models' creators, and the rights protected by the First Amendment "cannot be renamed away or their protections nullified by mere labels." *Chiles v. Salazar*, 146 S. Ct. 1023 (2026).

have repeatedly held that the use of a person's identity, including their speech, is protected by the First Amendment if the use is transformative. *See, e.g.*, *Comedy III Productions v. Gary Saderup, Inc.*, 21 P. 3d 797, 808 (Cal. 2001) ("This inquiry into whether a work is 'transformative' appears to us to be necessarily at the heart of any judicial attempt to square the right of publicity with the First Amendment."); *Hamilton v. Speight*, 827 F. App'x 238, 240 (3d Cir. 2020) (holding character with similar image and voice was transformative and therefore First Amendment barred claims for unauthorized use of name or likeness, unjust enrichment, misappropriation of publicity, and invasion of privacy by misappropriation of identity). Plaintiffs allege here that the models learn "the dynamics of emotional expression" that are "then used to generate *new* speech that exhibits the acoustic features of the training voices," *i.e.*, a transformative use of the original recording. Compl. ¶ 41 (emphasis added). Therefore, Google's release of the models is independently protected under the transformative use principle.

### B. The First Amendment Bars Plaintiffs' Claims

Plaintiffs effectively seek to impose liability on the constitutionally protected activity discussed above, but "the First Amendment serves as a defense against claims that seek to attach liability to defendants for engaging in constitutionally protected speech." *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 700 (N.D. Ill. 2025) (Perry, J.) (citing *Snyder v. Phelps*, 562 U.S. 443, 458–59 (2011)). Here, each count implicates protected expressive activity, including: (1) selecting and assembling the training material (Compl. ¶ 49); (2) developing and training the model (*id.* ¶ 41); (3) offering the model to the public (*id.* ¶¶ 38–39); and (4) generating outputs in response to user's requests (*id.* ¶¶ 25, 41, 197). The burden these claims would impose on the protected activity is clear and substantial: Plaintiffs seek to both impose liability for the protected activity and to "[d]estroy or retrain" the foundational models, Compl. Prayer ¶ A(6), and to make Google "cease the distribution or making available of" the outputs, *id.* Prayer ¶ A(7).

27

Because a judgment on any count would chill the development of these models, shut down a substantial amount of protected expression, and ultimately foreclose an entire expressive medium, Plaintiffs' claims cannot proceed. *See Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 650 (7th Cir. 1983) (dismissing a tortious-interference claim as barred by the First Amendment right to petition); *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1281 (D. Colo. 2002) (dismissing tort claims against video-game and media defendants because imposing liability for protected expression would violate the First Amendment); *DeFilippo v. Nat'l Broad. Co.*, 446 A.2d 1036, 1041–42 (R.I. 1982) (dismissing a wrongful-death claim against a broadcaster because imposing liability for protected expression would violate the First Amendment). Indeed, claims that seek to punish or prohibit protected speech are generally dismissed at the threshold—*i.e.*, without applying strict or intermediate scrutiny. *See, e.g.*, *Angelilli*, 781 F. Supp. 3d at 703 (no strict scrutiny applied to dismiss claims); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 932–33 (1982) (same); *James v. Meow Media, Inc*., 300 F.3d 683, 696 (6th Cir. 2002) (courts apply strict scrutiny not to claims in isolation, but to assess the constitutionality of statutes, which are the "product[s] of the reasoned deliberation of democratically elected legislative bodies").

At a minimum, the Court should interpret the underlying statutes on which Plaintiffs' claims rely in a way that avoids constitutional doubt. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems"); *Williams*, 518 N.E.2d at 137 (courts must construe Illinois law in a way that avoids raising a "substantial question as to its constitutionality").[13]

---

[13] For example, BIPA should reach only the actual collection of an identifiable voiceprint from a customer (which Plaintiffs have not pleaded), not the lawful act of building an expressive model from sources open to public inspection.

28

## C.    IRPA Section 30(b) Is Unconstitutional as Applied

Plaintiffs' Section 30(b) claim independently fails because the provision is unconstitutional as applied.[14] *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (as-applied challenges render a statute inapplicable to the conduct at issue).

