**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. 1:26-cv-05436 |
| | ) | Hon. April M. Perry |
| Plaintiffs, | ) | |
| v. | ) | |
| ALPHABET, INC., a Delaware corporation, and GOOGLE LLC, a Delaware limited liability company, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO GOOGLE'S**
**<u>MOTION TO DISMISS THE COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**


I. Introduction ....................1

II. Rule 12 Tests the Complaint, Not Google's Contrary Factual Account ....................2

III. Plaintiffs Plead an Illinois Violation, Not an Extraterritorial Application of BIPA ....................4

A. Avery Requires the Entire Course of Conduct, Not a Server Location Rule ....................4

B. There Is No Constitutional Question to Avoid ....................7

IV. The Complaint States All Five BIPA Claims ....................8

A. Google Operated the Pipeline and Extracted the Voiceprints ....................8

B. Plaintiffs Plead Voiceprints Capable of Identifying Speakers ....................9

C. Count II Also Pleads the Missing Retention Policy ....................11

D. Count III Pleads Paid Access to Models Encoding Biometric Data ....................11

E. Count IV Pleads the Recipients, Manner, and Purpose ....................12

F. Count V Pleads Both Duties Under Section 15(e) ....................13

V. The Copyright Act Does Not Preempt Any Claims ....................14

A. Identity Is Not a Work of Authorship, and BIPA Regulates Different Acts ....................14

B. YouTube's Terms Supply Neither Speaker Consent Nor a Training License ....................16

C. Counts VII Through IX Rest on Noncopyright Interests ....................18

VI. Google Commercialized Plaintiffs' Identities Without Consent ....................18

A. Google Built and Markets Its Voice Products on Plaintiffs' Identities ....................19

B. Paragraph 197 Pleads Both Google's Distribution and Knowing Facilitation ....................20

VII. The First Amendment Does Not Immunize Google's Conduct ....................22

A. Sosa and Clearview Hold That Biometric Collection Is Conduct, Not Speech ....................22

B. Google's Cases Protect Expression, Not the Acquisition That Precedes It ..........23

C. Google's As-Applied Challenge to Section 30(b) Is Premature ............................25

VIII. Counts VII Through IX State Claims ..................................................................28

A. Count VII Pleads Unfairness Independently of Deception ..................................28

B. Count VIII Pleads an Ongoing Likelihood of Confusion and Future Harm ..........29

C. Count IX Is Properly Pleaded in the Alternative ..................................................30

IX. Any Dismissal Should Be Without Prejudice ..................................................................30

CONCLUSION ..................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Angelilli v. Activision Blizzard, Inc.*,
781 F. Supp. 3d 691 (N.D. Ill. 2025) ....................24, 30

*Art Akiane LLC v. Art & SoulWorks LLC*,
No. 19 C 2952, 2026 WL 893344 (N.D. Ill. Mar. 31, 2026) ....................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................2

*ATC Healthcare Services, Inc. v. RCM Technologies, Inc.*,
192 F. Supp. 3d 943 (N.D. Ill. 2016) ....................29

*Avery v. State Farm Mutual Automobile Insurance Co.*,
216 Ill. 2d 100, 835 N.E.2d 801 (2005) ....................2, 4–5, 7–8

*Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*,
805 F.2d 663 (7th Cir. 1986) ....................15

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) ....................29

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................2

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) ....................3

*Campana v. Nuance Communications, Inc.*,
2024 WL 2809838 (N.D. Ill. Mar. 8, 2024) ....................6

*Carpenter v. McDonald's Corp.*,
580 F. Supp. 3d 512 (N.D. Ill. 2022) ....................9

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ....................25

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ....................26

*Dahlstrom v. Sun-Times Media, LLC*,
777 F.3d 937 (7th Cir. 2015) ....................22–23

*D'Ambrosio v. Meta Platforms, Inc.*,
176 F.4th 928 (7th Cir. 2026) ....................19

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) ....................20

*Delgado v. Meta Platforms, Inc.*,
No. 23-cv-04181-SI, Dkt. 174 (N.D. Cal. June 25, 2026) ....................10–11

*Fox v. Dakkota Integrated Systems, LLC*,
980 F.3d 1146 (7th Cir. 2020) ....................11

*G.T. v. Samsung Electronics America, Inc.*,
No. 25-1120, 2026 WL 2279903 (7th Cir. Aug. 7, 2026) ....................8, 11

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ....................25

*Hamilton v. Speight*,
827 F. App'x 238 (3d Cir. 2020) ....................27

*Hayes v. CGB Enterprises, Inc.*,
No. 23-cv-3296, 2024 WL 3091083 (C.D. Ill. June 20, 2024) ....................14

*Heard v. Becton, Dickinson & Co.*,
440 F. Supp. 3d 960 (N.D. Ill. 2020) ....................12–13

*Heard v. Becton, Dickinson & Co.*,
524 F. Supp. 3d 831 (N.D. Ill. 2021) ....................13

*Hooks v. CloudSpotter Technologies*,
No. 25 CV 9754, 2026 WL 1045734 (N.D. Ill. Apr. 17, 2026) ....................4, 9

*Horn v. Method Products, PBC*,
No. 21 C 5621, 2022 WL 1090887 (N.D. Ill. Apr. 12, 2022) ....................12–13

*In re Allstate & Arity Consumer Privacy Litigation*,
2026 WL 594708 (N.D. Ill. Mar. 3, 2026) ....................3

*In re Clearview AI, Inc., Consumer Privacy Litigation*,
585 F. Supp. 3d 1111 (N.D. Ill. 2022) ....................2, 6, 8, 15, 22–23

*In re Jackson*,
972 F.3d 25 (2d Cir. 2020) ....................15–16

*Javid v. M.A.C. Cosmetics Inc.*,
No. 25 CV 11693, 2026 WL 1601454 (N.D. Ill. June 4, 2026) ....................10–11

*Jiles v. AU10TIX LTD.*,
No. 24 C 8122, 2026 WL 169358 (N.D. Ill. June 10, 2026) ....................6

*Kahn v. Walmart Inc.*,
107 F.4th 585 (7th Cir. 2024) ....................28, 30

*Laws v. Sony Music Entertainment, Inc.*,
448 F.3d 1134 (9th Cir. 2006) ....................15–16

*Love v. Simmons*,
2024 WL 809107 (N.D. Ill. Feb. 27, 2024) ....................20

*Mahmood v. Berbix, Inc.*,
No. 22 C 2456, 2022 WL 3684636 (N.D. Ill. Aug. 25, 2022)....................12

*Martell v. X Corp.*,
2024 WL 3011353 (N.D. Ill. June 13, 2024)....................9

*McGoveran v. Amazon Web Services, Inc.*,
175 F.4th 434 (3d Cir. 2026) ....................6

*Midler v. Ford Motor Co.*,
849 F.2d 460 (9th Cir. 1988) ....................15

*Monroy v. Shutterfly, Inc.*,
No. 16 C 10984, 2017 WL 4099846 (N.D. Ill. Sept. 15, 2017)....................6

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................24, 26

*Moomaw v. GeoSnapShot Pty Ltd.*,
No. 3:23-cv-1321-DWD, Dkt. 78 (S.D. Ill. Mar. 20, 2025) ....................12

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023)....................7

*Neals v. PAR Technology Corp.*,
419 F. Supp. 3d 1088 (N.D. Ill. 2019) ....................6

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)....................2, 7

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ....................2–3

*Richardson v. Kharbouch*,
156 F.4th 849 (7th Cir. 2025) ....................16

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) ....................5, 9

*Robinson v. Toyota Motor Credit Corp.*,
201 Ill. 2d 403, 775 N.E.2d 951 (2002)....................28

*Rodriguez v. ByteDance, Inc.*,
No. 23 CV 4953, 2025 WL 672951 (N.D. Ill. Mar. 3, 2025), 2025 WL 2495865 (N.D. Ill. Aug. 29, 2025) ....................11, 13

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*,
786 F.3d 510 (7th Cir. 2015) ....................30

*Seng-Tiong Ho v. Taflove*,
648 F.3d 489 (7th Cir. 2011) ....................15

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ........................................ 23, 25

*Sosa v. Onfido, Inc.*,
600 F. Supp. 3d 859 (N.D. Ill. 2022) ........................................ 22–23

*Svoboda v. Amazon, Inc.*,
168 F.4th 956 (7th Cir. 2026) ........................................ 5–6