Section 30(b) is content-based: it permits unauthorized digital replicas in limited categories including "news," "political campaigns," and "sports broadcasts," but not elsewhere. 765 ILCS 1075/35(c)(1). A content-based restriction must satisfy strict scrutiny, surviving only if it is "narrowly tailored to serve compelling state interests." *See Reed v. Gilbert*, 576 U.S. 155, 163 (2015) (invalidating a sign ordinance treating political speech differently).

Section 30(b)'s application here fails strict scrutiny. *See, e.g.*, *Sarver v. Chartier*, 813 F.3d 891, 903, 905 (9th Cir. 2016) (applying strict scrutiny to dismiss right of publicity claim). Illinois' interest in preventing voice misappropriation is not served here: Plaintiffs identify no output that reproduces any Plaintiff's voice, and the State has no compelling interest in suppressing models used by millions on the chance one might someday generate a sound-alike.

Plaintiffs' failure to identify any replica makes the chilling effect acute. If such a claim can proceed without any output that sounds like the plaintiff, anyone whose voice might appear in a training corpus could force costly litigation based purely on speculation about a future resemblance. And because outputs merely respond to user prompts—not a knowing act by Google—the only sure way to avoid liability is to stop offering the models, chilling development and suppressing the lawful speech they enable.

---

[14] Plaintiffs' Section 30(b) claim is the only one that arises from a statute whose plain language explicitly regulates protected, noncommercial speech. That makes the provision different than Section 30(a), which reaches only "commercial purposes" and is governed by *Central Hudson Gas & Elec. Corp. v. PSC*, 447 U.S. 557, 562–566 (1980). By contrast, Section 30(b) contains no commercial-purpose limit and reaches fully protected noncommercial expression—an audiobook, a dubbed film, a spoken-word recording. *See* 765 ILCS 1075/30(b).

29

That is the very compliance dilemma the Supreme Court condemned in *Reno v. ACLU*, 521 U.S. 844, 874 (1997); a content-based law that "effectively suppresses a large amount of speech that adults have a constitutional right to receive" cannot survive. Forcing Google to withdraw its models to avoid liability would "burn the house to roast the pig." *Id.* at 882 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 127 (1989)). Because "foreclos[ing] an entire medium of expression" is the antithesis of narrow tailoring, Plaintiffs' claim must fail. *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994).

Independently, Section 30(b) is unconstitutional as applied because it is overbroad. A law is overbroad where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010). Enforced through the model-wide relief Plaintiffs seek, Section 30(b) would extinguish an enormous body of expression that "records no crime and creates no victims by its production." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250 (2002). The State "may not suppress lawful speech as the means to suppress unlawful speech," *id.* at 255, yet Plaintiffs weaponize Section 30(b) to do exactly that.

Where a less restrictive alternative would serve the State's interest, the State "must use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Here, an obvious one exists: hold liable the person who knowingly distributes an unauthorized digital replica to the public, not the developer of a general-purpose tool of expression. Section 30(b)'s text already points the same way: it reaches only one who "knowingly" distributes such a work "to the general public" with "actual knowledge" of its contents, and Section 30(e) provides a safe harbor for those who merely "provide[] access to . . . software." 765 ILCS 1075/30(b), (e).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

30

Dated: July 27, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Viola Trebicka*
Andrew H. Schapiro (Ill. Bar No. 6209041)
andrewschapiro@quinnemanuel.com
Tyler C. Murray (Ill. Bar No. 6274108)
tylermurray@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400 (phone)
(312) 705-4001 (fax)

Viola Trebicka (admitted *pro hac vice*)
violatrebicka@quinnemanuel.com
Moon Hee Lee (admitted *pro hac vice*)
moonheelee@quinnemanuel.com
Eli Pales (admitted *pro hac vice*)
elipales@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000 (phone)
(213) 443-3100 (fax)

*Attorneys for Defendants*
*Alphabet, Inc. and Google LLC*

31