*Thornley v. Clearview AI, Inc.*,
984 F.3d 1241 (7th Cir. 2021) ........................................ 11

*Toney v. L'Oréal USA, Inc.*,
406 F.3d 905 (7th Cir. 2005) ........................................ 14–15, 19

*Tri-Plex Technical Services, Ltd. v. Jon-Don, LLC*,
241 N.E.3d 454 (Ill. 2024) ........................................ 28–29

*United States v. Hansen*,
599 U.S. 762 (2023) ........................................ 26

*United States v. O'Brien*,
391 U.S. 367 (1968) ........................................ 23

*Vance v. Google LLC*,
No. 20-cv-4696-BLF, 2024 WL 1141007 (N.D. Cal. Mar. 15, 2024), 2024 WL 5011611 (N.D. Cal. Dec. 5, 2024) ........................................ 5–7

*Vance v. Microsoft Corp.*,
534 F. Supp. 3d 1301 (W.D. Wash. 2021) ........................................ 11

*Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*,
536 F.3d 663 (7th Cir. 2008) ........................................ 28

*X Corp. v. Bright Data Ltd.*,
733 F. Supp. 3d 832 (N.D. Cal. 2024) ........................................ 15–16

*Zacchini v. Scripps-Howard Broadcasting Co.*,
433 U.S. 562 (1977) ........................................ 26

*Zellmer v. Meta Platforms, Inc.*,
104 F.4th 1117 (9th Cir. 2024) ........................................ 11

**STATUTES**

740 ILCS 14/10 ........................................ 14

740 ILCS 14/15(a) ........................................ 5, 9, 11, 15

740 ILCS 14/15(b) ........................................ 5, 9, 15, 22, 24

740 ILCS 14/15(c) ........................................ 5, 11, 15

740 ILCS 14/15(d) ..........5, 13, 15

740 ILCS 14/15(e), (e)(1)–(2)..........5, 13, 15

765 ILCS 1075/5..........19–20, 26

765 ILCS 1075/30(a) ..........19–20, 23

765 ILCS 1075/30(b) ..........20–22, 25–26

765 ILCS 1075/30(d)–(f) ..........20, 22, 26

765 ILCS 1075/35(b)(1) ..........20

765 ILCS 1075/35(c) ..........26–27

15 U.S.C. § 9411(a)(2)..........7

17 U.S.C. § 106..........14, 18

17 U.S.C. § 114(b) ..........16

17 U.S.C. § 301..........14

**RULES**

Fed. R. Civ. P. 8..........3, 8, 12–13, 21, 28–30

Fed. R. Civ. P. 8(d)(2)–(3)..........30

Fed. R. Civ. P. 9(b) ..........21–22, 28

Fed. R. Civ. P. 12..........2, 4, 6, 8, 14, 17, 29

Fed. R. Civ. P. 12(b)(6)..........29

Fed. R. Civ. P. 12(d) ..........4

Fed. R. Civ. P. 23..........20

**OTHER AUTHORITIES**

S. Rep. No. 116-300 (2020)..........7

## I. Introduction

Google frames this case as a choice between useful voice technology and biometric privacy. Illinois law requires no such choice. Nor does Google, by its own practices, make that choice: for some voice products, Google obtains recorded consent, applies Responsible AI review, and watermarks synthetic audio. (Dkt. 1, ¶¶ 46–51, 123–25.) BIPA does not prohibit narration for visually impaired readers or multilingual dubbing; it governs how private entities acquire and handle voiceprints and the biometric information derived from them. This case is not about whether Google may innovate. It is about whether Google may take and commercialize Illinois speakers' voiceprints and the biometric information derived from them without the notice and written release BIPA requires. Useful ends do not make the alleged means lawful.

Google's motion replaces the Complaint Plaintiffs filed with a factual account supplied by its counsel. Plaintiffs are seven Illinois journalists, podcasters, broadcasters, and narrators. They allege that Google ingested recordings publicly attributed to them by name and source, extracted speaker-identifying representations through its tokenization and training pipeline, encoded those representations in commercial model parameters, and deployed them without notice, consent, or written release. (Id. ¶¶ 3, 41–45, 52–59, 153–61.) The brief answers with assertions: the weights contain no voiceprints; voiceprints are "neither necessary nor relevant" to the accused products; Google did not target Illinois speakers; training occurred outside Illinois; and source owners licensed "any use, including model training." (Dkt. 27-1 at 2, 5 n.3, 6, 9–10.) None of those propositions appears in the Complaint. The only declaration authenticates three documents and offers nothing about the corpus, weights, training, licenses, or anything else. (Dkt. 27-2 ¶¶ 1–5.) The motion's technology, geography, and contract terms come from counsel.

The documents counsel authenticated make Google's position worse. Google's AudioLM

paper reports that acoustic tokens recover speaker identity, that prompted continuations achieved 92.6% speaker-classification accuracy, and that preserving speaker identity can enable biometric spoofing and impersonation. (Ex. B, Dkt. 27-4 at 2, 5, 7, 9–10.) That contrast is the motion's central defect: the Complaint pleads a speaker-modeling mechanism; the brief denies it through counsel; and Google's own exhibit documents the very capability that makes the pleaded mechanism plausible. Rule 12 does not permit the Court to choose counsel's technical account over the well-pleaded one.

Google's legal defenses share the same defect. *Avery* requires the entire Illinois course of conduct, not the location of one computing step, and the dormant Commerce Clause argument rests on the same unresolved geography and on a *Pike* record that Google never supplies. A public recording is not the nonpublic biometric measurement extracted from it. *In re Clearview AI, Inc., Consumer Privacy Litig.*, 585 F. Supp. 3d 1111, 1120–23 (N.D. Ill. 2022). An uploader cannot license away another person's voiceprint, so no YouTube term supplies the speaker's release or consent. And whatever protection particular outputs may ultimately receive, the First Amendment does not immunize the biometric taking that preceded them. At every turn, Google asks the Court to resolve contested technical, contractual, and operational facts in its favor, before discovery, on counsel's word. Rule 12 permits none of that. The motion should be denied.

## II. Rule 12 Tests the Complaint, Not Google's Contrary Factual Account

Rule 12 tests plausibility, not proof. The Court accepts well-pleaded facts and draws reasonable inferences in Plaintiffs' favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When the decisive facts lie within the defendant's closed systems, information-and-belief pleading is proper so long as the complaint supplies plausible grounds for the belief. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits*

*Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). This Complaint does both. It describes Google's tokenization and training pipeline, pleads Plaintiff-specific grounds for inferring ingestion, and identifies the manifests, ingestion logs, source URLs, and provenance records, all within Google's systems, that will prove the rest. (Dkt. 1, ¶¶ 41–45, 49, 52–59, 79–114, 138, 146.) Google's motion demands the contents of those records now. Rule 8 does not.

Google's exhibits do not change the standard. Incorporation by reference permits the Court to read a document referenced in and central to the Complaint. It does not permit Google to resolve affirmative defenses on facts not before the Court, *Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 690–91 (7th Cir. 2012), or to convert counsel's reading of a document into an allegation of the Complaint. *See In re Allstate & Arity Consumer Privacy Litig.*, 2026 WL 594708, at *2–3 (N.D. Ill. Mar. 3, 2026) (declining to resolve consent through attached policies where the operative versions and the plaintiffs' acceptance remained disputed). The exhibits resolve nothing. Exhibit A is a July 2026 capture of terms effective December 15, 2023; it establishes what that version says and nothing more.[1] *See infra* § V.B. The Trebicka Declaration authenticates three documents and attests to nothing else. (Dkt. 27-2 ¶¶ 1–5.) No exhibit states what the production weights contain, where training occurred, or whose recordings were used. On every question that matters, Google's brief supplies counsel's assertions, and Rule 12 reads the Complaint, not the briefs.

[1] Complaint ¶¶ 55 and 130 characterize YouTube's Sept. 2024 announcement as an amendment to its Terms of Service. Plaintiffs do not rely on that characterization. YouTube stated that it had long used uploaded content across YouTube and Google for machine-learning and AI applications under existing creator terms, and that the third-party training controls launched in Dec. 2024 did not change those Terms. *See* Amjad Hanif, *New Tools to Protect Creators and Artists*, YouTube Official Blog (Sept. 5, 2024), https://blog.youtube/news-and-events/responsible-ai-tools/ (last visited Aug. 27, 2026); TeamYouTube, *Third Party AI Trainability on YouTube* (Dec. 16, 2024), https://support.google.com/youtube/thread/313644973/third-party-ai-trainability-on-youtube?hl=en (last visited Aug. 27, 2026). The correction cuts against Google: YouTube's own statements claim preexisting authority for Google's training while offering choice only as to third parties, and none at all to speakers whose voices appear in content they never uploaded. (Dkt. 1, ¶¶ 56–57.) Nothing here concedes Google's construction of Exhibit A or its application to the challenged uses.

*Hooks v. CloudSpotter Technologies* enforces this standard in both directions. It dismissed a complaint that never explained what the software captured or how it operated. And it refused to credit the defendant's competing technical account, because facts outside the pleadings enter only through Rule 12(d) conversion. No. 25 CV 9754, 2026 WL 1045734, *3-4 (N.D. Ill. Apr. 17, 2026). This Complaint sits on the opposite side of both lines: it explains the mechanism at every step, from receipt and tokenization through extraction, parameter encoding, retention, and deployment, and the technical account supporting it is one Google itself attached. (Dkt. 1 ¶¶ 41–45, 153.)

## III. Plaintiffs Plead an Illinois Violation, Not an Extraterritorial Application of BIPA

### A. *Avery* Requires the Entire Course of Conduct, Not a Server Location Rule

Google's territorial argument addresses a complaint Plaintiffs did not file under a test *Avery* does not impose. The complaint it describes alleges only Illinois residence and injury; the test it applies asks where a single computing step occurred. (Dkt. 27-1 at 7, 10.) The Complaint Plaintiffs filed pleads an Illinois directed conduct *from origin to sale*. Plaintiffs' voices were produced, recorded, and published in Illinois, with metadata publicly identifying the speakers, their professional provenance, and the recordings' Illinois origin. Google accessed and processed those specific, attributed recordings, not a passively received, anonymized dataset. Engineering and cloud-infrastructure personnel in this District support the products relevant to this case. And Google sells and delivers those products in recurring Illinois transactions. (Dkt. 1 ¶¶ 34–35, 60–66, 72, 77.) Google engages with none of this. It describes a complaint alleging only Illinois residence and injury, and asserts that Plaintiffs plead "no Illinois-based transaction at all" (Dkt. 27-1 at 7–8 & n.5), a statement contradicted by ¶¶ 34, 35, and 77.[2]

[2] The uploader agreement's California choice-of-law clause adds nothing. Plaintiffs never signed it (Dkt. 1 ¶ 56), and a clause choosing the law says nothing about where Google took or exploited Plaintiffs' biometric data.

Google also misstates the governing test. *Avery* asks whether "the circumstances relating to the disputed transaction" occurred primarily and substantially in Illinois, an inquiry the Illinois Supreme Court refused to reduce to any "single formula or bright-line test." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 187–88, 835 N.E.2d 801, 853–54 (2005). A totality test cannot be applied by isolating each circumstance and requiring that it establish situs on its own. *Svoboda v. Amazon, Inc.* confirms that BIPA reaches only Illinois violations but adopts no server-location rule; it involved customers using Amazon's biometric feature while physically in Illinois and did not decide how to locate a distributed acquisition from previously recorded media. 168 F.4th 956, 959–63 (7th Cir. 2026).

Google's single-location theory has a second defect: it collapses five distinct claims into a single supposed event, model training. Section 15(b) regulates acquisition; § 15(a), possession and the retention-policy duty that follows it; § 15(c), profit transactions; § 15(d), disclosure and dissemination; and § 15(e), storage, transmission, and protection. (Dkt. 1 ¶¶ 153–88.) The relevant considerations for territoriality differ by claim. The location of model training may bear on § 15(b). It cannot fix the situs of possession without a retention policy, recurring Illinois sales of model capabilities, or transmission through infrastructure supported in this District and used to serve Illinois customers.

Google has litigated the same issue before in this District, and lost. In *Rivera*, Judge Chang rejected Google's attempt to make the location of the biometric scan dispositive and ordered discovery into Google's cloud processing facilities in Illinois. 238 F. Supp. 3d at 1101–04. Google cites the March 2024 *Vance* dismissal, but not what happened next. The dismissed complaint alleged that Google obtained a face dataset from an out-of-state intermediary and alleged no Google processing, storage, use, or interaction in Illinois. *Vance v. Google LLC*, No.

20-cv-4696-BLF, 2024 WL 1141007, at *3–5 (N.D. Cal. Mar. 15, 2024). When the plaintiffs amended to allege that Chicago engineers worked on the relevant product, the same court denied Google's renewed territorial challenge: a plaintiff's inability to plead precisely where Google obtained or profited from the data was not dispositive at the Rule 12 stage. 2024 WL 5011611, at *3–4 (N.D. Cal. Dec. 5, 2024). Plaintiffs not only plead the Chicago allegations that sufficed to pass the pleadings stage, but also add facts about an attributed acquisition and recurring Illinois sales that the *Vance* plaintiffs never had. (Dkt. 1 ¶¶ 34, 72, 77.) The other digital-biometric cases hold the same line. *Jiles v. AU10TIX LTD.*, No. 24 C 8122, 2026 WL 169358, at *6 (N.D. Ill. June 10, 2026) (applying *Svoboda*; situs of online biometric process not resolvable at dismissal); *Monroy v Shutterfly,* 2017 WL 4099846, at *6–7; *Clearview*, 585 F. Supp. 3d at 1121–22 (deferring territorial challenges pending factual development).

Google's other cases divide into two groups, and this case fits neither. *Neals v. PAR Tec. Corp*, 419 F. Supp. 3d 1088 (N.D. Ill 2019) and *Campana v. Nuance Commc'n s, Inc.*, 2024 WL 2809838 (N.D. Ill. Mar. 8, 2024) dismissed complaints that alleged no Illinois collection event at all. *McGoveran v. Amazon Web Servs., Inc.* affirmed summary judgment on a record showing Virginia processing, no Illinois interaction, no Illinois employee with data access, and no stored voiceprints. 175 F.4th 434, 444–45 (3d Cir. 2026). Thus, Google's authorities lack the Illinois allegations this Complaint pleads or rest on records the parties here have yet to develop.

Nor does the Complaint concede out-of-state processing. Paragraph 64 is location-neutral, and ¶¶ 38 and 40 identify a country, not a state. In light of the Chicago engineering and infrastructure allegations in ¶¶ 34 and 72, it is plausible that extraction and training occurred in Illinois, and there is certainly no basis in the Complaint for Google's assertion otherwise. The Complaint alleges not that Google selected recordings *because* they were from Illinois, but that it

accessed and processed recordings whose speakers, sources, and Illinois provenance were publicly identifiable as from Illinois (Dkt. 1 ¶¶ 63, 65–66), the distinction on which *Vance* turned. Where extraction and training occurred is a fact inside Google's systems; the geography Google asserts comes only from counsel's brief. *See supra* § II.

### B. There Is No Constitutional Question to Avoid

Google's constitutional-avoidance argument borrows the same disputed premise as its *Avery* argument: that all relevant conduct occurred outside Illinois. The avoidance canon tells a court how to read an ambiguous statute. It does not let a party assume the disputed facts that would create the constitutional problem in the first place. If the circumstances of the alleged violations occurred primarily and substantially in Illinois, applying BIPA is territorial, and no regulation of out-of-state conduct is at issue. If they did not, *Avery* disposes of the claims without need to consider constitutional extraterritoriality issues.

Nor could a *Pike* question be resolved on this record. *National Pork Producers Council v. Ross* rejected an "almost per se" rule against nondiscriminatory state laws with out-of-state effects, 598 U.S. 356, 374–76 (2023), and Google does not contend that BIPA discriminates against interstate commerce. Even assuming *Pike v. Bruce Church, Inc.* applies, it requires an actual comparison of the interstate burden against the local benefits. 397 U.S. 137, 142 (1970). Google offers a single word in place of that record, "insurmountable" (Dkt. 27-1 at 10), and nothing about the affected recordings, available compliance options, engineering constraints, or costs.[3]

[3] Google's footnote 7 cites some federal initiatives promoting AI research and leadership. Its appeal to federal AI legislation adds policy, not the missing record; federal enthusiasm for AI is not an exemption from state biometric privacy law. None addresses BIPA, biometric consent, training-data acquisition, or compliance cost, and read in full they cut the other way. The National AI Initiative pairs American leadership with "trustworthy artificial intelligence systems," 15 U.S.C. § 9411(a)(2), and the Senate report states that the legislation "would not impact the personal privacy of individuals" and "would make no change to existing law." S. Rep. No. 116-300, at 5–6 (2020).

Google also understates the other side of the ledger. Illinois's interest is not secrecy in public recordings; it is control over the nonpublic biometric measurements extracted from them, a distinction *Clearview* drew in rejecting the same public-source argument, 585 F. Supp. 3d at 1120–23, and one that Google's privacy-tort cases, each about information already public, never confront. And Google's model-destruction rhetoric concerns remedy, not territoriality; it is at best premature and the Court may deny or tailor any injunction after liability is established, on a developed record. *Infra* § VII.C. Google's constitutional argument needs the facts its *Avery* argument denies exist. Neither can be resolved against the Complaint at the Rule 12 stage.

## IV. The Complaint States All Five BIPA Claims

Google attacks all five BIPA counts the same way. Its counsel denies the pleaded mechanism, and the motion then demands that Plaintiffs produce, before discovery, the proof only Google's systems hold: the extraction step, the public parameter proven to contain a voiceprint, the named recipient, and the governing industry standard. Rule 8 requires a plausible claim, not evidence. The Complaint pleads a specific mechanism, Google's research documents the capability, and each count's elements follow.

### A. Google Operated the Pipeline and Extracted the Voiceprints

*G.T. v. Samsung Electronics America, Inc.* asks whether the defendant had or gained control over the biometric data. The Seventh Circuit assumed the data qualified as biometrics and affirmed because the data remained on users' devices, beyond Samsung's access or use. No. 25-1120, 2026 WL 2279903, at *3 n.2, *4-6 (7th Cir. Aug. 7, 2026). This Complaint pleads the opposite. Google allegedly acquired the recordings, ingested them into its own pipeline, converted the waveforms into acoustic tokens, trained models on those representations, encoded speaker characteristics in model parameters, retained and hosted the models, and deployed them

through commercial products. (Dkt. 1 ¶¶ 40–42, 53–59, 65–66, 142, 153, 160.) That pleads the acquisition Section 15(b) requires and the possession that triggers Section 15(a).

The extraction step is equally specific. Paragraphs 41 through 45 describe SoundStream tokens carrying "speaker characteristics," representations capable of converting speaker identities, and storage in model parameters; ¶ 153 alleges extraction of speaker embeddings, acoustic tokens, and related representations capable of identifying the speakers. (Dkt. 1 ¶¶ 9 n.1, 41–45, 153.) *Martell* involved a whole-image hash with no allegation that the process measured a face, and *Hooks* involved a complaint that did not explain how the software operated. *Martell v. X Corp*, 2024 WL 3011353, at *2–3 (N.D. Ill. Jun. 13, 2024); *Hooks*, No. 25 CV 9754, 2026 WL 1045734, *3. This Complaint pleads the input, extraction, encoding, retention, and identification functions.[4]

### B. Plaintiffs Plead Voiceprints Capable of Identifying Speakers

Google begins with a standard Plaintiffs satisfy, then adds an element BIPA does not contain. A voiceprint must capture vocal characteristics in enough detail to distinguish one speaker from others and be capable of identifying that person. (Dkt. 27-1 at 12.) The Complaint alleges speaker-specific representations and the information connecting those representations to named speakers. (Dkt. 1 ¶¶ 41–45, 63, 65–66, 138, 153.) Google nevertheless insists that the representation must be created "for the purpose of identifying" the speaker. (Dkt. 27-1 at 12.) BIPA contains no such purpose requirement. It asks what the information can do, not why Google created it or whether Google later used it to identify anyone. *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 518 n.2 (N.D. Ill. 2022); *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094–97 (N.D. Ill. 2017).

[4] Counts I and II do not depend on Custom Voice or Chirp 3 sharing the accused models' architecture; those products are relevant to Google's separate consent practices.

Google's own paper makes that capability concrete. AudioLM maintains speaker identity for unseen speakers; coarse acoustic tokens recover speaker identity; and speaker identity is largely carried by those tokens. In an experiment across 291 speakers, prompted continuations were assigned to the corresponding prompt speaker 92.6% of the time. The paper also warns that preserving speaker identity can enable biometric spoofing or impersonation of a specific speaker. (Ex. B, Dkt. 27-4 at 2, 5, 7–10.) Those findings concern speaker identity, not generic speech quality. They also answer Google's pooled-audio argument. A common pipeline does not produce one common identity: holding semantic content constant, repeated sampling produced "a wide variety of speakers," and Google concluded that identity was "mostly determined by the acoustic tokens." (Id. at 8–9.) A standardized process can preserve distinct speaker identities.

The classifier was an evaluation tool, and Exhibit B does not prove that any named Plaintiff appears in the production corpus or that every accused model uses the same architecture. It establishes the narrower point relevant here: generated audio retained enough speaker-specific information to be matched to its speaker. That makes the pleaded mechanism plausible; the production facts remain within Google's systems.

The Complaint separately pleads attribution to real people. Google allegedly acquired recordings identified by name, source, professional biography, and Illinois-origin metadata and maintains source URLs, provenance records, and speaker- and file-level identifiers. (Dkt. 1 ¶¶ 63, 65–66, 138.) BIPA does not require the biometric representation and the speaker's name to occupy the same vector, file, or database record. The representation can perform the biometric match while separately held source information supplies the name. *Javid* and *Delgado* both recognize that identifying information held separately from the biometric representation may complete that connection and that formal enrollment under a person's name is not the exclusive

path to identification. *Javid v. M.A.C. Cosmetics Inc.*, No. 25 CV 11693, 2026 WL 1601454, at *5-6 (N.D. Ill. June 4, 2026); *Delgado v. Meta Platforms, Inc.*, No. 23-cv-04181-SI, Dkt. 174 at 6–10 (N.D. Cal. June 25, 2026).

Neither *Zellmer v. Meta Platforms, Inc.* nor *G.T.* supports dismissal. *Zellmer* followed discovery and summary-judgment evidence showing that Meta's face signatures could not identify the plaintiff. 104 F.4th 1117, 1121–26 (9th Cir. 2024). *G.T.* assumed biometric status and decided control. Here, Google's own paper documents speaker-identity preservation and classification. Whether its production systems retained and could connect that information to Plaintiffs is a question for discovery, not a pleading defect.

### C. Count II Also Pleads the Missing Retention Policy

Google's only argument to Count II is derivative: no possession, no policy duty. (Dkt. 27-1 at 14.) Possession is pleaded, *supra* §§ IV.A–B, and the rest is unrebutted: ¶ 161 alleges that Google has no retention and destruction policy applicable to voiceprints extracted from non-user training data, and *Fox v. Dakkota Integrated Systems, LLC* holds that retention without the required policy is a concrete § 15(a) injury. 980 F.3d 1146, 1154–56 (7th Cir. 2020).

### D. Count III Pleads Paid Access to Models Encoding Biometric Data

Section 15(c) reaches a market in biometric data, not every product that biometric data once helped improve. *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1247 (7th Cir. 2021); *Vance v. Microsoft Corp.*, 534 F. Supp. 3d 1301, 1306–09 (W.D. Wash. 2021); *Rodriguez v. ByteDance, Inc.*, No. 23 CV 4953, 2025 WL 672951, *18-19 (N.D. Ill. Mar. 3, 2025). Count III alleges the former. Google allegedly extracted speaker-specific representations from Plaintiffs' recordings, encoded and retained them in production models, and charges enterprise customers by the character and audio second to use those models. (Dkt. 1 ¶¶ 41, 69–71, 166–67.)

Customers therefore pay to use the same model assets in which Plaintiffs' voiceprints, or biometric information derived from them, allegedly remain encoded.

That differs from revenue earned from a separate product that biometric data merely improved. *Mahmood* sustained a claim where customers paid to use a platform that processed the plaintiff's biometrics, and *Moomaw* held that direct database access was unnecessary where biometric collection and storage were "inextricably intertwined" with the paid service. *Mahmood v. Berbix, Inc.*, No. 22 C 2456, 2022 WL 3684636, at *2 (N.D. Ill. Aug. 25, 2022); *Moomaw v. GeoSnapShot Pty Ltd.*, No. 3:23-cv-1321-DWD, Dkt. 78, slip op. at 19–21 (S.D. Ill. Mar. 20, 2025). Count III alleges more: as pleaded, the data and the product are one.

**E. Count IV Pleads the Recipients, Manner, and Purpose**

Google says Plaintiffs name no recipient and do not allege that the relevant facts sit in Google's exclusive control. (Dkt. 27-1 at 15.) The second assertion is wrong: the Complaint identifies the internal records within Google's control. (Dkt. 1 ¶¶ 81, 87, 138, 146.) And the first demands more than Rule 8 requires, because the Complaint pleads the dissemination events themselves. It identifies the recipients: affiliated subsidiaries, nonparty vendors, and contracted service providers. It identifies the data: model parameters and the voiceprints encoded within them. It identifies the mechanism: transmission through subprocessor chains, cloud regions, data centers, and Google's corporate and product infrastructure. And it identifies the purposes: training, evaluation, deployment, and operation of the foundational voice models. (Dkt. 1 ¶¶ 72–76, 173.) The allegation is that Google transmitted the parameters through its own infrastructure, not that Google supplied software through which someone else moved data.

That is the path *Heard v. Becton* required, and *Horn v. Method Prods., PBC* lacked. *Heard* demanded facts giving a "basis to even suspect" a disclosure occurred, 440 F. Supp. 3d

960, 969 (N.D. Ill. 2020), and its later decision sustained a § 15(d) claim without recipient names where the complaint alleged third-party data centers and an architecture through which the data plausibly traveled. *Heard*, 524 F. Supp. 3d 831, 843 (N.D. Ill. 2021). *Horn* alleged only that the defendant "may have" disclosed data. No. 21 C 5621, 2022 WL 1090887, *3 (N.D. Ill. Apr. 12, 2022). Rule 8 requires a plausible transfer event, not a pre-discovery list of every recipient.

**F. Count V Pleads Both Duties Under Section 15(e)**

Section 15(e) requires both industry-standard care and protection at least equal to Google's treatment of its other confidential information. 740 ILCS 14/15(e)(1)–(2). Count V pleads both.

On the standard of care, Google cites half a docket for the second time. Its authority is the March 2025 *Rodriguez* order, which dismissed a complaint identifying neither an industry standard nor a departure from it. (Dkt. 27-1 at 15.) After the plaintiffs repleaded concrete standards and departures, the same court held they had "done enough to state a claim under Section 15(e)." *Rodriguez*, 2025 WL 2495865 at *11 (N.D. Ill. Aug. 29, 2025). This Complaint starts where that amended one succeeded: it pleads the benchmarks Google itself recognizes and uses, from encryption and internal classification to ISO 27001, SOC 2, and zero-trust architecture, alleges materially weaker protection for the biometric model assets, and alleges that Google gives non-user data subjects no mechanism to access, correct, delete, or verify protection of their data. (Dkt. 1 ¶¶ 184–88.) Whether those practices fix the governing standard is an evidentiary question.

On equal protection, the comparison is pleaded and Google's only argument is a denial. The Complaint sets Google's longstanding public release of voice-model code and weights against the closed access, encryption, and confidentiality controls it applies to its source code,

customer data, and trade secrets, and alleges that the released and production model assets carry voiceprints of nonconsenting individuals. (Dkt. 1 ¶¶ 179–87.) Google responds that Plaintiffs have produced no public parameter proven to contain a voiceprint. (Dkt. 27-1 at 15–16.)

That is a factual denial, not a missing allegation, and it fails twice over. No declarant states what the weights contain. *Supra* §§ II, IV.B. And the demand for evidence assumes the wrong architecture: the Complaint alleges that the voiceprints are not stored in a deletable database but encoded in the parameters of the models themselves, so that "the biometric data and the product are the same thing," (Dkt. 1 ¶¶ 9 & n.1, 41, 119), which is how Google's own paper and brief describe the models. (Ex. B, Dkt. 27-4 at 4–8; Dkt. 27-1 at 5 (the model "encodes ... acoustic features in its parameters").) BIPA covers biometric information "regardless of how it is captured, converted, stored, or shared." 740 ILCS 14/10. Google's contrary assertion cannot resolve that technical question at Rule 12. *Hayes v. CGB Enterprises, Inc.* sustained a thinner internal comparison. No. 23-cv-3296, 2024 WL 3091083, *6-7 (C.D. Ill. June 20, 2024).

## V. The Copyright Act Does Not Preempt Any Claims

### A. Identity Is Not a Work of Authorship, and BIPA Regulates Different Acts

Google's preemption theory treats the recording and the person recorded as the same thing. Copyright law treats them as two, and *Toney v. L'Oréal USA, Inc.* 406 F.3d 905 (7th Cir. 2005) decides the issue in this Circuit. A person's identity is not a work of authorship fixed in a tangible medium of expression, so claims protecting identity fall outside § 301's subject matter; and the rights asserted are not equivalent to § 106 rights, because they persist no matter who owns the copyright in the photograph or recording that happens to embody the person. *Toney*, 406 F.3d at 908–11. Google's brief quotes the governing standard: state law survives if it regulates conduct "qualitatively distinguishable" from "reproduction, adaptation, publication,

performance, and display." (Dkt. 27-1 at 21, quoting *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 501 (7th Cir. 2011), quoting *Toney*, 406 F.3d at 910.) That standard resolves this section.

*Midler v. Ford Motor Co.* makes the point voice-specific. Ford held a license to the song; it held no license to Bette Midler's voice. Copyright did not preempt protection of the deliberately imitated voice, because "[a] voice is not copyrightable" and the interest protected is "more personal than any work of authorship." 849 F.2d 460, 462–63 (9th Cir. 1988). Google is, at best, Ford. Whatever it holds in the recordings, it holds nothing in the voices.

The BIPA claims sit even farther from copyright, because the two regimes regulate different acts against different objects. Copyright governs reproduction, adaptation, distribution, performance, and display of works. BIPA imposes subject-specific notice, release, retention, commercial-use, dissemination, and protection duties for biometric data. 740 ILCS 14/15(a)–(e). The permutations prove the non-equivalence. Google could reproduce a recording without extracting a voiceprint: copyright, not BIPA. It could extract a voiceprint from a fully licensed recording without the speaker's written release: BIPA, not copyright. An unlicensed copy involving no extraction: copyright alone. Rights triggered by different conduct and satisfied by different permissions are not equivalent rights. And the objects differ as much as the acts: a public recording is not the nonpublic biometric measurement taken from it. *Clearview*, 585 F. Supp. 3d at 1120–23.

Google’s cases all involved control or reuse of the copyrighted content itself. *Baltimore Orioles* and *Laws* concerned reproduction of the telecasts or licensed recording; *X Corp.* concerned copying and resale of platform content; and *Jackson* concerned an actual copyrighted sample. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 676–79 (7th Cir. 1986); *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134, 1137–43 (9th Cir.

2006); *X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 850–53 (N.D. Cal. 2024); *In re Jackson,* 972 F.3d 25, 34–43 (2d Cir. 2020). *Jackson* expressly distinguished claims protecting privacy, reputation, consumer confusion, and persona interests. *Id.* Those are the interests Plaintiffs plead. They seek no control over the source recordings, only rights in their identities and the biometric measurements taken from them.

Conflict preemption fails for the same reason. A copyright license excuses conduct that would otherwise infringe copyright; it does not supply BIPA's written release or IRPA's previous written consent. Nothing in BIPA alters copyright ownership, invalidates a license, or prohibits use of a recording as such. The statute regulates the additional act of extracting and handling the speaker's biometric identifier, and Google may exercise every copyright right it validly holds while complying with both statutes. Whether Google holds any license at all is a separate defect. *Infra* § V.B.

Section 114(b) confirms the separation for generated outputs: copyright does not reach an independent fixation that merely imitates copyrighted sounds. *Richardson v. Kharbouch*, 156 F.4th 849, 858–60 (7th Cir. 2025). That does not establish an IRPA replica; it establishes that a claim directed at a new imitation is not equivalent to a copyright right § 114(b) withholds.

**B. YouTube's Terms Supply Neither Speaker Consent Nor a Training License**

Google's license theory invokes the wrong permission, proves no license for any particular recording, and cannot reach the multi-source corpus the Complaint alleges.[5]

***First, an uploader's content license is not the speaker's consent.*** Exhibit A grants rights in uploaded content; BIPA requires the subject's own written release, and IRPA requires

[5] These defects are independent. The first is categorical: even a valid copyright license for every recording would convey no speaker consent, because that consent was never the uploader's to give. The second and third are evidentiary: on this record, Exhibit A proves no license for any recording, much less the corpus.

previous written consent from the person authorized to control the identity or that person's representative. Plaintiffs license their voices for a living; that is what a narration contract does. What no uploader has ever held is the right to give that consent for someone else, and nothing in Exhibit A shows that any uploader was the speaker or the speaker's representative. Paragraph 56 does not "retract" a copyright license; it identifies personal rights the uploader never held. Plaintiffs claim no veto over the source recordings, *supra* § V.A. Who owns the copyrights is beside the point.

***Second, Exhibit A proves no source-specific license.*** It is a July 2026 capture of terms effective December 15, 2023, and establishes neither the operative version, assent, uploader ownership, the source copy Google obtained, nor the scope of the grant. *Supra* § II. Nor is the grant the “any use” license Google describes. It authorizes use “in connection with the Service and YouTube’s (and its successors’ and Affiliates’) business.” (Ex. A, Dkt. 27-3 at 9–10.) Google acknowledges that it contains no express machine-learning or AI language and relies, “[i]n any event,” on the general grant. (Dkt. 27-1 at 22 n.10.) The Affiliates parenthetical does not erase "in connection with the Service," and nothing establishes that training a particular accused model on a particular recording fell within it. Version, assent, ownership, source, scope, and use remain disputed and cannot be resolved in Google’s favor at Rule 12.

***Third, a YouTube license cannot cover the pleaded source universe.*** The Complaint alleges acquisition from publicly accessible internet sources and from Google’s own and third-party platforms, including broadcast, podcast, streaming, audiobook, and Google services. (Dkt. 1 ¶¶ 53, 65, 80, 86, 91–92, 96–97, 101, 106–07, 111.) Google identifies no source copy it used. Even a valid YouTube license for some recordings would not cover recordings obtained elsewhere and could not support dismissal of any count.

### C. Counts VII Through IX Rest on Noncopyright Interests

Google's preemption argument against the consumer-protection counts repeats the same error at a smaller scale: it reads each count as a claim about copying. None is.

Count VII (ICFA) pleads unfairness, and copying does not establish unfairness. The count requires unconsented biometric collection and identity exploitation, substantial injury Plaintiffs could not reasonably avoid, and causation tied to that conduct, duties and injuries with no counterpart in § 106. (Dkt. 1 ¶¶ 205–08.)

Count VIII (UDTPA) is not the reverse-passing-off claim Google describes, an allegation that Google copied Plaintiffs' recordings and called them its own. It alleges likely confusion about whether generated voices were created, sponsored, approved, or authorized by the persons whose vocal characteristics they reproduce. (Id. ¶¶ 213–16.) *Art Akiane LLC v. Art & SoulWorks LLC* held that exactly that claim is not preempted: confusion over authorization or affiliation survives because copying alone does not establish it. No. 19 C 2952, 2026 WL 893344, *6-7 (N.D. Ill. Mar. 31, 2026).

Count IX (unjust enrichment) is broader than the avoided-license-cost sentence Google isolates. The alternative claim alleges benefits retained through the unconsented acquisition of voiceprints and identity attributes, and grounds unjustness in BIPA and IRPA. (Dkt. 1 ¶¶ 218–24.) *Art Akiane* preempted unjust enrichment where the claim duplicated unauthorized reproduction and distribution, *id.* at 17–18; Count IX incorporates noncopyright duties instead, and survives to the extent its BIPA and IRPA predicates survive.

None of these counts asks who may copy a recording. Each asks what Google owed the speakers, and those duties come from Illinois, not from anything Congress made exclusive.

## VI. Google Commercialized Plaintiffs' Identities Without Consent

### A. Google Built and Markets Its Voice Products on Plaintiffs' Identities

Section 30(a) prohibits the commercial use of an individual's identity, expressly including voice, without previous written consent. 765 ILCS 1075/5, 30(a). The Complaint pleads two independent uses: Google built and operates its commercial voice products on the modeled characteristics of Plaintiffs' actual voices, and those products reproduce Plaintiffs' voices in generated audio. (Dkt. 1 ¶¶ 9, 41–45, 81, 87, 92, 97, 102, 107, 112, 195.) Google's output-specific objections do not answer the first theory.

On commercial purpose, Google answers an endorsement case Plaintiffs did not bring. It observes that no identity was used to advertise or sell anything (Dkt. 27-1 at 16), as if § 30(a) reached only the testimonial and the billboard. The statute is broader. Advertising is one enumerated commercial purpose, but not the only one; the definition separately covers the public use or holding out of an identity "on or in connection with" the sale of a product itself, 765 ILCS 1075/5, and *Toney* was such a case: the identity appeared on the product, not in its promotion. 406 F.3d at 906–07. Paragraph 195 pleads that use here: Google "holds out" the ability to generate realistic, expressive human voices as "a core commercial feature" of its monetized products, "a capability built from the identities" of the people whose recordings trained the models. In an endorsement case, the identity persuades the customer. Here, the identity is what the customer buys: the Complaint pleads the sales, from per-character enterprise licensing to consumer subscriptions, and alleges that the characteristics extracted from Plaintiffs' recordings "enable each of these revenue streams." (Dkt. 1 ¶¶ 69–70, 195.) That answers *D'Ambrosio v. Meta Platforms, Inc.*, which requires the identity to help sell something and rejects claims where it merely sits near unrelated revenue. 176 F.4th 928, 935–36 (7th Cir. 2026). Nothing sells a voice product more directly than the voices it generates.

Google also converts *Dancel*'s ordinary-listener standard into a celebrity requirement and a classwide-output requirement. *Dancel v. Groupon, Inc.* asks whether the challenged use identifies the particular person to an ordinary, reasonable listener; celebrity is not a separate element. 949 F.3d 999, 1006–09 (7th Cir. 2019). The Complaint alleges actual recordings attributed to each Plaintiff by name, source, profession, and catalog, together with the recognition their voices command, including Marin's five decades of nationally honored broadcasting, Lacour's Pulitzer and Peabody-winning podcast, and Dorcus's more than 200 audiobooks. (Dkt. 1 ¶¶ 63, 65–66, 79, 85, 105.) Count VI alleges separate uses of separate identities, not one generic output that identifies every class member at once. Whether those individual claims can be certified is a Rule 23 question, not a basis to dismiss.

The Section 35(b)(1) exemption also does not eliminate the claim. The first theory alleges no portrayal or impersonation "in" an expressive work; it alleges that Google modeled Plaintiffs' voices to build and market a product. *Love v. Simmons* addressed a specific documentary in which the plaintiff appeared and was portrayed. 2024 WL 809107, at *7–9 (N.D. Ill. Feb. 27, 2024). The output theory is work-specific, but Google identifies no work the Court can assess. Whatever the exemption may do as to a particular output, it does not reach the product theory and cannot dismiss Section 30(a) in full.

### B. Paragraph 197 Pleads Both Google's Distribution and Knowing Facilitation

IRPA creates two paths to digital-replica liability. Section 30(b) reaches the knowing public distribution of a fixed work containing an unauthorized replica of a particular person. Section 30(d) reaches a person who, with actual knowledge of another's violation, materially contributes to, induces, or facilitates it. 765 ILCS 1075/5, 30(b), (d). Paragraph 197 pleads both paths. It alleges that Google's products generate and make unauthorized replicas public and,

alternatively, that Google knowingly facilitates their distribution through the identified products. (Dkt. 1 ¶¶ 197–98.) Google's count-specific argument addresses only Google's own distribution under Section 30(b).

Google first demands a particular output exemplar. Rule 8 requires a plausible allegation that the work exists, not production of the work before discovery. Paragraph 197 is grounded in pleaded technical and product facts: Google's own paper documents speaker-identity preservation in generated continuations and warns of biometric spoofing and impersonation of specific speakers, *supra* § IV.B, and the Complaint identifies the relevant output forms, NotebookLM podcast audio, auto-dubbed video preserving speaker characteristics, and downloadable and shareable synthesized speech. (Dkt. 1 ¶¶ 117–18, 197, 214.) Those are fixed sound recordings and audiovisual works, not internal model activations.

Google's public-availability argument fares no better. It argues that if a replica were made available to the general public, Plaintiffs necessarily would possess it. (Dkt. 27-1 at 18.) But a customer may download and distribute generated audio, share an Audio Overview, or publish an auto-dubbed video without the speaker ever learning that the work exists or knowing where to find it. Public availability is not notice to the person who was imitated.

The Complaint also plausibly alleges actual knowledge. Knowledge may be alleged generally. Fed. R. Civ. P. 9(b). Google designed and operates the products alleged to generate and distribute the works; its own researchers documented speaker-identity preservation and the risk of impersonating a specific speaker; Google allegedly acquired attributed source recordings, maintains provenance records, and obtained no consent from Plaintiffs. (Dkt. 1 ¶¶ 63, 65–66, 122–25, 138, 197–98.) Taken together, those allegations support the knowledge allegation for work Google itself allegedly generated and distributed. Whether a particular work existed and

what Google knew when it made that work public are merits questions within Google's systems.

Section 30(d) supplies the alternative Google never briefs: the user made the replica public, and Google knowingly provided material assistance. That theory ultimately requires proof that Google actually knew of the user's violation, not merely that misuse was possible. But Google does not explain why Rule 9(b) required Plaintiffs to identify, before discovery, the internal record establishing that knowledge. Its argument against Google's own distribution under Section 30(b) does not dispose of the separately pleaded Section 30(d) theory.

## VII. The First Amendment Does Not Immunize Google's Conduct

### A. *Sosa* and *Clearview* Hold That Biometric Collection Is Conduct, Not Speech

Google starts at the wrong end of the pipeline. It argues that voice models may be expressive tools and that particular outputs may be protected speech. Plaintiffs need not dispute either proposition.[6] Counts I through V do not impose liability because of what a model says, how an output is organized, or what effect an output has on a listener. They regulate Google's alleged acquisition, possession, commercial use, dissemination, and protection of biometric data. (Dkt. 1 ¶¶ 153–88.) The constitutional question is what triggers liability, not what Google later builds with the data.

*Sosa v. Onfido, Inc.* answers that question for § 15(b). Rejecting Onfido's argument that a consent requirement restricted its creation and use of information, the court applied *Dahlstrom v. Sun-Times Media, LLC*: the First Amendment confers no right to obtain regulated personal information merely because the acquirer intends to use it in later expression. Section 15(b) regulates an entity's ability to obtain biometric data, not its speech, and would survive

[6] Plaintiffs assume both propositions solely for this motion. Whether any accused model or particular output is expressive, whose expression it would be, and what protection, if any, it would receive are fact- and work-specific questions reserved for a developed record. Nothing in this brief concedes them.

intermediate scrutiny even if speech were implicated. *Sosa*, 600 F. Supp. 3d 859, 876–81 (N.D. Ill. 2022); *Dahlstrom*, 777 F.3d 937, 946–49 (7th Cir. 2015). *Sosa* also forecloses Google's *Sorrell* theory: the law there selectively restricted prescriber information used for pharmaceutical marketing while permitting other speakers and uses, whereas BIPA applies without regard to the collector's identity, viewpoint, intended message, or downstream use. 600 F. Supp. 3d at 878–79. An intention to speak with the data later does not convert the antecedent taking into speech.

*Clearview* answers the public-source and artificial-intelligence halves of Google's theory. Clearview argued that collecting public photographs, analyzing them through artificial intelligence, and operating a search product were protected speech. The court held that this characterization "oversimplifie[d]" the conduct: the photographs were public, but the biometric identifiers harvested from them were not. Applying *O'Brien*, it held that BIPA serves Illinois's important, content-neutral interest in protecting immutable biometric data, and denied dismissal. 585 F. Supp. 3d at 1120–23. The same distinction governs here. A public recording is not the nonpublic voiceprint extracted from it, and BIPA regulates neither what the source recording says nor what Google's model later says. It regulates the intervening biometric conduct.[7]

The conduct rationale reaches every claim resting on Google's taking and exploitation of Plaintiffs' identities: § 30(a)'s acquisition-and-commercial-use theory, ICFA unfairness, and unjust enrichment. The output-based theories under §§ 30(a) and 30(b) and the UDTPA turn on particular generated works, and Google has identified none to analyze. *Infra* § VII.C. What no output theory permits is categorical immunity for everything that preceded the outputs.

### B. *Google's* Cases Protect Expression, Not The Acquisition That Precedes It

[7] Google's footnote 13 asks the Court to write two limitations into the statute: collection from a "customer," and collection from nonpublic source media. (Dkt. 27-1 at 28 n.13.) BIPA applies to a "person or customer," and *Sosa* and *Clearview* reject the premise that consent to, or public availability of, the source media supplies consent to the later extraction.

Every authority Google cites protects something downstream of the act Plaintiffs challenge: a finished work, an editorial judgment, a message, an audience. This Court's decision in *Angelilli v. Activision Blizzard, Inc.* drew that line in the right place. The alleged injury there arose from the words, images, design, and communicative effect of the games themselves, and the algorithms mattered because they generated the expressive content their human designers intended. 781 F. Supp. 3d 691, 700–03 & n.6 (N.D. Ill. 2025).

This case is different at the point that matters. Section 15(b) liability does not depend on any word, sound, viewpoint, or communicative effect produced by a model. Plaintiffs could prove that Google obtained their voiceprints without notice or a release, without introducing any output. Google may use code as a painter uses paint, but BIPA does not regulate the resulting painting. It regulates whether Google lawfully obtained the biometric material used to create it.

*Moody v. NetChoice, LLC* protects editorial decisions about selecting, excluding, organizing, and presenting third-party speech. 603 U.S. 707, 731–40 (2024). BIPA prescribes no editorial choice: it does not dictate which speakers, accents, subjects, or expressive qualities Google may select, or how it must arrange an output; it asks whether Google first complied with the law governing biometric acquisition. Nor does Exhibit C supply the editorial judgments the *Moody* analogy needs. The "precise speaker annotations" and conversational disfluencies Google invokes appear in the paper's discussion of a smaller fine-tuning dataset; the paper separately states that the model was pretrained on hundreds of thousands of hours of speech from an unidentified corpus. (Dkt. 27-1 at 25; Ex. C, Dkt. 27-5 at 6.) Exhibit C shows no curatorial judgment in assembling the pretraining corpus, and no notice to or consent from the pretraining speakers.

Google's remaining authorities concern access to speech, expressive works, editorial

presentation, or liability based on a work's effect on an audience. *Chiles v. Salazar*, the most recent, asks the right question and answers it against Google. The question is "whether, in fact, the law regulates speech in the case at hand," 146 S. Ct. 1010, 1024 (2026), and the Court distinguished laws that "trai[n] directly on the content" of speech, like Colorado's viewpoint-based restriction on a talk therapist, from laws that "forbi[d] conduct without regard to the message it may convey," like "an ordinance against outdoor fires" applied to a flag burning. *Id.* at 1026 (citing *Sorrell*, 564 U.S. at 567). BIPA is the ordinance, not the therapy ban. It regulates the taking of a biometric identifier without regard to who takes it, why, or what is later said with it, *supra* § VII.A, and the act it regulates is a computational step, not a message. None of Google's authorities recognizes a First Amendment right to extract another person's biometric identifier without the notice and release a generally applicable law requires. Whether any particular output receives First Amendment protection is a question about that output, to be answered when one is before the Court. What no answer to it can do is run backward to immunize the acquisition.

### C. Google's As-Applied Challenge to Section 30(b) Is Premature

Google's two attacks on § 30(b) cannot both be true. Its merits argument insists the Complaint identifies no replica, no distribution, no imitated speaker, and no knowledge, and therefore no application of the statute at all. Its constitutional argument asks the Court to hold the statute unconstitutional *as applied* to that very conduct. But an as-applied challenge requires an application: a particular work, a particular distribution, a particular person imitated, and the knowledge that defines the violation. *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007). If those elements are absent, there is nothing for the Constitution to reach. If they are pleaded, the constitutional analysis must confront them, not the hypothetical audiobooks and dubbed films of

Google's footnote. Google's factual attack refutes its constitutional one.

Even assuming § 35(c)'s exceptions trigger strict scrutiny, § 30(b) is constitutional as applied to the conduct alleged. Illinois has a compelling interest in preventing the knowing public distribution of a fixed, unauthorized replica that causes reasonable listeners to believe a real person spoke words the person never uttered, and the First Amendment does not strip a State of authority to protect a performer's identity and performance from unauthorized appropriation. *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573–76 (1977). Section 30(b) is tailored to that harm: it reaches only that defined act, 765 ILCS 1075/5, 30(b), and prohibits neither voice models, synthetic speech, nor imitation as a medium. That disposes of Google's "entire medium" authorities. *City of Ladue v. Gilleo* involved an almost complete ban on residential signs, a distinct and important means of communication. 512 U.S. 43, 54–55 (1994). Section 30(b) closes no medium.

Google's overbreadth argument fails for a separate reason. Though styled "as applied," it asks the Court to invalidate § 30(b) based on hypothetical applications to unidentified third-party speech, which is a facial challenge in substance. Overbreadth requires identifying the statute's applications, determining which are unconstitutional, and comparing them against its legitimate sweep. *United States v. Hansen*, 599 U.S. 762, 769–70 (2023); *Moody*, 603 U.S. at 723–26. Google identifies no work before the Court and performs no comparison.

Google's proposed less restrictive alternative is the statute Illinois enacted. The Act already grades liability by role and knowledge: direct distributors, knowing facilitators, and conditionally protected passive providers. 765 ILCS 1075/30(b), (d)–(f); *supra* § VI.B. The Complaint alleges that Google did more than passively provide: it developed the models, operates the products, generates outputs, and distributes those outputs or knowingly facilitates

their distribution. (Dkt. 1 ¶¶ 38–40, 197–98.) Whether Google qualifies as a passive provider depends on what it did in connection with the particular work, not on its characterization of itself as the developer of a general-purpose tool.

Section 35(c) and Google's transformative-use theory fail the same way: both are defenses about particular works, and Google identifies none. Section 35(c) exempts specified news, documentary, commentary, satire, and related uses, several subject to false-impression limits, 765 ILCS 1075/35(c), and no work is before the Court to classify. Transformative use adds a second defect: the doctrine is a defense to claims about expressive works, not a license for the biometric taking that preceded them, *supra* § VII.A, and Google's own authorities assessed identified works to ask whether each added expression beyond the person's likeness. *See Hamilton v. Speight*, 827 F. App'x 238, 240 (3d Cir. 2020) (character protected because it differed from the plaintiff). The allegation Google quotes answers that question against it: outputs that "exhibit[] the acoustic features of the training voices" (Dkt. 1 ¶ 41) preserve identity rather than transform it. Google cannot deny that any work is pleaded and simultaneously declare the unidentified works transformative.

Google's chilling-effect argument assumes a false choice: comply with nothing or withdraw the models. Google's own practices refute the premise. For other voice products, it obtains recorded consent, applies Responsible AI review, and watermarks synthetic audio through SynthID. (Dkt. 1 ¶¶ 46–51, 123–25.) Voice-model development is not incompatible with consent, governance, and safeguards; Google does all three when it chooses to.

Google's remedy argument fails for a more basic reason: the relief a complaint requests does not determine whether its claims are valid or a statute constitutional. Remedy comes after liability, on a developed record, and the Court may tailor any injunction; narrower collection,

retention, and disclosure remedies exist alongside damages. Google cannot obtain constitutional immunity by assuming the most disruptive remedy and declaring every other path impossible.

## VIII. Counts VII Through IX State Claims

### A. Count VII Pleads Unfairness Independently of Deception

Google devotes its ICFA analysis to deception and Rule 9(b), then dismisses unfairness in a single derivative sentence. (Dkt. 27-1 19–20.) *Kahn v. Walmart Inc.* reversed exactly that error: the district court had treated an ICFA count pleading both theories as a fraud claim, and the Seventh Circuit held that unfairness and deception are distinct and that an unfairness claim not premised on fraud is governed by Rule 8. 107 F.4th 585, 601–03 (7th Cir. 2024); *see also Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 669–70 (7th Cir. 2008).

Count VII pleads unfairness without depending on any representation, and it pleads each *Robinson* consideration. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18, 775 N.E.2d 951, 960–61 (2002). Public policy: Illinois's protections against unconsented biometric collection and commercial identity use. (Dkt. 1 ¶ 205.) Oppressiveness and unavoidable injury: diverted licensing income and displaced professional work that Plaintiffs could not prevent because Google took their biometric data without their knowledge. (*Id.* ¶ 206.) Causation: those injuries flow from the unauthorized collection and exploitation. (*Id.* ¶ 208.) Plaintiffs do not contend that every BIPA or IRPA violation is automatically an ICFA violation; the statutes supply the policy, and the Complaint pleads the rest. Google's own brief confirms the point when it observes that ¶ 208 attributes Plaintiffs' injuries to unauthorized biometric collection, not to any misrepresentation. (Dkt. 27-1 at 20.) That is the unfair practice.

Google's *Tri-Plex* argument reaches only ¶ 207's alternative deception theory. *Tri-Plex*

*Tech Servs., Ltd. v. Jon-Don, LLC* requires a deception plaintiff to allege that it was the intended target of the deception and that the deception caused its injury. 241 N.E.3d 454, 461-62, 464-65 (Ill. 2024.) Because Count VII independently states an unfairness claim, and Rule 12(b)(6) does not permit piecemeal dismissal of one theory when another supports the claim, *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015), the Court need not decide whether ¶ 207 also supports deception.

**B. Count VIII Pleads an Ongoing Likelihood of Confusion and Future Harm**

Count VIII seeks only prospective relief: disclosures that the outputs are AI-generated and that the people whose vocal characteristics they reproduce did not authorize the use. (Dkt. 1 ¶¶ 212, 216.) *Tri-Plex* confirms that UDTPA authorizes private injunctive relief. 241 N.E.3d. at 460. The claim alleges that unlabeled, identity-reproducing outputs create a likelihood of confusion concerning source, sponsorship, approval, affiliation, and authorization under Sections 2(a)(2) and (3). That claim is governed by Rule 8. *ATC Healthcare Services, Inc. v. RCM Technologies, Inc.*, 192 F. Supp. 3d 943, 954 n.3 (N.D. Ill. 2016).

The confusion mechanism is pleaded: Google's products generate outputs simulating distinctive vocal characteristics; customers can download and distribute them; and the outputs omit disclosure that they are AI-generated or unauthorized by the person whose voice they reproduce. The resulting confusion concerns whether that person created, endorsed, or is affiliated with the content. (Dkt. 1 ¶¶ 213–14.) UDTPA requires likely confusion, not an identified instance of completed confusion, and the dispersed, on-demand nature of the outputs explains why no output necessarily reaches Plaintiffs. *See supra* § VI.B.

Future injury is also pleaded. Google continues to offer the products in Illinois, third parties can continue distributing unlabeled outputs, and Plaintiffs remain active in the

professional markets where the alleged confusion diverts demand and impairs attribution. (Dkt. 1 ¶¶ 39, 77, 214–16.) That distinguishes *Kahn*, where the plaintiff faced no prospect of encountering the practice again. 107 F.4th at 606. These Plaintiffs need not transact with Google to be injured; the harm occurs when third parties distribute unlabeled outputs resembling their voices, and staying away from Google does not prevent it.

### C. Count IX Is Properly Pleaded in the Alternative

Google argues that unjust enrichment cannot survive dismissal of its predicate claims. (Dkt. 27-1 at 20.) The predicates survive, so the argument fails on its own terms. *Kahn* is directly on point: the Seventh Circuit reinstated an unjust-enrichment count once the statutory consumer claims were revived, holding that Rule 8 permits the claim to proceed in the alternative. 107 F.4th at 606–07. Count IX invokes Rule 8(d)(2)–(3), disclaims duplicative recovery, and grounds Google's unjust retention in the BIPA and IRPA violations. (Dkt. 1 ¶¶ 218–24.)

## IX. Any Dismissal Should Be Without Prejudice

Google asks for dismissal with prejudice of an original Complaint. (Dkt. 27 at 2.) The Seventh Circuit requires at least one opportunity to amend unless amendment would be futile, *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015), and Google does not argue futility. This Court applied that rule in *Angelilli*, granting leave to amend after dismissing every claim against Google and Apple. 781 F. Supp. 3d at 706. If the Court finds any curable deficiency, the remedy is amendment, not dismissal with prejudice.

## CONCLUSION

The Court should deny Google’s motion. If the Court dismisses any claim, it should dismiss without prejudice and grant Plaintiffs leave to amend.

Dated: August 31, 2026

Respectfully submitted,

LOEVY & LOEVY

/s/ Ross Kimbarovsky

______________________________________

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902ax)

*Attorneys for Plaintiffs Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*